**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway, Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No: 22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>    Plaintiff,<br><br>v.<br><br>MEDIA EFFECTIVE LLC; JAVIER TORRES; JAVIER TORRES, JR.; DORA DILLMAN; NATALIA TORRES; PAULINA TORRES; ALLEGHENY EAST CONFERENCE CORPORATION OF SEVENTH DAY ADVENTISTS dba COMMUNITY SEVENTH-DAY ADVENTIST CHURCH dba EBENEZER II SPANISH SEVENTH-DAY ADVENTIST CHURCH dba ENGLEWOOD SPANISH CHURCH; and JOHN DOES 1-100,<br><br>    Defendants. | Adv. Pro. No.  23-_____-JKS |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D5148B4

## VERIFIED COMPLAINT

Plaintiff AIRN Liquidation Trust Co., LLC (the "Liquidation Trustee" or "Plaintiff"), in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* ("Plan") [Docket No. 3256] and the order confirming the Plan (the "Confirmation Order"), which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined herein and in the Plan), by and through its undersigned counsel, brings this verified complaint (the "Complaint") against the above-captioned Defendants and hereby alleges as follows:[2]

## NATURE OF THE COMPLAINT[3]

1.      Defendant Media Effective LLC ("Media Effective") and its Founder/Director Javier Torres ("Javier Torres") promote themselves as a "media planning" and "promotion development" company. *See*, http://www.mediaeffective.com/ (last accessed Nov. 1, 2023).

2.      Media Effective is in reality a one-man shop, with Javier Torres as the only employee, operating out of his *recently purchased* home at 148 Bayside Drive, Atlantic Highlands, New Jersey:

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.
[3] The allegations in this Complaint are based upon the documents and information available to Plaintiff at the time of this filing and are subject to clarification, amendment, revision, or other modification in light of new documents and information obtained through subsequent discovery in this action, in the underlying Chapter 11 cases, or otherwise.

DocuSign Envelope ID: 287DF5A3-5A0F-48CB-979C-92527D5146BA



3.      Under the guise of providing media planning and promotion expertise, National Realty Investment Advisors, LLC ("<u>NRIA</u>") and NRIA Partners Portfolio Fund, I LLC (collectively with "<u>NRIA</u>," and their debtor affiliates, the "<u>Debtors</u>"), through and at the direction of Thomas "Nick" Salzano ("<u>Salzano</u>"), engaged Media Effective and Javier Torres as its purportedly *exclusive* marketing agent beginning in or about 2012.

4.      As set forth in greater detail throughout this Complaint, the Debtors solicited over $600 million in investments by promising extraordinarily high guaranteed returns to its investors and that its investors would be paid their return of capital first when, in fact, NRIA operated like a Ponzi scheme.

5.      Media Effective and Javier Torres were aiding and profiting off the Ponzi scheme orchestrated by Salzano and co-conspirators. *See*, ¶¶ 46-49 & 54-70 below.

6.      The legitimate business services provided by Media Effective and Javier Torres are not readily apparent from the limited documents Media Effective has provided to date,[4] but it is

---

[4] Despite repeated efforts by the Liquidation Trustee to obtain targeted discovery, Media Effective and Javier Torres have not been forthcoming when responding to Rule 2004 Subpoenas, further concealing their fraudulent transfers and improper taking of the Debtors' assets.

DocuSign Envelope ID: 293DF5A3-5A0F-48GB-978C-92527D5148B4

obvious that the value of the services they alleged to have provided do not fairly equate to the significant payments made by NRIA to Media Effective, particularly between 2016 and 2022, which appear to be the peak years of NRIA's and Salzano's fraudulent activity. Although Media Effective has not produced an accounting of all the payments it received from Debtors and the payments it made on behalf of the Debtors for advertising and media services, the statements the Liquidation Trustee has obtained for one Media Effective account reflect a "mark-up" of the cost of those services by approximately 44%. In other words, NRIA transferred to Media Effective far more funds than was actually necessary or beneficial or fair value to the company and its investors and creditors.

7.      The money NRIA paid to Media Effective was paid by NRIA or the Fund. Specifically, from 2016 through 2022, the Debtors transferred approximately $36,522,290 to Media Effective and Javier Torres (collectively, the "NRIA Fraudulent Transfers"). A summary of the NRIA Fraudulent Transfers including details for the originating NRIA or Fund account is set forth on **Exhibit A**. Approximately $34,486,210 of the NRIA Fraudulent Transfers occurred on and after June 7, 2018. Based on NRIA accounting records, Media Effective was also paid approximately $1,518,661 from NRIA during the period of August 2012 to December 2015.

8.      Because many of the properties owned and operated by the Debtors were not profitable, the funds transferred to Media Effective actually came from investors.

9.      The Debtors transferred tens of millions of dollars to Media Effective but did not receive equivalent value in return. Subsequently, Media Effective and Javier Torres perpetrated a scheme to hinder, delay, and defraud the Liquidation Trustee's recovery of such fraudulent transfers by transferring the monies paid by the Debtors to Javier Torres personally, his family, and other third-party entities.

10.    Once received, Javier Torres caused Media Effective to transfer some of the NRIA
Fraudulent Transfers to himself and the other Defendants, including his family members and the
Englewood Spanish Church[5] (collectively, the "Subsequent Fraudulent Transfers," and with the
NRIA Fraudulent Transfers, the "Fraudulent Transfers").[6] A summary of the Subsequent
Fraudulent Transfers is set forth on **Exhibit B**.

11.    The Liquidation Trustee brings this action seeking entry of a judgment, among
other things: (i) avoiding and recovering the Fraudulent Transfers pursuant to 11 U.S.C. §§ 544,
548, 550, N.J.S.A. §§ 25:2-25, 25:2-27 and applicable law; (ii) granting the Liquidation Trustee a
temporary restraining order and preliminary and permanent injunction barring the Defendants from
selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands
Property, the Fraudulent Transfers set forth in **Exhibits A** and **B**, and certain funds held in various
accounts identified on **Exhibit C**, affixed hereto, and through a pre-judgment asset freeze; (iii)
compelling Defendants to provide an accounting of all funds or property transferred and payments
made to them by or for the benefit of the Defendants prior to the Petition Date, (iv) granting the
Liquidation Trustee equitable relief as requested herein; and (v) granting the Liquidation Trustee
such other and further relief as may be just and proper.

---

[5] The transfers reflected in Exhibit B refer to "Englewood Spanish Church." On information and belief,
those entries reflect transfers of funds to Allegheny East Conference Corporation of Seventh Day
Adventists (the "Allegheny Conference"), Community Seventh-Day Adventist Church ("Community
SDAC"), and/or Ebenezer II Spanish Seventh-Day Adventist Church a/k/a Englewood Spanish Church
("ESC") (collectively, "Englewood Spanish Church.").

[6] The Liquidation Trustee has obtained bank records for one Media Effective LLC account at TD Bank
ending x0941 that has received over $18.7 million from the Debtors since January 1, 2016. There is at least
one other Media Effective LLC account that received an additional $17.8 million since January 1, 2016.
Large transfers were also identified from the Media Effective LLC – TD Bank x0941 account to other Javier
Torres' controlled bank and investment accounts – many of which have yet to be obtained.

## JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the *Standing Order*, dated July 23, 1984, referring all cases under the Bankruptcy Code to the bankruptcy judges for this District, as amended on September 18, 2012. Standing Order of Reference 12-1 (Simandle, C.J.).

13.    The claims asserted in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

14.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

15.    Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") of the Debtors.

16.    This Court has personal jurisdiction over the Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f) and other applicable law.

17.    Pursuant to Bankruptcy Rule 7008, Liquidation Trustee consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

18.    The statutory and legal bases for the relief requested in this Complaint are sections 105(a), 544, 548, 550, and 551 of the Bankruptcy Code, Bankruptcy Rule 7065, and applicable state law, including N.J.S.A. 25:2-25, and N.J.S.A.  25:2-27, and N.J.S.A. 49:3-52, and N.J.S.A. 49:3-71.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-979C-92527D5148B4

## PARTIES

19.     Plaintiff is the Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan and the Liquidation Trust Agreement approved by the Confirmation Order.

20.     Pursuant to Article IV.F of the Plan, the Liquidation Trustee holds and retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date or thereafter arising), including all Avoidance Actions and Contributed Claims and Liquidation Trust Actions, as each of those terms is defined in the Plan.

21.     Defendant Media Effective LLC is a New Jersey limited liability company whose principal place of business is 148 Bayside Dr., Atlantic Highlands, NJ 07716.

22.     Although Media Effective represents on its website that it "has been working hard to build lasting partnerships with clients" since 2003, according to the New Jersey Department of the Treasury, Media Effective LLC was not formed until around September 27, 2019.

23.     Defendant Javier Torres is the Registered Agent of Media Effective with an office address of 148 Bayside Dr., Atlantic Highlands, NJ 07716 (a residence). On information and belief, Javier Torres resides at this same address. Javier Torres is the Founder/Director of Media Effective. According to Javier Torres' LinkedIn profile, he has been with Media Effective since 2008.

24.     Defendant Javier Torres, Jr. is an individual who, on information and belief, resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' son. On information and belief, Javier Torres, Jr. is a Member/Manager of Media Effective.

DocuSign Envelope ID: 293DF5A2-5A0F-48CB-978C-92527D5148B4

25.     Defendant Dora Dillman is an individual who, on information and belief, also resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716. Ms. Dillman and Javier Torres are husband and wife.

26.     Defendant Natalia Torres is an individual who, on information and belief, also resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' daughter. On information and belief, Natalia Torres is a Member/Manager of Media Effective.

27.     Defendant Paulina Torres is an individual who, on information and belief, resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' daughter. On information and belief, Paulina Torres is a Member/Manager of Media Effective.

28.     Defendant Allegheny East Conference Corporation of Seventh Day Adventists (the "Allegheny Conference") is a Pennsylvania not-for-profit corporation whose principal place of business is 767 Douglass Drive, Boyertown, PA 19512.

29.     Upon information and belief, Community Seventh-Day Adventist Church ("Community SDAC") is a local church of the Seventh-Day Adventist Church, located at 245 Tenafly Rd., Englewood, NJ 07631, which is operated by and a "d/b/a" of the Allegheny Conference.

30.     Upon information and belief, Ebenezer II Spanish Seventh-Day Adventist Church a/k/a Englewood Spanish Church ("ESC") is a local church of the Seventh-Day Adventist Church, located at 90 W Demarest Avenue, Englewood, NJ 07631, which is operated by and a "d/b/a" of the Allegheny Conference.

31.     On information and belief, John Does 1-100 include, among others, initial and subsequent transferees of one or more of the Fraudulent Transfers and/or their respective affiliates, successors, or assigns.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5116BA

## BACKGROUND

### A. Overview of the Chapter 11 Cases

32.     On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

33.     The Chapter 11 Cases are jointly administered pursuant to the *Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* [Docket No. 27], entered on June 9, 2022.

34.     Following several months of negotiations, on April 11, 2023, the Debtors and the Official Committee of Unsecured Creditors (the "Committee") filed the *Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 228] and the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for National Realty Investment Advisors, LLC, et al.* [Docket No. 2229] (the "Disclosure Statement"), which was approved by the Court on May 18, 2023 [Docket No. 2556].

35.     Additional information about the Debtors' business, capital structure, and the events leading up to the commencement of these Chapter 11 Cases can be found in the Disclosure Statement.

36.     Following the confirmation hearing held on August 1, 2023, on August 10, 2023, the Court entered the Confirmation Order [Docket No. 3599].

### B. NRIA's Business Structure and Fraudulent Scheme

37.     NRIA is a Delaware limited liability company that was formed on November 27, 2006, by Thomas Nicholas Salzano, a/k/a Nick Salzano ("Salzano") and Rey E. Grabato II ("Grabato"). NRIA's principal place of business was located at 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

DocuSign Envelope ID: 2B7DF6A3-5A0F-48CB-978C-92527D5148B4

38.     Grabato was the majority owner, President, and the Chief Executive Officer of NRIA.

39.     Salzano served as a "Senior Independent Executive Advisor and Portfolio Manager" of NRIA, although his involvement in the company was more akin to a President or chief executive officer until he was removed in October 2021.

40.     The Debtors operated as a massive international Ponzi scheme. As part of this fraudulent scheme, the Debtors, their leadership team, including Salzano, and their co-conspirators, used the Debtors to solicit over $600 million in investments from unsuspecting investors (collectively, the "Investors").

41.     NRIA claimed to operate as a real estate investment, management, and development firm that, since its inception, had developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA also claimed that it would pay extraordinarily high guaranteed returns to its investors, and that its investors would be paid their return of capital first. In reality, NRIA operated like a Ponzi scheme, using Investors' own contributions to pay investor distributions, to orchestrate an extensive marketing effort to attract new investors, and to divert funds and pay the personal expenses of Salzano, Grabato, their family members, and others. And any actual profits were not allocated in full to investor returns as promised, but instead went to Salzano, Grabato, their family members, and countless other individuals and entities.

42.     Since its inception, NRIA offered investors interests in a series of limited liability companies ("LLCs") developing real estate properties. Initially, each of the LLCs purportedly held a single investment property, and NRIA represented to each investor which property the Investors were investing in and from which property the Investors would purportedly receive profits. This

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D511CBA

opportunity was marketed to investors as securities exempt from registration under applicable securities laws.

43.    On February 5, 2018, Salzano, Grabato, and Arthur S. Scuttaro a/k/a Arthur Scutaro ("Scuttaro"), with the assistance, participation and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund"). A principal goal of the Fund was to "roll up" pre-existing Investors in individual property LLCs into one pooled fund, and to solicit investments from additional investors. The creation of the Fund made it more difficult for Investors to track the progress on any particular property in which they were invested and the profits supposedly flowing therefrom.

44.    From the Fund's inception in 2018, until at least January 2022, NRIA raised more than $600 million for the Fund from approximately 2,000 Investors. Three hundred and eighty-two Investors were retirees who contributed more than $94.8 million from hard-earned retirement accounts. Because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

45.    Investors believed that their investments were being used to fund the purchase and development of real estate. In reality, the bulk of the investments was funneled to insiders or used to pay NRIA employee salaries and overhead expenses. More than $100 million of the investor funds was used to pay "guaranteed" returns to other Investors.

46.    To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial investor monies. Salzano and Scuttaro led and directed the marketing campaign, which employed deception, material misrepresentations and omissions, and falsified documents. None of the securities issued by the Debtors were registered, and the private placement memoranda issued to

DocuSign Envelope ID: 297DF5A3-5A0F-48CB-978C-92527D5146BA

solicit investments failed to disclose substantial material facts that should have been disclosed to investors, including, for example, Salzano's true controlling position with the Debtors and his lengthy prior criminal history.[7]

47.    NRIA, aided by Defendants Media Effective and Javier Torres, advertised heavily to solicit investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio, YouTube, and television advertisements. For example, billboards in high traffic areas in New Jersey lured investors into the scheme by promising 12% returns and the opportunity of obtaining up to 21%.

48.    NRIA, with the assistance of Defendants Media Effective and Javier Torres, also advertised the investment opportunities on Indian television networks and elsewhere including in an Indian newspaper and opened three offices in India. NRIA raised millions of dollars from investors through this scheme, with Media Effective's and Javier Torres' material assistance.

49.    NRIA spent over $80 million on advertising and promotional costs, which amounts to approximately 14% of the funds received from Investors. Approximately $36 million of that spend was paid to Media Effective (a one-man shop, run from his home).

50.    On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. As of the Petition Date, NRIA's Investors had claims for outstanding principal investments of at least $515 million.[8] The Liquidation Trust estimates that the Debtors' Available Cash and real estate assets will generate approximately $130-

---

[7] *See* New Jersey Bureau of Securities Summary Cease and Desist Order filed on June 21, 2022 [Docket No. 60].

[8] Over $4 billion in claims have been asserted in 5,770 filed proofs of claims. *See,* NRIA Omni Claims Docket. The Liquidation Trustee is in the process of reconciling the filed claims against investor and other Debtor records.

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D511CBA

180 million in proceeds for Investors, leaving Investors with a loss of approximately \$335-385 million.

51.    On June 21, 2022, just two weeks after the Petition Date, the New Jersey Bureau of Securities filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the Fund. *See* Letter to Honorable John K. Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS (Bankr. D.N.J. June 21, 2022) [Docket No. 60]. Attached to the New Jersey Bureau of Securities' letter response described above was a Summary Cease and Desist Order against the Fund, its general partner, NRIA, NRIA Capital Partners, Inc., NRIA Structured Credit Strategies, LLC, and four Fund officers (Salzano, Grabato, O'Brien, and Scuttaro, collectively, the "Respondents") based, in large part, on the violations described above. *See* Summary Cease and Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities June 21, 2022) (the "Summary Order").

## C. Media Effective and Its Principal, Javier Torres

52.    Salzano, Grabato, and their team operated the Debtors' business as a Ponzi scheme to defraud innocent Investors for the benefit of those in the NRIA inner circle, their insiders, affiliates, and others—including Media Effective and Javier Torres.

53.    Throughout the course of NRIA's fraudulent scheme, the Debtors spent tens of millions of dollars on promising, promoting, and advertising unheard-of guaranteed returns (up to 21%) to innocent, unwitting investors. One of the principal advertising entities aiding in the promise, promotion, and advertising of NRIA's illicit securities offerings was Media Effective, run and operated by Javier Torres.

DocuSign Envelope ID: 287DF5A3-5A0F-48CB-979C-92527D5148BA

54.     Media Effective purports to be a marketing agency, which holds itself out as assisting its clients with coordinating and integrating television, radio, and digital marketing campaigns:



**MEDIA EFFECTIVE**

Having been an on-air personality, an in-house ad director, account exec, and media director, Javier knows the advertising business inside and out. His goal in partnering with his clients today is to use all his experience to ensure that his clients are receiving the best negotiations & rates in the most effective venues for their advertising campaigns.

Media Effective is able to implement many revolutionary advertising concepts that develop into strong direct response vehicles for clients utilizing Radio and TV strategies.

Since 2003, Media Effective has been working hard to build lasting partnerships with clients and to help their direct marketing campaigns succeed. We bring years of experience in the field in order to help clients get the most out of their advertising efforts.

*See* http://www.mediaeffective.com/ (last accessed Nov. 10, 2023). Javier Torres is the "Founder/Director" of Media Effective. *Id.*

55.     On information and belief, Javier Torres is the sole employee of Media Effective.

56.     On information and belief, the members of Media Effective are Defendants Natalia Torres, Paulina Torres, and Javier Torres, Jr.

57.     NRIA spent more than $80 million on advertising and promotional costs. Of those marketing and advertising costs, Media Effective received, at a minimum, approximately $38 million from the inception of their relationship in 2012, with approximately $36.5 million paid between 2016 and 2022 as follows:

    a.   2016 - $684,000

    b.   2017 - $868,000

    c.   2018 - $2,060,000

     d.  2019 - $3,040,000

     e.  2020 - $12,600,000

     f.  2021- $16,600,000

     g.  2022 - $618,000

58.    Significant payments to Media Effective occurred during January 2016 through 2022, at the height of the Debtors' fraudulent scheme.

59.    Media Effective, by its principal Javier Torres, purported to act as a middleman between NRIA and other companies ultimately running NRIA's advertisements.

60.    Javier Torres (individually, and as an officer of Media Effective) even sent NRIA advertising scripts as intermediary between NRIA and advertisers, some of which promoted and advertised the illicit unheard-of rates of returns to investors (up to 21%), in furtherance of the securities fraud scheme described above.

61.    For example, the following script was sent to Javier Torres on October 15, 2020, which he acknowledged receipt of and acted as an intermediary to promote NRIA's advertisements for ultimate airing to prospective NRIA investors touting "10% steady real estate backed monthly Cash Flow" and "bonuses targeted to 21%":

Investors…

How about a 10% steady real estate backed monthly Cash Flow?

Have you thought about the only one true supply constrained asset - Real Estate?

NRIA is one of the nation's top specialists and offers 10% annualized monthly payouts with bonuses targeted to 21%.

With NRIA you can obtain steady 10% return monthly payments with bonuses.

Remember , they specialize in "Realty Investing Done Right".

You can even use your 401K or IRA to invest.

NRIA's 15-year track record and $1.2 Billion in new construction development backs you.

Learn how you can invest in this hard asset Real Estate cash flow Fund today and receive 10% annualized monthly payouts with bonuses.

This is something every smart investor should review with their team.

Call now 800-700-5483.  That's 800-700-5483 or visit NRIA dot net.

An offer to buy or sell any security is only made by our Private Placement Memorandum. Read it first. Past Performance is No Guarantee of Future Results. Returns are annualized. National is a Real Estate Development firm. See Us at NRIA.NET

62.     Advertising scripts like the excerpt above aired for years with Media Effective and Javier Torres' aid, promoting the NRIA fraudulent scheme to countless individuals and causing Investors to pour their life savings into NRIA.

63.     Media Effective and Javier Torres played a quintessential role in spreading NRIA's false message to the public and the impact of that role cannot be understated. Because of them, hundreds, and perhaps thousands of individuals were fed lies and false information, and ultimately lost millions in retirement funds.

64.     Media Effective failed to return to Debtors the value equivalent to the approximately $36.5 million it received in payments.

65.     In 2020 and 2021 alone (the years immediately pre-bankruptcy), NRIA paid Media Effective approximately $29.2 million, making those years the most lucrative years of the 9-year relationship.

66.     In those same years, NRIA had hired an in-house Director of Media, Katey Kana, who was hired to, and on information and believe could have, performed most of the "services" for which Debtors were compensating Media Effective and Javier Torres millions of dollars to allegedly perform.

67.     The services Media Effective and Javier Torres allege they provided were not necessary or beneficial to the estate, and the funds they received far exceed the value received by the Debtors (or the Investors) pre-petition.

68.     The NRIA Fraudulent Transfers to Media Effective, Javier Torres and the other Defendants are, at their origin, Investor funds, fraudulently obtained from the Debtors' sale and promotion of unregistered securities by unregistered brokers, using false and misleading Private Placement Memoranda, with the material aid and assistance of Media Effective and Javier Torres, who plainly benefitted from the Debtors' Ponzi scheme.

**D.  Fraudulent Transfers to Defendants**

69.     The Committee and, thereafter, the Liquidation Trustee has been conducting discovery pursuant to Rule 2004 of various third parties, including third-party financial institutions.[9]

70.     On or about January 20, 2023, the Committee caused a Rule 2004 Subpoena to be issued to Media Effective.[10]

71.     That same day, the Committee caused a Rule 2004 Subpoena to be issued to Javier Torres.

---

[9] The Committee had no standing during the Debtors' pending chapter 11 bankruptcy cases to commence this action but conducted an investigation and issued subpoenas pursuant to Rule 2004 and D.N.J. LBR 2004-1. The Liquidation Trustee has the requisite standing to commence this action.

[10] The Committee issued the Rule 2004 Subpoena at the time, and pursuant to the Plan and Confirmation Order, the Liquidation Trustee is empowered to enforce the Subpoena.

72.    In the ensuing months, counsel to the Committee and then for the Liquidation Trustee worked with counsel for Media Effective and Javier Torres to obtain responses to those Subpoenas.

73.    For example, after sending a document upload link to counsel for Media Effective and Javier Torres on March 10, 2023, the upload link remained empty, and no documents were produced as of May 2023. At that time, the Committee's, and thereafter, the Liquidation Trustee's counsel continued to attempt to work with Media Effective and Javier Torres to ensure that documents were being produced, but received delayed responses and were, at times, outright ignored in attempting to receive a date certain that documents would be turned over.

74.    Ultimately, some documents were produced on May 24, 2023, but it was readily apparent that those responses of Media Effective and Javier Torres were incomplete.

75.    Committee professionals knew at the time that Media Effective and Javier Torres had been retained since 2012 and received approximately $38 million during that time, yet Media Effective produced invoices only from January through February 2016 showing less than $120,000 paid to Media Effective. In other words, **two months** of invoices were produced when Media Effective's relationship with NRIA lasted **nine years** representing a blatant failure to comply with the Rule 2004 Subpoenas.

76.    Meanwhile, Rule 2004 subpoenas were issued to other third-party financial institutions to obtain documents related to Debtors' financial transactions. That is where Media Effective and Javier Torres' conduct was uncovered.

77.    For Media Effective, Counsel for the Committee and Liquidation Trustee received and analyzed records for TD Bank account x0941. Those records reveal no other customer/client deposits—**NRIA appeared to be the <u>sole</u> source for substantially all of the incoming funds**.

78.     From the period of March 2021 to December 2021, the Media Effective LLC – TD Bank x0941 account balance grew from approximately $850,000 to $2,700,000. This growth was substantially driven by continuing deposits from NRIA for purported advertising services. However, unlike in prior periods, **there were no outgoing payments from the Media Effective LLC – TD Bank x0941 account to advertisers, and Media Effective retained NRIA's funds (i.e., Investor funds)**.

79.     In August 2022 (just two months after the Petition Date), two checks totaling $2,550,000 were written from the Media Effective LLC – TD Bank x0941 account to Charles Schwab with the check memos referencing "Investing" and "Investment." Documents received from Charles Schwab confirm Javier Torres applied for and was approved for an investment account in August 2022. The $2,550,000 of Media Effective funds, sourced from NRIA (*see* **Exhibit A**), were the first deposits into the Charles Schwab investment accounts. As described below, multiple other round-dollar deposits were received by this Charles Schwab account after August 2022 that, on information and belief, are sourced from other Media Effective and Torres-controlled accounts funded by NRIA.



**charles SCHWAB**

Schwab One® Account  of
**JAVIER TORRES
DESIGNATED BENE PLAN/TOD**

Account Number
████-5940

Statement Period
**August 3-31, 2022**

### Transaction Detail - Purchases & Sales (continued)

**Fixed Income Activity**

| Settle Date | Trade Dat | Transaction | Description | Par | Unit Price | Charges and Interest | Total Amount |
|---|---|---|---|---|---|---|---|
| 08/05/22 | 08/04/22 | Bought | US TREASUR NT 2.75%07/23 | 225,000.0000 | 99.6994 | 84.07 | (224,407.94) |
| | | | UST NOTE  DUE 07/31/23: 912828Y61 | | | | |
| | | | With accrued interest of $84.07 | | | | |
| 08/10/22 | 08/04/22 | Bought | CAPITAL ONE, NTNL 3.4%27 | 225,000.0000 | 100.0000 | 0.00 | (225,000.00) |
| | | | CD FDIC INS  DUE 08/10/27: 14042RTN1 | | | | |
| | | | With accrued interest of $0.00 | | | | |
| 08/10/22 | 08/04/22 | Bought | SALLIE MAE BANK  3.35%25 | 225,000.0000 | 100.0000 | 0.00 | (225,000.00) |
| | | | CD FDIC INS  DUE 08/11/25: 795451CB7 | | | | |
| | | | With accrued interest of $0.00 | | | | |
| 08/12/22 | 08/04/22 | Bought | SYNCHRONY BANK   3.3%24 | 225,000.0000 | 100.0000 | 0.00 | (225,000.00) |
| | | | CD FDIC INS DUE 08/12/24: 87165GT44 | | | | |
| | | | With accrued interest of $0.00 | | | | |
| **Total Fixed Income Activity** | | | | | | | **(899,407.94)** |
| **Total Purchases & Sales** | | | | | | | **(2,551,535.94)** |

### Transaction Detail - Deposits & Withdrawals

| Transaction Date | Process Date | Activity | Description | Location | Credit/(Debit) |
|---|---|---|---|---|---|
| 08/03/22 | 08/03/22 | Funds Received | FUNDS RECEIVED | | 1,050,000.00 |
| 08/15/22 | 08/15/22 | Funds Received | FUNDS RECEIVED | | 1,500,000.00 |
| **Total Deposits & Withdrawals** | | | | | **2,550,000.00** |

80.    The Fraudulent Transfers do not stop there. Indeed, based on information available to the Liquidation Trustee at the time, a listing of the Fraudulent Transfers to or for the benefit of each of the Defendants are set forth on **Exhibit B** to this Complaint.

81.    As detailed previously, at all relevant times, and since at least 2016, Salzano, and other co-conspirators, operated the Debtors as a Ponzi scheme.

82.    The Debtors were, at the time each Fraudulent Transfer was made, insolvent, as such term is defined in 11 U.S.C. § 101(32) and were kept afloat and continued to operate solely by misappropriating Investor funds – and not from legitimately generated operating profits.

83.    Accordingly, by this Complaint, the Liquidation Trustee seeks to avoid and recover all avoidable transfers made, obligations incurred, and payments made by the Debtors to or for the benefit of one or more of the Defendants.

DocuSign Envelope ID: 293DF5A3-5A0F-48GB-978C-92527D5146BA

### i.  Javier Torres and Dora Dillman use Debtors' Money to Purchase the Atlantic Highlands Property

84.    In or about June 2021, Javier Torres and his wife, Defendant Dora Dillman, purchased a waterfront property in Atlantic Highlands, New Jersey having an address of 148 Bayside Drive, Atlantic Highlands, New Jersey (the "Atlantic Highlands Property").

85.    The Atlantic Highlands Property was purchased for $1,575,000, apparently in cash as no recorded mortgage was located.

86.    The Atlantic Highlands Property is wholly unencumbered and, on information and belief, was purchased using the monies paid by the Debtors to Media Effective.

87.    Notably, on information and belief, Javier Torres resides at the Atlantic Highlands Property with his three children (Natalia, Paulina, and Javier Torres Jr.) who are all members/managers of Media Effective.

88.    Javier Torres allegedly operates Media Effective out of the Atlantic Highlands Property.

### ii.  Javier Torres Causes Media Effective to Transfer Debtors' Money to Personal Accounts

89.    Despite the blatant deficiencies in Media Effective's and Javier Torres' productions, the Liquidation Trustee has uncovered a number of transfers from Media Effective to Javier Torres' personal accounts. On information and belief, each of these transfers were of money paid to Media Effective by Debtors. Although an exhaustive list of transfers is not yet known, on information and belief, the following transfers have occurred:[11]

---

[11] The Liquidation Trustee believes, based on the information available to date, that additional discovery may lead to the discovery of further transfers, which the Liquidation trustee intends to pursue. Accordingly, the Liquidation Trustee reserves the right to further amend and supplement this Complaint and the relief sought against the named and to-be-named defendants.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5146B4

a. On or about October 6, 2017, Media Effective transferred $200,000 to a TD Ameritrade investment account, which on information and belief, is an account owned and managed by Javier Torres;

b. On or about October 15, 2019, Media Effective transferred $230,000 to Javier Torres' JP Morgan Chase account; and

c. In or about May 2020, Media Effective transferred $361,000 to Javier Torres' personal TD Bank account.

*See* **Exhibit B**.

90.      In addition to the $2,550,000 transferred from the Media Effective LLC – TD Bank x0941 account to Torres' Charles Schwab investment account in August 2022, the following other round dollar deposits were also identified in the Charles Schwab account. On information and belief, these other deposits also were made with money (Investor funds) received from Debtors:

a. September 9, 2022—Torres deposited $600,000;

b. December 30, 2022—Torres deposited $450,000;

c. January 24, 2023—Torres deposited $300,000; and

d. June 29, 2023—Torres deposited $300,000.

*See* **Exhibit B**.

91.      Of particular concern to the Liquidation Trustee, through documents produced by Charles Schwab on October 10, 2023, in response to a Rule 2004 subpoena, the Liquidation Trustee recently discovered that in or about **July 2023**, Javier Torres withdrew **$1,000,000** from his Charles Schwab account. The current status of this money is unknown.

### iii.  Javier Torres Causes Media Effective to Transfer Debtors' Money to Torres' Family Members

92.      In addition to transferring significant amounts of money received from Debtors (Investor funds) to his own personal accounts, Javier Torres has caused Media Effective to transfer

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D5116B4

Debtors' funds to various family members. On information and belief, none of these Torres family members were employed by Media Effective or performed any work for Debtors.

93.     The Liquidation Trustee is currently aware of the following transfers:

   a.   In February 2017, Media Effective paid a total of $255,000 to Natalia Torres;

   b.   On or about February 28, 2018, Media Effective paid $2,000 to Fabio Dillman;

   c.   Between May 2019 and December 2019, Media Effective paid a total of $27,745 to Ana Belen Torres; and

   d.   On or about June 22, 2020, Media Effective paid $3,400 to Paulina Torres.

*See* **Exhibit B**.

94.     On information and belief, the Debtors had no business or other relationship with Natalia Torres, Ana Belen Torres, Paulina Torres or Fabio Dillman.

### iv.  Javier Torres Causes Media Effective to Transfer the Debtors' Money to Englewood Spanish Church

95.     From January 2016 through January 2022 (shortly before the bankruptcy filing), Javier Torres caused Media Effective to transfer approximately $555,000 to the Englewood Spanish Church. *See* **Exhibit B**.

96.     This includes over **two hundred transfers**, ranging from $150 to $18,000 per payment. *Id.*

### E.  Badges of Fraud and Facts Supporting a Direct Inference of Fraudulent Intent and Constructive Fraudulent Transfers

97.     There are numerous badges of fraud and facts supporting a direct inference of actual intent to hinder, delay, and defraud the Debtors' Estate and its creditors.  For example, and without limitation:

   a.   The Fraudulent Transfers were concealed. Defendants Media Effective and Javier Torres were not cooperative or transparent in the Committee's discovery demands.

    b.   The Debtors did not receive value, let alone reasonably equivalent value, for the Fraudulent Transfers.

    c.   The Fraudulent Transfers were made while Salzano and his co-conspirators operated the Debtors as a Ponzi scheme, and while the Debtors were insolvent.

98.    Starting in March 2021, the same month Salzano was arrested, the Media Effective LLC – TD Bank x0941 account continued to receive millions of dollars from NRIA for purported advertising **but no corresponding withdrawals from the account to the actual advertisers were identified within this account**. Media Effective's bank account balance continued to build and at least $2,550,000 was transferred to a personal investment account at Charles Schwab. Notably, Salzano was Media Effective's initial and main contact at NRIA.

99.    Also, over the course of the Committee's and Liquidation Trustee's efforts to receive responses to the Rule 2004 Subpoenas issued to Media Effective and Javier Torres, after over two months passed, minimal documents were produced. For example, of the nine years that Media Effective was engaged with NRIA, only **two months** of invoices were produced.

100.    The Liquidation Trustee was also forced to resort to additional third-party Rule 2004 Subpoenas to financial and other institutions to unveil the greater detail regarding Media Effective and Javier Torres' fraudulent transfers for Javier Torres' personal benefit, for the benefit of his family, and to other third parties—all, on information and belief, using the Debtors' funds to the detriment of the creditors.

101.    To be clear, Media Effective and Javier Torres have already and are continuing to put funds **beyond the reach of the Liquidation Trustee** from which it is entitled to recover as funds of the Debtors. Millions of dollars have been improperly transferred by Media Effective and Javier Torres with no end in sight.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-979C-92527D5116B4

102.    Notably, the Liquidation Trustee has recently discovered from third-party subpoena production that—just months ago and after the Petition Date—in or about July 2023, Javier Torres withdrew $1,000,000 from his Charles Schwab account. The current status of this money is unknown.

103.    Media Effective and Javier Torres siphoned millions of dollars of Debtors' funds to themselves and to the other Defendants, including, on information and belief, to acquire the Atlantic Highlands Property, using Debtors' funds to make unauthorized and improper distributions of the Debtors' funds to Torres personally and to his family, and to pay personal expenses of themselves and one or more other Defendants.

104.    The fraud and other misconduct by Media Effective and Javier Torres, which were aided by the other Defendants, were part of one fraudulent scheme that has continued after the Petition Date, all to enrich the Defendants at the expense of the Debtors' Estate and its creditors.

### COUNT I—ACTUAL FRAUDULENT TRANSFERS
**Avoidance Pursuant To 11 U.S.C. § 548(a)(1)(A), 11 U.S.C. § 544, and Applicable State Law Including N.J.S.A. § 25:2-25(a)(1) and Recovery and Preservation of Same Pursuant To 11 U.S.C. §§ 550 and 551**
**(Against All Defendants)**

105.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

106.    The Liquidation Trustee seeks to avoid the Fraudulent Transfers to each of the Defendants set forth on **Exhibits A** and **B** and to recover and preserve the value thereof.

107.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors as set forth on **Exhibits A** and **B**.

108.    The NRIA Fraudulent Transfers were made to or for the benefit of Media Effective and/or Javier Torres, and each of the Defendants are either initial, immediate, or mediate transferees of the Fraudulent Transfers as set forth on **Exhibits A and B**.[12]

109.    Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date.

110.    As is set forth in detail above, each of the Fraudulent Transfers was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

111.    The Defendants did not take any of the transfers in good faith.

112.    At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

113.    Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(A) of the Bankruptcy Code and/or section 544(b) of the

---

[12] While the NRIA Fraudulent Transfers on **Exhibit A** were transferred to an account in the name of Media Effective, Plaintiff avers that such transfers were to both Media Effective and Javier Torres given Javier Torres' complete control of Media Effective. Plaintiff reserves the right to amend this Complaint to assert or assert in other proceedings that Media Effective is an alter ego of Javier Torres and that the corporate veil should be pierced.  Plaintiff further reserves its right to amend this Complaint to assert or assert in other proceedings that, independent of the avoidance actions asserted herein, the Subsequent Fraudulent Transfers are avoidable under state law because they were made by Media Effective and/or Javier Torres in order to hinder, delay, or defraud creditors of Media Effective and/or Javier Torres and/or that such transfers were for less than reasonably equivalent value.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D514BBA

Bankruptcy Code and New Jersey Revised Statutes § 25:2-25(a)(1), and (2) recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT II—CONSTRUCTIVE FRAUDULENT TRANSFERS
### Avoidance Pursuant to 11 U.S.C. § 548(a)(1)(B), 11 U.S.C. § 544(b), and Applicable State Law Including N.J.S.A. 25:2-25(a)(2) and 25:2-27(a)
### (Against All Defendants)

114.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

115.    The Liquidation Trustee seeks to avoid the Fraudulent Transfers to each of the Defendants set forth on **Exhibits A** and **B** and to recover and preserve the value thereof.

116.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors as set forth on **Exhibits A** and **B**.

117.    The NRIA Fraudulent Transfers were made to or for the benefit of Media Effective and/or Javier Torres, and each of the Defendants are either initial, immediate, or mediate transferees of the Fraudulent Transfers as set forth on **Exhibits A** and **B**.

118.    Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

119.    Each of the Fraudulent Transfers was made within either the two-year period prior to the Petition Date, the four-year period prior to the Petition Date, or the ten-year period prior to the Petition Date

120.    On the dates that each of the Fraudulent Transfers were made, Debtors were (1) insolvent or became insolvent as a result of such transfer; (2) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (3) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

121.    At the time of each of the Fraudulent Transfers, NRIA and the Fund, as applicable, each had at least one general unsecured creditor holding an allowable claim who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid and recover the Fraudulent Transfers, including but not limited to the Internal Revenue Service.

122.    Accordingly, Plaintiff is entitled to a judgment (1) avoiding the Fraudulent Transfers under section 548(a)(1)(B) of the Bankruptcy Code and/or section 544(b) of the Bankruptcy Code and New Jersey Revised Statutes §§ 25:2-25(a)(2) and 25:2-27(a), and (2) recovering and preserving all such avoided transfers under sections 550 and 551 of the Bankruptcy Code.

## COUNT III—AIDING AND ABETTING SECURITIES FRAUD
### Violations of Applicable State Law Including N.J.S.A. §§ 49:3-52 and 49:3-71
### (Against Media Effective and Javier Torres)

123.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

124.    Any person violates the New Jersey Uniform Securities Act ("NJUSA") if, for example, they:

    a.    Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud; or

    b.    Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; or

    c.    Engage in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensations and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of the NJUSA or of any rule or order promulgated pursuant to the NJUSA, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-97BC-92527D5143B4

N.J.S.A. § 49:3-71(a)(3)-(5).

125.    Additionally, N.J.S.A. § 49:3-71(d) provides as follows:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative **or agent who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser**, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability.

(Emphasis added).

126.    Media Effective and Javier Torres provided advertising "services" to NRIA and its affiliates since approximately 2012, receiving over $36 million in compensation along the way.

127.    Media Effective and Javier Torres were agents of NRIA.

128.    Media Effective and Javier Torres materially aided the sale of securities and conduct of NRIA in violating the NJUSA through its advertising services and other conduct facilitating the public dissemination of false and misleading advertisements inducing the public to invest in NRIA's Ponzi scheme.

129.    Media Effective and Javier Torres were advertising publications as to the value of securities and the advisability of investing in NRIA in willful violation of the NJUSA. Those advertisements were also deployed as a device and scheme to defraud unknowing investors to invest in NRIA's Fund.

130.    On information and belief, Media Effective and Javier Torres knew of the untruths and omissions made in the countless advertisements it aided the Debtors in publishing over the

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-979C-92527D5148B4

years, including but not limited to, that the unheard-of rates of returns (up to 21%) were false and that guaranteed returns on investments were also false.

131.    On information and belief, Media Effective and Javier Torres could have, in the exercise of reasonable care, known of the existence of facts under N.J.S.A. § 49:3-71(a)(1)-(5) giving rise to liability under the NJUSA.

132.    As a result of Media Effective and Javier Torres' material promotion and aiding of Debtors in selling securities, for significant compensation, thousands of investors suffered financial detriment.

133.    Accordingly, the Liquidation Trustee is entitled damages pursuant to N.J.S.A. § 49:3-71.

## COUNT IV – FRAUD
## (Against Media Effective and Javier Torres)

134.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

135.    Media Effective and Javier Torres misrepresentations to the public, including investors in NRIA and the Fund, regarding NRIA and the Fund.

136.    The misrepresentations made by Media Effective and Javier Torres were material.

137.    On information and belief, Media Effective and Javier Torres made those material misrepresentations with knowledge of their falsity or with reckless disregard as to the falsity of the statements made with the intent that others would reasonably and justifiably rely upon the misrepresentations and invest in NRIA and/or the Fund, resulting in damages.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D51465A

138.    For example, Javier Torres (individually, and as an agent of Media Effective) sent NRIA advertising scripts in his capacity as intermediary between NRIA and advertisers, some of which promoted and advertised the illicit unheard-of rates of returns to investors (up to 21%).

139.    On information and belief, Media Effective and Javier Torres had knowledge or belief of the false statements contained in advertising.

140.    Through its role providing advertising services to NRIA, Media Effective and Javier Torres intended other persons to reasonably rely on the misrepresentations in order to bring new Investors into NRIA's Ponzi- scheme.

141.    Media Effective and Javier Torres led others to reasonably rely on the misrepresentations contained in the advertising services Media Effective and Javier Torres performed for NRIA.

142.    The Investors, and therefore the Liquidation Trustee, suffered losses, thus resulting in damages.

143.    Accordingly, the Liquidation Trustee is entitled to a judgment that Media Effective and Javier Torres committed fraud and the damages resulting therefrom in an amount to be proven at trial but reasonably expected to exceed millions of dollars.

## <u>COUNT V – AIDING AND ABETTING IN FRAUD</u>
### <u>(Against Media Effective and Javier Torres)</u>

144.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

145.    As established herein, Debtors committed fraud through a Ponzi scheme which caused millions of dollars of damages to approximately 2,000 individual investors—many of whom were elderly and, in some instances, invested their life savings with NRIA and/or the Fund.

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D5448B4

146.    NRIA materially misrepresented the rates-of-return available on its investments and new or had reason to know that those statements were false.

147.    For example, because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

148.    NRIA intended for investors to rely on those statements, and the Investors reasonably relied on those materially false statements.

149.    But the Debtors did not commit their fraud alone. The Debtors' fraud was aided and abetted by others, including Media Effective and Javier Torres. But for Media Effective and Javier Torres' conduct, particularly as it related to advertising and promoting the Debtors' fraud, the Ponzi scheme would not have been as expansive and destructive to thousands of individuals.

150.    On information and belief, Media Effective and Javier Torres engaged in a wrongful act that caused the Investors to suffer an injury by losing investments by rendering advertising services to NRIA containing false information.

151.    On information and belief, Media Effective and Javier Torres were aware of the role they played in this illegal activity at the time they assisted NRIA.

152.    On information and belief, Media Effective and Javier Torres knowingly and substantially assisted NRIA in its fraud.

153.    For example, Media Effective and Javier Torres aided and abetted in NRIA's fraudulent scheme by assisting in the Debtor's advertising to attract new Investors, receiving over $36 million in return from the Debtors.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5148B4

154.    Javier Torres (individually, and as an agent of Media Effective) sent NRIA advertising scripts in his capacity as intermediary between NRIA and advertisers, some of which promoted and advertised the illicit unheard-of rates of returns to investors (up to 21%).

155.    On information and belief, Media Effective and Javier Torres knew of the untruths and omissions made in the countless advertisements it aided NRIA in publishing over the years, including but not limited to, that the unheard-of rates of returns (up to 21%) were false and that guaranteed returns on investments were also false.

156.    As a result of this advertising, the Investors, and therefore the Liquidation Trustee, suffered an injury through funds lost to the Ponzi scheme engaged in by NRIA and aided and abet by Media Effective and Javier Torres.

157.    Accordingly, the Liquidation Trustee is entitled to a judgment that Media Effective and Javier Torres aided and abetted in fraud by the Debtors and are entitled to damages in an amount to be determined at trial but reasonable expected to exceed millions of dollars.

## COUNT VI – UNJUST ENRICHMENT
### (Against All Defendants)

158.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

159.    In the alternative, the Trustee asserts claims for unjust enrichment against each of the Defendants.

160.    Each of the Defendants was enriched and received economic benefits without justification as a result of, but not limited to, the Fraudulent Transfers set forth on **Exhibits A** and **B** to this Complaint.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5448BA

161.    Defendants have unjustly retained the sums received by each of them to the detriment of the Debtors' Estate and its creditors.

162.    The Debtors were impoverished as a result of the Fraudulent Transfers. Without limitation, the Debtors did not receive a reasonably equivalent value for any of the Fraudulent Transfers. Further, the conduct alleged herein facilitated and perpetuated the Ponzi scheme, which resulted in substantially all of the Debtors' assets being syphoned off and their estates being left with millions of dollars in unpaid claims and other liabilities.

163.    There is a direct relationship between the enrichment of the Defendants and the impoverishment of the Debtors' Estates, as the Fraudulent Transfers were made directly from the Debtors' bank account to or for the benefit of one or more of the Defendants.

164.    There is no justification at all for the Fraudulent Transfers, which were the product of self-dealings and other misconduct and are not supported by reasonably equivalent value.

165.    Accordingly, the Liquidation Trustee is entitled to a judgment against each of the Defendants compelling them to disgorge and return the amounts by which they were unjustly enriched.

## COUNT VII – INJUNCTIVE RELIEF
### (Against All Defendants)

166.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

167.    Pursuant to section 105(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules, the Liquidation Trustee seeks a temporary restraining order and preliminary and permanent injunction barring the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands Property, the Fraudulent Transfers

DocuSign Envelope ID: 28DF5A3-5A0F-48CB-978C-92527D5116B4

set forth in **Exhibits <u>A</u>** and **<u>B</u>**, and certain funds held in various accounts identified on **Exhibit <u>C</u>**, affixed hereto, and through a pre-judgment asset freeze.

168.    Section 105(a) provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

169.    Bankruptcy Rule 7065 provides that "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." Fed. R. Bankr. P. 7065.[13]

170.    A party is entitled to injunctive relief upon a showing of (i) reasonable probability of success in the litigation and (ii) more likely than not irreparable injury absent such relief. If a party succeeds in making those showings, the court then conducts an overall balancing in consideration of two additional factors: (iii) the possibility of harm to other interested persons from the grant or denial of the injunction, and (iv) the public interest.

171.    As set forth in detail in this Complaint, there is a reasonable probability—in fact, there is a high probability—that the Liquidation Trustee will succeed on the merits of its claims against the Defendants.

172.    As also set forth in detail in this Complaint, there is a real threat of irreparable harm if the Trustee is not granted an injunction. Media Effective and Javier Torres have already transferred substantial assets. *See* **Exhibit B**. But more concern is the fact that they've stepped up such efforts.  Most recently, the Liquidation Trustee learned that in July 2023, Javier Torres

---

[13] Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security." Fed. R. Civ. P. 65(c).

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5448B4

withdrew $1,000,000 from his Charles Schwab investment account. The location of those funds remains unknown.

173.    This is all part of a pattern to hinder, delay, and defraud creditors. Over the course of the Liquidation Trustee's efforts to receive responses to the Rule 2004 Subpoenas issued to Media Effective and Javier Torres, minimal documents were produced. Further, of the nine years that Media Effective was engaged with NRIA, only **two months** of invoices were produced.

174.    The Liquidation Trustee has also been forced to resort to additional third-party subpoenas to financial institutions in order to uncover the full extent of Media Effective and Javier Torres' Fraudulent Transfers. Despite being well-within the scope of the subpoenas issued to them, they chose not to produce responsive information that was revealing of their misconduct.

175.    The entire picture of Media Effective and Javier Torres' improper transfers and use of Debtors' funds, in excess of $36.5 million, remains fuzzy because of their failure to volunteer responsive information to the Liquidation Trustee's requests. That much is telling.

176.    The balance of equities weighs in favor of granting the injunctive relief requested by the Liquidation Trustee. Defendants have continued their efforts to hinder, delay, and frustrate the Liquidation Trustee's investigation of the Debtors' assets and liabilities. There is a very real risk that, as soon as Defendants receive this Complaint, the funds at issue will be further dissipated or disappear entirely.

177.    The Defendants will not suffer any true prejudice by entry of an order prohibiting the transfer of the Atlantic Highlands Property and/or the Fraudulent Transfers. At most these assets will be frozen and subject to further Court order while this litigation progresses. Moreover, the injunction would only remain in effect until the Liquidation Trustee's money judgment has been satisfied or this case has been dismissed.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D5143B4

178.    The public interest would be served by granting the injunctive relief, as the Defendants have improperly diverted or received millions of dollars in transfers that were made with actual intent to hinder, delay, and defraud the Debtors' creditors and continue to frustrate efforts to untangle the Ponzi scheme.

179.    Absent the injunctive relief requested herein, the Liquidation Trustee would suffer manifest prejudice as it would be compelled to repeat the "cat and mouse" game of chasing down fraudulently transferred assets.

180.    No security should be required pursuant to Bankruptcy Rule 7065 and Rule 65(c), as the Trustee is seeking injunctive relief simply to prevent the diversion or dissipation of funds that have already been diverted and to recover such funds for the benefit of the creditor victims of the fraudulent scheme perpetrated by Media Effective and Javier Torres for the benefit of themselves and the other Defendants. The harm to the Defendants as a result of any preliminary or permanent injunctive relief would be minimal, if any harm exists at all.

181.    Accordingly, the Liquidation Trustee is entitled to the entry of a temporary, preliminary, and permanent injunction on the terms requested herein.

### COUNT VIII – CONSTRUCTIVE TRUST
**(Against All Defendants)**

182.    The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

183.    A constructive trust is an equitable remedy to redress a wrong. When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-978C-92527D514CB4

184.     As set forth in detail in this Complaint, Media Effective, Javier Torres, and others—acting on their own behalf and on behalf of each of the Defendants—engaged in conduct that were fraudulent, unfair, and/or unconscionable.

185.     Each of the Defendants was directly and materially enriched by virtue of such fraudulent, unfair, and/or unconscionable conduct.

186.     Each of the Defendants received the Fraudulent Transfers by fraud.

187.     Accordingly, each of the Defendants is the voluntary trustee of the Fraudulent Transfers and/or Atlantic Highlands Property, as applicable, for the benefit of the Liquidation Trustee, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust.

188.     Accordingly, the Liquidation Trustee seeks the entry of a judgment (a) declaring a constructive trust with respect to the Atlantic Highlands Property and the Fraudulent Transfers and (b) directing each of the Defendants, as applicable, to convey to the Liquidation Trustee (i) title to the Atlantic Highlands Property and (ii) the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibit B** to this Complaint.

## <u>COUNT IX - ACCOUNTING</u>
### (Against Media Effective and Javier Torres)

189.     The Liquidation Trustee repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

190.     An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of judgment for the amount ascertained to be due to either as a result.

191.     As set forth in detail in this Complaint, Media Effective and Javier Torres failed to maintain complete and accurate books and records of the Debtors' transfers to and transactions with Media Effective, Javier Torres, and the other Defendants.

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-979C-92527D5146B4

192.    On information and belief, Media Effective and Javier Torres possess financial books and records relating to the Debtors.

193.    However, Media Effective and Javier Torres have each failed and refused to turn over the Debtors' complete books and records and/or actively concealed or destroyed the Debtors' books and records.

194.    The Liquidation Trustee requires and is entitled to an accounting setting forth all of the Debtors' transfers to and transactions with Media Effective, Javier Torres, and the other Defendants.

195.    Accordingly, the Liquidation Trustee seeks the entry of a judgment directing Media Effective and Javier Torres to perform a full and complete accounting of all of the Debtors' transfers to or for the benefit of the Defendants for the period of January 1, 2016 through the date of entry of judgment.

## **RESERVATION OF RIGHTS**

196.    During the course of this proceeding, the Liquidation Trustee may learn through discovery or otherwise of additional claims or causes of action that are actionable under the provisions of the Bankruptcy Code or other applicable law. The Liquidation Trustee reserves all rights to amend this original Complaint to, among other things, (i) modify of and/or revise to Defendants' names; (ii) add defendants; and/or (iii) add claims or causes of action, if applicable (collectively, the "Amendments"), that may become known to the Liquidation Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the filing of this original Complaint.

DocuSign Envelope ID: 283DF5A3-5A0F-48CB-978C-92527D5116BA

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Liquidation Trustee respectfully requests this Court enter judgment in Liquidation Trustee's favor and against each of the Defendants as follows:

a.   The entry of a judgment in favor of the Liquidation Trustee and against each of the Defendants avoiding and recovering the Fraudulent Transfers, in an amount to be determined at trial;

b.   The entry of judgment in favor of the Liquidation Trustee and against Media Effective and Javier Torres on the Liquidation Trustee's aiding and abetting New Jersey Securities Law claim and damages therefor in an amount to be determined at trial;

c.   The entry of a judgment in favor of the Liquidation Trustee and against Media Effective and Javier Torres on the Liquidation Trustee's fraud claim and for damages therefor in an amount to be determined at trial;

d.   The entry of a judgment in favor of the Liquidation Trustee and against Media Effective and Javier Torres on the Liquidation Trustee's aiding and abetting fraud claim and for damages therefore in an amount to be determined at trial;

e.   The entry of judgment in favor of the Liquidation Trustee and against each of the Defendants to the extent that they were unjustly enriched at the expense of Debtors and damages therefor in an amount to be determined at trial;

f.   The entry of a temporary restraining order and preliminary and permanent injunction barring the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands Property, the Fraudulent Transfers set forth in **Exhibits A** and **B**, and certain funds held in various accounts identified on **Exhibit C**, affixed hereto, and through a pre-judgment asset freeze;

g.   The entry of a judgment imposing a constructive trust upon each of the Defendants with respect to the Atlantic Highlands Property and the Fraudulent Transfers, as to each Defendant, in the amounts set forth on **Exhibits A, B and C** to this Complaint;

h.   The entry of a judgment requiring Defendants Media Effective and Javier Torres to perform and accounting, as set forth above;

i.   An award of reasonable attorneys' fees and costs;

j.   An award of pre- and post-judgment interest; and

DocuSign Envelope ID: 287DF5A3-5A0F-48CB-979C-92527D514CBA

k.  Such additional relief as this Court deems just and equitable.

Dated: November 10, 2023

**ICE MILLER LLP**

*/s/ Louis T. DeLucia*
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway
Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to the AIRN Liquidation Trust Co.,*
*LLC, in its capacity as Liquidation Trustee of*
*the AIRN Liquidation Trust*

DocuSign Envelope ID: 293DF5A3-5A0F-48CB-979C-92527D5146BA

## <u>VERIFICATION</u>

I, Matthew P. Ward, hereby certify and verify under penalty of perjury that:

I am the sole member and manager of Thetford Holding Co. LLC, which is the sole member and manager of AIRN Liquidation Trust Co., LLC, Liquidation Trustee of the AIRN Liquidation Trust. I have read the factual allegations contained in the Verified Complaint and affirm such allegations are true and correct to the best of my knowledge, information, and belief.

Dated: November 10, 2023

By:    AIRN Liquidation Trust Co., LLC,
Liquidation Trustee of the AIRN
Liquidation Trust

By:    Thetford Holding Co. LLC, Sole Member
and Manager

Signed: _____

Name:    Matthew Ward

Title:    Sole Member and Manager

Date:    11/10/2023 _____