**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway, Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

*Counsel to Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1]<br><br>     Debtors. | Chapter 11<br><br>Case No:  22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>     Plaintiff,<br><br>v.<br><br>MEDIA EFFECTIVE LLC; JAVIER TORRES; JAVIER TORRES, JR.; DORA DILLMAN; NATALIA TORRES; PAULINA TORRES; ALLEGHENY EAST CONFERENCE CORPORATION OF SEVENTH DAY ADVENTISTS dba COMMUNITY SEVENTH-DAY ADVENTIST CHURCH dba EBENEZER II SPANISH SEVENTH-DAY ADVENTIST CHURCH dba ENGLEWOOD SPANISH CHURCH; and JOHN DOES 1-100,<br><br>     Defendants. | Adv. Pro. No.  23-1335-JKS<br><br><br><br><br><br><br><br><br>**Hearing Date:** November 14, 2023 at 10:00 A.M. (ET) or such other date and time as the Court may set |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

1

**LIQUIDATION TRUSTEE'S EMERGENCY APPLICATION FOR
TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE,
AND PRELIMINARY AND PERMANENT INJUNCTION**

Pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* (as amended and supplemented, the "Plan") [Docket No. 3256[2]] and the order confirming same [Docket No. 3599] (the "Confirmation Order"), Plaintiff AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust (the "Liquidation Trustee" or "Plaintiff"), established under the Plan and Confirmation Order, which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined in the Plan), by and through its undersigned counsel, hereby submits this application (the "Application") requesting the Court (i) enter a temporary restraining order substantially in the form attached hereto as **Exhibit 1**; and (ii) enter the subsequent preliminary injunction substantially in the form attached hereto as **Exhibit 2**.

Contemporaneously with the filing of this Motion, the Liquidation Trustee has filed the Verified Complaint ("Complaint") commencing the above-captioned adversary proceeding seeking, among other things, to avoid and recover the Fraudulent Transfers, as well as injunctive and other relief.[3] In support of this Motion, the Liquidation Trustee relies on and incorporates (i) the Complaint which is attached hereto as **Exhibit 3**, and (ii) the Declaration of William B. Waldie (the "Waldie Dec."), filed contemporaneously herewith.

In further support of the relief requested, the Liquidation Trustee respectfully states as follows:

---

[2] All references to Docket Numbers contained herein refer to the docket in Bankr. D.N.J. Case No: 22-14539-JKS.

[3] Capitalized terms used but not defined in this Motion have the meaning set forth in the Complaint.

## PRELIMINARY STATEMENT

1.      This Motion fully incorporates the facts set forth in the Complaint, as supported by each of the exhibits affixed thereto.

2.      Media Effective LLC ("Media Effective") and its Founder/Director Javier Torres ("Javier Torres") spent years amassing over $36 million in funds transferred from National Realty Investment Advisors, LLC ("NRIA"), and NRIA Partners Portfolio Fund I, LLC  (collectively with "NRIA," and their debtor affiliates, the "Debtors") (collectively, as set forth in detail on **Exhibit A** to the Complaint, the "NRIA Fraudulent Transfers"), which it has already and is apparently continuing to fraudulently transfer to Javier Torres personally, Javier Torres' family, and other entities fraudulently (collectively, the "Subsequent Fraudulent Transfers," as set forth in detail on **Exhibit B** to the Complaint, and with the NRIA Fraudulent Transfers, the "Fraudulent Transfers").

3.      Based upon third-party discovery recently obtained by the Liquidation Trustee pursuant to Bankruptcy Rule 2004, of the funds fraudulently transferred to Media Effective, Javier Torres appears to be moving *again*, in a $1 million lump sum. *See* Waldie Dec. at ¶ 20; Ex. 3 at ¶ 90. Absent a pre-judgment asset freeze of the Fraudulent Transfers, the Liquidation Trustee and its beneficiaries of the Liquidation Trust will be immediately and irreparably harmed. The *status quo.* must be maintained.

4.      Accordingly, the Liquidation Trustee requests that this Court grant the Liquidation Trustee (i) a temporary restraining order and preliminary and permanent injunction barring the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands Property, the funds and accounts holding and constituting the Fraudulent Transfers set forth in the Complaint (**Exhibits A** and **B** thereto), and certain funds held in various

3

accounts identified on the Complaint (*see*, **Exhibit C**), affixed hereto, and through a pre-judgment asset freeze; (ii) compelling Defendants to provide an accounting of all funds or property transferred and payments made to them by or for the benefit of the Debtors prior to the Petition Date; and (iii) granting the Liquidation Trustee such other and further relief as may be just and proper.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the *Standing Order*, dated July 23, 1984, referring all cases under the Bankruptcy Code to the bankruptcy judges for this District, as amended on September 18, 2012. Standing Order of Reference 12-1 (Simandle, C.J.).

6.      The claims asserted in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") of the Debtors.

9.      This Court has personal jurisdiction over the Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f) and other applicable law.

10.      Pursuant to Bankruptcy Rule 7008, Liquidation Trustee consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

11.     The predicates for the relief requested herein are section 105(a) of title II of the

United States Bankruptcy Code, Rule 7065 of the Federal Rules of Bankruptcy Procedure, and

Rule 65 of the Federal Rules of Civil Procedure.

## PARTIES

12.     Plaintiff is the Liquidation Trustee of the AIRN Liquidation Trust established

pursuant to the Plan and the Liquidation Trust Agreement, approved by the Confirmation Order.

13.     Pursuant to Article IV.F of the Plan, the Liquidation Trustee holds and retains all

rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise,

release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes

of Action (whether existing as of the Petition Date or thereafter arising), including all Avoidance

Actions and Contributed Claims and Liquidation Trust Actions, as each of those terms is defined

in the Plan.

14.     Defendant Media Effective LLC is a New Jersey limited liability company whose

principal place of business is 148 Bayside Dr., Atlantic Highlands, NJ 07716.

15.     Although Media Effective represents on its website that it "has been working hard

to build lasting partnerships with clients" since 2003, according to the New Jersey Department of

the Treasury, Media Effective LLC was not formed until around September 27, 2019.

16.     Defendant Javier Torres is the Registered Agent of Media Effective with an office

address of 148 Bayside Dr., Atlantic Highlands, NJ 07716 (a residence). On information and belief,

Javier Torres resides at this same address. Javier Torres is the Founder/Director of Media Effective.

According to Javier Torres' LinkedIn profile, he has been with Media Effective since 2008 (even

though Media Effective LLC was not incorporated until 2019, and Javier Torres is the sole Media

Effective employee, which alleges on its website that it started its business in 2003 (five years earlier)).

17.    Defendant Javier Torres, Jr. is an individual who, on information and belief, resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' son. On information and belief, Javier Torres, Jr. is a Member/Manager of Media Effective.

18.    Defendant Dora Dillman is an individual who, on information and belief, also resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716. Ms. Dillman and Javier Torres are husband and wife.

19.    Defendant Natalia Torres is an individual who, on information and belief, also resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' daughter. On information and belief, Natalia Torres is a Member/Manager of Media Effective.

20.    Defendant Paulina Torres is an individual who, on information and belief, resides at 148 Bayside Dr., Atlantic Highlands, NJ 07716 and is Javier Torres' daughter. On information and belief, Paulina Torres is a Member/Manager of Media Effective.

21.    Defendant Allegheny East Conference Corporation of Seventh Day Adventists (the "Allegheny Conference") is a Pennsylvania not-for-profit corporation whose principal place of business is 767 Douglass Drive, Boyertown, PA 19512.

22.    Upon information and belief, Community Seventh-Day Adventist Church ("Community SDAC") is a local church of the Seventh-Day Adventist Church, located at 245 Tenafly Rd., Englewood, NJ 07631, which is operated by and a "d/b/a" of the Allegheny Conference.

23.    Upon information and belief, Ebenezer II Spanish Seventh-Day Adventist Church a/k/a Englewood Spanish Church ("ESC") is a local church of the Seventh-Day Adventist Church,

located at 90 W Demarest Avenue, Englewood, NJ 07631, which is operated by and a "d/b/a" of the Allegheny Conference.

24.    On information and belief, John Does 1-100 include, among others, initial and subsequent transferees of one or more of the Fraudulent Transfers and/or their respective affiliates, successors, or assigns.

## RELEVANT BACKGROUND

### A.    Overview of the Chapter 11 Cases

25.    On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

26.    The Chapter 11 Cases are jointly administered pursuant to the *Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief* [Docket No. 27], entered on June 9, 2022.

27.    Following several months of negotiations, on April 11, 2023, the Debtors and the Official Committee of Unsecured Creditors (the "Committee", together with the Debtors, the "Plan Proponents") filed the *Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Docket No. 228] and the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation for National Realty Investment Advisors, LLC, et al.* [Docket No. 2229] (the "Disclosure Statement"), which was approved by the Court on May 18, 2023 [Docket No. 2556].

28.    Additional information about the Debtors' business, capital structure, and the events leading up to the commencement of these Chapter 11 Cases can be found in the Disclosure Statement and Complaint.

7

29.    Following the confirmation hearing held on August 1, 2023, on August 10, 2023, the Court entered the Confirmation Order [Docket No. 3599].

**B.    NRIA Business Structure and Fraudulent Scheme**

30.    NRIA is a Delaware limited liability company that was formed on November 27, 2006, by Thomas Nicholas Salzano, a/k/a Nick Salzano ("Salzano") and Rey E. Grabato II ("Grabato"). NRIA's principal place of business was located at 1 Harmon Plaza, Floor 9, Secaucus, New Jersey 07094.

31.    As set forth more fully in the Complaint, the Debtors operated as a massive international Ponzi scheme. As part of this fraudulent scheme, the Debtors, their leadership team, including Salzano, and their co-conspirators, used the Debtors to solicit over $600 million in investments from unsuspecting investors (collectively, the "Investors").

32.    NRIA claimed to operate as a real estate investment, management, and development firm that, since its inception, had developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA also claimed that it would pay extraordinarily high guaranteed returns to its investors, and that its investors would be paid their return of capital first. In reality, NRIA operated like a Ponzi scheme, using Investors' own contributions to pay investor distributions, to orchestrate an extensive marketing effort to attract new investors, and to divert funds and pay the personal expenses of Salzano, Grabato, their family members, and countless other individuals and entities.

33.    Since its inception, NRIA offered investors interests in a series of limited liability companies ("LLCs") developing real estate properties. Initially, each of the LLCs purportedly held a single investment property, and NRIA represented to each investor which property the Investors were investing in and from which property the Investors would purportedly receive profits. This

opportunity was marketed to investors as securities exempt from registration under applicable securities laws.

34.     On February 5, 2018, Salzano, Grabato, and Arthur S. Scuttaro a/k/a Arthur Scutaro ("Scuttaro"), with the assistance, participation and in collaboration with others, formed NRIA Partners Portfolio Fund I LLC (the "Fund"). A principal goal of the Fund was to "roll up" pre-existing Investors in individual property LLCs into one pooled fund, and to solicit investments from additional investors.

35.     From the Fund's inception in 2018, until at least January 2022, NRIA raised more than $600 million for the Fund from approximately 2,000 Investors. Three hundred and eighty-two Investors were retirees who contributed more than $94.8 million from hard-earned retirement accounts. Because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, NRIA manipulated the Fund's financial statements and financial information included within marketing materials to mislead Investors.

36.     To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial investor monies. Salzano and Scuttaro led and directed the marketing campaign, which employed deception, material misrepresentations and omissions, and falsified documents. None of the securities issued by the Debtors were registered, and the private placement memoranda issued to solicit investments failed to disclose substantial material facts that should have been disclosed to investors, including, for example, Salzano's true controlling position with the Debtors and his lengthy prior criminal history.[4]

---

[4] *See* New Jersey Bureau of Securities Summary Cease and Desist Order filed on June 21, 2022 [Docket No. 60].

37.    NRIA, aided by Defendants Media Effective and Javier Torres, advertised heavily to solicit investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio, YouTube, and television advertisements. For example, billboards in high traffic areas in New Jersey lured investors into the scheme by promising 12% returns and the opportunity of obtaining up to 21%.

38.    NRIA, with the assistance of Defendants Media Effective and Javier Torres, also advertised the investment opportunities on Indian television networks and elsewhere including in an Indian newspaper and opened three offices in India. NRIA raised millions of dollars from investors through this scheme, with Media Effective's and Javier Torres' material assistance.

39.    NRIA spent over $80 million on advertising and promotional costs, which amounts to approximately 14% of the funds received from Investors. Approximately $36 million of that spend was paid to Media Effective (a one-man shop, run from his home).

40.    On June 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. As of the Petition Date, NRIA's Investors had claims for outstanding principal investments of at least $515 million.[5] The Liquidation Trust estimates that the Debtors' Available Cash and real estate assets will generate approximately $130-180 million in proceeds for Investors, leaving Investors with a loss of approximately $335-385 million.

41.    On June 21, 2022, just two weeks after the Petition Date, the New Jersey Bureau of Securities filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law, N.J.S.A.

---

[5] Over $4 billion in claims have been asserted in 5,770 filed proofs of claims. *See,* NRIA Omni Claims Docket. The Liquidation Trustee is in the process of reconciling the filed claims against investor and other Debtor records.

49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the Fund. *See* Letter

to Honorable John K. Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case

No. 22-14539-JKS (Bankr. D.N.J. June 21, 2022) [Docket No. 60]. Attached to the New Jersey

Bureau of Securities' letter response described above was a Summary Cease and Desist Order

against the Fund, its general partner, NRIA, NRIA Capital Partners, Inc., NRIA Structured Credit

Strategies, LLC, and four Fund officers (Salzano, Grabato, O'Brien, and Scuttaro, collectively, the

"Respondents") based, in large part, on the violations described above. *See* Summary Cease and

Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities

June 21, 2022) (the "Summary Order").

### C.    Media Effective and Its Principal, Javier Torres

42.    Media Effective purports to be a marketing agency, which holds itself out as

assisting its clients with coordinating and integrating television, radio, and digital marketing

campaigns. Javier Torres is the "Founder/Director" of Media Effective.

43.    On information and belief, Media Effective is in reality a one-man shop, with Javier

Torres as the only employee, operating out of his recently purchased home at 148 Bayside Drive,

Atlantic Highlands, NJ.

44.    Under the guise of providing media planning and promotion expertise, NRIA,

through and at the direction of Salzano, engaged Media Effective and Javier Torres as its

purportedly *exclusive* marketing agent—beginning in or about 2012.

45.    Media Effective, by its principal Javier Torres, purported to act as a middleman

between NRIA and other companies ultimately running NRIA's advertisements.

46.    Javier Torres (individually, and as an officer of Media Effective) even sent NRIA

advertising "scripts" as intermediary between NRIA and advertisers, some of which promoted and

advertised the illicit unheard-of rates of returns to investors (up to 21%), in furtherance of the securities fraud scheme described above.

47.    Media Effective and Javier Torres played a quintessential role in spreading NRIA's false message to the public and the impact of that role cannot be understated. Because of them, hundreds, and perhaps thousands of individuals were fed lies and false information, and ultimately lost millions in retirement funds.

48.    The legitimate business services provided by Media Effective and Javier Torres are not readily apparent from the limited documents Media Effective has provided to date,[6] and the value of the services they allege to have provided do not comport with the significant amount of money paid to Media Effective particularly between 2016 and 2022, which appears to be the peak of NRIA's and Salzano's fraudulent activity.

49.    Although Media Effective has not produced an accounting of all payments it received from Debtors and the payments it made on behalf of the Debtors for advertising and media services, the bank statements the Liquidation Trustee has obtained for one Media Effective account reflect a "mark-up" of the cost of those services by approximately 44%. In other words, NRIA transferred to Media Effective far more funds than actually necessary or beneficial or fair value to the company and its investors and creditors.

50.    The money NRIA paid to Media Effective was paid by NRIA or the Fund. Specifically, from 2016 through 2022, the Debtors transferred approximately $36,522,290 to Media Effective and Javier Torres. **Exhibit 3, Ex. A**. Approximately $34,486,210 of the NRIA Fraudulent Transfers occurred on and after June 7, 2018. Based on NRIA accounting records,

---

[6] Despite repeated efforts by the Liquidation Trustee to obtain discovery, Media Effective and Javier Torres have not been forthcoming when responding to Rule 2004 Subpoenas, further concealing their fraudulent transfers and improper taking of Debtors' assets.

Media Effective was also paid approximately $1,518,661 from NRIA during the period of August 2012 to December 2015.

51.     Because many of the properties owned and operated by the Debtors were not profitable, the funds transferred to Media Effective actually came from Investors.

52.     NRIA ultimately spent more than $80 million on advertising and promotional costs, which amounts to approximately 14% of the funds received from Investors. Approximately $36 million of that spend was paid to Media Effective (a one-man shop, run from Javier Torres' home).

53.     Approximately $36,522,290 of those funds were transferred between 2016 to 2022, as follows:

    a.      2016 - $684,000

    b.      2017 - $868,000

    c.      2018 - $2,060,000

    d.      2019 - $3,040,000

    e.      2020 - $12,600,000

    f.      2021- $16,600,000

    g.      2022 - $618,000

54.     During the 2016 to 2022 period, on information and belief, despite these NRIA Fraudulent Transfers, Media Effective failed to return equivalent value to the Debtors. Subsequently, on information and belief, Media Effective and Javier Torres have perpetrated a scheme to hinder, delay, and defraud the Liquidation Trustee's recovery of such fraudulent transfers by further transferring monies paid by the Debtors to Javier Torres, his family, and other third-party entities, each of which had no reason to be receiving Debtors' (or Investor) funds.

55.     In 2020 and 2021 alone (the years immediately pre-bankruptcy), NRIA paid Media Effective approximately $29.2 million, making those years the most lucrative years for Media Effective and Javier Torres of the 9-year relationship. In 2020-2021, losses from the Debtors' property ownership and development business were mounting, making it even more critical that additional investor funds were solicited in order to continue the charade of "12% -21% guaranteed investor returns". Otherwise, Salzano's entire house of cards would fall, and the Ponzi scheme would be revealed.

56.     In those same years, NRIA had hired a Director of Media, Katey Kana, who, on information and belief, was hired to, and could have, performed most of the "services" that Debtors were compensating Media Effective and Javier Torres tens of millions of dollars to allegedly perform. Thus, neither NRIA nor the Fund had an obligation or business purpose to funnel tens of millions of dollars to an individual operating out of his home to "promote" NRIA's alleged business. Ms. Kana was capable of and hired to do the *same job* with an annual base salary of $165,000 with the opportunity of additional "commission payments."

57.     Once funds were transferred from the Debtors and received by Media Effective, those funds (the Subsequent Fraudulent Transfers) were transferred to other Defendants such as Javier Torres' family members and the Englewood Spanish Church.[7] *See,* **Exhibit 3, Ex. B**

---

[7] The transfers reflected in Exhibit 3, Ex. B. refer to "Englewood Spanish Church." On information and belief, those entries reflect transfers of funds to Allegheny East Conference Corporation of Seventh Day Adventists (the "Allegheny Conference"), Community Seventh-Day Adventist Church ("Community SDAC"), and/or Ebenezer II Spanish Seventh-Day Adventist Church a/k/a Englewood Spanish Church ("ESC") (collectively, "Englewood Spanish Church.").

**D.**      **Fraudulent Transfers to Defendants**

58.      The Committee and, thereafter, the Liquidation Trustee has been conducting discovery under Rule 2004 of various third parties, including third-party financial institutions.[8]

59.      On or about January 20, 2023, the Committee caused a Rule 2004 Subpoena to be issued to Media Effective.[9] That same day, the Committee caused a Rule 2004 Subpoena to be issued to Javier Torres.

60.      In the ensuing months, counsel for the Committee and then for the Liquidation Trustee worked with counsel for Media Effective and Javier Torres to obtain responses to those Subpoenas.

61.      For example, after sending a document upload link for Media Effective and Javier Torres on March 10, 2023, the upload link remained empty, and no documents were produced as of May 2023. At that time, the Committee's, and thereafter, the Liquidation Trustee's counsel, continued to attempt to work with Media Effective and Javier Torres to ensure that the documents were being produced, but received delayed responses and were, at times, outright ignored in attempting to receive a date certain that documents would be turned over. Ultimately, some documents were produced on May 24, 2023, but it was readily apparent that the responses of Media Effective and Javier Torres were incomplete.

62.      Committee professionals knew at the time that Media Effective and Javier Torres had been retained since 2012 and received over $36 million between 2016 and 2022 alone, yet Media Effective produced invoices only from January through February 2016, showing less than

---

[8] The Committee had no standing during the Debtors' pending chapter 11 bankruptcy cases to commence this action but conducted an investigation and issued subpoenas pursuant to Rule 2004 and D.N.J. LBR 2004-1. The Liquidation Trustee has the requisite standing to commence this action.

[9] The Committee issued the Rule 2004 Subpoena at the time, and pursuant to the Plan and Confirmation Order, the Liquidation Trustee is empowered to enforce the Subpoena.

$120,000 paid to Media Effective. In other words, only **two months of invoices** were produced

when Media Effective's relationship with NRIA **lasted nine years**—a blatant failure to comply

with the Rule 2004 Subpoenas.

63.     Meanwhile, Rule 2004 subpoenas were issued to other third-party financial

institutions to obtain documents related to Debtors' financial transactions. That is where Media

Effective and Javier Torres' true conduct was uncovered.

64.     For the Media Effective – TD Bank x0941 account records received and analyzed,

no other customer/client deposits were identified, and **NRIA appeared to be the <u>sole</u> source of**

**substantially all of the incoming funds.**

65.     From the period of March 2021 to December 2021, the Media Effective LLC – TD

Bank x0941 account balance grew from approximately $850,000 to $2,700,000. This growth was

substantially driven by continuing deposits from NRIA for purported advertising. However, unlike

in prior periods**, there were no outgoing payments for the Media Effective – TD Bank x0941**

**account to advertisers and Media Effective retained NRIA's funds (i.e., Investor funds).**

66.     In August 2022 (just two months after the Petition date) two checks totaling

$2,550,000 were written from the Media Effective LLC – TD Bank x0941 account to Charles

Schwab with the check memos referencing "Investing" and "Investment." Documents received

from Charles Schwab confirm Torres applied for and was approved for an investment account in

August 2022. The $2,550,000 of Media Effective funds, sourced from NRIA (*see* Exhibit 3, Ex.

A), were the first deposits into the Charles Schwab investment account. As described below,

multiple other round-dollar deposits were deposited into this Charles Schwab account after August

2022 that, on information and belief, are sourced from other Media Effective and Torres-controlled

accounts funded by NRIA.



67.    The Fraudulent Transfers do not stop there. Based on information available to the

Liquidation Trustee at this time, a listing of outgoing transfers from the Media Effective LLC –

TD Bank x0941 account, including Fraudulent Transfers to Defendants, ranging from $150 to

$1,500,000 is set forth in the attached Exhibit 3, Ex. B.

1.     **Javier Torres and Ms. Dillman Used Debtor's Money to Purchase the Atlantic Highlands Property.**

68.     Notably, in or about June 2021, Javier Torres and his wife, Defendant Dora Dillman, purchased a waterfront property in Atlantic Highlands, New Jersey having an address of 148 Bayside Drive, Atlantic Highlands, New Jersey (the "<u>Atlantic Highlands Property</u>").

69.     The Atlantic Highlands Property was purchased for $1,575,000, apparently in cash as no recorded mortgage was located.

70.     The Atlantic Highlands Property is wholly unencumbered and, on information and belief, was purchased using the monies paid by the Debtors to Media Effective.

71.     Notably, on information and belief, Javier Torres resides at the Atlantic Highlands Property with his three children (Natalia, Paulina, and Javier Torres, Jr.) who are all members/ managers of Media Effective.

72.     Javier Torres allegedly operates Media Effective out of the Atlantic Highlands Property.

2.     **Javier Torres Caused Media Effective to Transfer Debtors' Money to Personal Accounts.**

73.     Despite the blatant deficiencies in Media Effective's and Javier Torres' productions, the Liquidation Trustee has uncovered a number of transfers from Media Effective to Javier Torres' personal accounts. On information and belief, each of these transfers were of money paid to Media Effective by Debtors. Although an exhaustive list of transfers is not yet known, on information and belief, the following transfers occurred:[10]

---

[10] The Liquidation Trustee believes, based on the information available to date, that additional discovery may lead to the discovery of further transfers, which the Liquidation trustee intends to pursue. Accordingly, the Liquidation Trustee reserves the right to further amend and supplement this Motion and the relief sought against the named and to-be-named defendants.

a. On or about October 6, 2017, Media Effective transferred $200,000 to a TD Ameritrade investment account, which on information and belief, is an account owned and managed by Javier Torres;

b. On or about October 15, 2019, Media Effective transferred $230,000 to Javier Torres' JP Morgan Chase account; and

c. In or about May 2020, Media Effective transferred $361,000 to Javier Torres' personal TD Bank account.

*See* **Exhibit 3, Ex. B**.

74.    In addition to the $2,550,000 transferred from the Media Effective LLC – TD Bank x0941 account to Javier Torres' Charles Schwab account in August 2022, the following other round dollar deposits were also identified in the Charles Schwab account. On information and belief, these other deposits also were made with money received from Debtors:

a.    September 9, 2022 – Torres deposited $600,000;

b.    December 30, 2022 – Torres deposited $450,000;

c.    January 24, 2023 – Torres deposited $300,000; and

d.    June 29, 2023 – Torres deposited $300,000.

*See* **Exhibit 3, Ex. B**.

75.    Of particular concern for the Liquidation Trustee and emphasizing the necessity of the **emergency relief** requested herein, through documents produced by Charles Schwab on October 10, 2023, in response to a Rule 2004 subpoena, the Liquidation Trustee recently discovered that in or about **July 2023**, Torres withdrew **$1,000,000** from his Charles Schwab account. The current status of that money is unknown. Moreover, neither Javier Torres nor Media Effective *ever* disclosed the existence of the Charles Schwab accounts in discovery – thereby concealing their receipt of the Fraudulent Transfers and diversion/conversion of Investor funds.

76.     Absent the assistance of this Court, and the issuance of appropriate restraints, Javier
Torres individually, or thorough Media Effective as his conduit, are unconstrained from the
substantial amount of cash they received from the Debtors (and therefore, Investors), irreparably
damaging the Investors ability to recover.

### 3.     Javier Torres Causes Media Effective to Transfer Debtors' Money to His Own Family Members.

77.     In addition to transferring significant amounts of money received from Debtors
(Investor funds) to his own personal accounts, Javier Torres has caused Media Effective to transfer
Debtors' funds to various family members. On information and belief, none of these Torres family
members were employed by Media Effective or performed any work for Debtors.

78.     The Liquidation Trustee is currently aware of the following transfers:

d.  In February 2017, Media Effective paid a total of $255,000 to Natalia Torres;

e.  On or about February 28, 2018, Media Effective paid $2,000 to Fabio Dillman;

f.  Between May 2019 and December 2019, Media Effective paid a total of $27,745 to Ana Belen Torres; and

g.  On or about June 22, 2020, Media Effective paid $3,400 to Paulina Torres.

*See* **Exhibit 3, Ex. B**.

79.     On information and belief, the Debtors had no business or other relationship with
Natalia Torres, Ana Belen Torres, Paulina Torres, or Fabio Dillman.

### 4.     Javier Torres Causes Media Effective to Transfer the Debtors' Money to the Englewood Spanish Church.

80.     From January 2016 through January 2022 (shortly before the bankruptcy filing),
Javier Torres caused Media Effective to transfer approximately $555,000 to the Englewood
Spanish Church. *See* **Exhibit 3, Ex. B**.

81.    This includes over two hundred transfers, ranging from $150 to $18,000 per payment. *Id.*

**E.    Badges of Fraud and Facts Supporting a Direct Inference of Fraudulent Intent and Constructive Fraudulent Transfers**

82.    There are numerous badges of fraud and facts supporting a direct inference of actual intent to hinder, delay, and defraud the Debtors' Estate and its creditors. For example, and without limitation:

a.    The Fraudulent Transfers were concealed.  Defendants Media Effective and Javier Torres were not cooperative or transparent in the Committee's discovery demands.

b.    The Debtors did not receive value, let alone reasonably equivalent value, for the Fraudulent Transfers.

c.    The Fraudulent Transfers were made while Salzano and his co-conspirators operated the Debtors as a Ponzi scheme, and while the Debtors were insolvent.

83.    Starting in March 2021, the same month Salzano was arrested, the Media Effective LLC – TD Bank x0941 account continued to receive millions of dollars from NRIA for purported advertising **but no corresponding withdrawals to the actual advertisers were identified within this account**. Media Effective's bank account balance continued to build and at least $2,550,000 was transferred to a personal investment account at Charles Schwab. Notably, Salzano was Media Effective's main contact at NRIA.

84.    Also, over the course of the Committee's and Liquidation Trustee's efforts to receive responses to the Rule 2004 Subpoenas issued to Media Effective and Javier Torres, after over two months passed, minimal documents were produced. For example, of the **nine years** that Media Effective was engaged with NRIA, only **two months** of invoices were produced.

85.    The Liquidation Trustee was also forced to resort to additional third-party Rule 2004 Subpoenas to financial and other institutions to unveil the full extent of Media Effective and

Javier Torres' fraudulent transfers for Javier Torres' personal benefit, for the benefit of his family, and to other third parties—all, on information and belief, using the Debtors' funds to the detriment of the creditors.

86.     To be clear, Media Effective and Javier Torres have already and are continuing to put funds **beyond the reach of the Liquidation Trustee** which it is entitled to recover from as funds of the Debtors. Millions of dollars have been improperly transferred by Media Effective and Javier Torres with no end in sight.

87.     Indeed, the Liquidation Trustee has **recently discovered** from third-party subpoena production that—just months ago and after the Petition Date—in or about July 2023, Javier Torres withdrew $1,000,000 from his Charles Schwab account. The current status of this money is unknown.

88.     The fraud and other misconduct by Media Effective and Javier Torres, which were aided by the other Defendants, were part of one fraudulent scheme that has continued after the Petition Date, all to enrich the Defendants at the expense of the Debtors' Estate and its creditors.

**INJUNCTIVE RELIEF SOUGHT**

89.     By this Application, the Liquidation Trustee seeks the entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "TRO Proposed Order") and **Exhibit 2** (the "PI Proposed Order") (i) barring the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands Property, the funds and accounts holding and constituting the Fraudulent Transfers set forth in the Complaint (**Exhibits A** and **B** thereto), and certain funds held in various accounts identified on the Complaint (*see*, **Exhibit C**), affixed hereto, and through a pre-judgment asset freeze; (ii) compelling Defendants to provide an accounting of all funds or property transferred and payments made to them by or for the benefit of

the Debtors prior to the Petition Date; and (iii) granting the Liquidation Trustee such other and

further relief as may be just and proper.

## ARGUMENT

**A.     Issuance of a Preliminary Injunction and Temporary Restraining Order Against the Defendants is Permissible and Justified Under the Traditional Elements for Such Relief.**

90.     The issuance of a temporary restraining order or a preliminary injunction is a matter

of discretion for the Court and is within its equitable powers.

91.     Federal Rule of Civil Procedure 65, made applicable in adversary proceedings

pursuant to Federal Rule of Bankruptcy Procedure 7065 and District of New Jersey Local

Bankruptcy Rule 7065-1, empowers the Bankruptcy Court to issue temporary and preliminary

injunctive relief.

92.     Section 105(a) of the Bankruptcy Code grants the Court the authority to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of [title

11]." 11 U.S.C. § 105(a); *see, e.g.*, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004),

*as amended* (Feb. 23, 2005) ("Section 105(a) of the Bankruptcy Code expressly provides

bankruptcy courts the equitable power to 'issue any order, process, or judgment that is necessary

or appropriate to carry out the provisions of this title.'") (citing 11 U.S.C. § 105(a)); *accord In re*

*LTL Mgmt., LLC*, 638 B.R. 291, 319 (Bankr. D.N.J. 2022).

93.     "The issuance of an injunction under section 105(a) is governed by the standards

generally applicable to the issuance of injunctive relief in non-bankruptcy contexts." *In re*

*Philadelphia Newspapers, LLC*, 423 B.R. 98, 105 (E.D. Pa. 2010); *see also Matter of Brennan*,

198 B.R. 445, 452 (D.N.J. 1996) ("In determining whether to issue a § 105 stay, bankruptcy courts

also use [the] traditional four-pronged analysis.").

94.     Regardless of whether a plaintiff seeks a temporary restraining order or a preliminary injunction, the standards for relief are the same. In *Winter v. Natural Resources Defense Council, Inc.*, the U.S. Supreme Court established the standard for imposing a preliminary injunction. *See* 555 U.S. 7, 129 S. Ct. 365 (2008). To qualify for injunctive relief, a litigant must demonstrate: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that the granting of preliminary relief will not result in even greater harm to the non-moving party; and (4) that the public interest favors such relief. *In re LTL*, 638 B.R. at 319 (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)).

95.     A preliminary injunction is appropriate where the defendants may dissipate or transfer assets before the entry of a final judgment. *See, e.g.*, *Elliott v. Kiesewtter*, 98 F.3d 47, 55-58 (3d Cir. 1996) (affirming preliminary injunction imposing an asset freeze where plaintiffs sought equitable relief).

96.     This Court may freeze a defendant's assets where the plaintiff seeks equitable relief. *Groupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999); *see also Juul Labs, Inc. v. 4X PODS*, 439 F.Supp.3d 341, 349-50 (D.N.J. 2020) (adopting *Grupo* analysis to conclude that a prejudgment asset freeze is permitted in a case seeking equitable accounting); *Sweet People Apparel, Inc. v. Fame of NY, Inc.*, 2011 WL 2937360, at *5 (D.N.J. July 19, 2011) (granting asset freeze after reasoning that, in the wake of *Grupo*, courts have repeatedly upheld the use of prejudgment asset freezes in cases seeking equitable relief).

97.     Indeed, "[i]t is well-established that a court may freeze a defendant's assets to preserve an ultimate equitable remedy sought by a plaintiff." *PNY Technologies, Inc. v. Salhi*, 2016 WL 4267950, at *2 (D.N.J. Aug. 10, 2016) (awarding the freezing of assets because "the record

reflects the need for emergency relief[.]") (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289-90, 61 S.Ct. 229, 85 L.Ed. 189 (1940)) (other citations omitted).

98.     Where, as here, a trustee seeks to recover the value of a case as a fraudulent conveyance and seeks an accounting (an equitable remedy) of the disposition of that cash, a pre-judgment asset freeze of that cash is proper. *See Juul Labs, Inc.*, 439 F.Supp.3d at 349-50; *In re Team Systems Int'l, LLC*, Bankr. D. Del. No. 22-10066 (CTG), 2023 WL 1428572, at *8-9 (Jan. 31, 2023).

99.     Indeed, in *In re Team Systems Int'l*, the trustee filed a complaint seeking recovery of about $14 million in transfers made by defendants in the action, as well as a preliminary injunction to, among other requests, freeze the defendants' assets—including cash. *In re Team Systems Int'l* at *7. Specifically, the trustee alleged that the owners of the debtor company and family members of the owners both received fraudulent conveyances from the debtor. *Id.* at *1. Finding that the trustee met the standard for preliminary injunctive relief, the court entered an order providing "a broad injunction against the dissipation of assets [containing] a carve out for ordinary course expenditures[.]" *Id.* at 13. The same result should occur here.

100.     As set forth more fully below, the Liquidation Trustee is (i) likely to succeed on the merits of the claims against Defendants; (ii) will suffer irreparable harm if an injunction does not issue; (iii) the injunctive relief will not cause harm to the Defendants; and (iv) the public interest favors the relief sought herein. A pre-judgment asset freeze is necessary and proper to prevent further dissipation and damage to the defrauded investors in this case.

### 1.     Likelihood of Success on the Merits

101.     The Liquidation Trustee is substantially likely to succeed on the merits of the claims contained in the Complaint.

102.    The Liquidation Trustee is seeking to avoid and recover approximately $36 million in Fraudulent Transfers made by the Debtors to Media Effective, Javier Torres, and the other Defendants with actual intent to hinder, delay, or defraud creditors and/or constituted constructive fraudulent transfers, pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), 548(a)(1)(B), 550 and state law (N.J.S.A. §§ 25:2-25(a)(1), 25:2-25(a)(2), and 25:2-27(a)).

103.    In order for the Liquidation Trustee to succeed on its actual fraudulent conveyance claim, it must prove (i) that the debtor has put some asset beyond the reach of the creditors which would have been available to them at some point in time but for the conveyance; and (ii) that the transfers were made "with actual intent to hinder, delay, or defraud creditors[,]" however courts may infer intent if sufficient "badges of fraud" are present. *U.S. v. Patras*, 909 F.Supp.2d 400, 412 (D.N.J. 2012); *see also In re Victor Intern, Inc.*, 278 B.R. 67, 84-85 (Bankr. D.N.J. 2002), subsequently aff'd, 97 F. App'x 365 (3d Cir. 2004). Actual intent is often established through inferential reasoning stemming from the circumstances surrounding the alleged fraudulent act. *Patras*, 909 F.Supp.2d at 412.

104.    Also, constructive fraudulent transfers exist, as they do here, where "the debtor made the transfer without receiving 'reasonably equivalent value' in exchange for the transfer and the debtor was insolvent at the time or became insolvent as a result of the transfer.'" *Motorworld, Inc. v. Benkendorf*. 228 N.J. 311, 316 (N.J.) (citing N.J.S.A. 25:2-27(a)) (affirming lower court finding that plaintiff established all elements of a constructive fraudulent transfer claim).

105.    The Fraudulent Transfers set forth in the Complaint constitute actual and/or constructive fraudulent transfers. Nevertheless, under either theory, the Liquidation Trustee is likely to succeed on its claims.

106.   For purposes of the New Jersey Uniform Fraudulent Transfer Act, "badges of fraud" can be found in a non-exhaustive list in N.J.S.A. § 25:2-26, including for example, (i) transfers to an insider, (ii) the transfer or obligation was disclosed or concealed, (iii) the debtor removed or concealed assets, (iv) whether the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred, or (v) the debtor was insolvent.

107.   "While a single badge of fraud may establish that a conveyance is fraudulent, 'the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.'" *Patras*, 909 F.Supp.2d at 412 (citing *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 490 (N.J. 1999)).

108.   As set forth in the Complaint, there are numerous badges of fraud as well as facts that support a direct inference of fraudulent intent, including without limitation, the following:

    a.   The Fraudulent Transfers were concealed.

    b.   The Debtors did not receive value, let alone reasonably equivalent value, for the Fraudulent Transfers.

    c.   The Fraudulent Transfers were made while Salzano and his co-conspirators operated the Debtors as a Ponzi scheme, and while the Debtors were insolvent.

109.   While the other claims set forth in the Complaint have varying legal standards, at bottom, they all require the Liquidation Trustee to demonstrate that the Defendants acted fraudulently or inequitably for their own benefit and to the detriment of the Debtors, its Estate, and the creditors. For all the same reasons that the Liquidation Trustee is likely to succeed on his actual and/or constructive fraudulent transfer claims, success is also likely on the claims for aiding and abetting securities fraud, fraud and aiding and abetting fraud, unjust enrichment, constructive trust, and for an accounting.

**2. The Irreparable Harm the Liquidation Trust and Its Beneficiaries Would Suffer Absent an Injunction Outweighs Any Harm to Defendants.**

110. A trial court has the equitable power to issue an asset-freezing injunction to protect a future damages remedy. *See e.g.*, *Elliott*, 98 F.3d at 55-56 (affirming preliminary injunction imposing an asset freeze where plaintiffs sought equitable relief); *see also In re Team Systems Int'l*, at *7.

111. A party may establish "irreparable injury by showing that the freeze is necessary to prevent the consumption, dissipation, or fraudulent conveyance of the assets that the party pursuing the asset freeze seeks to recover in the underlying litigation. The fact that the assets subject to the Freeze Order are primarily money assets does not preclude entry of a freeze order enjoining the use of those assets." *Id.* at 58; *see Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205-06 (3d Cir. 1990)) ("[T]here is ample authority for the proposition 'that the unsatisfiability of a money judgment can constitute irreparable injury' for the purposes of granting a preliminary injunction," in particular, where "'the injunction is reasonably necessary to preserve the status quo, and thus to ensure the satisfaction of a potential future judgment ordering the transfer of money from defendants to plaintiffs.'"); *EHT US1*, 2021 WL 3828556, at *2 (granting preliminary injunction to freeze defendants' assets where the defendants had "a history of wrongful acts and have proven that they are capable of shuffling assets" and the defendants had "knowingly or recklessly made false statements"); *In re Team Systems Int'l, LLC*, 2023 WL 1428572, *12. ("Here . . . the factual circumstances detailed . . . provide cause for concern that without an injunction restraining the use of such transfers, defendants may move or conceal assets.")

112. In the context of a bankruptcy case, the irreparable harm factor is satisfied where "the action sought to be enjoined would embarrass, burden, delay or otherwise impede the

reorganization proceeding, or if the stay is necessary to preserve or protect the Debtor's estate and reorganization prospects." *Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992).

113.    If the Liquidation Trustee can demonstrate a risk of irreparable injury, then the requisite strength of the merits claim depends on the balance of harms. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) ("How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief") (citing *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

114.    Here, the fact that in or about July 2023, Javier Torres withdrew **$1,000,000** from his Charles Schwab account (an account he never disclosed in discovery), with the status and location of that money unknown, indicates that Javier Torres could move, transfer, and conceal other funds in the future.

115.    Further, Javier Torres has demonstrated a pattern of transferring funds to family members, such as Natalia Torres, Paulina Torres, and Fabio Torres, which he could and likely will do in the future to conceal funds.

116.    In addition, the Atlantic Highlands Property is unencumbered and, therefore, could be sold or encumbered at any time for cash proceeds that Javier Torres or other Defendants could then further transfer or otherwise conceal.

117.    The Liquidation Trustee believes that, absent the relief requested herein, there is a high likelihood that Media Effective, Javier Torres, and the other Defendants (including Javier

Torres' close family members) will continue to move and/or conceal assets, thereby frustrating efforts to track down and recover fraudulently obtained property and funds.

118.    Today, the Debtors, apart from NRIA, are dissolved. The Liquidation Trustee has only agreed that NRIA may remain in existence so that it may be indicted by the Department of Justice in the future.

119.    The balance of equities favor granting the Liquidation Trustee a temporary restraining order and preliminary injunction.

120.    Absent the Court issuing the temporary restraining order and preliminary injunction to enjoin Defendants from the relief described in this Motion, the Trust will suffer great harm as they risk not being able to access, locate, or identify funds that were fraudulently transferred.

121.    By contrast, granting the requested relief will not impose cognizable harm on Defendants. Instead, the Liquidation Trustee simply asks that the *status quo* be maintained to prevent the sale or dissipation of the Fraudulent Transfers pending the outcome of this case.

122.    The harm suffered by the Liquidation Trust would therefore exceed the harm suffered by the Defendants.

123.    Accordingly, the balance of harms militates strongly in the Liquidation Trustee's favor, warranting the imposition of the temporary restraining order and preliminary injunction.

### 3. The Public Interest Favors Granting the Requested Injunctive Relief.

124.    Considerations of the public interest also weigh in favor of the Liquidation Trustee.

125.    The U.S. Supreme Court has identified two congressional purposes behind Chapter 11: (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *In re Soundview Elite Ltd.*, 543 B.R. 78, 120 (Bankr. S.D.N.Y. 2016) ("it is in the public interest that

commercial obligors not dissipate their assets—or, when they have already done so, that they not do it again.").

126.    Granting relief here will "maximize[] [the] property available to satisfy creditors," by preventing the Defendants from transferring or otherwise concealing funds. *Bank of Am. Nat'l Trust & Sav. Ass'n*, 526 U.S. at 453.

127.    In these circumstances, the public interest demands that the temporary restraining order and the preliminary injunction be entered as requested herein.

## A BOND IS NOT REQUIRED

128.    Bankruptcy Rule 7065, applicable to adversary proceedings such as this one, sets out an exception to Fed. R. Civ. Pro. 65 that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."  Accordingly, the Liquidation Trustee respectfully submits that the Court should exercise its discretion under Bankruptcy Rule 7065 and not require a bond or other security.

129.    Should bond be ordered, Liquidation Trustee respectfully requests a nominal bond.

## RESERVATION OF RIGHTS

130.    The Liquidation Trustee's investigation remains ongoing, and it expressly reserves the right to seek injunctive and/or other relief with respect to other parties, transfers, or real or personal property. Nothing contained in this Motion or in the Complaint shall be construed as an admission against the Liquidation Trustee, the Debtors or the Estate in any other matter or proceeding. To the extent there is any inconsistency between this Motion and the Complaint, the Complaint (which is incorporated herein by reference) shall control. The Liquidation Trustee expressly reserves all rights.

## **CONCLUSION**

The Liquidation Trustee respectfully requests that this Court grant the Liquidation Trustee (i) a temporary restraining order and preliminary and permanent injunction barring the Defendants from selling, assigning, transferring, encumbering, or otherwise disposing of the Atlantic Highlands Property, the funds and accounts holding and constituting the Fraudulent Transfers set forth in the Complaint (**Exhibits A** and **B** thereto), and certain funds held in various accounts identified on the Complaint (*see*, **Exhibit C**), affixed hereto, and through a pre-judgment asset freeze; (ii) compelling Defendants to provide an accounting of all funds or property transferred and payments made to them by or for the benefit of the Debtors prior to the Petition Date; and (iii) granting the Liquidation Trustee such other and further relief as may be just and proper.

[SIGNATURES ON FOLLOWING PAGE]

Dated: November 10, 2023

**ICE MILLER LLP**

_/s/ Louis T. DeLucia_

Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
1500 Broadway
Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com

_Counsel to the AIRN Liquidation Trust Co.,_
_LLC, in its capacity as Liquidation Trustee of_
_the AIRN Liquidation Trust_