UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**Edmond M. George, Esquire**<br>**OBERMAYER REBMANN MAXWELL & HIPPEL, LLP**<br>**1120 S NJ 73**<br>**Suite 420**<br>**Mount Laurel, NJ  08054**<br>*Counsel to Defendants Javier Torres, Media Effective, LLC, Dora Dillman, Javier Torres, Jr., Natalia Torres, Paulina Torres.* | |
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No:  22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>                    Plaintiff,<br><br>v.<br><br>MEDIA EFFECTIVE LLC, *et al.*,<br><br>                    Defendants. | Adv. Pro. No.  23-1335-JKS |

**EXPEDITED MOTION OF JAVIER TORRES, MEDIA EFFECTIVE,
DORA DILLMAN, JAVIER TORRES, JR., NATALIA TORRES, AND
PAULINA TORRES TO DECLARE TEMPORARY RESTRAINING ORDER
DATED NOVEMBER 22, 2023, DISSOLVED**

Javier Torres ("Javier"), Media Effective ("Media"), Dora Dillman, Javier Torres, Jr.,

Natalia Torres, Paulina Torres (the "Torres Family," and collectively with Javier and Media, the

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

"Defendants"), by and through their undersigned counsel, Obermayer Rebmann Maxwell & Hippel LLP, file this Expedited Motion to Declare the Temporary Restraining Order dated November 22, 2023 (the "TRO") Dissolved (the "Motion") as of December 6, 2023, or, at a minimum, from this point forward.

## I.    **INTRODUCTION**

On November 10, 2023, the Trustee[2] marched into court and filed an "emergency motion" for injunctive relief that was riddled with falsehoods, innuendo, legal conclusions, and allegations that violate Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 9011.  As the Court aptly noted, "there [] [was] not a whole lot of meat on the bones . . . ."[3]  Despite the Court's apparent skepticism, the Trustee persisted, arguing facts directly contrary to those scribed in the motion filed only four days prior.[4]

The Trustee's bare-bones filing and inconsistent messaging notwithstanding, this Court issued a temporary restraining order on November 22, 2023, that enjoined the Defendants from "selling, assigning, transferring, encumbering, or otherwise disposing" of certain funds in their possession.[5]  The Court issued the TRO based on a specific understanding between the Court and the parties:  an evidentiary hearing on the injunction request would occur as soon as possible but certainly "before the Christmas/New Year break."[6]  In agreeing to enter the TRO, the Court tasked

---

[2] Throughout this Motion, Defendants will refer to Plaintiff, AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust (the "Trust"), as the "Trustee."

[3] TRO Hr'g Tr. at 6:20–21.

[4] *Compare, e.g.*, Mot. TRO, Dkt. No. 2, ¶ 82(b) (claiming NRIA "did not receive value" for the payments it made to Javier Torres), *with* TRO Hr'g Tr. at 10:11–15 (acknowledging that Javier Torres, through his company, was "a middleman.  And so [he] w[as] negotiating all of these placements and the scripts were flowing through [him].  And so [he] w[as] significantly involved in the entire advertising and marketing campaign that was ongoing at NRIA that resulted in over 2,000 investors investing over $600 million with NRIA[]"); *compare also, e.g.*, Mot. TRO, Dkt. No. 2, ¶ 110–111 (acknowledging, and attempting to circumvent, the notion that harm redressable with money damages cannot constitute "irreparable harm"), *with* TRO Hr'g Tr. at 17:9–10 (claiming that Plaintiff's harm is not limited to money, stating, "It is not just damages that are [at] issue here.  There's equitable relief sought.").

[5] TRO Order (Nov. 22, 2023), Dkt. No. 9.

[6] TRO Hr'g Tr. at 25:21–22.

the Trustee with "talk[ing] to [Javier Torres' counsel] and submit[ting] an order, and then contact[ing] chambers for a date for the evidentiary [hearing]."[7]

The Trustee has followed none of this Court's instructions.  Using the TRO as both a sword and a shield, the Trustee continues to hang the TRO over Defendants' heads, while simultaneously refusing to cooperate with counsel for Defendants to set a date for the evidentiary hearing and refusing to sit for a deposition.  Exemplified by the falsities and unsubstantiated legal propositions advanced in the "emergency motion," the Trustee's litigation tactics are meant only to torment Javier and his family.  And now, to further that objective, the Trustee is weaponizing the TRO.

Unfortunately for the Trustee, the TRO is no longer enforceable.  Well-settled law makes clear that temporary restraining orders expire, by operation of law, within 14 days of their issuance, regardless of any text in the order that says otherwise.  Absent an agreement between the parties, a temporary restraining order can exist for a maximum of only 28 days.  The November 22, 2023, TRO expired on December 6, 2023.  And even if it was properly extended—it was not—the TRO would have expired on December 20, 2023, at the latest.  Either way, the TRO expired one month ago, so it is no longer enforceable.

In addition to being expired, the TRO is void for failing to require a bond or other security. While the Federal Rules of Bankruptcy Procedure permit the court to exercise discretion in requiring the bond for injunctive relief, the rule was not intended as a catch-all workaround for the bond requirement.  Instead, the relevant Bankruptcy Rule was codified only after courts began noting that an across-the-board bond requirement is unworkable in the bankruptcy context, as bankruptcy involves adversarial proceedings, like this one (where a bond should be required) and non-adversarial proceedings, like reorganization proceedings (where a bond should not be

---

[7] *Id.* at 26:2–3.

required).  The TRO here was not issued as part of—or to further the Court's management of—reorganization proceedings.  Instead, it was requested in a traditional adversarial proceeding that is subject to the bond requirement.  Because the TRO was unsecured by any bond or other security—and the Trustee fails to develop its supposed entitlement to this Court's exercise of discretion in the Trustee's favor—the TRO is void and unenforceable.  This Court should declare as much.

In addition to being expired and void, the TRO is also unenforceable and should be deemed dissolved because it is unsupported by anything in the record.  Not only did the Trustee fail to establish the irreparable harm required to justify an asset-freezing TRO like the one issued here, but the Trustee also failed to establish a likelihood of success on the merits of any of its nine claims.

At bottom, the Trustee's lawsuit and emergency ask this Court to enjoin and punish Javier[8] (and the Torres Family as a whole) for working hard.  The Trustee goes to great lengths in its submissions to emphasize that Javier's business, Media Effective, is a "one-man shop" that operates from Javier's house, as if owning a solo shop—and landing a client who pays millions of dollars for advertising—is somehow criminal or suspicious. By painting Javier and Media as parties with knowledge of the Debtors' bad acts, both by conclusion and innuendo, the Trustee chooses to sully and blacken Javier's reputation, rather than allege facts supporting his specious claims.  Indeed, the record for the TRO consists solely of the Trustee's allegations in his Complaint, most of which violate Bankruptcy Rule 9011.  If the Trustee is correct, then the masterminds behind successful companies like Facebook and Bumble would have also, at their

---

[8] Given the numerous individuals in this case who share the "Torres" surname, this Motion references the Torres family members by their first names to ensure clarity.

companies' inceptions, been engaged in illicit schemes that should have hailed them and their families into Court.

But, of course, the Trustee's position in this regard is neither accurate nor practical. As this Court said best, from Javier's perspective, he got lucky with a good client, performed good work, and got paid for the work he performed.[9] Indeed, it was more than luck. Javier took NRIA from advertising on one local radio station in 2012 to advertising nationally on multiple radio and television stations in 2022. Javier and Media conducted over ten (10) years of effective negotiations with television and radio stations on NRIA's behalf. In short, NRIA would never have been as successful as it was without the efforts of Javier and NRIA.

If NRIA was committing any crimes, Javier had no reason whatsoever to know about it, and neither the Complaint nor the emergency motion allege otherwise. Notably, although the government charged the principals of NRIA for the alleged Ponzi scheme, the government has not transmitted any target letters to Javier nor subjected him or his family to any questioning regarding the purported scheme. The only facts that the Trustee alleges to "demonstrate" that Javier aided or abetted in the Ponzi scheme are that the scheme could not have been accomplished without Javier and that Javier was somehow involved in content. Neither of these allegations is true.

Nonetheless, the Trustee has alleged in the publicly filed Complaint that Javier and Media were intricately involved in the alleged Ponzi Scheme alongside the Debtors' principals. These false public allegations have impacted Javier's ability to conduct business and make a living for himself and his family and prevented Javier from moving to the next phase of his life and from moving projects with which he is involved.

---

[9] *See* TRO Hr'g at 12:23–13:3 ("Maybe [Javier] is just saying that you know, I'm in the advertising business and got a good client, and I placed ads on billboards and on the radio and on TV, and I signed a celebrity spokesperson. And you know, I got paid for that.").

4875-2748-5592 v6

The Trustee has made clear that he has no intention of working with Javier's counsel to schedule the evidentiary hearing required to develop a record.  Instead, the Trustee intends to drag Javier and Media's names through the mud as a form vigilante justice for some perceived wrong, while relying on knowingly baseless allegations to do so.

Absent this Court's declaration that the TRO is no longer in effect, the Trustee will continue to abuse the TRO and avoid scheduling a date for the evidentiary hearing, likely because the evidence Defendants will present will expose the weakness and speciousness of the Trustee's claims.  Further, the Trustee will continue to use the TRO and the allegations contained in the Complaint to blacken Javier and Media's reputation.  This is not the proper purpose for a temporary restraining order.

Finally, the entire effort to connect the TRO to an "accounting" required by all Defendants, many of whom, like Javier's children, did no business with NRIA or any of the Debtors, is a step too far. An "accounting" is a reconciliation of an open account. Only Javier and Media did business with NRIA, they are the only Defendants who can provide any accounting.

Therefore, Defendants respectfully request that this Court should confirm what has already been accomplished by operation of law and declare that the TRO is dissolved.

## II.    <u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) as this matter arises in, under, and is related to a bankruptcy case.

2.    The instant matter is "related to" the Debtors' bankruptcies since the adjudication will have a material effect on the Debtors' choices in the case and the administration of their case.

3.    The instant this adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4875-2748-5592 v6

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory and legal bases for the relief requested in this Motion are section 105(a) of the Federal Bankruptcy Code (the "Bankruptcy Code"); Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7001 and 7065; Federal Rules of Civil Procedure (the "Federal Rules") 65(b)(4), (c), and (d); and applicable state law.

## III.  BACKGROUND

### A.      Javier Torres and Media Effective

6.      Javier Torres[10] is a self-starter and entrepreneur with a passion for marketing.

7.      After studying the topic at the University Jorge Tadeo Lozano in Bogota, Colombia, from 1981 to 1985, Javier went to the University of California Los Angeles, where he continued his marketing education, specializing in marketing in the United States and to Hispanics in the United States.

8.      During his time at UCLA and for the next 17 years, Javier occupied many marketing roles at various companies.

9.      Eventually, when he felt he had mastered his trade, Javier founded Media Effective LLC ("Media"), a marketing agency that assists clients with coordinating and integrating television, radio, and digital marketing campaigns.  *See* Compl., Dkt. No. 1, ¶ 54.

10.     Javier is Media's Founder and Director.  *See id.* ¶ 55.

11.     Javier's children, Natalia Torres, Paulina Torres, and Javier Torres, Jr., are each minority members of Media, having been gifted said interest by Javier.

12.     Javier operates Media from his home in New Jersey.

---

[10] Given the numerous individuals in this case who share the "Torres" surname, this Motion references the Torres family members by their first names to ensure clarity.

13. Javier has no education or experience in financial analytics or related subject matter.

**B.** **Media performs significant work for NRIA and is paid well for doing so**

14. Around 2012, Javier and Media landed National Realty Investment Advisors, LLC ("NRIA") as a client when NRIA asked Media to be NRIA's exclusive marketing agent.

15. Throughout their relationship, Javier, through Media, provided numerous services to NRIA by acting as media agent for the placement of advertising on radio and television.

16. The Trustee's papers are internally inconsistent about whether Javier and Media performed work for NRIA. In some places, the Trustee claims that Javier and Media did not provide NRIA any value, "let alone reasonably equivalent value." Mot. TRO, Dkt. No. 2, ¶ 108(b). In other places, the Trustee acknowledges the substantial work Javier and Media provided to NRIA.

17. For example, in its court submissions, the Trustee acknowledges at least three types of services Javier and Media provided to NRIA:

    a. "NIRA, aided by Defendants Media Effective and Javier Torres, advertised heavily to solicit investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio, YouTube, and television advertisements. For example, billboards in high traffic areas in New Jersey lured investors into the scheme by promising 12% returns and the opportunity of obtaining up to 21%." Mot. TRO, Dkt. No. 2, ¶ 37.

    b. "NRIA, with the assistance of Defendants Media Effective and Javier Torres, also advertised the investment opportunities on Indian television networks and elsewhere including in an Indian newspaper and opened three offices in India. NRIA raised millions of dollars from investors through this scheme, with Media Effective's and Javier Torres's material assistance." *Id.* ¶ 38.

    c. "Javier . . . even sent NRIA advertising 'scripts' as intermediary between NRIA and advertisers[.]" Id. ¶ 46; *see also id.* ¶ 47 (providing an example of the product Javier transmitted to NRIA).

8

18.     Notably absent from any of the Trustee's filings are any factual allegations that Javier knew of the intentions of the principals of NRIA or any of the Debtors; the *sine qua non* of any claim of aiding and abetting.

**C.     NRIA files for bankruptcy, and Javier hires counsel, who fails to represent him adequately**

19.     On June 7, 2022, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  *See* Mot. TRO, Dkt. No. 2, ¶ 7.

20.     Consistent with Bankruptcy Rule 2004, the Committee and, later, the Trustee began conducting discovery of various third parties, including third-party financial institutions.  *See* Compl., Dkt. No. 1, ¶ 69.

21.     On January 20, 2023, the Committee issued one Bankruptcy Rule 2004 Subpoena to Media and one to Javier.  *See id.* ¶¶ 70–71.

22.     In an effort to paint Javier as evasive and non-compliant and the Trustee's counsel as sacrosanct, the Trustee claims that "[i]n the ensuing months, counsel to the Committee and then for the Trustee worked with [former] counsel for Media . . . and Javier . . . to obtain responses to those Subpoenas[,] . . . but received delayed responses and were, at times, outright ignored in attempting to receive a date certain that documents would be turned over."  *Id.* ¶¶ 72–73.

23.     In doing so, the Trustee improperly attempts to impute the laziness and actions of Javier's former counsel onto Javier.

24.     But in reality, it was Javier's former counsel, and his former counsel alone, who failed to respond to the subpoenas in a timely manner.

25.     Once Javier realized the issues with the subpoenas, he retained competent counsel and began collecting responsive documents on behalf of himself and Media.

9

**D.    The Trustee moves this Court for a preliminary injunction with temporary restraints, asking the Court to freeze the assets of Media, Javier, <u>and many of Javier's family members</u>**

26.     On Friday, November 10, 2023, the Trustee filed an emergency motion with this Court, requesting injunctive relief that would freeze the assets of Media, Javier, and many of Javier's family members.  *See* Dkt. 2.

27.     The principal motivator for the emergency motion, the Trustee contended, was that, around October 10, 2023, "the Trustee . . . discovered that in or about July 2023, [Javier] withdrew $1,000,000 from his Charles Schwab account."  Mot. TRO, Dkt. 2, ¶ 75.

28.     In reality, the funds were never withdrawn from Charles Schwab, they were simply moved from one type of investing account to another.

29.     Notably, neither the emergency motion nor the Complaint mentions that Javier or Media withdrew money from their accounts after July of 2023.

30.     This transfer, coupled with Javier's "pattern of transferring funds to family members, such as Natalia . . . , Paulina . . . , and Fabio[,]" caused the Trustee to "believe[] that absent the relief requested herein, there is a high likelihood that Media Effective, Javier Torres, and the other Defendants (including Javier Torres' close family members) will continue to move and/or conceal assets, thereby frustrating efforts to track down and recover fraudulently obtained property and funds."  *Id.* ¶ 117.

**E.    The Court holds a hearing on the Trustee's injunction request, and the parties <u>agree to a time-limited interim order</u>**

31.     On Monday, November 13, 2023, this Court entered an order scheduling a hearing for the following morning.  *See* Dkt. No. 4.

32.     Among others, current counsel for Javier and counsel for the Trustee attended the hearing.

33.    At the outset, the Court noted, "So there's not a whole lot of meat on the bones here yet.  But it looks like Media Effective and maybe [Javier] received some funds, substantial funds from the Debtor, [NRIA]."  TRO Hr'g Tr. at 6:20–23.

34.    In any event, the Court permitted counsel for the Trustee to present her arguments. While doing so, the Trustee's counsel again undermined the allegation that Media provided no value to NRIA, stating, "[Media] was a middleman.  And so [it] w[as] negotiating all of these placements and the scripts were flowing through [it].  And so [Media] w[as] significantly involved in the entire advertising and marketing campaign that was ongoing at NRIA . . . ."  TRO Hr'g Tr. at 10:10–15 (cleaned up).

35.    During the argument, Javier's undersigned counsel argued strenuously that the papers failed to meet the Trustee's burden as the allegations were simply conclusions unsupported by facts and served only to damage the reputations of both Javier and Media.

36.    At some point in the argument, the Court pressed the Trustee's counsel about the absence of any allegation regarding a meaningful, beyond-business relationship between Javier and the principals of NRIA, stating, "Well what's that relationship like?  Was it – I mean I don't know what Mr. Torres is going to say.  Maybe he's just saying that you know, I'm in the advertising business and I got a good client, and I placed ads on billboards and on the radio and on TV, and I signed celebrity spokesmen.  And you know, I got paid for that."  *Id.* at 12:23–13:3.

37.    Shortly after, the Court stated it did not want to decide the injunction on the merits "without giving both sides an opportunity to argue it fully," *id.* at 15:23–25, at which point counsel for Javier offered a solution that highlights Javier's willingness—and eagerness—to cooperate:

> Your Honor, I could offer this, that if you set a hearing date reasonably short, I can get my client to agree not to move those monies voluntarily, and not pursuant to some kind of directed [sic],

> but we'll agree not to move the money pending a hearing on – where
> we can actually have witnesses come in and have testimony on this.

*Id.* at 16:1–6.

38.     The Court decided to pursue the solution Javier's counsel offered and issue an

interim order, or temporary restraining order, conditioned on the notion that the evidentiary hearing

would be held as quickly as possible:

> All right.  What I'd like to do simply is schedule a hearing.  And I
> need to know how much time you guys need, and I would enter a
> temporary restraining order for a short period of time enjoining you
> know, the subsequent – these alleged subsequent transferees from
> transferring property, except in the ordinary course.  I mean if, you
> know, if one of the Torres children has to pay their bills, then they
> have to pay their bills.  And I'm not going to enjoin any of that.
>
> But I think I'm more comfortable doing it if we get the[re] quickly.
> But this hearing could be a full day hearing, and we have to give you
> a full day in the near future.  And you're going to have to call
> Alvarez.  And I want [current counsel for Defendants] to be here on
> behalf of the Torres – Mr. Torres. . . .

*Id.* at 21:9–23.

39.     The Court noted that it would enter the proposed order the Trustee filed along with

its injunction request, with minor edits, but made clear that the decision to issue the temporary

order was not predicated on the merits of the Trustee's submission but, rather, on the fact that an

evidentiary hearing would be completed "before the Christmas/New Year break."  *Id.* at 25:4–8,

25:21–22.

40.     The Court then instructed counsel for the Trustee to speak with counsel for Javier

to agree on a date for the evidentiary hearing.  *See id.* at 25:24–26:3.

41.     The Court entered the temporary restraining order on November 22, 2023 (the

"TRO").  *See* Dkt. No. 9.

42.    While the Court went with the suggestion of Defendants' counsel, it included significantly more restraints in the TRO than Defendants' counsel suggested and would have ever agreed to.

43.    The TRO prohibited numerous people and entities, including Media, Javier, Natalia, Paulina, and Javier's wife, Dora, from "selling, assigning, transferring, encumbering, or otherwise disposing of the [the delineated] funds." *Id.* ¶¶ 3(a)–(e).

**F.    Javier, Media, and the Torres Family submit to the Trustee all requested documents and an accounting, but the Trustee refuses to coordinate <u>a date for the evidentiary hearing and refuses to be deposed</u>**

44.    On December 1, 2023, and December 6, 2023, Javier and Media provided the Trustee with a full accounting of every dollar spent on advertising with Javier and Media. *See* **Exhibits "A"** and **"B"** to Certification of Edmond George.

45.    Among other things, the Trustee's counsel was provided with canceled checks and invoices for all advertisements that Javier or Media placed since 2016, and subsequently, how that money was spent. *See Id.*

46.    Additionally, Media supplied the Trustee with an accounting of the money the Trustee alleges was paid to Media but not used to pay for advertising.

47.    When counsel for Javier and Media served the production, he asked the Trustee's counsel to advise him of any problems.

48.    The Trustee never raised any problems with the production or otherwise responded.

49.    Since the Court issued the TRO, and despite this Court's explicit instruction that counsel for the Trustee cooperate with Javier's counsel to schedule an evidentiary hearing immediately, the Trustee's counsel has refused to do so.

50.    Further, the Trustee refuses to be deposed in this case.

13

51.     In light of all of the above, it is clear that the Trustee is abusing the now-expired TRO; and as such, the Defendants now seek to have the TRO formally dissolved.

## IV.    **ARGUMENT**

52.     In claiming the TRO remains enforceable, the Trustee is attempting to force Javier—and his entire family—to live in the balance while the Trustee refuses to reciprocally engage in discovery and to agree to a date for an evidentiary hearing on his request for an injunction.

53.     Media, Javier, and the Torres Family need this Court's assistance to halt the Trustee's abuse and confirm to the Trustee what already has occurred by operation of law:  the TRO is dissolved and no longer legally enforceable.

54.     To this end, this Court should declare, for the parties and the record, that the TRO already dissolved and is no longer legally enforceable for three (3) reasons.

55.     First, the TRO expired by operation of law 14 days after its issuance, namely, on December 6, 2023.

56.     Second, the TRO was never perfected because a bond was neither required nor posted, even though the Trustee did nothing to demonstrate that this Court's exercise of its discretion to waive the bond requirement in certain bankruptcy proceedings was warranted in these circumstances.

57.     Third, the TRO was not granted as a matter of merit but, rather, based on the suggestion of Defendants' counsel; however, it included significantly more restraints in the TRO than Defendants' counsel suggested and would have ever agreed to.

58.     Had the Court been required to analyze the substance of the Trustee's request for a temporary restraining order and preliminary injunction, the Court would have been constrained to

deny it, as the Trustee failed to establish—by clear and convincing evidence or otherwise—the Trustee's entitlement to injunctive relief.

**A.      The TRO dissolved by operation of law and is unenforceable because it expired in December of 2023.**

59.      This Court should declare that the TRO issued on November 22, 2023, dissolved and legally unenforceable because, first, the TRO expired on December 6, 2023—14 days after it was issued—by operation of law and, second, the TRO was issued based on a time-limited agreement between the parties that also expired.

**i.      The TRO expired by operation of law on December 6, 2023.**

60.      Federal Rule of Civil Procedure 65 authorizes courts to issue temporary restraining orders. *See* Fed. R. Civ. P. 65(b).

61.      By operation of law, a temporary restraining order expires no later than fourteen (14) days after its issuance unless (1) the court extends it for good cause or (2) the adverse party consents to a longer extension. *See* Fed. R. Civ. P. 65(b)(2); *see also Globus Med., Inc. v. Vortex Spine, LLC*, 605 Fed. App'x 126, 128–29 (3d Cir. 2015) ("This order therefore would expire after fourteen days if it was a temporary restraining order unless the district court for good cause extended it for a like period and entered the reasons for the extension in the record.").

62.      If a court decides to extend a temporary restraining order, it must enter the reasons for the extension in the record. *See Globus Med., Inc.*, 605 Fed. App'x at 128–29.

63.      Bankruptcy courts, too, are empowered to issue temporary restraining orders. *See* 11 U.S.C. § 105(a).

64.     Temporary restraining orders issued in the bankruptcy context must adhere to the strictures outlined in Rule 65.  *See* Fed. R. Bankr. P. 7065 (noting that "Rule 65 F.R.Civ.P. applies in adversary proceedings[]").[11]

65.     This Court entered the TRO on November 22, 2023.  *See* Dkt. No. 9.

66.     By operation of Rule 65, the TRO expired 14 days after its issuance—namely, on December 6, 2023—unless the Court extended it for good cause or Defendants agreed to an extension.

67.     This Court did not extend the TRO for any reason, and Defendants never agreed to an extension, nor were they asked to do so.

68.     Under Rule 65, the TRO issued on November 22, 2023, expired by operation of law on December 6, 2023.

69.     As the TRO expired over one (1) month ago, this Court should declare the TRO is dissolved and unenforceable.

### ii.     At the latest, the TRO expired at the end of December 2023, given the parties' time-limited agreement.

70.     The Court should also declare the TRO dissolved and unenforceable because, at the latest, it expired at the end of December 2023, consistent with the parties' time-limited agreement.

71.     The hearing transcript makes clear that the Court's issuance of the TRO—and counsel for Defendants' agreement to the interim order—was predicated on the notion that an evidentiary hearing on the merits of the injunction request would be completed "quickly."  TRO Hr'g Tr. at 25:21–22, 16:1–6 ("*[I]f you set a hearing date reasonably short,* I can get my client to agree not to move those monies voluntarily . . . ." (emphasis added)).

---

[11] There is one exception to this general rule.  But, as discussed below, that exception does not apply in the present case.

72.     "Quickly," in both the Court's view and counsel for Defendants' view, was no later than the Christmas/New Year break.  *See* TRO Hr'g Tr. at 25:21–22 ("We'll get it done before the Christmas/New Year break.  That's for sure.").

73.     Based on the Court's comments and those of Javier's counsel, the TRO was intended to be an interim order that lasted only until the injunction hearing, which should have been held in December.

74.     In an effort to extend the TRO's length, the Trustee has refused to agree to a date for an evidentiary hearing.

75.     But the transcript makes clear that the TRO was issued based on a material condition:  the injunction hearing would be held in December.

76.     As it is now January and the Trustee still refuses to cooperate in scheduling an evidentiary hearing, the TRO expired and is unenforceable.

**B.     Because the TRO was not sought as a means of preserving this Court's subject-matter jurisdiction, it should have been secured by a bond.  Because it was not, <u>the TRO was unenforceable at its inception.</u>**

77.     Because the TRO was not secured as a means of preserving the Court's subject-matter jurisdiction, the TRO should have been secured by a bond.  As it was not, the TRO was unenforceable at its inception.  This Court should declare as much.

78.     In addition to setting forth the maximum duration of a temporary restraining order, Rule 65 requires that such orders be accompanied by "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

4875-2748-5592 v6

79.    A bond is, in effect, "the moving party's warranty that the law will uphold the issuance of the injunction." *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring).

80.    The Third Circuit interprets the bond requirement strictly. *See Scanvec Amiable Ltd. V. Jim Chang*, 80 Fed. App'x 171, 175 (3d Cir. 2003) ("We have strictly interpreted the bond requirement of Rule 65(c), noting that '[w]hile there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.'" (quoting *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 110 (3d Cir. 1988))).

81.    Absent extraordinary circumstances, an unsecured temporary restraining order is void at its inception.

82.    Historically, temporary restraining orders issued in the bankruptcy context were bound by Rule 65's bond requirement, but bankruptcy courts took issue with the requirement in certain contexts, reasoning that "Rule 65 contemplates ordinary civil litigation and adversary proceedings, which contemplation is not consistent with corporate reorganization proceedings." *Magidson v. Duggan*, 180 F.2d 473, 479 (8th Cir. 1950) ("The temporary and permanent injunctions issued by the trial court in the instance case were to aid and preserve the court's jurisdiction over the subject matter involved and as such were not limited by Rule 65(c).").

83.    Based on this proceeding-based rationale, and despite Rule 65's mandatory language, courts began excusing the bond requirement in bankruptcy proceedings where the injunction was issued to "prevent the impairment of the court's jurisdiction." *E.g.*, *In re J. S. Gissel & Co.*, 238 F. Supp. 130, 134 (S.D. Tex. 1965).

84.    The courts' rationale was later codified in Bankruptcy Rule 7065, which carves a narrow exception to the general rule outlined in Rule 65 and endows bankruptcy courts with the

discretion to issue a temporary restraining order without requiring the moving party to post a bond or other security. *See* Fed. R. Bankr. P. 7065.

85.     The Trustee should not have been permitted to benefit from the limited exception outlined in Rule 7065 for two reasons.

86.     First, the Trustee did not seek a TRO to "prevent the impairment of the court's jurisdiction."

87.     Nor did the TRO have any such effect.

88.     Instead, the Trustee sought the TRO to embarrass, harass, and torment Javier, Media, and the Torres Family by prohibiting them from disposing of the property they worked diligently to obtain.

89.     Second, the Trustee failed to explain why the Court should exercise its discretion under Rule 7065 to waive the posting of a bond or other security in support of the TRO. *See* Mot. TRO, Dkt. No. 2, ¶ 128.

90.     Beyond reciting the text of Bankruptcy Rule 7065, the Trustee neglected to present any advocacy, much less developed advocacy, to support the Trustee's request that this Court waive the bond requirement. *See id.*

91.     Indeed, the Trustee's entire argument in this regard is limited to two statements: (1) "Accordingly, the Trustee respectfully submits that the Court should exercise its discretion under Bankruptcy Rule 7065 and not require a bond or other security[;]" and (2) "Should bond be ordered, Liquidation Trustee respectfully requests a nominal bond." *Id.* ¶¶ 128–29.

92.     In short, the Trustee has done nothing to explain why this Court should exercise its discretion in the Trustee's favor with regard to the bond requirement.

4875-2748-5592 v6

93.     Thus, this Court should "consider [the Trustee's] failure to acknowledge this point as another factor weighing against the [continuance] of an injunction . . . ." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 784 (D.N.J. 2013).

94.     Because the TRO is unsecured when a bond or other security should have secured it, the Court should declare that the TRO is dissolved and unenforceable.

**C.     Aside from being declared dissolved because it was expired and was never perfected, the Court should dissolve the TRO because the Trustee failed to <u>establish entitlement to injunctive relief by clear and convincing evidence.</u>**

95.     In addition to declaring the TRO dissolved and unenforceable because it expired over one month ago and should have been, but was not, secured by a bond or other security, this Court should declare the TRO dissolved because the Trustee failed to carry its burden of establishing an entitlement to such an order by clear and convincing evidence for two (2) reasons: (1) the relief the Trustee seeks is inherently monetary, which belies a claim of irreparable harm; and (2) the Trustee is not likely to succeed on the merits.

96.     For the same reasons, the Trustee cannot establish entitlement to a preliminary injunction, even after an evidentiary hearing.

97.     As this Court knows, "the grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) (citing *Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988)).

98.     The imposition of a temporary restraining order is permitted only where the moving party makes a "clear and specific showing by affidavit, other document complying with 28 U.S.C. § 1746 or verified pleading of good and sufficient reasons why a procedure other than by notice of motion is necessary." L. Civ. R. 65.1(a).

99.    Parties seeking a temporary restraining order or preliminary injunction bear a significant burden of establishing four (4) factors by clear and convincing evidence:  (1) a likelihood of success on the merits; (2) that immediate and irreparable injury will result without the issuance of an injunction; (3) the balance of harm to the moving party relative to the nonmoving party favors the moving party; and, (4) the public interest will be served by the injunction's issuance.  *See NutraSweet Co. v. Vit-Mar Enters, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)).

100.    All four (4) factors must be met, or else the issuance of a temporary restraining order or injunction is improper.  *See id.*  (noting that a movant's "failure to establish any element in its favor renders [this remedy] inappropriate").

101.    When this Court issued the TRO, it did not do so based on the injunctive request's merits but, rather, on the time-limited agreement between the parties.  *See* discussion *supra* pp. 10–11.

102.    Had the Court been required to analyze the emergency motion's substance, the Court would have been constrained to deny injunctive relief because the Trustee failed to establish, by clear and convincing evidence or otherwise, that (1) the Trust would suffer irreparable harm absent the requested relief, and (2) the Trustee had a likelihood of success on the merits of his claims.

103.    Nothing has changed to improve the Trustee's position in this case.

104.    Accordingly, if the Court concludes the TRO was perfected and did not expire, the Court should dissolve the TRO for the same reasons the TRO was meritless in the first instance.

4875-2748-5592 v6

     **i.**      **The Trustee failed to establish the specific irreparable harm required to justify a freeze-assets injunction.**

105.    The Trustee failed to establish that it would suffer immediate irreparable harm absent a temporary restraining order.

106.    As noted, a party seeking a temporary restraining order or preliminary injunction has the burden of demonstrating a "clear showing of immediate irreparable injury."  *Louis v. Bledsoe*, 438 F. App'x 129, 130 (3d Cir. 2011) (citing *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

107.    "Establishing a risk of irreparable harm is not enough."  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

108.    While harms redressable by money damages usually are not considered "irreparable," the Third Circuit recognized in *Hoxworth v. Binder, Robinson & Company* that courts, in limited instances, have the equitable authority to protect a future damages remedy by imposing an injunction to freeze assets.  *See* 903 F.2d 186, 205–06 (3d Cir. 1990).

109.    But the irreparable harm showing required to secure this type of injunction is substantial:  the moving party must establish that it is "likely to become entitled to the encumbered funds upon final judgment and . . . that without the preliminary injunction, [the moving party] will probably be unable to recover those funds."  *Juuls Labs, Inc. v. 4x Pods.*, 439 F. Supp. 3d 341, 358 (D.N.J. 2020) (quoting *Hoxworth*, 903 F.2d at 197).

110.    The Trustee has done nothing to meet *Hoxworth*'s irreparable harm standard for an asset freezing injunction.

111.    First, the Trustee fails to demonstrate, with concrete evidence, that he is likely "to become entitled to the encumbered funds upon final judgment."

112.    The entirety of the Trustee's argument on this point is limited to speculation and suspicion, unsupported by any factual material in the record.

113.    Second, the Trustee fails to present a plausible position—let alone one with evidentiary support—that, absent the injunction, he will "probably be unable to recover [the encumbered] funds."

114.    The Trustee's entire argument regarding inability to recover is limited almost exclusively to one instance that, according to the Trustee, is "[o]f particular concern for the Trustee and emphasiz[es] the necessity of the *emergency relief* requested" by the Trustee:  the Trustee "recently discovered" (in October of 2023) that Javier withdrew $1,000,000 from his personal Charles Schwab account in July of 2023.  *See* Mot. TRO, Dkt. No. 2, ¶ 75 (emphasis in original).

115.    Aside from disingenuously arguing that Javier never disclosed the existence of the Charles Schwab account in discovery to support the fallacious premise that the transfer is proof that Javier and his entire family will dissipate the money to which the Trustee might at some point become entitled, the Trustee does not allege that Javier made any withdrawals from that account *after* July of 2023, even though the account, according to the Trustee, held more than at least $2.2 million.  *See id.* ¶ 66.

116.    Instead, the Trustee "believes" that the probability of inability to recover after final judgment is substantial because, in addition to this transaction, Javier—a husband and father—made numerous deposits from Media into the accounts of his wife and children over between three and seven years ago.

117.    More specifically, the Trustee claims that based on these transactions—one isolated incident from July of 2023 and transactions that occurred over between three and seven years ago—he "believes that, absent the relief requested herein, there is a high likelihood that Media

Effective, Javier Torres, and the other Defendants (including Javier Torres' close family members) will continue to move and/or conceal assets, thereby frustrating efforts to track down and recover fraudulently obtained property and funds." *Id.* ¶ 117.

118.    The Trustee's fear and apprehension that Javier Torres *might* move money—based on events that took place as long ago as February of 2017 and one isolated incident that occurred in July of 2023—does not constitute "irreparable harm" under *Hoxworth*. Nor do they support the issuance of an injunction. *See Campbell Soup Co. v. ConAgra*, 977 F.2d 86, 92 (3d Cir. 1992) (quotation marks and citations omitted) ("[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.").

119.    As the Trustee's allegations of irreparable harm are limited to unsubstantiated speculation and fear of harm, the Trustee failed to make the requisite showing of irreparable harm for purposes of an asset freezing injunction.

120.    For that reason alone, the TRO should be dissolved, and the preliminary injunction should be denied.

**ii.        The Trustee failed to demonstrate a likelihood of success on the merits.**

121.    Although the Trustee addresses only the likelihood of its claims for actual and constructive fraudulent conveyance, *see* Mot. TRO, Dkt. No. 2, ¶ 103–109, the Complaint advances nine claims against either Javier and Media, or Javier and his family members: (1) actual fraudulent transfers (violation of 11 U.S.C. §§ 544, 548, 550, 551 and N.J.S.A. § 25:2-25(a)(1)); (2) constructive fraudulent transfers (violation of 11 U.S.C. §§ 544, 548 and N.J.S.A. § 25:2-25(a)(2) and 25:2-7(a)); (3) aiding and abetting securities fraud under N.J.S.A. § 49:3-52 and 49:3-71; (4) fraud; (5) aiding and abetting in fraud; (6) unjust enrichment; (7) injunctive relief; (8) constructive trust; and (9) accounting.

122.     The Trustee is not likely to succeed on the merits of any of his claims against Javier,

Media, or the Torres Family.

> **a.     Based on the evidence so far of record, the Trustee is not likely
> to succeed on the merits of his claims for fraudulent conveyance
> (Counts I and II).**

123.     From the cessation of the Debtors' businesses until the filing of the instant lawsuit,

neither Javier nor Media moved money, secreted money, created new accounts to secrete the

money paid to them, or otherwise did a single thing to move or secrete money.

124.     The Trustee's claims are garden variety fraudulent conveyance claims for which

there is not a single fact supporting the claim of illegality or of a "sham" by which money was

funneled to or for the benefit of insiders.

125.     To succeed on a claim for fraudulent conveyance, a party must show: (1) the debtor

had interest in the property; (2) the transfer of that interest occurred within one year of bankruptcy

filing; (3) the debtor was insolvent at time of transfer or became insolvent as result of transfer;

and (4) transfer resulted in no value for debtor or value received was not reasonably equivalent to

value of relinquished property interest. *See,* 11 U.S.C. §§ 548; *In re Fruehauf Trailer Corp.*, 444

F.3d 203, 210–11 (3d Cir. 2006); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994).

126.     The party bringing the fraudulent conveyance action bears the burden of proving

each of these four (4) elements by a preponderance of the evidence. *See id.; see also Mellon Bank,*

*N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 144 (3d

Cir.1996).

127.     Here, the Trustee has not and cannot prove any of these four (4) elements, much

less can he do so by a preponderance of the evidence.

128.     The Trustee's claims for fraudulent conveyance are baseless and unsupported even by a liberal reading of the Complaint.

129.     Specifically, the Trustee cannot show that NRIA had any interest in the transferred money.

130.     All that has been alleged in the Complaint, aside from argument or surplusage, is that Javier and then Media received money for advertising, which Javier placed as a third-party media vendor, and had nothing to do with NRIA's operations.

131.     Not a single dollar received by Javier or Media ended up in the hands of NRIA's principals.

132.     Further, even if NRIA has an interest in the money, NRIA received more than reasonable value for the claimed exchange.

133.     Indeed, from the efforts of Javier, Media, and other third-party advertisers, hundreds of millions of dollars were invested in NRIA, far in excess of the expenditures made by NRIA to Javier or Media.

134.     While the Trustee claims NRIA received no value whatsoever from Media, "let alone reasonably equivalent value," for the money it paid Media, at oral argument, counsel for the Trustee acknowledged that Javier performed extensive work for NRIA, describing him as "a middleman.  And so [he] w[as] negotiating all of these placements and the scripts were flowing through [him].  And so [he] w[as] significantly involved in the entire advertising and marketing campaign that was ongoing at NRIA that resulted in over 2,000 investors investing over $600 million with NRIA."  *See* Mot. TRO, Dkt. No. 2, ¶ 108(b); *see also* TRO Hr'g Tr. at 10:11–15.

135.     It is incredulous for the Trustee to assert NRIA received no value when he admits Javier and Media performed extensive work for NRIA.

136.     Though the Trustee has been provided a full accounting for every dollar spent on advertising with Javier and Media, he persists in his baseless allegations—the Trustee choosing to sully and blacken Javier's reputation, rather than allege facts supporting his specious claims.

137.     The record for the TRO consists solely of the Trustee's baseless allegations in his Complaint, which allegations violate Bankruptcy Rule 9011.

138.     Again, the allegations in the Complaint were made for an improper purpose, to blacken Javier and Media's reputation and plant in the Court a notion that not enjoining them would allow a potential wrongdoer to escape a remedy by this court.

139.     There is not a single email, document, or testimony to support that NRIA had any interest in the money or that Javier knew of any illegality, played any roll, or was responsible for any aspect of NRIA or any of the Debtors' businesses.

140.     Javier acted reasonably in his dealings with NRIA, viewing and treating NRIA as an important customer and nothing more.

141.     Yes, Javier spent profits from Media but did nothing to hide anything from the Trustee or creditors.

142.     Indeed, if the Trustee's fraudulent conveyance claims carried any weight or truth, the additional $50,000,000.00 NRIA spent on advertising with third parties and through its internal media person, would also be fraudulent conveyances.

143.     As such, the Trustee cannot succeed on the merits of its fraudulent conveyance claims.

      **b.     The Trustee cannot succeed on the merits of his claim for aiding and abetting securities fraud (Count III) because the claim is time-barred.**

144.     The Trustee's claim for aiding and abetting securities fraud (Count III) is barred by the applicable statute of limitations for securities fraud, which is two (2) years.

145.     As an initial matter, although the Trustee identifies sections 49:3-52 and 49:3-71 in the caption for Count III, the allegations in this section expressly relate only to section 49:3-71. Thus, Javier will address only the merit of the claim under section 49:3–71.

146.     New Jersey law instructs that claims for securities fraud under Section 49:3-71 must be brought within "two years after the contract of sale or the rendering of the investment advice, or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later." N.J.S.A. § 49:3-71(g).

147.     The statute of limitations bars Count III because the Complaint makes clear that the complained-of conduct goes back to at least 2012. *See* Compl. ¶ 126.

148.     Thus, any securities claim against Javier, Media, or the Torres Family accrued in 2012 and expired in 2014.

149.     Put differently, any securities claim against Javier, Media, or the Torres Family is ten years too late.

150.     Because the securities claims are barred, so, too, are any claims relating to the "aiding and abetting" of those time-barred claims.

4875-2748-5592 v6

>           c.      **The Trustee is not likely to succeed on the merits of his fraud-related claims (Counts IV and V) because the Complaint is devoid of any allegation that Javier or Media knew that the advertisements were supposedly false.**

151.    The Trustee is not likely to succeed on the merits of his fraud-related claims (Counts IV and V) because the Complaint fails to allege that Javier or Media knew that NRIA's advertisements were false.

152.    To succeed on a claim for common-law fraud in New Jersey, a party must prove five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and, (5) resulting damages. *See Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015).

153.    The sole allegation regarding knowledge in the Trustee's Complaint is a legal conclusion with no factual support whatsoever: "On information and belief, Media Effective and Javier Torres made those material misrepresentations with knowledge of their falsity or with reckless disregard as to the falsity of the statements . . . ." Compl., Dkt. No. 1, ¶ 137.

154.    Query what the "information and belief" is here, as the facts the Trustee alleged on "information and belief" are not facts but merely allegations that the Trustee heard and believed.

155.    Aside from this bald legal conclusion, the Complaint does not allege—as a factual matter—that Javier knew about NRIA's purported misdeeds or that the statements he was hired to help NRIA advertise were supposedly false, much less *how* Javier could have known anything.

156.    The absence of any factual allegation to establish the connection between Javier and NRIA's purported misdeeds is exemplified by the question this Court asked at the TRO hearing:  "Well, what's that relationship [between Javier Torres, Nick Salzano, and Rey Grabato] like?" TRO Hr'g Tr. at 12:19–23.

157.    Because the Trustee did not establish with any factual allegations that Javier had knowledge or a belief about the falsity of the statements NRIA hired him to advertise, the Trustee is not likely to succeed on the merits of his claim for common-law fraud.

158.    And because the Trustee cannot establish common-law fraud based on the current record, he cannot succeed on a claim for "aiding and abetting" a nonexistent claim.

> **d.    The Trustee cannot succeed on the merits of his claim for unjust enrichment (Count VI) because Media performed the work for which it received money.**

159.    Because Javier performed the work for which he received money from NRIA, the Trustee cannot succeed on the merits of his claim for unjust enrichment (Count VI).

160.    To state a claim for unjust enrichment in New Jersey, a party must establish five elements:  (1) the defendant received a benefit; (2) at the party's expense; (iii) retention of the benefit without payment would be unjust; (iv) the party expected remuneration from the defendant at the time the party conferred a benefit on the defendant; and, (v) the failure of remuneration enriched the defendant beyond their contractual rights.  *See Slack v. Suburban Propane Partners, L.P.*, No. 10-2548, 2010 WL 5392845, at *9 (D.N.J. Dec. 22, 2010); *see also Maniscalco v. Brother Intern., Corp.*, 627 F. Supp. 2d 494, 506 (D.N.J. 2009).

161.    Even at this early stage, the record makes clear that the Trustee cannot recover on his claim for unjust enrichment because Media performed the work for which it received money from NRIA.

162.    Although the Trustee sometimes claims NRIA received no value whatsoever from Media, "let alone reasonably equivalent value," for the money it paid Media, *see* Mot. TRO, Dkt. No. 2, ¶ 108(b), the Trustee simultaneously notes that "Javier Torres . . . as an agent of Media . . .

sent NRIA advertising scripts in his capacity as an intermediary between NRIA and advertisers . . . ." Compl., Dkt. No. 1, ¶¶ 60–61.

163.    He also concedes that over $600,000,000.00 was generated by the advertising.

164.    There cannot be a lack of consideration when so much value was generated by the advertising.

165.    Any markup by Javier and Media is irrelevant; NRIA clearly received in value many, many times more than it spent on advertising.

166.    Of course, assisting customers in marketing their products is the crux of Javier's job at Media. *See id.* ¶¶ 54, 59.

167.    The Trustee wrongfully and falsely attempts to make hay of the fact that Javier and Media forwarded scripts to the media outlets.

168.    Indeed, Javier is prepared to testify that he never had any involvement in drafting or writing scripts.

169.    Even at oral argument, counsel for the Trustee acknowledged that Javier performed extensive work for NRIA, describing him as "a middleman.  And so [he] w[as] negotiating all of these placements and the scripts were flowing through [him].  And so [he] w[as] significantly involved in the entire advertising and marketing campaign that was ongoing at NRIA that resulted in over 2,000 investors investing over $600 million with NRIA."  TRO Hr'g Tr. at 10:11–15.

170.    If this is what the Trustee alleges, then he has no claims.

171.    To the extent the Trustee's unjust enrichment claim is premised on the notion that the value NRIA received from Javier and Media was not reasonably equivalent to the work they performed, the Trustee's claim is mere speculation.

172.    Indeed, throughout the emergency motion, the Trustee cursorily claims—with no proof whatsoever—that "the value of the services [Javier] allege[s] to have provided do[es] not comport with the significant amount of money paid to Media Effective, particularly between 2016 and 2022[.]" Mot. TRO, Dkt. No. 2, ¶ 48.

173.    But this bald allegation is merely the Trustee's opinion of the relative value and has no evidentiary support.

174.    Because the Trustee concedes that Javier performed work for NRIA in exchange for payment received, the Trustee's claim for unjust enrichment must fail.

175.    And even if this claim is based on the notion that the performed services' value is incongruent with the amount NRIA paid Javier and Media for their work, the claim still fails because the Trustee offers no proof whatsoever to support his opinion about the supposed incongruency.

176.    For these reasons, the Trustee is unlikely to succeed on the merits of his claim for unjust enrichment.

>    **e.    The Trustee cannot succeed on the merits of his claim for injunctive relief (Count VII) because "injunctive relief" is a remedy, not a cause of action.**

177.    The Trustee cannot succeed on the merits of his claim for injunctive relief (Count VII) because injunctive relief is a remedy rather than a separate cause of action. *See, e.g.*, *Chruby v. Kowaleski*, 534 Fed. App'x 156, 160 n.2 (3d Cir. 2013) (agreeing "that an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary." (citing *Birdman v. Office of the Governor*, 677 F.3d 167, 172 (3d Cir. 2012))); *Educ. Impact, Inc. v. Danielson*, No. 14-937, 2015 WL 381332, at *1 (D.N.J. Jan. 28, 2015) ("Count 6, injunctive relief, is dismissed because injunctive relief is not a cause of action but only a remedy.").

32

> **f.      The Trustee cannot succeed on the merits of his claim for a constructive trust (Count VIII) because "constructive trust" is a remedy, not a cause of action.**

178.    The Trustee cannot succeed on the merits of his claim for "constructive trust" (Count VIII) because a constructive trust is a remedy, rather than a separate cause of action.  *See, e.g.*, *Balanced Bridge Funding LLC v. Mitnick L. Off., LLC*, No. 21-20512, 2022 WL 3593892, at *2 (D.N.J. Aug. 23, 2022) ("It is well established that '[a] constructive trust is an equitable remedy and not an independent cause of action.'" (collecting cases)).

> **g.      The Trustee cannot succeed on the merits of his claim for an accounting (Count IX) because "accounting" is a remedy, not a cause of action.**

179.    The Trustee cannot succeed on the merits of his claim for "accounting" (Count IX) because an accounting is a remedy, rather than a separate cause of action.  *See, e.g.*, *Reyes v. Governmental Nat'l Mortg. Ass'n*, No. 2:15-cv-00064, 2015 WL 2448962, at *4 (D.N.J. May 21, 2015) ("However, an accounting is considered a remedy, not a separate cause of action." (citing *Tolia v. Dunkin Brands*, No. 11-3656, 2011 WL 6132102, at *6 n.5 (D.N.J. Oct. 7, 2011))); *Vassallo v. Bank of N.Y.*, No. 15-3227, 2016 WL 1394436, at *5 (D.N.J. Apr. 8, 2016) ("[A]n accounting is an equitable remedy." (quoting *In re U.S. Mortg. Corp.*, 492 B.R. 784, 813 (D.N.J. 2013)) (quotation marks omitted)).

180.    In sum, the Trustee cannot succeed on the merits of any of its claims against the parties he seeks to enjoin, namely, Javier, Media, and the Torres Family.

> **iii.      The Trustee failed to establish that any harms it might face absent the injunction outweigh the harms the Torres Family would face.**

181.    The balancing of hardships does not weigh in favor of allowing the TRO to remain in place or for the issuance of a preliminary injunction.

182.     As set forth in Section C.i. of this Motion, the absence of a temporary restraining order or preliminary injunction will result in no irreparable harm to the Trust because the alleged injury does not amount to the irreparable harm required to establish entitlement to the freeze-asset injunction the Trustee has requested.

183.     Importantly, the Trustee's entire injunction request stems from the Trustee's fear or apprehension that maybe Javier and the Torres Family will withdraw money from their accounts and dissipate it.

184.     As explained in Section C.i. of this Motion, the Trustee's fear is premised on two alleged "facts": (1) in July of 2023, Javier withdrew $1,000,000.00 from his personal Charles Schwab account (but, apparently according to the omissions in the Trustee's pleadings, nothing *after* that date); and, (2) between three and five years ago, Javier, through Media, gave his daughters and wife a total of roughly $288,145.00.

185.     Put differently, the "harm" the Trustee argues the Trust faces is almost—if not actually—entirely theoretical and rooted in a fear of possible loss.

186.     On the other hand, the TRO has caused—and a preliminary injunction would continue to cause—significant hardship to Javier, Media, and the Torres Family.  These hardships include, without limitation: (i) TD Bank terminating its depository relationship with Javier and Media, (ii) preventing Javier from moving to the next phase of his life and from moving projects with which he is involved, and (iii) saddling Javier with the false public allegations that he engaged, alongside the Debtors' principals, in a Ponzi scheme (which has impacted his ability to conduct business and make a living for himself and his family).

4875-2748-5592 v6

187.    Further, now that Javier and Media have fully accounted for their receipt and use of the proceeds of their contractual relationships, it is clear that the Trustee has no basis for continued restraints.

188.    The hardships that Javier and the Torres Family have endured (and will continue to endure unless this Court gets involved) far outweigh the manufactured and unsubstantiated "irreparable harm" that the Trustee alleges the Trust will suffer.

189.    Accordingly, this Court should grant Defendants' motion to declare the TRO dissolved and deny the Trustee's request for a preliminary injunction.

       **iv.**       **The Trustee failed to demonstrate that the temporary restraining order or preliminary injunction is in the public's best interest.**

190.    Neither the TRO nor a preliminary injunction is in the public's best interest.

191.    The public undoubtedly has an interest in encouraging innovation and supporting self-starters.

192.    As the Trustee's papers say repeatedly, Javier Torres *does* operate his company from his home.  He *is*, for the most part, a one-man shop.  On his own, he landed a large client—NRIA—who was willing to pay him large sums of money for quality work product.

193.    Further, over the course of their relationship, Javier and Media helped NRIA grow immensely.

194.    Imposing an injunction in these circumstances—for no reason other than because the Trustee has an unsubstantiated fear that something *might* happen to the money to which the creditors *might* be entitled in the future—will undermine the public's interest in promoting entrepreneurship and innovation.

4875-2748-5592 v6

## V.    <u>CONCLUSION</u>

195.    The Trustee is abusing the TRO, which expired one month ago, was void at its inception, and, in any event, is unsupported by the record.  Unlike the Trustee and the Trust, both of which suffer minimal harm without an injunction, Javier, Media, and the Torres Family have already suffered substantial harm as a result of the TRO and, absent this Court's involvement, will continue to suffer such harm if the Court does not apprise the Trustee that the TRO dissolved by operation of law one month ago, or else is dissolved from this point forward.

**WHEREFORE**, Defendants, Javier Torres, Media Effective, Dora Dillman, Javier Torres, Jr., Natalia Torres, and Paulina Torres respectfully ask this Court to enter an order in their favor (i) declaring that the November 22, 2023, temporary restraining order dissolved over one month ago or else is dissolved from this point forward and (ii) providing such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated: January 16, 2024         <u>*/s/ Edmond M. George*          </u>
Edmond M. George, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
1120 S NJ 73
Suite 420
Mount Laurel, NJ  08054
*Counsel to Defendants Javier Torres, Media Effective,*
*LLC, Dora Dillman, Javier Torres, Jr., Natalia Torres,*
*Paulina Torres.*