# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
ADV. PRO. NO. 23-1335 JKS
- - -

In Re:

National Realty Investment
Advisors, LLC, et al.,
    Debtors.

AIRN Liquidation Trust Co., LLC,
in capacity as Liquidation Trustee
of the AIRN Liquidation Trust,
    Plaintiff,
      v
Media Effective, LLC, et al.,
    Defendants.
- - -


    Videotaped deposition of GLENN A. La MATTINA,
taken at the law offices of Obermayer, Rebmann,
Maxwell & Hippel, 1120 Route 73, Suite 420, Mount
Laurel, New Jersey, on Friday, March 22, 2024,
commencing at 10:00 a.m., before Alan L. Lesky,
Certified Court Reporter of the State of
New Jersey, pursuant to notice.


MAGNA LEGAL SERVICES
866-624-6221



Page 2

```
 1    APPEARANCES:
 2
 3         Ice Miller, LLP
           By:  Aneca Lasley, Esquire
 4              Louis Delucia, Esquire (via conference)
                Alyson Fiedler, Esquire (via conference)
 5              Erica Arras, Esquire (via conference)
           250 West Street, Suite 700
 6         Columbus, Ohio 43215
           Aneca.lasley@icemiller.com
 7         Attorneys for the Plaintiff
 8
 9
           Obermayer, Rebmann, Maxwell & Hippel, LLP
10         By:  Edmond M. George, Esquire
           1120 Route 73, Suite 420
11         Mount Laurel, New Jersey 08054
           Edmond.george@obermayer.com
12         Attorneys for Defendants, Javier Torres,
           Media Effective, LLC, Dora Dillman, Javier
13         Torres, Jr., Natalia Torres, Paulina Torres
14
15
           Cho Legal Group
16         By:  Rachel Baxter, Esquire
           100 Plainfield Avenue, Suite 86
17         Edison, New Jersey 08817
           JAE@cholegal.com
18         Attorneys for New Jersey
           Conference of Seventh Day Adventists
19
20    Also Present:
21         Zachary Cloyd, Videographer
22
23
24
25
```



Page 3

1                    W I T N E S S    I N D E X

2

    Glenn A. La Mattina

3

         By Mr. George                              6, 166

4

         By Ms. Lasley                              153

5

6

7

                         E X H I B I T S

8

9    La Mattina 3      Post on Prime Equity         53

10   La Mattina 4      Case study                   55

11   La Mattina 5      Trustee answers to discovery 59

12   La Mattina 6      Declaration to court         63

13   La Mattina 7      Resume                       39

14   La Mattina 9      LinkedIn page                50

15   La Mattina 10     Top 100 magazine article     82

16   La Mattina 11     Real estate development svcs  92

17   La Mattina 14     7-20-20 email chain          95

18   La Mattina 16     5-29-20 email               97

19   La Mattina 17     8-13-20 email chain          98

20   La Mattina 18     12-2-20 letter              101

21   La Mattina 20     6-15-20 email chain         107

22   La Mattina 21     5-21-20 email chain         107

23   La Mattina 23     12-8-20 email               108

24   La Mattina 24     2-23-21 email chain         109

25



Page 4

1    Exhibits continued:
2
     La Mattina 25      12-8-20 email                    110
3
     La Mattina 26      6-27-20 email                    111
4
     La Mattina 27      9-23-2- email                    111
5
     La Mattina 28      10-16-18 email                   113
6
     La Mattina 29      10-9-19 email                    122
7
     La Mattina 30      2-27-20 email                    116
8
     La Mattina 31      10-11-21 email                   117
9
     La Mattina 32      10-14-21 email chain             117
10
     La Mattina 33      8-2-21 email chain               118
11
     La Mattina 35      10-11-21 email chain             124
12
     La Mattina 36      9-9-20 email chain               124
13
     La Mattina 37      7-22-20 email chain              126
14
     La Mattina 38      8-28-20 Renascent invoice        101
15
16
17
18
19
20
21
22
23
24
25



Page 5

1            THE VIDEOGRAPHER:  We are now on the

2       record.  This begins video number one in the

3       deposition of Glenn A. La Mattina in the matter

4       of AIRN Liquidation Trust Co. LLC et al., v Media

5       Effective LLC et al., in the United States

6       Bankruptcy Court, District of New Jersey.

7            Today is Friday, March 22nd, 2024 and the

8       time is 9:43 a.m.  This deposition is being taken

9       at Obermayer, Rebmann, Maxwell and Hippel LLP,

10      Mount Laurel, New Jersey at the request of

11      Obermayer, Rebmann, Maxwell and Hippel, LLP.

12           The videographer is Zachary Cloyd of Magna

13      Legal Services.  The court reporter is Alan Lesky

14      of Magna Legal Services.  Will counsel and all

15      parties present state their appearances and who

16      they represent.

17           MR. GEORGE:  Edmond George on behalf of

18      Javier Torres, the Torres family and Media

19      Effective.

20           MS. LASLEY:  Aneca Lasley on behalf of

21      the Liquidation Trustee.  Also in attendance

22      today by conference only are Louis Delucia,

23      D-u-l-u-c-i-a, Alyson, A-l-y-s-o-n, Fiedler,

24      F-i-e-d-l-e-r, and Erica, E-r-i-c-a, Arras,

25      A-r-r-a-s.



Page 6

1          THE VIDEOGRAPHER:  Will the court

2    reporter please swear in the witness.

3    Glenn La Mattina, having been duly sworn, was

4    examined and testified as follows:

5    EXAMINATION BY MR. GEORGE:

6          Q.  Mr. La Mattina, my name is Ed George and

7    I represent Javier Torres and his family and

8    Media Effective.  We'll be taking your deposition

9    today in connection with an adversary that was

10   filed against my clients by the Liquidating Trust

11   of NAIR.  Have you ever had your deposition taken

12   before?

13         A.  Many, many, many years ago.

14         Q.  Let me just go through the rules.

15         A.  Sure.

16         Q.  I'm going to try to ask you questions

17   about your relationship with NAIR and it's --

18         A.  Excuse me, it's NIRA.

19          MS. LASLEY:  And I'll correct both of

20   you.  It's NRIA.

21         Q.  And I'm going to be asking you about

22   your relationship to that company and the

23   declaration you filed in the adversary proceeding

24   on behalf of the Trustee.  I'll try to ask the

25   questions to you in a straightforward way.



1      If you don't understand the question you have

2   to tell me because if you just answer the

3   question I'm going to assume you heard it, you

4   understood it and your answer is responsive.

5      A.   Um-hum.  Okay.

6      Q.   You can't do um-hum --

7      A.   Yes.

8      Q.   -- or huh-uh, you have to answer

9   verbally with a yes or a no because um-hum or a

10   huh-uh could be misconstrued by somebody and we

11   want to make sure that the record is clear.

12      A.   Correct.  Okay.

13      Q.   I'll try not to talk when you're talking

14   and you try not to talk when I'm talking and that

15   way the record will be clear.  Because as you can

16   see the reporter is here and they need to take

17   down this information in a clear way and it will

18   be harder to do if you and I are talking over

19   each other.  Okay?

20      So when did you have your deposition last

21   taken?

22      A.   Oh, God, I don't even know the date.

23   Years ago.

24      Q.   Were you a defendant in a lawsuit?

25      A.   To be honest with you I don't even



Page 8

1    remember.  I know I had to go --

2         Q.  Have you ever been a defendant in a

3    lawsuit?

4         A.  No.

5         Q.  I'm going to give you two documents.

6    We're going to mark them as La Mattina 1.  Just

7    take a minute and look at that document if you

8    could.

9              (Off the record)

10        Q.  So, Mr. La Mattina, did you receive this

11   document?

12        A.  Yes, I did.

13        Q.  Can you go to the page that says

14   documents to be produced prior to the deposition.

15        A.  Um-hum.

16        Q.  Before the deposition Ms. Lasley

17   indicated you didn't have any documents in your

18   possession.  But I want to go through these and

19   ask you about what efforts you made to find these

20   documents if any?

21        A.  Well, I can tell you right --

22        Q.  Excuse me.  I'll ask you the questions.

23        A.  Okay.

24        Q.  Do you have any written communications

25   between you and the Trustee or its counsel?



Page 9

1      A.  No.

2      Q.  Did you ever email with Ms. Lasley or

3  with the Liquidating Trustee?

4      A.  I think they asked me to send some kind

5  of document over to sign the last time.

6      Q.  Was there any communications in

7  connection with that or was it just a document?

8      A.  Well, no.  They reached out to me.  They

9  said they wanted a statement.  I wanted to --

10  they wanted me to appear in front of them at the

11  time and I said I was starting a new job.  I have

12  training I'm doing.  I can't do it.  They said

13  okay, we'll send over a statement and look it and

14  sign it.

15      Q.  Who wrote the statement?

16      A.  Who wrote it?

17      Q.  Yes.

18      A.  They did.  They gave it to me to review.

19      Q.  Did you make revisions to it?

20      A.  Some minor stuff.

21      Q.  Do you have any of the copies of any of

22  the things you marked up?

23      A.  No.

24      Q.  What did you do with them?

25      A.  I just got rid of it after I sent it



Page 10

1   over to 'em.  I didn't keep it.  Yes, I just got

2   rid of it.  I threw it out.  I didn't need it.

3       Q.  So you emailed it back to them?

4       A.  Yes.

5       Q.  So you have email communicated with

6   them?

7       A.  I do have email, yeah.

8       Q.  Any other ones other than that?

9       A.  Not as far as I'm aware, no.

10      Q.  Have you ever had any discussions with

11  the Trustee about whether the Trustee might have

12  any claims against you?

13      A.  As far as I know they said no.

14      Q.  That's not what I asked you.  Sir,

15  listen to the question and answer the question I

16  ask, not the question you want me to ask.  Okay?

17      A.  Okay.

18      Q.  Did you have any discussions with the

19  Trustee about the possibility that there were

20  claims against you?

21      A.  Yes.

22      Q.  When was that?

23      A.  When I met with them at I guess one of

24  their offices in North Jersey with Rick Barry.

25      Q.  When was that?



Page 11

1        A.   I don't have the exact date.

2        Q.   How about generally was it in 2022,

3   2021, 2020?

4        A.   Probably 2022.

5        Q.   Do you remember the month?

6        A.   No.

7        Q.   You went in and you had a meeting with

8   the Trustee and his counsel?

9        A.   With Rick Barry, his associates and I

10  believe there was an attorney on a video call or

11  conference.

12       Q.   When you say Rick Barry is that the

13  gentleman that used to work for the New Jersey

14  Securities Exchange Bureau?

15       A.   I believe so, yes.

16       Q.   How do you know him?

17       A.   I was introduced to him via a phone call

18  from him that he was representing or working with

19  the investors.

20       Q.   You got a call from Rick Barry that he

21  was working as an investigator for the investors?

22       A.   Correct.

23       Q.   Did you know whether Mr. Barry had any

24  relationship with the Trustee or his counsel?

25       A.   No.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 13 of 203

Page 12

1        Q.  Do you know whether Mr. Barry was hired

2    by the Trustee or his counsel?

3        A.  I have no idea.

4        Q.  How do you communicate with Mr. Barry?

5        A.  Telephone.

6        Q.  Did you ever email him?

7        A.  Probably.

8        Q.  What's his email address?

9        A.  I have no idea off the top of my head.

10       Q.  What's your email address?

11       A.  GLM274 at Gmail.

12       Q.  Have you had that email for a period of

13   time?

14       A.  Yes.

15       Q.  How long?

16       A.  Years.

17       Q.  While you were at NRIA?

18       A.  Yes.

19       Q.  Did you have any contract of employment

20   between you and NRIA?

21       A.  Yes.

22       Q.  Did you have a copy of it?

23       A.  On my computer, yes.

24       Q.  Look at number 2.  So you had that

25   document and you failed to produce it, right?



Page 13

1        A.   Yes.

2        Q.   And you had communications between you

3   and the Trustee and you didn't produce any of

4   those, right?

5        A.   Correct.

6        Q.   Do you have any communications regarding

7   any promise, agreement, representation

8   forbearance or accommodation that might be

9   offered by the Trustee to you for your

10  cooperation in this case?

11       A.   No.

12       Q.   Did the Trustee tell you that he thought

13  he had claims against you?

14       A.   When I asked them about that they said

15  no.  I should have -- no.

16       Q.   I didn't ask you that.  I asked you did

17  the Trustee tell you that he had claims --

18       A.   No.

19            MS. LASLEY:  Hold on just a second.

20  Wait until he finishes his question before you

21  answer --

22            THE WITNESS:  No problem.

23            MS. LASLEY:  Hold on.  You just did it

24  to me too.  This gentleman here is trying to take

25  down everything.



Page 14

1            THE WITNESS:  I understand.

2            MS. LASLEY:  And he can't do it when

3    we're both talking or you are both talking.

4    BY MR. GEORGE:

5        Q.  So I want you to recast if you will the

6    conversation you had with the Trustee starting

7    with what prompted you to go to either -- New

8    York or North Jersey?

9        A.  North Jersey.

10       Q.  What prompted that?

11       A.  They wanted to know about my

12   relationship to NRIA and what I did for NRIA.

13       Q.  Did you go there under a subpoena or did

14   you go there voluntarily?

15       A.  Originally I said I didn't feel like

16   doing it.

17       Q.  And you got a subpoena?

18       A.  No.  They called me back probably a

19   couple months later and he said instead of going

20   and getting a subpoena why don't you be nice and

21   come in and talk to me.

22       Q.  Why was it that you didn't feel like

23   doing it?

24       A.  Because I thought it was a waste of

25   time.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 16 of 203

Page 15

1        Q.  In what way?

2        A.  In what way?

3        Q.  Yeah.  Why is it a waste time?  The

4   Trustee is trying to collect money from investors

5   from a company that you were one of the chief

6   operating officers of.

7        A.  Right.  I know in most cases -- and I

8   don't take this negatively -- I think the

9   attorneys are trying to get more money out of

10  everything versus the investors.  I think the

11  investors only get pennies on the dollar and at

12  the end the day I don't think they make the

13  investors any happier than what they were.

14       Q.  You think the Trustee's efforts are

15  folly?

16       A.  That's my own personal opinion.

17       Q.  No, I'm asking you.

18       A.  Personal opinion.

19       Q.  So then did they contact you again after

20  the first indication that you had that you didn't

21  want to appear?

22       A.  Yes.  I said that.

23       Q.  When was that in relationship to when

24  you first got the phone call to come meet with

25  them?



Page 16

1       A.  A couple months.

2       Q.  Do you remember when that was, what

3   month that was?

4       A.  No.

5       Q.  Was it in the spring or summer, was it

6   in the winter?

7       A.  I'd have to look at my calendar.  I

8   don't know.

9       Q.  You don't remember whether it was

10  snowing or warm?

11      A.  It wasn't snowing.

12      Q.  Was it cold?

13      A.  I don't remember.

14      Q.  How did you get to Newark or New York?

15      A.  I drove.

16      Q.  Did the Trustee provide you any

17  documents other than the document that you

18  mentioned you signed and sent back?

19      A.  No.  Do you have a water?

20          MR. GEORGE:  Anybody else need a water?

21          THE VIDEOGRAPHER:  We're going off

22  record, the time is 9:56 a.m.

23          (Off the record)

24          THE VIDEOGRAPHER:  Back on the record,

25  the time is 9:57 a.m.



Page 17

1        Q.   Do you have an accountant?

2        A.   Yes.

3        Q.   What's his name?

4        A.   I just switched.  Hold on.  Give me a

5   minute.  Okay.  His name is Mark Weisholtz,

6   W-e-i-s-h-o-l-t-z.  He's in Springfield on Morris

7   Avenue.

8        Q.   Is he an individual or is he with a

9   firm?

10        A.   Individual.

11        Q.   On Morris Avenue, is that what you said?

12        A.   Yeah, Morris Avenue.

13        Q.   Springfield?

14        A.   Yes.

15        Q.   So you mentioned you had a contract for

16   employment with NRIA, right?

17        A.   Correct.

18        Q.   And was it for a term?

19        A.   Ongoing.  It was open.

20        Q.   What was your compensation?

21        A.   Well, originally when I first was hired

22   it was verbal.  I was hired at a hundred thousand

23   and change, I believe 110 offhand back in 2018.

24   Then I got a written contract probably 2021, '22.

25        Q.   So prior to '21 or '22 your arrangement



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 19 of 203

Page 18

1    for employment was an oral agreement?

2         A.   Correct.

3         Q.   And you made $110,000 a year.  Was that

4    a salary?

5         A.   1099.

6         Q.   Were there any bonus or incentive

7    packages for you in 2018?

8         A.   At different times Nick would say to me

9    you're doing a good job, we'll give you a little

10   bonus or good job here, whatever, here's an extra

11   put in your billing.

12        Q.   When you say whatever are we talking

13   about 20,000?

14        A.   No.

15        Q.   50,000?

16        A.   No.

17        Q.   10,000?

18        A.   Maybe a thousand.  Whatever it might be.

19        Q.   Did you have any reimbursement of

20   expenses?

21        A.   Yes.

22        Q.   What kind of arrangement was that?

23        A.   If I had dinner with somebody, get the

24   receipt, sometimes hotels if I was traveling,

25   stuff like that.



Page 19

1        Q.   Why did it change from an oral agreement

2   to a written one in '21 or '22?

3        A.   Well, when Nick had his issues and the

4   DOJ was in it was decided that it was better to

5   put people on W-2s versus 1099s.  So contracts

6   were being drawn up and I was given one at that

7   time.

8        Q.   So when you said Nick had his issues,

9   what were Nick's issues you were aware of in '21?

10        A.   He was arrested I believe in 2021.

11        Q.   Was it because of this NRIA situation --

12        A.   Yes.

13        Q.   -- or some other?

14        A.   Yes, NRIA.

15        Q.   So how long after Nick was arrested did

16   you continue to work for NRIA?

17        A.   I left there in August 2022.

18        Q.   Do you know when Nick was arrested?

19        A.   I believe 2021, I think earlier that

20   year.

21        Q.   So when Nick was arrested did he come

22   back to work after he was released from jail?

23        A.   He was at work a while, maybe a month if

24   that and then he decided it was better to not be

25   associated with the company at the location, so



Page 20

1   he wanted to work independently out of his house.

2       Q.   So after Nick was arrested did you

3   continue to head up the marketing department?

4       A.   I never headed up the marketing

5   department.

6       Q.   So back to this document that's in front

7   of you.  Did you file tax returns for the years

8   2018 through 2020?

9       A.   Um-hum, yes.

10      Q.   That's number 7.

11      A.   Yes.

12      Q.   Did you produce those today?

13      A.   No, I didn't.  My fault.

14      Q.   I think it's all your fault that you

15  didn't produce any of these things.

16      A.   Yes.  I admitted it.

17      Q.   You don't think it's Aneca's fault?

18      A.   I admitted it.  It's my fault.  I didn't

19  bring the documents.

20      Q.   Did you look for them?

21      A.   I had them, yes.

22      Q.   You had them and you didn't produce

23  them?

24      A.   No, I didn't.

25      Q.   Why is that, sir?  Why do you think it's



Page 21

1    okay for you to disobey a subpoena?

2         A.   I never said I thought.

3         Q.   Why do you think it's okay to disobey a

4    subpoena is the question?

5         A.   I don't have an answer for that.

6         Q.   Do you have any periodicals,

7    publications, ads or other articles where you

8    personally or publicly stated to investors a

9    state of return?

10        A.   No.  It was not my job.

11        Q.   You've never published any documentation

12   anywhere where you said that NRIA was returning

13   12 percent to investors?  You never did that?

14        A.   I never published anything like that.

15        Q.   Do you have any scripts or any

16   narratives that you might have created for any

17   advertising?

18        A.   I never created those.

19        Q.   How about the phrase "real estate done

20   right" you didn't create that?

21        A.   That was Nick.

22        Q.   How about "returning 12 percent to

23   investors at this time"?

24        A.   Did you hear what I said?

25        Q.   I'm asking you a different question.



Page 22

1        A.   No.

2        Q.   That's a different statement.

3        A.   No, I did not produce any of those

4    statements.

5        Q.   How about this statement of "producing

6    12 percent returns to investors at this time"?

7        A.   No.

8        Q.   You didn't ever write that or publish

9    that anywhere?

10        A.   I never published that.

11        Q.   Did you retain any of the materials you

12    used for your presentations to investors in India

13    that were interested in the E85 program?

14        A.   EB-5 program, no.

15        Q.   Where would you have kept those

16    documents when you were working?

17        A.   On my company computer.

18        Q.   Did you have a laptop?

19        A.   Yes.

20        Q.   And did you retain that laptop?

21        A.   It was my personal laptop, yes.

22        Q.   So your laptop could have information on

23    it from back when you worked at NRIA?

24        A.   It's possible, yes.

25        Q.   And you didn't -- again you didn't look



Page 23

1    on that computer for one single document from

2    that subpoena, right?

3         A.  Correct.

4         Q.  How about any communications between you

5    and Renascent Enterprises, would they be on your

6    computer?

7         A.  Probably.

8         Q.  Did the Trustee ever ask you to give

9    that computer back?

10        A.  It was my personal computer.

11        Q.  How about any communications between you

12   and Renascent Enterprises or its principals

13   relating to advertising programs set up through

14   or to be administered by Renascent Enterprises in

15   connection with NRIA, any documents like that?

16        MS. LASLEY:  You went through that last.

17   I guess you're reading it from the subpoena, so I

18   can read it.

19        MR. GEORGE:  Yeah.  It's number 12.

20        Q.  Number 12, sir.  Could those documents

21   also be on your computer?

22        A.  Probably not.  I don't have any access

23   to my old accounts via email.  If anything my

24   computer was more for communicating via email

25   when I was in India.



Page 24

1        Q.  Have you been contacted by the SEC?

2        A.  No.

3        Q.  Have you been contacted by the

4   Department of Justice?

5        A.  Yes.

6        Q.  Who at the Department of Justice

7   contacted you?

8        A.  I have no idea their agents' names

9   anymore.  It's been over two and a half years.

10       Q.  Who was that at the Department of

11  Justice?

12       A.  Like I said I do not have the agent's

13  name anymore.

14       Q.  I didn't ask you the agent's name.  I

15  asked you the agency's name?

16       A.  The FBI.  Speak clearer next time.

17  Thank you.

18       Q.  The Department of Justice was very

19  clear.  You just didn't listen, FBI, and you

20  don't remember the agent at the FBI?  Do you

21  remember what office it was out of?

22       A.  No.  It was two and a half years ago.

23       Q.  Do you know whether they were out of the

24  Newark office?

25       A.  Maybe.  I cannot confirm that one way or



Page 25

1    another.

2        Q.   Did they come see you in Point Pleasant

3    or did you go see them?

4        A.   Why Point Pleasant?

5        Q.   Where do you live?

6        A.   New Jersey, North Jersey, Lincoln Park.

7        Q.   Did they come see you in Lincoln Park?

8        A.   Yes.

9        Q.   Showed up at your house?

10       A.   Yes.

11       Q.   Did they have a warrant?

12       A.   Nope.

13       Q.   How many agents?

14       A.   Two.

15       Q.   Did you give the FBI any statements?

16       A.   No.  It was just a general conversation.

17   They were just curious to know what I did at NRIA

18   and he let me know that they were looking to

19   arrest Nick.

20       Q.   What were the nature of the

21   conversations?

22       A.   Friendly.

23       Q.   I mean did they ask you did you know

24   what was going on?

25       A.   They just said we're here.  We want to



Page 26

1    know about NRIA.  We want to know about Nick.

2    Tell us what you do.  And at the end of the day

3    he said just to let you know we're going to be

4    arresting him.  I said okay.

5         Q.  Have you ever received a target letter

6    from any governmental agency?

7         A.  I don't know what a target letter is.

8         Q.  A letter that is telling you that you

9    may be subject to criminal charges?

10        A.  No.

11        Q.  Again number 16 we asked for drafts of

12   the declarations and you didn't look for or

13   produce those, right?

14            MS. LASLEY:  Objection.

15   Mischaracterizes.

16        A.  No.

17        Q.  Did you have any documents that you were

18   relying on in order to try to create the

19   declaration for the Trustee?

20        A.  No.

21        Q.  So the statements that you made in there

22   are basically from your recollection, not from

23   any documentation that was shown from you or any

24   documents --

25        A.  Correct.


MAGNA
LEGAL SERVICES

Page 27

1      Q.   -- from the company?

2      A.   Correct.

3      Q.   Did you have any market studies or any

4  other information you used to try to formulate

5  the statements in the declaration?

6      A.   No.

7      Q.   Have you ever done a market study, ever

8  conduct one?

9      A.   No.

10     Q.   Number 19, any documentation that shows

11  the role that you had in what the Trustee is now

12  calling the largest Ponzi scheme in New Jersey,

13  including any communications between you the

14  principals of NRIA discussing the debtor's

15  financial condition?

16     A.   No.

17     Q.   No, what, you don't have any?

18     A.   No, I don't have any.

19     Q.   When you were working at the company did

20  you ever email with Nick or the other principals

21  about the financial condition of the company?

22     A.   No.  As far as I was aware everything

23  was rosey.

24     Q.   All the way up to the end in August of

25  '22?



Page 28

1        A.   We knew that no more money was coming in

2   and obviously the company was in dire straits.

3        Q.   You knew in 2021, right --

4        A.   Yeah.

5        Q.   -- that there were problems because Nick

6   got arrested?

7        A.   Yeah.  We knew that.

8        Q.   And when Nick got arrested did you write

9   him any emails and say what the heck is going on,

10  what did you get arrested for?

11       A.   No.  Because he came out and we all met

12  at the office.

13       Q.   Did he tell you that the government was

14  accusing him of conducting a Ponzi scheme?

15       A.   Not at that time.

16       Q.   Did he later tell you that?

17       A.   He never admitted that was a Ponzi

18  scheme.

19       Q.   What did he tell you he got arrested

20  for?

21       A.   He signed a letter of intent with a

22  president of a bank's name and signature on it.

23  He forged the signature.

24       Q.   He forged the signature of a bank

25  officer on what, a loan commitment?



Page 29

1        A.   LOI, letter of intent.

2        Q.   Did you ask him why he forged the name

3   on a letter of intent?

4        A.   I didn't need to ask him.  He told us,

5   told everybody.

6        Q.   What did he tell you?

7        A.   He basically said he was waiting for an

8   LOI to come in.  It was late.  One of the

9   investors wanted to put money into a project.

10  Instead of waiting he decided he was going to

11  forge it or give it to the investor so they would

12  give the money.

13       Q.   You knew at that time that he had forged

14  a document for the purposes of inducing an

15  investor to invest money, right?

16       A.   At that time that's what I was told,

17  yes.

18       Q.   Yet you stayed there for another year,

19  right?

20       A.   At the end the day, yes.

21       Q.   So you knew he was defrauding people and

22  you continued to work for him for another year,

23  right?

24       A.   Yes.  But I was working for Rey, not

25  him.  Rey owned the company.



Page 30

1      Q.  So even though he was the principal and

2   owner in the company your position is you were

3   working for Rey.  Even though he was making

4   financial decisions and defrauding banks your

5   position was you weren't working for the company,

6   you were working for Rey?

7      A.  I was working for the principal of NRIA

8   which was Rey Grabato, not Nick Salzano.

9      Q.  But your employer was NRIA, neither of

10   those individuals, right?

11      A.  My employer was NRIA.

12      Q.  Have you filed any other declarations in

13   the bankruptcy case?

14      A.  No.

15      Q.  Why didn't you quit right away when you

16   found out that Nick was defrauding people?

17      A.  I didn't believe he was defrauding

18   people.

19      Q.  Well, he got arrested and he told you he

20   forged an LOI to get somebody to invest.  That's

21   not clear evidence to you -- excuse me, that's

22   not clear evidence to you that he's defrauding

23   people, that he signed someone's name falsely on

24   a document to get somebody to invest and that's

25   not evidence to you that he's defrauding people?



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 32 of 203

Page 31

1       A.  No.  I mean do you want me to elaborate?

2       Q.  No, I don't.  You answered.  You

3    mentioned Mr. Barry.  How often do you talk to

4    Mr. Barry?

5       A.  I don't know.  A couple times.

6       Q.  A couple times what, a week, a day, a

7    month?

8       A.  A couple times in a month maybe.  I

9    don't know.  A couple months.

10      Q.  Why don't you keep saying I don't know?

11   You do or you don't.

12      A.  Because I don't know.  I don't write

13   down, oh, I talked to Rick Barry today.  I talked

14   to Rick Barry an hour ago.

15      Q.  But you talked to him a few times a

16   month?

17      A.  Maybe two, three times.

18      Q.  And has that been consistent since --

19      A.  No.

20      Q.  Can you let me finish.  Has that been

21   consistent --

22      A.  No.

23      Q.  -- since you first started talking to

24   Mr. Barry?

25      A.  Yes.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 33 of 203

Page 32

1        Q.  So when you said no --

2        A.  No, no, let me correct that statement.

3   I talked to Rick Barry like I said originally a

4   couple months ago, a year ago maybe.  And then he

5   asked me to come meet him there which we did.

6   Then he calls me every so often because of this.

7   That was it.  And this is representing that.

8        Q.  When you say this what are you saying?

9        A.  Your subpoena.

10       Q.  Is representing what?

11       A.  That's the reason why I was talking to

12  Rick Barry.

13       Q.  What did you talk to him about with

14  respect to the subpoena?

15       A.  He was just letting me know I was

16  requested to come here.

17       Q.  How did he know that?

18       A.  How do I know?

19       Q.  Was he communicating with the Trustee?

20       A.  How do I know?

21       Q.  He's never told you he's communicated

22  with the Trustee?

23       A.  Not my wheelhouse to talk to him.

24       Q.  How about when the deposition got

25  continued, wasn't it Mr. Barry that was



1   communicating with the Trustee's office about

2   that?

3         A.   I guess so, yeah.

4              MS. LASLEY:   I object to form in terms

5   of Trustee's office.

6         Q.   The Trustee's lawyers.  Did you want me

7   to rephrase that?

8         A.   Which is fine.  Go ahead.

9         Q.   Was Mr. Barry communicating with you as

10  an intermediary between you and the Trustee's

11  lawyers about the scheduling of the depositions?

12        A.   Correct.

13        Q.   What did Mr. Barry tell you about the

14  deposition itself?

15        A.   He asked me to come down and tell them

16  what I know about the situation.

17        Q.   He asked you to come down to him?

18        A.   No, come down.

19        Q.   To appear at the deposition?

20        A.   Yes.

21        Q.   He asked you to appear?

22        A.   He told me that I was going to be

23  getting a subpoena and I'm going to be needed to

24  appear at this deposition based upon the

25  subpoena.



Page 34

1        Q.  How did Mr. Barry know you were getting

2   a subpoena?

3        A.  I don't know.

4        Q.  Once you found out that Nick had

5   defrauded a bank in order to induce investors to

6   put in money, did you have any discussions with

7   the person that you said you were actually

8   working for about that?

9        A.  Rey Grabato?

10       Q.  Yes.

11       A.  He was aware of it.

12       Q.  Did you say to him what's going on,

13  isn't this a bad thing?

14       A.  The way it worked was when Nick got out

15  of jail we all went back to the office and he

16  explained the situation that the original LOI

17  should have come in.  It was late.  He was trying

18  to do a shortcut which was wrong and he

19  understood that he's going to pay the

20  consequences.

21       Q.  What was the letter of intent, what bank

22  was it from, do you recall?

23       A.  I don't recall.

24       Q.  Was it from a bank or some other

25  financial institution?



Page 35

1        A.   It was a bank as far as I was aware.

2        Q.   Was the letter of intent a commitment to

3    put money into NRIA?

4        A.   It was to loan money I believe.

5        Q.   Were you ever a person who was involved

6    with the banking connections --

7        A.   No.

8        Q.   -- for NRIA?

9        A.   No.  Let me rephrase that.  When you say

10   banking connections --

11       Q.   Didn't you arrange loans through the

12   banks?

13       A.   I used to be a mortgage banker.  I used

14   to take care of that in my prior position working

15   for mortgage companies and my own mortgage

16   company.  Yes, I have.  But the LOI was a

17   temporary letter of intent to loan money.

18       Q.   That's not what the question was, sir.

19       A.   Sorry.  Repeat the question.

20       Q.   The question was didn't you have --

21   weren't you the person at NRIA who handled

22   banking relations?

23       A.   No.  I was not arranging loans.

24       Q.   What were you doing with the banks?

25       A.   When we had issues with the banks, TD



Page 36

1   Bank was shutting us down, did not want to keep

2   our money in the bank anymore.  I was trying to

3   find other banks to take our accounts.

4        Q.  Why did TD Bank not want to handle your

5   accounts anymore?

6        A.  For whatever reason we were on a watch

7   list.  I guess they didn't want to do business

8   with us.

9        Q.  When you went to the other banks were

10  you able to find someone to take over TD Bank?

11       A.  We had occasions where we were approved

12  and down the road they cancelled the approval.

13       Q.  When you made the application you never

14  told them that Nick had been arrested for

15  defrauding a bank, right?

16       A.  I don't remember the conversation.

17       Q.  You would clearly remember if you were

18  sitting with a bank officer whether you told him

19  Nick was arrested for fraud, wouldn't you?

20       A.  We explained the situation.

21       Q.  What banks did you go to to explain that

22  situation to?

23       A.  I believe it was Signature.

24       Q.  Where are they?

25       A.  New York City.



Page 37

1        Q.  Who were the officers at Signature?

2        A.  I don't remember.

3        Q.  When was that?

4        A.  '21, '22.  I know Rey had a relationship

5   with Bank of America.

6        Q.  I want to talk about you specifically.

7        A.  All right.

8        Q.  Who did you go to besides Signature?

9        A.  I believe it was PNC.

10       Q.  Again do you know who the officer was?

11       A.  No.

12       Q.  You recall specifically sitting down at

13   the time that you requested to move the accounts

14   and telling them that Nick was arrested for

15   fraud?

16       A.  I never requested to remove the

17   accounts.  All my job was to make the connection

18   and talk to somebody.

19       Q.  Did it concern you that you were trying

20   to make the connection for a company that was

21   defrauding people for them to go to a different

22   bank where that opportunity might also appear?

23       A.  At the time defrauding somebody wasn't

24   on the table.

25       Q.  When you say wasn't on the table what do



Page 38

1   you mean by that?

2        A.   There was no correlation.  People saying

3   they were being defrauded.  We weren't frauding

4   anybody.

5        Q.   You mean investors?

6        A.   Investors.

7        Q.   But Nick was trying to defraud an

8   investor when he created that false document,

9   wasn't he?

10       A.   The lady got her money back.

11       Q.   That's not what I asked you whether she

12   got her money back or not isn't the question.

13       A.   Okay.

14       Q.   You knew he was creating a false

15   document in order to get an investor to put in

16   money.  You knew it.  You admitted it three times

17   so far.

18       A.   Yes.  That's the fourth time I admitted

19   it.

20       Q.   And it didn't concern you that this

21   fraud that was running NRIA was asking you to

22   move the accounts to another bank where

23   conveniently the fact that he had been arrested

24   was not disclosed initially?

25       A.   Correct.



Page 39

1        Q.  You were waiting for the banks to find

2    out themselves that they were dealing with

3    someone who was a fraud, right?

4        A.  No comment.

5        Q.  That's a question.  There's no comment

6    in a deposition.

7        A.  Oh, there isn't?  Okay.  Thank you.

8        Q.  What's the answer?

9        A.  No.

10          (Off the record)

11          MS. LASLEY:  You're marking this La

12   Mattina 7?

13          MR. GEORGE:  Yes.

14   BY MR. GEORGE:

15       Q.  Have you ever seen that document before,

16   sir?

17       A.  I wrote it, yes.

18       Q.  And does this accurately reflect your

19   work history and experience?

20       A.  Correct.

21       Q.  So the first entry is the NRIA entry and

22   it says you're the chief operating officer,

23   right?

24       A.  Correct.

25       Q.  Who was above you in the hierarchy at



Page 40

1   the company?

2        A.   Rey Grabato was CEO.

3        Q.   So he was CEO and you were COO?

4        A.   Correct.

5        Q.   Was there anybody between you and

6   Mr. Grabato in the hierarchy of the officership?

7        A.   Nick -- Rey had Nick as his consultant

8   to oversee the company.

9        Q.   Why was Nick a consultant as opposed to

10  an employee of the company?

11       A.   Not my call.  I don't know.

12       Q.   When you started at the company were you

13  aware of Nick?

14       A.   Yes.

15       Q.   Did you know when you started at the

16  company he had a prior conviction for fraud?

17       A.   No.

18       Q.   Did you learn that later?

19       A.   Yes.

20       Q.   When?

21       A.   2021.

22       Q.   So now you learned that he gave -- he

23  forged a document to a bank to induce an investor

24  to invest and that he had a prior criminal

25  conviction and you learned that in 2021 and you



Page 41

1    stayed there all the way through 2022, right?

2         A.  Yes.

3         Q.  And continued to collect money from

4    investors, right?

5         A.  Yes.

6         Q.  Do you have any reason to believe that

7    Javier knew this guy defrauded a bank?

8         A.  No.

9         Q.  Do you have any reason to believe that

10   Javier knew he had a criminal conviction?

11        A.  No.

12        Q.  But you implied in your declaration that

13   there was something nefarious between the guy you

14   knew was a fraud and my client to try to make it

15   look like he was stealing from the company like

16   your boss was, right?

17        A.  I have no idea.

18        Q.  How did you try to determine Javier's

19   margins on his sales?

20        A.  I have no idea.

21        Q.  You never tried to determine his

22   margins, did you?

23        A.  No.

24        Q.  When an advertising campaign was being

25   done were you the person who put it out to bid?



    1         A.   Nick would say --

    2         Q.   I asked you a question.

    3         A.   No.

    4         Q.   Were you the person who put it out the

    5    bid?

    6         A.   No.

    7         Q.   So let's go through your resume and you

    8    tell me what in here is correct and what's

    9    incorrect.  Okay?

    10        A.   Go ahead.

    11        Q.   Did you coordinate with all the

    12   department heads on critical issues in their

    13   departments?

    14        A.   Yes.

    15        Q.   Was there a financial department?

    16        A.   Accounting department, yes.

    17        Q.   You coordinated with them as the COO,

    18   right?

    19        A.   Define coordinating.

    20        Q.   You wrote it.  What's it mean?

    21        A.   That means we talked to them.

    22        Q.   What were the critical issues in the

    23   financial department, cash flows?

    24        A.   Sometimes, yes.

    25        Q.   So you knew about the fact that at



Page 43

1    certain times there were cash flow shortages,

2    right?

3         A.  Not all the time, no.

4         Q.  I didn't say all the time.  You knew

5    that on occasion there were cash flow problems?

6         A.  Occasionally there were issues, yes.

7         Q.  You assisted the CEO.  Hold on a second.

8    It says, including accounting, right?  So you

9    coordinated the accounting, you coordinated the

10   media, you coordinated accounts payable and

11   others, right?

12        A.  Um-hum.  Yes.

13        Q.  You assisted the CEO in the daily

14   function of the company?

15        A.  Correct.

16        Q.  You did contract reviews.  What kind of

17   contracts were you reviewing?

18        A.  Sales of condos, per se, or developments

19   we were marketing at the time.

20        Q.  Investment sales?

21        A.  No.

22        Q.  No what?

23        A.  No, I did not do investment sales.

24        Q.  Why does it say assisted the CEO in his

25   daily functions including investment sales.  Was



Page 44

1    that a lie or are you just backing away from it

2    now because it puts you in a bad light?

3         A.   No.

4              MS. LASLEY:   Objection to form.

5         Q.   That's fine.  Answer it.

6         A.   Investment sales meaning I went to Art

7    and A.J. and said how's it going with the sales

8    or is everybody working and stuff like that.

9    That's what I meant by coordinating investment

10   sales.  I did not directly deal with any

11   investors at any time directly in the U.S. for

12   investment sales.

13        Q.   But in India you did, right?

14        A.   Yes.

15        Q.   You went to India and you directly

16   solicited people to invest and you stated to them

17   directly that you were giving 12 percent when

18   you went to India, didn't you?

19        A.   No.  I was marketing EB-5 platforms at

20   the time when I went to India before we started

21   to try investment offices.

22        Q.   And those were personal meetings between

23   you and Tanvi Chandra --

24        A.   Right.

25        Q.   -- and investors in Southeast Asia?



Page 45

1        A.   Correct.

2        Q.   You went there and you made

3    representations to them about the nature and

4    quality of the investments, didn't you?

5        A.   At the time I knew that the quality was

6    there at the time.

7        Q.   You didn't know because it wasn't there,

8    was it?

9        A.   At the time it was there.

10       Q.   Oh, maybe that's where the quote came

11   from "returning 12 percent at the time."  That

12   was your quote, wasn't it Glenn?

13       A.   No.

14            MS. LASLEY:  Objection to form.

15       Q.   Reviewed and approved marketing

16   materials involving the parent company and the

17   subsidiaries.  So everything that got marketed

18   you approved?

19            MS. LASLEY:  Objection.

20       A.   Did I approve it?  It was Nick or Rey

21   approved the finals.

22       Q.   He finally approved it but it says here

23   that you did it with your assistance that you

24   provided.  You reviewed and approved marketing

25   materials?



Page 46

1      A.   Okay.

2      Q.   Okay.   Reviewed the metrics on current

3   advertising and social media campaigns for

4   projects.   What did that involve?

5      A.   That means when we had Katey Kana there

6   and she was getting the marketing numbers we all

7   sat down and looked at how different ads were

8   performing.

9      Q.   How did you -- what did you do after you

10   saw how those ads were performing, what kind of

11   steps would the company take in response to that?

12      A.   We all discussed how different ads were

13   performing and ultimately everything went to Nick

14   to decide what he wanted to continue to market or

15   not.

16      Q.   Raised $8.5 million for Green Card

17   investment?

18      A.   Yes.

19      Q.   You raised that money, right?

20      A.   I assisted in it, yes.

21      Q.   It doesn't say assisted.   It says

22   raised.   Like you're taking credit for it here.

23   Now you're saying you didn't do it yourself, you

24   did it with other people, but here you said you

25   did it yourself.   You raised $8.5 million, right?



Page 47

1      A.   I'm a miracle worker, aren't I?

2           MS. LASLEY:   Okay.   Let's just answer

3    the question.

4      Q.   Is that a true statement?

5      A.   Yes, it is very true.

6      Q.   Those $8.5 million in investors are

7    people who never got their money back, right?

8      A.   Wrong.   It's a Green Card.   They're

9    waiting to get their Green Card.   Then they get

10   their money back.   If you knew something about

11   EB-5 you might --

12     Q.   You said coordinated work

13   internationally in India, Dubai and Thailand for

14   fund investors, EB-5 and B-1 investors.   What are

15   B-1 investors?

16     A.   It's a program where B-1 I believe you

17   can open a business in the states if I remember

18   right.

19     Q.   Did you live overseas for a period of

20   time?

21     A.   Probably around eight, nine months I was

22   overseas maybe two and a half weeks, three weeks,

23   came back for 10 days, went back overseas again.

24     Q.   So you didn't live there for six months,

25   you went back and forth for six months?



Page 48

1          A.   Correct.

2          Q.   It's not what it says here.

3          A.   Okay.

4          Q.   It says while living overseas for a

5    period of six months?

6          A.   Correct.

7          Q.   That's a lie, isn't it?

8          A.   No.

9          Q.   It's not true?

10         A.   It's interpretation.

11         Q.   So traveling back and forth for six

12   months could be interpreted to mean you lived

13   there for six months, right?

14         A.   Correct.

15         Q.   And it says you brought in international

16   investments?

17         A.   Correct.

18         Q.   How did you learn about the opportunity

19   with NRIA?

20         A.   How was I hired?

21         Q.   Yes.

22         A.   I got a call from Nick.

23         Q.   From Nick?

24         A.   Yeah.

25         Q.   Not from Rey?



Page 49

1      A.  No.  Nick.

2      Q.  How did you know Nick?

3      A.  He answered an ad maybe two years prior

4  to me working for him.  He was looking for

5  salespeople.  I met with him.  He goes I think

6  you have a better opportunity maybe working with

7  me doing mortgages for some of my people that I'm

8  working with.  So we became associates.  He

9  referred business to me.  In regards to taking

10  out construction loans in some of the projects in

11  Philly.  When I say taking out construction I

12  mean refinancing construction loans and getting

13  an end mortgage for the investors.

14      Q.  So initially what you're saying is that

15  your business relationship with NRIA was based on

16  you refinancing certain projects that Nick

17  already had going?

18      A.  Certain investors.

19      Q.  Investors?

20      A.  Investors.

21      Q.  How would you refinance investors?

22      A.  The way the project program worked at

23  the time Nick would buy a piece of property,

24  subdivide it.  The investors would get a

25  construction loan, buy the project, so when the



Page 50

1  project got a CO I would refinance the

2  construction money and get a standard 30 year or

3  15 year fixed mortgage on it.

4      Q.   And you did that after the building was

5  built on the project?

6      A.   Correct.

7      Q.   So there was the construction financing

8  and then you got the permanent financing?

9      A.   Correct.

10      Q.   This is 9, La Mattina number 9.  Have

11  you ever seen this document before?

12      A.   It's LinkedIn, my LinkedIn.

13      Q.   You've seen it before?

14      A.   I saw my LinkedIn.  I did not see this

15  document, per se.  I've seen LinkedIn.

16      Q.   Does this look like your LinkedIn page?

17      A.   Yes.

18      Q.   This is dated -- I'll represent to you

19  and if you look at upper corner -- 1/22/24.  Do

20  you see that?

21      A.   Um-hum.

22      Q.   You've made changes to it since then,

23  haven't you?

24      A.   Correct.

25      Q.   You've deleted a lot of the information



Page 51

1    in here about NRIA, didn't you?

2         A.   Correct.

3         Q.   You did it before or after you got the

4    subpoena?

5         A.   It was an ongoing process.

6         Q.   Before or after you got the subpoena,

7    when did you start?

8         A.   I don't know.

9         Q.   You didn't like what the original

10   LinkedIn said about your role in NRIA, did you,

11   Glenn?

12        A.   It's called updating my profile.

13        Q.   And deleting your association with a

14   company that defrauded people out of 600 million

15   dollars, right?

16        A.   Is that --

17        Q.   That was a side issue?

18        A.   -- a question?

19        Q.   No, it wasn't.

20        A.   Okay.  Thank you.  I want to make sure I

21   answer them correctly.

22        Q.   If you go on the second page of this

23   document, do you see that?

24        A.   Um-hum,

25        Q.   It says Glenn A. La Mattina was the



Page 52

1   chief operations officer for a national

2   development firm and investment fund manager.  Is

3   that NRIA you're talking about?

4        A.  Correct.

5        Q.  When you spell your name do you put the

6   La and the M together or do you put a space in

7   between that?

8        A.  Usually I space it.

9        Q.  It says here Mr. La Mattina has served

10  on the executive teams in different capacities

11  for the past seven years.  Do you agree with

12  that?

13       A.  Not for the whole past seven years, no.

14       Q.  But how about the rest of it?  That you

15  served on the executive teams in different

16  capacities?

17       A.  Correct.

18       Q.  It says Mr. La Mattina oversaw the sales

19  and marketing efforts for the firm globally,

20  correct?

21       A.  Correct.

22       Q.  Under experience, do you see that, two

23  of six.

24       A.  Okay.

25       Q.  There's a company call X-On Consultants



Page 53

1   LLC?

2        A.  Correct.

3        Q.  And it says under it I was instrumental

4   in the development of a national real estate fund

5   and in the development and management over 1.2

6   billion dollars of, of course, it says see more.

7   Are you making reference to NRIA in that

8   paragraph?

9        A.  Correct.

10        Q.  Under chief operating officer can you

11   read what you wrote there for your job

12   description, read it out loud.

13        A.  Responsible for the daily operations of

14   NRIA and its global EB-5 investment strategies.

15   Established NRIA investment offices in India,

16   Dubai.  Oversaw mortgage and production -- I'm

17   just looking where --

18        Q.  That's fine.  That's all I needed you to

19   read to.  It cuts off there at the end.  Were

20   there other offices other than India and Dubai?

21        A.  We were looking at opening one in

22   Thailand at the time.

23        Q.  This is going to be La Mattina 3.  Do

24   you have that document in front of you, sir?

25        A.  Yes.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 55 of 203

Page 54

1        Q.  Do you have an indication here I'm
2    reaching out to share an exciting investment
3    opportunity to Prime Equity a renowned national
4    development company.  What's Prime Equity?
5        A.  It's a company that I contracted to do
6    consulting work for.
7        Q.  What kind of consulting are you doing?
8        A.  Helping them grow their funds.
9        Q.  Is it like what NRIA was doing?
10       A.  Like a real estate fund, yes.
11       Q.  Are you doing the same things for Prime
12   Equity today that you were doing for NRIA?
13       A.  No.
14       Q.  Are you still working for Prime Equity?
15       A.  No.
16       Q.  How long did you do that?
17       A.  Probably about two months.
18       Q.  Why was it so short?
19       A.  They didn't want to spend the money to
20   do what I thought was a better campaign to help
21   grow the company.
22       Q.  You mean advertising?
23       A.  Advertising, yes.
24       Q.  Have you ever been an advertising
25   executive?



Page 55

1        A.   No.

2        Q.   Do you have any media experience?

3        A.   Other than my own, no.

4        Q.   You mean other than your own media?

5        A.   My own media experience, marketing my

6    own companies.

7        Q.   Have you ever been an ad agency

8    executive?

9        A.   No.

10        Q.   An ad agency employee?

11        A.   No.

12        Q.   A marketing agency executive?

13        A.   No.

14        Q.   A marketing agency employee?

15        A.   No.

16        Q.   An advertising broker?

17        A.   No.

18        Q.   An advertising agent?

19        A.   No.

20        Q.   This is number 4.  Mr. La Mattina, have

21    you ever seen -- do you need more time to look at

22    it?

23        A.   Go ahead.

24        Q.   Have you ever seen this before?

25        A.   No.



Page 56

1      Q.   Do you know what Renascent Enterprises

2   is?

3      A.   Yes.

4      Q.   What is that?

5      A.   It's an advertising marketing company

6   owned by Tanvi Chandra, T-a-n-v-i, and then

7   Chandra, C-h-a-n-d-r-a.

8      Q.   Did you bring Renascent Enterprises into

9   NRIA or did NRIA seek out Renascent Enterprises,

10  how did Renascent Enterprises begin being

11  involved with NRIA?

12     A.   I have no idea.  I met Renascent after I

13  was working there.

14     Q.   You mean after you quit working there?

15     A.   No.  I met Renascent from -- Tanvi was

16  working there prior.  I started after that.

17     Q.   Tanvi was working at NRIA?

18     A.   No, at Renascent.  Renascent was a

19  marketing agency for NRIA.  I met them after I

20  started working there.

21     Q.   After you started working at NRIA?

22     A.   Yes.

23     Q.   And at the time you started working at

24  NRIA was she providing services through Renascent

25  to NRIA?



Page 57

 1      A.   I believe so, yes.

 2      Q.   Do you recall what that was?

 3      A.   Not at the time when I first met, no.

 4      Q.   Can you go to page 2 of 4 of that

 5 document.  Could you read that piece about NRIA?

 6      A.   Building a trust --

 7      Q.   I just meant for you to read it to

 8 yourself so I could ask you some questions about

 9 it.  Is there anything in there that Tanvi said

10 that you disagree with?

11      A.   No.

12      Q.   What is the exclusive project launches

13 in celebrity -- she spelled it wrong -- but

14 engagements, what are those, do you know?

15      A.   I know she brought some Indian

16 celebrities to introduce them to NRIA and for

17 marketing.

18      Q.   Were those celebrities people that were

19 doing advertisements or were they investors?

20      A.   I believe they were doing

21 advertisements.

22      Q.   They would have been the talent, right?

23      A.   The talent, yes.

24      Q.   Would you agree with her that the EB-5

25 project -- strike that.  Would you agree with her



Page 58

1    as a result of her efforts and Renascent's

2    efforts that investor percentages increased to 20

3    percent and South Asian percentages went up to 50

4    percent?

5        A.  I don't have the statistics.  I can't

6    confirm that.

7        Q.  Do you know when you first started was

8    NRIA already soliciting people in India?

9        A.  Not in India direct but Indian nationals

10   in the U.S.

11       Q.  So there was no foreign program when you

12   first started?

13       A.  No.

14       Q.  Did you set that up with Tanvi?

15       A.  No.  Nick set that up.

16       Q.  Who set up the EB-5 program?

17       A.  I worked in coordination with Nick to

18   start doing that.

19       Q.  How about Tanvi?

20       A.  No.  She was brought in sort of like

21   from the marketing side of that, my

22   understanding.

23       Q.  Do you have any other relationship with

24   Tanvi?

25       A.  Other than being a friend.



Page 59

1        Q.  Are you a married man?

2        A.  Yes.

3        Q.  This is number 5.  Mr. La Mattina, I'm

4   not suggesting this is your document.  I'm going

5   to represent to you this is the Trustee's answers

6   to discovery that we propounded upon them.  I

7   want you to go to paragraph number two if you

8   could.

9        A.  What page?

10       Q.  It's page number 5.

11       A.  Okay.

12       Q.  If you go to number 2 the question is

13   state all facts that show when the debtor became

14   or was rendered insolvent.  And in here it says

15   additionally the date of the debtor's insolvency

16   is evidenced by his financial information which

17   establishes from at least February of 2019 the

18   debtors were unable to meet their debts as they

19   came due from operating revenue absent the

20   infusion of additional investor funds through the

21   continued perpetration of a Ponzi scheme.

22       Were you aware that in February of 2019 the

23   company wasn't paying its debts as they came due?

24       A.  No.

25       Q.  Did anybody that you communicated as a



Page 60

1  head of any of those departments including the

2  financial department ever say to you hey, Glenn,

3  we're not paying our bills back in 2019?

4       A.  No.

5       Q.  So in those communications you had with

6  the heads of those departments that issue never

7  came up, the inability to pay the debt?

8       A.  No.

9       Q.  Did you ever ask the heads of those

10  departments whether bills were being paid?

11       A.  In 2019 I was not in a COO position.  I

12  was a VP of operations.

13       Q.  What was VP of operations, what did that

14  person do?

15       A.  Basically kept the operations moving and

16  by that I meant making sure contracts -- let's

17  say the sale of a house was being done or in

18  Philly I would look at the contract, talk to the

19  realtor, coordinate any projects that Nick wanted

20  done for let's say research on different topics,

21  stuff like that.

22       Q.  So you went from VP of operations to the

23  COO?

24       A.  Right.

25       Q.  In 2021 I think you said, right?



Page 61

1        A.  I believe it was 2021 when we got our

2    contracts.

3        Q.  When you did that did you sit down with

4    all the heads of the department and say, hey, how

5    are things going in finances, did you do that?

6        A.  No.  We just had a general conversation

7    with everybody in the room to say what was going

8    on at the time.

9        Q.  As a person who was supposed to be

10   overseeing the department heads as what you said

11   in here you don't think whether they were paying

12   bills should have been a topic of conversation

13   between you the heads of those departments?

14       A.  In 2019 it was not my place.

15       Q.  I didn't say in '19. I asked you about

16   --

17       A.  When I became COO we discussed some of

18   the issues.

19       Q.  What were those issues that bills

20   weren't being paid?

21       A.  I'd have to -- I don't remember to be

22   honest with you.

23       Q.  When did you first hear that bills

24   weren't being paid?

25       A.  I guess from when Tommy was discussing



Page 62

1   that with everybody.

2        Q.   When was that?

3        A.   Probably 2021.

4        Q.   When you heard that as the COO did you

5   ever recommend to Rey or to Nick, hey, let's stop

6   taking people's money?

7        A.   No.

8        Q.   Is real estate always a safe investment?

9        A.   No.

10        Q.   What happens in a real estate investment

11   when interest rates double, are they projected to

12   produce the same kind of income?

13        A.   No.

14        Q.   And you know that insurance or that

15   interest rates went from an all time high like

16   not lower, it hasn't been lower in 30 years to

17   now they're about 7 percent, 8 percent?

18        A.   About 7, 7 and a half.

19        Q.   When those interest rates went up as the

20   person who was the head of operations didn't that

21   start to make things happen in your head about,

22   hey, how are we adjusting our operations and

23   paying our bills now that our interest

24   obligations have essentially doubled?

25        A.   No.



Page 63

1       Q.  You don't have any reason to dispute

2   what the Trustee's response is to number 2 of the

3   interrogatories, do you?

4       A.  No.  Just I wasn't aware of anything in

5   2019.

6       Q.  Fair enough.  That's number 6.  Just

7   take a minute and look at that if you could.

8   Have you seen that document before?

9       A.  Yes.

10      Q.  Do you know what changes you made to

11  this document prior to it being filed?

12      A.  Let me read it here a little closer.  I

13  don't remember what changes I made, no.

14      Q.  So now a minute ago I asked you whether

15  in 2019 you knew whether the bills weren't being

16  paid and you said you didn't think you became the

17  COO until sometime in 2020, right?

18      A.  '21.

19      Q.  Okay.  Can you read paragraph four out

20  loud.

21      A.  On May of 2018 I was hired by National

22  Realty Investment Advisors, NRIA, to serve as

23  vice president of operations.  I served in that

24  role until 2019 when I was named NRIA senior VP

25  of global operations, a role that I held in 2021.



Page 64

1          (Off the record)

2      I became the chief operating officer and was

3  ultimately laid off.  A role that I held through

4  2021 until I became the chief operating officer.

5  I was ultimately laid off as the senior VP of

6  global operations.  I took directions principally

7  from Thomas Nicholas, Nick Salzano -- Nick

8  Salzano.

9      Q.  Now you earlier testified you said you

10  didn't feel like you were working for Nick.  You

11  thought you were working for Rey?

12      A.  No.  I was always told Rey owns the

13  company.

14      Q.  If Rey owned the company and you thought

15  you were working for him why were you taking

16  directions from Nick?

17      A.  That's what I was told to do.

18      Q.  Who told you to do that?

19      A.  Nick.

20      Q.  So you worked for a company and you

21  testified earlier you thought you worked for Rey?

22      A.  Right.

23      Q.  And you put a statement into court that

24  you took your directions from Nick and that Nick

25  is the one that told to you take directions from



Page 65

1    Nick, right?

2         A.   Yeah.   Because Rey was chief executive

3    officer and Nick was Nick, whatever reason.

4         Q.   I don't understand your answer there.

5    Rey was the chief executive officer?

6         A.   And basically Nick was his consultant

7    and --

8         Q.   So you were taking direction from Ray's

9    consultant?

10        A.   Correct.

11        Q.   Not from an officer in the company?

12        A.   No.

13        Q.   So you did what Nick told you to do?

14        A.   Correct.

15        Q.   Even though he wasn't an officer of the

16   company and you didn't consider it his company,

17   right?

18        A.   Not at the time, no.

19        Q.   Not at the time you didn't consider it

20   his company?

21        A.   I did not consider it was his company

22   because he always said Rey owned the company.

23        Q.   When Nick said to you, hey, you answer

24   to me --

25        A.   Right.



Page 66

1        Q.  -- didn't you go to your buddy Rey who

2   you thought owned the company and you thought you

3   worked for said, hey, what the hell is going on

4   here, Nick's telling me I got to answer to him?

5        A.  That's the way it was.

6        Q.  I didn't ask you that.

7        A.  No.

8        Q.  Did you go to Rey?

9        A.  No.

10       Q.  So you knew there was something strange

11  going on there, didn't you?

12       A.  No.

13       Q.  You didn't?

14       A.  No.

15       Q.  You didn't think it was odd that the

16  person that owned the company and ran the company

17  was having you respond and take orders from his

18  consultant?

19       A.  No.

20       Q.  You didn't find that odd?

21       A.  Not at all.

22       Q.  In paragraph five you said you traveled

23  abroad to help attract new investors, true?

24       A.  True.

25       Q.  Did you actually attract new investors?



Page 67

1        A.   We brought people in from India, yes.

2        Q.   Was that in '21 and '22?

3        A.   That was 2019, 2020.

4        Q.   The paragraph six it says generally when

5   someone at NRIA, usually Nick, had an idea for a

6   new advertisement I would submit bids to two or

7   three advertising companies to assess the cost of

8   implementing the idea.  Is that true?

9        A.   Yes.

10       Q.   Who were the advertising companies you

11  submitted bids to?

12       A.   We had H&L Media, Renascent, the

13  advertising company that was with Star Ledger

14  which was -- I forget their name.

15       Q.   Renascent, H&L Media --

16       A.   Renascent, H&L.

17       Q.   How did you transmit those bid requests,

18  by email?

19       A.   Yes.  Or I called them and told them

20  what was needed.

21       Q.   Did they give you the proposals back by

22  email?

23       A.   Yes.

24       Q.   So if you did this, if you submitted bid

25  requests they should still be on the company's



Page 68

1   servers, right?

2       A.   I believe so, yes.

3       Q.   When you got to the company was Javier

4   and Media Effective doing business with the

5   company?

6       A.   Yes.

7       Q.   So when you said you were instructed to

8   include Media Effective wouldn't you have

9   included them anyway as a party that they were

10  already doing business with when you were

11  soliciting bids?

12      A.   Yes.

13      Q.   He didn't just direct you to send it to

14  Media.  He directed you to send it to Media --

15      A.   Other people, yes.

16      Q.   -- Effective, H&L Media, Renascent, a

17  lot of different people, right?

18      A.   Different companies, yes.

19      Q.   So when you said you were instructed by

20  Nick to include Media Effective he asked you to

21  include everybody?

22      A.   Everybody.

23      Q.   He wasn't picking Media Effective and

24  saying send it to them?

25      A.   No, he was saying send it to everybody.



 1      Q.  Right.  When you got the bids back how

 2  did you compare them?

 3      A.  I just looked at the numbers and I gave

 4  it to Nick and we discussed it.

 5      Q.  Were they always apples to apples?  You

 6  know what that means?

 7      A.  Yes, I know what that means.  At the

 8  time they looked similar.  A lot of times the

 9  prices, Renascent would be a little cheaper than

10  Javier.  Nick would always say Javier's my guy.

11  We're going with Javier.

12      Q.  There were issues with Tanvi at the

13  company, weren't there?

14      A.  There were some issues, yes.

15      Q.  They had to send her a cease and desist

16  letter, didn't they?

17      A.  I believe they did, yes.

18      Q.  You didn't want to send it, did you?

19      A.  I don't remember.

20      Q.  You don't remember --

21      A.  I don't remember.

22      Q.  You don't remember being written to

23  three times being told send out that letter?

24      A.  I don't remember.  It's been two and a

25  half, three years.



Page 70

1      Q.  Think about it.  Were you resistant to

2  sending it out?

3      A.  I don't remember even why the cease and

4  desist was sent.

5      Q.  Were you aware she was holding herself

6  out as an officer of NRIA after she'd been

7  terminated?

8      A.  No.

9      Q.  Did you ever see any emails that Javier

10  wrote to Nick and to Rey where he showed that the

11  prices that Tanvi was charging for time on local

12  sports events that he was getting 60 seconds time

13  for the amount she was -- for the same amount she

14  was charging and offering 30 seconds of time in

15  the ads?

16      A.  I don't remember, no.

17      Q.  You don't remember Javier beating her

18  badly in that?

19      A.  I remember Javier did underbid her on

20  different occasions.

21      Q.  She didn't like that much, did she?

22      A.  I imagine not, no.

23      Q.  You were worried about it because it was

24  hurting your efforts in India because Tanvi was

25  upset, right?



Page 71

1        A.   No.   She was upset but it wouldn't hurt

2    my efforts in India.   I made enough connections

3    over there.

4        Q.   You didn't need Tanvi in India is what

5    you're saying?

6        A.   Yes.

7        Q.   Even thought you couldn't speak the

8    language?

9        A.   They speak English.

10       Q.   Even though you didn't know any of the

11   local politicians?

12       A.   No.

13       Q.   When you say nine times out of 10 what

14   does that actually mean?

15       A.   I believe more times Javier's prices

16   were higher.

17       Q.   More times?

18       A.   I don't know.

19       Q.   When you said nine out of 10 did you

20   have them in front of you?

21       A.   No.

22       Q.   So you can't --

23            MS. LASLEY:   Hold on one second.   We

24   still need an answer.

25       A.   Go ahead.



Page 72

1        Q.  So you didn't have any documents in

2    front of you when you wrote this, you can't

3    remember what any of the bids were?

4        A.  Correct.

5        Q.  And yet you're able to say nine out of

6    10 he was higher?

7        A.  Yes.  General statement.

8        Q.  It's a general statement.  It wasn't

9    based on anything you actually saw.  It was just

10   a recollection from over two and a half years

11   ago?

12       A.  Correct.

13       Q.  It could be flawed, right?

14       A.  Could be.

15       Q.  Did you oppose using Media Effective at

16   all?

17       A.  No.

18       Q.  How did you determine the margins that

19   Javier was making?

20       A.  I didn't.

21       Q.  Then how come you're saying it included

22   a 40 percent margin in your declaration if you

23   never saw what he paid for it?

24       A.  I was told by the investigator at that

25   time.



Page 73

1     Q.  Oh?

2     A.  That's what the average margins were at

3  the time.

4     Q.  Wait a minute now.  This isn't of your

5  personal knowledge, is it?

6     A.  No.

7     Q.  You signed a document under penalty of

8  perjury that says I have personal knowledge and

9  am competent to testify.

10     A.  My personal knowledge was that his bids

11  were higher but I didn't know the percentage.

12     Q.  So that's not true what you wrote?

13     A.  I believe not then.

14     Q.  And at the time you didn't have any idea

15  what his margins were?

16     A.  Correct.

17     Q.  And you still don't?

18     A.  No.

19     Q.  But you signed this document anyway?

20     A.  Yes.

21     Q.  And you weren't offered anything by the

22  Trustee to do that, right?

23     A.  No.

24     Q.  You haven't been offered any kind of

25  forbearance or anything for your cooperation,



Page 74

1    right?

2         A.   No.

3         Q.   When you say the cost was always

4    substantially more that's not true either, is it?

5         A.   Define the word substantial.

6         Q.   You wrote it.

7         A.   Okay.  It was more.  Whether it be

8    substantially more, I don't know.

9         Q.   You said always.  It wasn't always?

10        A.   No.  Can't be always, no.

11        Q.   I just pointed out an example to you

12   where he beat her by 50 percent.

13        A.   Correct.

14        Q.   Do you know what the card rate is for

15   advertising?

16        A.   I'm going to say probably between 10 and

17   15 percent.

18        Q.   No, no, I didn't ask you what margins

19   were.  I asked you what's the card rate in

20   advertising, do you know what that is?

21        A.   No.

22        Q.   How are you comparing bids when you

23   don't even know what the card rate is?

24        A.   I'm just saying from what I was told.

25        Q.   What you were told by the Trustee's



Page 75

1   lawyers --

2         A.   No.

3         Q.   -- the Trustee or someone else?

4         A.   No.   What I was told by when we were

5   looking over the -- Nick deciding where to go

6   with the bids.

7         Q.   Is this your sentence at the end of

8   paragraph seven?   Read it.

9         A.   Which page, which document?

10        Q.   The document --

11        A.   Number seven?

12        Q.   Yes.

13        A.   All right.

14        Q.   For reasons unknown to me Nick Salzano

15  whose criminal trial begins March 5th.   Did you

16  add that?

17        A.   No.

18        Q.   Who put that in there?

19        A.   I believe -- I guess the investigators.

20        Q.   Those aren't your words, right?

21        A.   No.   I wasn't aware of when his trial

22  was going to start I believe.

23        Q.   Do you know what personal knowledge is?

24        A.   Yes.

25        Q.   Do you know you signed this under a



Page 76

1    penalty of perjury, do you know that, sir,

2    because that's serious?

3         A.  Okay.

4         Q.  Did you know you signed it under penalty

5    of perjury?

6         A.  No.

7         Q.  Well, what's the bottom say, pursuant to

8    28 USC I declare under penalty of perjury --

9         A.  Yes.  Okay, fair enough.

10        Q.  And it's replete with false statements,

11   isn't it?

12        A.  Obviously, yes.

13        Q.  So when Tanvi was bidding at a price

14   twice what Javier was for spots you didn't have

15   any problems with giving Tanvi business, did you?

16        A.  I wouldn't decide who got business.  It

17   was Nick's decision.

18        Q.  Do you have any information sitting here

19   today that there was some kind of nefarious

20   relationship between Mr. Torres and Mr. Salzano

21   that caused the business he gave him other than

22   your own speculation?

23        A.  No.

24        Q.  Do you have any reason to think he was

25   kicking money back to Nick?



Page 77

1          A.   No.

2          Q.   These are direct response

3    advertisements, right?

4          A.   Um-hum.

5          Q.   Do you know what a direct response is?

6          A.   You see the ad and somebody calls.

7          Q.   Right.  As opposed to like a commercial

8    for Coca-Cola where it's just about how many

9    people see it?

10         A.   Right.

11         Q.   So when someone sees an ad for NRIA do

12   they just sign up and invest or does somebody

13   have to close that transaction?

14         A.   Someone is going to call and they'll

15   talk to a representative and hopefully they'll

16   close.

17         Q.   So the ad itself just gets interest, it

18   doesn't result in anybody investing?

19         A.   Correct.

20         Q.   So the fact that someone saw an ad that

21   was put on by NRIA doesn't in effect mean they

22   were an investor, right?

23         A.   Correct.

24         Q.   Were you a closer?

25         A.   No.



Page 78

1      Q.  Who were the closers?

2      A.  We had Art, A.J. and 15, 20 other

3   people.

4      Q.  Who wrote the scripts for them?

5      A.  I believe Nick did.

6      Q.  Did you review those scripts?

7      A.  Nope.

8      Q.  Never reviewed them?

9      A.  I read them, yes.

10     Q.  Oh, you read them.

11     A.  But I didn't review them.  If you want

12  to use the word review means you took it apart

13  and go through it piece by piece.

14     Q.  You read them and you were aware of the

15  context?

16     A.  Yes.

17     Q.  Did you ever make any suggested changes?

18     A.  No.

19     Q.  Who authorized checks to be cut at the

20  company at NRIA?

21     A.  It would be Rey or Nick.

22     Q.  Did you ever tell Rey, hey, don't pay

23  Javier, he's overcharging?

24     A.  No.

25     Q.  Did you ever tell Nick?



1      A.  No.

2      Q.  At the time you were at the company you

3  never raised issues about Javier's rates, did

4  you?

5      A.  No.

6      Q.  So this is just hindsight.  You're going

7  back in time and saying, hey, guess what, back in

8  the day I thought this.  I never told anybody but

9  I thought it, right?

10     A.  I dealt with Javier in marketing and

11  advertising for a period of --

12     Q.  Sir, that's not the answer to the

13  question.

14          MS. LASLEY:  Hold on.  Let him finish.

15     A.  Let me finish.  I'm going to give you an

16  answer but it's a little more revolved --

17  involved.  Okay?  I became involved with the

18  advertising and marketing more probably in, end

19  of 2019 into 2020 when I was in India and when I

20  got back in the states in 2020.

21     Katey Kana was hired to handle the

22  advertising and marketing at the time.  She dealt

23  with Javier, Tanvi, Brian Prinsell, Claudio and I

24  was just more hearing what was going on behind

25  the scenes between the people.



Page 80

1        Q.  Before we get too far I want to hand you

2    the subpoena for your attendance at trial on

3    April 10th.  We put notice of it on the docket

4    today.  Mr. La Mattina, I just want to remind you

5    that your testimony today is no different than

6    you sitting on a witness stand in court.

7        A.  I understand.

8        Q.  Have you ever been involved with a

9    company that did reputation salvation or

10   reputation restoration?

11       A.  Reputation management, yes.

12       Q.  What was the name of that company?

13       A.  I don't remember offhand.

14       Q.  Was one of the things that you did as a

15   reputation -- what was the word you used?

16       A.  Reputation management.

17       Q.  What would you do as a reputation

18   manager?

19       A.  I wouldn't be doing anything.  Katey

20   Kana contracted a reputation management company

21   to oversee what could be done when Nick was

22   arrested.

23       Q.  You said you were a reputation manager.

24   I asked you did you --

25       A.  I didn't say I was a reputation manager.



Page 81

1      Q.  Have you been involved in reputation

2   management services?

3      A.  Not myself, no.

4      Q.  But Katey Kana hired somebody?

5      A.  Yes.

6      Q.  Were you the person that dealt with

7   them?

8      A.  I dealt with Katey and that person.

9      Q.  Who was that person?

10      A.  I don't remember the name of the company

11   or the firm that was handling it.

12      Q.  Do you remember the name of the

13   individual that you sat with?

14      A.  No.

15      Q.  Were some of the recommendations that

16   names get spelled differently?

17      A.  Are we talking about Nick Salzano?

18      Q.  Yes.

19      A.  I did nothing for that.  That was not

20   the reputation manager I was talking about.  I

21   believe Nick Salzano had other -- what word am I

22   going to use here -- identities or personas.  He

23   was a body builder, he was a hairdresser, stuff

24   like that on the internet.

25      Q.  What I'm asking you is the company that



Page 82

1    you dealt with, was one of their reputation

2    management proposals that people spelled their

3    names different?

4         A.   No.

5         Q.   Do you know that Nick had spelled his

6    name a number of different ways?

7         A.   That I found out.

8         Q.   When did you find that out?

9         A.   After he was arrested.

10        Q.   When he came back did you continue to

11   take directions from him at Rey's direction?

12        A.   Yes.

13        Q.   So when he came back you knew he was

14   arrested for trying to defraud a bank.  You knew

15   that he was spelling his name different so people

16   couldn't find out who he was.  You knew he wasn't

17   the owner of the company but you were directed to

18   work for him.  And when he came back from being

19   jailed you continued to take instruction from

20   him, right?

21        A.   Correct.

22             THE VIDEOGRAPHER:  We're going off

23   record.  The time is 11:20 a.m.

24             (Morning recess)

25             THE VIDEOGRAPHER:  We're back on the



Page 83

1    record.  The time is 11:29 a.m.

2    BY MR. GEORGE:

3        Q.  Mr. La Mattina, we're going to keep

4    going here.  This is La Mattina 10.

5        A.  With all due respect I don't have my

6    reading glasses.

7        Q.  I'll read it for you.  So have you ever

8    seen this before, the Top 100 Magazine?

9        A.  Yeah.

10       Q.  Do you recall giving them an interview?

11       A.  Yeah.  We paid for it.

12       Q.  You paid for it?

13       A.  It's one of those paid kind of --

14       Q.  It's kind of an advertisement?

15       A.  Yeah.

16       Q.  Intended to solicit people to invest?

17       A.  I guess to solicit, just to market NRIA,

18   yes.

19       Q.  To solicit interest in NRIA?

20       A.  Yes.

21       Q.  On the bottom of it here it says I

22   managed a team of four project managers in India

23   and I run the firm's EB-5 visa program.  True?

24       A.  Yes.

25       Q.  Our primary responsibility is to raise



Page 84

1   foreign capital to invest in real estate

2   development projects in the U.S. via NRIA's

3   partnership portfolio fund.  And then it says,

4   which offers foreign investors an assured 12

5   percent return on investment.  Do you see that?

6        A.  Yes.

7        Q.  Did you say that?

8        A.  I didn't say it but yes, that's what it

9   says.

10       Q.  It's in an article about you --

11       A.  Yes.

12       Q.  -- in a magazine and your picture is

13  here?

14       A.  Yes.

15       Q.  And being quoted as the person who is

16  the chief operating officer of NRIA, right?

17       A.  What year was this written?

18       Q.  I don't know.

19       A.  Because I was not COO at the time like I

20  said.  Most likely I was still a VP.

21       Q.  When did you start the EB-5 program?

22       A.  2019.

23       Q.  So it was sometime after 2019, right?

24       A.  Yeah.

25       Q.  I mean this article?


MAGNA
LEGAL SERVICES

1       A.   Yeah.

2       Q.   Because you're making reference to that

3  program, right?

4       A.   Correct.

5       Q.   It says last year in December the EB-5

6  minimum investment increased from 500 to 900,000

7  to 1.8 million depending on the geographic area

8  of the project.  What's that about?

9       A.   In EB-5 they have what's called target

10  areas, employment target areas, where there's a

11  high unemployment rate.  That area is deemed,

12  instead of investing a larger amount of money

13  such at the time let's say 900,000, you could

14  invest 500,000.

15      Q.   So it was reducing the minimum

16  investment?

17      A.   Correct.  Because of the high

18  unemployment area.

19      Q.   Because of the high unemployment area,

20  explain that?

21      A.   Because it's a government program they

22  look at different areas that need stimulation.

23  So if it's a high unemployment area the EB-5 is

24  supposed to bring in 10 jobs per investment for a

25  period of two years.  At that time if you're in a



Page 86

1   targeted employment area where your project is

2   located then you can invest 500,000.  If it's not

3   in a high unemployment area you can invest the

4   higher amount.

5        Q.  I see.  I understand.  And who creates

6   these designated areas, the government, the

7   federal government?

8        A.  Federal government.

9        Q.  It's like an area in need or something?

10       A.  I guess something like that, yeah.

11       Q.  In need of redevelopment?

12       A.  Yeah.

13       Q.  So was there a time NRIA had difficulty

14  refinancing with low interest rate permanent

15  financing on facilities?

16       A.  I wouldn't know that at the time.

17       Q.  You wouldn't know that at the time?

18       A.  No.

19       Q.  I thought you said you were the guy who

20  went to try to get permanent loans to take out

21  the construction financing?

22       A.  That was for individual investors, not

23  NRIA.

24       Q.  So if an individual investor said, hey,

25  I want my money back or I want to make a



1   withdrawal from the --

2       A.  No, the way that worked was they would

3   take a project, subdivide the project let's say

4   into 10 lots, then sell off each lot to

5   individual investors.  They would assist the

6   investor and then getting a construction loan to

7   buy -- to build let's say the project.  Then you

8   have a construction loan.  I would have come in

9   at the time and then refinanced the construction

10  loan to bring in permanent financing to a 30 or

11  15 year mortgage.

12      Q.  So when the investor put up its money

13  did it actually get title to one of those

14  individuals lots?

15      A.  Yes.

16      Q.  And then did NRIA through its U.S.

17  Construction then construct a building on the

18  property?

19      A.  Correct.

20      Q.  How was U.S. Construction funded?

21      A.  I have no idea.

22      Q.  Were you ever asked to move money from

23  NRIA into U.S. Construction?

24      A.  No.

25      Q.  Can you go to page 2 of 3 of that



Page 88

1    document.  If you go to that page it says, what

2    makes NRIA unique.  Do you see that?

3         A.  Yeah.

4         Q.  It says, second is NRIA's one hundred

5    percent successful track record.  Since 2010 NRIA

6    has acquired and developed or is in the process

7    of developing more than 1,100 luxury residential

8    units across more than a hundred projects

9    totaling over 2.3 million square feet valued in

10   excess of $1 billion all successfully completed.

11   Is that true?

12        A.  Part of it is true.

13        Q.  Which part is not true?

14        A.  It wasn't a hundred projects roughly.

15   During the time I think it was like 18 projects.

16        Q.  Why did you say a hundred?

17        A.  I don't remember.

18        Q.  You knew at the time it wasn't a

19   hundred, that it was 18?

20        A.  I don't remember doing the article so I

21   don't remember.

22        Q.  But you're sure that that part's false?

23        A.  That one I know is not right.

24        Q.  How about 2.3 million square feet?

25        A.  Possibly.  I don't know the statistics.



Page 89

1        Q.   In 18 projects?

2        A.   18 projects we had it valued at 1.2

3   billion from the analysts.

4        Q.   Who were the analysts?

5        A.   We hired analysts, individual analysts.

6        Q.   Who were they, a company I assume,

7   right?

8        A.   No.  We had our own individual analysts.

9   We had Raaj Patel and two other individuals.

10       Q.   What did Raaj Patel do?

11       A.   He was an analyst.  He looked at

12   numbers, construction numbers, looking at

13   covering rentals and stuff like that.

14       Q.   Who did he answer to?

15       A.   Nick.

16       Q.   Not to you?

17       A.   No.

18       Q.   Did you see this before it was

19   published?

20       A.   I probably did, yes.

21       Q.   Why didn't you correct that?  I mean

22   that's 10 times bigger than what you -- or five

23   times bigger than what you had.

24       A.   That's true.  I don't know.  I don't

25   have the answer.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 91 of 203

Page 90

1       Q.  It says third, NRIA's excellent

2   relationship with the lenders allow us to finance

3   a majority of projects with low cost debt.  Was

4   there a time that that didn't become true?

5       A.  I can't answer that.

6       Q.  Was there a time when you had difficulty

7   getting investor money back to them with bank

8   loans, permanent bank loans?

9       A.  No.  I wouldn't say they ever had an

10  issue with that.  The ACH payments were paid back

11  every month.  That's what we were paying the

12  investors back a monthly stipend on their

13  investment.

14      Q.  When you say stipend was there an

15  interest component or was it just a return of

16  principal?

17      A.  No.  It was a return of principal,

18  excuse me.

19      Q.  So you were returning principal?

20      A.  Yes.

21      Q.  Why were you doing that?

22      A.  That's the format they set up at the

23  time.  That was between Nick and Coley, Coley

24  O'Brien.

25      Q.  So how did you determine how much a



Page 91

1    stipend would be for any particular investment?

2         A.   It was in their contracts.

3         Q.   Were you ever a signatory on any of

4    those contracts?

5         A.   No.

6         Q.   Who signed those contracts for the

7    company?

8         A.   Rey.

9         Q.   Rey signed them all?

10        A.   Um-hum.

11        Q.   Then it says, more than 950 investors

12   have participated in NRIA's fund since its

13   inception and all have received full returns of

14   principal investment and targeted returns.  True?

15        A.   They received their -- they received,

16   some of them received principal returns if

17   requested.  Some of them were rolled over in

18   other projects.

19        Q.   So they didn't all get full returns?

20        A.   Correct.  Correct.

21        Q.   Some of that money got rolled over in

22   other projects?

23        A.   Correct.

24        Q.   Was that because you didn't have the

25   ability to pay them?



Page 92

1          A.   No.  It's just what they chose.

2          Q.   But you had to meet their investment

3    money to roll over.  When you I say you I mean

4    NRIA.

5          A.   Yes.

6          Q.   NRIA needed that money to keep coming

7    in, right?

8          A.   Correct.

9          Q.   So that rollover helped NRIA?

10         A.   Correct.

11         Q.   This is number 11.  Can you tell me what

12   this document is?

13         A.   It looks like my website.

14         Q.   What is X-On Consulting?

15         A.   Yes, my company.

16         Q.   X dash on, you pronounce the dash part?

17         A.   X-On Consulting I call it.

18         Q.   Is this a company you're running now?

19         A.   Yes.

20         Q.   How long has X-On Consulting consultants

21   been operating?

22         A.   The X-On Consulting was probably -- I

23   filed that I think about a year and a half ago,

24   year and a quarter ago roughly.

25         Q.   A year and a quarter?



Page 93

1      A.  Yeah, about a year roughly here or

2   there, give or take.

3      Q.  So what does X-On Consulting actually

4   do?

5      A.  I do business consulting.  Like I said,

6   I was working with another company called Prime

7   Equity.  They were looking to develop their --

8   one of their projects, have fund money come in to

9   develop it.  I gave them some ideas to do it.

10  It's basically a consulting company.

11     Q.  How do you get paid?

12     A.  I negotiate a fee.  We negotiate it and

13  have a contract.

14     Q.  A fixed fee?

15     A.  Yes.

16     Q.  I think I asked you what your salary was

17  at the NRIA and I think you said initially it was

18  110.  Did it go up when you became the COO?

19     A.  Yeah.  When I left there I was making

20  about 350.

21     Q.  How about bonuses?

22     A.  Occasionally, yeah.  I don't know the

23  number.

24     Q.  So if we saw your tax return we'd know

25  what you made?



Page 94

1          A.   Yes.

2          Q.   You filed a tax return in each of those

3     years?

4          A.   Yes.

5          Q.   When you said bonuses were they like the

6     bonuses you talked about when you were making

7     110,000, a thousand here and --

8          A.   Yeah, it wasn't much.  I mean I'm not

9     making 10,000, 20,000.

10         Q.   But you were making 350,000?

11         A.   Yeah.

12         Q.   Would it be fair to say that Tanvi or

13    Renascent, her company, were running a lot of

14    high volume ads for NRIA?

15         A.   Yeah.  I would say so.

16         Q.   They weren't as targeted as they were as

17    regards to particular times that they were airing

18    and things like that, right?

19         A.   I don't know off the top of my head.

20         Q.   Do you remember there was a discussion

21    between Katey and Nick and Rey about the fact

22    that Tanvi was running, running a lot of ads but

23    they weren't in great time slots and they weren't

24    getting the kind of responses that they were

25    expecting for Tanvi?



Page 95

1      A.  I believe that conversation I heard

2  about it.

3      Q.  Do you remember Javier looking at

4  Tanvi's quotes for time and coming back and

5  saying that he thought that the spots were not

6  being effective in generating leads for the

7  company?

8      A.  I believe that's third party from Nick

9  at the time, yes.

10      Q.  So back to that document we just stuck

11  in front of you that says X-On.  What's the motto

12  that you put up there?

13      A.  Business done right.

14      Q.  Oh, sounds almost like real estate done

15  right, doesn't it?

16      A.  Yeah, I know.

17      Q.  But you're sure you didn't come up with

18  that slogan, right?

19      A.  No.  I borrowed it.

20      Q.  This is number 14.  Have you ever seen

21  this email chain before, Glenn?

22      A.  Probably.  I don't have a full

23  recollection.

24      Q.  Do you see there in the middle I still

25  like the tag lie -- it's supposed to be a line



Page 96

1    I think but it says lie, like the false

2    statement -- real estate investing done right.

3    That's the first time I see that in a document

4    and it came from you and you're sure that came

5    from Rey?

6        A.  Yeah.

7        Q.  Do you see below that there's an email

8    from Javier that's written to a number of people

9    including you and he's telling you the things

10   that have to be on the billboard, right?

11       A.  Um-hum.

12       Q.  He wasn't suggesting content, was he?

13       A.  I don't know.

14       Q.  Was he saying you should say you'll get

15   12 percent, you could say this, you could say

16   that?

17       A.  Most of the content always came from

18   Nick.

19       Q.  So you don't know of anything?

20       A.  No.

21       Q.  If you go to the third page of that

22   document there's an email from Claudio Burgos.

23   Do you know who that is?

24       A.  Yes.

25       Q.  Who is that?



1        A.   One of the partners from H&L Media.

2        Q.   That's one of the entities you mentioned

3   here when you were talking to me about people

4   you'd bid?

5        A.   Yes.

6        Q.   He says, here's the markup with the

7   shading but we balance the size and position and

8   you said I don't like the look.

9        A.   Okay.

10        Q.   So you were approving that ad, right?

11        A.   I believe so, yeah.

12        Q.   Did Katey Kana work for you?

13        A.   No.  She worked for NRIA.

14        Q.   Was she one of the department heads?

15        A.   Yes.

16        Q.   So she answered to you, right, you said

17   initially that you --

18        A.   Yes.

19        Q.   Here she's suggesting on page 3 please

20   make the following edits on the realty investing

21   done right.  Do you see that?

22        A.   Okay.

23        Q.   I assume you approved those?

24        A.   Going back not remembering, probably.

25        Q.   This will be La Mattina 16.  Can you go



1    to the top of that document.

2         A.   Okay.

3         Q.   It appears to be an email from you,

4    Glenn La Mattina, to Nicholas Salzano, Tanvi and

5    Javier and Kyle Stafirny, right?

6         A.   Um-hum.

7         Q.   And there's a quote underneath there.

8    Read that if you could into the record.

9         A.   NRIA delivering superior returns and

10   steady cash flow to all investors at this time.

11        Q.   So those were your revisions to that

12   language, right?

13        A.   I believe so.

14        Q.   And you bolded the things that you

15   added?

16        A.   I can't say that for sure because I

17   don't remember.

18        Q.   If you look below it says, okay, let's

19   say NRIA helping with superior returns and cash

20   flows and above you said NRIA delivering superior

21   returns and steady cash flows.

22        A.   Probably.

23        Q.   You don't have any reason to dispute

24   that that's your writing, right?

25        A.   I have no reason to dispute it, no.



Page 99

1      Q.  This is 17.  Have you ever seen this

2  email before?

3      A.  No.

4      Q.  Do you see here that Javier is telling

5  her that she's delivering 407 spots and that with

6  his proposal he will deliver more than 800 live

7  game spots?

8      A.  What part?

9      Q.  Next to the last paragraph.

10      A.  Okay.

11      Q.  Can you go to the next to last page of

12  that document or maybe the third from the last

13  page.  It starts with an email from Javier dated

14  August 12, 2020.  Have you ever seen that?

15      A.  Where are you?  August 10th?

16      Q.  I'm sorry, Glenn, I gave you the wrong

17  page numbers.  It's the third page in.

18      A.  Okay.

19      Q.  Were you aware at this time that Tanvi

20  was charging twice as much for these live game

21  shows that Javier was?

22      A.  No.

23      Q.  At the bottom of this there's an email

24  to Javier, right, and it says, sorry to drag you

25  into this but please give me a detailed answer



Page 100

1   below.  I have to answer accurately since I

2   reduced her a lot and she's a known liar.  Do you

3   see that?

4        A.  Um-hum.

5        Q.  He's talking about Tanvi, right?

6        A.  Yes.

7        Q.  Did he ever tell you he thought she was

8   a liar?

9        A.  No.  Javier never said that to me.

10       Q.  No, no, I'm talking about Nick.  It's

11   from Nick that email.  See it?

12       A.  Um-hum.  Yes.

13       Q.  You didn't know that Nick thought she

14   was a liar?

15       A.  I know Nick didn't like some of the

16   dealings from the advertising.

17       Q.  What was wrong with some of the

18   dealings?  He thought she was self-dealing,

19   right?

20       A.  He thought she was charging for spots

21   not delivered.

22       Q.  That was in fact true, wasn't it?

23       A.  From my understanding, from what I

24   heard, yes.

25       Q.  It got her fired, didn't it?



Page 101

1       A.   No.

2       Q.   Who fired her from NRIA?

3       A.   You mean the contract side?  She

4  actually became an employee at NRIA at the very

5  end.

6       Q.   That's what I'm talking about, was she

7  an employee at the very end?

8       A.   At the very end, yeah.

9       Q.   This is 18.

10      A.   Okay.

11      Q.   Did you ever see this letter?

12      A.   I believe, yeah, Nick ordered it done.

13      Q.   And he ordered you to send it out,

14  right?

15      A.   I believe so, yes.

16      Q.   You were somewhat resistant to the

17  notion of that, weren't you?

18      A.   Yeah.  I didn't realize the full extent

19  of what was going on with Tanvi and Nick.

20      Q.   Were you the person who looked at her

21  bills?

22      A.   Reviewed them, yeah.  Then I gave them

23  to Nick.

24      Q.   This is number 38.  Does that look like

25  one of Renascent Enterprises' bills?



Page 102

1          A.  Correct, yes.

2          Q.  You authorized the payment of these?

3          A.  I reviewed them and then sent them to

4      Nick.

5          Q.  Tell me how many ads ran between August

6      31st and September 6, the number?

7          A.  I have no idea.

8          Q.  How many ads ran on Fun Asia Radio, how

9      many times did they run it?

10         A.  I don't know.

11         Q.  So how do you know that she ran them at

12     all?

13         A.  I don't have full confirmation that she

14     did.

15         Q.  Did you ever see a bill for Tanvi where

16     she detailed the amount of times the spots ran?

17         A.  I don't say a hundred percent.  I

18     believe she did send that over to Nick to review

19     to show.

20         Q.  I'm talking about an invoice?

21         A.  No.

22         Q.  You never saw an invoice from her that

23     actually detailed the amount of times the spots

24     ran, right?

25         A.  No, not that I've seen, no.  These were



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 104 of 203

Page 103

1   usually the bills and she gave me copies.

2        Q.  Do you know what kind of margin she was

3   making on these sales?  It could have been a

4   hundred percent, right?

5        A.  Could have been.  In discussion, though,

6   she was saying she did anywhere between 10 to 15

7   percent.  And then I could tell you at the end

8   Nick told her to get raw pricing and add her

9   profit on top separately.

10        Q.  You didn't have any problems paying

11   them, though, even though there was an absence of

12   any detail for how many spots ran, right?

13        A.  No.  Whatever was given to Nick.  Nick

14   reviewed it.  He paid it.

15        Q.  Were you able to determine the margins

16   that any of these other companies were charging?

17        A.  I know between H&L about the same,

18   between 10 to 15 percent.

19        Q.  How were you able to determine that?

20        A.  This is what they told me.  This is what

21   it was charging me to buy, let's say, the

22   billboard ads.  We're adding our profit on top.

23        Q.  19 percent you said?

24        A.  No.  I said between 10 to 15.

25        Q.  And that would be right on the invoice?



Page 104

1        A.    That's -- I believe so, yes.    I haven't

2    seen their invoices in a long time.

3        Q.    Was there a particular place where you

4    retained the competitive bids other than

5    electronically, did you keep any paper copies of

6    any of that stuff?

7        A.    No.   It was all electronic.

8        Q.    Was there a particular space inside of

9    your email box like a box within your in-box?

10       A.    Like a folder?

11       Q.    Yeah.

12       A.    Probably.

13       Q.    Do you know what kind of office software

14   NRIA used, did they use Microsoft Outlook?

15       A.    Yeah.

16       Q.    How did you know Rey Grabato?

17       A.    I met him when I met Nick.

18       Q.    So you didn't know him before you met

19   Nick?

20       A.    No.

21       Q.    Was he also a mortgage broker?

22       A.    I believe so, yes.

23       Q.    You didn't know him from those circles?

24       A.    No.

25       Q.    Did NRIA have any commercial property it



Page 105

1   was developing?

2        A.   When you say commercial, what do you

3   mean?

4        Q.   You know a shopping center, a mall?

5        A.   No.

6        Q.   Office building?

7        A.   We had apartments with retail.  That was

8   pretty much our mixture of the two.

9        Q.   So they were essentially residential but

10  maybe there might be a first floor retail

11  component?

12       A.   Yeah.

13       Q.   Who is Patryk Golaszewski?

14       A.   He was one of the employees at NRIA.

15       Q.   What was his job?

16       A.   I'll call him the gopher for Nick.

17       Q.   Gopher, g-o-p-h-e-r?

18       A.   Yeah.

19       Q.   Like the rodent?

20       A.   Yeah.

21       Q.   I think a gopher is a rodent but I'm not

22  sure.

23       A.   I guess.

24       Q.   When you say he was a gopher did he have

25  any skills, like --



1        A.   No.   He was a young college kid.

2        Q.   Were you aware that Nick was trying to

3   get Javier to actually find out what Tanvi was

4   paying for the advertisement separate from the

5   agency fee?

6        A.   No.

7        Q.   Did you know that Nick had concerns that

8   Tanvi was overcharging for the advertising time?

9        A.   He brought it to my attention.

10        Q.   Did you ever discuss with Tanvi the

11   cease and desist letter?

12        A.   I asked her what that was about and she

13   mentioned to me that she was still trying to get

14   better pricing on different things on behalf of

15   NRIA.   I told her to stop.   Nick wanted her to

16   stop.

17        Q.   So she was no longer an employee of NRIA

18   at that point?

19        A.   She wasn't.   She was still contracted.

20   She was a contracted vendor.

21        Q.   So she was out and representing to third

22   parties she had some authority within NRIA,

23   right?

24        A.   Correct.

25        Q.   And she didn't have that authority, did



1   she?

2       A.   Not when she got her cease and desist,

3   no.

4       Q.   Who is Tom Marsillo?

5       A.   Who?

6       Q.   Tom Marsillo, do you know him?

7       A.   No.

8       Q.   This is La Mattina 20.  Did you ever see

9   this email from Javier to Nick and to Pat and to

10  Katey Kana?

11      A.   No.

12      Q.   In it he's saying she's charging $142

13  for a 30 second spot and that his price is $71,

14  right?

15      A.   Um-hum.

16      Q.   Yes?

17      A.   Yes, sorry.

18      Q.   This is going to be La Mattina 21.

19  Glenn, do you see you're listed on here on these

20  email chains?

21      A.   I see that.

22      Q.   You see this email from Patryk

23  Golaszewski.  He says, team, javier has a better

24  A&D cost.  Like he said he is trying to get them

25  to place more spots in the six to 10 time frame.



Page 108

1  I think we should stick with just pushing more

2  spots -- I think we should stick with just

3  pushing more spots here because it is a

4  conservative talk show.  There's a typo in it and

5  I read the typo.  He said, like he said he is

6  trying to get them to place more spots at

7  six a.m. to 10 a.m. time frame.  I think we

8  should stick with just pushing more spots her

9  since it is conservative talk show.  I do not

10  think we should increase frequency and spend more

11  on this situation yet until we see if the

12  conservative talk delivers.  Do you see that?

13      A.  Um-hum.

14      Q.  In response to Pat telling Nick that

15  Javier has the better rates he says Jav, proceed,

16  right?

17      A.  Yes.

18      Q.  Did you at that time have any

19  reservation about Javier proceeding with that

20  program?

21      A.  I didn't even go to Nick with anything.

22  I let Nick handle it.

23      Q.  No, but you were copied on it?

24      A.  I was copied on it, but I didn't --

25      Q.  But you didn't say to Nick this is a bad



Page 109

1    idea?

2         A.  No.  Nick runs the show pretty much.

3         Q.  Understood.  This is La Mattina 23.

4    Have you ever seen this email before?

5         A.  No.  Just now.

6         Q.  Are you aware of any contractual

7    provisions between NRIA and either Media

8    Effective and/or Javier, have you ever seen any

9    contracts?

10        A.  No.

11        Q.  La Mattina 24.  Have you ever seen this

12   email?

13        A.  No.

14        Q.  This is from Katey Kana to Javier,

15   Patryk and Nick.  And he says, the previous buy

16   under Tanvi was 24,000 and 60 and Javier

17   negotiated it to 21,275.  Do you see that?

18        A.  Um-hum.

19        Q.  Here's an instance where Javier again

20   beat Tanvi's quotes, right?

21        A.  Yes.

22        Q.  Were you responsible for any of the

23   filming of the TV spots?

24        A.  No.

25        Q.  Who did those?



Page 110

1        A.   When you say who?

2        Q.   Who arranged for those to be done?

3        A.   Probably Katey Kana and maybe Kyle

4   Stafirny.

5        Q.   How about before Katey came, she wasn't

6   there the whole time, right?

7        A.   No.

8        Q.   Who was doing them before Katey, do you

9   know?

10       A.   No idea.  I think Nick had somebody in

11  Philly.

12       Q.   That was actually filming them?

13       A.   Yeah.

14       Q.   Setting them up to film?

15       A.   Um-hum.

16       Q.   Were you ever in any of the spots?

17       A.   No.

18       Q.   You never acted as talent?

19       A.   Nope.  Behind the scenes.

20            MS. LASLEY:  With a face like that?

21            THE WITNESS:  I could take that two

22  ways.

23            (Off the record)

24  BY MR. GEORGE:

25       Q.   This is La Mattina 25.  This looks like



Page 111

1   an email from Nick and you're copied on it.  And

2   I think what they're sending is the cease and

3   desist letter.  And if you look at the bottom

4   you'll see that the lawyer that you were dealing

5   with Kristin Grant is listed there?

6       A.  Um-hum, yeah.

7       Q.  Was this the email you received the

8   cease and desist letter in connection with?

9       A.  I believe so.

10      Q.  When you saw the letter did you go to

11  Nick and say what's this about or did you know

12  about it in advance?

13      A.  I probably knew about it in advance.  He

14  probably told me.

15      Q.  This is La Mattina 26.  Have you seen

16  this email before?

17      A.  No.

18      Q.  Did you know that Nick was asking Javier

19  to quote all of the work that Tanvi was actually

20  providing, all the media and advertising?

21      A.  I can't say a hundred percent that I

22  did.

23      Q.  Did you later find out as this thing

24  indicates that he asked Javier to quote the whole

25  shebang?



Page 112

1         A.   I can't remember.

2         Q.   This is La Mattina 27.  Did you ever see

3    that email before?

4         A.   No.

5         Q.   So would you agree that prior to 2021

6    that Javier was not the sole buyer for I guess

7    SEA means Southeast Asia advertising time?

8         A.   Correct.

9         Q.   So only after 2021 -- and in particular

10   September of 2020 this email is written I don't

11   know whether that's the date or not but effective

12   2021 -- Javier was the sole supplier of the

13   Southeast Asia time, right?

14        A.   Correct.

15        Q.   And prior to that time was it Renascent

16   and Tanvi?

17        A.   And Tanvi, yes.  I think there was

18   another small sales agent company.  I forget the

19   name.

20        Q.   Does Tanvi live in the U.S.?

21        A.   Yes.

22        Q.   Where does she live?

23        A.   Edison I think.

24        Q.   Near the Ford plant?

25        A.   I have no idea.



Page 113

1      Q.   That's the only thing I know about
2   Edison.   So while you were working with Tanvi did
3   you develop a close relationship?
4      A.   We have a friendship, yes.
5      Q.   Did you ever socialize with her when you
6   were in India, go out to dinner with her?
7      A.   Yeah.   We had some drinks.
8      Q.   Had some drinks and dinner?
9      A.   Yes.
10      Q.   Is she a married person?
11      A.   Yes.
12      Q.   Did you meet her husband?
13      A.   On one of the events, yes.
14      Q.   Were you aware that Nick was asking
15   Javier to investigate whether Tanvi was stealing
16   from the company?
17      A.   No.
18      Q.   This is La Mattina 28.   Do you see here
19   where Nick is telling Javier we'd like to go
20   directly to these stations and get a better deal
21   but at least confirm that we are not getting
22   ripped off?
23      A.   Correct.
24      Q.   Nobody at NRIA knew what she was paying
25   for the time, right?



Page 114

1        A.   No.

2        Q.   And none of the bills had any invoices

3   to show when she was running the time, right?

4        A.   As far as I'm aware, correct.

5        Q.   Did you and Tanvi ever overlap as

6   employees at NRIA?

7        A.   What do you mean?

8        Q.   Well, were you ever there at the same

9   time as employees?

10       A.   At the very end, yeah.

11       Q.   And was she selling media time at that

12  time?

13       A.   I believe so.

14       Q.   And making a commission?

15       A.   I guess.  I didn't control anything.  It

16  wasn't my wheelhouse.

17       Q.   But as the COO did you see any potential

18  conflicts of interest in her being both an

19  employee of the company and at the same time

20  making sales?

21       A.   She was being hired as an employee to

22  work with the salespeople.  That was her new

23  position when she was hired.

24       Q.   When you say the salespeople?

25       A.   The marketing people, the agents to help



Page 115

1    bring in investor money.

2          Q.   Are you talking about the closers?

3          A.   Closer, if you want to call it that.

4          Q.   She became a closer?

5          A.   Yeah.

6          Q.   But she was still selling ad time to the

7    company, right?

8          A.   I don't know at the time to be honest

9    with you.

10         Q.   Did you ever see any of the scripts that

11   were read to investors?

12         A.   I read the scripts, yes.

13         Q.   Did they say anything about 12 percent

14   in them?

15         A.   Yes.

16         Q.   When did that stop being included in the

17   investor package?

18         A.   I believe when Brian Casey suggested

19   that change, the verbiage.

20         Q.   To verbiage?

21         A.   Change the verbiage.

22         Q.   The verbiage?

23         A.   Change the verbiage, yes.

24         Q.   Is that because at that time you weren't

25   generating 12 percent returns?



Page 116

1        A.   We were paying our ACH payments monthly.

2    We felt you couldn't guarantee 12 percent.   We

3    felt it should be changed.

4        Q.   So now when you felt that way did you go

5    back to the original people that you solicited

6    with the 12 percent guarantee number and tell

7    them that?

8        A.   I didn't solicit anybody for any

9    investment.

10       Q.   When NRIA solicited those people did you

11   as the chief operating officer suggest that you

12   go back to those original investors and say, hey,

13   we're not giving 12 percent anymore and we can't

14   guarantee it?

15       A.   No.

16       Q.   Number 30.   Did you ever see this email

17   before?

18       A.   No.

19       Q.   Do you know what an insertion order is?

20       A.   No.

21       Q.   I asked you earlier if you knew Tom

22   Marsillo from Emerging --

23       A.   Correct.

24       Q.   You didn't know him?

25       A.   No.



1          THE VIDEOGRAPHER:  We're going off

2    record.  The time is 12:32 p.m.

3             (Off the record)

4          THE VIDEOGRAPHER:  We're back on the

5    record.  The time is 12:33 p.m.

6    BY MR. GEORGE:

7       Q.  You should have 31.

8       A.  Okay.

9       Q.  Did you redo a letter appointing him as

10   the South --

11      A.  I believe I did, yes.

12      Q.  And this didn't come from Nick, though,

13   this came from Rey?

14      A.  Correct.

15      Q.  And that was the guy you considered that

16   you worked for, right?

17      A.  He was the CEO.

18      Q.  Did she then make proposals for

19   newsreels, construction and video of the

20   construction and sales of the properties, did she

21   start doing that, do you know?

22      A.  I don't remember if she got any

23   involvement on that.

24      Q.  What's the date of that email?

25      A.  October 11, 2021.



Page 118

1       Q.  La Mattina 32.  Glenn, the first email

2    is Monday, October 11th and by the 14th he's

3    writing you again and saying -- why did it take

4    you so long to do that?

5       A.  I don't know.

6       Q.  Do you have a personality conflict with

7    Javier?

8       A.  No.  I like Javier.  I think he's a nice

9    guy.

10      Q.  La Mattina 33.  Have you ever seen this

11   email before, Mr. La Mattina?

12      A.  No.

13      Q.  Were you aware that as of July 2021 she

14   was maintaining she was the VP of global

15   marketing for NRIA?

16      A.  No.

17      Q.  Was she the VP of global marketing at

18   NRIA at any point?

19      A.  No.

20      Q.  What was her actual position, do you

21   know, when she was hired?

22      A.  Once she was hired as an employee she

23   was a project manager.

24      Q.  Not a VP of anything, right?

25      A.  No.



1       Q.  She may have overstated her case a

2   little bit there, right?

3       A.  Um-hum.

4       Q.  Why was she doing that, do you know?

5   Why was she holding herself out as a --

6       A.  I think she was trying to solidify her

7   position or she was trying to gain access to the

8   market so she could sell advertising.

9       Q.  Why would she have to be related to NRIA

10  to do that?

11      A.  I think she was still trying to get

12  business from NRIA and Nick.

13      Q.  If she would have reached out just as an

14  individual she wouldn't have been able to get

15  those kind of contacts?

16      A.  I don't know.

17      Q.  So your suggestion is she was trying to

18  keep an oar in the water for future opportunities

19  with NRIA?

20      A.  I guess so, yes.

21      Q.  Did Nick tell you that people at

22  Emerging Markets were complaining that Tanvi was

23  causing confusion and making mayhem for them?

24      A.  Not in so many words.  Just, you know --

25      Q.  Making it difficult?



Page 120

1     A.   Yeah.  Yeah.

2     Q.   How much was Tanvi paid a year?

3     A.   I have no idea.

4     Q.   You didn't hire her?

5     A.   Art hired her.

6     Q.   Who?

7     A.   Art Scutaro, senior VP of sales,

8  marketing, whatever you want to call it, project

9  management.

10    Q.   Was Scutaro selling investments?

11    A.   Yes.

12    Q.   Was he the guy who oversaw the closers?

13    A.   Yes.

14    Q.   Did he write scripts for the closers?

15    A.   Not that I'm aware.

16    Q.   Who wrote the scripts for the closers?

17    A.   Usually Nick and then an advertising

18  firm down in Philadelphia.

19    Q.   Was there a room where the closers sat?

20    A.   Just an open space, open bullpen.

21    Q.   Cubicles?

22    A.   Yeah.

23    Q.   Were they all in the same area?

24    A.   Yes.

25    Q.   Were any particular people committed to



Page 121

1    the Southeast Asian market?

2         A.   No.   Wait.   What's his name, Raaj, one

3    of project managers from India.

4         Q.   He would marshal the contacts in from

5    Southeast Asia?

6         A.   As much as he could, yeah.

7         Q.   And then the closers, were any of these

8    people -- they were all English speaking I

9    assume?

10        A.   Yes.

11        Q.   So they would call in and then Raaj

12   would --

13        A.   It was on a rotating basis.   Everybody

14   got a call.   If it was a South Asian person they

15   would try to direct it toward Kulraaj.

16        Q.   Then did Kulraaj do the actual closing

17   or did he oversee the closing?

18        A.   Art and A.J. all work with the closers

19   together.   It was a joint effort.

20        Q.   While you were at the company was the

21   company ever sued for any business debt?

22        A.   Not that I'm aware of.

23        Q.   Did you ever see any letters from

24   creditors that bills weren't being paid?

25        A.   Not that I was aware of, no.



Page 122

1      Q.  Did Tanvi ever express to you she was

2  upset that Javier took her business?

3      A.  She mentioned it, yes.

4      Q.  Did that concern you in any way, she was

5  a friend, a social friend?

6      A.  She was a friend.  I said talk to Nick.

7  Nick ran the show and nothing got done without

8  his say so.

9      Q.  Did you make any commissions on sales

10  through the EB program?

11      A.  No.

12      Q.  Did you make any commissions on any

13  sales anywhere?

14      A.  No.

15      Q.  Strictly salaried?

16      A.  Strictly fee or salary.

17      Q.  This is 29.

18      MS. LASLEY:  Do you know, if there's a

19  reason why the bottom portion of that email is

20  not there?

21      MR. GEORGE:  Yes.  You mean the rest of

22  the chain?

23      MS. LASLEY:  Also it says on Wednesday,

24  October 9, 2019 Thomas Marsillo wrote and then

25  there's nothing that he wrote.



Page 123

1           MR. GEORGE:  I don't, but I'll look and

2     see.  Aneca, let me make a note.  I'll check on

3     that and let you know right away.

4           MS. LASLEY:  Okay.

5     BY MR. GEORGE:

6           Q.  Do you have that document, sir, in front

7     of you, 29?

8           A.  Yes.

9           Q.  This is again Tom Marsillo saying, we

10    had no idea she was an NRIA employee.  In October

11    9 of 2019 was she an employee of NRIA?

12          A.  No.

13          MR. GEORGE:  This seems like a good time

14    to break.

15          THE VIDEOGRAPHER:  We are going off

16    record.  The time is 12:47 p.m.

17          (Lunch recess)

18          THE VIDEOGRAPHER:  We're back on the

19    record.  The time is 1:17 p.m.

20    BY MR. GEORGE:

21          Q.  Tanvi was doing the same kind of thing

22    with other networks that might have dealt with

23    Southeast Asia like Z TV?

24          A.  I think she was part of the Z network

25    there.



Page 124

1        Q.   What is that, the Z network?

2        A.   It's like ABC, CBS.

3        Q.   But it's in Southeast Asia?

4        A.   I believe so.  I'm not really familiar

5   with the network.

6        Q.   This is 35.  Have you ever seen this

7   email chain?

8        A.   Obviously, yes.  I'm CC'd on it, I guess

9   or part of it.

10       Q.   Do you recall what going on at this

11  time?

12       A.   I believe there was two letters of

13  agency floating around.  Tanvi was given one and

14  I guess Javier got the new one, updated one.

15       Q.   Did Nick also try to shut that down,

16  prevent her from doing that?

17       A.   I guess, yes.

18       Q.   He viewed it at unauthorized?

19       A.   Yes.

20       Q.   La Mattina 36.  So this is an email from

21  Katey Kana to Javier Torres, right?

22       A.   Yes.

23       Q.   And she says, please see below.  Will

24  that suffice to move over to you 100 percent.

25  Please advise.  There's an email below it that



Page 125

1   says, noted and will do.  We will cancel for

2   December only, only in capital letters, and then

3   transition to Javier.  Let me see if we can

4   cancel sooner or if December and transitioning to

5   Javier will work.  We'll handle and circle back

6   with an update.  Do you see that?

7        A.   Um-hum.

8        Q.   This is Katey Kana directing that the

9   business go back to Javier, right?

10       A.   Correct.

11       Q.   She was the head of marketing?

12       A.   Yes.

13       Q.   Do you have any reason to believe she

14   wasn't consulting with Nick and your friend Rey?

15       A.   Rey, no.

16       Q.   Do you know what Nick means in this last

17   email that he wrote.  In fairness you're not

18   copied on it so if you don't know it's fine.  But

19   he says in here, let's move to implement this

20   immediately.  Take one month off only.  Cancel

21   all South Asia India media.  That will take two

22   weeks' notice likely with Tanvi.  Do you know

23   what that means?

24       A.   I think he was canceling her contracts

25   and Javier was talking over from what it sounds



Page 126

1   like.

2        Q.   Was there some kind of two-week notice

3   provision or something?

4        A.   Not that I'm aware.

5        Q.   Have you ever seen Tanvi's or

6   Renascent's agreements?

7        A.   No.

8        Q.   Do you have any idea what the terms

9   were?

10       A.   No.

11       Q.   You see on the last page Javier is

12   talking about partnering with someone else down

13   in the Southeast Asian market to get better rates

14   for NRIA?

15       A.   I remember that in conversation probably

16   a couple years back when they were discussing it,

17   yeah.

18       Q.   Do you recall ever voicing an objection

19   to Javier being the agent of record for NRIA in

20   Southeast Asia?

21       A.   No.

22       Q.   La Mattina 37.  Did you ever see this

23   email where Katey Kana wrote to Javier and said,

24   Javier, we don't have any contracts with anyone

25   so please get the proposal.  The direction is



Page 127

1   from Nicholas to get two proposals minimum before

2   any buy.  Do you see that?

3        A.  Yes, I saw it.  But no, I have no

4   knowledge of any of that.

5        Q.  Do you know that Javier was getting

6   proposals from multiple sources?

7        A.  Maybe in a sidebar with Katey but no,

8   nothing direct.

9        Q.  If you look at the second page of that,

10  Mr. La Mattina, the top of it.

11       A.  Hold on.

12       Q.  Did you see -- go ahead.

13       A.  Yeah.

14       Q.  Were you aware that Javier was trying to

15  get business with Sony TV and that Renascent and

16  the Tanvi were holding themselves out as contract

17  parties for NRIA?

18       A.  Not directly, no.

19       Q.  Did you hear about that indirectly?

20       A.  In the conversations probably around the

21  office.

22            MR. GEORGE:  Could we go off the record?

23            THE VIDEOGRAPHER:  We're going off

24  record.  The time is 1:26 p.m.

25            (Off the record)



Page 128

1          THE VIDEOGRAPHER:  Back on the record,

2     1:27.

3          MR. GEORGE:  I think make these 39 or

4     make them another -- let's mark them as 39.  And

5     let me show them to you first before we mark

6     them.  It's the only ones unfortunately that I

7     have.

8          THE VIDEOGRAPHER:  We're going off the

9     record.  The time is 1:28 p.m.

10          (Off the record)

11          MR. GEORGE:  I'm withdrawing 39.

12          THE VIDEOGRAPHER:  We're back on the

13     record.  The time is 1:30 p.m.

14     BY MR. GEORGE:

15     Q.  Mr. La Mattina, did you as COO monitor

16     cash flows --

17     A.  No.

18     Q.  -- coming into the company?

19     A.  No.

20     Q.  Who would have been the person that

21     would have been doing that?

22     A.  That would have been the accountant

23     which was Bob or the comptroller during the time

24     which was Bob and his last name is, Rey's cousin.

25     I'm trying to get his name for you.  I don't have



Page 129

1   his full name for you.

2        Q.  That's fine.  Mr. La Mattina, early on

3   right at the beginning of your deposition you

4   said that you were the bank relationship person

5   in the sense not of -- not in the sense that you

6   were dealing with the day-to-day deposits that

7   happened but in the refinancing of these

8   obligations that were created by NRIA to build

9   the buildings, right?

10       A.  Well, I was refinancing individual

11  investor projects, not anything for NRIA.

12       Q.  So when you did that how did you get the

13  financial information to provide to the banks on

14  the refinance?

15       A.  I asked the clients for their updated

16  pay stubs, tax returns, bank statements, so forth

17  and so on.

18       Q.  So the loans were being obtained in the

19  names of the investors?

20       A.  Correct.

21       Q.  Did you make any commissions on those

22  sales?

23       A.  Yes.

24       Q.  Were you the broker?

25       A.  I was the agent.  At the time I was a



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration    Page 131 of 203

Page 130

1    licensed mortgage originator.

2        Q.  What's the difference between that and a

3    broker?

4        A.  If you're a broker that's one

5    designation of a license.  When I had my company

6    I was a licensed banker non-servicing.  That

7    means I closed in my name and sold off to other

8    entities.

9        Q.  So you didn't have your own line you

10   were funding them with?

11       A.  No.  I used -- correct.  Then a broker

12   is somebody that just uses somebody else's money.

13   They commit in the other person's name.  When I

14   shut my company down I lowered my license

15   category to an originator.  That means I just

16   worked for a company under their tutelage.

17       Q.  When you made those commissions that's

18   separate from your salary from NRIA, right?

19       A.  I wasn't working for NRIA yet.  Meaning

20   I was an independent mortgage originator working

21   I believe for First Franklin, United Mortgage,

22   stuff like that.

23       Q.  When you became an employee of NRIA then

24   who did those refinance deals?

25       A.  They went to other banks, other



Page 131

1    concerns.

2         Q.   But were you placing them?

3         A.   No.

4         Q.   Who then was the person at the company

5    who was refinancing those investor loans?

6         A.   Nisha Scharman, Caroline Taylor were two

7    individuals working under them.

8         Q.   Were they bankers, did they have access

9    to lines or how were they getting --

10        A.   They would bring in independent people

11   like me to work to refinance.

12        Q.   And this was while you were an employee

13   at NRIA?

14        A.   While I was an independent vendor or

15   contractor.  Remember I was a 1099 employee and

16   then --

17        Q.   So while you were a 1099 employee of the

18   company loans were -- investor loans were being

19   refinanced?

20        A.   Correct.

21        Q.   You were not the person receiving

22   commissions on those transactions?

23        A.   No.

24        Q.   Before you were a 1099 employee you were

25   doing that for NRIA and at that time you made



1   commissions?

2       A.   Correct.

3       Q.   Do you know how much you made in

4   commissions?

5       A.   Not off the top of my head.

6       Q.   Do you know how much gross in loans you

7   recast?

8       A.   That's going back years -- no, I don't.

9       Q.   Could it be 15 or $20 million?

10      A.   I can't even guess at a number.

11      Q.   Was it less than $5?

12      A.   Of course it was.

13      Q.   Was it more than $10,000?

14      A.   I would say -- it's speculatory.  I

15  can't give you a figure.  It's been how many

16  years for me?

17      Q.   I don't know.

18      A.   2016, 2017.

19      Q.   That was the time period 2016 to 2017?

20      A.   Yeah.

21      Q.   Did you file a tax return in those

22  periods too?

23      A.   Yes, I did.

24      Q.   As interest rates started to go up did

25  refinancing those investor loans start to become



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 134 of 203

Page 133

1   more difficult?

2        A.   No.   The problem was not the interest

3   rates but the property values.   When you do a

4   mortgage you have a conforming loan amount and

5   then you have jumbo loan amounts.   My jumbo loan

6   outlets were very limited.   I did not get good

7   financing rates.   So that was one of the reasons

8   why this move was a good move for me at the time.

9        Q.   So you're basically saying loan to value

10   was the issue?

11        A.   No.   It was the product, meaning if

12   jumbo loan rates -- just as an example a jumbo

13   loan category let's say in the standard market

14   for as an originator not working for a bank might

15   be seven.   But like small S&Ls have better

16   products.   They can give you 6.5.   I didn't have

17   access to that kind of money.

18        Q.   And what's a jumbo, above 417?

19        A.   Today it's like 720 at the time.

20        Q.   720 is a jumbo?

21        A.   Yeah.

22        Q.   Wow.

23        A.   Yeah.

24        Q.   Was there an average price these units

25   went or were they all over the page with respect



Page 134

1   to values?

2        A.   There you go.  They varied.

3        Q.   What states were they located in?

4        A.   This was all Pennsylvania.

5        Q.   Did you in any way aid in trying to

6   locate property for redevelopment?

7        A.   No.

8        Q.   Did you ever inspect any of the

9   construction going on at the properties?

10       A.   I've been at sites, yes.

11       Q.   What was the purpose of your visit to

12  the sites?

13       A.   Nick wanted me to see what was going on.

14  Nick wanted to see what was going on, how the

15  progression of the project was, if the projects

16  were built according to specs, stuff like that.

17       Q.   How often did you go to the actual

18  projects?

19       A.   It varied.  Maybe once a month, maybe if

20  I had to go to Florida it was six months, eight

21  months.

22       Q.   After 2019 did you ever go to any of

23  those sites and hear any of the construction

24  vendors complaining about not being paid?

25       A.   Not in 2019.



Page 135

1          Q.   How about in 2020?

2          A.   '21, '22 there were some issues.

3          Q.   Who was complaining?

4          A.   Tony, the construction manager or senior

5     VP of construction.  He was complaining that he

6     put his invoices in.  They don't get paid on

7     time.

8          Q.   And Tony was an employee of NRIA?

9          A.   Yes.

10         Q.   When you said his invoices?

11         A.   When he would review the invoices coming

12    in from different vendors.

13         Q.   Fair enough.  So he's saying I got a

14    group of vendor claims here, they need to be paid

15    and they're not being paid fast enough?

16         A.   Correct.

17         Q.   When that happened did you go back and

18    say to Nick or Rey, hey, what the heck is going

19    on?

20         A.   Yeah.  They said they would take care of

21    it.

22         Q.   That was their answer, they'll take care

23    of it?

24         A.   Yeah.

25         Q.   You never inquired as the COO how they



Page 136

1    would take care of it?

2         A.   No.  Because again Nick ran the company

3    very tight.  It was Nick's way or no way.

4         Q.   Could you have made a suggestion to him

5    or said, hey --

6         A.   If they asked me to, yes.

7         Q.   You just weren't volunteering?

8         A.   Right.

9         Q.   Did you feel as the COO you had any duty

10   to the company to volunteer?

11        A.   I had duties but I know with Nick's

12   mentality of running the company it was his way

13   or no way.

14        Q.   Did that concern you that you couldn't

15   express what you felt?

16        A.   Yeah.  When I did say it I got an answer

17   from Nick and I moved on.

18        Q.   Why didn't you quit when that started

19   happening?

20        A.   Because I was still hoping we might be

21   able to save the company.

22        Q.   And that's in '21 you said?

23        A.   '21 going into '22.

24        Q.   Were you involved in the discussion

25   about filing bankruptcy?



Page 137

1        A.   Yes.

2        Q.   How were you involved?

3        A.   Brian Casey, myself, John Collins, Rey,

4   Tommy Scadero, the CFO, we all sat down and said

5   what was the best way to do it along with the

6   attorneys, what needed to be done to try to save

7   the company.

8        Q.   How long prior to the bankruptcy filing

9   did that first meeting happen, a few months?

10       A.   A few months, I guess, yeah.

11       Q.   At that time, in that meeting did Nick

12   and Rey -- were there any lawyers there?

13       A.   They were probably on conference calls

14   with us.  Not in person.

15       Q.   At that time was all the issues that

16   were going on at the company discussed with the

17   lawyers?

18       A.   With my access, yes.  With my access not

19   there, I don't know.

20       Q.   You mean if you were there and you heard

21   it?

22       A.   Yeah.

23       Q.   But you don't know what happened when

24   you got off the conference call or whatever?

25       A.   Yeah.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 139 of 203

Page 138

1      Q.  It was not an in-person meeting, it was

2  a Zoom meeting?

3      A.  No.  It was in person with the people in

4  the conference room.

5      Q.  Was it at NRIA's location?

6      A.  Yes.

7      Q.  Who were the lawyers, what firm?

8      A.  Sills and Cummis was one of them.

9      Q.  Is that who filed for bankruptcy?

10      A.  I believe so.  Was it Sills and Cummis?

11  I'm not sure.  Off the top of my head I don't

12  know.

13      Q.  I should probably know that myself.  Was

14  Nick pressuring people to get in more investor

15  money?

16      A.  Always.  Yeah.  Always pushed the ads,

17  pushed the calls, that kind of thing.

18      Q.  Did that concern you when you started to

19  hear about the financial issues that started in

20  2019 with the non-payment of vendors and through

21  '21 when you went to the sites and heard the

22  construction people complain about payments?

23      A.  No one ever complained to me at the

24  sites, nor anything in 2019.  The issues were

25  probably around 2021 into 2022 when Tony was



Page 139

1   complaining about the vendors taking their time

2   to get paid.

3       Q.   Is that the time period when Nick was

4   pressuring people to ramp up the ads and ramp up

5   the investors?

6       A.   He always ramped up everybody.  Time

7   doesn't matter.  He always pushed salespeople to

8   push.

9       Q.   So you didn't have a perception at a

10  certain point in time he was driving to get more

11  investor money --

12      A.   No.

13      Q.   -- it wasn't something you appreciated?

14      A.   No.  It was just ongoing.

15      Q.   Did you use any software or anything

16  like that to manage the construction or to

17  oversee the constructive activity?

18      A.   It wasn't my wheelhouse.

19      Q.   Who was keeping track of the

20  construction expenditures and how much was being

21  spent?

22      A.   That was Tony and Richard Stabile.

23      Q.   Tony?

24      A.   Tony, I'll tell you last name, Tony

25  Ulisse, U-l-i-s-s-e, and Richard Stabile.



Page 140

1    Stabile was a realtor that was working with NRIA

2    at the time.

3        Q.  Do you know who the principals of U.S.

4    Construction are?

5        A.  I found out John Ferino and Nick's son

6    Dustin.

7        Q.  You didn't have anything to do with that

8    entity?

9        A.  No.

10       Q.  You never worked for it?

11       A.  No.

12       Q.  Never consulted for it?

13       A.  No.

14       Q.  Never consulted for any of the owners?

15       A.  No.

16       Q.  So was U.S. Construction, were they

17   basically the prime contractor with a bunch of

18   subs under them, is that how U.S. Construction

19   got in the chain?

20       A.  Yes.

21       Q.  Was U.S. Construction marking up the

22   bills from vendors?

23       A.  I don't know.

24       Q.  Could they have been?

25       A.  That wasn't my wheelhouse.  I don't



Page 141

1    know.

2        Q.   The gentleman that you said spoke to you

3    and said the people were complaining, did he work

4    for NRIA?

5        A.   Yes.

6        Q.   He didn't work for U.S. Construction?

7        A.   No.

8        Q.   So was it U.S. Construction's bills that

9    weren't getting paid?

10       A.   I believe U.S. Construction was

11   complaining and maybe one or two of the other

12   vendors off the top of my head.

13       Q.   Do you know who hired U.S. Construction?

14       A.   They were in the company when I got

15   there.

16       Q.   When you say in the company?

17       A.   They already had a relationship with

18   NRIA when I got there.

19       Q.   When you initially got there?

20       A.   Yes.

21       Q.   Before you were an employee when you

22   were a 1099 --

23       A.   No.  When I was an employee.

24       Q.   So when you first became the 1099

25   employee they were involved but you're not sure



Page 142

1    about before that time?

2         A.   No.

3         Q.   When you came in in that time period in

4    2019 were there construction projects going on?

5         A.   Yes.

6         Q.   Were you involved with training any of

7    the closers?

8         A.   No.

9         Q.   Do you know who was?

10        A.   Art and A.J.  Art Scutaro and A.J.

11   Scutaro.

12        Q.   Who created the scripts for them to

13   pitch the investors?

14        A.   Nick.

15        Q.   Did you ever see these scripts?

16        A.   Yeah, I read them.

17        Q.   You did?

18        A.   Yes.

19        Q.   Did you make any revisions to them?

20        A.   No.

21        Q.   Did Nick ever advise you to have the

22   advertisements or any of the documentation back

23   off on the assertion of a 12 percent return?

24        A.   No.

25        Q.   And you never went to Nick or Rey and



Page 143

1    said we can't say 12 percent returns anymore?

2         A.   It wasn't them -- it wasn't me saying

3    it.  I believe Brian Casey is the one that told

4    that to Rey.

5         Q.   What was his role at the company?

6         A.   He came in as co-fund manager originally

7    on the advice of the attorney, Sills and Cummis I

8    believe.

9         Q.   Co-fund manager?

10        A.   Yes.

11        Q.   He had to come in, did he work with Nick

12   then?

13        A.   No.  Nick was no longer there.  Nick was

14   working from his home.  Brian Casey came in to

15   help strengthen the company in running the

16   company and managing it.

17        Q.   So even though Nick wasn't there at the

18   location he was still controlling the company

19   from his home?

20        A.   Correct.

21        Q.   And the fund manager was basically

22   taking Nick's place in the company?

23        A.   Correct.

24        Q.   What was that individual's name again?

25        A.   Brian Casey.



Page 144

1        Q.   Do you know what his background is?

2        A.   Independent consultant.  He's worked

3   with a few attorneys.  That's why he came over

4   here.  He was referred by one of the attorneys.

5        Q.   So he's like a financial guy that was

6   referred by the attorneys?

7        A.   Yeah.

8        Q.   At Sills Cummis?

9        A.   Don't mark me on which attorney referred

10  him.

11       Q.   That's okay.  What another firm do you

12  remember other than the Sills Cummis?

13       A.   We had Sills Cummis.  We had Nick's

14  private attorney, the gentleman from Washington.

15  I don't remember his name off the top of my head.

16  Rey's attorney.

17       Q.   They were all rendering services to

18  NRIA?

19       A.   To them personally, yes.

20       Q.   But how about to NRIA did they have any

21  other lawyers other than --

22       A.   We had Glenn Glerum was a real estate

23  attorney that was doing closings.  I had the

24  attorney down in Florida, Tom -- bear with me a

25  minute.  He was doing closings for us to Florida.



Page 145

1          Q.  I'm more or less interested in people

2     that were advising the company about the issues

3     that were going on --

4          A.  No.

5          Q.  -- as opposed to real estate closings.

6          A.  No.

7          Q.  Sills Cummis is the only one you

8     recollect?

9          A.  Yes.  They were also doing HR work for

10    us.

11         Q.  Do you recall when Sills Cummis was

12    hired, what year?

13         A.  They were already hired by Rey.  I don't

14    remember when.  They were here for a while.

15         Q.  Do you remember the names of any of the

16    lawyers from Sills Cummis?

17         A.  Patti, Patricia Prezioso,

18    P-r-e-z-i-o-s-o.  She was my main contact.

19         Q.  So you were the one communicating with

20    her?

21         A.  Yes.  Mainly on HR issues.

22         Q.  I want to focus on the other issues they

23    were there for.  Were you speaking to her about

24    those as well?

25         A.  In general, yeah.



Page 146

1        Q.   Do you have a criminal record?

2        A.   No.

3        Q.   Have you ever been arrested?

4        A.   Nope.

5        Q.   Who is Art Scutaro?

6        A.   He was the senior VP of sales or project

7   manager we'll call it.

8        Q.   Which one is it?

9        A.   You officially can't sell securities so

10  he was a project manager.

11       Q.   Do you know whether Mr. Scutaro has a

12  criminal record?

13       A.   No.  Not as far as I know.

14       Q.   You're saying you don't know or he

15  doesn't?

16       A.   As far as I know, no.

17       Q.   Do you know why he spells his name

18  sometimes with one T and sometimes with two?

19       A.   Yes.

20       Q.   Why?

21       A.   Because he was connected with Nick

22  Salzano at another company called Norvirgins.

23  Norvirgins went bankrupt and I believe he in a

24  Google search felt it was easier to take one of

25  the Ts out of his name.



Page 147

1        Q.  Was that your advice?

2        A.  No.

3        Q.  Did you ever talk to him about that?

4        A.  No.  I didn't even know about it until

5   at the very end.

6        Q.  Was he there on a day-to-day basis, Art

7   Scutaro?

8        A.  Pretty much, yeah.

9        Q.  So when you say he was a project manager

10  because he couldn't sell securities or because

11  you couldn't call it securities?

12       A.  You can't call it sales -- you can't get

13  a commission on a sale of securities unless

14  you're a registered broker.  We didn't have a

15  registered broker so they called them project

16  managers and they were paid accordingly under the

17  project manager contract.

18       Q.  How were project managers -- so what

19  you're really saying is project managers were

20  closing investor deals, right?

21       A.  Correct.

22       Q.  Instead of getting a commission for the

23  sale of the security you paid them as a project

24  manager, a commission as a project manager?

25       A.  Correct.



Page 148

1        Q.   How much did those commissions --

2        A.   It varied depending on the amount of

3    calls they made, depending on the amount of

4    paperwork they generated it varied.  It was a

5    hundred plus to one of them or two of them were

6    making 800 to 900,000.

7        Q.   800 to 900,000 a year?

8        A.   Yeah.

9        MR. GEORGE:  Sounds like we're in the

10   wrong line of business, Aneca.

11            THE WITNESS:  I thought about that.

12            MS. LASLEY:  But we're not facing jail

13   time.

14            (Off the record)

15       Q.   Did you ever see any contract with

16   Javier to require them to bill at the lowest

17   possible price for advertising?

18       A.   No.

19       Q.   I just want to ask you a couple more

20   questions about the EB-5 program.  Can you tell

21   me generally how that program works?

22       A.   Basically you have a project and if it's

23   in a T-zone area your investment amount is lower

24   than the standard EB-5 investment amount.  So...

25       Q.   Let me stop you for a second.  The EB-5



Page 149

1    is a federal program --

2         A.   Correct.

3         Q.   -- that allows people who are aliens to

4    get a Green Card by investing --

5         A.   In projects in the states, yes.  The

6    investment has to create 10 jobs for a minimum of

7    two years.  And basically once the project is

8    done, whether it be sold, refinanced or whatever,

9    the money comes back to the investors with any

10   type of return which is a minimum return anywhere

11   between 3 to 6 percent on an average.

12        Q.   So, Mr. La Mattina, how did the

13   individual investor create if he's building a

14   residential unit and he's investing in a

15   residential unit, how does he create 10 jobs that

16   lasts for two years?

17        A.   It wouldn't be -- it would be a project.

18   It would be like an apartment building.  It would

19   be like a mall, something like that.

20        Q.   Where the construction lasts --

21        A.   Lasts for a while for a minimum of two

22   years but also your jobs were to be accountants,

23   attorneys, financial planners, all looking at the

24   numbers.  You would have architects.  You would

25   have appraisers.  You'd have workers building



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 151 of 203

Page 150

1   with steel, concrete, whatever.  Then you would

2   have people that would manage the projects, let's

3   say maintenance people that are filling

4   apartments up with people to sell or rent

5   contracts and stuff like that.

6       Q.  Like if an investor got a unit and he

7   was still holding it for investment there were

8   people that would rent the units for them, is

9   that what you're saying?

10      A.  No, somebody that would manage a

11  building for them, like a building manager,

12  cleaning the building, stuff like that.

13      Q.  Did you have buildings where one or two

14  investors owned all the units?

15      A.  No.

16      Q.  Basically --

17      A.  This is just a project where you have --

18  like one project, we had 97 units with a retail

19  spot on the -- that's an EB-5 project in North

20  Bergen.

21      Q.  Who monitors the length of time and the

22  employees or is it just the certifications?

23      A.  There's an independent company set up by

24  the U.S. Government called USCIS.  What they do

25  are the policemen of the EB-5.  We contract an



Page 151

1   attorney, Mona Shah, she was an EB-5 attorney.

2   She handled all the investors that wanted to

3   invest money for us.  She would qualify them to

4   make sure the money is real, not any issues.  She

5   would then fill out the paperwork and submit

6   everything to the USCIS.  And then once that

7   happens the money would go from her escrow

8   account to the USCIS project.  And from there it

9   would be disbursed from the project to NRIA.

10      Q.  So the investor money first went through

11  USCIS?

12      A.  It would go to Mona Shah first.

13      Q.  The attorney through her escrow account?

14      A.  And then it would go to the regional

15  center.  The regional center is the actual feet

16  on the ground for the USCIS.  So it would go to

17  the regional center and then to NRIA.

18      Q.  And you're saying that USCIS was the one

19  who cut the check to NRIA?

20      A.  No, it would go from the regional

21  center.  And the regional center is basically

22  feet on the ground.

23          MS. LASLEY:  Counsel, could we take a

24  break?

25          THE VIDEOGRAPHER:  We're going off the



Page 152

1    record.  The time is 1:58 p.m.

2              (Afternoon recess)

3              THE VIDEOGRAPHER:  We are back on the

4    record.  The time is 2:12 p.m.

5    BY MR. GEORGE:

6         Q.  I just have a few more things to go

7    through, Mr. La Mattina, and thank you for being

8    patient with us today.  I know these things are

9    stressful.

10        There was a statement that was made that the

11   company spent over $80 million on advertising and

12   media buys.  Are you aware of any of that?

13        A.  I never heard the exact number like

14   that, no.

15        Q.  Do you know who the other vendors were

16   that were supplying media time to the company

17   other than Javier and Media Effective?

18        A.  You had H&L.

19        Q.  They were selling directly too?

20        A.  I believe so.  And then you had someone

21   like Star Ledger, New Jersey Media maybe.  It's

22   been a while.

23        Q.  New Jersey Media, is that what it's

24   called?

25        A.  I believe so, yeah.



Page 153

1        Q.   Is that part of the Star Ledger?

2        A.   That's part of the Star Ledger.  That's

3   their media side.

4        Q.   Star Ledger is the North Jersey paper,

5   right?

6        A.   Yeah.

7        Q.   When was the last time you spoke to

8   either Rey or Nick?

9        A.   Let's see.  Last time I spoke to Rey was

10  probably a Zoom call when he was in the

11  Philippines probably about nine months ago, a

12  year ago.  And Nick I haven't spoken to him since

13  the -- since I left the company.

14       Q.   You said that Rey is in the Philippines?

15       A.   Yeah.

16       Q.   Still?

17       A.   Yeah.

18            MR. GEORGE:  I think that's all I have.

19  EXAMINATION BY MS. LASLEY:

20       Q.   Mr. La Mattina, we met this morning.

21  Aneca Lasley with Ice Miller.  I do have a few

22  follow-up questions for you.  Earlier on this

23  morning when Mr. George first started questioning

24  you you had talked about having met with the

25  Liquidation Trustee.



Page 154

1          I want to be clear about something.  In terms

2     of your meeting did you meet with the Liquidation

3     Trustee or counsel for the Liquidation Trustee?

4          A.  Counsel.

5          Q.  So it's fair to say you've never met

6     with Matthew Ward, the Liquidation Trustee?

7          A.  Yes.

8          Q.  That is fair to say you've never met?

9          A.  Yes.

10          Q.  In terms of timing that's the other

11     thing I wanted to clarify here.  I know you don't

12     remember the specific time of when you first met

13     with the Liquidation's counsel but --

14          A.  The attorney you mean?

15          Q.  The attorney for the Liquidation

16     Trustee.  See I did it too.  But regardless you

17     met one time in person with counsel for the

18     Liquidation Trustee; is that correct?

19          A.  Correct.

20          Q.  If I told you that that meeting was in

21     January of 2024, does that seem about right to

22     you?

23          A.  Yeah.

24          Q.  So if earlier there was some reference

25     to it being in 2021 or 2022 that would not be



Page 155

1    correct?

2         A.   You're right.

3         Q.   And when you met with counsel for the

4    Liquidation Trustee, Mr. Rick Barry, a consultant

5    to the Liquidation Trustee was present as well?

6         A.   Correct.

7              MR. GEORGE:   Did you say consultant?

8              MS. LASLEY:   Correct.

9              MR. GEORGE:   Is he a hired consultant?

10             MS. LASLEY:   Yes.

11   BY MS. LASLEY:

12        Q.   When you met with counsel for the

13   Liquidation Trustee did counsel for the

14   Liquidation Trustee ask you to be truthful?

15        A.   Yes.

16        Q.   And at any point in time did counsel for

17   the Liquidation Trustee ever ask you to

18   manufacture or falsify any information with

19   regard to either Media Effective or Javier

20   Torres?

21        A.   No.

22        Q.   I'll stop there.  Did the counsel for

23   the Liquidation Trustee ask you to falsify

24   information with regard to anything related to

25   NRIA?



Page 156

1         A.  No.  No.

2         Q.  You've got your declaration in front of

3    you.  That was La Mattina Exhibit 6.  You recall

4    receiving a copy of that declaration that had

5    been drafted for you to review, correct?

6         A.  Correct.

7         Q.  And you were given an opportunity to

8    review all of the statements in that declaration,

9    correct?

10        A.  Correct.

11        Q.  And I believe you said that you had some

12   changes to it, correct?

13        A.  Correct.

14        Q.  So you had an opportunity to make

15   revisions to it --

16        A.  Correct.

17        Q.  -- if you wanted to?

18        A.  Correct.

19        Q.  And prior to signing it did you have the

20   opportunity to read through everything?

21        A.  To be honest with you, no, I did not

22   read it fully.

23        Q.  I know you apparently didn't read it

24   fully based on what we talked about here today,

25   but you had an opportunity to read it, correct?



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 158 of 203

Page 157

1       A.  Correct.

2       Q.  And with regard to the interview that

3  you had with counsel for the Liquidation Trustee

4  do you recall talking with the Liquidation

5  Trustee about concerns you had regarding the

6  rates that were being charged by Media Effective?

7       A.  The conversation was -- again, I don't

8  know the exact question they put out there but it

9  was basically -- what I did I reviewed bids that

10 Nick requested.  When the bids came in I looked

11 at them and then sent them over to Nick and gave

12 him my recommendation of what I saw, about the

13 cost of whoever was bidding and when I looked at

14 I believe one of the bids Javier was higher and I

15 said to Nick and Nick said Javier is my boy or my

16 man whatever he called it.  Don't worry about it.

17 I said okay.

18      Q.  Did Nick Salzano ever tell you he

19 trusted Javier?

20      A.  Yes.  Maybe not directly but his mood

21 and what he said showed trust I guess.

22      Q.  Did you ever have any discussion with

23 Nick Salzano about his relationship with Javier

24 Torres?

25      A.  No.



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 159 of 203

Page 158

1          Q.  I know you mentioned when you came on to

2     NRIA as an employee that Javier was already doing

3     business with NRIA?

4          A.  Correct.

5          Q.  Did you ever have any discussions about

6     how that relationship began?

7          A.  No.

8          Q.  Take a look at La Mattina Exhibit 10.

9     This is that Top 100 Magazine article.

10         A.  Okay.

11         Q.  Do you recall how -- you said you were

12    interviewed for this article?

13         A.  Generally.

14         Q.  Describe the process for me what you can

15    remember?

16         A.  A repoeter called and says hey, we're

17    doing an interview.  We're going to give you the

18    opportunity to be in the Top 100 Magazine.

19    Basically give us a little overview of what

20    you've done, what you do, who you are.  I sent it

21    over to them and one of the reporters called me

22    up and said okay, let's talk about this.  I said

23    okay.  This sounds good and that was it.

24         Q.  In terms of the questions that are

25    reflected in this article were these the



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration    Page 160 of 203

Page 159

1    questions they asked you when they called you

2    then?

3        A.   Correct.

4        Q.   And was anyone -- so you sent over

5    information about yourself and about the company

6    generally ahead of time?

7        A.   Correct.

8        Q.   And then you had an actual interview

9    over the phone?

10       A.   Correct.

11       Q.   And was there anybody else sitting with

12   you for that interview?

13       A.   I don't remember, no.

14       Q.   You don't remember?

15       A.   No.

16       Q.   But in terms of everything that's in

17   bold are these questions that you remember them

18   asking you as part of the interview?

19       A.   I believe the questions were answered

20   but when the article came out they were more

21   embellished.

22       Q.   Did you have an opportunity to review it

23   before the article was published?

24       A.   Yeah.

25       Q.   Did you recall making any changes to the




Page 160

1  article before it was published?

2      A.  Not off the top of my head.  I believe I

3  let Rey and Nick also look at it prior to going

4  published.

5      Q.  I'm done with that exhibit.  Exhibit 1

6  is your subpoena for the testimony.  And earlier

7  this morning Mr. George went through with you the

8  documents that -- some of the documents you were

9  requested to bring with you to the deposition,

10 correct?

11     A.  Correct.

12     Q.  And did counsel for the Liquidation

13 Trustee ever tell you anything about -- to not

14 produce any documents?

15     A.  No.  No.

16     Q.  Did counsel for the Trustee ask you

17 whether you had documents?

18     A.  They asked me if I had anything.  I said

19 no.

20     Q.  When Mr. George was asking you about a

21 statement in your declaration regarding paragraph

22 7 that references the criminal trial of Nick

23 Salzano you said you didn't realize it began on

24 March 5th of 2024.  Are you aware that Nick

25 Salzano has since plead guilty?



Page 161

1      A.   Yes.

2      Q.   And how did you become aware of that?

3      A.   John Collins gave me a call.  He

4  mentioned it.

5      Q.   When did Mr. Collins call you?

6      A.   Maybe two weeks ago.

7      Q.   Was it on the day that he entered his

8  guilty plea?

9      A.   I don't know.

10      Q.   Just for the record who is John Collins?

11      A.   John Collins was an associate that I

12  worked at at NRIA.  He handled investor relations

13  for us, helping the investors go over the

14  paperwork.

15      Q.   What did he say to you when he called

16  you?

17      A.   He said I heard Nick took a plea.  I

18  said oh, really.  Okay.

19      Q.   Did you read anything about the plea

20  that was entered?

21      A.   No, I didn't go through the dockets.

22      Q.   Have you heard anything about the

23  allocation testimony that Nick Salzano provided?

24      A.   No.

25      Q.   Are you aware he has admitted to



Page 162

1   conducting -- operating a Ponzi scheme?

2       A.   Obviously he's being sentenced, yes.

3       Q.   Remind me again when you left the employ

4   of NRIA?

5       A.   August 26, 2022.

6       Q.   Since August 26th of 2022 have you

7   spoken -- who all from NRIA have you spoken with

8   since then?

9       A.   Quite a few different people.  A couple

10  of the salespeople, Art, A.J., John Collins,

11  Tanvi, my nephew Zach Luca, his father Joe Luca,

12  Byron Cortese, one of the salespeople.  My mother

13  passed away recently so a few of them reached out

14  to me also.

15          MR. GEORGE:  Sorry about that.

16          THE WITNESS:  101.

17          (Off the record)

18  BY MS. LASLEY:

19      Q.   When is the last time you had spoken

20  with Tanvi Chandra?

21      A.   Maybe a month ago.

22      Q.   What was the purpose of that call?

23      A.   Just wondering what was going on.  Just

24  catching up basically.

25      Q.   Did she have any conversation with you



Page 163

1  about this case?

2      A.  No.

3      Q.  In terms of the documents that you've

4  seen regarding the cease and desist and what it

5  was that Tanvi was allegedly doing representing

6  herself as affiliated with NRIA, what was your

7  knowledge of what Ms. Tanvi -- what Ms. Chandra

8  was doing at the time so back when you were with

9  NRIA versus today?

10     A.  When I was with NRIA her position was

11  bringing in advertisements for the South Asian

12  community.  And today I have no idea what she's

13  doing other than ShopRite.  She works doing

14  advertisement for ShopRite in the Edison area.

15     Q.  While you were with NRIA did you believe

16  that Ms. Chandra was misrepresenting her

17  affiliation with NRIA to advertisers?

18     A.  Not that I was aware of.  I know she had

19  an agency letter she was requested to get and she

20  was given the agency letter and that was it.

21     Q.  I've got a question about that because

22  just for the record explain what an agency letter

23  is?

24     A.  She's been given authorization by the

25  company to negotiate on the company's behalf for



Page 164

1   advertising.

2        Q.   How does an advertiser get an agency

3   letter?

4        A.   Requested by the company.

5        Q.   Who from the company was responsible for

6   issuing agency letters?

7        A.   Nick asked me to produce one and I gave

8   it to Tanvi.

9        Q.   When did Nick Salzano -- do you recall

10  when he asked you to produce one?

11       A.   I don't know the date.

12       Q.   Did you ever produce an agency letter to

13  Ms. Chandra without being told to do so by Nick

14  Salzano?

15       A.   No.

16       Q.   Is there a process by which you revoke

17  an agency letter?

18       A.   Not that I'm aware of other than

19  canceling the old agency letter and getting a new

20  one with somebody else.

21       Q.   We saw some exhibits to the effect that

22  it went through that process with Tanvi and

23  replaced her with Mr. Torres effective

24  immediately?

25       A.   Yes.




Page 165

1        Q.   Do you recall that?

2        A.   Yes.

3        Q.   Prior to that process we saw reflected

4    in that exhibit had that ever been done before

5    that point in time?

6        A.   No.

7        Q.   So until you go through that process

8    Ms. Chandra has the authority due to the agency

9    letter to act on behalf of the company?

10       A.   Correct.

11       Q.   You were asked about your CV which I

12   think is La Mattina Exhibit 7.  I believe you had

13   said or it was represented perhaps that the CV

14   reflected in Exhibit 7 that you have since made

15   changes to your CV and removed references to

16   NRIA?

17       A.   You mean my LinkedIn, yes.

18       Q.   Your LinkedIn is Exhibit 9?

19       A.   Yeah, I took out NRIA.

20       Q.   Since leaving the employ of NRIA have

21   you had difficulty finding employment?

22       A.   Yes.

23       Q.   Does that in any way impact the decision

24   you made to make -- delete references to NRIA on

25   your LinkedIn?



Page 166

1      A.   Yes.

2      Q.   Explain that.

3      A.   Well, because I worked for a company

4   that was called a Ponzi scheme I probably put out

5   200 to 300 resumes, got calls, got interviewed,

6   not even an offer.  I did get an offer from one

7   company to be an independent -- to work as a

8   consultant and traveling around the country

9   evaluating different businesses.  There was a

10  third interview.  Was hired.  I was given their

11  paperwork.  I did a background check

12  authorization and it came back, like I said, that

13  I worked for NRIA and I was part of a Ponzi

14  scheme.

15      So on Wednesday I filled out the paperwork.

16  I was hired.  On Friday they called me up and

17  said oh, by the way, we decided not to hire you

18  based upon your prior history being a COO of a

19  company that was part of a Ponzi scheme.  I said

20  it had nothing to do with me and they didn't want

21  to hear it.

22      MS. LASLEY:  Mr. La Mattina, those are

23  all questions I have for you.

24      MS. BAXTER:  No questions.

25  BY MR. GEORGE:



Page 167

1      Q.  So just a couple more, Mr. La Mattina.

2  I just learned from Ms. Lasley that Mr. Barry is

3  a consultant that was hired by the Trustee.  Were

4  you aware of that when you first made contact

5  with him?

6      A.  I believe he was hired by the fund I

7  call it, the Trustee.

8      Q.  But were you aware of that when he first

9  contacted you?

10     A.  Yes.

11     Q.  He said I've been hired by the Trustee?

12     A.  Yes.

13     Q.  What did he tell you his intentions were

14  with respect to --

15     A.  He just wanted to talk and see what I

16  did and what was going on.  He had some pertinent

17  questions.  That was it.

18     Q.  Did he give you -- do you know where

19  he's located?

20     A.  No.

21     Q.  Does he still work for the New Jersey

22  SEC or he's just a consultant?

23     A.  I have no idea.

24     Q.  How often do you talk to Mr. Barry?

25     A.  Prior to coming here, probably maybe



Page 168

1    about three times over the last month and prior

2    to that I don't know, a couple months, maybe a

3    year since he last contacted me.

4         Q.  Has he acted as an intermediary for

5    communications between you and the Trustee?

6         A.  Yes.

7         Q.  He calls you and says the Trustee wants

8    to know this.  You give the information to him

9    and he gives it back to the Trustee?

10        A.  Or he asks me a question and I give him

11   an answer.  That's it.

12            MR. GEORGE:  That's it.  That's all I

13   have.

14            THE VIDEOGRAPHER:  We are going off

15   record.  The time is 2:33 p.m.  This concludes

16   the video deposition.

17            THE REPORTER:  Counsel, do you want a

18   copy of the transcript?

19            MS. BAXTER:  Yes.

20            MS. LASKEY:  Expedited, please.

21

22            (Deposition concluded)

23

24

25



Page 169

1
2

CERTIFICATION

3
4       I, Alan L. Lesky, a Certified Shorthand
Reporter of New Jersey, license number XI000730,
5   approved reporter of the United States District
Court and notary public, Commissioner of the
6   Pennsylvania Court of Common Pleas hereby certify
that the foregoing is a true and accurate
7   transcript.
8       I further certify that I am neither attorney
nor counsel for, not related to nor employed by
9   any of the parties to the action in which this
transcript was taken; and further, that I am not
10  a relative or employee of any attorney or counsel
employed in this action, nor am I financially
11  interested in this case.
12      The foregoing transcript is prepared with the
currect Transript Format for Judicial
13  Proceedings.
14  _Alan L. Lesky_
15  (S) Alan L. Lesky,
Certified Court Reporter
16
17
18
19
20
21
22
23
24
25



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 171 of 203

Page 1

**A**

**ABC**
124:2
**ability**
91:25
**able**
36:10 72:5 103:15,19
119:14 136:21
**abroad**
66:23
**absence**
103:11
**absent**
59:19
**access**
23:22 119:7 131:8
133:17 137:18,18
**accommodation**
13:8
**account**
151:8,13
**accountant**
17:1 128:22
**accountants**
149:22
**accounting**
42:16 43:8,9
**accounts**
23:23 36:3,5 37:13
37:17 38:22 43:10
**accurate**
169:6
**accurately**
39:18 100:1
**accusing**
28:14
**ACH**
90:10 116:1
**acquired**
88:6
**act**
165:9
**acted**
110:18 168:4
**action**

169:9,10
**activity**
139:17
**actual**
118:20 121:16
134:17 151:15
159:8
**ad**
49:3 55:7,10 77:6,11
77:17,20 97:10
115:6
**add**
75:16 103:8
**added**
98:15
**adding**
103:22
**additional**
59:20
**additionally**
59:15
**address**
12:8,10
**adjusting**
62:22
**administered**
23:14
**admitted**
20:16,18 28:17 38:16
38:18 161:25
**ads**
21:7 46:7,10,12
70:15 94:14,22
102:5,8 103:22
138:16 139:4
**ADV**
1:2
**advance**
111:12,13
**Adventists**
2:18
**adversary**
6:9,23
**advertisement**
67:6 83:14 106:4
163:14

**advertisements**
57:19,21 77:3 142:22
163:11
**advertiser**
164:2
**advertisers**
163:17
**advertising**
21:17 23:13 41:24
46:3 54:22,23,24
55:16,18 56:5 67:7
67:10,13 74:15,20
79:11,18,22 100:16
106:8 111:20 112:7
119:8 120:17
148:17 152:11
164:1
**advice**
143:7 147:1
**advise**
124:25 142:21
**advising**
145:2
**Advisors**
1:6 63:22
**affiliated**
163:6
**affiliation**
163:17
**Afternoon**
152:2
**agency**
26:6 55:7,10,12,14
56:19 106:5 124:13
163:19,20,22 164:2
164:6,12,17,19
165:8
**agency's**
24:15
**agent**
24:20 55:18 112:18
126:19 129:25
**agents**
24:8 25:13 114:25
**agent's**
24:12,14

**ago**
6:13 7:23 24:22
31:14 32:4,4 63:14
72:11 92:23,24
153:11,12 161:6
162:21
**agree**
52:11 57:24,25 112:5
**agreement**
13:7 18:1 19:1
**agreements**
126:6
**ahead**
33:8 42:10 55:23
71:25 127:12 159:6
**aid**
134:5
**airing**
94:17
**AIRN**
1:9,10 5:4
**al**
1:6,13 5:4,5
**Alan**
1:18 5:13 169:4,15
**aliens**
149:3
**allegedly**
163:5
**allocation**
161:23
**allow**
90:2
**allows**
149:3
**Alyson**
2:4 5:23
**America**
37:5
**amount**
70:13,13 85:12 86:4
102:16,23 133:4
148:2,3,23,24
**amounts**
133:5
**analyst**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 172 of 203

Page 2

89:11
**analysts**
89:3,4,5,5,8
**and/or**
109:8
**Aneca**
2:3 5:20 123:2
148:10 153:21
**Aneca's**
20:17
**Aneca.lasley@ice...**
2:6
**answer**
7:2,4,8 10:15 13:21
21:5 39:8 44:5 47:2
51:21 65:4,23 66:4
71:24 79:12,16
89:14,25 90:5 99:25
100:1 135:22
136:16 168:11
**answered**
31:2 49:3 97:16
159:19
**answers**
3:11 59:5
**anybody**
16:20 38:4 40:5
59:25 77:18 79:8
116:8 159:11
**anymore**
24:9,13 36:2,5
116:13 143:1
**anyway**
68:9 73:19
**apart**
78:12
**apartment**
149:18
**apartments**
105:7 150:4
**apparently**
156:23
**appear**
9:10 15:21 33:19,21
33:24 37:22
**appearances**

2:1 5:15
**appears**
98:3
**apples**
69:5,5
**application**
36:13
**appointing**
117:9
**appraisers**
149:25
**appreciated**
139:13
**approval**
36:12
**approve**
45:20
**approved**
36:11 45:15,18,21,22
45:24 97:23 169:5
**approving**
97:10
**April**
80:3
**architects**
149:24
**area**
85:7,11,18,19,23
86:1,3,9 120:23
148:23 163:14
**areas**
85:10,10,22 86:6
**arrange**
35:11
**arranged**
110:2
**arrangement**
17:25 18:22
**arranging**
35:23
**Arras**
2:5 5:24
**arrest**
25:19
**arrested**
19:10,15,18,21 20:2

28:6,8,10,19 30:19
36:14,19 37:14
38:23 80:22 82:9,14
146:3
**arresting**
26:4
**Art**
44:6 78:2 120:5,7
121:18 142:10,10
146:5 147:6 162:10
**article**
3:15 84:10,25 88:20
158:9,12,25 159:20
159:23 160:1
**articles**
21:7
**Asia**
44:25 102:8 112:7,13
121:5 123:23 124:3
125:21 126:20
**Asian**
58:3 121:1,14 126:13
163:11
**asked**
9:4 10:14 13:14,16
24:15 26:11 32:5
33:15,17,21 38:11
42:2 61:15 63:14
68:20 74:19 80:24
87:22 93:16 106:12
111:24 116:21
129:15 136:6 159:1
160:18 164:7,10
165:11
**asking**
6:21 15:17 21:25
38:21 81:25 111:18
113:14 159:18
160:20
**asks**
168:10
**assertion**
142:23
**assess**
67:7
**assist**

87:5
**assistance**
45:23
**assisted**
43:7,13,24 46:20,21
**associate**
161:11
**associated**
19:25
**associates**
11:9 49:8
**association**
51:13
**assume**
7:3 89:6 97:23 121:9
**assured**
84:4
**attendance**
5:21 80:2
**attention**
106:9
**attorney**
11:10 143:7 144:9,14
144:16,23,24 151:1
151:1,13 154:14,15
169:8,10
**attorneys**
2:7,12,18 15:9 137:6
144:3,4,6 149:23
**attract**
66:23,25
**August**
19:17 27:24 99:14,15
102:5 162:5,6
**authority**
106:22,25 165:8
**authorization**
163:24 166:12
**authorized**
78:19 102:2
**Avenue**
2:16 17:7,11,12
**average**
73:2 133:24 149:11
**aware**
10:9 19:9 27:22



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 173 of 203

Page 3

34:11 35:1 40:13
59:22 63:4 70:5
75:21 78:14 99:19
106:2 109:6 113:14
114:4 118:13
120:15 121:22,25
126:4 127:14
152:12 160:24
161:2,25 163:18
164:18 167:4,8

**A&D**
107:24

**A-l-y-s-o-n**
5:23

**A-r-r-a-s**
5:25

**A.J**
44:7 78:2 121:18
142:10,10 162:10

**a.m**
1:18 5:8 16:22,25
82:23 83:1 108:7,7

---

**B**

**B**
3:7

**back**
10:3 14:18 16:18,24
17:23 19:22 20:6
22:23 23:9 34:15
38:10,12 47:7,10,23
47:23,25 48:11 60:3
67:21 69:1 76:25
79:7,7,20 82:10,13
82:18,25 86:25 90:7
90:10,12 95:4,10
97:24 116:5,12
117:4 123:18 125:5
125:9 126:16 128:1
128:12 132:8
135:17 142:22
149:9 152:3 163:8
166:12 168:9

**background**
144:1 166:11

**backing**

**44:1**

**bad**
34:13 44:2 108:25

**badly**
70:18

**balance**
97:7

**bank**
28:24 34:5,21,24
35:1 36:1,2,4,10,15
36:18 37:5,22 38:22
40:23 41:7 82:14
90:7,8 129:4,16
133:14

**banker**
35:13 130:6

**bankers**
131:8

**banking**
35:6,10,22

**bankrupt**
146:23

**bankruptcy**
1:1 5:6 30:13 136:25
137:8 138:9

**banks**
30:4 35:12,24,25
36:3,9,21 39:1
129:13 130:25

**bank's**
28:22

**Barry**
10:24 11:9,12,20,23
12:1,4 31:3,4,13,14
31:24 32:3,12,25
33:9,13 34:1 155:4
167:2,24

**based**
33:24 49:15 72:9
156:24 166:18

**basically**
26:22 29:7 60:15
65:6 93:10 133:9
140:17 143:21
148:22 149:7
150:16 151:21

157:9 158:19
162:24

**basis**
121:13 147:6

**Baxter**
2:16 166:24 168:19

**bear**
144:24

**beat**
74:12 109:20

**beating**
70:17

**began**
158:6 160:23

**beginning**
129:3

**begins**
5:2 75:15

**behalf**
5:17,20 6:24 106:14
163:25 165:9

**believe**
11:10,15 17:23 19:10
19:19 30:17 35:4
36:23 37:9 41:6,9
47:16 57:1,20 61:1
68:2 69:17 71:15
73:13 75:19,22 78:5
81:21 95:1,8 97:11
98:13 101:12,15
102:18 104:1,22
111:9 114:13
115:18 117:11
124:4,12 125:13
130:21 138:10
141:10 143:3,8
146:23 152:20,25
156:11 157:14
159:19 160:2
163:15 165:12
167:6

**Bergen**
150:20

**best**
137:5

**better**

19:4,24 49:6 54:20
106:14 107:23
108:15 113:20
126:13 133:15

**bid**
41:25 42:5 67:17,24
97:4

**bidding**
76:13 157:13

**bids**
67:6,11 68:11 69:1
72:3 73:10 74:22
75:6 104:4 157:9,10
157:14

**bigger**
89:22,23

**bill**
102:15 148:16

**billboard**
96:10 103:22

**billing**
18:11

**billion**
53:6 88:10 89:3

**bills**
60:3,10 61:12,19,23
62:23 63:15 101:21
101:25 103:1 114:2
121:24 140:22
141:8

**bit**
119:2

**Bob**
128:23,24

**body**
81:23

**bold**
159:17

**bolded**
98:14

**bonus**
18:6,10

**bonuses**
93:21 94:5,6

**borrowed**
95:19



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 174 of 203

Page 4

**boss**
41:16
**bottom**
76:7 83:21 99:23
    111:3 122:19
**box**
104:9,9
**boy**
157:15
**break**
123:14 151:24
**Brian**
79:23 115:18 137:3
    143:3,14,25
**bring**
20:19 56:8 85:24
    87:10 115:1 131:10
    160:9
**bringing**
163:11
**broker**
55:16 104:21 129:24
    130:3,4,11 147:14
    147:15
**brought**
48:15 57:15 58:20
    67:1 106:9
**buddy**
66:1
**build**
87:7 129:8
**builder**
81:23
**building**
50:4 57:6 87:17
    105:6 149:13,18,25
    150:11,11,12
**buildings**
129:9 150:13
**built**
50:5 134:16
**bullpen**
120:20
**bunch**
140:17
**Bureau**

11:14
**Burgos**
96:22
**business**
36:7 47:17 49:9,15
    68:4,10 76:15,16,21
    93:5 95:13 119:12
    121:21 122:2 125:9
    127:15 148:10
    158:3
**businesses**
166:9
**buy**
49:23,25 87:7 103:21
    109:15 127:2
**buyer**
112:6
**buys**
152:12
**Byron**
162:12
**B-1**
47:14,15,16

—————— **C** ——————
**calendar**
16:7
**call**
11:10,17,20 15:24
    40:11 48:22 52:25
    77:14 92:17 105:16
    115:3 120:8 121:11
    121:14 137:24
    146:7 147:11,12
    153:10 161:3,5
    162:22 167:7
**called**
14:18 51:12 67:19
    85:9 93:6 146:22
    147:15 150:24
    152:24 157:16
    158:16,21 159:1
    161:15 166:4,16
**calling**
27:12
**calls**

32:6 77:6 137:13
    138:17 148:3 166:5
    168:7
**campaign**
41:24 54:20
**campaigns**
46:3
**cancel**
125:1,4,20
**canceling**
125:24 164:19
**cancelled**
36:12
**capacities**
52:10,16
**capacity**
1:9
**capital**
84:1 125:2
**card**
46:16 47:8,9 74:14
    74:19,23 149:4
**care**
35:14 135:20,22
    136:1
**Caroline**
131:6
**case**
3:10 13:10 30:13
    119:1 163:1 169:11
**cases**
15:7
**Casey**
115:18 137:3 143:3
    143:14,25
**cash**
42:23 43:1,5 98:10
    98:19,21 128:16
**catching**
162:24
**category**
130:15 133:13
**caused**
76:21
**causing**
119:23

**CBS**
124:2
**CC'd**
124:8
**cease**
69:15 70:3 106:11
    107:2 111:2,8 163:4
**celebrities**
57:16,18
**celebrity**
57:13
**center**
105:4 151:15,15,17
    151:21,21
**CEO**
40:2,3 43:7,13,24
    117:17
**certain**
43:1 49:16,18 139:10
**CERTIFICATION**
169:2
**certifications**
150:22
**Certified**
1:19 169:4,15
**certify**
169:6,8
**CFO**
137:4
**chain**
3:17,19,21,22,24 4:9
    4:10,11,12,13 95:21
    122:22 124:7
    140:19
**chains**
107:20
**Chandra**
44:23 56:6,7 162:20
    163:7,16 164:13
    165:8
**change**
17:23 19:1 115:19,21
    115:23
**changed**
116:3
**changes**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 175 of 203

Page 5

50:22 63:10,13
78:17 156:12
159:25 165:15
**charged**
157:6
**charges**
26:9
**charging**
70:11,14 99:20
100:20 103:16,21
107:12
**cheaper**
69:9
**check**
123:2 151:19 166:11
**checks**
78:19
**chief**
15:5 39:22 52:1
53:10 64:2,4 65:2,5
84:16 116:11
**Cho**
2:15
**chose**
92:1
**circle**
125:5
**circles**
104:23
**City**
36:25
**claims**
10:12,20 13:13,17
135:14
**clarify**
154:11
**Claudio**
79:23 96:22
**cleaning**
150:12
**clear**
7:11,15,17 24:19
30:21,22 154:1
**clearer**
24:16
**clearly**

36:17
**client**
41:14
**clients**
6:10 129:15
**close**
77:13,16 113:3
**closed**
130:7
**closer**
63:12 77:24 115:3,4
**closers**
78:1 115:2 120:12,14
120:16,19 121:7,18
142:7
**closing**
121:16,17 147:20
**closings**
144:23,25 145:5
**Cloyd**
2:21 5:12
**Coca-Cola**
77:8
**cold**
16:12
**Coley**
90:23,23
**collect**
15:4 41:3
**college**
106:1
**Collins**
137:3 161:3,5,10,11
162:10
**Columbus**
2:6
**come**
14:21 15:24 19:21
25:2,7 29:8 32:5,16
33:15,17,18 34:17
72:21 87:8 93:8
95:17 117:12
143:11
**comes**
149:9
**coming**

28:1 92:6 95:4
128:18 135:11
167:25
**commencing**
1:18
**comment**
39:4,5
**commercial**
77:7 104:25 105:2
**commission**
114:14 147:13,22,24
**Commissioner**
169:5
**commissions**
122:9,12 129:21
130:17 131:22
132:1,4 148:1
**commit**
130:13
**commitment**
28:25 35:2
**committed**
120:25
**Common**
169:6
**communicate**
12:4
**communicated**
10:5 32:21 59:25
**communicating**
23:24 32:19 33:1,9
145:19
**communications**
8:24 9:6 13:2,6 23:4
23:11 27:13 60:5
168:5
**community**
163:12
**companies**
35:15 55:6 67:7,10
68:18 103:16
**company**
6:22 15:5 19:25
22:17 27:1,19,21
28:2 29:25 30:2,5
35:16 37:20 40:1,8

40:10,12,16 41:15
43:14 45:16 46:11
51:14 52:25 54:4,5
54:21 56:5 59:23
64:13,14,20 65:11
65:16,16,20,21,22
66:2,16,16 67:13
68:3,5 69:13 78:20
79:2 80:9,12,20
81:10,25 82:17 89:6
91:7 92:15,18 93:6
93:10 94:13 95:7
112:18 113:16
114:19 115:7
121:20,21 128:18
130:5,14,16 131:4
131:18 136:2,10,12
136:21 137:7,16
141:14,16 143:5,15
143:16,18,22 145:2
146:22 150:23
152:11,16 153:13
159:5 163:25 164:4
164:5 165:9 166:3,7
166:19
**company's**
67:25 163:25
**compare**
69:2
**comparing**
74:22
**compensation**
17:20
**competent**
73:9
**competitive**
104:4
**complain**
138:22
**complained**
138:23
**complaining**
119:22 134:24 135:3
135:5 139:1 141:3
141:11
**completed**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 176 of 203

Page 6

88:10
**component**
90:15 105:11
**comptroller**
128:23
**computer**
12:23 22:17 23:1,6,9
23:10,21,24
**concern**
37:19 38:20 122:4
136:14 138:18
**concerns**
106:7 131:1 157:5
**concluded**
168:22
**concludes**
168:15
**concrete**
150:1
**condition**
27:15,21
**condos**
43:18
**conduct**
27:8
**conducting**
28:14 162:1
**conference**
2:4,4,5,18 5:22 11:11
137:13,24 138:4
**confirm**
24:25 58:6 113:21
**confirmation**
102:13
**conflict**
118:6
**conflicts**
114:18
**conforming**
133:4
**confusion**
119:23
**connected**
146:21
**connection**
6:9 9:7 23:15 37:17

37:20 111:8
**connections**
35:6,10 71:2
**consequences**
34:20
**conservative**
108:4,9,12
**consider**
65:16,19,21
**considered**
117:15
**consistent**
31:18,21
**construct**
87:17
**construction**
49:10,11,12,25 50:2
50:7 86:21 87:6,8,9
87:17,20,23 89:12
117:19,20 134:9,23
135:4,5 138:22
139:16,20 140:4,16
140:18,21 141:6,10
141:13 142:4
149:20
**Construction's**
141:8
**constructive**
139:17
**consultant**
40:7,9 65:6,9 66:18
144:2 155:4,7,9
166:8 167:3,22
**consultants**
52:25 92:20
**consulted**
140:12,14
**consulting**
54:6,7 92:14,17,20
92:22 93:3,5,10
125:14
**contact**
15:19 145:18 167:4
**contacted**
24:1,3,7 167:9 168:3
**contacts**

119:15 121:4
**content**
96:12,17
**context**
78:15
**continue**
19:16 20:3 46:14
82:10
**continued**
4:1 29:22 32:25 41:3
59:21 82:19
**contract**
12:19 17:15,24 43:16
60:18 93:13 101:3
127:16 147:17
148:15 150:25
**contracted**
54:5 80:20 106:19,20
**contractor**
131:15 140:17
**contracts**
19:5 43:17 60:16
61:2 91:2,4,6 109:9
125:24 126:24
150:5
**contractual**
109:6
**control**
114:15
**controlling**
143:18
**conveniently**
38:23
**conversation**
14:6 25:16 36:16
61:6,12 95:1 126:15
157:7 162:25
**conversations**
25:21 127:20
**conviction**
40:16,25 41:10
**COO**
40:3 42:17 60:11,23
61:17 62:4 63:17
84:19 93:18 114:17
128:15 135:25

136:9 166:18
**cooperation**
13:10 73:25
**coordinate**
42:11 60:19
**coordinated**
42:17 43:9,9,10
47:12
**coordinating**
42:19 44:9
**coordination**
58:17
**copied**
108:23,24 111:1
125:18
**copies**
9:21 103:1 104:5
**copy**
12:22 156:4 168:18
**corner**
50:19
**correct**
6:19 7:12 11:22 13:5
17:17 18:2 23:3
26:25 27:2 32:2
33:12 38:25 39:20
39:24 40:4 42:8
43:15 45:1 48:1,6
48:14,17 50:6,9,24
51:2 52:4,17,20,21
53:2,9 65:10,14
72:4,12 73:16 74:13
77:19,23 82:21 85:4
85:17 87:19 89:21
91:20,20,23 92:8,10
102:1 106:24 112:8
112:14 113:23
114:4 116:23
117:14 125:10
129:20 130:11
131:20 132:2
135:16 143:20,23
147:21,25 149:2
154:18,19 155:1,6,8
156:5,6,9,10,12,13
156:16,18,25 157:1



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 177 of 203

Page 7

158:4 159:3,7,10
160:10,11 165:10
**correctly**
51:21
**correlation**
38:2
**Cortese**
162:12
**cost**
67:7 74:3 90:3
107:24 157:13
**counsel**
5:14 8:25 11:8,24
12:2 151:23 154:3,4
154:13,17 155:3,12
155:13,16,22 157:3
160:12,16 168:17
169:8,10
**country**
166:8
**couple**
14:19 16:1 31:5,6,8,9
32:4 126:16 148:19
162:9 167:1 168:2
**course**
53:6 132:12
**court**
1:1,19 3:12 5:6,13
6:1 64:23 80:6
169:5,6,15
**cousin**
128:24
**covering**
89:13
**co-fund**
143:6,9
**create**
21:20 26:18 149:6,13
149:15
**created**
21:16,18 38:8 129:8
142:12
**creates**
86:5
**creating**
38:14

**credit**
46:22
**creditors**
121:24
**criminal**
26:9 40:24 41:10
75:15 146:1,12
160:22
**critical**
42:12,22
**Cubicles**
120:21
**Cummis**
138:8,10 143:7 144:8
144:12,13 145:7,11
145:16
**curious**
25:17
**currect**
169:12
**current**
46:2
**cut**
78:19 151:19
**cuts**
53:19
**CV**
165:11,13,15
**C-h-a-n-d-r-a**
56:7

---
**D**
---

**D**
3:1
**daily**
43:13,25 53:13
**dash**
92:16,16
**date**
7:22 11:1 59:15
112:11 117:24
164:11
**dated**
50:18 99:13
**day**
2:18 15:12 26:2

29:20 31:6 79:8
161:7
**days**
47:23
**day-to-day**
129:6 147:6
**deal**
44:10 113:20
**dealing**
39:2 111:4 129:6
**dealings**
100:16,18
**deals**
130:24 147:20
**dealt**
79:10,22 81:6,8 82:1
123:22
**debt**
60:7 90:3 121:21
**debtor**
59:13
**debtors**
1:7 59:18
**debtor's**
27:14 59:15
**debts**
59:18,23
**December**
85:5 125:2,4
**decide**
46:14 76:16
**decided**
19:4,24 29:10 166:17
**deciding**
75:5
**decision**
76:17 165:23
**decisions**
30:4
**declaration**
3:12 6:23 26:19 27:5
41:12 72:22 156:2,4
156:8 160:21
**declarations**
26:12 30:12
**declare**

76:8
**deemed**
85:11
**defendant**
7:24 8:2
**Defendants**
1:14 2:12
**Define**
42:19 74:5
**defraud**
38:7 82:14
**defrauded**
34:5 38:3 41:7 51:14
**defrauding**
29:21 30:4,16,17,22
30:25 36:15 37:21
37:23
**delete**
165:24
**deleted**
50:25
**deleting**
51:13
**deliver**
99:6
**delivered**
100:21
**delivering**
98:9,20 99:5
**delivers**
108:12
**Delucia**
2:4 5:22
**department**
20:3,5 24:4,6,10,18
42:12,15,16,23 60:2
61:4,10 97:14
**departments**
42:13 60:1,6,10
61:13
**depending**
85:7 148:2,3
**deposition**
1:16 5:3,8 6:8,11
7:20 8:14,16 32:24
33:14,19,24 39:6



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 178 of 203

Page 8

129:3 160:9 168:16
168:22
**depositions**
33:11
**deposits**
129:6
**Describe**
158:14
**description**
53:12
**designated**
86:6
**designation**
130:5
**desist**
69:15 70:4 106:11
107:2 111:3,8 163:4
**detail**
103:12
**detailed**
99:25 102:16,23
**determine**
41:18,21 72:18 90:25
103:15,19
**develop**
93:7,9 113:3
**developed**
88:6
**developing**
88:7 105:1
**development**
3:16 52:2 53:4,5 54:4
84:2
**developments**
43:18
**difference**
130:2
**different**
18:8 21:25 22:2
37:21 46:7,12 52:10
52:15 60:20 68:17
68:18 70:20 80:5
82:3,6,15 85:22
106:14 135:12
162:9 166:9
**differently**

81:16
**difficult**
119:25 133:1
**difficulty**
86:13 90:6 165:21
**Dillman**
2:12
**dinner**
18:23 113:6,8
**dire**
28:2
**direct**
58:9 68:13 77:2,5
121:15 127:8
**directed**
68:14 82:17
**directing**
125:8
**direction**
65:8 82:11 126:25
**directions**
64:6,16,24,25 82:11
**directly**
44:10,11,15,17
113:20 127:18
152:19 157:20
**disagree**
57:10
**disbursed**
151:9
**disclosed**
38:24
**discovery**
3:11 59:6
**discuss**
106:10
**discussed**
46:12 61:17 69:4
137:16
**discussing**
27:14 61:25 126:16
**discussion**
94:20 103:5 136:24
157:22
**discussions**
10:10,18 34:6 158:5

**disobey**
21:1,3
**dispute**
63:1 98:23,25
**District**
1:1 5:6 169:5
**docket**
80:3
**dockets**
161:21
**document**
8:7,11 9:5,7 12:25
16:17 20:6 23:1
29:14 30:24 38:8,15
39:15 40:23 50:11
50:15 51:23 53:24
57:5 59:4 63:8,11
73:7,19 75:9,10
88:1 92:12 95:10
96:3,22 98:1 99:12
123:6
**documentation**
21:11 26:23 27:10
142:22
**documents**
8:5,14,17,20 16:17
20:19 22:16 23:15
23:20 26:17,24 72:1
160:8,8,14,17 163:3
**doing**
9:12 14:16,23 18:9
35:24 49:7 54:7,9
54:11,12 57:19,20
58:18 68:4,10 80:19
88:20 90:21 110:8
117:21 119:4
123:21 124:16
128:21 131:25
144:23,25 145:9
158:2,17 163:5,8,13
163:13
**DOJ**
19:4
**dollar**
15:11
**dollars**

51:15 53:6
**Dora**
2:12
**double**
62:11
**doubled**
62:24
**drafted**
156:5
**drafts**
26:11
**drag**
99:24
**drawn**
19:6
**drinks**
113:7,8
**driving**
139:10
**drove**
16:15
**Dubai**
47:13 53:16,20
**due**
59:19,23 83:5 165:8
**duly**
6:3
**Dustin**
140:6
**duties**
136:11
**duty**
136:9
**D-u-l-u-c-i-a**
5:23

_____
E
_____
**E**
3:1,1,7
**earlier**
19:19 64:9,21 116:21
153:22 154:24
160:6
**early**
129:2
**easier**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 179 of 203

Page 9

146:24

**EB**
122:10

**EB-5**
22:14 44:19 47:11,14
53:14 57:24 58:16
83:23 84:21 85:5,9
85:23 148:20,24,25
150:19,25 151:1

**Ed**
6:6

**Edison**
2:17 112:23 113:2
163:14

**edits**
97:20

**Edmond**
2:10 5:17

**Edmond.george@...**
2:11

**effect**
77:21 164:21

**effective**
1:13 2:12 5:5,19 6:8
68:4,8,16,20,23
72:15 95:6 109:8
112:11 152:17
155:19 157:6
164:23

**effort**
121:19

**efforts**
8:19 15:14 52:19
58:1,2 70:24 71:2

**eight**
47:21 134:20

**either**
14:7 74:4 109:7
153:8 155:19

**elaborate**
31:1

**electronic**
104:7

**electronically**
104:5

**else's**

130:12

**em**
10:1

**email**
3:17,18,19,21,22,23
3:24 4:2,3,4,5,6,7,8
4:9,10,11,12,13 9:2
10:5,7 12:6,8,10,12
23:23,24 27:20
67:18,22 95:21 96:7
96:22 98:3 99:2,13
99:23 100:11 104:9
107:9,20,22 109:4
109:12 111:1,7,16
112:3,10 116:16
117:24 118:1,11
122:19 124:7,20,25
125:17 126:23

**emailed**
10:3

**emails**
28:9 70:9

**embellished**
159:21

**Emerging**
116:22 119:22

**employ**
162:3 165:20

**employed**
169:8,10

**employee**
40:10 55:10,14 101:4
101:7 106:17
114:19,21 118:22
123:10,11 130:23
131:12,15,17,24
135:8 141:21,23,25
158:2 169:10

**employees**
105:14 114:6,9
150:22

**employer**
30:9,11

**employment**
12:19 17:16 18:1
85:10 86:1 165:21

**engagements**
57:14

**English**
71:9 121:8

**entered**
161:7,20

**Enterprises**
23:5,12,14 56:1,8,9
56:10 101:25

**entities**
97:2 130:8

**entity**
140:8

**entry**
39:21,21

**Equity**
3:9 54:3,4,12,14 93:7

**Erica**
2:5 5:24

**escrow**
151:7,13

**Esquire**
2:3,4,4,5,10,16

**essentially**
62:24 105:9

**Established**
53:15

**establishes**
59:17

**estate**
3:16 21:19 53:4
54:10 62:8,10 84:1
95:14 96:2 144:22
145:5

**et**
1:6,13 5:4,5

**evaluating**
166:9

**events**
70:12 113:13

**everybody**
29:5 44:8 61:7 62:1
68:21,22,25 121:13
139:6

**evidence**
30:21,22,25

**evidenced**
59:16

**exact**
11:1 152:13 157:8

**EXAMINATION**
6:5 153:19

**examined**
6:4

**example**
74:11 133:12

**excellent**
90:1

**excess**
88:10

**Exchange**
11:14

**exciting**
54:2

**exclusive**
57:12

**excuse**
6:18 8:22 30:21
90:18

**executive**
52:10,15 54:25 55:8
55:12 65:2,5

**exhibit**
156:3 158:8 160:5,5
165:4,12,14,18

**exhibits**
4:1 164:21

**expecting**
94:25

**Expedited**
168:20

**expenditures**
139:20

**expenses**
18:20

**experience**
39:19 52:22 55:2,5

**explain**
36:21 85:20 163:22
166:2

**explained**
34:16 36:20



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 180 of 203

Page 10

**express**
122:1 136:15
**extent**
101:18
**extra**
18:10
**E-r-i-c-a**
5:24
**E85**
22:13

**F**

**face**
110:20
**facilities**
86:15
**facing**
148:12
**fact**
38:23 42:25 77:20
94:21 100:22
**facts**
59:13
**failed**
12:25
**fair**
63:6 76:9 94:12
135:13 154:5,8
**fairness**
125:17
**false**
38:8,14 76:10 88:22
96:1
**falsely**
30:23
**falsify**
155:18,23
**familiar**
124:4
**family**
5:18 6:7
**far**
10:9,13 27:22 35:1
38:17 80:1 114:4
146:13,16
**fast**

**135:15**
**father**
162:11
**fault**
20:13,14,17,18
**FBI**
24:16,19,20 25:15
**February**
59:17,22
**federal**
86:7,8 149:1
**fee**
93:12,14 106:5
122:16
**feel**
14:15,22 64:10 136:9
**feet**
88:9,24 151:15,22
**felt**
116:2,3,4 136:15
146:24
**Ferino**
140:5
**Fiedler**
2:4 5:23
**figure**
132:15
**file**
20:7 132:21
**filed**
6:10,23 30:12 63:11
92:23 94:2 138:9
**filing**
136:25 137:8
**fill**
151:5
**filled**
166:15
**filling**
150:3
**film**
110:14
**filming**
109:23 110:12
**finally**
45:22

**finals**
45:21
**finance**
90:2
**finances**
61:5
**financial**
27:15,21 30:4 34:25
42:15,23 59:16 60:2
129:13 138:19
144:5 149:23
**financially**
169:10
**financing**
50:7,8 86:15,21
87:10 133:7
**find**
8:19 36:3,10 39:1
66:20 82:8,16 106:3
111:23
**finding**
165:21
**fine**
33:8 44:5 53:18
125:18 129:2
**finish**
31:20 79:14,15
**finishes**
13:20
**fired**
100:25 101:2
**firm**
17:9 52:2,19 81:11
120:18 138:7
144:11
**firm's**
83:23
**first**
15:20,24 17:21 31:23
39:21 57:3 58:7,12
61:23 96:3 105:10
118:1 128:5 130:21
137:9 141:24
151:10,12 153:23
154:12 167:4,8
**five**

**66:22 89:22**
**fixed**
50:3 93:14
**flawed**
72:13
**floating**
124:13
**floor**
105:10
**Florida**
134:20 144:24,25
**flow**
43:1,5 98:10
**flows**
42:23 98:20,21
128:16
**focus**
145:22
**folder**
104:10
**following**
97:20
**follows**
6:4
**follow-up**
153:22
**folly**
15:15
**forbearance**
13:8 73:25
**Ford**
112:24
**foregoing**
169:6,12
**foreign**
58:11 84:1,4
**forge**
29:11
**forged**
28:23,24 29:2,13
30:20 40:23
**forget**
67:14 112:18
**form**
33:4 44:4 45:14
**format**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 181 of 203

Page 11

90:22 169:12

**formulate**
27:4

**forth**
47:25 48:11 129:16

**found**
30:16 34:4 82:7
140:5

**four**
63:19 83:22

**fourth**
38:18

**frame**
107:25 108:7

**Franklin**
130:21

**fraud**
36:19 37:15 38:21
39:3 40:16 41:14

**frauding**
38:3

**frequency**
108:10

**Friday**
1:18 5:7 166:16

**friend**
58:25 122:5,5,6
125:14

**Friendly**
25:22

**friendship**
113:4

**front**
9:10 20:6 53:24
71:20 72:2 95:11
123:6 156:2

**full**
91:13,19 95:22
101:18 102:13
129:1

**fully**
156:22,24

**Fun**
102:8

**function**
43:14

**functions**
43:25

**fund**
47:14 52:2 53:4
54:10 84:3 91:12
93:8 143:21 167:6

**funded**
87:20

**funding**
130:10

**funds**
54:8 59:20

**further**
169:8,9

**future**
119:18

**F-i-e-d-l-e-r**
5:24

---

**G**

**gain**
119:7

**game**
99:7,20

**general**
25:16 61:6 72:7,8
145:25

**generally**
11:2 67:4 148:21
158:13 159:6

**generated**
148:4

**generating**
95:6 115:25

**gentleman**
11:13 13:24 141:2
144:14

**geographic**
85:7

**George**
2:10 3:3 5:17,17 6:5
6:6 14:4 16:20
23:19 39:13,14 83:2
110:24 117:6
122:21 123:1,5,13
123:20 127:22

**128:3**,11,14 148:9
152:5 153:18,23
155:7,9 160:7,20
162:15 166:25
168:12

**getting**
14:20 33:23 34:1
46:6 49:12 70:12
87:6 90:7 94:24
113:21 127:5 131:9
141:9 147:22
164:19

**give**
8:5 17:4 18:9 23:8
25:15 29:11,12
67:21 79:15 93:2
99:25 132:15
133:16 158:17,19
167:18 168:8,10

**given**
19:6 103:13 124:13
156:7 163:20,24
166:10

**gives**
168:9

**giving**
44:17 76:15 83:10
116:13

**glasses**
83:6

**Glenn**
1:16 3:2 5:3 6:3
45:12 51:11,25 60:2
95:21 98:4 99:16
107:19 118:1
144:22

**Glerum**
144:22

**GLM274**
12:11

**global**
53:14 63:25 64:6
118:14,17

**globally**
52:19

**Gmail**

12:11

**go**
6:14 8:1,13,18 14:7
14:13,14 25:3 33:8
36:21 37:8,21 42:7
42:10 51:22 55:23
57:4 59:7,12 66:1,8
71:25 75:5 78:13
87:25 88:1 93:18
96:21 97:25 99:11
108:21 111:10
113:6,19 116:4,12
125:9 127:12,22
132:24 134:2,17,20
134:22 135:17
151:7,12,14,16,20
152:6 161:13,21
165:7

**God**
7:22

**goes**
49:5

**going**
6:16,21 7:3 8:5,6
14:19 16:21 25:24
26:3 28:9 29:10
33:22,23 34:12,19
44:7 49:17 53:23
59:4 61:5,7 66:3,11
69:11 74:16 75:22
77:14 79:6,15,24
81:22 82:22 83:3,4
97:24 101:19
107:18 117:1
123:15 124:10
127:23 128:8 132:8
134:9,13,14 135:18
136:23 137:16
142:4 145:3 151:25
158:17 160:3
162:23 167:16
168:14

**Golaszewski**
105:13 107:23

**good**
18:9,10 123:13 133:6



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 182 of 203

Page 12

133:8 158:23
**Google**
146:24
**gopher**
105:16,17,21,24
**government**
28:13 85:21 86:6,7,8
150:24
**governmental**
26:6
**Grabato**
30:8 34:9 40:2,6
104:16
**Grant**
111:5
**great**
94:23
**Green**
46:16 47:8,9 149:4
**gross**
132:6
**ground**
151:16,22
**group**
2:15 135:14
**grow**
54:8,21
**guarantee**
116:2,6,14
**guess**
10:23 23:17 33:3
36:7 61:25 75:19
79:7 83:17 86:10
105:23 112:6
114:15 119:20
124:8,14,17 132:10
137:10 157:21
**guilty**
160:25 161:8
**guy**
41:7,13 69:10 86:19
117:15 118:9
120:12 144:5
**g-o-p-h-e-r**
105:17

---
**H**

**H**
3:7
**hairdresser**
81:23
**half**
24:9,22 47:22 62:18
69:25 72:10 92:23
**hand**
80:1
**handle**
36:4 79:21 108:22
125:5
**handled**
35:21 151:2 161:12
**handling**
81:11
**happen**
62:21 137:9
**happened**
129:7 135:17 137:23
**happening**
136:19
**happens**
62:10 151:7
**happier**
15:13
**harder**
7:18
**head**
12:9 20:3 60:1 62:20
62:21 94:19 125:11
132:5 138:11
141:12 144:15
160:2
**headed**
20:4
**heads**
42:12 60:6,9 61:4,10
61:13 97:14
**hear**
21:24 61:23 127:19
134:23 138:19
166:21
**heard**

7:3 62:4 95:1 100:24
137:20 138:21
152:13 161:17,22
**hearing**
79:24
**heck**
28:9 135:18
**held**
63:25 64:3
**hell**
66:3
**help**
54:20 66:23 114:25
143:15
**helped**
92:9
**helping**
54:8 98:19 161:13
**hey**
60:2 61:4 62:5,22
65:23 66:3 78:22
79:7 86:24 116:12
135:18 136:5
158:16
**hierarchy**
39:25 40:6
**high**
62:15 85:11,17,19,23
86:3 94:14
**higher**
71:16 72:6 73:11
86:4 157:14
**hindsight**
79:6
**Hippel**
1:17 2:9 5:9,11
**hire**
120:4 166:17
**hired**
12:1 17:21,22 48:20
63:21 79:21 81:4
89:5 114:21,23
118:21,22 120:5
141:13 145:12,13
155:9 166:10,16
167:3,6,11

**history**
39:19 166:18
**Hold**
13:19,23 17:4 43:7
71:23 79:14 127:11
**holding**
70:5 119:5 127:16
150:7
**home**
143:14,19
**honest**
7:25 61:22 115:8
156:21
**hopefully**
77:15
**hoping**
136:20
**hotels**
18:24
**hour**
31:14
**house**
20:1 25:9 60:17
**how's**
44:7
**HR**
145:9,21
**huh-uh**
7:8,10
**hundred**
17:22 88:4,8,14,16
88:19 102:17 103:4
111:21 148:5
**hurt**
71:1
**hurting**
70:24
**husband**
113:12
**H&L**
67:12,15,16 68:16
97:1 103:17 152:18

---
**I**

**Ice**
2:3 153:21



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 183 of 203

Page 13

idea
12:3,9 24:8 41:17,20
56:12 67:5,8 73:14
87:21 102:7 109:1
110:10 112:25
120:3 123:10 126:8
163:12 167:23
ideas
93:9
identities
81:22
imagine
70:22
immediately
125:20 164:24
impact
165:23
implement
125:19
implementing
67:8
implied
41:12
inability
60:7
incentive
18:6
inception
91:13
include
68:8,20,21
included
68:9 72:21 115:16
including
27:13 43:8,25 60:1
96:9
income
62:12
incorrect
42:9
increase
108:10
increased
58:2 85:6
independent
130:20 131:10,14

144:2 150:23 166:7
independently
20:1
India
22:12 23:25 44:13,15
44:18,20 47:13
53:15,20 58:8,9
67:1 70:24 71:2,4
79:19 83:22 113:6
121:3 125:21
Indian
57:15 58:9
indicated
8:17
indicates
111:24
indication
15:20 54:1
indirectly
127:19
individual
17:8,10 81:13 86:22
86:24 87:5 89:5,8
119:14 129:10
149:13
individuals
30:10 87:14 89:9
131:7
individual's
143:24
induce
34:5 40:23
inducing
29:14
information
7:17 22:22 27:4
50:25 59:16 76:18
129:13 155:18,24
159:5 168:8
infusion
59:20
initially
38:24 49:14 93:17
97:17 141:19
inquired
135:25

insertion
116:19
inside
104:8
insolvency
59:15
insolvent
59:14
inspect
134:8
instance
109:19
institution
34:25
instructed
68:7,19
instruction
82:19
instrumental
53:3
insurance
62:14
Intended
83:16
intent
28:21 29:1,3 34:21
35:2,17
intentions
167:13
interest
62:11,15,19,23 77:17
83:19 86:14 90:15
114:18 132:24
133:2
interested
22:13 145:1 169:11
intermediary
33:10 168:4
international
48:15
internationally
47:13
internet
81:24
interpretation
48:10

interpreted
48:12
interrogatories
63:3
interview
83:10 157:2 158:17
159:8,12,18 166:10
interviewed
158:12 166:5
introduce
57:16
introduced
11:17
invest
29:15 30:20,24 40:24
44:16 77:12 83:16
84:1 85:14 86:2,3
151:3
investigate
113:15
investigator
11:21 72:24
investigators
75:19
investing
77:18 85:12 96:2
97:20 149:4,14
investment
1:5 43:20,23,25 44:6
44:9,12,21 46:17
52:2 53:14,15 54:2
62:8,10 63:22 84:5
85:6,16,24 90:13
91:1,14 92:2 116:9
148:23,24 149:6
150:7
investments
45:4 48:16 120:10
investor
29:11,15 38:8,15
40:23 58:2 59:20
77:22 86:24 87:6,12
90:7 115:1,17
129:11 131:5,18
132:25 138:14
139:11 147:20



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 184 of 203

Page 14

149:13 150:6
151:10 161:12
**investors**
11:19,21 15:4,10,11
15:13 21:8,13,23
22:6,12 29:9 34:5
38:5,6 41:4 44:11
44:25 47:6,14,14,15
49:13,18,19,20,21
49:24 57:19 66:23
66:25 84:4 86:22
87:5 90:12 91:11
98:10 115:11
116:12 129:19
139:5 142:13 149:9
150:14 151:2
161:13
**invoice**
4:14 102:20,22
103:25
**invoices**
104:2 114:2 135:6,10
135:11
**involve**
46:4
**involved**
35:5 56:11 79:17,17
80:8 81:1 136:24
137:2 141:25 142:6
**involvement**
117:23
**involving**
45:16
**in-box**
104:9
**in-person**
138:1
**issue**
51:17 60:6 90:10
133:10
**issues**
19:3,8,9 35:25 42:12
42:22 43:6 61:18,19
69:12,14 79:3 135:2
137:15 138:19,24
145:2,21,22 151:4

**issuing**
164:6

---

**J**

**JAE@cholegal.com**
2:17
**jail**
19:22 34:15 148:12
**jailed**
82:19
**January**
154:21
**Jav**
108:15
**javier**
2:12,12 5:18 6:7 41:7
41:10 68:3 69:10,11
70:9,17,19 72:19
76:14 78:23 79:10
79:23 95:3 96:8
98:5 99:4,13,21,24
100:9 106:3 107:9
107:23 108:15,19
109:8,14,16,19
111:18,24 112:6,12
113:15,19 118:7,8
122:2 124:14,21
125:3,5,9,25 126:11
126:19,23,24 127:5
127:14 148:16
152:17 155:19
157:14,15,19,23
158:2
**Javier's**
41:18 69:10 71:15
79:3
**Jersey**
1:1,18,19 2:11,17,18
5:6,10 10:24 11:13
14:8,9 25:6,6 27:12
152:21,23 153:4
167:21 169:4
**JKS**
1:2
**job**
9:11 18:9,10 21:10

37:17 53:11 105:15
**jobs**
85:24 149:6,15,22
**Joe**
162:11
**John**
137:3 140:5 161:3,10
161:11 162:10
**joint**
121:19
**Jr**
2:13
**Judicial**
169:12
**July**
118:13
**jumbo**
133:5,5,12,12,18,20
**Justice**
24:4,6,11,18

---

**K**

**Kana**
46:5 79:21 80:20
81:4 97:12 107:10
109:14 110:3
124:21 125:8
126:23
**Katey**
46:5 79:21 80:19
81:4,8 94:21 97:12
107:10 109:14
110:3,5,8 124:21
125:8 126:23 127:7
**keep**
10:1 31:10 36:1 83:3
92:6 104:5 119:18
**keeping**
139:19
**kept**
22:15 60:15
**kicking**
76:25
**kid**
106:1
**kind**

9:4 18:22 43:16
46:10 54:7 62:12
73:24 76:19 83:13
83:14 94:24 103:2
104:13 119:15
123:21 126:2
133:17 138:17
**knew**
28:1,3,7 29:13,21
38:14,16 41:7,10,14
42:25 43:4 45:5
47:10 63:15 66:10
82:13,14,16 88:18
111:13 113:24
116:21
**know**
7:22 8:1 10:13 11:16
11:23 12:1 14:11
15:7 16:8 19:18
24:23 25:17,18,23
26:1,1,3,7 31:5,9,10
31:12 32:15,17,18
32:20 33:16 34:1,3
37:4,10 40:11,15
45:7 49:2 51:8 56:1
57:14,15 58:7 62:14
63:10 69:6,7 71:10
71:18 73:11 74:8,14
74:20,23 75:23,25
76:1,4 77:5 82:5
84:18 86:16,17
88:23,25 89:24
93:22,24 94:19
95:16 96:13,19,23
100:13,15 102:10
102:11 103:2,17
104:13,16,18,23
105:4 106:7 107:6
110:9 111:11,18
112:11 113:1 115:8
116:19,24 117:21
118:5,21 119:4,16
119:24 122:18
123:3 125:16,18,22
127:5 132:3,6,17
136:11 137:19,23



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 185 of 203

Page 15

138:12,13 140:3,23
141:1,13 142:9
144:1 146:11,13,14
146:16,17 147:4
152:8,15 154:11
156:23 157:8 158:1
161:9 163:18
164:11 167:18
168:2,8
**knowledge**
73:5,8,10 75:23
127:4 163:7
**known**
100:2
**Kristin**
111:5
**Kulraaj**
121:15,16
**Kyle**
98:5 110:3

**L**

**L**
1:18 169:4,15
**La**
1:16 3:2,9,10,11,12
3:13,14,15,16,17,18
3:19,20,21,22,23,24
4:2,3,4,5,6,7,8,9,10
4:11,12,13,14 5:3
6:3,6 8:6,10 39:11
50:10 51:25 52:6,9
52:18 53:23 55:20
59:3 80:4 83:3,4
97:25 98:4 107:8,18
109:3,11 110:25
111:15 112:2
113:18 118:1,10,11
124:20 126:22
127:10 128:15
129:2 149:12 152:7
153:20 156:3 158:8
165:12 166:22
167:1
**lady**
38:10

**laid**
64:3,5
**language**
71:8 98:12
**laptop**
22:18,20,21,22
**larger**
85:12
**largest**
27:12
**LASKEY**
168:20
**Lasley**
2:3 3:4 5:20,20 6:19
8:16 9:2 13:19,23
14:2 23:16 26:14
33:4 39:11 44:4
45:14,19 47:2 71:23
79:14 110:20
122:18,23 123:4
148:12 151:23
153:19,21 155:8,10
155:11 162:18
166:22 167:2
**lasts**
149:16,20,21
**late**
29:8 34:17
**launches**
57:12
**Laurel**
1:18 2:11 5:10
**law**
1:17
**lawsuit**
7:24 8:3
**lawyer**
111:4
**lawyers**
33:6,11 75:1 137:12
137:17 138:7
144:21 145:16
**leads**
95:6
**learn**
40:18 48:18

**learned**
40:22,25 167:2
**leaving**
165:20
**Ledger**
67:13 152:21 153:1,2
153:4
**left**
19:17 93:19 153:13
162:3
**Legal**
1:24 2:15 5:13,14
**lenders**
90:2
**length**
150:21
**Lesky**
1:18 5:13 169:4,15
**letter**
3:20 26:5,7,8 28:21
29:1,3 34:21 35:2
35:17 69:16,23
101:11 106:11
111:3,8,10 117:9
163:19,20,22 164:3
164:12,17,19 165:9
**letters**
121:23 124:12 125:2
164:6
**letting**
32:15
**let's**
42:7 47:2 60:16,20
62:5 85:13 87:3,7
98:18 103:21
125:19 128:4
133:13 150:2 153:9
158:22
**liar**
100:2,8,14
**license**
130:5,14 169:4
**licensed**
130:1,6
**lie**
44:1 48:7 95:25 96:1

**light**
44:2
**limited**
133:6
**Lincoln**
25:6,7
**line**
95:25 130:9 148:10
**lines**
131:9
**LinkedIn**
3:14 50:12,14,15
50:16 51:10 165:17
165:18,25
**Liquidating**
6:10 9:3
**Liquidation**
1:9,9,10 5:4,21
153:25 154:2,3,6,15
154:18 155:4,5,13
155:14,17,23 157:3
157:4 160:12
**Liquidation's**
154:13
**list**
36:7
**listed**
107:19 111:5
**listen**
10:15 24:19
**little**
18:9 63:12 69:9
79:16 119:2 158:19
**live**
25:5 47:19,24 99:6
99:20 112:20,22
**lived**
48:12
**living**
48:4
**LLC**
1:6,9,13 2:12 5:4,5
53:1
**LLP**
2:3,9 5:9,11
**loan**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 186 of 203

Page 16

28:25 35:4,17 49:25
87:6,8,10 133:4,5,5
133:9,12,13
**loans**
35:11,23 49:10,12
86:20 90:8,8 129:18
131:5,18,18 132:6
132:25
**local**
70:11 71:11
**locate**
134:6
**located**
86:2 134:3 167:19
**location**
19:25 138:5 143:18
**LOI**
29:1,8 30:20 34:16
35:16
**long**
12:15 19:15 54:16
92:20 104:2 118:4
137:8
**longer**
106:17 143:13
**look**
8:7 9:13 12:24 16:7
20:20 22:25 26:12
41:15 50:16,19
55:21 60:18 63:7
85:22 97:8 98:18
101:24 111:3 123:11
127:9 158:8 160:3
**looked**
46:7 69:3,8 89:11
101:20 157:10,13
**looking**
25:18 49:4 53:17,21
75:5 89:12 93:7
95:3 149:23
**looks**
92:13 110:25
**lot**
50:25 68:17 69:8
87:4 94:13,22 100:2
**lots**

87:4,14
**loud**
53:12 63:20
**Louis**
2:4 5:22
**low**
86:14 90:3
**lower**
62:16,16 148:23
**lowered**
130:14
**lowest**
148:16
**Luca**
162:11,11
**Lunch**
123:17
**luxury**
88:7

---

**M**

**M**
2:10 52:6
**magazine**
3:15 83:8 84:12
158:9,18
**Magna**
1:24 5:12,14
**main**
145:18
**maintaining**
118:14
**maintenance**
150:3
**majority**
90:3
**making**
30:3 53:7 60:16
72:19 85:2 93:19
94:6,9,10 103:3
114:14,20 119:23
119:25 148:6
159:25
**mall**
105:4 149:19
**man**

59:1 157:16
**manage**
139:16 150:2,10
**managed**
83:22
**management**
53:5 80:11,16,20
81:2 82:2 120:9
**manager**
52:2 80:18,23,25
81:20 118:23 135:4
143:6,9,21 146:7,10
147:9,17,24,24
150:11
**managers**
83:22 121:3 147:16
147:18,19
**managing**
143:16
**manufacture**
155:18
**March**
1:18 5:7 75:15
160:24
**margin**
72:22 103:2
**margins**
41:19,22 72:18 73:2
73:15 74:18 103:15
**mark**
8:6 17:5 128:4,5
144:9
**marked**
9:22
**market**
27:3,7 46:14 83:17
119:8 121:1 126:13
133:13
**marketed**
45:17
**marketing**
20:3,4 43:19 44:19
45:15,24 46:6 52:19
55:5,12,14 56:5,19
57:17 58:21 79:10
79:18,22 114:25

118:15,17 120:8
125:11
**Markets**
119:22
**marking**
39:11 140:21
**markup**
97:6
**married**
59:1 113:10
**marshal**
121:4
**Marsillo**
107:4,6 116:22
122:24 123:9
**materials**
22:11 45:16,25
**matter**
5:3 139:7
**Matthew**
154:6
**Mattina**
1:16 3:2,9,10,11,12
3:13,14,15,16,17,18
3:19,20,21,22,23,24
4:2,3,4,5,6,7,8,9,10
4:11,12,13,14 5:3
6:3,6 8:6,10 39:12
50:10 51:25 52:9,18
53:23 55:20 59:3
80:4 83:3,4 97:25
98:4 107:8,18 109:3
109:11 110:25
111:15 112:2
113:18 118:1,10,11
124:20 126:22
127:10 128:15
129:2 149:12 152:7
153:20 156:3 158:8
165:12 166:22
167:1
**Maxwell**
1:17 2:9 5:9,11
**mayhem**
119:23
**mean**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 187 of 203

Page 17

25:23 31:1 38:1,5
42:20 48:12 49:12
54:22 55:4 56:14
71:14 77:21 84:25
89:21 92:3 94:8
101:3 105:3 114:7
122:21 137:20
154:14 165:17
**meaning**
44:6 130:19 133:11
**means**
42:21 46:5 69:6,7
78:12 112:7 125:16
125:23 130:7,15
**meant**
44:9 57:7 60:16
**media**
1:13 2:12 5:4,18 6:8
43:10 46:3 55:2,4,5
67:12,15 68:4,8,14
68:14,16,20,23
72:15 97:1 109:7
111:20 114:11
125:21 152:12,16
152:17,21,23 153:3
155:19 157:6
**meet**
15:24 32:5 59:18
92:2 113:12 154:2
**meeting**
11:7 137:9,11 138:1
138:2 154:2,20
**meetings**
44:22
**mentality**
136:12
**mentioned**
16:18 17:15 31:3
97:2 106:13 122:3
158:1 161:4
**met**
10:23 28:11 49:5
56:12,15,19 57:3
104:17,17,18
153:20,24 154:5,8
154:12,17 155:3,12

**metrics**
46:2
**Microsoft**
104:14
**middle**
95:24
**Miller**
2:3 153:21
**million**
46:16,25 47:6 51:14
85:7 88:9,24 132:9
152:11
**minimum**
85:6,15 127:1 149:6
149:10,21
**minor**
9:20
**minute**
8:7 17:5 63:7,14 73:4
144:25
**miracle**
47:1
**Mischaracterizes**
26:15
**misconstrued**
7:10
**misrepresenting**
163:16
**mixture**
105:8
**Mona**
151:1,12
**Monday**
118:2
**money**
15:4,9 28:1 29:9,12
29:15 34:6 35:3,4
35:17 36:2 38:10,12
38:16 41:3 46:19
47:7,10 50:2 54:19
62:6 76:25 85:12
86:25 87:12,22 90:7
91:21 92:3,6 93:8
115:1 130:12
133:17 138:15
139:11 149:9 151:3

151:4,7,10
**monitor**
128:15
**monitors**
150:21
**month**
11:5 16:3 19:23 31:7
31:8,16 90:11
125:20 134:19
162:21 168:1
**monthly**
90:12 116:1
**months**
14:19 16:1 31:9 32:4
47:21,24,25 48:5,12
48:13 54:17 134:20
134:21 137:9,10
153:11 168:2
**mood**
157:20
**morning**
82:24 153:20,23
160:7
**Morris**
17:6,11,12
**mortgage**
35:13,15,15 49:13
50:3 53:16 87:11
104:21 130:1,20,21
133:4
**mortgages**
49:7
**mother**
162:12
**motto**
95:11
**Mount**
1:17 2:11 5:10
**move**
37:13 38:22 87:22
124:24 125:19
133:8,8
**moved**
136:17
**moving**
60:15

**multiple**
127:6

## N

**N**
3:1,1
**NAIR**
6:11,17
**name**
6:6 17:3,5 24:13,14
24:15 28:22 29:2
30:23 52:5 67:14
80:12 81:10,12 82:6
82:15 112:19 121:2
128:24,25 129:1
130:7,13 139:24
143:24 144:15
146:17,25
**named**
63:24
**names**
24:8 81:16 82:3
129:19 145:15
**narratives**
21:16
**Natalia**
2:13
**national**
1:5 52:1 53:4 54:3
63:21
**nationals**
58:9
**nature**
25:20 45:3
**Near**
112:24
**need**
7:16 10:2 16:20 29:4
55:21 71:4,24 85:22
86:9,11 135:14
**needed**
33:23 53:18 67:20
92:6 137:6
**nefarious**
41:13 76:19
**negatively**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 188 of 203

Page 18

15:8
**negotiate**
93:12,12 163:25
**negotiated**
109:17
**neither**
30:9 169:8
**nephew**
162:11
**network**
123:24 124:1,5
**networks**
123:22
**never**
20:4 21:2,11,13,14
21:18 22:10 28:17
32:21 36:13 37:16
41:21 47:7 60:6
72:23 78:8 79:3,8
100:9 102:22
110:18 135:25
140:10,12,14
142:25 152:13
154:5,8
**new**
1:1,18,19 2:11,17,18
5:6,10 9:11 11:13
14:7 16:14 25:6
27:12 36:25 66:23
66:25 67:6 114:22
124:14 152:21,23
164:19 167:21
169:4
**Newark**
16:14 24:24
**newsreels**
117:19
**nice**
14:20 118:8
**Nicholas**
64:7 98:4 127:1
**Nick**
18:8 19:3,8,15,18,21
20:2 21:21 25:19
26:1 27:20 28:5,8
30:8,16 34:4,14

36:14,19 37:14 38:7
40:7,7,9,13 42:1
45:20 46:13 48:22
48:23 49:1,2,16,23
58:15,17 60:19 62:5
64:7,7,10,16,19,24
64:24 65:1,3,3,6,13
65:23 67:5 68:20
69:4,10 70:10 75:5
75:14 76:25 78:5,21
78:25 80:21 81:17
81:21 82:5 89:15
90:23 94:21 95:8
96:18 100:10,11,13
100:15 101:12,19
101:23 102:4,18
103:8,13,13 104:17
104:19 105:16
106:2,7,15 107:9
108:14,21,22,25
109:2,15 110:10
111:1,11,18 113:14
113:19 117:12
119:12,21 120:17
122:6,7 124:15
125:14,16 134:13
134:14 135:18
136:2,17 137:11
138:14 139:3
142:14,21,25
143:11,13,13,17
146:21 153:8,12
157:10,11,15,15,18
157:23 160:3,22,24
161:17,23 164:7,9
164:13
**Nick's**
19:9 66:4 76:17
136:3,11 140:5
143:22 144:13
**nine**
47:21 71:13,19 72:5
153:11
**NIRA**
6:18
**Nisha**

131:6
**non-payment**
138:20
**non-servicing**
130:6
**Nope**
25:12 78:7 110:19
146:4
**North**
10:24 14:8,9 25:6
150:19 153:4
**Norvirgins**
146:22,23
**notary**
169:5
**note**
123:2
**noted**
125:1
**notice**
1:19 80:3 125:22
126:2
**notion**
101:17
**NRIA**
6:20 12:17,20 14:12
14:12 17:16 19:11
19:14,16 21:12
22:23 23:15 25:17
26:1 27:14 30:7,9
30:11 35:3,8,21
38:21 39:21 48:19
49:15 51:1,10 52:3
53:7,14,15 54:9,12
56:9,9,11,17,19,21
56:24,25 57:5,16
58:8 63:22,24 67:5
70:6 77:11,21 78:20
83:17,19 84:16
86:13,23 87:16,23
88:2,5 92:4,6,9
93:17 94:14 97:13
98:9,19,20 101:2,4
104:14,25 105:14
106:15,17,22 109:7
113:24 114:6

116:10 118:15,18
119:9,12,19 123:10
123:11 126:14,19
127:17 129:8,11
130:18,19,23
131:13,25 135:8
140:1 141:4,18
144:18,20 151:9,17
151:19 155:25
158:2,3 161:12
162:4,7 163:6,9,10
163:15,17 165:16
165:19,20,24
166:13
**NRIA's**
84:2 88:4 90:1 91:12
138:5
**number**
5:2 12:24 20:10
23:19,20 26:11
27:10 50:10 55:20
59:3,7,10,12 63:2,6
75:11 82:6 92:11
93:23 95:20 96:8
101:24 102:6 116:6
116:16 132:10
152:13 169:4
**numbers**
46:6 69:3 89:12,12
99:17 149:24

O

**oar**
119:18
**Obermayer**
1:17 2:9 5:9,11
**object**
33:4
**objection**
26:14 44:4 45:14,19
126:18
**obligations**
62:24 129:8
**obtained**
129:18
**obviously**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 189 of 203

Page 19

28:2 76:12 124:8
162:2
**occasion**
43:5
**Occasionally**
43:6 93:22
**occasions**
36:11 70:20
**October**
117:25 118:2 122:24
123:10
**odd**
66:15,20
**offer**
166:6,6
**offered**
13:9 73:21,24
**offering**
70:14
**offers**
84:4
**offhand**
17:23 80:13
**office**
24:21,24 28:12 33:1
33:5 34:15 104:13
105:6 127:21
**officer**
28:25 36:18 37:10
39:22 52:1 53:10
64:2,4 65:3,5,11,15
70:6 84:16 116:11
**officers**
15:6 37:1
**officership**
40:6
**offices**
1:17 10:24 44:21
53:15,20
**officially**
146:9
**oh**
7:22 31:13 39:7
45:10 73:1 78:10
95:14 161:18
166:17

**Ohio**
2:6
**okay**
7:5,12,19 8:23 9:13
10:16,17 17:5 21:1
21:3 26:4 38:13
39:7 42:9 46:1,2
47:2 48:3 51:20
52:24 59:11 63:19
74:7 76:3,9 79:17
97:9,22 98:2,18
99:10,18 101:10
117:8 123:4 144:11
157:17 158:10,22
158:23 161:18
**old**
23:23 164:19
**once**
34:4 118:22 134:19
149:7 151:6
**ones**
10:8 128:6
**ongoing**
17:19 51:5 139:14
**open**
17:19 47:17 120:20
120:20
**opening**
53:21
**operating**
15:6 39:22 53:10
59:19 64:2,4 84:16
92:21 116:11 162:1
**operations**
52:1 53:13 60:12,13
60:15,22 62:20,22
63:23,25 64:6
**opinion**
15:16,18
**opportunities**
119:18
**opportunity**
37:22 48:18 49:6
54:3 156:7,14,20,25
158:18 159:22
**oppose**

72:15
**opposed**
40:9 77:7 145:5
**oral**
18:1 19:1
**order**
26:18 34:5 38:15
116:19
**ordered**
101:12,13
**orders**
66:17
**original**
34:16 51:9 116:5,12
**originally**
14:15 17:21 32:3
143:6
**originator**
130:1,15,20 133:14
**outlets**
133:6
**Outlook**
104:14
**overcharging**
78:23 106:8
**overlap**
114:5
**oversaw**
52:18 53:16 120:12
**overseas**
47:19,22,23 48:4
**oversee**
40:8 80:21 121:17
139:17
**overseeing**
61:10
**overstated**
119:1
**overview**
158:19
**owned**
29:25 56:6 64:14
65:22 66:2,16
150:14
**owner**
30:2 82:17

**owners**
140:14
**owns**
64:12
**O'Brien**
90:24

—————————
**P**
—————————
**package**
115:17
**packages**
18:7
**page**
3:14 8:13 50:16
51:22 57:4 59:9,10
75:9 87:25 88:1
96:21 97:19 99:11
99:13,17,17 126:11
127:9 133:25
**paid**
60:10 61:20,24 63:16
72:23 83:11,12,13
90:10 93:11 103:14
120:2 121:24
134:24 135:6,14,15
139:2 141:9 147:16
147:23
**paper**
104:5 153:4
**paperwork**
148:4 151:5 161:14
166:11,15
**paragraph**
53:8 59:7 63:19
66:22 67:4 75:8
99:9 160:21
**parent**
45:16
**Park**
25:6,7
**part**
88:12,13 92:16 99:8
123:24 124:9 153:1
153:2 159:18
166:13,19
**participated**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 190 of 203

Page 20

91:12
**particular**
91:1 94:17 104:3,8
  112:9 120:25
**parties**
5:15 106:22 127:17
  169:9
**partnering**
126:12
**partners**
97:1
**partnership**
84:3
**party**
68:9 95:8
**part's**
88:22
**passed**
162:13
**Pat**
107:9 108:14
**Patel**
89:9,10
**patient**
152:8
**Patricia**
145:17
**Patryk**
105:13 107:22
  109:15
**Patti**
145:17
**Paulina**
2:13
**pay**
34:19 60:7 78:22
  91:25 129:16
**payable**
43:10
**paying**
59:23 60:3 61:11
  62:23 90:11 103:10
  106:4 113:24 116:1
**payment**
102:2
**payments**

90:10 116:1 138:22
**penalty**
73:7 76:1,4,8
**pennies**
15:11
**Pennsylvania**
134:4 169:6
**people**
19:5 29:21 30:16,18
  30:23,25 37:21 38:2
  44:16 46:24 47:7
  49:7 51:14 57:18
  58:8 67:1 68:15,17
  77:9 78:3 79:25
  82:2,15 83:16 96:8
  97:3 114:25 116:5
  116:10 119:21
  120:25 121:8
  131:10 138:3,14,22
  139:4 141:3 145:1
  149:3 150:2,3,4,8
  162:9
**people's**
62:6
**percent**
21:13,22 22:6 44:17
  45:11 58:3,4 62:17
  62:17 72:22 74:12
  74:17 84:5 88:5
  96:15 102:17 103:4
  103:7,18,23 111:21
  115:13,25 116:2,6
  116:13 124:24
  142:23 143:1
  149:11
**percentage**
73:11
**percentages**
58:2,3
**perception**
139:9
**performing**
46:8,10,13
**period**
12:12 47:19 48:5
  79:11 85:25 132:19

139:3 142:3
**periodicals**
21:6
**periods**
132:22
**perjury**
73:8 76:1,5,8
**permanent**
50:8 86:14,20 87:10
  90:8
**perpetration**
59:21
**person**
34:7 35:5,21 41:25
  42:4 60:14 61:9
  62:20 66:16 81:6,8
  81:9 84:15 101:20
  113:10 121:14
  128:20 129:4 131:4
  131:21 137:14
  138:3 154:17
**personal**
15:16,18 22:21 23:10
  44:22 73:5,8,10
  75:23
**personality**
118:6
**personally**
21:8 144:19
**personas**
81:22
**person's**
130:13
**pertinent**
167:16
**Philadelphia**
120:18
**Philippines**
153:11,14
**Philly**
49:11 60:18 110:11
**phone**
11:17 15:24 159:9
**phrase**
21:19
**picking**

68:23
**picture**
84:12
**piece**
49:23 57:5 78:13,13
**pitch**
142:13
**place**
61:14 104:3 107:25
  108:6 143:22
**placing**
131:2
**Plainfield**
2:16
**Plaintiff**
1:11 2:7
**planners**
149:23
**plant**
112:24
**platforms**
44:19
**plea**
161:8,17,19
**plead**
160:25
**Pleas**
169:6
**Pleasant**
25:2,4
**please**
6:2 97:19 99:25
  124:23,25 126:25
  168:20
**plus**
148:5
**PNC**
37:9
**point**
25:2,4 106:18 118:18
  139:10 155:16
  165:5
**pointed**
74:11
**policemen**
150:25



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 191 of 203

Page 21

**politicians**
71:11
**Ponzi**
27:12 28:14,17 59:21
  162:1 166:4,13,19
**portfolio**
84:3
**portion**
122:19
**position**
30:2,5 35:14 60:11
  97:7 114:23 118:20
  119:7 163:10
**possession**
8:18
**possibility**
10:19
**possible**
22:24 148:17
**Possibly**
88:25
**Post**
3:9
**potential**
114:17
**prepared**
169:12
**present**
2:20 5:15 155:5
**presentations**
22:12
**president**
28:22 63:23
**pressuring**
138:14 139:4
**pretty**
105:8 109:2 147:8
**prevent**
124:16
**previous**
109:15
**Prezioso**
145:17
**price**
76:13 107:13 133:24
  148:17

**prices**
69:9 70:11 71:15
**pricing**
103:8 106:14
**primary**
83:25
**prime**
3:9 54:3,4,11,14 93:6
  140:17
**principal**
30:1,7 90:16,17,19
  91:14,16
**principally**
64:6
**principals**
23:12 27:14,20 140:3
**Prinsell**
79:23
**prior**
8:14 17:25 35:14
  40:16,24 49:3 56:16
  63:11 112:5,15
  137:8 156:19 160:3
  165:3 166:18
  167:25 168:1
**private**
144:14
**PRO**
1:2
**probably**
11:4 12:7 14:18
  17:24 23:7,22 47:21
  54:17 62:3 74:16
  79:18 89:20 92:22
  95:22 97:24 98:22
  104:12 110:3
  111:13,14 126:15
  127:20 137:13
  138:13,25 153:10
  153:11 166:4
  167:25
**problem**
13:22 133:2
**problems**
28:5 43:5 76:15
  103:10

**proceed**
108:15
**proceeding**
6:23 108:19
**Proceedings**
169:13
**process**
51:5 88:6 158:14
  164:16,22 165:3,7
**produce**
12:25 13:3 20:12,15
  20:22 22:3 26:13
  62:12 160:14 164:7
  164:10,12
**produced**
8:14
**producing**
22:5
**product**
133:11
**production**
53:16
**products**
133:16
**profile**
51:12
**profit**
103:9,22
**program**
22:13,14 47:16 49:22
  58:11,16 83:23
  84:21 85:3,21
  108:20 122:10
  148:20,21 149:1
**programs**
23:13
**progression**
134:15
**project**
29:9 49:22,25 50:1,5
  57:12,25 83:22 85:8
  86:1 87:3,3,7
  118:23 120:8 121:3
  134:15 146:6,10
  147:9,15,17,18,19
  147:23,24 148:22

149:7,17 150:17,18
  150:19 151:8,9
**projected**
62:11
**projects**
46:4 49:10,16 60:19
  84:2 88:8,14,15
  89:1,2 90:3 91:18
  91:22 93:8 129:11
  134:15,18 142:4
  149:5 150:2
**promise**
13:7
**prompted**
14:7,10
**pronounce**
92:16
**properties**
117:20 134:9
**property**
49:23 87:18 104:25
  133:3 134:6
**proposal**
99:6 126:25
**proposals**
67:21 82:2 117:18
  127:1,6
**propounded**
59:6
**provide**
16:16 129:13
**provided**
45:24 161:23
**providing**
56:24 111:20
**provision**
126:3
**provisions**
109:7
**public**
169:5
**publications**
21:7
**publicly**
21:8
**publish**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 192 of 203

Page  22

22:8
**published**
21:11,14 22:10 89:19
159:23 160:1,4
**purpose**
134:11 162:22
**purposes**
29:14
**pursuant**
1:19 76:7
**push**
139:8
**pushed**
138:16,17 139:7
**pushing**
108:1,3,8
**put**
18:11 19:5 29:9 34:6
35:3 38:15 41:25
42:4 52:5,6 64:23
75:18 77:21 80:3
87:12 95:12 135:6
157:8 166:4
**puts**
44:2
**P-r-e-z-i-o-s-o**
145:18
**p.m**
117:2,5 123:16,19
127:24 128:9,13
152:1,4 168:15

---

**Q**

**qualify**
151:3
**quality**
45:4,5
**quarter**
92:24,25
**question**
7:1,3 10:15,15,16
13:20 21:4,25 35:18
35:19,20 38:12 39:5
42:2 47:3 51:18
59:12 79:13 157:8
163:21 168:10

**questioning**
153:23
**questions**
6:16,25 8:22 57:8
148:20 153:22
158:24 159:1,17,19
166:23,24 167:17
**quit**
30:15 56:14 136:18
**Quite**
162:9
**quote**
45:10,12 98:7 111:19
111:24
**quoted**
84:15
**quotes**
95:4 109:20

---

**R**

**Raaj**
89:9,10 121:2,11
**Rachel**
2:16
**Radio**
102:8
**raise**
83:25
**raised**
46:16,19,22,25 79:3
**ramp**
139:4,4
**ramped**
139:6
**ran**
66:16 102:5,8,11,16
102:24 103:12
122:7 136:2
**rate**
74:14,19,23 85:11
86:14
**rates**
62:11,15,19 79:3
108:15 126:13
132:24 133:3,7,12
157:6

**raw**
103:8
**Ray's**
65:8
**reached**
9:8 119:13 162:13
**reaching**
54:2
**read**
23:18 53:11,12,19
57:5,7 63:12,19
75:8 78:9,10,14
83:7 98:8 108:5
115:11,12 142:16
156:20,22,23,25
161:19
**reading**
23:17 83:6
**real**
3:16 21:19 53:4
54:10 62:8,10 84:1
95:14 96:2 144:22
145:5 151:4
**realize**
101:18 160:23
**really**
124:4 147:19 161:18
**realtor**
60:19 140:1
**realty**
1:5 63:22 97:20
**reason**
32:11 36:6 41:6,9
63:1 65:3 76:24
98:23,25 122:19
125:13
**reasons**
75:14 133:7
**Rebmann**
1:17 2:9 5:9,11
**recall**
34:22,23 37:12 57:2
83:10 124:10
126:18 145:11
156:3 157:4 158:11
159:25 164:9 165:1

**recast**
14:5 132:7
**receipt**
18:24
**receive**
8:10
**received**
26:5 91:13,15,15,16
111:7
**receiving**
131:21 156:4
**recess**
82:24 123:17 152:2
**recollect**
145:8
**recollection**
26:22 72:10 95:23
**recommend**
62:5
**recommendation**
157:12
**recommendations**
81:15
**record**
5:2 7:11,15 8:9 16:22
16:23,24 39:10 64:1
82:23 83:1 88:5
98:8 110:23 117:2,3
117:5 123:16,19
126:19 127:22,24
127:25 128:1,9,10
128:13 146:1,12
148:14 152:1,4
161:10 162:17
163:22 168:15
**redevelopment**
86:11 134:6
**redo**
117:9
**reduced**
100:2
**reducing**
85:15
**reference**
53:7 85:2 154:24
**references**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 193 of 203

Page 23

**references**
160:22 165:15,24
**referred**
49:9 144:4,6,9
**refinance**
49:21 50:1 129:14
130:24 131:11
**refinanced**
87:9 131:19 149:8
**refinancing**
49:12,16 86:14 129:7
129:10 131:5
132:25
**reflect**
39:18
**reflected**
158:25 165:3,14
**regard**
155:19,24 157:2
**regarding**
13:6 157:5 160:21
163:4
**regardless**
154:16
**regards**
49:9 94:17
**regional**
151:14,15,17,20,21
**registered**
147:14,15
**reimbursement**
18:19
**related**
119:9 155:24 169:8
**relating**
23:13
**relations**
35:22 161:12
**relationship**
6:17,22 11:24 14:12
15:23 37:4 49:15
58:23 76:20 90:2
113:3 129:4 141:17
157:23 158:6
**relative**
169:10

**released**
19:22
**relying**
26:18
**remember**
8:1 11:5 16:2,9,13
24:20,21 36:16,17
37:2 47:17 61:21
63:13 69:19,20,21
69:22,24 70:3,16,17
70:19 72:3 80:13
81:10,12 88:17,20
88:21 94:20 95:3
98:17 112:1 117:22
126:15 131:15
144:12,15 145:14
145:15 154:12
158:15 159:13,14
159:17
**remembering**
97:24
**remind**
80:4 162:3
**remove**
37:16
**removed**
165:15
**Renascent**
4:14 23:5,12,14 56:1
56:8,9,10,12,15,18
56:18,24 67:12,15
67:16 68:16 69:9
94:13 101:25
112:15 127:15
**Renascent's**
58:1 126:6
**rendered**
59:14
**rendering**
144:17
**renowned**
54:3
**rent**
150:4,8
**rentals**
89:13

**Repeat**
35:19
**rephrase**
33:7 35:9
**replaced**
164:23
**replete**
76:10
**repoeter**
158:16
**reporter**
1:19 5:13 6:2 7:16
168:17 169:4,5,15
**reporters**
158:21
**represent**
5:16 6:7 50:18 59:5
**representation**
13:7
**representations**
45:3
**representative**
77:15
**represented**
165:13
**representing**
11:18 32:7,10 106:21
163:5
**reputation**
80:9,10,11,15,16,17
80:20,23,25 81:1,20
82:1
**request**
5:10
**requested**
32:16 37:13,16 91:17
157:10 160:9
163:19 164:4
**requests**
67:17,25
**require**
148:16
**research**
60:20
**reservation**
108:19

**residential**
88:7 105:9 149:14,15
**resistant**
70:1 101:16
**respect**
32:14 83:5 133:25
167:14
**respond**
66:17
**response**
46:11 63:2 77:2,5
108:14
**responses**
94:24
**responsibility**
83:25
**responsible**
53:13 109:22 164:5
**responsive**
7:4
**rest**
52:14 122:21
**restoration**
80:10
**result**
58:1 77:18
**resume**
3:13 42:7
**resumes**
166:5
**retail**
105:7,10 150:18
**retain**
22:11,20
**retained**
104:4
**return**
21:9 84:5 90:15,17
93:24 94:2 132:21
142:23 149:10,10
**returning**
21:12,22 45:11 90:19
**returns**
20:7 22:6 91:13,14
91:16,19 98:9,19,21
115:25 129:16



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 194 of 203

Page 24

143:1
**revenue**
59:19
**review**
9:18 78:6,11,12
102:18 135:11
156:5,8 159:22
**reviewed**
45:15,24 46:2 78:8
101:22 102:3
103:14 157:9
**reviewing**
43:17
**reviews**
43:16
**revisions**
9:19 98:11 142:19
156:15
**revoke**
164:16
**revolved**
79:16
**Rey**
29:24,25 30:3,6,8
34:9 37:4 40:2,7
45:20 48:25 62:5
64:11,12,14,21 65:2
65:5,22 66:1,8
70:10 78:21,22 91:8
91:9 94:21 96:5
104:16 117:13
125:14,15 135:18
137:3,12 142:25
143:4 145:13 153:8
153:9,14 160:3
**Rey's**
82:11 128:24 144:16
**Richard**
139:22,25
**Rick**
10:24 11:9,12,20
31:13,14 32:3,12
155:4
**rid**
9:25 10:2
**right**

8:21 12:25 13:4 15:7
17:16 21:20 23:2
26:13 28:3 29:15,19
29:23 30:10,15
36:15 37:7 39:3,23
41:1,4,16 42:18
43:2,8,11 44:13,24
46:19,25 47:7,18
48:13 51:15 57:22
60:24,25 63:17
64:22 65:1,17,25
68:1,17 69:1 70:25
72:13 73:22 74:1
75:13,20 77:3,7,10
77:22 79:9 82:20
84:16,23 85:3 88:23
89:7 92:7 94:18
95:13,15,18 96:2,10
97:10,16,21 98:5,12
98:24 99:24 100:5
100:19 101:14
102:24 103:4,12,25
106:23 107:14
108:16 109:20
110:6 112:13
113:25 114:3 115:7
117:16 118:24
119:2 123:3 124:21
125:9 129:3,9
130:18 136:8
147:20 153:5
154:21 155:2
**ripped**
113:22
**road**
36:12
**rodent**
105:19,21
**role**
27:11 51:10 63:24,25
64:3 143:5
**roll**
92:3
**rolled**
91:17,21
**rollover**

92:9
**room**
61:7 120:19 138:4
**rosey**
27:23
**rotating**
121:13
**roughly**
88:14 92:24 93:1
**Route**
1:17 2:10
**rules**
6:14
**run**
83:23 102:9
**running**
38:21 92:18 94:13,22
94:22 114:3 136:12
143:15
**runs**
109:2

_____
**S**
_____

**S**
3:1,1,7 169:15
**safe**
62:8
**salaried**
122:15
**salary**
18:4 93:16 122:16
130:18
**sale**
60:17 147:13,23
**sales**
41:19 43:18,20,23,25
44:6,7,10,12 52:18
103:3 112:18
114:20 117:20
120:7 122:9,13
129:22 146:6
147:12
**salespeople**
49:5 114:22,24 139:7
162:10,12
**salvation**

80:9
**Salzano**
30:8 64:7,8 75:14
76:20 81:17,21 98:4
146:22 157:18,23
160:23,25 161:23
164:9,14
**sat**
46:7 81:13 120:19
137:4
**save**
136:21 137:6
**saw**
46:10 50:14 72:9,23
77:20 93:24 102:22
111:10 127:3
157:12 164:21
165:3
**saying**
31:10 32:8 38:2
46:23 49:14 68:24
68:25 71:5 72:21
74:24 79:7 95:5
96:14 103:6 107:12
118:3 123:9 133:9
135:13 143:2
146:14 147:19
150:9 151:18
**says**
8:13 39:22 43:8
45:22 46:21 48:2,4
48:15 51:25 52:9,18
53:3,6 59:14 67:4
73:8 83:21 84:3,9
85:5 88:1,4 90:1
91:11 95:11 96:1
97:6 98:18 99:24
107:23 108:15
109:15 122:23
124:23 125:1,19
158:16 168:7
**Scadero**
137:4
**scenes**
79:25 110:19
**Scharman**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 195 of 203

Page 25

131:6
**scheduling**
33:11
**scheme**
27:12 28:14,18 59:21
  162:1 166:4,14,19
**scripts**
21:15 78:4,6 115:10
  115:12 120:14,16
  142:12,15
**Scutaro**
120:7,10 142:10,11
  146:5,11 147:7
**se**
43:18 50:15
**SEA**
112:7
**search**
146:24
**SEC**
24:1 167:22
**second**
13:19 43:7 51:22
  71:23 88:4 107:13
  127:9 148:25
**seconds**
70:12,14
**securities**
11:14 146:9 147:10
  147:11,13
**security**
147:23
**see**
7:16 25:2,3,7 50:14
  50:20 51:23 52:22
  53:6 70:9 77:6,9
  84:5 86:5 88:2
  89:18 95:24 96:3,7
  97:21 99:4 100:3,11
  101:11 102:15
  107:8,19,21,22
  108:11,12 109:17
  111:4 112:2 113:18
  114:17 115:10
  116:16 121:23
  123:2 124:23 125:3

125:6 126:11,22
127:2,12 134:13,14
142:15 148:15
153:9 154:16
167:15
**seek**
56:9
**seen**
39:15 50:11,13,15
  55:21,24 63:8 83:8
  95:20 99:1,14
  102:25 104:2 109:4
  109:8,11 111:15
  118:10 124:6 126:5
  163:4
**sees**
77:11
**self-dealing**
100:18
**sell**
87:4 119:8 146:9
  147:10 150:4
**selling**
114:11 115:6 120:10
  152:19
**send**
9:4,13 68:13,14,24
  68:25 69:15,18,23
  101:13 102:18
**sending**
70:2 111:2
**senior**
63:24 64:5 120:7
  135:4 146:6
**sense**
129:5,5
**sent**
9:25 16:18 70:4
  102:3 157:11
  158:20 159:4
**sentence**
75:7
**sentenced**
162:2
**separate**
106:4 130:18

**separately**
103:9
**September**
102:6 112:10
**serious**
76:2
**serve**
63:22
**served**
52:9,15 63:23
**servers**
68:1
**services**
1:24 5:13,14 56:24
  81:2 144:17
**set**
23:13 58:14,15,16
  90:22 150:23
**Setting**
110:14
**seven**
52:11,13 75:8,11
  133:15
**Seventh**
2:18
**shading**
97:7
**Shah**
151:1,12
**share**
54:2
**shebang**
111:25
**she'd**
70:6
**shopping**
105:4
**ShopRite**
163:13,14
**short**
54:18
**shortages**
43:1
**shortcut**
34:18
**Shorthand**

169:4
**show**
59:13 102:19 108:4,9
  109:2 114:3 122:7
  128:5
**showed**
25:9 70:10 157:21
**shown**
26:23
**shows**
27:10 99:21
**shut**
124:15 130:14
**shutting**
36:1
**side**
51:17 58:21 101:3
  153:3
**sidebar**
127:7
**sign**
9:5,14 77:12
**signatory**
91:3
**signature**
28:22,23,24 36:23
  37:1,8
**signed**
16:18 28:21 30:23
  73:7,19 75:25 76:4
  91:6,9
**signing**
156:19
**Sills**
138:8,10 143:7 144:8
  144:12,13 145:7,11
  145:16
**similar**
69:8
**single**
23:1
**sir**
10:14 20:25 23:20
  35:18 39:16 53:24
  76:1 79:12 123:6
**sit**



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 196 of 203

Page 26

61:3
**sites**
134:10,12,23 138:21
138:24
**sitting**
36:18 37:12 76:18
80:6 159:11
**situation**
19:11 33:16 34:16
36:20,22 108:11
**six**
47:24,25 48:5,11,13
52:23 67:4 107:25
108:7 134:20
**size**
97:7
**skills**
105:25
**slogan**
95:18
**slots**
94:23
**small**
112:18 133:15
**snowing**
16:10,11
**social**
46:3 122:5
**socialize**
113:5
**software**
104:13 139:15
**sold**
130:7 149:8
**sole**
112:6,12
**solicit**
83:16,17,19 116:8
**solicited**
44:16 116:5,10
**soliciting**
58:8 68:11
**solidify**
119:6
**somebody**
7:10 18:23 30:20,24

37:18,23 77:6,12
81:4 110:10 130:12
130:12 150:10
164:20
**someone's**
30:23
**somewhat**
101:16
**son**
140:5
**Sony**
127:15
**sooner**
125:4
**sorry**
35:19 99:16,24
107:17 162:15
**sort**
58:20
**sounds**
95:14 125:25 148:9
158:23
**sources**
127:6
**South**
58:3 117:10 121:14
125:21 163:11
**Southeast**
44:25 112:7,13 121:1
121:5 123:23 124:3
126:13,20
**space**
52:6,8 104:8 120:20
**speak**
24:16 71:7,9
**speaking**
121:8 145:23
**specific**
154:12
**specifically**
37:6,12
**specs**
134:16
**speculation**
76:22
**speculatory**

132:14
**spell**
52:5
**spelled**
57:13 81:16 82:2,5
**spelling**
82:15
**spells**
146:17
**spend**
54:19 108:10
**spent**
139:21 152:11
**spoke**
141:2 153:7,9
**spoken**
153:12 162:7,7,19
**sports**
70:12
**spot**
107:13 150:19
**spots**
76:14 95:5 99:5,7
100:20 102:16,23
103:12 107:25
108:2,3,6,8 109:23
110:16
**spring**
16:5
**Springfield**
17:6,13
**square**
88:9,24
**Stabile**
139:22,25 140:1
**Stafirny**
98:5 110:4
**stand**
80:6
**standard**
50:2 133:13 148:24
**Star**
67:13 152:21 153:1,2
153:4
**start**
51:7 58:18 62:21

75:22 84:21 117:21
132:25
**started**
31:23 40:12,15 44:20
56:16,20,21,23 58:7
58:12 132:24
136:18 138:18,19
153:23
**starting**
9:11 14:6
**starts**
99:13
**state**
1:19 5:15 21:9 59:13
**stated**
21:8 44:16
**statement**
9:9,13,15 22:2,5 32:2
47:4 64:23 72:7,8
96:2 152:10 160:21
**statements**
22:4 25:15 26:21
27:5 76:10 129:16
156:8
**states**
1:1 5:5 47:17 79:20
134:3 149:5 169:5
**stations**
113:20
**statistics**
58:5 88:25
**stayed**
29:18 41:1
**steady**
98:10,21
**stealing**
41:15 113:15
**steel**
150:1
**steps**
46:11
**stick**
108:1,2,8
**stimulation**
85:22
**stipend**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 197 of 203

Page  27

90:12,14 91:1
**stop**
62:5 106:15,16
115:16 148:25
155:22
**straightforward**
6:25
**straits**
28:2
**strange**
66:10
**strategies**
53:14
**Street**
2:5
**strengthen**
143:15
**stressful**
152:9
**Strictly**
122:15,16
**strike**
57:25
**stubs**
129:16
**stuck**
95:10
**studies**
27:3
**study**
3:10 27:7
**stuff**
9:20 18:25 44:8
60:21 81:23 89:13
104:6 130:22
134:16 150:5,12
**subdivide**
49:24 87:3
**subject**
26:9
**submit**
67:6 151:5
**submitted**
67:11,24
**subpoena**
14:13,17,20 21:1,4

23:2,17 32:9,14
33:23,25 34:2 51:4
51:6 80:2 160:6
**subs**
140:18
**subsidiaries**
45:17
**substantial**
74:5
**substantially**
74:4,8
**successful**
88:5
**successfully**
88:10
**sued**
121:21
**suffice**
124:24
**suggest**
116:11
**suggested**
78:17 115:18
**suggesting**
59:4 96:12 97:19
**suggestion**
119:17 136:4
**Suite**
1:17 2:5,10,16
**summer**
16:5
**superior**
98:9,19,20
**supplier**
112:12
**supplying**
152:16
**supposed**
61:9 85:24 95:25
**sure**
6:15 7:11 51:20
60:16 88:22 95:17
96:4 98:16 105:22
138:11 141:25
151:4
**svcs**

3:16
**swear**
6:2
**switched**
17:4
**sworn**
6:3
**S&Ls**
133:15

———————————
**T**
———————————
**T**
3:1,7 146:18
**table**
37:24,25
**tag**
95:25
**take**
7:16 8:7 13:24 15:8
35:14 36:3,10 46:11
63:7 64:25 66:17
82:11,19 86:20 87:3
93:2 110:21 118:3
125:20,21 135:20
135:22 136:1
146:24 151:23
158:8
**taken**
1:17 5:8 6:11 7:21
169:9
**talent**
57:22,23 110:18
**talk**
7:13,14 14:21 31:3
32:13,23 37:6,18
60:18 77:15 108:4,9
108:12 122:6 147:3
158:22 167:15,24
**talked**
31:13,13,15 32:3
42:21 94:6 153:24
156:24
**talking**
7:13,14,18 14:3,3
18:12 31:23 32:11
52:3 81:17,20 97:3

100:5,10 101:6
102:20 115:2
125:25 126:12
157:4
**Tanvi**
44:23 56:6,15,17
57:9 58:14,19,24
69:12 70:11,24 71:4
76:13,15 79:23
94:12,22,25 98:4
99:19 100:5 101:19
102:15 106:3,8,10
109:16 111:19
112:16,17,20 113:2
113:15 114:5
119:22 120:2 122:1
123:21 124:13
125:22 127:16
162:11,20 163:5,7
164:8,22
**Tanvi's**
95:4 109:20 126:5
**target**
26:5,7 85:9,10
**targeted**
86:1 91:14 94:16
**tax**
20:7 93:24 94:2
129:16 132:21
**Taylor**
131:6
**TD**
35:25 36:4,10
**team**
83:22 107:23
**teams**
52:10,15
**Telephone**
12:5
**tell**
7:2 8:21 13:12,17
26:2 28:13,16,19
29:6 33:13,15 42:8
78:22,25 92:11
100:7 102:5 103:7
116:6 119:21



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 198 of 203

Page 28

139:24 148:20
157:18 160:13
167:13
**telling**
26:8 37:14 66:4 96:9
99:4 108:14 113:19
**temporary**
35:17
**term**
17:18
**terminated**
70:7
**terms**
33:4 126:8 154:1,10
158:24 159:16
163:3
**testified**
6:4 64:9,21
**testify**
73:9
**testimony**
80:5 160:6 161:23
**Thailand**
47:13 53:22
**thank**
24:17 39:7 51:20
152:7
**thing**
34:13 111:23 113:1
123:21 138:17
154:11
**things**
9:22 20:15 54:11
61:5 62:21 80:14
94:18 96:9 98:14
106:14 152:6,8
**think**
9:4 15:8,10,12,14
19:19 20:14,17,25
21:3 49:5 60:25
61:11 63:16 66:15
70:1 76:24 88:15
92:23 93:16,17 96:1
105:21 108:1,2,7,10
110:10 111:2
112:17,23 118:8

119:6,11 123:24
125:24 128:3
153:18 165:12
**third**
90:1 95:8 96:21
99:12,17 106:21
166:10
**Thomas**
64:7 122:24
**thought**
13:12 14:24 21:2
54:20 64:11,14,21
66:2,2 71:7 79:8,9
86:19 95:5 100:7,13
100:18,20 148:11
**thousand**
17:22 18:18 94:7
**three**
31:17 38:16 47:22
67:7 69:23,25 168:1
**threw**
10:2
**tight**
136:3
**time**
5:8 9:5,11 12:13
14:25 15:3 16:22,25
19:7 21:23 22:6
24:16 28:15 29:13
29:16 37:13,23
38:18 43:3,4,19
44:11,20 45:5,6,9
45:11 47:20 49:23
53:22 55:21 56:23
57:3 61:8 62:15
65:18,19 69:8 70:11
70:12,14 72:25 73:3
73:14 79:2,7,22
82:23 83:1 84:19
85:13,25 86:13,16
86:17 87:9 88:15,18
90:4,6,23 94:23
95:4,9 96:3 98:10
99:19 104:2 106:8
107:25 108:7,18
110:6 112:7,13,15

113:25 114:3,9,11
114:12,19 115:6,8
115:24 117:2,5
123:13,16,19
124:11 127:24
128:9,13,23 129:25
131:25 132:19
133:8,19 135:7
137:11,15 139:1,3,6
139:10 140:2 142:1
142:3 148:13
150:21 152:1,4,16
153:7,9 154:12,17
155:16 159:6
162:19 163:8 165:5
168:15
**times**
18:8 31:5,6,8,15,17
38:16 43:1 69:8,23
71:13,15,17 89:22
89:23 94:17 102:9
102:16,23 168:1
**timing**
154:10
**title**
87:13
**today**
5:7,22 6:9 20:12
31:13 54:12 76:19
80:4,5 133:19 152:8
156:24 163:9,12
**told**
29:4,5,16 30:19
32:21 33:22 36:14
36:18 64:12,17,18
64:25 65:13 67:19
69:23 72:24 74:24
74:25 75:4 79:8
103:8,20 106:15
111:14 143:3
154:20 164:13
**Tom**
107:4,6 116:21 123:9
144:24
**Tommy**
61:25 137:4

**Tony**
135:4,8 138:25
139:22,23,24,24
**top**
3:15 12:9 83:8 94:19
98:1 103:9,22
127:10 132:5
138:11 141:12
144:15 158:9,18
160:2
**topic**
61:12
**topics**
60:20
**Torres**
2:12,13,13,13 5:18
5:18 6:7 76:20
124:21 155:20
157:24 164:23
**totaling**
88:9
**track**
88:5 139:19
**training**
9:12 142:6
**transaction**
77:13
**transactions**
131:22
**transcript**
168:18 169:7,9,12
**transition**
125:3
**transitioning**
125:4
**transmit**
67:17
**Transript**
169:12
**traveled**
66:22
**traveling**
18:24 48:11 166:8
**trial**
75:15,21 80:2 160:22
**tried**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 199 of 203

Page 29

41:21
**true**
47:4,5 48:9 66:23,24
67:8 73:12 74:4
83:23 88:11,12,13
89:24 90:4 91:14
100:22 169:6
**trust**
1:9,10 5:4 6:10 57:6
157:21
**trusted**
157:19
**Trustee**
1:9 3:11 5:21 6:24
8:25 9:3 10:11,11
10:19 11:8,24 12:2
13:3,9,12,17 14:6
15:4 16:16 23:8
26:19 27:11 32:19
32:22 73:22 75:3
153:25 154:3,3,6,16
154:18 155:4,5,13
155:14,17,23 157:3
157:5 160:13,16
167:3,7,11 168:5,7
168:9
**Trustee's**
15:14 33:1,5,6,10
59:5 63:2 74:25
**truthful**
155:14
**try**
6:16,24 7:13,14
26:18 27:4 41:14,18
44:21 86:20 121:15
124:15 137:6
**trying**
13:24 15:4,9 34:17
36:2 37:19 38:7
82:14 106:2,13
107:24 108:6 119:6
119:7,11,17 127:14
128:25 134:5
**Ts**
146:25
**tutelage**

130:16
**TV**
109:23 123:23
127:15
**twice**
76:14 99:20
**two**
8:5 24:9,22 25:14
31:17 47:22 49:3
52:22 54:17 59:7
67:6 69:24 72:10
85:25 89:9 105:8
110:21 124:12
125:21 127:1 131:6
141:11 146:18
148:5 149:7,16,21
150:13 161:6
**two-week**
126:2
**type**
149:10
**typo**
108:4,5
**T-a-n-v-i**
56:6
**T-zone**
148:23

_____
            U
_____

**Ulisse**
139:25
**ultimately**
46:13 64:3,5
**um-hum**
7:5,6,9 8:15 20:9
43:12 50:21 51:24
77:4 91:10 96:11
98:6 100:4,12
107:15 108:13
109:18 110:15
111:6 119:3 125:7
**unable**
59:18
**unauthorized**
124:18
**underbid**

70:19
**underneath**
98:7
**understand**
7:1 14:1 65:4 80:7
86:5
**understanding**
58:22 100:23
**understood**
7:4 34:19 109:3
**unemployment**
85:11,18,19,23 86:3
**unfortunately**
128:6
**unique**
88:2
**unit**
149:14,15 150:6
**United**
1:1 5:5 130:21 169:5
**units**
88:8 133:24 150:8,14
150:18
**unknown**
75:14
**update**
125:6
**updated**
124:14 129:15
**updating**
51:12
**upper**
50:19
**upset**
70:25 71:1 122:2
**USC**
76:8
**USCIS**
150:24 151:6,8,11,16
151:18
**use**
78:12 81:22 104:14
139:15
**uses**
130:12
**usually**

52:8 67:5 103:1
120:17
**U-l-i-s-s-e**
139:25
**U.S**
44:11 58:10 84:2
87:16,20,23 112:20
140:3,16,18,21
141:6,8,10,13
150:24

_____
            V
_____

**v**
1:12 5:4
**value**
133:9
**valued**
88:9 89:2
**values**
133:3 134:1
**varied**
134:2,19 148:2,4
**vendor**
106:20 131:14
135:14
**vendors**
134:24 135:12
138:20 139:1
140:22 141:12
152:15
**verbal**
17:22
**verbally**
7:9
**verbiage**
115:19,20,21,22,23
**versus**
15:10 19:5 163:9
**vice**
63:23
**video**
5:2 11:10 117:19
168:16
**videographer**
2:21 5:1,12 6:1 16:21
16:24 82:22,25



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 200 of 203

Page 30

117:1,4 123:15,18
127:23 128:1,8,12
151:25 152:3
168:14
**Videotaped**
1:16
**viewed**
124:18
**visa**
83:23
**visit**
134:11
**voicing**
126:18
**volume**
94:14
**voluntarily**
14:14
**volunteer**
136:10
**volunteering**
136:7
**VP**
60:12,13,22 63:24
64:5 84:20 118:14
118:17,24 120:7
135:5 146:6

——————————
**W**
——————————
**W**
3:1
**Wait**
13:20 73:4 121:2
**waiting**
29:7,10 39:1 47:9
**want**
7:11 8:18 10:16 14:5
15:21 25:25 26:1
31:1 33:6 36:1,4,7
37:6 51:20 54:19
59:7 69:18 78:11
80:1,4 86:25,25
115:3 120:8 145:22
148:19 154:1
166:20 168:17
**wanted**

9:9,9,10 14:11 20:1
29:9 46:14 60:19
106:15 134:13,14
151:2 154:11
156:17 167:15
**wants**
168:7
**Ward**
154:6
**warm**
16:10
**warrant**
25:11
**Washington**
144:14
**wasn't**
16:11 32:25 37:23,25
38:9 45:7,12 51:19
59:23 63:4 65:15
68:23 72:8 74:9
75:21 82:16 88:14
88:18 94:8 96:12
100:22 106:19
110:5 114:16
125:14 130:19
139:13,18 140:25
143:2,2,17
**waste**
14:24 15:3
**watch**
36:6
**water**
16:19,20 119:18
**way**
6:25 7:15,17 15:1,2
24:25 27:24 34:14
41:1 49:22 66:5
87:2 116:4 122:4
134:5 136:3,3,12,13
137:5 165:23
166:17
**ways**
82:6 110:22
**website**
92:13
**Wednesday**

122:23 166:15
**week**
31:6
**weeks**
47:22,22 125:22
161:6
**Weisholtz**
17:5
**went**
11:7 23:16 34:15
36:9 44:6,15,18,20
45:2 46:13 47:23,25
58:3 60:22 62:15,19
86:20 130:25
133:25 138:21
142:25 146:23
151:10 160:7
164:22
**weren't**
30:5 35:21 38:3
61:20,24 63:15
69:13 73:21 94:16
94:23,23 101:17
115:24 121:24
136:7 141:9
**West**
2:5
**we'll**
6:8 9:13 18:9 125:5
146:7
**we're**
8:6 14:3 16:21 25:25
26:3 60:3 69:11
82:22,25 83:3
103:22 116:13
117:1,4 123:18
127:23 128:8,12
148:9,12 151:25
158:16,17
**wheelhouse**
32:23 114:16 139:18
140:25
**winter**
16:6
**withdrawal**
87:1

**withdrawing**
128:11
**witness**
6:2 13:22 14:1 80:6
110:21 148:11
162:16
**wondering**
162:23
**word**
74:5 78:12 80:15
81:21
**words**
75:20 119:24
**work**
11:13 19:16,22,23
20:1 29:22 39:19
47:12 54:6 82:18
97:12 111:19
114:22 121:18
125:5 131:11 141:3
141:6 143:11 145:9
166:7 167:21
**worked**
22:23 34:14 49:22
58:17 64:20,21 66:3
87:2 97:13 117:16
130:16 140:10
144:2 161:12 166:3
166:13
**worker**
47:1
**workers**
149:25
**working**
11:18,21 22:16 27:19
29:24 30:3,5,6,7
34:8 35:14 44:8
49:4,6,8 54:14
56:13,14,16,17,20
56:21,23 64:10,11
64:15 93:6 113:2
130:19,20 131:7
133:14 140:1
143:14
**works**
148:21 163:13



Case 23-01335-JKS   Doc 55-2   Filed 04/08/24   Entered 04/08/24 12:24:50   Desc
Exhibit Exhibit A to the Declaration   Page 201 of 203

Page 31

**worried**
70:23
**worry**
157:16
**wouldn't**
36:19 68:8 71:1
76:16 80:19 86:16
86:17 90:9 119:14
149:17
**Wow**
133:22
**write**
22:8 28:8 31:12
120:14
**writing**
98:24 118:3
**written**
8:24 17:24 19:2
69:22 84:17 96:8
112:10
**wrong**
34:18 47:8 57:13
99:16 100:17
148:10
**wrote**
9:15,16 39:17 42:20
53:11 70:10 72:2
73:12 74:6 78:4
120:16 122:24,25
125:17 126:23
**W-e-i-s-h-o-l-t-z**
17:6
**W-2s**
19:5

**X**
**X**
3:1,7 92:16
**XI000730**
169:4
**X-On**
52:25 92:14,17,20,22
93:3 95:11

**Y**
**yeah**

10:7 15:3 17:12
23:19 28:4,7 33:3
48:24 65:2 83:9,11
83:15 84:24 85:1
86:10,12 88:3 93:1
93:19,22 94:8,11,15
95:16 96:6 97:11
101:8,12,18,22
104:11,15 105:12
105:18,20 110:13
111:6 113:7 114:10
115:5 120:1,1,22
121:6 126:17
127:13 132:20
133:21,23 135:20
135:24 136:16
137:10,22,25
138:16 142:16
144:7 145:25 147:8
148:8 152:25 153:6
153:15,17 154:23
159:24 165:19
**year**
18:3 19:20 29:18,22
32:4 50:2,3 84:17
85:5 87:11 92:23,24
92:25 93:1 120:2
145:12 148:7
153:12 168:3
**years**
6:13 7:23 12:16 20:7
24:9,22 49:3 52:11
52:13 62:16 69:25
72:10 85:25 94:3
126:16 132:8,16
149:7,16,22
**York**
14:8 16:14 36:25
**young**
106:1

**Z**
**Z**
123:23,24 124:1
**Zach**
162:11

**Zachary**
2:21 5:12
**Zoom**
138:2 153:10

**$**
**$1**
88:10
**$10,000**
132:13
**$110,000**
18:3
**$142**
107:12
**$20**
132:9
**$5**
132:11
**$71**
107:13
**$8.5**
46:16,25 47:6
**$80**
152:11

**0**
**08054**
2:11
**08817**
2:17

**1**
**1**
8:6 160:5
**1,100**
88:7
**1.2**
53:5 89:2
**1.8**
85:7
**1/22/24**
50:19
**1:17**
123:19
**1:26**
127:24

**1:27**
128:2
**1:28**
128:9
**1:30**
128:13
**1:58**
152:1
**10**
3:15 47:23 71:13,19
72:6 74:16 83:4
85:24 87:4 89:22
103:6,18,24 107:25
108:7 149:6,15
158:8
**10th**
80:3 99:15
**10,000**
18:17 94:9
**10-11-21**
4:8,11
**10-14-21**
4:9
**10-16-18**
4:5
**10-9-19**
4:6
**10:00**
1:18
**100**
2:16 3:15 83:8
124:24 158:9,18
**101**
3:20 4:14 162:16
**107**
3:21,22
**108**
3:23
**109**
3:24
**1099**
18:5 131:15,17,24
141:22,24
**1099s**
19:5
**11**



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 202 of 203

Page  32

3:16 92:11 117:25

**11th**
118:2
**11:20**
82:23
**11:29**
83:1
**110**
4:2 17:23 93:18
**110,000**
94:7
**111**
4:3,4
**1120**
1:17 2:10
**113**
4:5
**116**
4:7
**117**
4:8,9
**118**
4:10
**12**
21:13,22 22:6 23:19
23:20 44:17 45:11
84:4 96:15 99:14
115:13,25 116:2,6
116:13 142:23
143:1
**12-2-20**
3:20
**12-8-20**
3:23 4:2
**12:32**
117:2
**12:33**
117:5
**12:47**
123:16
**122**
4:6
**124**
4:11,12
**126**
4:13

**14**
3:17 95:20
**14th**
118:2
**15**
50:3 74:17 78:2
87:11 103:6,18,24
132:9
**153**
3:4
**16**
3:18 26:11 97:25
**166**
3:3
**17**
3:19 99:1
**18**
3:20 88:15,19 89:1,2
101:9
**19**
27:10 61:15 103:23

———————

**2**

**2**
12:24 57:4 59:12
63:2 87:25
**2-23-21**
3:24
**2-27-20**
4:7
**2.3**
88:9,24
**2:12**
152:4
**2:33**
168:15
**20**
3:21 58:2 78:2 107:8
**20,000**
18:13 94:9
**200**
166:5
**2010**
88:5
**2016**
132:18,19

**2017**
132:18,19
**2018**
17:23 18:7 20:8
63:21
**2019**
59:17,22 60:3,11
61:14 63:5,15,24
67:3 79:19 84:22,23
122:24 123:11
134:22,25 138:20
138:24 142:4
**2020**
11:3 20:8 63:17 67:3
79:19,20 99:14
112:10 135:1
**2021**
11:3 17:24 19:10,19
28:3 40:21,25 60:25
61:1 62:3 63:25
64:4 112:5,9,12
117:25 118:13
138:25 154:25
**2022**
11:2,4 19:17 41:1
138:25 154:25
162:5,6
**2024**
1:18 5:7 154:21
160:24
**21**
3:22 17:25 19:2,9
37:4 63:18 67:2
107:18 135:2
136:22,23 138:21
**21,275**
109:17
**22**
1:18 17:24,25 19:2
27:25 37:4 67:2
135:2 136:23
**22nd**
5:7
**23**
3:23 109:3
**23-1335**

**1:2**
**24**
3:24 109:11
**24,000**
109:16
**25**
4:2 110:25
**250**
2:5
**26**
4:3 111:15 162:5
**26th**
162:6
**27**
4:4 112:2
**28**
4:5 76:8 113:18
**29**
4:6 122:17 123:7

———————

**3**

**3**
3:9 53:23 87:25
97:19 149:11
**30**
4:7 50:2 62:16 70:14
87:10 107:13
116:16
**300**
166:5
**31**
4:8 117:7
**31st**
102:6
**32**
4:9 118:1
**33**
4:10 118:10
**35**
4:11 124:6
**350**
93:20
**350,000**
94:10
**36**
4:12 124:20



Case 23-01335-JKS    Doc 55-2    Filed 04/08/24    Entered 04/08/24 12:24:50    Desc
Exhibit Exhibit A to the Declaration    Page 203 of 203

Page 33

**37**
4:13 126:22
**38**
4:14 101:24
**39**
3:13 128:3,4,11

---
**4**

**4**
3:10 55:20 57:4
**40**
72:22
**407**
99:5
**417**
133:18
**420**
1:17 2:10
**43215**
2:6

---
**5**

**5**
3:11 59:3,10
**5th**
75:15 160:24
**5-21-20**
3:22
**5-29-20**
3:18
**50**
3:14 58:3 74:12
**50,000**
18:15
**500**
85:6
**500,000**
85:14 86:2
**53**
3:9
**55**
3:10
**59**
3:11

---
**6**

**6**
3:3,12 63:6 102:6
149:11 156:3
**6-15-20**
3:21
**6-27-20**
4:3
**6.5**
133:16
**60**
70:12 109:16
**600**
51:14
**63**
3:12

---
**7**

**7**
3:13 20:10 39:12
62:17,18,18 160:22
165:12,14
**7-20-20**
3:17
**7-22-20**
4:13
**700**
2:5
**720**
133:19,20
**73**
1:17 2:10

---
**8**

**8**
62:17
**8-13-20**
3:19
**8-2-21**
4:10
**8-28-20**
4:14
**800**
99:6 148:6,7
**82**
3:15
**86**

2:16
**866-624-6221**
1:25

---
**9**

**9**
3:14 50:10,10 122:24
123:11 165:18
**9-23-2**
4:4
**9-9-20**
4:12
**9:43**
5:8
**9:56**
16:22
**9:57**
16:25
**900,000**
85:6,13 148:6,7
**92**
3:16
**95**
3:17
**950**
91:11
**97**
3:18 150:18
**98**
3:19

