# EXHIBIT "B"

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**ICE MILLER LLP**<br>Louis T. DeLucia<br>Alyson M. Fiedler<br>1500 Broadway, Suite 2900<br>New York, NY 10036<br>Phone: (212) 835-6312<br>louis.delucia@icemiller.com<br>alyson.fiedler@icemiller.com<br><br>Aneca E. Lasley (admitted pro hac vice)<br>John C. Cannizzaro (admitted pro hac vice)<br>250 West Street, Suite 700<br>Columbus, Ohio 43215<br>Phone: (614) 462-1085<br>aneca.lasley@icemiller.com<br>john.cannizzaro@icemiller.com<br><br>*Counsel to AIRN Liquidation Trust Co., LLC, in its capacity as Liquidation Trustee of the AIRN Liquidation Trust.* | |
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>               Debtors. | Chapter 11<br><br>Case No: 22-14539-JKS |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>               Plaintiff,<br><br>v.<br><br>MEDIA EFFECTIVE LLC, *et al.*,<br><br>               Defendants. | Adv. Pro. No. 23-1335-JKS |

1

## DECLARATION OF ANGELA SOLK

I, Angela Solk, having been first duly sworn upon an oath, state:

1. I am an adult over the age of 18, and I have personal knowledge of and am competent to testify to the facts set forth in this declaration.

### Background & Expertise

2. I am a Managing Director with Alvarez & Marsal's Corporate Performance Improvement in Miami, Florida, a division of Alvarez & Marsal's Media and Entertainment practice.

3. I have extensive experience in media and media buying and planning. I possess a comprehensive background spanning notable roles within media, marketing, advertising, technology, measurement, data spaces, client management, media planning and media buying. My LinkedIn profile is at **Exhibit 101**.

4. I earned a bachelor's degree in consumer studies and marketing from Syracuse University and a master's degree in marketing research (honorary) (MSMR) from The University of Texas.

5. My current role, combined with my previous positions as Managing Director/President at Blippar, Global Head of Agencies and Accounts at Spotify, leading WPP/GroupM relationship with media platforms (Twitter, Spotify, Facebook, Instagram, Snap, Pinterest), leading the P&G client relationship for media, data and digital across multiple holding companies, and leading pitches for media for Coke, Sony, M&M/Mars, Volkswagen and P&G globally highlight my thorough understanding of the media, marketing, and advertising space.

6. My experience in the advertising industry is particularly diverse, as it spans both the buy and sell side of media spaces including client side (Nokia, Avaya), agency side (WPP, Publicis), and platforms (Spotify). These experiences demonstrate my expertise in leading

companies through end-to-end media planning, media buying, data and measurement, contract negotiations, and growth phases. A steady constant in my roles in the industry have been to drive financial success and put return on investment at the heart of what I deliver for clients and companies.

7. For example, as Chief Commercial Officer of Blippar, I was pivotal in achieving a 171% revenue growth from 2021-2022, despite that time frame being during the Covid-19 pandemic, showcasing my ability not only to strategize media buying and strategic marketing positioning, but to execute plans that lead to substantial financial outcomes.

8. While at Spotify, I was the Global Head of Agency and Partnerships and helped facilitate year over year growth exceeding 30% for three consecutive years. While at Spotify, I obtained a specialized understanding of the sell side of media including the following: rate cards, rate negotiations, inventory loading, discounts, insertion orders (IOs), fees, creative fit, and production for audio.

9. I am also the founding member of Chief, a female executive network, served on the Board of Mad Hive, an Ad Tech company, for six years, a strategic advisor to MayaAI, an AI company, a strategic advisor to Cohley, a UGC content platform, and most recently joined the advisory board of Impact Media, utilizing programmatic advertising to advance client media.

10. I hold board roles at Active Plus and Girls Inc Miami, non-profit organizations.

11. I was retained in this case to analyze Media Effective LLC's ("Media Effective") role in the Debtors' advertising and marketing strategy and implementation, whether Media Effective and Javier Torres complied with industry standards, guidelines, and norms, and ultimately, to opine on the value of the services provided by Media Effective. Given my extensive

experience in the industry and particular specialized experiences, I am qualified to provide an opinion as to each of these areas.

**Advertising Industry—Radio & Television Media Campaigns**

12. Media planning consists of the art and science of delivering messages in the right places, at the right times, and to the right target group. At bottom, a successful media plan is focused on the following areas: (i) the goal of the campaign; (ii) the target(s) of the campaign; (iii) where advertising will run; (iv) when advertising media will run; and (v) how much media will run.

13. Throughout the media plan process, a "brief" is generally formulated to set out and frame the key performance indicators (KPIs), key audience, and desired outcomes. KPIs are essential and measure the outcome of the marketing activities and ultimately measure business success.

14. Two measures in particular are relevant to evaluating the success of a campaign: "CPM" or the cost per 1,000 impressions and "GRP" or the gross rating point. CPM is a paid advertising option where companies will pay a price for every 1,000 impressions an ad receives. GRP is a standard measure of impact for TV Broadcasting calculated as a percentage of the target market reached multiplied by the exposure frequency.

15. Once a media plan and campaign have been launched, a team should be constantly monitoring to optimize the campaigns based on channel or campaign KPIs that help drive performance during the campaign including creative rotation, audience targeting approaches, or budget reallocation. Insights and reporting should also be developed to provide lessons for future media efforts or help inform creative strategies. Campaigns typically see ongoing insights followed by overarching lookback or post-campaign review when the activity is completed.

16. The following graphic demonstrates how a typical media buying process works:



MEDIA PLACE PARTNERS, *Breaking down the traditional media buying process*, https://www.mediaplacepartners.com/how-the-traditional-media-buying-process-works/ (last accessed Apr. 3, 2024).

17. A general formula for calculating how much a radio ad will cost is the number of listeners multiplied by the CPM. However, the number of people listening to a radio station varies based on time of day, time of year, station, and program popularity. As a result, there is no fixed rate for radio advertising costs, and rates will fluctuate resulting in constant negotiations.

18. Direct buys, or "publisher direct," is the process of finding a media publisher, negotiating the price, buying inventory, and finally serving the ad on the chosen property. A majority of traditional media is purchased as a direct buy. Media may also be bought in an

"addressable" format which refers to a form of advertising that lets brands connect with individual consumers across various platforms, social media, and over-the-top (OTT) content providers, streaming audio, and TV platforms. In the addressable format, different users see different media based on data-driven attributes. Finally, media may be bought in a "biddable" or "programmatic" format. That process consists of buying ads via a real-time bidding auction, where advertisers place bids simultaneously and the highest bidder takes the inventory slot. This process is automated and occurs with minimum intervention of the media buyer.

19. Within all media buying processes (direct buys, addressable, or biddable/programmatic), there is remnant media that becomes available. Remnant media is advertising space or time that has not been sold by a media outlet or platform through its regular sales channels. These unsold ad slots are often offered at discounted rates as a way for media companies to generate additional revenue from otherwise unused inventory. While remnant media is discounted, the cost of the media will vary based on who is bidding on the media so there is no consistency in pricing.

20. Media Effective's work for NRIA included "direct response advertising." Direct response advertising is advertising that an advertiser makes and that requires a "call to action" to prompt an immediate response. With direct response advertising, you need to get your potential customer familiar with the company, so frequency in ads is critical, in addition to persuasive content.

21. The Interactive Advertising Bureau (IAB) is the overarching governing body for all things advertising, and advertisers generally align with IAB best practices on both the buying and selling side. The IAB in conjunction with the industry leaders from the buy and sell side have created advertising creative best practices. *See* **Exhibit 94**. According to those IAB best practices,

transparency plays a crucial role in media buying, particularly in ensuring fairness, accountability, and effectiveness in the advertising ecosystem.

22. The following are key aspects of transparency in media buying that must be adhered to:

1. **Cost Transparency**: Advertisers need to know exactly how much they are paying for media placements and what they are getting in return. Transparent pricing helps advertisers assess the value of different advertising opportunities and make informed decisions about budget allocation.
2. **Performance Transparency**: Advertisers require visibility into the performance of their ad campaigns, including metrics such as impressions, clicks, conversions, and return on investment (ROI). Transparent reporting allows advertisers to gauge the effectiveness of their campaigns and optimize them for better results.
3. **Supply Chain Transparency**: Advertisers should have insights into the various intermediaries involved in the media buying process, including ad exchanges, agencies, and technology platforms. Understanding the supply chain helps advertisers identify inefficiencies, minimize ad fraud, and ensure that their ads reach the intended audience.
4. **Data Transparency**: Advertisers rely on accurate and reliable data to target their ads effectively. Transparency around data sources, data usage, and data ownership is essential for building trust between advertisers and media buyers. Advertisers should have control over how their data is collected, stored, and utilized for ad targeting purposes.
5. **Ad Placement Transparency**: Advertisers want assurance that their ads are displayed in brand-safe environments and alongside relevant content. Transparency regarding ad placement helps advertisers avoid association with harmful or inappropriate content and maintain the integrity of their brand image.
6. **Contractual Transparency**: Clear and transparent contracts between advertisers and media buyers outline the terms and conditions of the media buying arrangement, including pricing, deliverables, timelines, and performance metrics. Transparent contracts mitigate the risk of misunderstandings and disputes between parties.

23. As to Media Effective, the governance expected from a media partner, particularly a "middle man" who needs to prove and demonstrate value, would include adherence to all the above areas of transparency.

24. In reviewing the invoices of Media Effective and communications with NRIA, Media Effective did not adhere to the transparency practices above. For example, and as will be set forth more fully below, Media Effective did not provide transparency as to how much NRIA was paying for media placements, particularly as it relates to Media Effective's commissions. Media Effective also did not provide transparency as to reporting. Instead, NRIA was conducting its own recording of call leads from advertisements and simply relaying that information to Media Effective along with Thomas Nicholas Salzano's ("Salzano") direction as to any changes to be made to the media campaign. Media Effective also was not contractually transparent in outlining the terms and conditions of the media buying arrangement, including for example, by failing to disclose to NRIA that it was utilizing Hybrid Media Services LLC ("Hybrid Media") to perform over 90% of the work on media campaigns and tacking on an additional commission for that work. Media Effective was far from transparent in any respect.

**Media Effective's Role in NRIA Media Campaigns**

25. Media Effective, through its principal and sole employee Javier Torres, played a key role in assisting the Debtors in promoting and advertising investments in NRIA, so much so that the aid and assistance generated over $600 million in investor funds from over 2,000 investors.

26. But Media Effective's role was far from ordinary in the industry. In essence, Media Effective was a "middle man." While a "middle man" type role is not out of the ordinary, the *way* that Media Effective operated is what was suspect and caused the Debtors to significantly overpay for the services provided.

27. The standard industry markup or commission for an agency in a "middle man" type role like Media Effective is 5-15%, which percentage is typically included in the commission of the media buy. In contravention of this standard, Media Effective received an average markup of 36%—an unheard-of percentage—on top of the 15% markup charged by Hybrid Media.

28. Media Effective had no team of individuals or employees reviewing and analyzing NRIA's media campaigns or creating comprehensive plans. Instead, it relied on NRIA's call logs and analysis of leads and research and reports conducted by third parties such as Hybrid Media or Emerging Networks LLC ("Emerging Networks") to air campaigns for the Debtors. Media Effective was simply the go-between.

29. From the inception of taking on NRIA as a client, Media Effective leveraged the rates that Hybrid Media negotiated, the media plans that Hybrid Media created, the research and reports that Hybrid Media generated, and all of the relationships that Hybrid Media has established as a reputable media buying agency and repurposed it all .as Media Effective's own to NRIA. Media Effective leveraged the same resources with Emerging Networks, albeit at a smaller scale than with Hybrid Media.

30. There was never a disclosure to NRIA of Media Effective's partnership with Hybrid Media or of how Hybrid Media was doing nearly all of the work. Instead, Javier Torres kept that information to himself as his "secret sauce," even to the exclusion of his trusted partner, NRIA.

31. There is no reason why NRIA could not have worked directly with Hybrid Media, and if they had, they would have received the same media buys, the same reports and recommendations at the industry standard rate of 15%. Unlike Media Effective, Hybrid Media was transparent with their agency fees and clearly identified them on their supporting documentation for their invoices, whereas Media Effective never disclosed their agency fees and added an

additional average markup of 36% on top of Hybrid Media's 15%. *See* **Exhibit 30** (Hybrid May Invoice and Back Up); *compare* **Exhibit 66** (demonstrating an example of a standard Media Effective invoice provided to NRIA pre-October 2021 with no detail as to commission). Media Effective's practice was neither standard nor transparent. All fees in media buying are generally disclosed upfront in client negotiations and are transparent so that a client can accurately determine their return on investment for their media investment.

32. A representative from Emerging Networks (another third-party vendor utilized by Media Effective to negotiate, plan for, and place ads) asked for meetings with the client. Such a meeting is standard to further determine efficiencies to meet the client objectives and make recommendations to increase a client's return on investment. Yet, Javier Torres denied their request. *See* **Exhibit 49**. This is highly unusual and not commonplace for delivering the transparency required in the media industry.

**Media Effective's Obligations & Role With Scripts**

33. The Federal Trade Commission establishes guidelines to ensure truthful, evidence-based messaging in advertisements to prevent deceptiveness. *See e.g.*, FEDERAL TRADE COMMISSION, *Advertising and Marketing Basics*, https://www.ftc.gov/business-guidance/advertising-marketing/advertising-marketing-basics (last accessed Apr. 4, 2024). While there is no exhaustive list of specific "scam words" set forth by the FTC, there are certain types of claims and language commonly associated with deceptive advertising practices including the following, which were commonplace in the advertising being created and aired for NRIA with the aid and assistance of Media Effective:

1. **"Guaranteed"**: Claims of guaranteed results or outcomes can be misleading if they cannot be substantiated. Consumers should be cautious of products or services that promise guaranteed success without credible evidence to support such claims.

2. **"Exclusive"**: Claims of exclusivity may imply that a product or offer is unique or limited in availability. However, consumers should verify the validity of such claims to avoid falling for false scarcity tactics.
3. **"Risk-Free"**: Claims of "risk-free" trials or guarantees may be misleading if they fail to disclose potential risks or conditions. Consumers should read the fine print and understand the terms of any "risk-free" offers before making a purchase.
4. **"Instant"**: Claims of instant results or gratification may oversimplify complex processes or exaggerate the speed of outcomes. Consumers should be cautious of products that promise instant solutions without realistic expectations.

34. Javier Torres has made a number of unequivocal statements in both his answer and sworn deposition testimony that neither he nor Media Effective was the "scrivener, author or editor of [NRIA] scripts" and that "[t]here was no 'aid' provided by Defendants as to the content of any advertising[,]" (**Exhibit 93 at ¶¶ 59, 61;** *see also* Javier Torres Dep. Tr. at 14:25-15:21). Contrary to those assertions, numerous documents reviewed as part of this engagement demonstrate otherwise. While some revisions by Javier Torres on behalf of Media Effective were for mere timing cuts, others were much more substantive.

35. One example is of Javier Torres recommending and implementing a cut of the wording "your apartment building secured" in order to keep the advertisement within the allotted 30 second time frame occurred in an email to Salzano on January 6, 2020. *See* **Exhibit 38**.

36. In an email dated April 7, 2020, Javier Torres wrote: "I removed another '10%' mention at the end of spot. (A total of three '10%' mentions removed)". Torres also acknowledges in the email string that NRIA claims investors will receive 10% steady cash flow and can obtain returns with bonuses targeted at 18-21%. *See* **Exhibit 44**.

37. In June 2015, Media Effective was working with Salzano to get NRIA advertisements on CNBC. CNBC responded with significant compliance concerns about the

substance of the advertisements. In response, three claims needed to be "modified" or "removed", including a reference to guaranteed rents for five years. Javier Torres recommended to Nick Salzano wording that "could even make our claims stronger[.]" *See* **Exhibit 48**. Fast forward, in August 2020, Media Effective was again working to air content on CNBC/Universal and reminded Nick Salzano of his comments on the spot submitted in 2015, writing "I am sure it will bring back some memories. I believe this time around is going to be easier. Our actual spots look much more clear in message and more professional." *Id.*

38. On January 22, 2021, talent, Lou Dobbs, requested a further explanation of the 10% annualized payout referenced in the proposed NRIA script, relayed from Media Effective through Hybrid Media. Dobbs was not comfortable without an understanding of how the 10% guaranteed return worked. In response to Dobbs' question, **Javier Torres** drafted a suggested written response explaining how the guaranteed 10% return works. *See* **Exhibit 54; Exhibit 55**. Javier Torres' own response acknowledges his understanding and knowledge of NRIA's unusually high guaranteed rate of returns. Javier Torres even conveyed this information to Hybrid Media to allow the airing of Mr. Dobbs' script to proceed. *See* **Exhibit 57**.

39. Javier Torres' knowledge of the misleading advertisements for NRIA used to attract thousands of investors is demonstrated by his receipt of a message from Katey Kana, Marketing Director at NRIA, stating that "we came across as very unbelievable to the finance guys so this audience will need different messaging to work for us" regarding Bloomberg advertising. *See* **Exhibit 100**.

40. Perhaps most telling of the lengths to which Javier Torres and Media Effective would go to in order to air advertisements for NRIA comes in an exchange between Javier Torres and Nick Salzano in May 9, 2016. In that email chain, Javier Torres writes on May 6, 2016 that

12

"there is the issue of NRIA being a direct client and we need to find a way to work around it. Don't let me out on this one." *See* **Exhibit 20**. To propose such a work around, Javier Torres wrote later that day that "[w]hat I have done with another client is to negotiate/advertise under a different client name." In essence, to defraud the publisher and the consumer as to who the advertisement is on behalf of. Nick Salzano responded that he would need to see a sample spot/script, and Javier Torres personally drafted an entire script to try and accomplish his "work around." *Id.* at TORRES_MEDIAEFFECTIVE001135.

41. Notably, Media Effective's advertising for NRIA was limited to audio and digital advertisements. There was little to no evidence of print media from Media Effective for NRIA. That is unusual because the target audience NRIA was trying to reach was higher net worth individuals that lend themselves to print, digital and other media that would require the advertising copy to be highly scrutinized and put into doubt. Messaging leading with words like "guaranteed returns" and "no risk investment" run afoul of FTC guidelines and raise red flags as to truth in advertising messaging. Media Effective utilizing TV and radio advertising for NRIA afforded them the ability to refrain from putting those words into writing, causing it to be more difficult for consumers to report the advertising to the FTC for complaints and questions as to the copy.

## Transparency in Invoicing - Commissions

42. Of significant concern was Media Effective's lack of transparency in its invoicing. That lack of transparency is in stark contrast to the transparency it received from the third parties it utilized, such as Hybrid Media.

43. For example, Media Effective failed to disclose its commission or agency fee to NRIA on any of its invoices prior to October 2021, when NRIA pushed back and insisted that that information be provided. *See* **Exhibit 67**; *see* **Exhibit 66** (demonstrating an example of a standard

Media Effective invoice provided to NRIA pre-October 2021 with no detail as to commission). After Patryk Golaszewski asked Javier Torres to provide a breakout of all invoices showing Media Effective's booking fee for each transaction, Javier Torres responded that "….it is hard to put it down as an exact number in an invoice as it changes when my volume changes….Accordingly, most of the time the volume buyers and myself negotiate a commission with the media companies between 5-15% and it is split among the participants." *See* **Exhibit 67**. That same day, in response to further push back, Javier Torres further represented that "[m]y commission is included in the buys. I am paid by the media company for the business I bring them. You would pay the same gross amount if you buy directly from them (and have access to the same volume rates/negotiation). I can break it out, but it changes every time I make new deals with them than include or dont included buys for NRIA. A good indicator could be about 8% for radio buys and 7% for TV buys. I can include that in the next invoices, but your gross amount is always the same." *Id.* However, Javier Torres and Media Effective were misleading NRIA.

44. Subsequently, even when commissions were provided by Media Effective, the information from Media Effective was false and misleading. *See* **Exhibit 70**; *compare* **Exhibit 73**; *see also* **Exhibit 71**; *compare* **Exhibit 75** (*see also* additional back up from Hybrid supporting November TV advertising and Hybrid's agency fee for the same at **Exhibit 74**).

45. Javier Torres misled NRIA as to the actual markup he charged for Media Effective by claiming he and the other participants usually split the commission in the range of 5% to 15%.

46. Javier Torres' lack of transparency and deliberate misrepresentation of his markup displays his consciousness of wrongdoing regarding his inflated markup and willingness to defraud NRIA and its investors to enrich himself. Javier Torres claimed he got NRIA good rates through Hybrid Media but failed to mention his markup of approximately 36%.

14

47. At no point in time, after miscalculating Media Effective's commissions post-October 2021, did Media Effective or Javier Torres go back to NRIA and correct his statements and inform NRIA that, in fact, his commissions far exceeded 5-15%.

48. By contrast, when Hybrid Media provided its invoices to Media Effective, it consistently provided backup detail, including its own agency fee, transparently and openly to Media Effective. *See* **Exhibit 30** (Hybrid May Invoice and Back Up); **Exhibit 35** (Hybrid October Invoice and Back Up); **Exhibit 60** (Hybrid March Invoice and Back Up). Media Effective never provided back-up to NRIA as to its advertising.

### Conclusion

49. Based on all of the foregoing, I am of the opinion that Media Effective and Javier Torres received payments from NRIA that far exceeded the value of the services they provided. Additionally, Media Effective and Javier Torres understood the import of the aggressive messaging conveying guaranteed high rates of returns and actively assisted NRIA in responding to inquiries from both media outlets and talent regarding the same.

50. In my opinion, to a reasonable degree of certainty based on my industry experience, the aforementioned evidence supports this Court issuing a preliminary injunction on the same terms as the current temporary restraining order, which is in place.

51. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 4, 2024
      Miami, Florida                                           */s/ Angela Solk*
                                                                 Alvarez & Marsal North America, LLC
                                                                 Managing Director