# EXHIBIT "D"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
ADV. PRO. NO. 23-1335 JKS

In Re:                              :

National Realty Investment          :
Advisors, LLC, et al.,
      Debtors.                      :

AIRN Liquidation Trust Co.,         :
LLC, in capacity as
Liquidation Trustee of the          :
AIRN Liquidation Trust,
      Plaintiff,
       V
Media Effective, LLC, et
al.,
      Defendants.


- - -

VIDEOTAPED DEPOSITION BY ZOOM VIDEOCONFERENCE OF

WILLIAM WALDIE

Friday, March 29, 2024

- - -

REPORTED BY:  JENNIFER MAUTE, CCR

- - -



MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com



1     Transcript of the Videotaped
2   Videoconference Deposition of WILLIAM WALDIE,
3   called for Oral Examination in the above-captioned
4   matter, said deposition taken pursuant to Superior
5   Court Rules of Practice and Procedure by and before
6   JENNIFER MAUTE, Certified Court Reporter and Notary
7   Public for the State of New Jersey, commencing at
8   10:02 a.m.
9
10             - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   APPEARANCES:
2
      ICE MILLER, LLP
3     BY: ANECA LASLEY, ESQUIRE
          ERICA ARRAS, ESQUIRE
4     250 West Street, Suite 700
      Columbus, Ohio 43215
5     Aneca.lasley@icemiller.com
      Counsel for the Plaintiff
6
7
      OBERMAYER, REBMANN, MAXWELL & HIPPEL, LLP
8     BY: EDMOND M. GEORGE, ESQUIRE
          MICHAEL VAGNONI, ESQUIRE
9         WILLIAM SALDUTTI, ESQUIRE
      1120 Route 73, Suite 420
10    Mount Laurel, New Jersey 08054
      Edmond.george@obermayer.com
11    Counsel for the Defendants, Javier Torres,
      Media Effective, LLC, Dora Dillman, Javier
12    Torres, Jr., Natalia Torres, Paulina Torres
13
14    ALSO PRESENT:  John Vitali, Videographer
15
              - - -
16
17
18
19
20
21
22
23
24
25

1                 - - -
2             I N D E X
3                 - - -
4   Testimony of:  WILLIAM WALDIE
5     By Mr. George                PAGE 9
6
7                 - - -
8             E X H I B I T S
9                 - - -
10  NUMBER        DESCRIPTION        PAGE
11  Exhibit-1     Declaration        65
12  Exhibit-2     E-mail             68
13  Exhibit-3     E-mail             70
14  Exhibit-4     E-mail             70
15  Exhibit-5     Bill Waldie Profile      *
16  Exhibit-6     Media Effective Summary  102
              Activity by Year
17
      Exhibit-7     Javier Torres Summary   *
18            Activity by Year
19  Exhibit-8     Javier Torres and Media *
              Effective Transfers
20            To Investment Accounts
21  Exhibit-9     NRIA Daily Cash Balance  71
              January 1, 2016 to
22            June 30, 2022
23  Exhibit-10    William Waldie Resume    *
24  Exhibit-11    Weekly Radio Campaign    *
25  Exhibit-12    Weekly Radio Campaign    *

1   Exhibits (Continued):
2   NUMBER        DESCRIPTION        PAGE
3   Exhibit-13    E-mail             90
4   Exhibit-14    E-mail             *
5   Exhibit-15    Tanvi Invoices     38
6   Exhibit-16    Revised Deposition  11
              Notice
7
8   ** (Exhibit-5, Exhibits-7-8, Exhibits-10-12 and
    Exhibit-14 were not introduced.) **
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



```
1              - - -
2         DEPOSITION SUPPORT INDEX
3              - - -
4
5    Direction to Witness Not to Answer
6    Page Line    Page Line      Page Line
7    62, 17       63, 3          86, 18
8    89, 2        89, 22
9
10
11   Request for Production of Documents
12   Page Line    Page Line      Page Line
13   20, 13       32, 22
14
15
16   Stipulations
17   Page Line  Page Line      Page Line
18   None
19
20
21   Question Marked
22   Page Line  Page Line      Page Line
23   None
24
25
```

```
1              - - -
2         THE VIDEOGRAPHER:  We are now on record.
3    This begins the Videotape Number 1 in the
4    deposition of William B. Waldie, in the matter of
5    AIRN Liquidation Trust Company, LLC, et al. versus
6    Media Effective, LLC.
7         Today is Friday, March 29th, 2024.
8    The time is 10:02 a.m.  This deposition is being
9    taken remotely at the request of Obermayer,
10   Rebmann, Maxwell & Hippel, LLP.  The videographer
11   is John Vitali of Magna Legal Services and the
12   court reporter is Jennifer Maute of Magna Legal
13   Services.
14         Will Counsel and all parties present
15   please state their appearances and whom they
16   represent?
17         MR. GEORGE:  Edmond George for the
18   defendants.
19         MS. LASLEY:  Good morning.  Aneca
20   Lasley, with Ice Miller.  Along with me is Erica
21   Arras on behalf of the Plaintiff, the AIRN
22   Liquidation Trust.
23         THE VIDEOGRAPHER:  We also have William
24   Saldutti with us and Javier Torres that are both
25   present.
```

```
1         Will the court reporter please swear
2    in the witness?
3         COURT REPORTER:  Okay.  Sir, raise your
4    right hand, please.
5         Do you solemnly swear that the
6    testimony you are about to give will be the truth,
7    the whole truth and nothing but the truth?
8         THE WITNESS:  I do.
9         COURT REPORTER:  Great.  We can proceed.
10        MS. LASLEY:  Ed, before you start, I'm
11   sorry, who is William Saldutti?
12        MR. GEORGE:  He's my associate.  He's
13   here in the room with me and Michael Vagnoni, as
14   well.
15        MS. LASLEY:  Okay.
16        MR. GEORGE:  My partner.  You met him in
17   Newark.
18        MS. LASLEY:  Yep.
19        MR. GEORGE:  Are we going to see
20   Mr. Waldie, John?
21        MS. LASLEY:  He's on.
22        MR. GEORGE:  I'd much rather look at
23   Aneca, but --
24        THE VIDEOGRAPHER:  Yeah, I can rearrange
25   it, sir, so that everyone sees him, but would it be
```

```
1    okay if we go off record just for a second?
2         MR. GEORGE:  Sure.
3         THE VIDEOGRAPHER:  We're going to go off
4    record.  The time is 10:03 a.m.
5         (Whereupon, a discussion was held off
6    the record.)
7         THE VIDEOGRAPHER:  We're back on record
8    at 10:04 a.m.
9         Counsel, proceed.
10   BY MR. GEORGE:
11    Q.   Good morning, Mr. Waldie.  My name is
12   Edmond George.  I'm with the law firm of Obermayer,
13   Rebmann, Maxwell & Hippel.  I'm going to be taking
14   your deposition today in connection with a matter
15   that was brought by the AIRN Liquidation Trust
16   against my clients, Javier Torres, Dora Dillman,
17   the Torres Family and Media Effective.  I'm going
18   to take your deposition, which means that
19   everything anybody says in this proceeding is going
20   to be recorded.  We're also having a video of you
21   taken at this time.
22         Have you had your deposition taken
23   before?
24    A.   Yes.
25    Q.   How many times?
```



1    A.   Three.
2    Q.   At any time -- and at any time, were you
3  a defendant in any lawsuit?
4    A.   No.
5    Q.   I'm going to try and set some rules out
6  for you.  I'm going to ask you a series of
7  questions relating to this case.  I'll to try ask
8  them to you in a straight-forward way.  Sometimes
9  my words get jumbled or I say something and it's
10  inarticulate.  If you don't understand it, it is
11  important for you to tell me that you don't
12  understand it so I can rephrase it in a way in
13  which you can understand it.  If you answer the
14  question, we are going to assume that you heard the
15  question, that you understood it and that your
16  answers are responsive.
17        Do you understand that?
18    A.   Yes.
19    Q.   It's also important that you answer
20  orally.  You can't say um-hum or uh-uh.  Those are
21  things that could be confused by the reporter or
22  the reader.  So it's important that you answer
23  affirmatively or negatively to all of the questions
24  that I ask and that you don't blurt out an answer.
25  It's important that you make sure you understand

1  that rule.
2        The other thing is, because everything
3  is being recorded, we can't talk at the same time.
4  I'll try not to talk over you and if you'll kindly
5  try not to talk over me, that would be great.
6        Do you understand those rules?
7    A.   Yes.
8    Q.   Are you under the influence of any drugs
9  or any medication that might affect your ability to
10  either recall or answer the questions truthfully or
11  accurately that I'm going to pose to you?
12    A.   No.
13    Q.   So, Mr. Waldie, I'm going to start with
14  Number Exhibit-16, which is your Notice of
15  Deposition.  I want to go to the -- to the document
16  request.
17        Okay.  Mr. Waldie, have you ever seen
18  this Notice of Deposition before?
19    A.   Yes.
20    Q.   And did you, personally, make an effort
21  to recover documents?
22    A.   I did and my team.
23    Q.   I'm sorry?
24    A.   Me and my team.
25    Q.   Who is your team?

1    A.   Staff would have been Rich Bunion,
2  Christina Keith.  Maybe a couple of others, but I
3  know for sure those two.
4    Q.   So you didn't look for these documents
5  yourself, you had your staff do it?
6    A.   I looked for documents as well.  I
7  looked at what they sent over, but, no, I did not
8  pull all the documents together.
9    Q.   So you didn't look for them, you looked
10  at them after your staff produced them?
11        MS. LASLEY:  Objection.
12  Mischaracterizes.
13        THE WITNESS:  On some, yes, but not all.
14  BY MR. GEORGE:
15    Q.   But not all?
16    A.   Right.
17    Q.   So did you produce all the documents
18  you've reviewed in connection with your
19  investigation into the NRIA finances?
20    A.   Yes.
21    Q.   So there are no other documents that you
22  reviewed other than the four that was provided to
23  me yesterday by Ms. Lasley?
24        MS. LASLEY:  If I could, Counsel, I want
25  to be clear.  I -- we had an agreement.  I -- I had

1  told you ahead of time that he has reviewed every
2  financial record of this company that we have.  And
3  absent when you asked to produce every single one
4  of those, we have agreed and produced to you
5  summary charts that cor -- essentially summarize
6  all of that information that he has reviewed to
7  date or analyzed to date.  And so, no, not every
8  document has been turned over to you, but that was
9  pursuant to what I thought was our agreement.
10        MR. GEORGE:  So, Aneca, we were talking
11  about insolvency.  Not anything else and so when I
12  said --
13        MS. LASLEY:  When we talked --
14        MR. GEORGE:  Excuse me.  When I talked
15  to you about it, I said, you know, I wanted to know
16  about, you know, insolvency and when it happened,
17  you said that means every single document, can we
18  give you a summary?  But we didn't talk about any
19  of the other documents.  I mean, it is what it is.
20  I guess we have a disagreement here, but I
21  understand what you're saying.
22        MS. LASLEY:  Yeah.  I mean, your
23  category, Number 1, for example, Ed, "All documents
24  you reviewed in connection with the underlying
25  investigation into NRIA's finances."  I am still

MAGNA ▶
LEGAL SERVICES

1  happy today to turn over thousands -- hundreds of
2  thousands of pages of documents to you that reflect
3  those finances.  But it was --
4       MR. GEORGE:  Yes.
5       MS. LASLEY:  -- my understanding that in
6  terms of finances we would start with the summary
7  sheets and if there was anything that you wanted to
8  see that fed into those summary sheets, you would
9  let me know and we would turn those over.
10      MR. GEORGE:  Okay.  And how about --
11      MS. LASLEY:  And if that's wrong, that's
12  on me.  Not on him.
13      MR. GEORGE:  Understood.
14  BY MR. GEORGE:
15      Q.   "Any documents showing when NRIA first
16  became insolvent," did you produce documents
17  relating to that?
18      A.   We -- we produced a -- a summary of a
19  cash balance analysis.
20      Q.   So --
21      A.   And -- and --
22      Q.   Go ahead.  I didn't mean to interrupt
23  you.  Cash balances?
24      A.   It was a cash balance analysis, but
25  there's ongoing balance sheet testing, which has

1  not been provided.
2       Q.   And is that balance sheet testing going
3  on now?
4       A.   Yes.
5       Q.   And when was that started?
6       A.   A couple weeks ago.
7       Q.   And so was there ever a -- an insolvency
8  analysis for the year 2016 that was completed by
9  your firm prior to the filing of this lawsuit?
10      A.   No.
11      Q.   Was there an insolvency analysis
12  completed for 2017 prior to the date of the filing
13  of this lawsuit?
14      A.   No.
15      Q.   Was there an insolvency analysis done
16  for 2018 prior to the date of filing this lawsuit?
17      A.   No.
18      Q.   Was there an insolvency analysis done
19  prior to 2019 for this company prior to the filing
20  of the lawsuit?
21      A.   The -- well, going back prior to the
22  filing of the lawsuit the cash balance analysis has
23  been done for quite some time.
24      Q.   And how about the balance sheet
25  analysis, that -- was that ever done for 2019?

1       A.   It's not complete at this time and I am
2  happy to explain.
3       Q.   No, you don't have to explain.
4            How about 2020, was there one done for
5  2020?
6       A.   It's in process.
7       Q.   And how about for 2021?
8       A.   In process.
9       Q.   Do you have any understanding of why the
10 insolvency analysis wasn't completed for these
11 years that are in question here prior to a lawsuit
12 being filed that claimed that the debtor was
13 insolvent in each of these years?
14      A.   Well, the debtor was insolvent.
15      Q.   I didn't ask you that.  Can you answer
16 the question I asked you?
17      A.   We're unwinding a fraudulent enterprise
18 that has over 100 MDs and bank accounts.  They do
19 not have consolidated financial statements.  So we
20 have the transactional data that now we have to
21 extract because there's no historical year over
22 year data.  So we need to reconstruct that and put
23 that together.  That is a massive task.
24      Q.   Okay.
25      A.   When we're dealing with false financial

1  statements, fraudulent bank statements, imperfect
2  records, things got to be validated.  This is not
3  like doing an insolvency analysis on a company that
4  wasn't involved in a Ponzi scheme.
5       Q.   Understood.
6            For 2016, what evidence do you have
7  that the NRIA was conducting a Ponzi scheme?
8       A.   For 2016?
9       Q.   Yeah.
10      A.   On a cash -- on a cash balance analysis
11 what we've done was, we looked over all of the
12 accounts and looked at the balances day over day.
13 Then we extracted the investor contributions net of
14 redemptions for the period.  Based on that, we see
15 no -- no later than November 17th, they're under
16 water and unable to meet current debt obligations
17 without the use of those investor funds.  That does
18 not include indirect contributions from investors
19 where it went to like title companies and so forth.
20 If we take those into account, then we're talking
21 about another 38 million dollars, which would move
22 the bar back to January of 2016, but they did not
23 have the cash on hand to meet their debts or pay
24 them.
25      Q.   And do you have documents showing what

1  debts were unpaid in 2016?
2      A.   It's not what's unpaid.  It's they would
3  not have been able to pay them.  If --
4      Q.   And how do you know what investor
5  cont --
6          MS. LASLEY:  Please let him finish
7  answering the question.
8          MR. GEORGE:  Okay.  I thought he was
9  done.
10  BY MR. GEORGE:
11     Q.   And how did you know what --
12         MS. LASLEY:  And let him go back,
13  please, and finish answering the question.
14         THE WITNESS:  I said not unpaid.  I said
15  they were only able to pay because they were using
16  investor contributions.  Without those new
17  investors they would not have been able to meet
18  their current debt obligations.
19  BY MR. GEORGE:
20     Q.   So on day one in 2016 they were
21  insolvent, that's your testimony?
22         MS. LASLEY:  Objection.
23  Mischaracterizes.
24         You can answer.
25         THE WITNESS:  Yes.

1  BY MR. GEORGE:
2      Q.   Okay.  And was there a time when NRIA
3  stopped paying debts as they became due?
4      A.   Well, again, this is a Ponzi scheme,
5  right, so it's new money --
6      Q.   Well, you keep saying that.  I'm not
7  sure I necessarily agree.
8          MS. LASLEY:  Will you please let him
9  answer?
10         The question was, was there a time
11  when they stopped paying their debts when they came
12  due?  That's the question he needs to answer.
13         THE WITNESS:  I don't know the answer
14  because they were not -- they were using investor
15  funds to stay afloat.  They were desperate to bring
16  in money, just like --
17  BY MR. GEORGE:
18     Q.   Well, once -- well, once the investor
19  money was put in, it wasn't separately segregated,
20  right, it was co-mingled with the debtor's money,
21  wasn't it?
22     A.   It's co-mingled.  Correct.
23     Q.   And in your insolvency analysis, did you
24  value any of the other assets other than cash?
25     A.   I told you the insolvency analysis is

1  still ongoing.  I'm saying, all indications show
2  that they were unable to meet debt obligations as
3  early as 2016.
4      Q.   All right.
5      A.   Balance sheet tests and insolvency
6  analysis were taken into account properties, debt
7  and -- and the other factors that go into
8  insolvency is in process.  I told you it's because
9  of we're dealing with imperfect and fraudulent
10  records that need to be validated.
11         MR. GEORGE:  Okay.  And, Aneca, I would
12  like him to produce the records from Paragraph 2
13  and 3.
14  BY MR. GEORGE:
15     Q.   So Number 5, did you produce all the
16  documents relating to your analysis of the
17  documents that were provided to you by my clients?
18     A.   Ed, can you be a little clearer on that,
19  what you're talking about?
20     Q.   Number 5, "All documents relating to
21  Alvarez's analysis of the documents received in
22  response to any 2004 subpoena that relate to Javier
23  or Media," did you produce those?
24     A.   The financial analysis?  I think --
25     Q.   All the documents.  All documents.

1      A.   We provided all documents to Counsel.
2  What agreement you had from there, I don't know.
3          MS. LASLEY:  I'll represent to you, Ed,
4  you have all those documents.  We produced those to
5  you in re -- in our discovery responses.  If you
6  want them produced again, they will be duplicate --
7  duplicative of everything we produced.
8          MR. GEORGE:  No.  I don't want you to
9  produce things twice.
10         MS. LASLEY:  Okay.
11         MR. GEORGE:  I just want to understand
12  whether they've all been produced or not.
13         MS. LASLEY:  Yeah, you have those.
14  BY MR. GEORGE:
15     Q.   Okay.  All documents that Alvarez used
16  to determine Media's markup --
17     A.   Yes.
18     Q.   -- and it's transactions, did you
19  produce all those?
20     A.   Yes.
21     Q.   And what documents would those have
22  been?
23     A.   It would have been the bank records.  It
24  would have been the invoices from Hybrid Media.
25     Q.   And that's -- that's the only documents

1  you looked at to determine markup?
2      A.   It's really all that was needed.
3      Q.   Okay.  Did you take any efforts to try
4  to compare the prices that Media was charging to
5  the market rate for the advertising time that it
6  was being billed for?
7      A.   What I looked at was what Media -- what
8  Hybrid -- you mean Media -- Hybrid Media?
9      Q.   No.  I'm talking about Media Effective.
10     A.   I looked at what Hybrid Media --
11     Q.   Well --
12     A.   I'm sorry.
13     Q.   Go ahead, sir.
14     A.   I looked at what Hybrid Media was
15  charging as a markup and I looked at Mr. Torres'
16  explanation of what his markup -- he claimed his
17  markup was to NRIA of being the 5 to 15 percent.
18  And we did -- we looked at that compared to what
19  his actual markup was and looked at Hybrid Media's
20  markup, which he said included his fee and he was
21  paid by them.  We saw no evidence of payments from
22  Hybrid to Media Effective or Mr. Torres.  And
23  from --
24     Q.   Did --
25     A.   Go ahead.

1      Q.   Did you compare the prices that were
2  being charged by Media Effective or -- or Javier
3  Torres to NRIA to the market price for those
4  particular advertising times?
5      A.   No.  We looked at what Mr. Torres claims
6  he was charging Media Effective.  When asked by
7  him, he was misleading and provided false answers.
8  And that was not until October of '21, but the
9  market, we did not -- we looked at what was there.
10  We talked to Hybrid Media.  We asked them what was
11  customary.  They told us.  And we looked at other
12  vendors to see what they were charging on their
13  markup.  All were half to a third of what Mr.
14  Torres charged.
15     Q.   How did you know the other vendors'
16  markup?
17     A.   I looked at the invoices.
18     Q.   Well, how does that show you what they
19  paid for the time?
20     A.   Because they're transparent what their
21  commission is.  It's listed on the face of the
22  invoice.
23     Q.   And did NRIA ever put on the face of
24  their invoice what the commission structure or fee
25  base structure was?

1      A.   NRIA, why would they do that?
2      Q.   I mean -- I'm sorry, Media Effective.
3      A.   They -- they did that -- oh, Media
4  Effective, not until they were questioned in
5  October of 2021.  No.
6      Q.   Okay.  So the entire time for 2016 to
7  2020, are you aware of any agreement or document
8  that says that time is going to be sold on a
9  commission basis?
10     A.   I think it says that on his invoice.
11     Q.   You think that says that on his invoice?
12     A.   Yeah.  I don't recall off the top of my
13  head.
14     Q.   Okay.
15     A.   If you want to show me a document, I'll
16  be happy to --
17     Q.   No, that's all right.
18          Did you provide drafts of your
19  declaration filed by the Trustee?
20     A.   I had my declaration that I provided,
21  but we typically just save the new version into a
22  box folder.
23     Q.   Did the counsel to the Trustee make any
24  changes to your declaration before it was filed?
25     A.   We talked to them, but, no, the

1  declaration was drafted by me.
2      Q.   Okay.
3      A.   And my -- and my team, as far as doing
4  some of the QC and so forth on the numbers.
5      Q.   Do you have any e-mails between you and
6  trustee's counsel where trustee's counsel provided
7  facts to you that might have been contained in the
8  declaration?
9      A.   I have lots of e-mails from the
10  Trustee's counsel.  I don't know what's in those
11  e-mails.
12     Q.   But that's -- can you look at Number 10
13  specifically and answer that specific question?
14  Did you produce any of those documents?
15     A.   E-mails between me and -- I did not
16  produce e-mails between me and privileged
17  communications between me and Counsel.
18         MS. LASLEY:  Bill, read the full Number
19  10 to yourself, first.
20         MR. GEORGE:  Well, that's all right.
21  He's answered it.  We'll move on.
22         You can go to the next page, Bill.
23  Bill, I think that's it, right?
24  BY MR. GEORGE:
25     Q.   Mr. Waldie, do you know Rick Barry?

1      A.   I do.
2      Q.   How do you know Rick Barry?
3      A.   He's an investigator that's working on
4  this matter.
5      Q.   And --
6      A.   Former bureau chief from the New Jersey
7  Bureau of Securities.
8      Q.   And do you know him as an investigator
9  for the trustee?
10     A.   Yes.
11     Q.   Do you know Mr. La Mattina?
12     A.   I've met him.
13     Q.   When did you first meet him?
14     A.   I believe it was in May.  I don't know
15 the date offhand, but I -- I met him twice.  Once
16 at a diner and then once in a -- an interview
17 setting in Coun -- in Counsel's office.
18     Q.   Are you saying May of '23?
19     A.   Yes.
20     Q.   Now, Mr. Barry, when was the last time
21 you communicated with Mr. Barry?
22     A.   A couple of weeks ago maybe on a call on
23 -- on -- on this -- not this particular matter, but
24 on an NRIA matter, but not this one.
25     Q.   Have you spoken to him about this matter

1  in the last month?
2      A.   Maybe.  Not -- not in any great length.
3      Q.   Well, do you have a telephone that you
4  use to call him with?
5      A.   Yeah, or we could have been on a Teams
6  meeting, you know, with counsel, but I don't know
7  whether or not -- or not it was about this.  I can
8  probably go back to my time and see whether or not
9  we had a call or a joint meeting and give you the
10 exact.
11     Q.   Yeah.  I'm -- I'm not asking about
12 whether you had a meeting that involved the
13 Trustee's counsel.  I'm talking about you and
14 Mr. Barry communicating directly without counsel
15 being involved?
16     A.   It's possible.
17     Q.   Did you provide any facts to Mr. Barry
18 about the markup that Media Effective was charging
19 NRIA?
20     A.   We would have talked about that at some
21 point, yes.
22     Q.   And you're aware, aren't you, that
23 Mr. Barry was in almost constant communication with
24 Mr. La Mattina, are you aware of that?
25     A.   I --

1      MS. LASLEY:  Objection.
2  Mischaracterizes the facts.
3      You can answer.
4      THE WITNESS:  I don't know.  I know he
5  had been in contact.  I don't know about constant
6  contact, or how many times he spoke to him, or what
7  they talked about.
8  BY MR. GEORGE:
9      Q.   Can you preclude as a possibility that
10 the information that you gave to Mr. Barry about
11 the markup that Media Effective was charging may
12 have been provided by Mr. Barry to Mr. La Mattina
13 for inclusion in his declaration?
14     A.   No.
15     MS. LASLEY:  Hold please.  Court
16 Reporter, could you please read that question back?
17               - - -
18     (Whereupon, the pertinent portion of the
19 record was read.)
20               - - -
21     MS. LASLEY:  Object to form.
22     You can answer.
23     THE WITNESS:  I don't have any knowledge
24 of him providing information to him to put in his
25 declaration.  It may have come up in an interview

1  where it was asked in a way of -- of would it
2  surprise you to know that Media Effective charged
3  30 plus percent?  And then if I recall correctly,
4  Mr. La Mattina said it wouldn't surprise me.
5  Outside of that, when we were sitting, you know,
6  in this --
7      Q.   Okay.
8      A.   -- I don't know of any other
9  conversation.
10     Q.   All right.  So now you do recollect a
11 specific meeting with Mr. La Mattina where the
12 markup was mentioned by you to him, right?
13     A.   I said -- no, that was not me who said
14 that.  I recall that being said.  I don't know who
15 said it or how that came up.
16     Q.   You were in the room, though?
17     A.   Yes.
18     Q.   And who were the other people in the
19 room?
20     A.   Counsel, and -- and Rick Barry and
21 Glenn La Mattina.
22     Q.   Counsel to the Trustee?
23     A.   Yes.
24     Q.   So counsel to the Trustee, you and
25 Mr. Barry were in a room with Mr. La Mattina where

1  the markup issue came up and Mr. La Mattina was
2  present, right?
3      A.   I believe that it was a question, would
4  it surprise -- would it surprise you if and he's
5  like it -- it wouldn't surprise me.
6      Q.   And what were the reasons why you said
7  it wouldn't surprise him?
8      A.   I didn't say that.
9      Q.   What were the reasons that he said that
10  it wouldn't surprise him -- surprise him?
11      A.   Because he said that nine out of ten
12  times Mr. Torres' invoices were higher than
13  everybody else.  That when he put out bids, he
14  would get bids back and Mr. Torres' was always
15  substantially higher than everyone else.
16      Q.   And was this a meeting that you had to
17  discuss what was going to go into the declaration,
18  because it appears that both of those statements
19  appeared, nine out of times ten -- nine out of ten
20  times he was higher and the markup was 31 percent?
21      A.   Well --
22      Q.   Both of those appeared in his
23  declaration, right?
24      A.   I definitely know he said nine out of
25  ten times.

1      Q.   I didn't ask you that.  Both of those
2  things that men -- were mentioned in that meeting
3  ended up in his declaration, right?
4      A.   I haven't read his declaration, but I
5  can tell you that the meeting wasn't about what he
6  could put in his declaration.  It was an interview
7  about all of the work he had done at NRIA to
8  include his interactions with or knowledge of Media
9  Effective and Javier Torres.
10      Q.   No, but I thought you said the last time
11  you saw Mr. La Mattina may have been last May; is
12  that correct?
13      A.   No.  First time.
14          MS. LASLEY:  Mischaracterizes his
15  testimony.
16          You can answer.
17          THE WITNESS:  That was the first time.
18  BY MR. GEORGE:
19      Q.   That's the first time, last May.  And
20  when was the last time you saw him?
21      A.   I think it was January 11th of this
22  year.
23      Q.   Oh, right before he filed his
24  declaration and you filed your declaration, right?
25      A.   That's the date.  Yeah, I think mine was

1  like the 17th or 18th.
2      Q.   And at that meeting that you had, is
3  that where the markup was discussed, in January of
4  this year?
5      A.   The -- his knowledge of it being nine
6  out of ten times was discussed.
7      Q.   And how about the markup?  I'm asking
8  about the markup.  Not nine out of ten.
9      A.   I'm telling you, I vaguely recall that
10  part.  I think that's how that went.
11      Q.   You're an FBI agent --
12      A.   I went back and -- I went back and I
13  checked my notes.  I did not see any of that in my
14  notes.  My notes clearly talk about the nine out of
15  ten times of him being substantially higher.  That
16  I can tell you for sure happened.  The others
17  potentially may have happened if Rick or somebody
18  would have asked it.  I don't -- I can't sit here
19  and tell you 100 percent sure that's what happened.
20      Q.   Do you -- do you have those notes?
21      A.   Yes.
22          MR. GEORGE:  Aneca, I'm going to ask
23  that you produce those notes.
24  BY MR. GEORGE:
25      Q.   You're not a lawyer, are you?

1      A.   No.
2      Q.   You're an FBI agent, former?
3      A.   A retired FBI agent.
4      Q.   When did you last work for the FBI?
5      A.   I retired February 28th, 2013.
6      Q.   Are you a vet?
7      A.   No.
8      Q.   I thought I saw on your resume you were
9  in Afghanistan.  Not connected to the military?
10      A.   I deployed to both Iraq and Afghanistan.
11  I volunteered to go there where I worked with the
12  military.  I was an interrogator in Iraq, Al-Qaeda.
13  Whoever we captured, artil (ph) capture missions,
14  my job was to break them down and interrogate them.
15  I ran a kidnapping unit in Afghanistan with a major
16  crimes task force.
17      Q.   Have you ever worked for an advertising
18  agency?
19      A.   No.
20      Q.   Have you ever been in a situation where
21  as part of your job you reviewed the operations of
22  an ad agency?
23      A.   Outside of this, no.
24      Q.   Yeah, outside of this, obviously.  No.
25          Have you ever held yourself out as a



1  person with special expertise in the advertising
2  agency space?
3      A.   No.
4      Q.   Have you ever bought or sold advertising
5  time?
6      A.   No.
7      Q.   Have you ever bought or sold advertising
8  time on radio?
9      A.   I think that would be, I've never bought
10 or sold advertising time.
11     Q.   Do you know the difference between a
12 fee-based and commission-based compensation
13 structure when it comes to advertising sales?
14     A.   I'm not -- I'm not an advertising
15 expert.
16     Q.   Have you reviewed any treatises or
17 learned documents on markups for advertising time?
18     A.   No.
19     Q.   And would it be fair to say then that
20 your declaration doesn't turn at all on your
21 understanding of the advertising space, but merely
22 on your assessment of financial documents in the
23 case?
24     A.   It's based on financial documents,
25 correct.

1      Q.   Have you ever been in any kind of
2  business other than the current business that
3  you're in?
4      A.   Yeah.  I was in the FBI for 24 years.
5      Q.   No.  I meant, have you ever been in your
6  own business?  I'm sorry.
7      A.   No.  I was a -- an internal auditor and
8  a controller for a company that owned nursing homes
9  throughout New Jersey after I got out of college
10 before going into the FBI.
11     Q.   Well, in your experience in life, do
12 your vendors share their markup with you?  In other
13 words, if you hire a plumber to come into your
14 house, does he share his markup or does he just
15 give you a bill?
16     A.   It's not markup.  It's just labor.  It's
17 a labor rate, yeah, he tells me how much he charges
18 an hour.
19     Q.   And if he buys a toilet, do you know
20 that he bought that toilet and gave it to you at
21 the price he bought it at or maybe he marked it up,
22 do you know?
23     A.   Usually you buy your own toilet and then
24 they --
25     Q.   Well, no.  Let's say he supplies you

1  one.
2          MS. LASLEY:  Objection.  Counsel, you've
3  got to let him finish responding before you jump
4  back in.
5  BY MR. GEORGE:
6      Q.   Let's assume he supplied you one,
7  Mr. Waldie.  Not that you bought your own.
8      A.   Okay.
9      Q.   Do you ask your plumber how much did you
10 pay for that toilet that you're charging me X
11 dollars for?
12     A.   Yes.  I bought a generator and that was
13 the question I asked.  So I paid what they paid and
14 then the labor was what they made.  Of course I
15 ask.  I want to know if I'm getting what I'm paying
16 for.
17     Q.   Okay.  And if you didn't ask and you
18 just paid for it, would that be a fraud on you?
19     A.   If I didn't ask?
20     Q.   If you didn't ask whether there was a
21 markup and you paid the bill, would that be a fraud
22 perpetrated on you?
23         MS. LASLEY:  Object to form.
24 BY MR. GEORGE:
25     Q.   You can answer it.

1      A.   Depending on if the value he charged me
2  was commensurate with the product he was providing.
3      Q.   Okay.  Fair enough.
4          Have you ever read any articles about
5  ethics in advertising?
6      A.   In advertising, no.
7      Q.   Yeah.
8      A.   No.
9      Q.   Did you ever review the bills that were
10 being presented by Renascent Enterprises to the
11 debtor for payment?
12     A.   Some of them, yes.
13     Q.   Was there detail about the times and
14 frequency of the advertisings that were running
15 through Renascent in their bills?
16     A.   If I recall, they would say what they
17 advertised and there would be a fee and then on the
18 bottom of their invoice it said agency fee and a
19 percentage so they broke it out.  They were
20 transparent in what they were making.
21     Q.   No, that's not what I asked you.  I
22 asked you, did they disclose how many times that
23 they ran and what times they ran in the bills?
24     A.   I don't know off the top of my head.  If
25 you want to show me a bill.



1    Q.   Sure.  Let's go to 15.  Can you see
2    that, Mr. Waldie?
3    A.   Yes.
4        MR. GEORGE:  Roll it down, Bill, so he
5    can see the entries.
6    BY MR. GEORGE:
7    Q.   Now, do you see there, is there any
8    indication about how many times those ads ran and
9    what the rate was?  You see quantity and rates
10   empty in those boxes, right?
11   A.   I don't what support was behind this, if
12   -- if at all.  But on the cover here I see what
13   they charged for the Bolly Radio and Radio Campaign
14   in totals and then like I told you before, agency
15   fee is 10 percent on this one.  The one I recall
16   was 11 percent.
17   Q.   Now, sir, now you can try to answer the
18   question I asked you.  Is there any indication how
19   many times these ads ran, when and where?
20   A.   No.
21       MR. GEORGE:  And can you go to the next
22   page, Bill?
23   BY MR. GEORGE:
24   Q.   How about the second page of 15,
25   anything there to show how many times the ads ran

1    and what times they ran?
2    A.   No.  Just the date range.
3    Q.   So can you tell how much Renascent --
4    Renascent Enterprises paid for the time that they
5    charged NRIA from this document?
6    A.   Well --
7    Q.   Not the commission.  Not the commission.
8    How much they actually paid for the time that they
9    passed onto NRIA?
10   A.   Not from this document.
11   Q.   Well, have you ever seen any document
12   that showed what Tanvi Chandra or Renascent
13   Enterprises were actually paying for the time that
14   they were providing to NRIA?
15   A.   I have not done an analysis of Renascent
16   or Tanvi Chandra's billings.
17   Q.   Well, are you aware that on a number of
18   occasions that Javier Torres was able to beat the
19   price that Tanvi was offering for advertising by 50
20   percent?
21   A.   I have not seen anything to that effect.
22   Q.   Have you heard about that?
23   A.   Just now.
24   Q.   You never heard that before?
25   A.   That he beat them by 50 percent?

1    Q.   Right.
2    A.   With a 36 percent markup, I find that
3    hard to believe, but --
4    Q.   Okay.  I'm just asking -- I'm not asking
5    for your belief, sir.  I know you're an FBI agent,
6    you distrust everything everybody says but I'm just
7    asking for facts in this deposition.  Okay?
8        MS. LASLEY:  Move to strike.
9    BY MR. GEORGE:
10   Q.   You understand?  I just want facts.  I
11   don't want your speculation.  I don't want your
12   biases.  I don't want your opinions.  I want facts.
13       MS. LASLEY:  Again, move to strike.
14   Object.  Argumentative.  That's not even a
15   question.
16       THE WITNESS:  I -- I have not seen --
17       MS. LASLEY:  There's not a question.
18   BY MR. GEORGE:
19   Q.   Do you know whether the NRIA documents
20   that he provided, Javier or Media Effective
21   provided to the -- to NRIA showed the times that
22   the ads were actually running?
23   A.   The dates you mean?
24   Q.   The -- the actual frequency.  You know,
25   ten times at -- at nine to ten, fifteen times at

1    ten to twelve, did you see that on the bills?
2    A.   I've seen some of his invoices.  There
3    was very few provided.  We've done some independent
4    looks into seeing what's out there, but you know,
5    I'd have to look at his invoice.
6    Q.   Well, when you say there have been very
7    few provided, are you aware that early in this
8    case, early in January, I believe it was, that
9    Javier Torres produced every single invoice that he
10   had and -- and -- and tracked it to every check
11   that NRIA -- wait.  When you say he didn't produce
12   any invoices, are you sure that that's true?
13   A.   No.  Those invoices, yeah.  I -- I --
14   his invoices.  Are you talking his invoices?  We've
15   got those --
16   Q.   Yeah.  You said he didn't provide all
17   his invoices and I'm suggesting he provided all of
18   his invoices.
19   A.   I don't know if it was all of the
20   invoices.  I'm trying to -- I'm trying to remember
21   what was on there.  It was the amounts he was paid
22   and a Hybrid invoice I recall, but I don't know if
23   it was all of his invoices.  It was all of his
24   payments.
25   Q.   So if I were to tell you that the bills



1  for Media Effective to NRIA contained -- contained
2  the times and frequencies of the showing of the --
3  of the commercials on the advertisement, you
4  wouldn't have any reason to dispute that sitting
5  here today, right?
6       A.   If they're there, they're there.
7       Q.   I'm just saying you didn't see any
8  invoices in your review of the production that we
9  made back in January that -- that didn't have that
10 kind of information on it?
11      MS. LASLEY:  Object to form.
12      THE WITNESS:  Again, you know, put one
13 in front of me.  I'm going on memory.
14      MR. GEORGE:  Okay.  Bill, can you go
15 through the rest of those?
16 BY MR. GEORGE:
17      Q.   And I'm just going to ask you the same
18 question with respect to those remaining invoices.
19 And I'll represent these were produced by your
20 lawyer and attached to a deposition.  Do you see
21 that these are all the same in the respect that
22 there's not any information about the quantity or
23 rate?
24      A.   On the break -- yeah.  I -- I see the
25 date range and I see the names and totals for --

1  for each campaign.
2       Q.   But you don't see how many times the ads
3  ran.  It's the same question as before, sir.  Do
4  you want me to --
5       A.   I --
6       Q.   -- just go through all --
7       A.   I can --
8       Q.   -- nine questions or do you want to just
9  answer that question?
10      A.   I don't see the time that they ran.
11      Q.   Okay.  How many times have you testified
12 in court?
13      A.   I have no idea.  A lot.
14      Q.   Dozens?
15      A.   I -- I don't count.  I -- I don't know
16 about dozens, but you know, a lot of times, you
17 know, people don't go to trial when they're
18 indicted on the fed -- in -- on the federal level,
19 but eight, ten, twelve times testifying in trial.
20 Dozens of times testifying in grand jury.
21      Q.   Over how many years?
22      A.   Twenty-four.  Twenty-three years, eleven
23 months.
24      Q.   Have you ever seen any learned treaties,
25 any industry periodicals that state that the fee

1  structure commission had to be in a writing?
2       A.   I have not looked at --
3       Q.   Have you ever seen a written agreement
4  between either Media Effective and Javier Torres
5  and -- on one side and NRIA on the other side that
6  set forth that there would be a commission charge
7  as opposed for a fee-for-service charge?
8       A.   Not that I recall.
9       Q.   Would you agree that NRIA spent
10 84 million dollars on advertising?
11      A.   Approximately, yes.
12      Q.   And do you know who the other vendors
13 were?
14      A.   For advertising?
15      Q.   Yes.
16      A.   I can check.  Yeah, I -- you know,
17 besides Media Effective it was 43 percent of that
18 budget.  And we -- yeah.  We have -- we have a list
19 somewhere, but some were, like, iHeart Radio, you
20 know, Fox.  It -- it was some of the actual
21 advertisers direct.
22      Q.   And so --
23      A.   And --
24      Q.   I didn't mean to interrupt you.  Go
25 ahead.

1       A.   It -- it was -- we have a list of them
2  broken out.
3       Q.   So if Media Effective was paid between
4  34 and 36 million, that would mean almost
5  50 million dollars was spent in other advertising
6  campaigns, right?
7       A.   36-and-a-half million went to Media
8  Effective.  The difference --
9       Q.   Okay.
10      A.   -- of the 84 would have gone to others,
11 correct.
12      Q.   The question is:  Would you agree that
13 after you take into account what Media Effective
14 was paid, that there were over 50 million dollars
15 in other expenses related to advertising?
16      A.   Probably just shy of 50 million.
17      Q.   And that was money to people other than
18 Javier Torres and Media Effective, right?
19      A.   Yes.
20      Q.   And did all of those people who ran
21 those ads, did they aid and abet NRIA and the
22 fraud?
23      MS. LASLEY:  Objection.  Calls for a
24 legal conclusion and I would also instruct not to
25 disclose any work product privilege.

1    BY MR. GEORGE:
2        Q.    Go ahead, sir.
3        A.    Well, Nick -- the fact that Nick Salzano
4    pled guilty to a Ponzi scheme and said that they
5    used false and misleading advertisers to attract
6    investors into a company that purported to be
7    profitable when in actuality they were making no
8    money, that fact coupled with the fact that Ponzis
9    are inherently insolvent.  So if a Ponzi is
10   inherently insolvent from the outset based on that
11   plea, then any transfers made from that point
12   forward would be in furtherance of the scheme.  So
13   --
14       Q.    So that -- would --
15       A.    So as of February of '18, anything based
16   on the lead target in this -- the leader organizer
17   of this Ponzi scheme saying that it was a Ponzi
18   scheme, anything from that date based on his
19   admission in court would be in furtherance of the
20   scheme.
21       Q.    Would be in furtherance of the fraud.
22   But don't you have to share the intention of the --
23   of the -- of the person committing the Ponzi scheme
24   to aid and abet?
25       A.    Okay.

1            MS. LASLEY:  Objection.  Calls for a
2    legal conclusion.  Outside the scope.
3    BY MR. GEORGE:
4        Q.    You can answer.
5        A.    I think the intent would be presumed
6    based on --
7        Q.    Oh.
8        A.    -- a Ponzi finding.
9        Q.    All right.  And you said that --
10       A.    The --
11       Q.    Oh, I'm sorry.  I didn't know you
12   weren't done.  You said the intent would be
13   presumed based on what?
14       A.    The debtor's actions that they were
15   running a Ponzi scheme.
16       Q.    So anybody that dealt with the debtor
17   after that date would aid and abet in the Ponzi
18   scheme, right?  It doesn't matter whether they knew
19   whether there was a Ponzi scheme going on or not,
20   any dollar that came out the door after -- after
21   Mr. Salzano said he was running a Ponzi scheme,
22   every one of those would be the people who aided
23   and abetted in the -- in the securities fraud,
24   right?
25           MS. LASLEY:  Same objection.  Calls for

1    a legal conclusion and outside the scope.
2            THE WITNESS:  What -- what it would mean
3    is that they were -- that they were fraudulent
4    transfers and money they would get --
5    BY MR. GEORGE:
6        Q.    Okay.
7        A.    -- in furtherance of a scheme.
8        Q.    But I'm not talking about the fraudulent
9    transfers, sir.  Fraudulent transfer don't
10   necessarily require any intent.  What I'm asking
11   you, and you're an FBI agent, right, so you've been
12   involved in the prosecution of Ponzi schemes,
13   right?
14       A.    I have.
15       Q.    You've been involved in the prosecution
16   of securities violations, haven't you?
17       A.    More on the -- I've worked on securities
18   cases, yes.
19       Q.    Okay.  And what I'm asking is, from your
20   experience as an FBI agent involved in the
21   prosecution of a security frauds case, have you
22   ever seen someone prosecuted for aiding and
23   abetting a securities fraud who didn't have
24   knowledge of the wrongful intent?
25       A.    Well, we're not talking about

1    prosecution here.  This is --
2        Q.    Okay.  I'm just asking.
3        A.    You know, so beyond a reasonable doubt
4    you're confusing two different legal terms.  I'm
5    not a lawyer, but you want me to ask a question
6    about convicting somebody for saying that somebody
7    was involved in a scheme who was profiting off of
8    the victims.
9        Q.    So you can't answer the question?
10       A.    Of aiding and abetting?
11       Q.    Yes.
12       A.    About who?  Give me -- give me who do
13   I --
14       Q.    I'm saying, you're saying that anybody
15   who got a dollar out of this company after 2018
16   received a fraudulent conveyance, right?
17       A.    I'm not saying anybody who got a dollar.
18   If you're going to say, well, they paid their cable
19   bill so the cable company is you, know, committing
20   fraud, no.  I'm talking about people who were
21   involved in helping them do things like promoting
22   through false and misleading advertising, then,
23   yeah.
24       Q.    Okay.  So you said that Mr. Salzano
25   admitted to using false advertisers or



1  advertisements?
2     A.   False and -- false and misleading
3  advertising.
4     Q.   Advertisements?
5     MS. LASLEY:  He said advertising.
6  BY MR. GEORGE:
7     Q.   Oh, so you're not referring to -- to
8  people who ran the -- the -- the ads, you're
9  talking about the actual content of the ads?
10    A.   Correct.
11    Q.   So if your view that the average
12 commissions is between 15 and 18 or 20 percent,
13 would it be a fraud to charge 25 percent?
14    A.   It can --
15    MS. LASLEY:  Objection.  Complete
16 hypothetical.
17    MR. GEORGE:  Yeah.  If you're lying
18 about what you're really charging, yeah.
19 BY MR. GEORGE:
20    Q.   I didn't ask you about if you were
21 lying.  I'm asking you, if the average commission
22 is 15 or 20 percent and I charge 25, is that a
23 fraud?  I'm not asking about what my intention is.
24    A.   You're -- you're saying a hypothetical.
25    Q.   Yeah.

1     A.   Right.  And I'm talking about if -- you
2  can charge what you want to charge if you're
3  transparent about what you're charging, but you
4  can't mislead and say you're charging one thing and
5  then charge the other.  Yeah, it will be fraud.
6     Q.   Okay.  So prior to 2021, when you said
7  that the commission was stated, did you see any
8  documents where Javier or Media Effective were
9  misrepresenting about what they were charging?
10    A.   It wasn't asked.
11    Q.   Prior to 2021, did you see any documents
12 where he was misrepresenting what he was charging?
13    A.   It -- it wasn't broken out.
14    Q.   Sir, prior to 2021, did you see any
15 documents where he misrepresented what he was
16 charging?
17    A.   I have not.
18    Q.   Sorry?
19    A.   No.  I saw a total on his invoice.
20 That's what I saw.
21    Q.   Okay.  Have you ever heard the term
22 "card rate?"
23    A.   The term what?
24    Q.   Card rate.
25    A.   Card rate?

1     Q.   Yeah.  C-A-R-D.
2     A.   Yeah.  There's -- yes.  So it's standard
3  rates I would say.
4     Q.   And when did you first learn about the
5  card rate, in the last few days?
6     A.   No.  I -- I've heard that in other
7  industries, as well.  There's rate cards.  You're
8  talking about a rate card, right?
9     Q.   Right.
10    A.   Advertising is not the only industry
11 with rate cards.
12    Q.   Okay.  And did you compare any of the
13 prices that NRIA -- that Media Effective or Javier
14 charged NRIA to the rate cards that existed at the
15 time?
16    A.   I did not.
17    Q.   Okay.  And you said you've seen those in
18 other industries.  You'd agree that rate cards,
19 that essentially the retail price that they would
20 charge someone to come in and buy that time?
21    A.   Well, I'm not sure how it works in
22 advertising, but rate cards would be this is the
23 rate we charge for the service we offer.
24    Q.   Have you ever heard of people purchasing
25 -- purchasing remnant time?

1     A.   Yes.
2     Q.   And you know what remnant time is?
3     A.   Yes.
4     Q.   What is it?
5     A.   It's leftover time, last minute time,
6  time others didn't want.  It's kind of, you know,
7  equivalent of wanting floor seats at a basketball
8  game, but you don't want to pay full rates.  You
9  wait until about an hour before the game and hope
10 something is available and you take what you get.
11    Q.   And -- and that's something you probably
12 know something about, for example, for the airline
13 industry, right, where as you get closer to the
14 flight if the plane is not full, there are
15 companies like Trivago or other places that will
16 buy a block of seats on that plane and they'll have
17 bought it at a substantial discount because of
18 proximity to the flight; have you heard of that?
19    A.   No.  I've typically had the opposite
20 affect on that, if you wait until the last minute,
21 you pay much more.
22    Q.   Okay.  Did you ever compare the overall
23 rate -- the overall charges that Media Effective or
24 Javier charged NRIA to the other effective rates
25 that the other vendors providing advertising time



1  provided?
2      A.   Overall, no.  I -- what we looked at was
3  what Hybrid Media, which was 94 percent of his
4  spend, what they charged.
5      Q.   Okay.
6      A.   We looked at it in comparison to what
7  Mr. Torres charged NRIA.
8      Q.   Right.  But I'm asking about the other
9  vendors to NRIA.  Not the people that Mr. Torres or
10 Media Effective were purchasing from.
11     A.   We're looking at several different
12 things in this project.  As far as who charged what
13 when, off the top of my head, we -- you know, it's
14 -- if there's a vendor or there's somebody -- so,
15 yeah, as far as what some vendors have charged
16 compared to others, yeah, that -- that has come up
17 in this case.
18     Q.   I'm asking, did you do any analysis that
19 compares the rates charged by other vendors of
20 advertising time to those that were provided by
21 Javier and Media Effective under their fee for
22 service arrangement?
23     A.   No.
24     Q.   Do parties have to disclose their
25 margins to deal with each other at arm's length?

1      A.   In advertising?
2      Q.   Anywhere.
3          MS. LASLEY:  Objection.  Outside the
4  scope.
5          THE WITNESS:  I -- I don't know all of
6  the margin rules on all businesses across the
7  board.
8  BY MR. GEORGE:
9      Q.   When you need to get ahold of Mr. Barry,
10 how do you reach him?
11     A.   Cell phone.
12     Q.   Sorry?
13     A.   By mobile.  Usually I call his cell.
14     Q.   What's his phone number?
15     A.   Can I get it from my phone?
16     Q.   Sure.
17         MS. LASLEY:  Just for the record,
18 Counsel, we'll object to any contact with Mr. Barry
19 that doesn't go through counsel.
20         MR. GEORGE:  Understood.
21         THE WITNESS:  (732) 503-5540.
22 BY MR. GEORGE:
23     Q.   Do you ever e-mail him?
24     A.   Yeah.  We've -- we've have had -- we've
25 had e-mails.

1      Q.   Do you know his e-mail address?
2      A.   Rwbarryconsulting@gmail.com.
3      Q.   Thank you.
4          You mentioned earlier on in your
5  testimony that you reviewed hundreds of thousands
6  of documents or were in the process of -- and I --
7  and maybe I'm misstating it.  It may have been your
8  counsel to the Trustee said there were hundreds of
9  thousands of documents.  So let me start over.
10         How many documents would you say
11 you've reviewed in connection with this matter?
12     A.   NRIA, the NRIA matter?
13     Q.   Yeah.  In connect with the NRIA matter.
14     A.   I -- I don't know.  There's thousands of
15 documents.  I don't know.
16     Q.   Ten -- tens of thousands?
17     A.   I don't review all of those documents.
18 I have staff that does all of the review.  I review
19 after certain levels when we get there.  I'm not
20 doing the deep dive into everything.  You know, we
21 -- we leverage our staff for that.
22     Q.   I get it.
23         Now, how about with respect to this
24 individual adversary, how many documents did you
25 review in connection with this?

1      A.   I -- I don't know.
2      Q.   Well, more than ten?
3      A.   Yeah, more than ten.
4      Q.   More than a hundred?
5      A.   Probably.
6      Q.   More than a thousand?
7      A.   No.
8      Q.   Have you or anyone in your staff ever
9  seen any competitive bid analyses that were
10 conducted by the debtor when reviewing the
11 advertising bids?
12     A.   I have not.  Whether staff has, it's not
13 something that I've seen.
14     Q.   Well, wouldn't that be important to know
15 that these things were being competitively bid?
16     A.   For what?  For what purpose?
17     Q.   You don't think it's important?
18     A.   For this here?
19     Q.   Yeah.
20     A.   I have not seen the bid documents.
21     Q.   Well, that's not what I asked you.  Try
22 to answer -- answer what I asked.
23     A.   If they're competitively bid?
24     Q.   Yeah.  These things that are --
25     A.   Depends on --

1    Q.   -- competitively bid, would that be
2  important to you?
3    A.   It could be, depending on whether or
4  not, you know, these were really competitively bid,
5  if there was insider leaks, if there was bid
6  rigging, if, you know, whatever -- whatever it may
7  be.
8    Q.   Have you ever seen any documentation
9  that indicated that either Javier or Media
10 Effective were kicking back money to either Ray
11 Grabato or Nick Salzano?
12   A.   I have not.
13   Q.   Have you ever seen any documentation
14 that showed that either Javier or -- or Media
15 Effective were providing money to family members of
16 Salzano or Grabato?
17   A.   I have not.
18   Q.   Have you ever seen any evidence that
19 other than the advertising money that Mr. Javier
20 Torres or Media Effective were secreting money away
21 from the bankruptcy estate?
22       MS. LASLEY: I'm sorry. Will you --
23 will you repeat that question or have it read --
24 BY MR. GEORGE:
25   Q.   Right.  Other than the money that was

1  paid through the advertising purchases and on the
2  fee based arrangement, have you seen any
3  documentation to show that Javier or Media
4  Effective got money from any other place that
5  originated from NRIA?
6    A.   All of his money came from NRIA.  Well,
7  the majority of it.  Is that the question?
8    Q.   I'm asking you, other than the money
9  that came through the advertising purchases, have
10 you ever seen any checks or monies coming from NRIA
11 to either Javier or Media Effective that weren't
12 for that -- that fee based service provider being
13 provided?
14   A.   The checks we've seen were all in
15 connection with the invoices provided.
16   Q.   Is your position that Javier and Media
17 Effective were overcharging NRIA?
18   A.   I believe NRIA did not get commensurate
19 value for what Javier Torres purported to be doing
20 for the money.
21   Q.   And why did it not get reasonable value?
22   A.   Because I don't know what he did.
23   Q.   Well, did anybody try interview him or
24 ask him?
25   A.   Mr. Torres?

1    Q.   Yeah.
2    A.   He is represented by counsel.  I can't
3  interview him.
4    Q.   I understand that, but how about early
5  on when the subpoena was issued, did anybody try to
6  reach out to him and ask him what he was doing?
7    A.   I believe he was represented.
8    Q.   He wasn't represented before he got a
9  subpoena, was he, sir?
10       MS. LASLEY: Objection.
11       THE WITNESS: I don't know.  I think he
12 was represented.
13 BY MR. GEORGE:
14   Q.   So your answer is that nobody reached
15 out to him, other than through the subpoena, to ask
16 him what he was doing?
17   A.   I still believe he was represented by
18 counsel, but I could -- I could be wrong.
19   Q.   Fair enough.
20       But you would agree with me that no
21 one reached out to him prior to issuing him a
22 subpoena to try to find out what he was doing?
23   A.   I didn't reach out to him.
24   Q.   Okay.  And you don't know of anybody
25 else that reached out to him, do you?

1    A.   No.
2    Q.   Did Mr. Barry, the securities exchange
3  investigator, did he reach out to him?
4    A.   Not that I know of.
5    Q.   Does Glenn La Mattina sound like an
6  honest guy to you?
7    A.   Glenn La Mattina?
8    Q.   Yeah, Glenn La Mattina.
9    A.   I've got two meetings with Glenn
10 La Mattina and we asked him questions.  Do I think,
11 you know, that he was completely transparent on
12 everything?  I don't know.
13   Q.   Well, you're an FBI agent, sir.  You
14 don't have to gild the lily with me.  You came out
15 of that meeting with him with a feeling about his
16 credibility, didn't you?
17   A.   Which meeting?
18   Q.   The meeting you had with Mr. La Mattina
19 that you were just talking about 30 seconds ago.
20   A.   Which meeting?  I had two.
21   Q.   I don't care.  I'm asking you, did you
22 come out of either of those meetings with a feeling
23 about his credibility?
24   A.   Well, I can tell you in the first
25 meeting we did not go into a lot of areas, as if

1 anybody you interview the first time is not going
2 to give you everything. But he did give us a lot
3 of verifiable information that happened at NRIA.
4     Q.   And you still didn't answer my question.
5 Did you, personally, come out of that meeting, that
6 second one, where you discussed the substance of
7 this matter with him on a feeling about his
8 credibility? Not about whether he gave you a fact
9 that you could verify.
10     A.   I did not have a -- feeling on his
11 credibility. I thought when we asked him a
12 question he gave us what he thought the answer was.
13     Q.   Okay. Was he involved in the Ponzi
14 scheme?
15     MS. LASLEY: Ob -- objection. And to
16 the extent that this is the work product that -- of
17 counsel, I would instruct you not to answer.
18     MR. GEORGE: Well, that -- that's
19 inappropriate because --
20     MS. LASLEY: It's not inappropriate. He
21 is -- Mr. -- Mr. Waldie is our expert.
22     MR. GEORGE: Yeah.
23     MS. LASLEY: He's the expert in this
24 case. He is also a consulting expert over -- in
25 the overall investigation. You're now asking

1 questions that get into other areas of this
2 investigation and that is our work product and I
3 would instruct him not to answer.
4     MR. GEORGE: Okay.
5 BY MR. GEORGE:
6     Q.   So, Mr. Waldie, are you aware that
7 Mr. La Mattina as far back as 2020 knew that bills
8 weren't being paid at NRIA?
9     A.   That's not a question I asked.
10     Q.   I didn't ask you whether you asked it.
11 I said, were you aware of that?
12     A.   If I didn't ask it, how would I be aware
13 of it?
14     Q.   There is a lot of ways you can become
15 aware of things, sir, without asking a question.
16 I'm asking you. If you're not aware, just say
17 you're not aware.
18     A.   I know that he said that without
19 investor money coming in they could not have paid
20 bills.
21     Q.   And you know that in spite of knowing
22 that the debtor wasn't paying its bill, he -- its
23 bills, he never went to Nick and Ray and said, hey,
24 we should stop advertising, we're not paying our
25 bills; are you aware of that?

1     A.   I'm aware of that happening with a lot
2 of people in this case, including your client.
3     Q.   Oh, my client went to the debtor and
4 said you're not paying your bills?
5     A.   No, but he -- he got questioned
6 regarding the legitimacy of the ads and he --
7     Q.   So --
8     A.   -- didn't go to them and say why --
9     Q.   Well, I'm going to move to strike that
10 because it's not responsive.
11     MS. LASLEY: You're going to let him
12 finish. First of all, you're going to let him
13 finish answering and then you can do whatever you
14 want.
15     MR. GEORGE: Can you read the question
16 back to him so he can answer the question I asked?
17          - - -
18     (Whereupon, the pertinent portion of the
19 record was read.)
20          - - -
21 BY MR. GEORGE:
22     Q.   Right. Did my client go to the debtor
23 and indicate that he had a concern that they
24 weren't paying bills, are you aware of that as a
25 fact?

1     A.   No. They were paying his bills.
2     Q.   Okay. Are you aware that he went to
3 them and said, you're not paying anybody else's
4 bills?
5     A.   I don't think he was worried about
6 anybody but himself.
7     Q.   Okay. Do you know whether he was aware
8 that they were not paying their other bills?
9     A.   I don't know what he was aware of.
10     Q.   Okay.
11     MS. LASLEY: Okay. Counsel, can we take
12 a brief five-minute break?
13     MR. GEORGE: Sure.
14     MS. LASLEY: Thanks.
15     THE VIDEOGRAPHER: We're going off
16 record. The time is 11:08 a.m.
17     (Whereupon, a short break was taken.)
18     THE VIDEOGRAPHER: We are back on record
19 at 11:20 a.m.
20          Counsel, proceed.
21     MR. GEORGE: Thank you, sir.
22     THE VIDEOGRAPHER: You're welcome.
23 BY MR. GEORGE:
24     Q.   Mr. Waldie, we're going to show you
25 Exhibit Number 1, your declaration.

MAGNA
LEGAL SERVICES

1    A.   Okay.
2    Q.   Mr. Waldie, in Paragraph 25 of that
3 document you talk about advertising scripts.  Let's
4 go to that, if you will.  Do you see that?
5    A.   Yes.
6    Q.   And you said that, "Torres advised NRIA
7 that they needed to eliminate a sentence in the
8 script and suggested removing the wording your
9 apartment building secured."
10        Do you see that?
11    A.   Yes.
12    Q.   Now, do you know whether he chose that
13 for any particular reason or whether that was just
14 a function of the fact that it exceeded the time
15 limit?
16    A.   It appears because it exceeded the time
17 limit.
18    Q.   Okay.  And you don't have any evidence
19 or facts to suggest that the original advertisement
20 that needed amended was drafted by Javier or Media
21 Effective, do you, the one that we're talking about
22 in 25, your apartment building secured?
23    A.   Not on this one, no.
24    Q.   Okay.  And with respect to any changes
25 to the scripts, have you ever seen an original

1 script written by Javier Torres?
2    A.   An original, no.
3    Q.   Have you ever seen a script revision
4 that wasn't either connected to or prompted by a
5 request by the advertiser to either shorten the
6 time period or to remove information that the
7 advertiser didn't want to see in the ad?
8    A.   Yeah, I've seen where they said they
9 were not comfortable with the 10 percent guarantee
10 and where Mr. Torres said we need to do a formal
11 response and wrote the response that they thought
12 they would have to send in order to make that
13 particular endorser comfortable.
14    Q.   So he was merely passing on the
15 information from that endorser to -- to NRIA,
16 right?
17    A.   Pass it on from the endorser and then
18 gave the suggested response.
19    Q.   Okay.  And Nick Salzano was the one who
20 approved that response, right?  There's an e-mail
21 there where he says, TY.  I assume that's thank
22 you, right?
23    A.   On -- on which one are you talking
24 about?
25    Q.   Well, let's -- let's -- let's go to one

1 here.  Hold on.
2    A.   I don't believe it's in here.
3    Q.   Yeah, I'll -- I'll get it.  Hold on.
4        MR. GEORGE:  Let's go to Exhibit
5 Number-2, Bill.
6 BY MR. GEORGE:
7    Q.   Do you see that, sir?
8    A.   TY?
9    Q.   Yeah.
10    A.   Yeah.
11        MR. GEORGE:  Can we go to the end of it,
12 Bill, please.  Hold it a little bit.
13 BY MR. GEORGE:
14    Q.   So do you see this e-mail, sir?
15        Go up a little bit more, Bill.
16    A.   Yes.
17    Q.   And the -- what Javier is doing there is
18 showing Nicholas what's in each line of the add,
19 right?  Do you see it has one is on the next page
20 back, do you see it has -- go ahead, Bill.
21        Do you see, attention investors is
22 Number 1?  So these are the lines that are the
23 lines from the script, right?
24    A.   Yes.
25        MR. GEORGE:  And go up, Bill.

1 BY MR. GEORGE:
2    Q.   And you see he's sending them a script
3 or an e-mail and saying, "Sending two
4 revised/approved; 60 second spots to all stations
5 all markets for replacement and 50/50 rotation.  On
6 30:  I need to eliminate one sentence with four or
7 more words at least, from the below copy.  Can we
8 eliminate?"
9        So he's asking Nick which one of those
10 line is Nick okay with removing; isn't he?
11    A.   Yes.
12    Q.   Okay.  You don't see one where he says,
13 well, we shouldn't take this out because this
14 wouldn't give the message that we're giving 12
15 percent return, you don't see any e-mails like
16 that, do you?
17    A.   Well, I see e-mails, for example --
18    Q.   Sir, answer the question.
19    A.   I tried.
20    Q.   No.  Did you see any e-mails where he
21 said that we don't want to eliminate this because
22 we won't be able to say there's 12 percent; did you
23 see him do that?
24    A.   Those exact words, no.
25        MR. GEORGE:  Okay.  Let's go to Number



1    3, Bill.
2    BY MR. GEORGE:
3        Q.   Can you see a Number 3, sir, do you see
4    here he says --
5            Bill, you getting it?
6            He says, "The 30 spot is still too
7    long.  Attached is also doc with time
8    measurements."
9            Do you see that?
10       A.   Yes.
11       Q.   So he's providing this to NRIA for their
12   approval, right?
13       A.   Yes.
14           MR. GEORGE:  Go down, Bill.
15   BY MR. GEORGE:
16       Q.   And then Nick says to him, hey, sorry
17   but we have to record the line in green on the
18   attached 60 seconds script.
19           So that's Nick writing to Javier and
20   saying this is a line I don't want to take out,
21   right?
22       A.   Yes.
23           MR. GEORGE:  Go to Number 4.  Bill,
24   again, can you go to the --
25   BY MR. GEORGE:

1        Q.   Did you ever see any scripts where
2    Mr. Torres was making the decision to either delete
3    or remove or edit that wasn't prompted by a request
4    from the advertiser?
5        A.   He made suggestions.  They approved it.
6        Q.   Did you see any evidence of Mr. Torres
7    trying to move any money, for example, out of the
8    country after the subpoenas were issued?
9        A.   We saw payments to family members.
10       Q.   Okay.  But did you ever see him try to
11   move money in bulk from himself to himself in
12   another country like Colombia?
13       A.   Not in another country.
14           MR. GEORGE:  Okay.  So, sir, can we go
15   now to Number 9.  I have to slide a little closer
16   because my eyes are so bad.
17           MR. SALDUTTI:  We can try to make it
18   bigger.
19           MR. GEORGE:  No, that's okay.
20   BY MR. GEORGE:
21       Q.   So, Mr. Waldie, can you tell me what
22   this document is?
23       A.   Yes.  This is what I was talking about
24   before, that based on a cash balance analysis.  Not
25   an insolvency analysis.  There's a difference.  And

1    it -- it appear -- based -- this -- this graph will
2    show the departure in or about November 2017.
3    Where if not for new investor contributions NRIA
4    would not be able to meet their current debt
5    obligations.  If you take into account investor
6    contributions not directly to them, but through
7    third parties like a title company, etcetera, that
8    date moves back to in or about the January of 2016
9    date.  That's what I was talking about before when
10   I say based on the cash, an inability to pay debts.
11   Not a full analysis of insolvency now.  It appears
12   based on this that they may have been insolvent as
13   early as 2016.
14       Q.   May have been.  So what's that solid
15   line in the middle?
16       A.   That's just a zero.  That's -- that's
17   zero cash balance in the banks so --
18       Q.   And did they start in 2016 with zero in
19   the banks?
20       A.   We started our timeline from '16
21   forward.
22       Q.   Did it have -- did they have zero in the
23   bank in 2016?
24       A.   Based --
25       Q.   That's what this shows, right?

1        A.   Well, it -- it's very close.  It's not
2    for, and I'm -- if I remember correctly on this
3    one, there was a couple of small like 85,000 or
4    100,000 round dollar transfers from US Construction
5    that came in at that time where they were under
6    water.  And there was a lot of money what moved
7    back and forth on verbal agreements and so-called
8    loans and so forth.  That's part of our ongoing
9    analysis, that if not for that deposit, they
10   would -- they would have been at zero on 1/16.
11       Q.   So they had other money that was in the
12   form of loans that they had made to US Construction
13   that wouldn't have been cash, that would have been
14   an asset is what you're saying, right?
15       A.   Well, it's purported loans.  There was a
16   lot of money back and forth for inexplicable
17   reasons.  There were alleged verbal agreements on
18   paying debts for them that there was no additional
19   proof for, to the tune of about 5 million dollars.
20   There was a lot of co-mingling and -- and fraud
21   going on.  We had to adjust, too, for true bank
22   balances because when we got subpoenas back from
23   one of the financial institutions we noticed that
24   the numbers didn't match what we got from the
25   debtors and it was a pretty good fake.  So we -- we



1  looked at the bank statements.  The bank statements
2  had been altered to increase their cash position,
3  which in effect made the financial statements
4  inflate cash value because the bank statements that
5  they had were fictitious.  They altered the
6  originals.
7      Q.  You're saying --
8      A.  It's not something that a company that's
9  strong on cash needs to do in order to borrow
10  money, or get money or sustain operations.
11      Q.  When did they start altering bank
12  statements?
13      A.  The first ones we found were in 2018.
14  We found them again in 2019.
15      Q.  Do you have any evidence or facts to
16  indicate that Mr. Torres was aware that the debtor
17  was fabricating or fraudulently creating financial
18  documents?
19      A.  On -- on that, no.
20      Q.  Okay.  So then let me just go back to
21  this line, sir.  And I'm sorry I'm going to get up
22  here a little bit.  But it shows -- is that number
23  in the middle a five or a zero between the
24  110 million above and the 110 million below?
25      A.  It's a zero.

1      Q.  That's a zero?
2      A.  Yeah.  The ax -- the axis runs at zero.
3  The black line would be including investor
4  contributions.  The red line would be the cash
5  position if they were removed.
6      Q.  And so you're making reference to M-9 --
7  M-17 as the date when the actual cash position
8  drops below the baseline?
9      A.  With direct contributions.
10      Q.  Okay.  And did --
11      A.  30 to 38 million in direct
12  contributions.
13      Q.  And --
14      A.  After that it goes back to 16.  And even
15  with this, it would still drop, if not for a couple
16  of those questionable transactions that I --
17      Q.  Now, are you aware that there was
18  discovery proffered to the Trustee and their
19  indication was that the debtor stopped paying its
20  bills when they came due in Nov -- in November in
21  2019?
22      A.  That they stopped paying their bills?
23      Q.  Yeah, that they stopped paying their
24  bills when they came due or were unable to pay
25  their bills when they came due in November of '19?

1      A.  I think that is they're unable to meet
2  current or short-term obligations without investor
3  funds, new investor funds.
4      Q.  In November of '19?
5      A.  Well, also in November of 2019, but
6  prior to that, too.
7      Q.  Okay.  And in determining what kind of
8  obligations they had to pay at this time, how did
9  you determine that?
10      A.  We -- I -- I told you.  We took the cash
11  position day over day for all bank accounts
12  combined.  This isn't just one account, or their
13  main account, or their operating account.  It's not
14  the 1872 main operating.  It's all accounts.
15  There's like 55 bank accounts at the time.  And we
16  peeled out the investor piece of that to see if
17  NRIA would be able to meet its obligations and
18  without it, they can't.
19      Q.  Okay.  What I'm asking is about -- I'm
20  not asking about the cash side.  I'm asking about
21  the obligation side.  What obligations did NRIA
22  have to pay at that period in November of '17?
23      A.  I don't know off the top of my head.
24      Q.  Well, did they have --
25      A.  The --

1      Q.  -- have mortgages?
2      A.  The -- the balance sheet test is
3  ongoing, if -- if that's where you're going as far
4  as trying to understand property values at a given
5  time, mortgages at a given time.  The historic --
6  the historical data -- data is not year over year.
7  That's what we're reconstructing now.  And the
8  financial statements that we got, even though there
9  was a compilation of they were not audited, are --
10  and some years were inaccurate for certain reasons
11  like false bank statements and so forth increasing
12  their cash position.  And -- and other items that
13  we're vetting now trying to untangle -- untangle
14  this fraudulent enterprise.
15      Q.  So sitting here today, you don't know
16  what the actual current obligations were in
17  November of '17?
18      A.  Correct.
19      Q.  And when the money came into the
20  debtor's accounts, was that the debtor's money?
21      A.  When it came in?
22      Q.  Yeah.
23      A.  Well, it was investors investing in that
24  money, but the money was being used for other
25  things.



1    Q.   Right.
2    A.   They looted the account.  They diverted
3 it for extravagant expenses buying cars, buying
4 houses, using what should have been an investment
5 in one project for another project.  There was a
6 pattern of failed real estate here where they were
7 purporting to be successful and selling at these
8 profits where most of the properties were at a
9 loss.  Meanwhile, they're offering these to be --
10 too good to be true guaranteed returns of 10 and
11 maybe even up to 24 percent throwing an enticement
12 to try and keep people in the fund.  So there would
13 be a make whole agreement.  There would be, you
14 know, a buyback agreement.  And then they put a --
15 put a kicker in so when the money rolled in there
16 was no true value with it.  They're rolling phantom
17 equity in doing whatever it took to keep people in
18 because they knew if they redeemed that, they --
19 their business could collapse.  It's -- it's --
20 it's seen all the time in a Ponzi scheme.  It's
21 just the way it works.
22    Q.   Okay.  And now I want you to try to
23 answer the question that I asked you because I
24 think it was a little bit different than that.
25         Can you read the question back,

1 Reporter?
2         COURT REPORTER:  Sure.  Let me find the
3 original question.
4         MR. GEORGE:  Oh, never mind.  I remember
5 it.
6         COURT REPORTER:  Okay.  Are you sure?
7         MR. GEORGE:  I've got it.  Yes.
8 BY MR. GEORGE:
9    Q.   Mr. Waldie, was there any kind of
10 documentation within the company that required the
11 debtor to separately segregate the money that was
12 being paid in by the investors?
13    A.   On some of the deals, yeah.
14    Q.   There were?
15    A.   Yeah.
16    Q.   And so when you did this chart, did you
17 -- how did you treat money that was segregated and
18 set aside and not part of the debtor's money?
19    A.   It was never set aside.  It was supposed
20 to be set aside, but it was co-mingled.
21    Q.   Oh, it was co-mingled.
22    A.   And used wherever they needed to use it.
23 They had entity accounts set up as flowthroughs
24 where all of the money that would go in for a
25 particular entity to all go back through this bank

1 into NRIA and they used it wherever they wanted.
2 Not necessarily in connection with the investment
3 that it was -- that it was told it was for.
4    Q.   What I'm really trying to -- what I'm
5 really trying to get at, sir, is that with respect
6 to the majority of the funds that came in from
7 investors, they weren't separately segregated, they
8 were co-mingled with the debtor's monies, right?
9    A.   Yup.
10    Q.   And those monies, those co-mingled
11 monies did allow that debtor to continue to pay its
12 -- its bills for a significant period of time,
13 right?
14    A.   Only with investor money.
15    Q.   Understood.
16         But there was nothing that required
17 them to separate that money and hold it out for the
18 investors, right?  It was the debtor's money once
19 it went into the debtor's bank account, right?
20    A.   Well, they purported to have, you know,
21 this big cash position and success and revenue
22 coming in, but they didn't.  They only had investor
23 money.  It wasn't a real -- it wasn't a legitimate
24 business.  And anybody looking at the offerings
25 would have known that.

1    Q.   Well, apparently 660 million dollars
2 worth of funds from thousands of people didn't
3 demonstrate that clearly, right?
4    A.   Well, they -- you know, they -- they got
5 enticed with all of the things that fraudsters do.
6 Nick Salzano is a career criminal.  It's not the
7 first time he's done this.
8    Q.   Well --
9    A.   If you're looking him up, you would have
10 seen it, if you've done any kind of diligence on
11 him.  People didn't do it.  You know, I'm not
12 faulting them for it.  They didn't do it.  You
13 know, what was it?  You know, they wanted to
14 believe what they heard, vendors that got involved
15 with him, was it willful blindness on their part or
16 their own greed to make money?  All that comes into
17 play.
18    Q.   Do you know whether your firm or you or
19 your team went through Glenn La Mattina's e-mails?
20    A.   I did not go through Glenn's e-mails.
21    Q.   Did anybody on your team?
22    A.   Only if you, know, because work e-mails
23 I don't know if we looked at his e-mails.  I -- I'd
24 be lying to you if I said I know that was one.  We
25 -- we -- we've got millions of documents in there



1  and we do do e-mail searches and go through, do key
2  word searches.  His name would have come up in
3  certain things where it popped on something, but I
4  don't know if we specifically did e-mail review
5  targeting him.
6      Q.    Well, he was the chief operating
7  officer, right?
8      A.    At one point, yeah.
9      Q.    Okay.  And you're telling me the chief
10  operating officer of a Ponzi scheme, nobody from
11  your firm, Alvarez, sat down and looked at his
12  e-mails?
13      A.    Well, we're -- we're -- we're trying to
14  spend investor's money wisely where we think we'll
15  get a return for the buck.  Right.
16      Q.    Is that why there's four lawyers --
17      A.    There's not --
18      Q.    -- at every deposition?
19      A.    What?
20      Q.    Is that why there's four lawyers at
21  every deposition, you're trying to save investors
22  money?
23      A.    I'm looking at we're -- we're not
24  prosecuting a criminal case here.  That's the FBI.
25  What we're looking at are causes of action.  We did

1  do like asset tracing and things like that in
2  looking at various targets across the board.
3      Q.    But, sir, what I'm asking you, because
4  Mr. La Mattina provided a declaration that was
5  patently false in this case and what I'm asking is,
6  what investigation did Alvarez do to try to
7  determine what kind of facts Mr. La Mattina was
8  actually in possession of before that declaration
9  was drafted?
10      A.    Mr. La Mattina was interviewed and told
11  us the answers to his questions.  What he did in
12  his deposition was as surprising to us as it was to
13  you.
14      Q.    And what I'm asking you is, you know
15  that this is a Ponzi scheme at this time, sir, in
16  January, right?
17      A.    Yep.
18      Q.    You know that he's the chief operating
19  officer of that Ponzi scheme, right?
20      A.    Yup.
21      Q.    And you sat down in a meeting and he
22  blindly says, well, that sounds right and you guys
23  put it in a declaration, didn't you?
24      MS. LASLEY:  Object to form.
25  Mischaracterizes what happened.

1      MR. GEORGE:  That's fine.
2      THE WITNESS:  I didn't put --
3  BY MR. GEORGE:
4      Q.    Didn't you?
5      A.    I didn't put anything in the
6  declaration.
7      Q.    Well, your team, the Trustee's team?
8      MS. LASLEY:  Objection.  Again, object
9  to form.
10  BY MR. GEORGE:
11      Q.    And if you would have reviewed those
12  e-mails, maybe you would have seen that what he was
13  telling you wasn't the truth, right?
14      MS. LASLEY:  Again, object to form.
15      MR. GEORGE:  That's fine.
16      THE WITNESS:  Not necessarily.
17  BY MR. GEORGE:
18      Q.    Well, not -- but you don't know because
19  you didn't look, did you?
20      MS. LASLEY:  Again, mischaracterizes his
21  testimony.
22      MR. GEORGE:  Come on.
23      THE WITNESS:  We had -- we had no reason
24  to look.
25  BY MR. GEORGE:

1      Q.    You had no reason to look.  The guy is
2  running a Ponzi scheme --
3      A.    No, he's --
4      Q.    -- and he's lying to you left and right
5  about what he did and you had no reason to look in
6  his e-mails to confirm whether factually what he
7  was saying was right --
8      A.    Well, we looked at --
9      Q.    -- that's your position, sir, as an FBI
10  agent?
11      A.    We looked at his documents regarding the
12  campaign contributions he said he made, which he
13  did.  We looked at the leads that they were paying
14  for and disguising commissions, which was true.  We
15  looked at other things that panned out as well.
16  Did we look at every single thing?  Again, we did
17  inter -- we interviewed him.  He gave a
18  declaration.  His declaration was edited by him and
19  submitted and sworn by him.  We don't tell people
20  what to say or what to do.  I've never done that in
21  my career.  Good, bad and indifferent, the evidence
22  is what the evidence is.
23      Q.    You said he was making contributions?
24      A.    Correct.  He was one of several.
25      Q.    And who was he making those

MAGNA
LEGAL SERVICES

1 contributions to, politicians?
2     A.   Politicians in Florida.
3     Q.   And he was doing it on behalf of Nick?
4     A.   Doing it on behalf of NRIA and getting
5 reimbursed in cash.
6     Q.   Well, he was doing it on behalf of Nick
7 and NRIA, right?
8     A.   Yes.
9     Q.   Were those payments to those politicians
10 illegal?
11     A.   I don't know.
12     Q.   Well, what were they for?
13     A.   I don't know.
14     Q.   Did anybody at the Trustee's office try
15 to sue those politicians to recover those
16 contributions?
17     MS. LASLEY: Objection. Work product.
18 Instruct you not to answer.
19 BY MR. GEORGE:
20     Q.   Are you aware of the filing of any
21 lawsuit against those politicians to recover those
22 monies?
23     A.   We have a lot of things going on right
24 now, so as far as what we're doing, who we're
25 targeting or how it's going, I'm not going to

1 discuss, you know, what our -- what our ongoing
2 process is.
3     Q.   I didn't ask what the ongoing process
4 was. I asked if you were aware of a pending
5 lawsuit against those criminals that took money
6 from these investors disguised as contributions?
7     A.   How do you know they're criminals?
8     Q.   You don't think someone who takes an
9 illegal campaign contribution is a criminal?
10     A.   How do you know it was in their eyes an
11 illegal campaign contribution?
12     Q.   Oh, in their eyes. So it matters in
13 their eyes, right?
14     A.   Well, if it was a contribution coming
15 from a company. I have no evidence to show that
16 the politician knew that the people giving -- or
17 individual that they were getting reimbursed.
18     Q.   Were they cash --
19     A.   And the NRIA knew that and they knew it
20 was illegal, but I don't know if the politician
21 knew that at this juncture.
22     Q.   Were they cash?
23     A.   They were checks and then reimbursed in
24 cash.
25     Q.   What does that mean?

1     A.   Glenn La Mattina wrote a check for a
2 thousand dollars, donated to the campaign --
3     Q.   His own check?
4     MS. LASLEY: Would you let him answer?
5     THE WITNESS: There's campaign
6 contribution limits, if you -- if you understand
7 how --
8 BY MR. GEORGE:
9     Q.   I know how it works.
10     A.   -- the way the corruption works. Right.
11 So there's limits depending on where it is. It
12 could be a limit per individual. So to circumvent
13 the limits NRIA had employees write checks. So
14 individual checks were given to the politician.
15 They were told, the people writing the check, like
16 Glenn and others, that they would be reimbursed in
17 cash. They knew what they were --
18     Q.   Sir --
19     A.   -- doing was wrong. I don't have
20 evidence to know what the conversations were with
21 that politician to know that it wasn't an
22 individual con -- contribution.
23     Q.   Well, when you -- when you were talking
24 to Glenn La Mattina, did you come to any conclusion
25 about whether he knew it was wrong?

1     MS. LASLEY: Objection. Instruct you --
2 objection. Work product. Instruct you not to
3 answer.
4     MR. GEORGE: That's not work product to
5 get --
6     MS. LASLEY: It is.
7     MR. GEORGE: -- his assessment. No,
8 it's not.
9     MS. LASLEY: You are getting into the
10 facts regarding an investigation into another
11 target of this litigation involved in the overall
12 broad litigation. That is our work product. You
13 cannot get into that. I will not allow him to
14 testify about that.
15     MR. GEORGE: Okay. That's fine.
16 BY MR. GEORGE:
17     Q.   Do you know of any facts that you can
18 reveal to us today, other than what you've
19 discovered in your investigation, to indicate that
20 Mr. La Mattina did not know that those were illegal
21 contributions?
22     MS. LASLEY: Same objection. Same
23 instruction.
24 BY MR. GEORGE:
25     Q.   You are willing to say that you

MAGNA
LEGAL SERVICES

1  understand that the debtor was trying to circumvent
2  the campaign contribution rules by using employees,
3  that you've stated, right?
4      A.   That's by assumption.
5      Q.   And Mr. La Mattina was one of those
6  employees, right?
7      A.   Yes.
8      Q.   And he was the COO of the largest Ponzi
9  scheme ever to hit New Jersey, right?
10     A.   He was the COO.
11     Q.   Of the largest Ponzi scheme that ever
12  hit the State of New Jersey, right?
13     A.   Is it?
14     Q.   You stated that in your papers, that was
15  over 660 million.  Do you know of a bigger one?
16     A.   I don't off the top of my head, but I --
17  I don't know that it's the biggest one.
18     Q.   Let's go to Number 13.  Have you ever
19  seen this e-mail before?
20     A.   No.
21     Q.   Never?
22     A.   Maybe.  I've looked at so many e-mails.
23  It's not -- it's not jumping out at me.
24     Q.   Have you ever seen this, sir?
25     A.   I don't recall seeing it, but I see it

1  now.
2      Q.   Well, do you see here that Javier is
3  writing the company and saying that he's beating
4  Tanvi's rate by 50 percent?
5      A.   I see Javier is writing --
6      Q.   By 100 percent?
7      A.   I see Javier is writing that.
8      Q.   Were you aware that there were other
9  vendors who were charging more than Javier for the
10  ad time that he was selling?
11     A.   As -- as far as this particular one?
12     Q.   Yeah.  Anywhere?
13     A.   I -- I see Javier is claiming he's half
14  of this rate on this particular one.  Outside of
15  that, that's all I see.
16     Q.   Well, do you have any reason to believe
17  that he didn't present that, book it and deliver
18  it, do you have any reason to -- to think that that
19  didn't happen?
20     A.   I've seen other things where he was
21  misleading and lied to NRIA.
22     Q.   I didn't ask you that.
23     A.   I can't say that --
24     Q.   Sir, that's not what I asked.
25     A.   You want me to make an assumption now

1  I'm not prepared to make based on the track record
2  I've seen with him.
3      Q.   I'm saying, have you seen anything to
4  indicate that that wasn't booked?  That's all I'm
5  asking you.
6      A.   I see it was his claim.  That's it.
7      Q.   That was it.  So you haven't seen
8  anything to indicate that it wasn't booked?
9      A.   I don't -- I have no idea if it was or
10  wasn't booked.
11     Q.   I asked you, you haven't seen anything?
12  That doesn't mean whether it was or wasn't.  I'm
13  asking whether you've seen anything?
14     A.   Not that I recall.
15         MS. LASLEY:  Answered.
16  BY MR. GEORGE:
17     Q.   Do you know Katey Kana?
18     A.   Yup.  Well, yes.
19     Q.   How do you know her?
20     A.   I interviewed her.
21     Q.   What was her position at NRIA?
22     A.   I forget her exact title, but she was
23  brought as in-house advertising.
24     Q.   Was she the director of media?
25     A.   Possibly, yeah.

1      Q.   Do you know whether she was responsible
2  for filming the commercials?
3          MS. LASLEY:  Object to form.
4  BY MR. GEORGE:
5      Q.   The advertisements, do you know --
6      A.   I know she was doing internal
7  advertising for -- for them.
8      Q.   Do you know whether she was helping to
9  write the scripts?
10     A.   She was.
11     Q.   She was?
12     A.   She -- yeah.
13     Q.   Has the Trustee sued her for aiding and
14  abetting in the securities fraud for helping write
15  those scripts, to your knowledge?
16     A.   To date, I don't know that that's
17  happened.
18     Q.   Do you have any evidence that Dora
19  Dillman was involved in any way in NRIA business --
20  or in Media Effective business?
21     A.   Other than being Javier's wife, maybe
22  dropping off or picking up checks, no.
23     Q.   Did you ever see any competitive bid
24  analysis that may have been performed by Katey
25  Kana?

1     A.   No.
2     Q.   Did she ever tell you that she was
3  performing competitive bid analyses?
4     A.   Not that I recall.
5     Q.   Do you know what happened to all of the
6  real estate that was owned by NRIA?
7     A.   Their -- the debtor is currently in the
8  process of trying to sell it.
9     Q.   You mean the debtor or the Trustee?
10    A.   The Trust.  The trust.  There's a
11 360 million dollar hole that needs to be filled.
12    Q.   And has Alvarez done any calculations of
13 what the value of the real estate is?
14    A.   Estimated right now average is probably
15 going to be about 160 million.  So --
16    Q.   160 million?
17    A.   Yeah.  So you have about 520 million in
18 claims.  They think they're going to get in maybe
19 between 130 and --
20    Q.   Can -- sir, I can't hear you.  Can you
21 keep your voice up a little bit?
22    A.   Yes.
23    Q.   I'm sorry.  I -- I just couldn't hear
24 you there, that last.
25    A.   Yeah.

1     Q.   I don't know if the reporter heard or
2  not.
3     A.   These are -- these are approximates.
4  There's about 120 -- there's about 520 million
5  dollars in claims, investor claims.  There's --
6  estimated there's a range, but if you take the
7  average, estimated about 160 million dollars in
8  projected real estate sales over time.  And it
9  leaves about a 360 million dollar hold that the
10 investors would still be out.
11    Q.   Do you know how much Alvarez has charged
12 so far in this case?
13    A.   Probably about 8 million.
14    Q.   8 million dollars, and has it been paid
15 that money?
16    A.   It's been paid, except for whatever the
17 most current invoice is.
18    Q.   Is Alvarez being paid monthly?
19    A.   Yes.
20    Q.   And how many Alvarez employees are on
21 this engagement?
22    A.   Less than you would think.  I don't
23 know.
24    Q.   Nothing would surprise me.
25    A.   I'm talking my team.  There's -- there's

1  three different groups, right.  There's a real
2  estate team.  There's a restructuring team.  I
3  don't know how many are on from those teams.  And
4  then there's the disputes and investigations team
5  which has maybe six or eight people.
6     Q.   Okay.
7     A.   So the -- the fee apps are public.  You
8  can see how many people are on them.  They're
9  approved by the Court.  We had a fee examiner.  So
10 --
11    Q.   Right.
12    A.   -- you can go to the docket and -- and
13 get all these answers.
14    Q.   About 20 employees of Alvarez working on
15 this file?
16    A.   Well, you're talking at certain times.
17 There's less restructuring in real estate now, so
18 probably, no.  And you know, so it depends on the
19 point in time how many we have, what's going on,
20 how busy things are, what's -- what's on the front
21 burner.
22    Q.   Do you have any facts that you
23 discovered that would establish that Javier was
24 part of the inner circle at NRIA?
25    A.   Only employees saying they were close.

1  Outside of that, I don't say he was part of the
2  inner circle.
3     Q.   That he was close with who, Nick?
4     A.   Nick.
5     Q.   Was Glenn La Mattina close with Nick?
6     A.   Not particularly.
7     Q.   Do you know if Glenn La Mattina had any
8  kind of meretricious relationship with Tanvi
9  Chandra?
10         MS. LASLEY:  Objection.
11         THE WITNESS:  I -- I found out recently.
12 BY MR. GEORGE:
13    Q.   What did you find out?
14    A.   Yesterday.  The day before, I mean.
15    Q.   Were they in a physical relationship?
16    A.   That's what I'm told.
17    Q.   Which might be the reason why
18 Mr. La Mattina wants to bang on Mr. Torres, right,
19 because his girlfriend got business taken from her,
20 right?
21         MS. LASLEY:  Objection.  Calls for
22 speculation.
23 BY MR. GEORGE:
24    Q.   Well, you're an FBI agent, sir.  You
25 know about motivations, right, you know what an MO

MAGNA ▶
LEGAL SERVICES

1 is, right?
2     A.    Mr. Torres was on our radar long
3 before N --
4     Q.    That's not what I asked you, sir.
5 That's not what I asked you.
6         MS. LASLEY:  You need to let him answer
7 the question.
8         MR. GEORGE:  He wasn't answering it.
9         MS. LASLEY:  You didn't --
10         MR. GEORGE:  Answer the question I
11 asked.
12         MS. LASLEY:  You may not like the
13 answer, but he gets to answer it.  There's a
14 process by which you ask the question, he answers
15 it, then you can follow-up.
16         MR. GEORGE:  He has to be responsive.
17         MS. LASLEY:  That's the way --
18         MR. GEORGE:  He's not supposed to
19 narrate and he's not supposed to editorialize.
20 He's supposed to answer the question.  And I'm not
21 going to let him use my record to spout stuff that
22 he says that has no support, factually or
23 otherwise.  So he can answer the question or not,
24 but he can't sit there and spout off what he wants
25 to get on the record because he thinks it's helpful

1 to the Trustee's case.
2         THE WITNESS:  Can you ask the question
3 again?
4 BY MR. GEORGE:
5     Q.    Mr. La Mattina is sleeping with Tanvi
6 Chandra, right?
7         MS. LASLEY:  Presently?
8 BY MR. GEORGE:
9     Q.    You know that as a fact, don't you?
10     A.    I know that secondhand that at one point
11 they had an affair.
12     Q.    How did you learn that?
13     A.    Counsel.
14     Q.    This is the game this trustee is
15 playing.
16     A.    It's not a game.  It's the truth.
17     Q.    You're not suggesting that no part of
18 the money that Mr. Torres earned or Media Effective
19 earned in providing these advertises -- advertising
20 can be retained by Mr. Torres, right, or Media
21 Effective, are you?
22         MS. LASLEY:  Objection.  Outside the
23 scope.
24         THE WITNESS:  Okay.  I'm sorry.  Can you
25 repeat that, please?

1 BY MR. GEORGE:
2     Q.    Yes.  If the -- if the margin was
3 supposed to be 15 percent and he charged 25 or 30,
4 are you saying he shouldn't even get the 15
5 percent?
6     A.    I'm saying that the money he was paid
7 wasn't commensurate with the services he purported
8 to provide.
9     Q.    Okay.  And how much more do you think
10 Mr. Torres got than he should have gotten?
11     A.    Well, the work that he claims he does on
12 his website and the work he said he was doing for
13 NRIA, he was not.  The research being done is to
14 what has to go on what ads and so forth was done by
15 NRIA, so what I see -- based on what I've seen to
16 date is he was a middleman, communication that an
17 employee of NRIA making 100 or 200 grand a year
18 could have done.  So if you take the fact --
19     Q.    What's he talking about?
20     A.    -- that everything he made over that per
21 year was probably an --
22     Q.    He was an employee.
23     A.    He wasn't.  I'm saying an employee could
24 have done what he did for --
25     Q.    Oh, I see.

1     A.    -- 100,000 a year versus paying him
2 millions of dollars.
3     Q.    So if -- if Nick Salzano wanted to hire
4 Michael Vagnoni, for example, my partner, he could
5 go in and do what Javier Torres was doing?
6     A.    Make a phone call to Hybrid Media,
7 probably.
8     Q.    Oh, that's how easy you think it is?
9 That's how easy you think it is, just pick up the
10 phone and call?  Nothing else has to be done?
11     A.    Not much.
12     Q.    Okay.  Well, that's how we feel about a
13 lot of people.
14         Can we take maybe a seven or
15 eight-minute break?  I'm getting close to the end
16 of the -- the examination, but I need to talk to
17 Michael and -- and Bill for a couple of minutes, so
18 --
19         MS. LASLEY:  Sure.
20         MR. GEORGE:  So seven or eight minutes
21 and I'll be right back.
22         THE WITNESS:  Okay.
23         THE VIDEOGRAPHER:  Going off record.
24 This marks the end of media Number 1.  The time is
25 12:04 p.m.

MAGNA
LEGAL SERVICES

1    (Whereupon, a short break was taken.)
2         THE VIDEOGRAPHER:  We are back on
3    record.  This marks the beginning of Media Number
4    2.  The time is 12:14 p.m.
5         Counsel, proceed.
6    BY MR. GEORGE:
7    Q.    Thank you.
8         Sir, can we go to Number 6, document
9    Number 6?  Is that a document that you created,
10   sir?
11   A.    My team created it.  I reviewed it.
12   Q.    Okay.  I want to focus you on 2022, if
13   you can.  See where that is?
14   A.    Yes.
15   Q.    How much did NRIA pay to Media Effective
16   in 2022?
17   A.    121 million.
18   Q.    I'm sorry?
19   A.    1.125 million.
20   Q.    And how much did the advertising in 2022
21   cost?
22   A.    3.5.
23   Q.    And, therefore, neither ME or Javier got
24   a commission on that 2.385, right, because it
25   wasn't paid?

1    A.    It was -- everything was paid.  That was
2    -- that's just the timing.
3    Q.    Well, he had a loss then of 2,385,599.
4    Doesn't that mean that NRIA got 3 million dollars
5    worth of advertising time and only paid a million,
6    one for it?
7    A.    We haven't seen any unpaid invoices that
8    Mr. Torres has.
9    Q.    Well, that's not what I asked you.  I
10   asked you --
11   A.    This -- this is a timing difference.  I
12   can't say that it was money that was not paid.
13   This is a carryover.  And if you look at all the
14   invoices he submitted, he was paid for all them.
15   Where it lines up on a date if it rolls over based
16   on timing, that's not material.
17   Q.    Not material?
18   A.    It's -- you're looking at the total paid
19   across.  He was paid all of his money.  And this is
20   an accounting of all of it.
21   Q.    And so you don't think that reflects a
22   benefit of 2.3 million dollars to NRIA?
23   A.    No, because there's no accounts
24   receivable.  Oh, on -- if he kept books, Mr.
25   Torres' books.

1    Q.    Was Alvarez the financial advisor for
2    the committee as well?
3    A.    Yes.
4    Q.    And the 8 million dollars that you
5    mentioned that Alvarez has been paid, does that
6    include the time as committee financial advisors?
7    A.    Yes.  And it's an approximate.  It's --
8    you know, it's around the 8 million number.  So to
9    my recollection, I don't refute the latest
10   invoices in a while so -- but, yeah, that's since,
11   I believe, July of 2022.
12   Q.    Are you aware that Mr. La Mattina
13   testified that he had no relationship with Tanvi
14   Chandra in his deposition?
15        MS. LASLEY:  Objection to form.
16        THE WITNESS:  No.  I was not present at
17   his deposition.
18   BY MR. GEORGE:
19   Q.    If he were to have testified that he had
20   no personal relationship with Tanvi Chandra, based
21   on what you know today, would that be true or
22   false?
23        MS. LASLEY:  Object to form.  Relevance.
24        You can answer.
25        THE WITNESS:  If -- if he -- if he said

1    that, that would be false based on what I was told
2    by Counsel.
3         MR. GEORGE:  Okay.  I don't have
4    anything further.  Thank you, sir, for cooperating.
5    I appreciate it.
6         THE WITNESS:  Thank you.
7         THE VIDEOGRAPHER:  Anybody else have
8    anything?
9         MS. LASLEY:  Nothing from me.
10        MR. GEORGE:  Thank you.
11        THE VIDEOGRAPHER:  We're going off
12   record.  Time is 12:18 p.m.  This marks the end of
13   Media Number 2 and -- the time is 12:19.  This
14   marks the end of Media Number 2 and concludes
15   today's deposition.
16        COURT REPORTER:  Ms. Lasley, do you need
17   a transcript?
18        MS. LASLEY:  Yes.  And we'd like to get
19   a rough of this and then expedite the final.
20        COURT REPORTER:  Okay.  When would you
21   like it?
22        MS. LASLEY:  Can you get us the final
23   by --
24        MR. GEORGE:  Monday?
25        MS. LASLEY:  Can you get us the final by

1  the end of the day Monday?
2      COURT REPORTER:  Yes, and I'll get you
3  the rough over the weekend.
4      MS. LASLEY:  Thank you.
5      MR. GEORGE:  Thanks, everybody.
6       And we want it on the same timing.
7      COURT REPORTER:  You want the same, as
8  well?
9      MR. GEORGE:  Yes, that's fine.
10  Jennifer.  Thank you.
11           - - -
12      (Whereupon, the witness was excused.)
13           - - -
14      (Whereupon, the deposition concluded at
15  approximately 12:18 p.m.)
16           - - -
17
18
19
20
21
22
23
24
25

1           CERTIFICATE
2
3      I, JENNIFER MAUTE, a Notary Public and
4  Certified Shorthand Reporter of the State of New
5  Jersey, do hereby certify that prior to the
6  commencement of the examination, WILLIAM WALDIE was
7  duly sworn by me remotely to testify to the truth,
8  the whole truth and nothing but the truth.
9      I DO FURTHER CERTIFY that the foregoing
10  is a verbatim transcript of the testimony as taken
11  stenographically by and before me at the time,
12  place and on the date hereinbefore set forth, to
13  the best of my ability.
14      I DO FURTHER CERTIFY that I am neither a
15  relative nor employee nor attorney nor counsel of
16  any of the parties to this action, and that I am
17  neither a relative nor employee of such attorney or
18  counsel, and that I am not financially interested
19  in the action.
20  _____
21  JENNIFER MAUTE, CCR
    License No. 30X100227400
22  Notary Public, State of New Jersey
    My Commission Expires:  February 19, 2025
23  Date:  March 30, 2024
24
25

1    LAWYER'S NOTES
    PAGE  LINE
2   ____  ____
3   ____  ____
4   ____  ____
5   ____  ____
6   ____  ____
7   ____  ____
8   ____  ____
9   ____  ____
10  ____  ____
11  ____  ____
12  ____  ____
13  ____  ____
14  ____  ____
15  ____  ____
16  ____  ____
17  ____  ____
18  ____  ____
19  ____  ____
20  ____  ____
21  ____  ____
22  ____  ____
23  ____  ____
24  ____  ____
25

**MAGNA**
LEGAL SERVICES

## A

**abet**
45:21 46:24 47:17
**abetted**
47:23
**abetting**
48:23 49:10 93:14
**ability**
11:9 107:13
**able**
18:3,15,17 39:18
69:22 72:4 76:17
**above-captioned**
2:3
**absent**
13:3
**account**
17:20 20:6 45:13
72:5 76:12,13,13
78:2 80:19
**accounting**
103:20
**accounts**
4:20 16:18 17:12
76:11,14,15 77:20
79:23 103:23
**accurately**
11:11
**action**
82:25 107:16,19
**actions**
47:14
**Activity**
4:16,18
**actual**
22:19 40:24 44:20
50:9 75:7 77:16
**actuality**
46:7
**ad**
33:22 67:7 91:10
**add**
68:18
**additional**
73:18

**address**
56:1
**adjust**
73:21
**admission**
46:19
**admitted**
49:25
**ads**
38:8,19,25 40:22
43:2 45:21 50:8,9
64:6 100:14
**ADV**
1:2
**adversary**
56:24
**advertised**
37:17
**advertisement**
42:3 66:19
**advertisements**
50:1,4 93:5
**advertiser**
67:5,7 71:4
**advertisers**
44:21 46:5 49:25
**advertises**
99:19
**advertising**
22:5 23:4 33:17 34:1
34:4,7,10,13,14,17
34:21 37:5,6 39:19
44:10,14 45:5,15
49:22 50:3,5 52:10
52:22 53:25 54:20
55:1 57:11 58:19
59:1,9 63:24 66:3
92:23 93:7 99:19
102:20 103:5
**advertisings**
37:14
**advised**
66:6
**advisor**
104:1
**advisors**

1:4 104:6
**affair**
99:11
**affect**
11:9 53:20
**affirmatively**
10:23
**Afghanistan**
33:9,10,15
**afloat**
19:15
**agency**
33:18,22 34:2 37:18
38:14
**agent**
32:11 33:2,3 40:5
48:11,20 61:13
85:10 97:24
**ago**
15:6 26:22 61:19
**agree**
19:7 44:9 45:12
52:18 60:20
**agreed**
13:4
**agreement**
12:25 13:9 21:2 24:7
44:3 78:13,14
**agreements**
73:7,17
**ahead**
13:1 14:22 22:13,25
44:25 46:2 68:20
**ahold**
55:9
**aid**
45:21 46:24 47:17
**aided**
47:22
**aiding**
48:22 49:10 93:13
**airline**
53:12
**AIRN**
1:6,7 7:5,21 9:15
**al**

1:4,9 7:5
**alleged**
73:17
**allow**
80:11 89:13
**altered**
74:2,5
**altering**
74:11
**Alvarez**
21:15 82:11 83:6
94:12 95:11,18,20
96:14 104:1,5
**Alvarez's**
20:21
**Al-Qaeda**
33:12
**amended**
66:20
**amounts**
41:21
**analyses**
57:9 94:3
**analysis**
14:19,24 15:8,11,15
15:18,22,25 16:10
17:3,10 19:23,25
20:6,16,21,24 39:15
54:18 71:24,25
72:11 73:9 93:24
**analyzed**
13:7
**Aneca**
3:3 7:19 8:23 13:10
20:11 32:22
**Aneca.lasley@ice...**
3:5
**answer**
6:5 10:13,19,22,24
11:10 16:15 18:24
19:9,12,13 25:13
28:3,22 31:16 36:25
38:17 43:9 47:4
49:9 57:22,22 60:14
62:4,12,17 63:3
64:16 69:18 78:23



86:18 88:4 89:3
98:6,10,13,13,20,23
104:24
**answered**
25:21 92:15
**answering**
18:7,13 64:13 98:8
**answers**
10:16 23:7 83:11
96:13 98:14
**anybody**
9:19 47:16 49:14,17
59:23 60:5,24 62:1
65:3,6 80:24 81:21
86:14 105:7
**apartment**
66:9,22
**apparently**
81:1
**appear**
72:1
**appearances**
3:1 7:15
**appeared**
30:19,22
**appears**
30:18 66:16 72:11
**appreciate**
105:5
**approval**
70:12
**approved**
67:20 71:5 96:9
**approximate**
104:7
**approximately**
44:11 106:15
**approximates**
95:3
**apps**
96:7
**areas**
61:25 63:1
**Argumentative**
40:14
**arm's**

54:25
**arrangement**
54:22 59:2
**Arras**
3:3 7:21
**articles**
37:4
**artil**
33:13
**aside**
79:18,19,20
**asked**
13:3 16:16 23:6,10
29:1 32:18 36:13
37:21,22 38:18
51:10 57:21,22
61:10 62:11 63:9,10
64:16 78:23 87:4
91:24 92:11 98:4,5
98:11 103:9,10
**asking**
27:11 32:7 40:4,4,7
48:10,19 49:2 50:21
50:23 54:8,18 59:8
61:21 62:25 63:15
63:16 69:9 76:19,20
76:20 83:3,5,14
92:5,13
**assessment**
34:22 89:7
**asset**
73:14 83:1
**assets**
19:24
**associate**
8:12
**assume**
10:14 36:6 67:21
**assumption**
90:4 91:25
**attached**
42:20 70:7,18
**attention**
68:21
**attorney**
107:15,17

**attract**
46:5
**audited**
77:9
**auditor**
35:7
**available**
53:10
**average**
50:11,21 94:14 95:7
**aware**
24:7 27:22,24 39:17
41:7 63:6,11,12,15
63:16,17,25 64:1,24
65:2,7,9 74:16
75:17 86:20 87:4
91:8 104:12
**ax**
75:2
**axis**
75:2
**a.m**
2:8 7:8 9:4,8 65:16
65:19

_____
| **B** |
_____
**B**
4:8 7:4
**back**
9:7 15:21 17:22
18:12 27:8 28:16
30:14 32:12,12 36:4
42:9 58:10 63:7
64:16 65:18 68:20
72:8 73:7,16,22
74:20 75:14 78:25
79:25,25 101:21
102:2
**bad**
71:16 85:21
**balance**
4:21 14:19,24,25
15:2,22,24 17:10
20:5 71:24 72:17
77:2
**balances**

14:23 17:12 73:22
**bang**
97:18
**bank**
16:18 17:1 21:23
72:23 73:21 74:1,1
74:4,11 76:11,15
77:11 80:19
**bankruptcy**
1:1 58:21
**banks**
72:17,19
**bar**
17:22
**Barry**
25:25 26:2,20,21
27:14,17,23 28:10
28:12 29:20,25 55:9
55:18 61:2
**base**
23:25
**based**
17:14 34:24 46:10,15
46:18 47:6,13 59:2
59:12 71:24 72:1,10
72:12,24 92:1
100:15 103:15
104:20 105:1
**baseline**
75:8
**basis**
24:9
**basketball**
53:7
**beat**
39:18,25
**beating**
91:3
**beginning**
102:3
**begins**
7:3
**behalf**
7:21 86:3,4,6
**belief**
40:5



**believe**
26:14 30:3 40:3 41:8
59:18 60:7,17 68:2
81:14 91:16 104:11
**benefit**
103:22
**best**
107:13
**beyond**
49:3
**biases**
40:12
**bid**
57:9,15,20,23 58:1,4
58:5 93:23 94:3
**bids**
30:13,14 57:11
**big**
80:21
**bigger**
71:18 90:15
**biggest**
90:17
**bill**
4:15 25:18,22,23
35:15 36:21 37:25
38:4,22 42:14 49:19
63:22 68:5,12,15,20
68:25 70:1,5,14,23
101:17
**billed**
22:6
**billings**
39:16
**bills**
37:9,15,23 41:1,25
63:7,20,23,25 64:4
64:24 65:1,4,8
75:20,22,24,25
80:12
**bit**
68:12,15 74:22 78:24
94:21
**black**
75:3
**blindly**

83:22
**blindness**
81:15
**block**
53:16
**blurt**
10:24
**board**
55:7 83:2
**Bolly**
38:13
**book**
91:17
**booked**
92:4,8,10
**books**
103:24,25
**borrow**
74:9
**bottom**
37:18
**bought**
34:4,7,9 35:20,21
36:7,12 53:17
**box**
24:22
**boxes**
38:10
**break**
33:14 42:24 65:12,17
101:15 102:1
**brief**
65:12
**bring**
19:15
**broad**
89:12
**broke**
37:19
**broken**
45:2 51:13
**brought**
9:15 92:23
**buck**
82:15
**budget**

44:18
**building**
66:9,22
**bulk**
71:11
**Bunion**
12:1
**bureau**
26:6,7
**burner**
96:21
**business**
35:2,2,6 78:19 80:24
93:19,20 97:19
**businesses**
55:6
**busy**
96:20
**buy**
35:23 52:20 53:16
**buyback**
78:14
**buying**
78:3,3
**buys**
35:19

---

**C**

---

**cable**
49:18,19
**calculations**
94:12
**call**
26:22 27:4,9 55:13
101:6,10
**called**
2:3
**Calls**
45:23 47:1,25 97:21
**campaign**
4:24,25 38:13 43:1
85:12 87:9,11 88:2
88:5 90:2
**campaigns**
45:6
**capacity**

1:6
**capture**
33:13
**captured**
33:13
**card**
51:22,24,25 52:5,8
**cards**
52:7,11,14,18,22
**care**
61:21
**career**
81:6 85:21
**carryover**
103:13
**cars**
78:3
**case**
10:7 34:23 41:8
48:21 54:17 62:24
64:2 82:24 83:5
95:12 99:1
**cases**
48:18
**cash**
4:21 14:19,23,24
15:22 17:10,10,23
19:24 71:24 72:10
72:17 73:13 74:2,4
74:9 75:4,7 76:10
76:20 77:12 80:21
86:5 87:18,22,24
88:17
**category**
13:23
**causes**
82:25
**CCR**
1:17 107:21
**cell**
55:11,13
**certain**
56:19 77:10 82:3
96:16
**CERTIFICATE**
107:1



**Certified**
2:6 107:4
**certify**
107:5,9,14
**Chandra**
39:12 97:9 99:6
104:14,20
**Chandra's**
39:16
**changes**
24:24 66:24
**charge**
44:6,7 50:13,22 51:2
51:2,5 52:20,23
**charged**
23:2,14 29:2 37:1
38:13 39:5 52:14
53:24 54:4,7,12,15
54:19 95:11 100:3
**charges**
35:17 53:23
**charging**
22:4,15 23:6,12
27:18 28:11 36:10
50:18 51:3,4,9,12
51:16 91:9
**chart**
79:16
**charts**
13:5
**check**
41:10 44:16 88:1,3
88:15
**checked**
32:13
**checks**
59:10,14 87:23 88:13
88:14 93:22
**chief**
26:6 82:6,9 83:18
**chose**
66:12
**Christina**
12:2
**circle**
96:24 97:2

**circumvent**
88:12 90:1
**claim**
92:6
**claimed**
16:12 22:16
**claiming**
91:13
**claims**
23:5 94:18 95:5,5
100:11
**clear**
12:25
**clearer**
20:18
**clearly**
32:14 81:3
**client**
64:2,3,22
**clients**
9:16 20:17
**close**
73:1 96:25 97:3,5
101:15
**closer**
53:13 71:15
**collapse**
78:19
**college**
35:9
**Colombia**
71:12
**Columbus**
3:4
**combined**
76:12
**come**
28:25 35:13 52:20
54:16 61:22 62:5
82:2 84:22 88:24
**comes**
34:13 81:16
**comfortable**
67:9,13
**coming**
59:10 63:19 80:22

87:14
**commencement**
107:6
**commencing**
2:7
**commensurate**
37:2 59:18 100:7
**commercials**
42:3 93:2
**commission**
23:21,24 24:9 39:7,7
44:1,6 50:21 51:7
102:24 107:22
**commissions**
50:12 85:14
**commission-based**
34:12
**committee**
104:2,6
**committing**
46:23 49:19
**communicated**
26:21
**communicating**
27:14
**communication**
27:23 100:16
**communications**
25:17
**companies**
17:19 53:15
**company**
7:5 13:2 15:19 17:3
35:8 46:6 49:15,19
72:7 74:8 79:10
87:15 91:3
**compare**
22:4 23:1 52:12
53:22
**compared**
22:18 54:16
**compares**
54:19
**comparison**
54:6
**compensation**

34:12
**competitive**
57:9 93:23 94:3
**competitively**
57:15,23 58:1,4
**compilation**
77:9
**complete**
16:1 50:15
**completed**
15:8,12 16:10
**completely**
61:11
**con**
88:22
**concern**
64:23
**concluded**
106:14
**concludes**
105:14
**conclusion**
45:24 47:2 48:1
88:24
**conducted**
57:10
**conducting**
17:7
**confirm**
85:6
**confused**
10:21
**confusing**
49:4
**connect**
56:13
**connected**
33:9 67:4
**connection**
9:14 12:18 13:24
56:11,25 59:15 80:2
**consolidated**
16:19
**constant**
27:23 28:5
**Construction**



73:4,12
**consulting**
62:24
**cont**
18:5
**contact**
28:5,6 55:18
**contained**
25:7 42:1,1
**content**
50:9
**continue**
80:11
**Continued**
5:1
**contribution**
87:9,11,14 88:6,22
90:2
**contributions**
17:13,18 18:16 72:3
72:6 75:4,9,12
85:12,23 86:1,16
87:6 89:21
**controller**
35:8
**conversation**
29:9
**conversations**
88:20
**conveyance**
49:16
**convicting**
49:6
**COO**
90:8,10
**cooperating**
105:4
**copy**
69:7
**cor**
13:5
**correct**
19:22 31:12 34:25
45:11 50:10 77:18
85:24
**correctly**

29:3 73:2
**corruption**
88:10
**cost**
102:21
**Coun**
26:17
**counsel**
3:5,11 7:14 9:9 12:24
21:1 24:23 25:6,6
25:10,17 27:6,13,14
29:20,22,24 36:2
55:18,19 56:8 60:2
60:18 62:17 65:11
65:20 99:13 102:5
105:2 107:15,18
**Counsel's**
26:17
**count**
43:15
**country**
71:8,12,13
**couple**
12:2 15:6 26:22 73:3
75:15 101:17
**coupled**
46:8
**course**
36:14
**court**
1:1 2:5,6 7:12 8:1,3,9
28:15 43:12 46:19
79:2,6 96:9 105:16
105:20 106:2,7
**cover**
38:12
**co-mingled**
19:20,22 79:20,21
80:8,10
**co-mingling**
73:20
**created**
102:9,11
**creating**
74:17
**credibility**

61:16,23 62:8,11
**crimes**
33:16
**criminal**
81:6 82:24 87:9
**criminals**
87:5,7
**current**
17:16 18:18 35:2
72:4 76:2 77:16
95:17
**currently**
94:7
**customary**
23:11
**C-A-R-D**
52:1

_____

**D**

**D**
4:2
**Daily**
4:21
**data**
16:20,22 77:6,6
**date**
13:7,7 15:12,16
26:15 31:25 39:2
42:25 46:18 47:17
72:8,9 75:7 93:16
100:16 103:15
107:12,23
**dates**
40:23
**day**
17:12,12 18:20 76:11
76:11 97:14 106:1
**days**
52:5
**deal**
54:25
**dealing**
16:25 20:9
**deals**
79:13
**dealt**

47:16
**debt**
17:16 18:18 20:2,6
72:4
**debtor**
16:12,14 37:11 47:16
57:10 63:22 64:3,22
74:16 75:19 79:11
80:11 90:1 94:7,9
**debtors**
1:5 73:25
**debtor's**
19:20 47:14 77:20,20
79:18 80:8,18,19
**debts**
17:23 18:1 19:3,11
72:10 73:18
**decision**
71:2
**declaration**
4:11 24:19,20,24
25:1,8 28:13,25
30:17,23 31:3,4,6
31:24,24 34:20
65:25 83:4,8,23
84:6 85:18,18
**deep**
56:20
**defendant**
10:3
**defendants**
1:10 3:11 7:18
**definitely**
30:24
**delete**
71:2
**deliver**
91:17
**demonstrate**
81:3
**departure**
72:2
**depending**
37:1 58:3 88:11
**depends**
57:25 96:18


MAGNA
LEGAL SERVICES

deployed
33:10
deposit
73:9
deposition
1:13 2:2,4 5:6 6:2 7:4
7:8 9:14,18,22
11:15,18 40:7 42:20
82:18,21 83:12
104:14,17 105:15
106:14
DESCRIPTION
4:10 5:2
desperate
19:15
detail
37:13
determine
21:16 22:1 76:9 83:7
determining
76:7
difference
34:11 45:8 71:25
103:11
different
49:4 54:11 78:24
96:1
diligence
81:10
Dillman
3:11 9:16 93:19
diner
26:16
direct
44:21 75:9,11
Direction
6:5
directly
27:14 72:6
director
92:24
disagreement
13:20
disclose
37:22 45:25 54:24
discount

53:17
discovered
89:19 96:23
discovery
21:5 75:18
discuss
30:17 87:1
discussed
32:3,6 62:6
discussion
9:5
disguised
87:6
disguising
85:14
dispute
42:4
disputes
96:4
DISTRICT
1:1
distrust
40:6
dive
56:20
diverted
78:2
doc
70:7
docket
96:12
document
11:15 13:8,17 24:7
24:15 39:5,10,11
66:3 71:22 102:8,9
documentation
58:8,13 59:3 79:10
documents
6:11 11:21 12:4,6,8
12:17,21 13:19,23
14:2,15,16 17:25
20:16,17,20,21,25
20:25 21:1,4,15,21
21:25 25:14 34:17
34:22,24 40:19 51:8
51:11,15 56:6,9,10

56:15,17,24 57:20
74:18 81:25 85:11
doing
17:3 25:3 56:20
59:19 60:6,16,22
68:17 78:17 86:3,4
86:6,24 88:19 93:6
100:12 101:5
dollar
47:20 49:15,17 73:4
94:11 95:9
dollars
17:21 36:11 44:10
45:5,14 73:19 81:1
88:2 95:5,7,14
101:2 103:4,22
104:4
donated
88:2
door
47:20
Dora
3:11 9:16 93:18
doubt
49:3
dozens
43:14,16,20
drafted
25:1 66:20 83:9
drafts
24:18
drop
75:15
dropping
93:22
drops
75:8
drugs
11:8
due
19:3,12 75:20,24,25
duly
107:7
duplicate
21:6
duplicative

21:7

---
E
---
E
4:2,8
earlier
56:4
early
20:3 41:7,8 60:4
72:13
earned
99:18,19
easy
101:8,9
Ed
8:10 13:23 20:18
21:3
edit
71:3
edited
85:18
editorialize
98:19
Edmond
3:8 7:17 9:12
Edmond.george@...
3:10
effect
39:21 74:3
effective
1:9 3:11 4:16,19 7:6
9:17 22:9,22 23:2,6
24:2,4 27:18 28:11
29:2 31:9 40:20
42:1 44:4,17 45:3,8
45:13,18 51:8 52:13
53:23,24 54:10,21
58:10,15,20 59:4,11
59:17 66:21 93:20
99:18,21 102:15
effort
11:20
efforts
22:3
eight
43:19 96:5 101:20



eight-minute
101:15
either
11:10 44:4 58:9,10
58:14 59:11 61:22
67:4,5 71:2
eleven
43:22
eliminate
66:7 69:6,8,21
else's
65:3
employee
100:17,22,23 107:15
107:17
employees
88:13 90:2,6 95:20
96:14,25
empty
38:10
ended
31:3
endorser
67:13,15,17
engagement
95:21
enterprise
16:17 77:14
Enterprises
37:10 39:4,13
enticed
81:5
enticement
78:11
entire
24:6
entity
79:23,25
entries
38:5
equity
78:17
equivalent
53:7
Erica
3:3 7:20

ESQUIRE
3:3,3,8,8,9
essentially
13:5 52:19
establish
96:23
estate
58:21 78:6 94:6,13
95:8 96:2,17
estimated
94:14 95:6,7
et
1:4,9 7:5
etcetera
72:7
ethics
37:5
everybody
30:13 40:6 106:5
evidence
17:6 22:21 58:18
66:18 71:6 74:15
85:21,22 87:15
88:20 93:18
exact
27:10 69:24 92:22
examination
2:3 101:16 107:6
examiner
96:9
example
13:23 53:12 69:17
71:7 101:4
exceeded
66:14,16
exchange
61:2
Excuse
13:14
excused
106:12
Exhibit
65:25 68:4
Exhibits
5:1
Exhibits-10-12

5:8
Exhibits-7-8
5:8
Exhibit-1
4:11
Exhibit-10
4:23
Exhibit-11
4:24
Exhibit-12
4:25
Exhibit-13
5:3
Exhibit-14
5:4,8
Exhibit-15
5:5
Exhibit-16
5:6 11:14
Exhibit-2
4:12
Exhibit-3
4:13
Exhibit-4
4:14
Exhibit-5
4:15 5:8
Exhibit-6
4:16
Exhibit-7
4:17
Exhibit-8
4:19
Exhibit-9
4:21
existed
52:14
expedite
105:19
expenses
45:15 78:3
experience
35:11 48:20
expert
34:15 62:21,23,24
expertise

34:1
Expires
107:22
explain
16:2,3
explanation
22:16
extent
62:16
extract
16:21
extracted
17:13
extravagant
78:3
eyes
71:16 87:10,12,13
e-mail
4:12,13,14 5:3,4
55:23 56:1 67:20
68:14 69:3 82:1,4
90:19
e-mails
25:5,9,11,15,16
55:25 69:15,17,20
81:19,20,22,23
82:12 84:12 85:6
90:22

F
fabricating
74:17
face
23:21,23
fact
46:3,8,8 62:8 64:25
66:14 99:9 100:18
factors
20:7
facts
25:7 27:17 28:2 40:7
40:10,12 66:19
74:15 83:7 89:10,17
96:22
factually
85:6 98:22



**failed**
78:6
**fair**
34:19 37:3 60:19
**fake**
73:25
**false**
16:25 23:7 46:5
    49:22,25 50:2,2
    77:11 83:5 104:22
    105:1
**family**
9:17 58:15 71:9
**far**
25:3 54:12,15 63:7
    77:3 86:24 91:11
    95:12
**faulting**
81:12
**FBI**
32:11 33:2,3,4 35:4
    35:10 40:5 48:11,20
    61:13 82:24 85:9
    97:24
**February**
33:5 46:15 107:22
**fed**
14:8 43:18
**federal**
43:18
**fee**
22:20 23:24 37:17,18
    38:15 43:25 54:21
    59:2,12 96:7,9
**feel**
101:12
**feeling**
61:15,22 62:7,10
**fee-based**
34:12
**fee-for-service**
44:7
**fictitious**
74:5
**fifteen**
40:25

**file**
96:15
**filed**
16:12 24:19,24 31:23
    31:24
**filing**
15:9,12,16,19,22
    86:20
**filled**
94:11
**filming**
93:2
**final**
105:19,22,25
**finances**
12:19 13:25 14:3,6
**financial**
13:2 16:19,25 20:24
    34:22,24 73:23 74:3
    74:17 77:8 104:1,6
**financially**
107:18
**find**
40:2 60:22 79:2
    97:13
**finding**
47:8
**fine**
84:1,15 89:15 106:9
**finish**
18:6,13 36:3 64:12
    64:13
**firm**
9:12 15:9 81:18
    82:11
**first**
14:15 25:19 26:13
    31:13,17,19 52:4
    61:24 62:1 64:12
    74:13 81:7
**five**
74:23
**five-minute**
65:12
**flight**
53:14,18

**floor**
53:7
**Florida**
86:2
**flowthroughs**
79:23
**focus**
102:12
**folder**
24:22
**follow-up**
98:15
**force**
33:16
**foregoing**
107:9
**forget**
92:22
**form**
28:21 36:23 42:11
    73:12 83:24 84:9,14
    93:3 104:15,23
**formal**
67:10
**former**
26:6 33:2
**forth**
17:19 25:4 44:6 73:7
    73:8,16 77:11
    100:14 107:12
**forward**
46:12 72:21
**found**
74:13,14 97:11
**four**
12:22 69:6 82:16,20
**Fox**
44:20
**fraud**
36:18,21 45:22 46:21
    47:23 48:23 49:20
    50:13,23 51:5 73:20
    93:14
**frauds**
48:21
**fraudsters**

81:5
**fraudulent**
16:17 17:1 20:9 48:3
    48:8,9 49:16 77:14
**fraudulently**
74:17
**frequencies**
42:2
**frequency**
37:14 40:24
**Friday**
1:15 7:7
**front**
42:13 96:20
**full**
25:18 53:8,14 72:11
**function**
66:14
**fund**
78:12
**funds**
17:17 19:15 76:3,3
    80:6 81:2
**further**
105:4 107:9,14
**furtherance**
46:12,19,21 48:7

---
**G**

**game**
53:8,9 99:14,16
**generator**
36:12
**George**
3:8 4:5 7:17,17 8:12
    8:16,19,22 9:2,10
    9:12 12:14 13:10,14
    14:4,10,13,14 18:8
    18:10,19 19:1,17
    20:11,14 21:8,11,14
    25:20,24 28:8 31:18
    32:22,24 36:5,24
    38:4,6,21,23 40:9
    40:18 42:14,16 46:1
    47:3 48:5 50:6,17
    50:19 55:8,20,22



58:24 60:13 62:18
62:22 63:4,5 64:15
64:21 65:13,21,23
68:4,6,11,13,25
69:1,25 70:2,14,15
70:23,25 71:14,19
71:20 79:4,7,8 84:1
84:3,10,15,17,22,25
86:19 88:8 89:4,7
89:15,16,24 92:16
93:4 97:12,23 98:8
98:10,16,18 99:4,8
100:1 101:20 102:6
104:18 105:3,10,24
106:5,9
**getting**
36:15 70:5 86:4
87:17 89:9 101:15
**gild**
61:14
**girlfriend**
97:19
**give**
8:6 13:18 27:9 35:15
49:12,12 62:2,2
69:14
**given**
77:4,5 88:14
**giving**
69:14 87:16
**Glenn**
29:21 61:5,7,8,9
81:19 88:1,16,24
97:5,7
**Glenn's**
81:20
**go**
9:1,3 11:15 14:22
18:12 20:7 22:13,25
25:22 27:8 30:17
33:11 38:1,21 42:14
43:6,17 44:24 46:2
55:19 61:25 64:8,22
66:4 67:25 68:4,11
68:15,20,25 69:25
70:14,23,24 71:14

74:20 79:24,25
81:20 82:1 90:18
96:12 100:14 101:5
102:8
**goes**
75:14
**going**
8:19 9:3,13,17,19
10:5,6,14 11:11,13
15:2,21 24:8 30:17
32:22 35:10 42:13
42:17 47:19 49:18
62:1 64:9,11,12
65:15,24 73:21
74:21 77:3 86:23,25
86:25 94:15,18
96:19 98:21 101:23
105:11
**good**
7:19 9:11 73:25
78:10 85:21
**gotten**
100:10
**Grabato**
58:11,16
**grand**
43:20 100:17
**graph**
72:1
**great**
8:9 11:5 27:2
**greed**
81:16
**green**
70:17
**groups**
96:1
**guarantee**
67:9
**guaranteed**
78:10
**guess**
13:20
**guilty**
46:4
**guy**

61:6 85:1
**guys**
83:22

_____

**H**

**H**
4:8
**half**
23:13 91:13
**hand**
8:4 17:23
**happen**
91:19
**happened**
13:16 32:16,17,19
62:3 83:25 93:17
94:5
**happening**
64:1
**happy**
14:1 16:2 24:16
**hard**
40:3
**head**
24:13 37:24 54:13
76:23 90:16
**hear**
94:20,23
**heard**
10:14 39:22,24 51:21
52:6,24 53:18 81:14
95:1
**held**
9:5 33:25
**helpful**
98:25
**helping**
49:21 93:8,14
**hereinbefore**
107:12
**hey**
63:23 70:16
**higher**
30:12,15,20 32:15
**Hippel**
3:7 7:10 9:13

**hire**
35:13 101:3
**historic**
77:5
**historical**
16:21 77:6
**hit**
90:9,12
**hold**
28:15 68:1,3,12
80:17 95:9
**hole**
94:11
**homes**
35:8
**honest**
61:6
**hope**
53:9
**hour**
35:18 53:9
**house**
35:14
**houses**
78:4
**hundred**
57:4
**hundreds**
14:1 56:5,8
**Hybrid**
21:24 22:8,8,10,14
22:19,22 23:10
41:22 54:3 101:6
**hypothetical**
50:16,24

_____

**I**

**Ice**
3:2 7:20
**idea**
43:13 92:9
**iHeart**
44:19
**illegal**
86:10 87:9,11,20
89:20



**imperfect**
17:1 20:9
**important**
10:11,19,22,25 57:14
57:17 58:2
**inability**
72:10
**inaccurate**
77:10
**inappropriate**
62:19,20
**inarticulate**
10:10
**include**
17:18 31:8 104:6
**included**
22:20
**including**
64:2 75:3
**inclusion**
28:13
**increase**
74:2
**increasing**
77:11
**independent**
41:3
**INDEX**
6:2
**indicate**
64:23 74:16 89:19
92:4,8
**indicated**
58:9
**indication**
38:8,18 75:19
**indications**
20:1
**indicted**
43:18
**indifferent**
85:21
**indirect**
17:18
**individual**
56:24 87:17 88:12,14

88:22
**industries**
52:7,18
**industry**
43:25 52:10 53:13
**inexplicable**
73:16
**inflate**
74:4
**influence**
11:8
**information**
13:6 28:10,24 42:10
42:22 62:3 67:6,15
**inherently**
46:9,10
**inner**
96:24 97:2
**insider**
58:5
**insolvency**
13:11,16 15:7,11,15
15:18 16:10 17:3
19:23,25 20:5,8
71:25 72:11
**insolvent**
14:16 16:13,14 18:21
46:9,10 72:12
**institutions**
73:23
**instruct**
45:24 62:17 63:3
86:18 89:1,2
**instruction**
89:23
**intent**
47:5,12 48:10,24
**intention**
46:22 50:23
**inter**
85:17
**interactions**
31:8
**interested**
107:18
**internal**

35:7 93:6
**interrogate**
33:14
**interrogator**
33:12
**interrupt**
14:22 44:24
**interview**
26:16 28:25 31:6
59:23 60:3 62:1
**interviewed**
83:10 85:17 92:20
**introduced**
5:8
**investigation**
12:19 13:25 62:25
63:2 83:6 89:10,19
**investigations**
96:4
**investigator**
26:3,8 61:3
**investing**
77:23
**investment**
1:4 4:20 78:4 80:2
**investor**
17:13,17 18:4,16
19:14,18 63:19 72:3
72:5 75:3 76:2,3,16
80:14,22 95:5
**investors**
17:18 18:17 46:6
68:21 77:23 79:12
80:7,18 82:21 87:6
95:10
**investor's**
82:14
**invoice**
23:22,24 24:10,11
37:18 41:5,9,22
51:19 95:17
**invoices**
5:5 21:24 23:17
30:12 41:2,12,13,14
41:14,17,18,20,23
42:8,18 59:15 103:7

103:14 104:10
**involved**
17:4 27:12,15 48:12
48:15,20 49:7,21
62:13 81:14 89:11
93:19
**in-house**
92:23
**Iraq**
33:10,12
**issue**
30:1
**issued**
60:5 71:8
**issuing**
60:21
**items**
77:12

---

**J**

**January**
4:21 17:22 31:21
32:3 41:8 42:9 72:8
83:16
**Javier**
3:11,11 4:17,19 7:24
9:16 20:22 23:2
31:9 39:18 40:20
41:9 44:4 45:18
51:8 52:13 53:24
54:21 58:9,14,19
59:3,11,16,19 66:20
67:1 68:17 70:19
91:2,5,7,9,13 96:23
101:5 102:23
**Javier's**
93:21
**Jennifer**
1:17 2:6 7:12 106:10
107:3,21
**Jersey**
1:1 2:7 3:10 26:6
35:9 90:9,12 107:5
107:22
**JKS**
1:2



**job**
33:14,21
**John**
3:14 7:11 8:20
**joint**
27:9
**Jr**
3:12
**July**
104:11
**jumbled**
10:9
**jump**
36:3
**jumping**
90:23
**juncture**
87:21
**June**
4:22
**jury**
43:20

### K

**Kana**
92:17 93:25
**Katey**
92:17 93:24
**keep**
19:6 78:12,17 94:21
**Keith**
12:2
**kept**
103:24
**key**
82:1
**kicker**
78:15
**kicking**
58:10
**kidnapping**
33:15
**kind**
35:1 42:10 53:6 76:7
   79:9 81:10 83:7
   97:8

**kindly**
11:4
**knew**
47:18 63:7 78:18
   87:16,19,19,21
   88:17,25
**know**
12:3 13:15,15,16
   14:9 18:4,11 19:13
   21:2 23:15 25:10,25
   26:2,8,11,14 27:6,6
   28:4,4,5 29:2,5,8,14
   30:24 34:11 35:19
   35:22 36:15 37:24
   40:5,19,24 41:4,19
   41:22 42:12 43:15
   43:16,17 44:12,16
   44:20 47:11 49:3,19
   53:2,6,12 54:13
   55:5 56:1,14,15,20
   57:1,14 58:4,6
   59:22 60:11,24 61:4
   61:11,12 63:18,21
   65:7,9 66:12 76:23
   77:15 78:14 80:20
   81:4,11,13,13,18,22
   81:23,24 82:4 83:14
   83:18 84:18 86:11
   86:13 87:1,7,10,20
   88:9,20,21 89:17,20
   90:15,17 92:17,19
   93:1,5,6,8,16 94:5
   95:1,11,23 96:3,18
   97:7,25,25 99:9,10
   104:8,21
**knowing**
63:21
**knowledge**
28:23 31:8 32:5
   48:24 93:15
**known**
80:25

### L

**La**
26:11 27:24 28:12

29:4,11,21,25 30:1
31:11 61:5,7,8,10
61:18 63:7 81:19
83:4,7,10 88:1,24
89:20 90:5 97:5,7
97:18 99:5 104:12
**labor**
35:16,17 36:14
**largest**
90:8,11
**Lasley**
3:3 7:19,20 8:10,15
   8:18,21 12:11,23,24
   13:13,22 14:5,11
   18:6,12,22 19:8
   21:3,10,13 25:18
   28:1,15,21 31:14
   36:2,23 40:8,13,17
   42:11 45:23 47:1,25
   50:5,15 55:3,17
   58:22 60:10 62:15
   62:20,23 64:11
   65:11,14 83:24 84:8
   84:14,20 86:17 88:4
   89:1,6,9,22 92:15
   93:3 97:10,21 98:6
   98:9,12,17 99:7,22
   101:19 104:15,23
   105:9,16,18,22,25
   106:4
**latest**
104:9
**Laurel**
3:10
**law**
9:12
**lawsuit**
10:3 15:9,13,16,20
   15:22 16:11 86:21
   87:5
**lawyer**
32:25 42:20 49:5
**lawyers**
82:16,20
**LAWYER'S**
108:1

**lead**
46:16
**leader**
46:16
**leads**
85:13
**leaks**
58:5
**learn**
52:4 99:12
**learned**
34:17 43:24
**leaves**
95:9
**left**
85:4
**leftover**
53:5
**legal**
1:21 7:11,12 45:24
   47:2 48:1 49:4
**legitimacy**
64:6
**legitimate**
80:23
**length**
27:2 54:25
**let's**
35:25 36:6 38:1 66:3
   67:25,25,25 68:4
   69:25 90:18
**level**
43:18
**levels**
56:19
**leverage**
56:21
**License**
107:21
**lied**
91:21
**life**
35:11
**lily**
61:14
**limit**


MAGNA
LEGAL SERVICES

66:15,17 88:12
**limits**
88:6,11,13
**line**
6:6,6,6,12,12,12,17
  6:17,17,22,22,22
  68:18 69:10 70:17
  70:20 72:15 74:21
  75:3,4 108:1
**lines**
68:22,23 103:15
**Liquidation**
1:6,7,7 7:5,22 9:15
**list**
44:18 45:1
**listed**
23:21
**litigation**
89:11,12
**little**
20:18 68:12,15 71:15
  74:22 78:24 94:21
**LLC**
1:4,6,9 3:11 7:5,6
**LLP**
3:2,7 7:10
**loans**
73:8,12,15
**long**
70:7 98:2
**look**
8:22 12:4,9 25:12
  41:5 84:19,24 85:1
  85:5,16 103:13
**looked**
12:6,7,9 17:11,12
  22:1,7,10,14,15,18
  22:19 23:5,9,11,17
  44:2 54:2,6 74:1
  81:23 82:11 85:8,11
  85:13,15 90:22
**looking**
54:11 80:24 81:9
  82:23,25 83:2
  103:18
**looks**

41:4
**looted**
78:2
**loss**
78:9 103:3
**lot**
43:13,16 61:25 62:2
  63:14 64:1 73:6,16
  73:20 86:23 101:13
**lots**
25:9
**lying**
50:17,21 81:24 85:4

---

**M**

**M**
3:8
**Magna**
1:21 7:11,12
**main**
76:13,14
**major**
33:15
**majority**
59:7 80:6
**making**
37:20 46:7 71:2 75:6
  85:23,25 100:17
**March**
1:15 7:7 107:23
**margin**
55:6 100:2
**margins**
54:25
**marked**
6:21 35:21
**market**
22:5 23:3,9
**markets**
69:5
**marks**
101:24 102:3 105:12
  105:14
**markup**
21:16 22:1,15,16,17
  22:19,20 23:13,16

27:18 28:11 29:12
  30:1,20 32:3,7,8
  35:12,14,16 36:21
  40:2
**markups**
34:17
**massive**
16:23
**match**
73:24
**material**
103:16,17
**matter**
2:4 7:4 9:14 26:4,23
  26:24,25 47:18
  56:11,12,13 62:7
**matters**
87:12
**Mattina**
26:11 27:24 28:12
  29:4,11,21,25 30:1
  31:11 61:5,7,8,10
  61:18 63:7 83:4,7
  83:10 88:1,24 89:20
  90:5 97:5,7,18 99:5
  104:12
**Mattina's**
81:19
**Maute**
1:17 2:6 7:12 107:3
  107:21
**Maxwell**
3:7 7:10 9:13
**MDs**
16:18
**mean**
13:19,22 14:22 22:8
  24:2 40:23 44:24
  45:4 48:2 87:25
  92:12 94:9 97:14
  103:4
**means**
9:18 13:17
**meant**
35:5
**measurements**

70:8
**media**
1:9 3:11 4:16,19 7:6
  9:17 20:23 21:24
  22:4,7,8,8,9,10,14
  22:22 23:2,6,10
  24:2,3 27:18 28:11
  29:2 31:8 40:20
  42:1 44:4,17 45:3,7
  45:13,18 51:8 52:13
  53:23 54:3,10,21
  58:9,14,20 59:3,11
  59:16 66:20 92:24
  93:20 99:18,20
  101:6,24 102:3,15
  105:13,14
**Media's**
21:16 22:19
**medication**
11:9
**meet**
17:16,23 18:17 20:2
  26:13 72:4 76:1,17
**meeting**
27:6,9,12 29:11
  30:16 31:2,5 32:2
  61:15,17,18,20,25
  62:5 83:21
**meetings**
61:9,22
**members**
58:15 71:9
**memory**
42:13
**men**
31:2
**mentioned**
29:12 31:2 56:4
  104:5
**merely**
34:21 67:14
**meretricious**
97:8
**message**
69:14
**met**



8:16 26:12,15
**Michael**
3:8 8:13 101:4,17
**middle**
72:15 74:23
**middleman**
100:16
**military**
33:9,12
**Miller**
3:2 7:20
**million**
17:21 44:10 45:4,5,7
45:14,16 73:19
74:24,24 75:11 81:1
90:15 94:11,15,16
94:17 95:4,7,9,13
95:14 102:17,19
103:4,5,22 104:4,8
**millions**
81:25 101:2
**mind**
79:4
**mine**
31:25
**minute**
53:5,20
**minutes**
101:17,20
**mischaracterizes**
12:12 18:23 28:2
31:14 83:25 84:20
**mislead**
51:4
**misleading**
23:7 46:5 49:22 50:2
91:21
**misrepresented**
51:15
**misrepresenting**
51:9,12
**missions**
33:13
**misstating**
56:7
**MO**

97:25
**mobile**
55:13
**Monday**
105:24 106:1
**money**
19:5,16,19,20 45:17
46:8 48:4 58:10,15
58:19,20,25 59:4,6
59:8,20 63:19 71:7
71:11 73:6,11,16
74:10,10 77:19,20
77:24,24 78:15
79:11,17,18,24
80:14,17,18,23
81:16 82:14,22 87:5
95:15 99:18 100:6
103:12,19
**monies**
59:10 80:8,10,11
86:22
**month**
27:1
**monthly**
95:18
**months**
43:23
**morning**
7:19 9:11
**mortgages**
77:1,5
**motivations**
97:25
**Mount**
3:10
**move**
17:21 25:21 40:8,13
64:9 71:7,11
**moved**
73:6
**moves**
72:8
**M-17**
75:7
**M-9**
75:6

| | N | |
|---|---|---|
**N**
4:2 98:3
**name**
9:11 82:2
**names**
42:25
**narrate**
98:19
**Natalia**
3:12
**National**
1:4
**necessarily**
19:7 48:10 80:2
84:16
**need**
16:22 20:10 55:9
67:10 69:6 98:6
101:16 105:16
**needed**
22:2 66:7,20 79:22
**needs**
19:12 74:9 94:11
**negatively**
10:23
**neither**
102:23 107:14,17
**net**
17:13
**never**
34:9 39:24 63:23
79:4,19 85:20 90:21
**new**
1:1 2:7 3:10 18:16
19:5 24:21 26:6
35:9 72:3 76:3 90:9
90:12 107:4,22
**Newark**
8:17
**Nicholas**
68:18
**Nick**
46:3,3 58:11 63:23
67:19 69:9,10 70:16

70:19 81:6 86:3,6
97:3,4,5 101:3
**nine**
30:11,19,19,24 32:5
32:8,14 40:25 43:8
**Notary**
2:6 107:3,22
**notes**
32:13,14,14,20,23
108:1
**Notice**
5:6 11:14,18
**noticed**
73:23
**Nov**
75:20
**November**
17:15 72:2 75:20,25
76:4,5,22 77:17
**NRIA**
4:21 12:19 14:15
17:7 19:2 22:17
23:3,23 24:1 26:24
27:19 31:7 39:5,9
39:14 40:19,21
41:11 42:1 44:5,9
45:21 52:13,14
53:24 54:7,9 56:12
56:12,13 59:5,6,10
59:17,18 62:3 63:8
66:6 67:15 70:11
72:3 76:17,21 80:1
86:4,7 87:19 88:13
91:21 92:21 93:19
94:6 96:24 100:13
100:15,17 102:15
103:4,22
**NRIA's**
13:25
**number**
4:10 5:2 7:3 11:14
13:23 20:15,20
25:12,18 39:17
55:14 65:25 68:22
69:25 70:3,23 71:15
74:22 90:18 101:24



102:3,8,9 104:8
105:13,14
**numbers**
25:4 73:24
**Number-2**
68:5
**nursing**
35:8

---

**O**

**Ob**
62:15
**Obermayer**
3:7 7:9 9:12
**object**
28:21 36:23 40:14
42:11 55:18 83:24
84:8,14 93:3 104:23
**objection**
12:11 18:22 28:1
36:2 45:23 47:1,25
50:15 55:3 60:10
62:15 84:8 86:17
89:1,2,22 97:10,21
99:22 104:15
**obligation**
76:21
**obligations**
17:16 18:18 20:2
72:5 76:2,8,17,21
77:16
**obviously**
33:24
**occasions**
39:18
**October**
23:8 24:5
**offer**
52:23
**offering**
39:19 78:9
**offerings**
80:24
**offhand**
26:15
**office**

26:17 86:14
**officer**
82:7,10 83:19
**oh**
24:3 31:23 47:7,11
50:7 64:3 79:4,21
87:12 100:25 101:8
103:24
**Ohio**
3:4
**okay**
8:3,15 9:1 11:17
14:10 16:24 18:8
19:2 20:11 21:10,15
22:3 24:6,14 25:2
29:7 36:8,17 37:3
40:4,7 42:14 43:11
45:9 46:25 48:6,19
49:2,24 51:6,21
52:12,17 53:22 54:5
60:24 62:13 63:4
65:2,7,10,11 66:1
66:18,24 67:19
69:10,12,25 71:10
71:14,19 74:20
75:10 76:7,19 78:22
79:6 82:9 89:15
96:6 99:24 100:9
101:12,22 102:12
105:3,20
**once**
19:18,18 26:15,16
80:18
**ones**
74:13
**ongoing**
14:25 20:1 73:8 77:3
87:1,3
**operating**
76:13,14 82:6,10
83:18
**operations**
33:21 74:10
**opinions**
40:12
**opposed**

44:7
**opposite**
53:19
**Oral**
2:3
**orally**
10:20
**order**
67:12 74:9
**organizer**
46:16
**original**
66:19,25 67:2 79:3
**originals**
74:6
**originated**
59:5
**outset**
46:10
**outside**
29:5 33:23,24 47:2
48:1 55:3 91:14
97:1 99:22
**overall**
53:22,23 54:2 62:25
89:11
**overcharging**
59:17
**owned**
35:8 94:6

---

**P**

**page**
4:5,10 5:2 6:6,6,6,12
6:12,12,17,17,17,22
6:22,22 25:22 38:22
38:24 68:19 108:1
**pages**
14:2
**paid**
22:21 23:19 36:13,13
36:18,21 39:4,8
41:21 45:3,14 49:18
59:1 63:8,19 79:12
95:14,16,18 100:6
102:25 103:1,5,12

103:14,18,19 104:5
**panned**
85:15
**papers**
90:14
**Paragraph**
20:12 66:2
**part**
32:10 33:21 73:8
79:18 81:15 96:24
97:1 99:17
**particular**
23:4 26:23 66:13
67:13 79:25 91:11
91:14
**particularly**
97:6
**parties**
7:14 54:24 72:7
107:16
**partner**
8:16 101:4
**Pass**
67:17
**passed**
39:9
**passing**
67:14
**patently**
83:5
**pattern**
78:6
**Paulina**
3:12
**pay**
17:23 18:3,15 36:10
53:8,21 72:10 75:24
76:8,22 80:11
102:15
**paying**
19:3,11 36:15 39:13
63:22,24 64:4,24
65:1,3,8 73:18
75:19,22,23 85:13
101:1
**payment**



37:11
**payments**
22:21 41:24 71:9
    86:9
**peeled**
76:16
**pending**
87:4
**people**
29:18 43:17 45:17,20
    47:22 49:20 50:8
    52:24 54:9 64:2
    78:12,17 81:2,11
    85:19 87:16 88:15
    96:5,8 101:13
**percent**
22:17 29:3 30:20
    32:19 38:15,16
    39:20,25 40:2 44:17
    50:12,13,22 54:3
    67:9 69:15,22 78:11
    91:4,6 100:3,5
**percentage**
37:19
**performed**
93:24
**performing**
94:3
**period**
17:14 67:6 76:22
    80:12
**periodicals**
43:25
**perpetrated**
36:22
**person**
34:1 46:23
**personal**
104:20
**personally**
11:20 62:5
**pertinent**
28:18 64:18
**ph**
33:13
**phantom**

78:16
**phone**
55:11,14,15 101:6,10
**physical**
97:15
**pick**
101:9
**picking**
93:22
**piece**
76:16
**place**
59:4 107:12
**places**
53:15
**Plaintiff**
1:8 3:5 7:21
**plane**
53:14,16
**play**
81:17
**playing**
99:15
**plea**
46:11
**please**
7:15 8:1,4 18:6,13
    19:8 28:15,16 68:12
    99:25
**pled**
46:4
**plumber**
35:13 36:9
**plus**
29:3
**point**
27:21 46:11 82:8
    96:19 99:10
**politician**
87:16,20 88:14,21
**politicians**
86:1,2,9,15,21
**Ponzi**
17:4,7 19:4 46:4,9,17
    46:17,23 47:8,15,17
    47:19,21 48:12

62:13 78:20 82:10
    83:15,19 85:2 90:8
    90:11
**Ponzis**
46:8
**popped**
82:3
**portion**
28:18 64:18
**pose**
11:11
**position**
59:16 74:2 75:5,7
    76:11 77:12 80:21
    85:9 92:21
**possession**
83:8
**possibility**
28:9
**possible**
27:16
**Possibly**
92:25
**potentially**
32:17
**Practice**
2:5
**preclude**
28:9
**prepared**
92:1
**present**
3:14 7:14,25 30:2
    91:17 104:16
**presented**
37:10
**Presently**
99:7
**presumed**
47:5,13
**pretty**
73:25
**price**
23:3 35:21 39:19
    52:19
**prices**

22:4 23:1 52:13
**prior**
15:9,12,16,19,19,21
    16:11 51:6,11,14
    60:21 76:6 107:5
**privilege**
45:25
**privileged**
25:16
**PRO**
1:2
**probably**
27:8 45:16 53:11
    57:5 94:14 95:13
    96:18 100:21 101:7
**Procedure**
2:5
**proceed**
8:9 9:9 65:20 102:5
**proceeding**
9:19
**process**
16:6,8 20:8 56:6 87:2
    87:3 94:8 98:14
**produce**
12:17 13:3 14:16
    20:12,15,23 21:9,19
    25:14,16 32:23
    41:11
**produced**
12:10 13:4 14:18
    21:4,6,7,12 41:9
    42:19
**product**
37:2 45:25 62:16
    63:2 86:17 89:2,4
    89:12
**production**
6:11 42:8
**proffered**
75:18
**Profile**
4:15
**profitable**
46:7
**profiting**



49:7
**profits**
78:8
**project**
54:12 78:5,5
**projected**
95:8
**promoting**
49:21
**prompted**
67:4 71:3
**proof**
73:19
**properties**
20:6 78:8
**property**
77:4
**prosecuted**
48:22
**prosecuting**
82:24
**prosecution**
48:12,15,21 49:1
**provide**
24:18 27:17 41:16
  100:8
**provided**
12:22 15:1 20:17
  21:1 23:7 24:20
  25:6 28:12 40:20,21
  41:3,7,17 54:1,20
  59:13,15 83:4
**provider**
59:12
**providing**
28:24 37:2 39:14
  53:25 58:15 70:11
  99:19
**proximity**
53:18
**public**
2:7 96:7 107:3,22
**pull**
12:8
**purchases**
59:1,9

**purchasing**
52:24,25 54:10
**purported**
46:6 59:19 73:15
  80:20 100:7
**purporting**
78:7
**purpose**
57:16
**pursuant**
2:4 13:9
**put**
16:22 19:19 23:23
  28:24 30:13 31:6
  42:12 78:14,15
  83:23 84:2,5
**p.m**
101:25 102:4 105:12
  106:15

**Q**

**QC**
25:4
**quantity**
38:9 42:22
**question**
6:21 10:14,15 16:11
  16:16 18:7,13 19:10
  19:12 25:13 28:16
  30:3 36:13 38:18
  40:15,17 42:18 43:3
  43:9 45:12 49:5,9
  58:23 59:7 62:4,12
  63:9,15 64:15,16
  69:18 78:23,25 79:3
  98:7,10,14,20,23
  99:2
**questionable**
75:16
**questioned**
24:4 64:5
**questions**
10:7,23 11:10 43:8
  61:10 63:1 83:11
**quite**
15:23

**R**

**radar**
98:2
**radio**
4:24,25 34:8 38:13
  38:13 44:19
**raise**
8:3
**ran**
33:15 37:23,23 38:8
  38:19,25 39:1 43:3
  43:10 45:20 50:8
**range**
39:2 42:25 95:6
**rate**
22:5 35:17 38:9
  42:23 51:22,24,25
  52:5,7,8,11,14,18
  52:22,23 53:23 91:4
  91:14
**rates**
38:9 52:3 53:8,24
  54:19
**Ray**
58:10 63:23
**reach**
55:10 60:6,23 61:3
**reached**
60:14,21,25
**read**
25:18 28:16,19 31:4
  37:4 58:23 64:15,19
  78:25
**reader**
10:22
**real**
78:6 80:23 94:6,13
  95:8 96:1,17
**really**
22:2 50:18 58:4 80:4
  80:5
**Realty**
1:4
**rearrange**
8:24

**reason**
42:4 66:13 84:23
  85:1,5 91:16,18
  97:17
**reasonable**
49:3 59:21
**reasons**
30:6,9 73:17 77:10
**Rebmann**
3:7 7:10 9:13
**recall**
11:10 24:12 29:3,14
  32:9 37:16 38:15
  41:22 44:8 90:25
  92:14 94:4
**receivable**
103:24
**received**
20:21 49:16
**recollect**
29:10
**recollection**
104:9
**reconstruct**
16:22
**reconstructing**
77:7
**record**
7:2 9:1,4,6,7 13:2
  28:19 55:17 64:19
  65:16,18 70:17 92:1
  98:21,25 101:23
  102:3 105:12
**recorded**
9:20 11:3
**records**
17:2 20:10,12 21:23
**recover**
11:21 86:15,21
**red**
75:4
**redeemed**
78:18
**redemptions**
17:14
**reference**

75:6
**referring**
50:7
**reflect**
14:2
**reflects**
103:21
**refute**
104:9
**regarding**
64:6 85:11 89:10
**reimbursed**
86:5 87:17,23 88:16
**relate**
20:22
**related**
45:15
**relating**
10:7 14:17 20:16,20
**relationship**
97:8,15 104:13,20
**relative**
107:15,17
**Relevance**
104:23
**remaining**
42:18
**remember**
41:20 73:2 79:4
**remnant**
52:25 53:2
**remotely**
7:9 107:7
**remove**
67:6 71:3
**removed**
75:5
**removing**
66:8 69:10
**Renascent**
37:10,15 39:3,4,12
39:15
**repeat**
58:23 99:25
**rephrase**
10:12

**replacement**
69:5
**REPORTED**
1:17
**reporter**
2:6 7:12 8:1,3,9
10:21 28:16 79:1,2
79:6 95:1 105:16,20
106:2,7 107:4
**represent**
7:16 21:3 42:19
**represented**
60:2,7,8,12,17
**request**
6:11 7:9 11:16 67:5
71:3
**require**
48:10
**required**
79:10 80:16
**research**
100:13
**respect**
42:18,21 56:23 66:24
80:5
**responding**
36:3
**response**
20:22 67:11,11,18,20
**responses**
21:5
**responsible**
93:1
**responsive**
10:16 64:10 98:16
**rest**
42:15
**restructuring**
96:2,17
**resume**
4:23 33:8
**retail**
52:19
**retained**
99:20
**retired**

33:3,5
**return**
69:15 82:15
**returns**
78:10
**reveal**
89:18
**revenue**
80:21
**review**
37:9 42:8 56:17,18
56:18,25 82:4
**reviewed**
12:18,22 13:1,6,24
33:21 34:16 56:5,11
84:11 102:11
**reviewing**
57:10
**Revised**
5:6
**revised/approved**
69:4
**revision**
67:3
**Rich**
12:1
**Rick**
25:25 26:2 29:20
32:17
**rigging**
58:6
**right**
8:4 12:16 19:5,20
20:4 24:17 25:20,23
29:10,12 30:2,23
31:3,23,24 38:10
40:1 42:5 45:6,18
47:9,18,24 48:11,13
49:16 51:1 52:8,9
53:13 54:8 58:25
64:22 67:16,20,22
68:19,23 70:12,21
72:25 73:14 78:1
80:8,13,18,19 81:3
82:7,15 83:16,19,22
84:13 85:4,7 86:7

86:23 87:13 88:10
90:3,6,9,12 94:14
96:1,11 97:18,20,25
98:1 99:6,20 101:21
102:24
**Roll**
38:4
**rolled**
78:15
**rolling**
78:16
**rolls**
103:15
**room**
8:13 29:16,19,25
**rotation**
69:5
**rough**
105:19 106:3
**round**
73:4
**Route**
3:9
**rule**
11:1
**rules**
2:5 10:5 11:6 55:6
90:2
**running**
37:14 40:22 47:15,21
85:2
**runs**
75:2
**Rwbarryconsultin...**
56:2

___
**S**

**S**
4:8
**Saldutti**
3:9 7:24 8:11 71:17
**sales**
34:13 95:8
**Salzano**
46:3 47:21 49:24
58:11,16 67:19 81:6



101:3
**sat**
82:11 83:21
**save**
24:21 82:21
**saw**
22:21 31:11,20 33:8
51:19,20 71:9
**saying**
13:21 19:6 20:1
26:18 42:7 46:17
49:6,14,14,17 50:24
69:3 70:20 73:14
74:7 85:7 91:3 92:3
96:25 100:4,6,23
**says**
9:19 24:8,10,11 40:6
67:21 69:12 70:4,6
70:16 83:22 98:22
**scheme**
17:4,7 19:4 46:4,12
46:17,18,20,23
47:15,18,19,21 48:7
49:7 62:14 78:20
82:10 83:15,19 85:2
90:9,11
**schemes**
48:12
**scope**
47:2 48:1 55:4 99:23
**script**
66:8 67:1,3 68:23
69:2 70:18
**scripts**
66:3,25 71:1 93:9,15
**searches**
82:1,2
**seats**
53:7,16
**second**
9:1 38:24 62:6 69:4
**secondhand**
99:10
**seconds**
61:19 70:18
**secreting**

58:20
**secured**
66:9,22
**securities**
26:7 47:23 48:16,17
48:23 61:2 93:14
**security**
48:21
**see**
8:19 14:8 17:14
23:12 27:8 32:13
38:1,5,7,9,12 41:1
42:7,20,24,25 43:2
43:10 51:7,11,14
66:4,10 67:7 68:7
68:14,19,20,21 69:2
69:12,15,17,20,23
70:3,3,9 71:1,6,10
76:16 90:25 91:2,5
91:7,13,15 92:6
93:23 96:8 100:15
100:25 102:13
**seeing**
41:4 90:25
**seen**
11:17 39:11,21 40:16
41:2 43:24 44:3
48:22 52:17 57:9,13
57:20 58:8,13,18
59:2,10,14 66:25
67:3,8 78:20 81:10
84:12 90:19,24
91:20 92:2,3,7,11
92:13 100:15 103:7
**sees**
8:25
**segregate**
79:11
**segregated**
19:19 79:17 80:7
**sell**
94:8
**selling**
78:7 91:10
**send**
67:12

**sending**
69:2,3
**sent**
12:7
**sentence**
66:7 69:6
**separate**
80:17
**separately**
19:19 79:11 80:7
**series**
10:6
**service**
52:23 54:22 59:12
**services**
1:21 7:11,13 100:7
**set**
10:5 44:6 79:18,19
79:20,23 107:12
**setting**
26:17
**seven**
101:14,20
**share**
35:12,14 46:22
**sheet**
14:25 15:2,24 20:5
77:2
**sheets**
14:7,8
**short**
65:17 102:1
**shorten**
67:5
**Shorthand**
107:4
**short-term**
76:2
**show**
20:1 23:18 24:15
37:25 38:25 59:3
65:24 72:2 87:15
**showed**
39:12 40:21 58:14
**showing**
14:15 17:25 42:2

68:18
**shows**
72:25 74:22
**shy**
45:16
**side**
44:5,5 76:20,21
**significant**
80:12
**single**
13:3,17 41:9 85:16
**sir**
8:3,25 22:13 38:17
40:5 43:3 46:2 48:9
51:14 60:9 61:13
63:15 65:21 68:7,14
69:18 70:3 71:14
74:21 80:5 83:3,15
85:9 88:18 90:24
91:24 94:20 97:24
98:4 102:8,10 105:4
**sit**
32:18 98:24
**sitting**
29:5 42:4 77:15
**situation**
33:20
**six**
96:5
**sleeping**
99:5
**slide**
71:15
**small**
73:3
**sold**
24:8 34:4,7,10
**solemnly**
8:5
**solid**
72:14
**somebody**
32:17 49:6,6 54:14
**sorry**
8:11 11:23 22:12
24:2 35:6 47:11



51:18 55:12 58:22
70:16 74:21 94:23
99:24 102:18
**sound**
61:5
**sounds**
83:22
**so-called**
73:7
**space**
34:2,21
**special**
34:1
**specific**
25:13 29:11
**specifically**
25:13 82:4
**speculation**
40:11 97:22
**spend**
54:4 82:14
**spent**
44:9 45:5
**spite**
63:21
**spoke**
28:6
**spoken**
26:25
**spot**
70:6
**spots**
69:4
**spout**
98:21,24
**staff**
12:1,5,10 56:18,21
57:8,12
**standard**
52:2
**start**
8:10 11:13 14:6 56:9
72:18 74:11
**started**
15:5 72:20
**state**

2:7 7:15 43:25 90:12
107:4,22
**stated**
51:7 90:3,14
**statements**
16:19 17:1,1 30:18
74:1,1,3,4,12 77:8
77:11
**STATES**
1:1
**stations**
69:4
**stay**
19:15
**stenographically**
107:11
**Stipulations**
6:16
**stop**
63:24
**stopped**
19:3,11 75:19,22,23
**straight-forward**
10:8
**Street**
3:4
**strike**
40:8,13 64:9
**strong**
74:9
**structure**
23:24,25 34:13 44:1
**stuff**
98:21
**submitted**
85:19 103:14
**subpoena**
20:22 60:5,9,15,22
**subpoenas**
71:8 73:22
**substance**
62:6
**substantial**
53:17
**substantially**
30:15 32:15

**success**
80:21
**successful**
78:7
**sue**
86:15
**sued**
93:13
**suggest**
66:19
**suggested**
66:8 67:18
**suggesting**
41:17 99:17
**suggestions**
71:5
**Suite**
3:4,9
**summarize**
13:5
**summary**
4:16,17 13:5,18 14:6
14:8,18
**Superior**
2:4
**supplied**
36:6
**supplies**
35:25
**support**
6:2 38:11 98:22
**supposed**
79:19 98:18,19,20
100:3
**sure**
9:2 10:25 12:3 19:7
32:16,19 38:1 41:12
52:21 55:16 65:13
79:2,6 101:19
**surprise**
29:2,4 30:4,4,5,7,10
30:10 95:24
**surprising**
83:12
**sustain**
74:10

**swear**
8:1,5
**sworn**
85:19 107:7

---

**T**

**T**
4:8
**take**
9:18 17:20 22:3
45:13 53:10 65:11
69:13 70:20 72:5
95:6 100:18 101:14
**taken**
2:4 7:9 9:21,22 20:6
65:17 97:19 102:1
107:10
**takes**
87:8
**talk**
11:3,4,5 13:18 32:14
66:3 101:16
**talked**
13:13,14 23:10 24:25
27:20 28:7
**talking**
13:10 17:20 20:19
22:9 27:13 41:14
48:8,25 49:20 50:9
51:1 52:8 61:19
66:21 67:23 71:23
72:9 88:23 95:25
96:16 100:19
**Tanvi**
5:5 39:12,16,19 97:8
99:5 104:13,20
**Tanvi's**
91:4
**target**
46:16 89:11
**targeting**
82:5 86:25
**targets**
83:2
**task**
16:23 33:16



team
11:22,24,25 25:3
81:19,21 84:7,7
95:25 96:2,2,4
102:11
teams
27:5 96:3
telephone
27:3
tell
10:11 31:5 32:16,19
39:3 41:25 61:24
71:21 85:19 94:2
telling
32:9 82:9 84:13
tells
35:17
ten
30:11,19,19,25 32:6
32:8,15 40:25,25
41:1 43:19 56:16
57:2,3
tens
56:16
term
51:21,23
terms
14:6 49:4
test
77:2
testified
43:11 104:13,19
testify
89:14 107:7
testifying
43:19,20
testimony
4:4 8:6 18:21 31:15
56:5 84:21 107:10
testing
14:25 15:2
tests
20:5
thank
56:3 65:21 67:21
102:7 105:4,6,10

106:4,10
Thanks
65:14 106:5
thing
11:2 51:4 85:16
things
10:21 17:2 21:9 31:2
49:21 54:12 57:15
57:24 63:15 77:25
81:5 82:3 83:1
85:15 86:23 91:20
96:20
think
20:24 24:10,11 25:23
31:21,25 32:10 34:9
47:5 57:17 60:11
61:10 65:5 76:1
78:24 82:14 87:8
91:18 94:18 95:22
100:9 101:8,9
103:21
thinks
98:25
third
23:13 72:7
thought
13:9 18:8 31:10 33:8
62:11,12 67:11
thousand
57:6 88:2
thousands
14:1,2 56:5,9,14,16
81:2
three
10:1 96:1
throwing
78:11
time
7:8 9:4,21 10:2,2
11:3 13:1 15:23
16:1 19:2,10 22:5
23:19 24:6,8 26:20
27:8 31:10,13,17,19
31:20 34:5,8,10,17
39:4,8,13 43:10
52:15,20,25 53:2,5

53:5,6,25 54:20
62:1 65:16 66:14,16
67:6 70:7 73:5 76:8
76:15 77:5,5 78:20
80:12 81:7 83:15
91:10 95:8 96:19
101:24 102:4 103:5
104:6 105:12,13
107:11
timeline
72:20
times
9:25 23:4 28:6 30:12
30:19,20,25 32:6,15
37:13,22,23 38:8,19
38:25 39:1 40:21,25
40:25 42:2 43:2,11
43:16,19,20 96:16
timing
103:2,11,16 106:6
title
17:19 72:7 92:22
today
7:7 9:14 14:1 42:5
77:15 89:18 104:21
today's
105:15
toilet
35:19,20,23 36:10
told
13:1 19:25 20:8
23:11 38:14 76:10
80:3 83:10 88:15
97:16 105:1
top
24:12 37:24 54:13
76:23 90:16
Torres
3:11,12,12,12 4:17
4:19 7:24 9:16,17
22:15,22 23:3,5,14
30:12,14 31:9 39:18
41:9 44:4 45:18
54:7,9 58:20 59:19
59:25 66:6 67:1,10
71:2,6 74:16 97:18

98:2 99:18,20
100:10 101:5 103:8
103:25
total
51:19 103:18
totals
38:14 42:25
tracing
83:1
track
92:1
tracked
41:10
transactional
16:20
transactions
21:18 75:16
transcript
2:1 105:17 107:10
transfer
48:9
transfers
4:19 46:11 48:4,9
73:4
transparent
23:20 37:20 51:3
61:11
treat
79:17
treaties
43:24
treatises
34:16
trial
43:17,19
tried
69:19
Trivago
53:15
true
41:12 73:21 78:10,16
85:14 104:21
trust
1:6,7 7:5,22 9:15
94:10,10
trustee



1:7 24:19,23 26:9
29:22,24 56:8 75:18
93:13 94:9 99:14
**trustee's**
25:6,6,10 27:13 84:7
86:14 99:1
**truth**
8:6,7,7 84:13 99:16
107:7,8,8
**truthfully**
11:10
**try**
10:5,7 11:4,5 22:3
38:17 57:21 59:23
60:5,22 71:10,17
78:12,22 83:6 86:14
**trying**
41:20,20 71:7 77:4
77:13 80:4,5 82:13
82:21 90:1 94:8
**tune**
73:19
**turn**
14:1,9 34:20
**turned**
13:8
**twelve**
41:1 43:19
**Twenty-four**
43:22
**Twenty-three**
43:22
**twice**
21:9 26:15
**two**
12:3 49:4 61:9,20
69:3
**TY**
67:21 68:8
**typically**
24:21 53:19

_____ U _____

**uh-uh**
10:20
**um-hum**

10:20
**unable**
17:16 20:2 75:24
76:1
**underlying**
13:24
**understand**
10:10,12,13,17,25
11:6 13:21 21:11
40:10 60:4 77:4
88:6 90:1
**understanding**
14:5 16:9 34:21
**understood**
10:15 14:13 17:5
55:20 80:15
**unit**
33:15
**UNITED**
1:1
**unpaid**
18:1,2,14 103:7
**untangle**
77:13,13
**unwinding**
16:17
**use**
17:17 27:4 79:22
98:21
**Usually**
35:23 55:13

_____ V _____

**V**
1:8
**Vagnoni**
3:8 8:13 101:4
**vaguely**
32:9
**validated**
17:2 20:10
**value**
19:24 37:1 59:19,21
74:4 78:16 94:13
**values**
77:4

**various**
83:2
**vendor**
54:14
**vendors**
23:12,15 35:12 44:12
53:25 54:9,15,19
81:14 91:9
**verbal**
73:7,17
**verbatim**
107:10
**verifiable**
62:3
**verify**
62:9
**version**
24:21
**versus**
7:5 101:1
**vet**
33:6
**vetting**
77:13
**victims**
49:8
**video**
9:20
**Videoconference**
1:13 2:2
**videographer**
3:14 7:2,10,23 8:24
9:3,7 65:15,18,22
101:23 102:2 105:7
105:11
**Videotape**
7:3
**Videotaped**
1:13 2:1
**view**
50:11
**violations**
48:16
**Vitali**
3:14 7:11
**voice**

94:21
**volunteered**
33:11

_____ W _____

**wait**
41:11 53:9,20
**Waldie**
1:14 2:2 4:4,15,23
7:4 8:20 9:11 11:13
11:17 25:25 36:7
38:2 62:21 63:6
65:24 66:2 71:21
79:9 107:6
**want**
11:15 12:24 21:6,8
21:11 24:15 36:15
37:25 40:10,11,11
40:12,12 43:4,8
49:5 51:2 53:6,8
64:14 67:7 69:21
70:20 78:22 91:25
102:12 106:6,7
**wanted**
13:15 14:7 80:1
81:13 101:3
**wanting**
53:7
**wants**
97:18 98:24
**wasn't**
16:10 17:4 19:19,21
31:5 51:10,13 60:8
63:22 67:4 71:3
80:23,23 84:13
88:21 92:4,8,10,12
98:8 100:7,23
102:25
**water**
17:16 73:6
**way**
10:8,12 29:1 78:21
88:10 93:19 98:17
**ways**
63:14
**website**



100:12
**weekend**
106:3
**Weekly**
4:24,25
**weeks**
15:6 26:22
**welcome**
65:22
**went**
17:19 32:10,12,12
  45:7 63:23 64:3
  65:2 80:19 81:19
**weren't**
47:12 59:11 63:8
  64:24 80:7
**West**
3:4
**we'll**
25:21 55:18 82:14
**we're**
9:3,7,20 16:17,25
  17:20 20:9 48:25
  54:11 63:24 65:15
  65:24 66:21 69:14
  77:7,13 82:13,13,13
  82:23,23,25 86:24
  86:24 105:11
**we've**
17:11 41:3,14 55:24
  55:24,24 59:14
  81:25
**wife**
93:21
**willful**
81:15
**William**
1:14 2:2 3:9 4:4,23
  7:4,23 8:11 107:6
**willing**
89:25
**wisely**
82:14
**witness**
6:5 8:2,8 12:13 18:14
  18:25 19:13 28:4,23

31:17 40:16 42:12
  48:2 55:5,21 60:11
  84:2,16,23 88:5
  97:11 99:2,24
  101:22 104:16,25
  105:6 106:12
**word**
82:2
**wording**
66:8
**words**
10:9 35:13 69:7,24
**work**
31:7 33:4 45:25
  62:16 63:2 81:22
  86:17 89:2,4,12
  100:11,12
**worked**
33:11,17 48:17
**working**
26:3 96:14
**works**
52:21 78:21 88:9,10
**worried**
65:5
**worth**
81:2 103:5
**wouldn't**
29:4 30:5,7,10 42:4
  57:14 69:14 73:13
**write**
88:13 93:9,14
**writing**
44:1 70:19 88:15
  91:3,5,7
**written**
44:3 67:1
**wrong**
14:11 60:18 88:19,25
**wrongful**
48:24
**wrote**
67:11 88:1
**www.MagnaLS.com**
1:22

| **X** |
|---|

**X**
4:2,8 36:10

| **Y** |
|---|

**yeah**
8:24 13:22 17:9
  21:13 24:12 27:5,11
  31:25 33:24 35:4,17
  37:7 41:13,16 42:24
  44:16,18 49:23
  50:17,18,25 51:5
  52:1,2 54:15,16
  55:24 56:13 57:3,19
  57:24 60:1 61:8
  62:22 67:8 68:3,9
  68:10 75:2,23 77:22
  79:13,15 82:8 91:12
  92:25 93:12 94:17
  94:25 104:10
**year**
4:16,18 15:8 16:21
  16:22 31:22 32:4
  77:6,6 100:17,21
  101:1
**years**
16:11,13 35:4 43:21
  43:22 77:10
**Yep**
8:18 83:17
**yesterday**
12:23 97:14
**Yup**
80:9 83:20 92:18

| **Z** |
|---|

**zero**
72:16,17,18,22 73:10
  74:23,25 75:1,2
**ZOOM**
1:13

| **0** |
|---|

**08054**
3:10

| **1** |
|---|

**1**
4:21 7:3 13:23 65:25
  68:22 101:24
**1.125**
102:19
**1/16**
73:10
**10**
25:12,19 67:9 78:10
**10:02**
2:8 7:8
**10:03**
9:4
**10:04**
9:8
**100**
16:18 32:19 91:6
  100:17
**100,000**
73:4 101:1
**102**
4:16
**11**
5:6 38:16
**11th**
31:21
**11:08**
65:16
**11:20**
65:19
**110**
74:24,24
**1120**
3:9
**12**
69:14,22
**12:04**
101:25
**12:14**
102:4
**12:18**
105:12 106:15
**12:19**
105:13



**120**
95:4
**121**
102:17
**13**
6:13 90:18
**130**
94:19
**15**
22:17 38:1,15,24
   50:12,22 100:3,4
**16**
72:20 75:14
**160**
94:15,16 95:7
**17**
6:7 76:22 77:17
**17th**
17:15 32:1
**18**
6:7 46:15 50:12
**18th**
32:1
**1872**
76:14
**19**
75:25 76:4 107:22

---
**2**
**2**
6:8 20:12 102:4
   105:13,14
**2,385,599**
103:3
**2.3**
103:22
**2.385**
102:24
**20**
6:13 50:12,22 96:14
**200**
100:17
**2004**
20:22
**2013**
33:5

**2016**
4:21 15:8 17:6,8,22
   18:1,20 20:3 24:6
   72:8,13,18,23
**2017**
15:12 72:2
**2018**
15:16 49:15 74:13
**2019**
15:19,25 74:14 75:21
   76:5
**2020**
16:4,5 24:7 63:7
**2021**
16:7 24:5 51:6,11,14
**2022**
4:22 102:12,16,20
   104:11
**2024**
1:15 7:7 107:23
**2025**
107:22
**21**
23:8
**22**
6:8,13
**23**
26:18
**23-1335**
1:2
**24**
35:4 78:11
**25**
50:13,22 66:2,22
   100:3
**250**
3:4
**28th**
33:5
**29**
1:15
**29th**
7:7

---
**3**
**3**

6:7 20:13 70:1,3
   103:4
**3.5**
102:22
**30**
4:22 29:3 61:19 69:6
   70:6 75:11 100:3
   107:23
**30X100227400**
107:21
**31**
30:20
**32**
6:13
**34**
45:4
**36**
40:2 45:4
**36-and-a-half**
45:7
**360**
94:11 95:9
**38**
5:5 17:21 75:11

---
**4**
**4**
70:23
**420**
3:9
**43**
44:17
**43215**
3:4

---
**5**
**5**
20:15,20 22:17 73:19
**50**
39:19,25 45:5,14,16
   91:4
**50/50**
69:5
**503-5540**
55:21
**520**

94:17 95:4
**55**
76:15

---
**6**
**6**
102:8,9
**60**
69:4 70:18
**62**
6:7
**63**
6:7
**65**
4:11
**660**
81:1 90:15
**68**
4:12

---
**7**
**70**
4:13,14
**700**
3:4
**71**
4:21
**73**
3:9
**732**
55:21

---
**8**
**8**
95:13,14 104:4,8
**84**
44:10 45:10
**85,000**
73:3
**86**
6:7
**866-624-6221**
1:21
**89**
6:8,8



| 9 | | | |
|---|---|---|---|
| **9**<br> 4:5 71:15<br>**90**<br> 5:3<br>**94**<br> 54:3 | | | |

