# **DEFENDANTS' EXHIBIT 2**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

Edmond M. George, Esquire
**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**
1120 S NJ 73
Suite 420
Mount Laurel, NJ  08054
*Counsel to Defendants Javier Torres, Media Effective, LLC, Dora Dillman, Javier Torres, Jr., Natalia Torres, Paulina Torres.*

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No:  22-14539-JKS<br><br>(Jointly Administered) |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MEDIA EFFECTIVE LLC, *et al.*,<br><br>Defendants. | Adv. Pro. No. 23-1335-JKS |

**DECLARATION OF JAVIER TORRES IN OPPOSITION TO THE CONTINUATION OF THE TEMPORARY RESTRAINING ORDER AND IN SUPPORT OF MOTION TO <u>DISSOLVE TEMPORARY RESTRAINING ORDER</u>**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

1

4862-7611-0259 v1

I, Javier Torres ("Javier"), having been duly sworn upon an oath and do hereby state as follows:

**I.    Who am I.**

1. I am one of the Defendants in the complaint filed in connection with the above lawsuit ("Lawsuit"), along with my company Media Effective, LLC, ("Media"), my wife Dora Dillman ("Dora"), and my children, Javier Junior ("Jr."), Natalia Torres ("Natalia") and Paulina Torres ("Paulina" or collectively, the "Defendants").

2. I own and control Media. I gave my children small percentage interests in Media, though none are or have been active in the creation, management or operation of Media's or my business.

3. No one in my family has any knowledge of the events leading up to the Lawsuit.

4. I have been in the advertising business since 1986, beginning my career in Colombia, and then moving to the Unites States where I held various marketing and advertising positions in the consumer goods, and real estate segments.

5. I have no personal affiliation with NRIA or its officers, owners, or principals.

6. I was never an owner, officer, manager, member, or employee of NRIA.

7. I was, and I am an independent third-party vendor of advertising time, no different that the person providing supplies or services to NRIA.

8. I was authorized by NRIA to book advertisement time.

**II.    The Lawsuit and its impact on my family and me.**

9. The Lawsuit names my children and my wife as Defendants. My son and my daughters are just starting their lives.

10. This Lawsuit has left them nervous and afraid that they will lose what they have or that their name will be forever associated with the reprehensible and criminal acts of NRIA and its principals.

11. The Trustee sued all my family members in an effort to apply pressure on me and to be vindictive towards me.

12. The Lawsuit, and in particular, the TRO entered and extended by this Court to April 10, 2024, is causing me injury. It has been almost 6 months since the TRO was put in place.

13. I have fully complied with the TRO and provided the Trustee proof that I spent the money paid to me by NRIA on advertising. I did not spend it on other things or divert it to the principals of NRIA or away from the Trustee. I don't owe any money to my media suppliers.

14. I have been severely restrained in any effort to start or obtain new business as the allegations in the Amended Complaint have accused me of aiding and abetting the wrongdoers in the NRIA case.

15. In response to the initial TRO, I produced substantial records showing all advertising time purchases, and tracking them to the checks deposited in my and Media's bank statements. I did this for each of my accounts.

16. After my bank ("TD Bank" or "TD") was served with subpoenas by the Trustee, I attempted to cash a check and was told by TD that my accounts had all been closed. I received no notice and to this day TD has refused to tell me why.

17. I believe the Subpoena, and the Lawsuit, which inaccurately and wrongfully painted me as a participant in a Ponzi scheme was the reason for TD ending its banking

3

relationship with me, though I will never know for sure. My son's account at TD bank was also closed as a result of this.

18. Prior to the service of the subpoenas, the commencement of the adversary proceeding or the TRO, I started investing in real estate in Colombia in or about 2019, where I have been building homes with my sister. Due to the TRO restrictions I haven't been able to continue this business and it is affecting my sister/partner and the workers associated with this projects.

19. I also have a restaurant in Columbia that will have to close if I do not get relief from the TRO so I can resume my business activities. Seven employees and vendors are waiting for financial assistance to continue this business.

20. My life, my finances and my business have effectively been frozen because of the TRO.

21. My wife and children are suffering under the pressure of the Trustee's lawsuit and the TRO while I have done nothing wrong.

**III.    My efforts to comply with the 2004 Subpoena**

22. When I received the initial Subpoena, I hired Christopher Brennan, Esquire to respond to it.

23. I began collecting documents to produce in response to the Subpoena and did in fact produce thousands of documents. When reviewing the documents, I realized I had a non-disclosure agreement with NRIA valid for 10 years. I told my lawyer that I was concerned that providing documents might expose me to liability to NRIA, so I asked him to verify the validity of the NDA. I also, asked to obtain a Protective Order to protect my business sources and methods. They never responded about this.

24. The Trustee's lawyer, Ms. Lasley, has acknowledged that she did communicate with Mr. Brennan about responding, and that they did discuss and prepare a protective order.

25. I was not made aware that Mr. Brennan communicated with the Trustee's attorney until March of 2024. I was unsatisfied with Mr. Brennan, and sought replacement counsel. While trying to obtain substitute counsel, I was sued by the Trustee. I have since retained Obermayer to substitute for Mr. Brennan, which they have done.

26. Obermayer immediately helped me get documents together. I complied with the original TRO and provided substantial documents to the Trustee's counsel. To date I have provided about 20,000 documents that include bank/financial statements, excel tables with all checks received and check paid to media suppliers, emails/communications with NRIA and communications with my main media suppliers.

27. Even prior to the TRO being entered, I voluntarily did not move assets away from me or the Trustee. Media is a single member LLC that I exclusively control. My children have only a tiny percentage of ownership and have never been active in it.

28. The Trustee has now completed his accounting and as I understand that was the reason for the TRO.

**IV.     Neither Media or I had a relationship with NRIA or the principals Raymond Grabato ("Grabato") and Nicholas Salzano ("Salzano").**

29. I was not controlled or influenced in any way by the principals of NRIA.

30. I did not at any time share with, kickback, compensate, remunerate, reward, or provide anything of value to anyone, but specifically Grabato and Salzano in exchange for receiving the orders for advertising time from NRIA.

5

31. I was unaware of Salzano's history and background, until late in 2021 when NRIA was, based upon Glen A. La Mattina's ("La Mattina") statements, on the verge of collapsing. I was shocked to hear this, as I had no idea there were financial issues or anything improper going on at NRIA.

32. I did not know that in 2019, NRIA was not paying its bills as they came due. To my understanding, there is no earlier evidence of insolvency. The Trustee has admitted in response to discovery that NRIA became insolvent in 2019.

33. I was also shocked to hear La Mattina's description of Grabato owning NRIA, because I always took my direction from Salzano. Based on Salzano's actions, I was under the impression that they were both owners of NRIA.

34. I had no idea the nuances of NRIA's ownership/management structure, or that Salzano was a "behind the scenes" person.

35. I was unaware that Salzano had a previous conviction in connection with his former company Norvergence or that he was adjudicated to have defrauded people.

36. I was not a social friend of Salzano or Grabato, though I was invited to the NRIA Christmas party, which I occasionally attended. I did not otherwise socialize with the principals of NRIA Salzano and Grabato.

37. The Trustee's financial advisor, Bill Waldie ("Waldie") indicated in his Declaration that it was in my and Media's best interest for NRIA to continue. This is true, but equally true for any company with a multiyear customer, as I and Media had with NRIA.

38. I was always acting in my and my company's interest, while achieving savings for the Debtor, in its advertising spend.

4862-7611-0259 v1

39. I do not know what Waldie means by this statement because it is in every vendor's best interest for his customer to grow and continue buying. This is by no means unusual.

40. I had no reason to believe that Grabato or Salzano were running what has been as alleged to be a Ponzi scheme. I was led to believe the company was strong and getting stronger all the time.

41. To the extent the Trust claims I aided and abetted in a Ponzi scheme, I had no indication that the intentions of the officers of NRIA were to commit fraud. As I understood it there was real estate being built which was valuable to NRIA customers. As I understand, there was over $200,000,000.00 in real estate when NRIA closed.

42. I did not know NRIA could not pay bills. It paid all my and Media's bills timely. Never once was there a suggesting of financial trouble at NRIA.

43. I had no idea that individuals inside of NRIA like La Mattina knew bills were not being paid but never warned management to stop taking investor money or reach out to investors or the authorities.

44. La Mattina maintains that he knew in 2020 that vendors were not being paid; however he never shared that with me or the investors, even though he is the former COO of the alleged Ponzi scheme.

45. I now see the Trustee is avoiding going after the people who were aware of and responsible for losses at NRIA, and instead targeting a vendor who had no knowledge that any harm was being committed.

4862-7611-0259 v1

## V. The Perjured La Mattina Declaration

46. As set forth in the Motion to Strike Declaration of La Mattina filed with this court, the extended TRO was supported with a false Declaration by La Mattina.

47. Under oath, Mr. La Mattina conceded that the statements about the margins he observed were actually false and that he in fact had no idea what margins were for Media or me or for that matter any other vendor.

48. He also concedes that his statement that "nine out of ten" times Media or I were higher in our advertising quotes is a contrivance and not actually supported by evidence.

49. Importantly the Trustee has not provided documents supporting La Mattina's statements. Mr. La Mattina didn't provide any of the many documents requested by his subpoena to testify/deposition. Not one.

50. Nonetheless, La Mattina's Declaration falsely states that he was aware of the margins of Media and compared them to others, when in actuality he had no knowledge about the margins and admitted as much in his deposition.

51. Equally important is La Mattina's admission that he did not know Media's competitors' margins.

52. The Trustee or the Trust's financial advisor, Alvarez & Marsal, had to have been the source of this statement which is knowingly false and perjurious. Mr. La Mattina admitted that he received this information from the "investigator".

53. During Mr. Waldie's recent deposition, he revealed that La Mattina had/has an intimate relationship with Tanvi Chandra ("Chandra"), the owner of Renascent Enterprises ("Renascent"), who was my direct competitor in providing media buys to NRIA. She also became an employee of NRIA while still providing media buy services to them. One of the

8

Trustee's main witnesses through his Declaration in support of the TRO is a person that had/has an affair with my former competitor. I was unaware that La Mattina and Chandra were having an affair until Mr. Waldie testified that he was aware of it in his deposition.

54. I was shocked when this information came to light, but more shocked to know that counsel to the trustee knew about this intimate relationship.

V. **Media's and my experience acquiring advertising time.**

55. I learned from early experiences that there are a number of ways advertising agencies and media buying companies work.

56. Early on in my career, I was involved with a company who bartered corporate travel and other surplus items for advertising time.

57. I learned from these experience that there are varied ways in which advertising time is obtained. I believed that I was able to design a business model that allowed me to buy media for NRIA at lower than market rates and at the same time I could make a profit. It was not a commissioned based agreement. I never agreed to do this for a commission. For over six years I did business the same way, by buying time at discounted rates and marking it up.

58. The Trustee is attempting to punish me for running an ethical and successful business, aligned with the standards and practices of my industry, whereby customers pay me for my talents, my knowledge and my contacts to buy media at discount, while building in a profit margin for myself that also protects the value for my customer. The Trustee is looking at my margins, which are irrelevant to this dispute. What is relevant is that the Debtor never overpaid for advertising time.

59. I learned about buying time in large volume at discount in the way that airlines sell off unfilled seats to companies like Priceline and Expedia. Advertising space/time is no

different. The "secret sauce" to my success was my media partners, and their ability to obtain savings. That's why I wanted a Protective Order to keep my sources and methods private. Buying at a discount through my media suppliers allowed me to design a similar business model to the Expedia example.

60. Because my media partners/suppliers purchase hundreds of millions of dollars in advertising, they can obtain major discounts and have access to remnant advertising, direct response and discounted rates. Sometimes at 50% off the card rate. I was able to negotiate at those rates with them, add my fee structure, and keep my rates below market/rate card for NRIA and still make a profit. Due to the constant change in rates due to factors such as holidays, political campaigns, offer and demand, etc., my fee structure provided stable pricing at fixed weekly budgets, at the request of my client, allowing me to absorb the variance in rates and still provide my client a discount off of marketplace pricing.

61. My rates for NRIA were always very competitive and consistently below market price. As an example, I would build a media plan with a set unit rate of $770 for a specific program to create a stable and value driven plan for NRIA. NRIA could solicit pricing directly from the network but as an advertiser, without an agency buyer, they would receive the network's published "rack rate" at $1,000 for that same program, or even a higher rate on account of the network assuming the client isn't paying an agency fee. As their agency of record, buying on NRIA's behalf, I would work diligently with my media partners who are able to receive volume discounts. However, discount pricing can fluctuate daily so on some weeks, I might have to pay $900, while only billing the client $770, and other weeks, I might be able to negotiate $580, allowing me to secure $190 profit on that unit. My job is to ensure value and results at consistent and discounted pricing, which required that I navigate and absorb the variances on behalf of

10

NRIA, while allowing them to receive a consistent $230 (23%) savings. This method allowed me to keep media rates for NRIA very consistent and without major increases for years and years.

62. While working with NRIA, I understood that NRIA was looking for direct response advertising time.

63. Direct response is markedly different than other types of advertising. Direct response advertisement requires more frequency, and its goal is to generate a subsequent contact from the viewer in order to offer/sell the advertised good or service.

64. Direct advertising requires a "call to action" meaning that the viewer must call in.

65. A good example is Medicaid coverage. Between November and January of each year you will see television advertisements, running in constant rotation, which might say "Call now"! This is classic direct response advertising.

66. However, the advertising merely reaches an audience. In order for direct advertising to work, the company, in this case NRIA, must actually sell the product once contacted.

67. Therefore, the success of any direct response ad campaign is tied to the number of responses received.

68. I closely watched these metrics to help NRIA refine its advertising strategy.

69. It is important to note that the direct response advertising simply gets people to call or reach out to the company. NRIA had employees called "closers", whose job it was to receive calls generated by direct response advertising and some of whom made $1,000,000,00 per year for convincing people to invest.

70. I was not a closer and I never had any contact with investors.

71. I did nothing to convince people to invest in NRIA. I never spoke to an investor.

11

72. The ad campaigns I placed for NRIA routinely reached audiences as intended. NRIA did the rest to close the transaction with the caller.

73. It is important to note that neither I, nor Media was an exclusive provider of advertising time services. As I understand, NRIA spent over $85,000,000,00 on advertising.

74. The amount spent with Media and me over the entire period of the relationship was about one-third of all advertising spending.

V.   **Media and I become vendors for NRIA**

75. I began offering advertising time to NRIA in 2012 when NRIA was a very small company and operated out of a basement office in Hoboken, NJ. I continued offering to obtain ad time through the beginning of 2022.

76. My only agreement with NRIA was to provide them with market competitive media buys and my invoices reflected an all-inclusive cost. The gross amount charged to NRIA in my invoices included my professional service fees, which are not fixed but rather vary on account of an industry that is constantly in flux. We never agreed to a fixed margin or commission structure verbally or in any contract. The scope of work NRIA requested of me involved a range of daily services, including strategic planning, negotiating, monitoring, and optimizing their campaigns across thousands of shows, while also providing a fixed weekly invoice tied to fixed pricing. This required that I absorb and reconcile pricing and inventory fluctuations in a market that is always in motion, impacted by supply, demand, economic indicators, political events, natural disasters, holidays, and more. NRIA was prescriptive about their weekly schedules and set budgets which they relied upon to benchmark their ROI, as they would measure closely on account of their phones ringing. They defined ROI as "value and

4862-7611-0259 v1

results" as their direct response objective and this was the service I provided. We never had a written contract stating any specifics. I was not the exclusive provider of this service.

77. I bid for advertising, never knowing if it would be awarded to me of Media.

78. I was routinely asked to beat others advertising prices, which I often did.

79. I realized that many vendors simply sold time based upon frequency not response. As an additional service supplementing my sale of advertising time, I provided additional services in the nature of time comparisons, follow up data assessments of viewership, and the like. Other vendors simply went for high frequency without regard to audience. I would see other vendors of advertising time quoting run times at 2:00AM and other times that are inexpensive but inefficient.

80. I learned that the NRIA targeted audience of males 55 and over with $1MM in assets and $250K in income and believed that these time slots would not reach the targeted audience.

81. If NRIA was buying advertising time directly with stations, it could not achieve or obtain the same rates that Media and I were able to obtain for NRIA, due to the purchase power of my media partners.

82. I routinely was able to beat other offered advertising time due to my expertise and industry contacts/suppliers.

83. It is critical to understand that I had no contract with NRIA. I was free to provide or not provide any services to NRIA, and NRIA was free not to use me and often exercised that right by using different advertisement agencies. I was not contractually obligated by any agreement oral or otherwise to obtain time at the cheapest rate available in the market, or on a

fixed commission. I was only required to save NRIA time and offer value for the retail prices for advertising.

84. For example, in the Southeastern Asia markets where NRIA was operating, NRIA was using Renascent, a company owned by Chandra, who at the time was a trusted vendor to NRIA. I was unaware at the time that La Mattina and Chandra were having an affair.

85. I was periodically asked to provide a competitive bid to Renascent's pricing and was able to beat their quoted rates on most occasions, by as much as 50% on one particular occasion in a general market radio buy.

86. Now I realize that La Mattina and Chandra having an affair put me at a disadvantage, as they likely worked against me to try and recapture the business for Renascent that NRIA ultimately awarded to Media and myself on account of consistently better pricing.

**VI. I never wrote scripts for advertising**

87. I never wrote scripts for NRIA, ever.

88. The Trustee falsely claims I did, but the facts say otherwise.

89. If an advertisement were too long, I would write Salzano and tell him the network position. Sometimes the ads were too long. If NRIA had to delete a line, I would tell Salzano, and he would make the decision of what to remove.

90. Salzano always s made these decisions on what the script said, never me.

91. The changes never related to making the ad more attractive or relatable to investors, ever. And it bears to reason that the network would communicate with me as the representative obtaining the time for NRIA.

92. On the occasion that a network didn't approve advertising content, they would identify the content that needed to be changed, which I would relay to Salzano, who would

14

author NRIA's edits and resubmit for approval. All edit requests were issued by the networks based solely on compliance matters and all edits were produced by NRIA and approved by Salzano. None of the feedback was issued by me and none of the changes were produced by me. I was the conduit ensuring compliance guidelines were messaged and met.

93. Waldie ultimately agreed that I did not provide substantive changes to the scripts.

**VII. The "Red Herring" Margin issue**

94. I drove my pricing from the "Card Rate" for advertising rates. My goal for NRIA was always to provide them with Value and Results.

95. The "Card Rate" is the retail price for advertising. However, discounts from the Card Rate are available to volume purchasers who are seeking to obtain large blocks of time.

96. My efforts were to always effectuate savings to NRIA from the card rate utilizing the volume buying power of my providers Hybrid Media and LWD mainly.

97. Based upon the time I sold to NRIA, I estimate that I saved them about $7 million dollars overall in advertising costs when compared to the card rate/retail price at the time.

98. The ads were effective in reaching an audience, because I constantly monitored, the outcome of the direct advertisement campaigns, including planning, modifying, ordering, supervising, evaluating with client, re-implementing changes and implementing new stations/changes, a set of services many other media buyers did not do or even offer.

99. I did a number of other things to aid NRIA which was part of the charge I had for the advertising time I sold:

    a. Understand NRIA's media strategy and needs.

    b. Meet with media vendors and present NRIA's media strategy and needs.

4862-7611-0259 v1

    c. Solicit from media vendors and broadcast stations research data and media information.

    d. Coordinate media plans with NRIA and media stations.

    e. Coordinate times, scheduling and deliveries of media.

    f. Oversee media implementation.

    g. Negotiate media plans, manage budget allocation and optimization.

    h. Secure competitive media marketplace pricing, foster strong media partner relationships and apply knowledge of media buying strategies, etc.

100. Vendors do not always share margins with their customers. From the onset, I and Media quoted prices on an all-in basis. The customer only cares about the net cost of advertising, not the vendor's margin. The Trustee however is hyper focused on this and would not have even known the margin had it not subpoenaed my records, which I willingly provided to the Trustee.

101. It is important to note that the Trustee is now using hindsight to create issues about the services I provided and is using perjured testimony to make it look like people at NRIA questioned my work. Never in the entire time of providing these services did any one question my or Media's efforts on NRIA's behalf.

102. NRIA was free to use or not use me based upon my all-in advertising strategy, as in each instance it was substantially cheaper than the Card Rate.

103. I was not obligated, nor was Media obligated, contractually, or otherwise, to provide the lowest cost for the advertising. Again, as ready, willing, and able purchasers, each party was fully apprised of the terms and agreed to them.

104. My purchasing strategy and margins are proprietary and private, and not something I would willingly share with my customer.

105. It wasn't until new management reached out in October 2021 that I was asked to provide my commission line using a standard Gross/Net calculation in my invoices. I explained that my business model wasn't a "fixed fee" model but varied to accommodate flat pricing at set weekly budgets for NRIA, which had always been their directive and priority. When pressed to put something down, I added a ballpark "commission" line noting it could be "higher or lower than stated due to market fluctuations, negotiations, and other factors."

106. I always delivered to NRIA, steep discounts from the Card Rate, which were easily competitive with the other vendors supplying NRIA advertising time.

107. I am being accused of charging high rates, but the trustee has never compared my rates at the time with other vendors of advertising at the time or with the market going rate at the time. They have no real point of comparison to come to any conclusion.

108. In summary, I have been accused of some of the most terrible things in this Lawsuit: (a) I was accused of being an insider. The Trustee has provided no evidence, not even a mention of this from any witness; (b) I was accused of aiding and abetting the bad actors at NRIA in a securities fraud, when all I did was; (c) I was accused of secreting money. I never moved money to avoid the Trustee. That money is my profit from years of hard work. I have had it in the same places since I earned it. I never moved it anywhere. The Trustee knows where every dollar is. I provided information to the Trustee that he had the wrong accounts and voluntarily amended the TRO to include them (d) I have been accused of overcharging, but my buys/rates were constantly better than Card Rates from media networks at the time and the results/response generated thousands of leads.

109. The Trustee plead most of this on "information and belief". Based upon the lies told int eh Declaration, and the absolute absence of credible evidence by the Trustee, I believe the facts of this suit are contrived and were made without due investigation.

110. I am therefore asking that the court vacate the TRO and allow me to continue with my and my family's lives.

Dated: 4/3/2024

By: _____
Javier Torres