# <u>DEFENDANTS' EXHIBIT 3</u>

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**Edmond M. George, Esquire**
**OBERMAYER REBMANN MAXWELL &**
**HIPPEL, LLP**
**1120 S NJ 73**
**Suite 420**
**Mount Laurel, NJ  08054**
*Counsel to Defendants Javier Torres, Media*
*Effective, LLC, Dora Dillman, Javier Torres, Jr.,*
*Natalia Torres, Paulina Torres.*

| | |
|---|---|
| In re: | Chapter 11 |
| NATIONAL REALTY INVESTMENT ADVISORS, LLC, *et al.*,[1] | Case No:  22-14539-JKS |
| | (Jointly Administered) |
| Debtors. | |
| AIRN LIQUIDATION TRUST CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST, | Adv. Pro. No.  23-1335-JKS |
| Plaintiff, | |
| v. | |
| MEDIA EFFECTIVE LLC, *et al.*, | |
| Defendants. | |

**DECLARATION OF ERIN AREND IN OPPOSITION TO THE CONTINUATION OF**
**THE TEMPORARY RESTRAINING ORDER AND IN SUPPORT OF MOTION TO**
**DISSOLVE TEMPORARY RESTRAINING ORDER**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://omniagentsolutions.com/NRIA.

4872-6037-2660 v1

I, Erin Arend, having been duly sworn upon an oath and do hereby state as follows:

1.     I have been retained by Media Effective LLC ("ME") and its Founder/Director Javier Torres ("Javier") to provide expert testimony relating to the pricing of advertising time sold by Javier and ME to NRIA.

2.     Attached as **Exhibit A** hereto, is my resume.

3.     I have over 25 years of experience in the media industry, working from 1994 to 2020 in sales and business development for various media properties, including Bravo, The Independent Film Channel, Telemundo, TV Guide, and ultimately all of the properties that represented the Discovery Networks portfolio, including Discovery Channel, Travel Channel, OWN, TLC, The Food Network, and many others.

4.     Throughout my career, I have worked with hundreds of advertisers in every major category, from fortune 500 companies to major film studios to small startups, overseeing multi-platform campaigns valued at over $1 billion in revenue. Many of these transactions were client direct but the bulk of my business was transacted with media agencies that ranged from small outfits to large conglomerates, Direct Response agencies, digitally centric agencies, and third-party resellers.

5.     I have a deep understanding of multiplatform media practices and disciplines across key markets and business categories, including strategic planning, pricing, inventory management, sales, marketing, agency and client relations, negotiations, stewardship, execution, and the ongoing customer service and discipline required to ensure successful campaigns and renewal business.

6.     I personally have had the privilege of helping to launch hundreds of successful campaigns for household names such as Priceline, Expedia, Home Depot, Overstock, Etsy,

2

Toyota, Clorox, Sony, and Apple, to name a few. I remain a trusted advisor to many media executives in the industry today, drawing on my extensive experience and knowledge.

7.      I have been retained as an expert witness on behalf of Javier and Media Effective in response to media-related claims filed against them by the AIRN Liquidation Trust Co., LLC.

8.      The following contains my responses to the various claims made against Javier Torres and ME, based on my expertise and experience in the media industry, as well as my understanding of the facts that were presented to me through a number of sources, including client interviews, review of records, and documents from the client and others.

9.      In that context, I have seen many different advertising arrangements between parties seeking advertising time and those who sell it.

10.     I have read and understand the Trust's theories in this case, and I believe none of them are well founded.  Both Javier and ME received the payments for advertising time in good faith, without knowledge of the unlawful acts of the principals of NRIA, and at a substantial savings to NRIA, from the market price for this advertising.

11.     First, it must be noted that Both Javier and ME actually provided the advertising in question and that NRIA benefitted from their ethical and effective media services.

12.     There is also no doubt that on numerous occasions, Javier was asked to beat, and did in fact beat the prices of other parties selling advertisement time.

13.     Javier's efforts through his proprietary model for advertising time purchases, admittedly created a profit for Javier and ME, but most importantly, delivered strong advertising results to the Debtor NRIA and full value for the expenditures.

14.     Neither Javier nor ME by definition, as an agency of record for media buying, was selling nor soliciting to consumers or investors.  As I understand the facts, the Debtor had

3

"closers" performing those services. This is common practice for Direct Response advertising, wherein the advertiser's goal is to attract consumers, inspire them to respond to their ads, communicate with them once they do respond, and then "close" them - meaning move them from "consideration" to "action/purchase." I have seen nothing to indicate either Javier or Media Effective interfaced with investors at all.

15.     Below I set forth my responses to each of the Trust's positions on the propriety of the charges by Javier and ME.

## Claim

Defendant Media Effective and Javier promote themselves as a "media planning" and "promotion development" company. See, http://www.mediaeffective.com/ (last accessed Nov. 1, 2023).

**Response:**

Media Effective and founder/ Director, Javier Torres, accurately list their broad scope of services on their site, which include: "Media planning, promotion development, and marketplace execution are primary…not secondary…factors in achieving brand success. We believe media planning is an interactive process between ourselves and our clients. Which is why we never make assumptions about your customers' marketing objectives and business goals. We'll coordinate and integrate your TV and Radio campaigns, so you can target your audience through multiple channels."  There is nothing inaccurate or false about these claims.

## Claim

Media Effective is in reality a one-man shop, with Javier Torres as the only employee, operating out of his recently purchased home at 148 Bayside Drive, Atlantic Highlands, New Jersey.

**Response:**

- Many LLC businesses are single-member LLC's, run by an individual.
- Single member LLC's can and often do use plural nouns like "we" on their websites and marketing materials. The use of the word "we" doesn't necessarily imply there are multiple owners or employees but rather is a common practice in business communication to create a sense of professionalism and inclusivity, even for a business with a single owner.
- ME/Javier never misled NRAI in any way about who he was and the services he offered. He expertly and ethically provided his professional services, without issue, in fact with frequent praise for consistently delivering tremendous results, for all of the years he was obtaining advertising time and proving media planning for NRIA.

4872-6037-2660 v1

- Moreover, working from home is legal and common practice. Many small business owners, including those who operate single-member LLCs, choose to work from home to reduce overhead costs and increase flexibility.

### Claim

Under the guise of providing media planning and promotion expertise, NRIA, through the direction of Thomas "Nick" Salzano, engaged ME and ME/Javier as its purportedly exclusive marketing agent beginning in or about 2012.

**Response:**

This language accuses ME/Javier of operating inauthentically and as a co-conspirator with "Nick" Salzano however the only evidence captured in the paper trail reflects years of correspondence, invoices, and exchange of buyer/seller information that illustrates the extensive workflow that ME/Javier executed on NRIA's behalf for their very successful direct response campaigns, and at arm's length. Also, there was no contract controlling the transactions between them. Any AOR document is nonbinding and nonexclusive, which is standard practice in the media industry. In fact, NRIA used a number of other media vendors, spending an additional $50,000,000.00 with these vendors.

### Claim

The debtors solicited over $600 million by promising extraordinarily high guaranteed returns to its investors and that its investors would be paid their return of capital first, but NRIA operated like a Ponzi scheme.

**Response:**

- ME/Javier was not a solicitor, author, or architect of NRIA's business model or messaging to any of their customers.
- ME/Javier was solely responsible for planning and executing direct response media campaigns for NRIA and at their direction.
- Part of this responsibility required that ME/Javier served as a liaison between the client and the media outlets on key business practices issued by each media's standards and practices teams, including but not limited to:
  - Each media outlet runs a credit check on every new advertiser to clear them for what is most commonly net 30 day payment terms (payment is owed after the media has run).
  - If an advertiser doesn't have established credit, the media outlet will require prepayment.
  - If an advertiser isn't meeting the payment or due diligence requirements, which can happen on rare occasions, the media outlets can deny the advertiser from running at all.
  - Each media outlet reviews the advertiser's creative ("spots") and provides feedback on any necessary edits if the spots fail to meet their compliance guidelines. For example, all media outlets require specific formatting, spot length, quality secs for audio and video tracks, and they will reject any claims that appear to be false or

unsubstantiated. They will require all spots are edited as necessary, to comply with guidelines that they issue in writing.
- The media outlets would not only have to approve NRIA advertisements to run but would deliver feedback on all necessary creative edits so that NRAI's spots could meet their compliance guidelines in order to be cleared to run.
- ME/Javier's role in creative compliance was solely to serve as a diligent messenger who communicated in a timely fashion to ensure NRIA was able to make any requested edits and could deliver all updated creative by the networks' deadlines, in order to be cleared and approved to run.
- There is no evidence Javier was the architect or scrivener of any of the advertising. His role as an intermediary between NRIA and the media outlets does not make him an author of the advertisements, or an endorser of their contents.

### Claim

ME/Javier Torres was aiding and profiting off the Ponzi scheme orchestrated by Salzano and co-conspirators.

### Response:

- ME/Javier was completely unaware that NRIA was running an unethical business, as at the time of his services, NRIA was not being accused of, and no person on the outside knew the Debtor's operations were illegal. Salzano has only recently pled guilty to charges of securities fraud.
- ME/Javier treated NRIA like a valued client and, as a very effective media executive, was able to yield successful results both for himself and for NRIA, based on strategically effective media buys.
- Also, it's worth noting that if ME/Javier was a co-conspirator, his compensation would have likely been tied to the performance of NRIA's media, as a percentage of their profit which was in the 10x range, or as a percentage of their overall budget. But, instead, ME/Javier maintained a steady fee for services structure tied to a comprehensive list of media services that yielded weekly payments with a relatively flat spend across 7+ years.

### Claim

The legitimate business services provided by Media Effective and Javier Torres are not readily apparent from the limited documents ME has provided to date, but it is obvious that the value of the services they alleged to have provided do not fairly equate to the significant payments made by NRIA to Media Effective, particularly between 2016 and 2022, which appear to be the peak years of NRIA's and Salzano's fraudulent activity. Although Media Effective has not produced an accounting of all the payments it received from Debtors and the payments it made on behalf of the Debtors for advertising and media services, the statements the Liquidation Trustee has obtained for one Media Effective account reflect a "mark-up" of the cost of those services by approximately 44%. In other words, NRIA transferred to Media Effective far more funds than was actually necessary or beneficial or fair value to the company and its investors and creditors.

**Response:**

- The Trustee has received every invoice for every advertising sale.
- The assertion that ME/Javier's legitimate business services is not "readily apparent" and that the "value of services... isn't fair" based on what the trustee deems "obvious" is stated as an opinion and one that lacks both accuracy and industry knowledge.
- Let's first address ME/Javier's legitimate business services. ME/Javier's service offering to NRIA's was extensive, and in line with the work of a robust direct response media agency:
    - ME/Javier assisted in NRIA's Direct Response campaigns across various media, including radio, and local tv for general entertainment, news, primetime, digital, and international outlets.
    - ME/Javier's services included strategic planning, buying, stewarding, accounting, clearance, rebooking, ongoing reconciliations, and correspondence with both the client and the media outlets on a daily basis to ensure optimal performance.
    - ME/Javier ran Direct Response media campaigns which uniquely require a high level of accountability to ensure the media is yielding results.
    - ME/Javier would review NRIA's performance with them daily and NRIA would provide feedback to ME/Javier, who would accommodate time sensitive media adjustments in an expert fashion to further optimize their performance.
- Now let's address the claim that the value of services do not fairly equate to payments made:
    - NRIA was never beholden or obligated to retain ME/Javier as their AOR.
    - NRIA was never obligated to buy advertising time from ME or Javier, and spent more than $50,000,000.00 with other advertisers.
    - NRIA and Javier/ME entered into an oral, "willing buyer, willing seller" agreement at the time of each ad purchase.
    - NRIA was free to shop or seek competitive bids for the advertising.
    - This is an arm's length transaction by any definition.
    - NRIA and ME/Javier communicated on a daily basis, measuring the success of their media based on the "direct response" call rate and optimized their media plans whenever they determined they could yield better results.
    - The response rate provided NRIA's key metrics as a function of their ROI. Their media dollars either yielded quality leads (calls they received from consumers who fit their profile) that they were able to convert to customers or they didn't, and when they didn't like the results, or thought they could be improved, they revised their plans with ME/Javier.
    - NRIA referred to the key benchmarks of their ROI as "value and results," which were the benchmarks they held ME/Javier to every week.
    - Another key criteria issued by NRIA, as they compared their performance from week to week, was that ME/Javier provided NRIA flat, fixed unit costs that met NRIA's weekly budgets.
    - This guideline put the onus on ME/Javier to absorb the supply/demand variables of the media market while maintaining stability for NRIA.
    - Therefore, ME/Javier's business model was not designed to be a fixed commission rate, tied to their weekly budgets, otherwise he would not have been able to provide the stability of a fixed rate media plan, which NRIA required, further evidenced by the absence of any agreement providing for a fixed "Commission".

- Instead, NRIA paid ME/Javier on a fee-based model for the extensive range of services rendered that allowed for ME/Javier to deliver NRIA a consistent fixed unit cost media model.
- The fees charged by Media Effective were specific to his business model, accommodating NRIA's scope and requirements, and were commensurate with industry standards which vary wildly depending on the nature of the services offered and the size of the agency.
  - Large media agencies may just handle buying airtime in bulk and they may charge 3-20% depending on their breadth and customer base.
  - Boutique shops may charge a retainer and earn a negotiated percentage of the business or equity.
  - Some agencies are compensated through a blend of fees and other perks, including in-kind gifts, provided they are industry approved.
  - Smaller firms like ME/Javier's business, build in fees that are reflective of the services and value delivered, as defined by the client.
  - Many reputable agencies today, including DR leader Icon Media, Publicis, Omnicom, and many others, participate in the legal practice of media arbitrage where, similar to finance, they buy volume inventory at discount pricing and repackage and resell that inventory at higher pricing. The margins on media arbitrage can range from as low as 5% to as high as 100% or more. In some cases, depending on the terms, margins may be revealed, but in many cases the margins are non transparent and considered proprietary information by the arbitrageur/ agency.
  - Many advertisers prefer the media arbitrage model because they don't want to pay commissions for services, which they deem non-working spend, so they'd rather bundle the cost into the working spend, particularly if their overall pricing is at a discount..
  - In ME/Javier's case with NRIA, the model was similar to the arbitrage model where the costs were built into the unit rates that ME/Javier repackaged for NRIA. This model allowed ME/Javier to provide NRIA with deep discounts while maintaining an average profit margin of 36% across 7 years. ME/Javier's business practices remained consistent and reliable and successfully delivered on NRIA's known performance indicators (KPI's).
  - Moreover, at all times he was providing savings to NRIA, which over time equaled in excess of $7,000,000.00.
- Agency performance, especially for direct response media, is always under scrutiny and advertisers may opt to change agencies, particularly if costs or performance are not optimal.
- ME/Javier's fees were built into the weekly cost of NRIA's fixed unit rates, and as a result, when NRIA spent more, Javier's billing would increase and vice versa. This too is in line with the business practices of media agencies across various disciplines.
- NRIA was aware that its payments included the cost of the media plus the cost of services rendered by ME/Javier.
- NRIA consistently paid the invoices for advertising time for 8 years without question.
- More importantly, if NRIA had negotiated with the media outlets directly, they would have been charged their full "rate card" and may have even incurred a premium charge on top of their full rate card.
- Media outlets assume that when a client isn't working through an agency, then they are not paying an agency fee, and they won't have an agency buyer or experienced media executive

managing the client through the buying process. The media outlet then has to step in and work directly with the client, which is labor intensive and time-consuming and typically involves high maintenance requests that the outlets prefer to be managed by agencies on behalf of their clients.

- By virtue of ME/Javier's business model, he worked with volume buyers such as Hybrid, who secured inventory across the media landscape at very deep discounts, thereby enabling ME/Javier to purchase inventory on behalf of NRIA at significant rollbacks from the card rate, and still provide discounts to NRIA.
- ME/Javier's ability to secure valuable inventory from volume buyers at steep discounts, demonstrates and delivers a few key points:
  o These relationships are a testament to Javier's experience and seasoned relationships in a very competitive market.
  o These relationships allowed ME/Javier to access and secure the consistent inventory his client demanded.
  o These relationships enabled ME/Javier to pass on significant savings to NRIA, cover his fees, while maintaining all of NRIA's criteria of fixed weekly unit rates and campaigns that delivered measurable value and results.
- It is evident that the trustee's attempt to hold Mr. Torres and Media Effective liable for NRIA's financial mismanagement and legal troubles is unjust and unwarranted. Mr. Torres conducted himself with integrity, diligence, and professionalism in his capacity as NRIA's agency of record, and he should not be held accountable for circumstances beyond his control.
- As a final thought on this claim, it is noteworthy that on one hand, the trustee is accusing ME/Javier of being a co-conspirator and benefitting from NRIA's Ponzi scheme yet on the other hand, they are treating ME/Javier as a vendor who didn't provide a fair and valuable service. One argument nullifies the other, yet neither has validity nor supporting evidence.

## Claim

Because many of the properties owned and operated by the Debtors were not profitable, the funds transferred to Media Effective actually came from investors.

## Response:

- Many advertisers have investors who pay for their campaigns and/or reinvest their profits into their media budgets.
- It is standard practice for agencies and media outlets to run a credit check to ensure the advertiser can afford payment. If the credit is insufficient, then networks require payment upfront. They are not, however, required to review the source of payment.
- Furthermore, at the time of engagement, NRIA was not found liable for any impropriety so there was no reason for ME/Javier or the media outlets to reject NRIA as an advertiser. In fact, any false claims that surfaced in their content was rejected and NRIA would edit the content to ensure it met the guidelines provided by the media outlets.
- There is no evidence that the money came solely from investors as the real properties were also generating moneys.
- The Trustee claims that there remains nearly $200,000,00.00 in real estate in NRIA.
- It is impossible to trace the sources of the moneys paid to Javier or ME.

9

## Claim

The Debtors transferred tens of millions of dollars to Media Effective but did not receive equivalent value in return. Subsequently, Media Effective and ME/Javier Torres perpetrated a scheme to hinder, delay, and defraud the Liquidation Trustee's recovery of such fraudulent transfers by transferring the monies paid by the Debtors to ME/Javier Torres personally, his family, and other third-party entities.

**Response:**

*Most of this was addressed in previous responses but to ensure all claims are addressed, I will respond here as well and will address any additional nuance.*

- NRIA didn't fraudulently transfer millions to ME. They paid for services rendered, the value of which was vetted, approved, invoiced, and tied directly to the media they placed, and paid for week after week, year after year, as their cost was baked into each individual unit that ran across every media outlet they purchased through ME/ Javier.
- This relationship exhibits a willing buyer and willing seller with transparent and agreeable terms that abided by their mutually arrangements as well as by the standards and practices of all participating media outlets.
- ME's fees are not negotiated on account of performance. However, if ME was not an effective agency and wasn't performing, then NRIA would have the right to leave ME/ Javier or place ads through another agency.
- The benefit of "value" is immediately measurable with direct response (DR) campaigns. DR campaigns run commercials that feature website url's or phone numbers for viewers to contact if the content is compelling and they decide to engage, thus the name, "direct response." DR is therefore immediately measurable and attributable to the creative that runs within each specific campaign. If a DR campaign does not yield effective results, the media plan can be adjusted. If the results are strong, then the campaign is deemed effective.
- ME/Javier received daily feedback from NRIA as they constantly optimized their performance. The "value" they were able to realize was ultimately a highly successful 10-15x return on their investment.

## Claim

To keep the Ponzi scheme afloat, NRIA needed to continually receive substantial investor monies. Salzano and Scuttaro led and directed the marketing campaign, which employed deception, material misrepresentations and omissions, and falsified documents. None of the securities issued by the Debtors were registered, and the private placement memoranda issued to solicit investments failed to disclose substantial material facts that should have been disclosed to investors, including, for example, Salzano's true controlling position with the Debtors and his lengthy prior criminal history.

**Response:**

- Agencies conduct a basic due diligence to understand their client's business model so they can effectively plan and execute media campaigns that meet their client's criteria.

10

4872-6037-2660 v1

- Media outlets conduct due diligence to verify an advertiser's creditworthiness, the accuracy of the information provided by the advertiser, and they actively remove any false claims.
- NRIA was circulating false materials misrepresenting their business model to all outside parties, including vendors and customers.
- NRIA's false documentation not only intentionally masked their true business model and misled investors but it also prevented ME/Javier and the media outlets from discovering anything other than what NRIA produced.

### Claim

NRIA, aided by Defendants Media Effective and Javier Torres, advertised heavily to solicit investors from within the United States, including on billboards in and around New Jersey, through the use of spokespeople and radio, YouTube, and television advertisements. For example, billboards in high traffic areas in New Jersey lured investors into the scheme by promising 12% returns and the opportunity of obtaining up to 21%.

NRIA, with the assistance of Defendants Media Effective and Javier Torres, also advertised the investment opportunities on Indian television networks and elsewhere including in an Indian newspaper and opened three offices in India. NRIA raised millions of dollars from investors through this scheme, with Media Effective's and Javier Torres' material assistance.

### Response:

ME/Javier Torres functioned solely as a media agency, not as solicitors. Furthermore, the Trustee's investigation falsely represents work that ME/Javier Torres never in fact was involved with.

- ME/Javier Torres never negotiated billboards in or around New Jersey.
- ME/Javier Torres never negotiated or purchased media in Indian Newspapers.
- ME/Javier never opened or helped to open offices in India. Instead, according to Javier, the person who aided NRIA to open these offices is a woman whom NRIA's former COO, Glen La Mattina, was having an affair with and whom was falsely accusing ME/Javier Torres and provided misinformation to the Trustee.
- Furthermore, as it relates to false claims and the media outlets that ME/Javier did work with, they all require that any claims are supported by necessary disclaimers.
- The onus is on the advertiser, and the assumption on behalf of the agency and the media outlets is that the advertiser is operating in good faith. There is no reason to assume they are running a Ponzi scheme.
- ME/Javier is not responsible for NRIA's business practices, navigating where their offices are located, nor was he aware of their impropriety until later when investors came forward with their claims, shedding light on NRIA's improper business practices.
- There have been several high-profile cases where advertisers were found guilty of fraud or false claims. In every case, the businesses were found guilty, but neither their agencies nor the media outlets where they ran their campaigns were liable.
- Some examples include:
    - Enron: While not exclusively an advertising case, Enron's executives engaged in widespread fraud to deceive investors and the public about the company's financial health. This led to one of the largest corporate scandals in history.

- o Volkswagen: In 2015, Volkswagen admitted to using illegal software to cheat emissions tests in their diesel vehicles, leading to a settlement of over $15 billion in the United States alone.
- o Theranos: The blood-testing startup Theranos and its founder, Elizabeth Holmes, were charged with massive fraud for misleading investors and customers about the capabilities of their technology.
- o Subway: Subway faced a lawsuit alleging that its spokesperson, Jared Fogle, misled consumers by promoting Subway's sandwiches as part of his weight loss success story while engaging in illegal activities.
- o Lumosity: The brain-training company Lumosity settled with the Federal Trade Commission (FTC) for $2 million over deceptive advertising claims that its games could improve cognitive function.
- These cases illustrate the importance of truthfulness and transparency in advertising and the potential legal consequences of making false claims or engaging in fraudulent practices. They hold the fraudulent companies liable but they in no way implicate the companies they worked with, all of whom were victims in a scandal, and unknowingly supported these business' fraudulent practices.

## Claim

Media Effective failed to return to Debtors the value equivalent to the approximately $36.5 million it received in payments.

### Response:

- ME/Javier were third party vendors who returned significant value to NRIA.
- ME and Javier were appropriately paid for services rendered, just as the media vendors for Enron, Subway, and Volkswagon were paid.
- NRIA is a bad actor, and is solely liable for their false claims and any debt owed to investors falls on their shoulders.

## Claim

In those same years, NRIA had hired an in-house Director of Media, Katey Kana, who was hired to, and on information and believe could have, performed most of the "services" for which Debtors were compensating Media Effective and Javier Torres millions of dollars to allegedly perform.

### Response:

- As previously stated, NRIA could have exited their arrangements with ME/Javier and re-assigned business to anyone.
- What NRIA could have done within house personnel is irrelevant and hindsight.
- Further, typically any in-house media director would not have the leverage with the media partners that ME/Javier had and would be charged a premium for circumnavigating their agency and putting the brunt of the workload on their media outlets.
- NRIA often cross-referenced competitive pricing and ME/Javier consistently outperformed any comparable.

- It was NRIA's decision on where to spend advertising dollars, and Javier and ME delivered full value on each occasion.

## Claim

The services Media Effective and Javier Torres allege they provided were not necessary or beneficial to the estate, and the funds they received far exceed the value received by the Debtors (or the Investors) pre-petition.

## Response:

- ME/Javier services and scope of work not alleged but rather was defined and measured by NRIA and deemed effective, week after week for 7 years.
- ME/Javier's vendors, particularly Hybrid Media, have indicated in email correspondence that he consistently **received up to 50% off their published rate card**.
- Moreover, when cross-referencing ME/Javier's media plans with published pricing featured in industry trades, ME/Javier's pricing is consistently and substantially cheaper. For example, ME/Javier received premium units during election programming, including the highly coveted election night in 2020 for $20k versus their published rate of $160k
- Additionally, when cross referenced with Vivvix, an acknowledged third-party industry accepted measurement company that looks at pricing, dollars spent, and Nielsen ratings across all advertisers and media outlets, NRIA's budget for their :30 units that ran on Fox News in 2020 through the 1st quarter of 2022 combined was valued at $2.65M. If their inventory had been priced in line with all other advertisers that ran on Fox News during that same time frame with NRIA's same media mix, they would have spent $4.7M (or 79% more) for the same media plan.
  - This was backed up with Vivvix's CPM analysis, which is the industry's standard unit of measure, denoting an advertiser's cost per thousand.
  - NRIA's CPM (cost per minute) on Fox News across all :30 inventory placed between 2020 and 1Q2022, averaged $4.24, meaning they spent $4.24 to reach 1,000 people on Fox News from 2020 through 1Q 2022.
  - The rest of the market during that time period on Fox News paid an average CPM of $7.56, which is a 79% increase over what NRIA paid.
  - In short, NRIA spent 2.65 Million on Fox News from 2020 – 2022, where the rest of the market would have spent $4.7M for the same media plan.
  - True and correct copies of the Vivvix reporting is attached hereto as **Exhibit B**.

## Claim

ME/Javier acted as agents of NRIA's and are guilty of aiding and abetting

## Response:

- Javier has established a 30+ year reputation in the media industry, an industry that is built on trust, responsibility, ethics, and truthfulness.
- Both ME/Javier and the vast array of media outlets conducted standard due diligence before running any advertising, including verifying NRIA's claims and ensuring compliance with relevant laws and regulations.

13

- Neither ME/Javier nor the media outlets were aware of NRIA's fraudulent practices and did not intentionally participate in or support them.
- Contractually, ME/NRIA and the media outlets required NRIA to provide accurate information and comply with the law.
- ME/Javier acted in good faith at all times, without knowledge of the claimed bad acts of NRIA.
- I understand that in depositions Mr. Waldie, from Alvarez Marcel Investigations, LLC claims Javier and ME were only acting in their own interests. This negates any argument that Javier or ME were aiding or assisting NRIA or its principals in wrongdoing.
- ME/Javier willingly furnished documentation outlining that all invoicing matched NRIA's weekly media schedules for 9 years, revealing ME/Javier was not aiding or abetting in NRIA's Ponzi scheme but was running an ethical media agency with ethical business practices.
- Neither ME/Javier nor the media outlets were complicit in NRIA's fraudulent activities.

## <u>Summary of Conclusions in this Report</u>

ME/Javier accurately represented his service offering on his website and did not mislead NRAI about his business model or the services he offered.

ME/Javier was not a co-conspirator with Thomas "Nick" Salzano but acted as NRAI's agency of record, executing media campaigns on their behalf, in accordance with industry standards.

As their agency of record, ME/Javier was not responsible for NRIA's business model or messaging and acted in good faith, providing valuable services to NRAI, as prescribed by NRIA.

ME/ Javier was not aware of NRIA's fraudulent practices and did not intentionally participate in or support them.

ME/Javier ran NRIA's campaigns on a fee-based model, which was both ethical and effective.

ME/Javier passed on significant double-digit savings to NRIA as a function of their ability to secure inventory through their volume discount vendors. Fox News reported a 79% difference between what NRIA paid and the average market price. This discount was also supported by third party Vivvix.

ME/Javier conducted due diligence and cooperated with authorities upon discovering NRIA's fraudulent activities, demonstrating their ethical business practices.

ME/ Javier was not complicit in NRIA's fraudulent activities and should not be held liable for circumstances beyond his control.

ME/Javier is in the same category as the select agencies who were indemnified for running campaigns for clients such as, Subway, Enron, Volkswagen, and many more, all of whom were found guilty of fraud and running creative with false claims including,

I state these opinions with reasonable certainty based upon my knowledge and experience in the advertising industry and on the facts I received from numerous sources including client

interviews, review of records and documents from the client and others, and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on:   4/2/24

_____

Erin Arend

4872-6037-2660 v1

# **EXHIBIT A**

# ERIN AREND

Corporate Development and Start Up Executive

📞 310 961-1938    ✉ erin.arend@gmail.com    🔗 erinarend/    📍 Park City, UT



## EXPERIENCE

### New Business Venture
Co-Founder, CEO
- Developing a consumer facing health product, launching end of 2024.
- Powered by BoaFit, the only start up in the BoaFit portfolio.

*Present*
*Park City, UT*

### SVP Corporate Development
DonateStock, Inc
- Monetized business with distribution platforms and strategic organizations.
- Secured matching fund valued at $1.5 million.
- Selected by Blackbaud's Social Good Accelerator program, valued at $1 million
- Transitioning to Advisory Board Chair

*10/2020 - Present*
*Remote*

### Real Estate Agent
The Big Sky Real Estate Co.
- Sold 6 properties including 2 conservation easements strategically valuable to the community and MT wildlife preservation organization.

*01/2020 - 06/2023*
*Big Sky, MT*

### National Sales Manager
Discovery Communications
- Secured $1.5B in revenue; consistently averaging +20% annual increase.
- Introduced 3 networks to the ad community securing critical launch partners.
- Developed sales strategies and go-to-market materials.
- Led team through merger and acquisition of Scripps Networks.

*01/1994 - 01/2000*
*Los Angeles, CA*

### VP Business Development
TV Guide
- Contracted deals with 10 studios and executed a tracking study to help pivot the network into an entertainment platform with addressability.

*01/2011 - 01/2019*
*Los Angeles, CA*

### National Sales Executive
NBC
- Migrated general market dollars the Hispanic market upon NBC's acquisition of Telemundo and launch of Mun2 securing new business verticals in the auto and studio space.

*01/2005 - 01/2006*
*Los Angeles, CA*

### VP Sales
Williams Communications
- Developed Entertainment portfolio to secure funding and acquisition.
- Led teams and strategy through IPO acquisition and merger.

*01/2002 - 01/2005*
*NYC and LA*

### National Sales Manager
BRAVO/ IFC
- Ran revenue models to support transition of Bravo to ad-supported format.
- Developed sales strategy and secured 100% advertiser base for year one.
- Helped launch the Independent Film Channel and secured annual studio deals.

*01/2000 - 01/2002*
*New York*

## SKILLS

Corporate Development ·

Business Strategy ·

Sales & Marketing · Team Building

## CONSULTANT WORK

◆ **Resper**
Consultant on business plan and collateral to secure fundraising and exit.

◆ **Awlogy**
Supplied 50 key introductions to start up tech platform

## VOLUNTEER WORK

◆ **Various board positions**
Big Sky Ski Education Foundation, Fundraising Chair
Ophir Elementary, PTO Chair
Kenter Canyon, Fundraising Chair
DonateStock, Advisory Chair

◆ **Nonprofit Co-Founder**
Feed the Frontline
Cocoa for the Cure for Angelman Syndrome

◆ **Mentor**
Leeds School fo Business, CU
Elevate, Development Program
Violence Intervention Program

## EDUCATION

**Bachelor of Arts in Communications and Journalism**
University of Colorado

# **EXHIBIT B**

| Year/Station/Daypart | Actual Clearance (:30s) | | | Market Pricing (:30's) | Market Increase (:30) | Impressions (000) | Market Increase | Variance |
| | Gross Spend | # of Units | NRIA CPM | MARKET TVHH CPM | vs. NRIA Pricing | by daypart | on Pricing | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **2020** | | | | | | | | |
| **Fox News** | **$384,350** | **32** | **$5.70** | **$9.09** | **60%** | **67455.683** | **$613,402.10** | **60%** |
| DAY | $16,150 | 2 | $3.37 | $3.58 | 6% | 4789.947 | $17,148.01 | 6% |
| EF | $7,800 | 2 | $3.41 | $8.75 | 156% | 2285.929 | $20,001.88 | 156% |
| EM | $23,000 | 7 | $11.58 | $4.25 | 168% | 14521.901 | $61,716.08 | 168% |
| LF | $145,000 | 3 | $9.55 | $13.40 | 40% | 15188.88 | $203,530.99 | 40% |
| LN | $43,500 | 12 | $3.34 | $11.93 | 257% | 13017.913 | $155,303.70 | 257% |
| OVN | $5,500 | 2 | $3.11 | $9.41 | 203% | 1769.499 | $16,650.99 | 203% |
| PA | $50,000 | 1 | $21.49 | $10.01 | -53% | 2326.168 | $23,284.94 | -53% |
| PRIME | $93,400 | 4 | $6.89 | $8.54 | 24% | 13555.446 | $115,763.51 | 24% |
| **2021** | | | | | | | | |
| **Fox News** | **$2,056,975** | **551** | **$4.17** | **$7.08** | **70%** | **493226.432** | **$3,490,227.21** | **70%** |
| DAY | $362,500 | 58 | $6.48 | $4.60 | 29% | 55964.574 | $257,437.04 | 29% |
| EF | $26,300 | 4 | $5.60 | $6.38 | 14% | 4698.14 | $29,974.13 | 14% |
| EM | $174,400 | 29 | $5.74 | $3.50 | 39% | 30387.729 | $106,355.30 | 39% |
| LF | $3,800 | 2 | $1.88 | $12.35 | 558% | 2024.43 | $25,001.71 | 558% |
| LN | $216,725 | 164 | $2.65 | $10.33 | 289% | 81661.889 | $843,567.31 | 289% |
| OVN | $44,300 | 111 | $1.18 | $8.09 | 586% | 37564.749 | $303,898.82 | 586% |
| PA | $68,050 | 10 | $5.28 | $6.58 | 25% | 12890.52 | $84,819.62 | 25% |
| PRIME | $1,134,400 | 149 | $4.46 | $6.75 | 51% | 254269.804 | $1,716,321.18 | 51% |
| WKD DAY | $0 | 4 | $0.00 | $8.64 | | | | |
| WKD EVE | $26,950 | 20 | $2.74 | $9.71 | 254% | 9661.716 | $93,815.26 | 254% |
| **2022 (1Q ONLY)** | | | | | | | | |
| **Fox News** | **$215,225** | **90** | **$3.11** | **$9.45** | **204%** | **69239.973** | **$654,393.17** | **204%** |
| LN | $31,775 | 29 | $2.13 | $11.93 | 460% | 14917.082 | $178,006.99 | 460% |
| OVN | $7,800 | 27 | $0.86 | $9.41 | 991% | 9040.06 | $85,089.35 | 991% |
| PRIME | $168,000 | 26 | $4.07 | $8.54 | 110% | 41308.335 | $352,691.93 | 110% |
| WKD EVE | $7,650 | 8 | $1.92 | $9.71 | 405% | 3974.496 | $38,604.91 | 405% |
| **Grand Total** | **$2,656,550** | **673** | **$4.24** | **$7.56** | **78%** | **626544.8113** | **$4,734,472.44** | **78%** |

(c) 2024 Competitive Media Reporting, LLC d/b/a Vivvix
Copyright 2024. The Nielsen Company.

# ERIN AREND

Corporate Development and Start Up Executive

📞 310 961-1938    ✉ erin.arend@gmail.com    🔗 erinarend/    📍 Park City, UT

## EXPERIENCE

### New Business Venture
Co-Founder, CEO
Present · Park City, UT
- Developing a consumer facing health product, launching end of 2024.
- Powered by BoaFit, the only start up in the BoaFit portfolio.

### SVP Corporate Development
DonateStock, Inc
10/2020 - Present · Remote
- Monetized business with distribution platforms and strategic organizations.
- Secured matching fund valued at $1.5 million.
- Selected by Blackbaud's Social Good Accelerator program, valued at $1 million
- Transitioning to Advisory Board Chair

### Real Estate Agent
The Big Sky Real Estate Co.
01/2020 - 06/2023 · Big Sky, MT
- Sold 6 properties including 2 conservation easements strategically valuable to the community and MT wildlife preservation organization.

### National Sales Manager
Discovery Communications
01/2006 - 01/2020 · Los Angeles, CA
- Secured $1.5B in revenue; consistently averaging +20% annual increase.
- Introduced 3 networks to the ad community securing critical launch partners.
- Developed sales strategies and go-to-market materials.
- Led team through merger and acquisition of Scripps Networks.

### VP Business Development
TV Guide
01/2004 - 01/2006 · Los Angeles, CA
- Contracted deals with 10 studios and executed a tracking study to help pivot the network into an entertainment platform with addressability.

### National Sales Executive
NBC
01/2001 - 01/2004 · Los Angeles, CA
- Migrated general market dollars the Hispanic market upon NBC's acquisition of Telemundo and launch of Mun2 securing new business verticals in the auto and studio space.

### VP Sales
Williams Communications
01/1999 - 01/2001 · NYC and LA
- Developed Entertainment portfolio to secure funding and acquisition.
- Led teams and strategy through IPO acquisition and merger.

### National Sales Manager
BRAVO/ IFC
01/1994 - 01/1999 · New York
- Ran revenue models to support transition of Bravo to ad-supported format.
- Developed sales strategy and secured 100% advertiser base for year one.
- Helped launch the Independent Film Channel and secured annual studio deals.

## SKILLS

Corporate Development · Business Strategy · Sales & Marketing · Team Building

## CONSULTANT WORK

💎 **Resper**
Consultant on business plan and collateral to secure fundraising and exit

💎 **Awlogy**
Supplied 50 key introductions to start up tech platform

## VOLUNTEER WORK

💎 **Various board positions**
Big Sky Ski Education Foundation, Fundraising Chair
Ophir Elementary, PTO Chair
Kenter Canyon, Fundraising Chair
DonateStock, Advisory Chair

💎 **Nonprofit Co-Founder**
Feed the Frontline
Cocoa for the Cure for Angelman Syndrome

💎 **Mentor**
Leeds School fo Business, CU
Elevate, Development Program
Violence Intervention Program

## EDUCATION

**Bachelor of Arts in Communications and Journalism**
University of Colorado


**EXHIBIT**
tabbies®
3  A