

**Order Filed on October 11, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>**NATIONAL REALITY INVESTMENT ADVISORS, LLC,** *et al.,*<br><br>Debtors. | Case No.:    22-14539<br>Chapter:    11<br>Judge:    John K. Sherwood |
| **AIRN LIQUIDATION TRUST CO., LLC,**<br>Plaintiff,<br>v.<br>**MEDIA EFFECTIVE LLC ET AL.,**<br>Defendants. | Adv. Pro. No.:   23-01335 |

### DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Page 2

| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
|---|---|
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

## INTRODUCTION

The debtors in this liquidating chapter 11 case, National Realty Investment Advisors, LLC and its affiliates ("NRIA" or the "Debtors"), allegedly engaged in a massive real estate Ponzi scheme. NRIA sought out wealthy individuals to invest in various real estate projects, promising guaranteed return rates and bonuses. Eventually, new investor money had to be used to pay returns due to existing investors. One of the architects of NRIA's scheme, Thomas "Nick" Salzano, has pled guilty to securities fraud, conspiracy to commit wire fraud, and conspiracy to defraud the United States.[1] Another has fled the country. When NRIA could not pay the guaranteed returns to their investors and regular expenses as they came due, the Debtors filed for chapter 11 bankruptcy.

The primary defendants in this adversary proceeding, Media Effective LLC ("Media Effective") and its owner and sole employee, Javier Torres, had a very lucrative relationship with NRIA. They were paid more than $38 million for advertising services designed to attract new investors. AIRN Liquidation Trust Co., LLC (the "Liquidation Trustee" or "Plaintiff") seeks to recover money from Media Effective, Javier Torres, and the other defendants for the benefit of NRIA's investors.

The Plaintiff presented two main themes in its case. First, given Javier's close relationship with Mr. Salzano and the fact that NRIA was Media Effective's only client, Mr. Torres either knew or should have known that NRIA was defrauding investors. The Plaintiff says that Media Effective, whose role was to place advertisements designed to seek out more investors, was a direct participant in NRIA's fraud. Second, the Plaintiff contends that Media Effective was deceitful with

---

[1] *See* U.S. District Court of New Jersey, Case No. 22-00690, [ECF No. 86].

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

NRIA when it came to the huge profits that it was making on NRIA's business. Media Effective did not fully disclose that almost all the media time purchased for NRIA was purchased by a third party who charged a commission. Media Effective's role was simply that of a "middleman" and it charged enormous amounts for playing this role. Then, when NRIA asked Mr. Torres about his commissions, he identified amounts that were well below what he was charging. The Plaintiff contends that Media Effective was being grossly overpaid for services and wants the overpaid amounts back for NRIA's investors.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey. This matter is a core proceeding pursuant 28 U.S.C. § 157(b)(2)(H) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a).

## PROCEDURAL HISTORY

The Debtors filed for chapter 11 relief on June 7, 2022. The Debtors submitted an Amended Chapter 11 Plan, which was confirmed on August 10, 2023. Pursuant to the Amended Plan, a liquidation trust was formed as the successor to the Debtors' bankruptcy estates for purposes of liquidating real estate assets and pursuing litigation.

The Liquidation Trustee commenced this action based on the investigation of pre-petition transfers of NRIA. The Liquidation Trustee filed a nine-count Amended Complaint against Media Effective, Javier Torres, and other related individuals and entities (the "Defendants") based upon its allegations that Javier Torres: (i) defrauded innocent investors by knowingly promoting NRIA's

Page 4

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

fraudulent statements in the media; and (ii) deceived NRIA by charging an egregious commission for work largely done by a third-party vendor. [ECF No. 31]. As more evidence of fraudulent intent, the Plaintiff notes that monies received from NRIA were transferred by Mr. Torres to the other Defendants: his wife, son, daughters, and church.[2] [ECF No. 31, ¶¶ 9, 10]. In Count I, the Liquidation Trustee alleges that all Defendants received actual fraudulent transfers because the transfers were made in furtherance of NRIA's effort to defraud investors. The Plaintiff alleges in Count II that the Defendants are transferees of constructive fraudulent transfers because Media Effective was grossly overcharging for its services to NRIA at a time when the Debtors were insolvent. In Count III, the Liquidation Trustee argues that Media Effective and Javier Torres aided and abetted in securities fraud under state law because, through reasonable care, they should have known about NRIA's fraud against the investors. Counts IV and V allege fraud and aiding and abetting in fraud directly against Media Effective and Javier Torres. The Plaintiff further claims that all Defendants were unjustly enriched in Count VI. Count VII seeks a preliminary injunction against all Defendants.[3] For damages, the Plaintiff seeks $12,858,481.67 based on the fraudulent transfer and unjust enrichment claims. On account of the direct fraud claims (Counts IV, V and VI), the Plaintiff seeks $127 million in damages.[4]

---

[2] Media Effective transferred $554,481 to Defendant, Englewood Spanish Church, on or after January 1, 2016. [Pl. Ex. 97].

[3] The Amended Complaint also includes two equitable remedies: Count VIII seeks a constructive trust with respect to any fraudulent transfers and Count IX asks for an accounting of Media Effective and Javier Torres. [ECF No. 31, ¶¶ 181-194]. In light of this decision, these Counts are now irrelevant. Lastly, the Plaintiff seeks attorney's fees, pre- and post-judgment interest, and damages. [*Id.* at pp. 40-41].

[4] The Plaintiff alleges that $295 million of investor funds that NRIA secured were sourced from television and radio advertisements, and Media Effective was responsible for 43% of that advertising or $127 million of investments. [Hr'g Tr. May 20, 2024, ECF No. 76, pp. 8-9].

Page 5

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

After commencing this Adversary Proceeding, the Liquidation Trustee filed an Emergency Application for a Temporary Restraining Order, a Preliminary Injunction, and a Permanent Injunction to freeze the Defendants' assets connected to the alleged fraudulent transfers. [ECF No. 2]. Following a hearing on November 14, 2023, the Plaintiff and Defendants consented to the entry of a Temporary Restraining Order, prohibiting the Defendants from transferring their funds except for ordinary and necessary business or living expenses. [ECF No. 9]. Under the Temporary Restraining Order, the assets subject to the injunction include an Atlantic Highlands, New Jersey residence which Javier Torres bought in cash for around $1.5 million and transfers Mr. Torres made to personal investment accounts totaling approximately $8,463,800. [Pl. Ex. 9].[5]

The preliminary injunction hearing began on April 10, 2024, and continued on five separate days with closing arguments occurring on July 19, 2024. At the close of the Defendants' case in chief, Defendants moved for a ruling pursuant to Fed. R. Bankr. P. 7052. [ECF No. 81]. Defendants seek entry of partial judgment on Counts I-V, arguing that the Plaintiff failed to meet its burden of proof on these claims. [ECF No. 81-1, ¶ 41].

During the preliminary injunction hearing, the Court heard testimony from Javier Torres and four other witnesses. On behalf of the Defendants, Erin Arend testified as a media and advertising expert. For the Plaintiff, Angela Solk testified as a media and advertising expert and William Waldie testified as an expert in accounting and Ponzi schemes. Finally, the Plaintiff presented Patryk Golaszewski, NRIA's media operations manager and former intern at NRIA,

---

[5] Exhibits submitted to the Court in ECF No. 84 will be referenced as either plaintiff or defendant exhibits and exclude the ECF number.

Page 6
Debtor:      National Realty Investment Advisors, LLC, *et al.*
Case No.:    22-14539
Adv. No.     23-01335
Caption:     **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

hired by Nick Salzano. Also, the Court and the parties discussed the possibility of consolidating

the preliminary injunction hearing with the trial on the merits, pursuant to Fed. R. Bankr. P. 7065.

The parties indicated that they did not object and deferred to the Court's discretion. At the

preliminary injunction hearing, the Court was presented with hundreds of exhibits and five days

of testimony. No party has suggested that more evidence or discovery is necessary. Therefore, the

Court will treat the preliminary injunction hearings as the trial and render a final decision.

## FINDINGS OF FACT

The focus of the evidence presented by the parties was on two factual issues: (1) whether

Media Effective and Javier Torres knew or should have known about NRIA's intention to mislead

investors through Media Effective's ads; and (2) whether Media Effective dishonestly received an

excessive commission. Before addressing these issues directly, the Court will provide some

general background.

NRIA was operated by Nick Salzano and Rey Grabato II out of Secaucus, NJ. [ECF No.

31, ¶ 36]. The Debtors solicited over $600 million from 2,000 investors for what NRIA claimed

would be a real estate investment in luxury properties yielding guaranteed return rates. The

Plaintiff contends that NRIA operated a Ponzi scheme. The Plaintiff presented William Waldie as

its financial advisor and expert in Ponzi schemes based on his career in the FBI managing white

collar crimes and Ponzi scheme investigations. From Mr. Waldie's investigation of NRIA between

the years 2016 and 2022, he discovered that NRIA needed to stop investors from redeeming their

returns while enticing new investments to keep the scheme from collapsing. Mr. Waldie found

evidence that NRIA principals submitted false financial reports and altered bank statements to

Page 7

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

conceal NRIA's insolvency. The diversion of NRIA investor monies for personal expenditures of insiders was another sign of a Ponzi scheme. Finally, when investor contributions were extracted out of NRIA's cash balance, Mr. Waldie found that the balance fell below $0 in November 2017. [Pl. Ex. 10]. To continue procuring investors and a steady influx of cash, NRIA relied on national and international marketing and advertisements to promote the real estate investment opportunity. Whether on billboards or in the media, NRIA routinely guaranteed prospective investors a 12-21% return on their investment. [ECF No. 31, ¶ 46, ECF No. 47-12, Pl. Ex. 21 and Hr'g Tr. May 20, 2024, ECF No. 76, p. 213]. It is also noteworthy that in Mr. Salzano's guilty plea (*see* footnote 1 above), he stated that he was defrauding investors from February 2018 to January 2022. The Defendants did not rebut Mr. Waldie's contentions. Thus, for the purposes of this adversary proceeding, the Court finds that NRIA operated a Ponzi Scheme.

Media Effective is a marketing agency that assists with coordinating and placing television, radio, and digital marketing advertisements on behalf of its clients. [Joint Stipulation of Facts dated 4/5/24 (the "Joint Stip.") ¶ 2]. Javier Torres is the founder, director, managing member and only employee of Media Effective. [Joint Stip. ¶¶ 4, 10, 15]. Media Effective's only client from 2012 to 2022 was NRIA, but Media Effective was not NRIA's exclusive media service provider. [Joint Stip. ¶¶ 16, 18, 26]. NRIA spent approximately $85 million in total on all advertising. Of NRIA's total advertising spending, NRIA paid Media Effective approximately $36 million or approximately 42%. [Hr'g Tr. Apr. 10, 2024, ECF No. 62, pp. 135-36].

On cross-examination of Javier Torres, Plaintiff sought to establish that Media Effective and Javier Torres were beholden to Nick Salzano, the de facto person in charge at NRIA. Javier

Page 8

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Torres testified that Nick Salzano told him what to do in their business relationship, and he would do it. [Hr'g. Tr. Apr. 10, 2024, ECF No. 62, p. 20-21]. Media Effective was an authorized agent to buy media and negotiate on NRIA's behalf. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 99]. But NRIA was not obligated to use only Media Effective for buying ad time. [Def. Ex. 2, ¶ 83]. While Defendants emphasize that Media Effective was one of many media outlets retained during NRIA's tenure, Nick Salzano referred to Javier Torres as NRIA's "Media Manager." [Pl. Ex. 40]. Likewise, Javier Torres referred to Nick Salzano as his "trusted partner," which makes sense given that NRIA was Media Effective's only client. [Hr'g Tr. Apr. 10, 2024, ECF No. 62, p. 16]. According to Mr. Torres, he "always took [his] direction from Salzano," but claims the two were not social friends. Javier's priority was to act in the best interest of himself and Media Effective, "while achieving savings for [NRIA]." [Def. Ex. 2, ¶¶ 33, 36 and 38].

Mr. Torres describes his services to NRIA as meeting with media vendors to present NRIA's media needs, soliciting research data and media information from media vendors, coordinating media delivery, scheduling and implementation, negotiating media plans, and securing competitive media pricing. [Def. Ex. 2, ¶ 99]. NRIA used direct response advertising, where the goal is to promote a "call to action" to motivate listeners to contact the advertiser and buy the good or service. [Def. Ex. 2, ¶¶ 63, 64]. NRIA hired "closers" to receive calls from ad listeners and secure their investment in NRIA's real estate. [Def. Ex. 2, ¶ 69]. NRIA paid Javier Torres weekly, and Nick Salzano insisted that Mr. Torres personally come into the NRIA office to pick up the checks, unlike other NRIA vendors. [Joint Stip. ¶ 34].

Page 9

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Mr. Torres obtained NRIA as a client after cold calling businesses he thought might benefit from Media Effective's services. [Hr'g Tr. April 10, 2024, ECF No. 62, p. 138]. NRIA was a dream client for Media Effective. It needed large amounts of advertising and thought that Media Effective was charging a fair price. For some reason, NRIA/Mr. Salzano did not inquire into the cost of the advertising for Media Effective until the end stages of the relationship. Had they done so earlier, they would have learned that Mr. Torres was benefiting from huge markups. Javier Torres went from modest financial status (foreclosure proceedings were initiated against him around 2009), to making $13 million between 2016 and 2022 and buying a $1.5 million home in cash. [Hr'g Tr. June 21, 2024, ECF No. 82, p. 152]. Clearly, Mr. Torres was not motivated to find something wrong with his lucrative relationship with NRIA.

### As of April 2021, Mr. Torres was on "Inquiry Notice" That NRIA Was Defrauding Investors

Although Javier Torres was in close contact with Nick Salzano and heavily involved in NRIA's advertising, the Plaintiff did not prove by a preponderance of the evidence that Mr. Torres knew that NRIA was defrauding investors. Of course, Mr. Torres denied knowledge of NRIA's fraudulent activities with investors – it was in his self-interest. Every invoice Javier Torres gave to NRIA was paid in full on a weekly basis, giving the impression that NRIA could afford to pay its expenses, at least when it came to advertising. [Def. Ex. 2, ¶ 42]. Mr. Torres knew that NRIA targeted males over the age of fifty-five with over $1 million in assets and $250,000 in annual income and successfully raised money from sophisticated investors. [*Id.* at ¶ 80]. From the perspective of a third-party vendor focusing on meeting his client's advertising needs, NRIA appeared to be a flourishing business. Mr. Torres believed that NRIA held over $200 million worth

| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
|---|---|
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

of real estate. [Def. Ex. 2, ¶ 41]. Mr. Golaszewski, operations manager at NRIA and family friend of Nick Salzano, also testified that he was not aware of the fraud committed by Mr. Salzano and NRIA at time of Mr. Salzano's arrest. He described Mr. Salzano as a "persuasive guy" and "the best salesperson [he'd] ever met." [Hr'g Tr. May 20, 2024, ECF No. 76, p. 211]. He testified that after Nick Salzano was arrested and the SEC investigation was underway, NRIA superiors tried to underplay the significance of the investigation to the point of making the investigation seem routine. Mr. Golaszewski explained how even after his arrest, Nick Salzano continued working to increase advertising by double or triple the amount. [Hr'g Tr. May 20, 2024, ECF No. 76, pp. 194, 212]. Though Mr. Golaszewski's testimony should be discounted due to his youth and inexperience, he was inside the business. He and Mr. Torres were the only witnesses who could provide a first-hand account of what Mr. Torres knew and neither supported the contention that Mr. Torres had actual knowledge of NRIA's fraudulent activities.

Still, the Plaintiff argues that Mr. Torres knew or was on inquiry notice of suspicious circumstances at NRIA based on the following evidence:

1. June 8, 2015: In response to submitting NRIA's advertisement to CNBC, Javier Torres received CNBC's concerns and comments on the ad. Among other concerns, CNBC said that: (1) the guarantee of "No Property Taxes for 10 years" was not accurate; (2) the "$150,000 built in equity profit per home" is unsubstantiated and cannot guarantee profits; (3) the "Guaranteed rents for 5 years" should be deleted because CNBC found a caveat in the investment where investors could not see rent profits during the first 60-day period, making the guarantee inaccurate; and (4) CNBC's legal regulations require claims be substantiated and accurate. [Pl. Ex. 48, p. 8].

2. 2019: Sometime in 2019, Javier Torres began investing in real estate in Columbia with his sister. [Def. Ex. 2, ¶ 18]. On direct examination, Mr. Torres stated that he worked in real estate throughout his entire career and had a history of investing in general. When the Plaintiff asked Javier Torres

Page 11

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

how common a 10% guaranteed rate of return was, he answered "Nobody guarantees anything." [Hr'g Tr. Apr. 10, 2024, ECF No. 62, pp. 61-65].

3. <u>November 24, 2019</u>: In an email to Nick Salzano, Javier Torres suggested that a "Financial Help" Podcast with Dave Ramsey would be a potentially viable and profitable media outlet on which NRIA could advertise. When Mr. Torres learned that Dave Ramsey does an initial screening of the companies' reputation that he uses for national advertisements, Mr. Torres told Nick Salzano: "there is a way to go around this screening and it's to buy by markets instead of nationally." [Pl. Ex. 36, pp. 1-2].

4. <u>May 26, 2020</u>: Javier Torres was informed that CNN in San Francisco would not air NRIA's advertisements due to the content and that CNN "does not allow anything related to high[-]risk investment, investment guarantees or money making opportunities." But when Mr. Torres learned that other San Francisco networks (CNBC and Fox News) would air NRIA's ads, he said "the other markets have not picked up on this yet, so I'm hoping it will continue to slide through." [Pl. Ex. 46, pp. 2-3]. Javier's hope that the high-risk nature of NRIA's business would "slide through" the cracks of media stations indicated that he knew NRIA had trouble with misleading advertisements.

5. <u>August 4, 2020</u>: Nick Salzano wanted to advertise on CNBC again. Mr. Torres sent Nick Salzano CNBC's comments from back in 2015 when NRIA attempted to advertise with CNBC to remind Nick Salzano about the concerns. Mr. Torres said "I believe this time around is going to be easier. Our actual spots look much more clear in message and more professional." [Pl. Ex. 48, p. 1].

6. <u>January 20, 2021</u>: Javier Torres informed Katey Kana, the NRIA Director of Advertising and Marketing, that Lou Dobbs (a television and radio personality) was "not comfortable without an understanding" of NRIA's 10% guaranteed return. [Pl. Ex. 54, p. 1]. Mr. Torres then drafted a script example to work around Lou Dobbs's concern about the guaranteed return, which did not directly address why NRIA could provide a 10% guarantee. He also suggested that the explanation be attached to "company letterhead or something official." [Pl. Ex. 55, p. 1]. Instead of questioning NRIA on how a real estate investment can guarantee a return of 10%, Mr. Torres was more concerned with making Lou Dobbs more comfortable. Mr. Torres suggested that NRIA provide an "easy" explanation "enriched by the investor's language" to satisfy Mr. Dobbs. The proof and basis for the guarantee, however, was not addressed. [*Id.*].

Page 12
Debtor:        National Realty Investment Advisors, LLC, *et al.*
Case No.:      22-14539
Adv. No.       23-01335
Caption:       **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

7. <u>March 4, 2021</u>: Nick Salzano was arrested. Javier Torres alleges that he did not learn about the March 2021 arrest until late 2021 from his own research of the news articles. [Hr'g Tr. May 17, 2024, ECF 75, pp. 26-29].

8. <u>March 6, 2021</u>: News article stating Nick Salzano was arrested for wire fraud and aggravated identity theft. [Pl. Ex. 114, p. 1].

9. <u>March 10, 2021</u>: Katey Kana asked Mr. Torres to submit "ALL files of all ads, scripts, etc., for as far back as [he] can provide." [Pl. Ex. 59, p. 3].

10. <u>March 17, 2021</u>: Javier Torres was asked by NRIA to remove Nick Salzano, his "trusted partner" and only client from whom Mr. Torres took direction for 9 years, from any communications going forward. Mr. Torres responded, without further inquiry: "Will do." [Pl. Ex. 113].

11. <u>April 26, 2021</u>: Article published stating Nick Salzano and NRIA are under SEC investigation. [Pl. Ex. 114, p. 4].

12. <u>April 2021</u>: Katey Kana quit after the FBI approached her at her home. [Hr'g Tr., May 20, 2024, ECF No. 76, p. 49].

13. <u>September 28, 2021</u>: Javier's call records show communications with Nick Salzano's burner phone. While Mr. Torres testified that he was aware the calls were coming from a different number than Nick Salzano's, he was allegedly unaware it was a burner phone. [Hr'g Tr. May 17, 2024, ECF No. 75, p. 25 and Pl. Ex. 124].

14. <u>October/ November 2021</u>: Javier Torres learns about Nick Salzano's arrest and SEC complaint against Nick Salzano/NRIA. [Hr'g Tr. Apr. 10, 2024, ECF No. 62, pp. 110-111].

15. <u>October 6, 2021</u>: Mr. Torres was informed that CNN would not approve of NRIA's advertisements because they found a pending SEC complaint against Nick Salzano. Mr. Torres testified that at the time, he believed the SEC complaint involved an isolated incident from three years before when an investor was shown inappropriate documents. [Pl. Ex. 110 and Hr'g Tr. April 10, 2024, ECF No. 62, p. 109].

16. <u>December 6, 2021</u>: News article is published explaining NRIA is under investigation due to "cash recycling" investments. [Pl. Ex. 114, p. 9].

For purposes of the Defendants' good faith defense to the fraudulent conveyance claims (discussed below), the Court must determine whether Mr. Torres was ever on inquiry notice that NRIA was defrauding potential investors in its advertisements and, if

Page 13

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

so, when? The analysis considers Javier's years of experience and sophistication in real estate and advertising. The Court also notes that Mr. Torres was a one-man operation and did not have access to a legal or compliance department. But given that NRIA was his only client for ten years, Mr. Torres should have had intimate knowledge of its business and its personnel. He had personal knowledge of the many challenges raised by media outlets to the contents of NRIA's advertisements (especially with respect to guaranteed returns). His main contact, Nick Salzano, abruptly vanished from the process and NRIA urgently requested his media scripts. And even when he learned about NRIA's legal troubles, Mr. Torres was disinterested. Plaintiff contends that a reasonable advertising agency would have inquired about these red flags and performed due diligence on NRIA's guaranteed returns and Nick Salzano.

The expert testimony suggested that Media Effective had an ethical duty to inquire about the networks' requests for substantiation of NRIA's claims of guaranteed return rates. The Plaintiff presented Angela Solk, an expert in media advertising and media buying and planning. Ms. Solk explained that whether a media agency is a large business or a one-man operation, the agency is responsible for doing "homework" and due diligence on its client. Ms. Solk opined that an agency's obligation to monitor news and know everything about their client is the same "whether you have one client or a hundred clients." [Hr'g Tr. May 20, 2024, ECF No. 76, p. 138]. Guidelines by the Federal Trade Commission pay particular attention to advertisements promising guaranteed returns, regarding them as "automatic red flags." [*Id.* at p. 108]. Ms. Solk stated that if a red flag such as a guarantee or promised return on an investment gets questioned by a station, a media

Debtor:     National Realty Investment Advisors, LLC, *et al.*
Case No.:   22-14539
Adv. No.    23-01335
Caption:    **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

agency needs documentation and validation from the client supporting the claim – something more than the client's word. Ms. Solk said an agency should never be substantiating the claims on behalf of its client. [*Id.* at pp. 108-09, 131]. Yet, Mr. Torres was involved in the process of trying to substantiate NRIA's guaranteed return claims in some cases, and in others, he conspired with Mr. Salzano to avoid any scrutiny of NRIA's advertisements.

On the other hand, Defendants' media expert, Erin Arend, testified how "incredibly common" it is for ad agencies to brainstorm workarounds to satisfy a network's requirements until they agree to run the ad. Ms. Arend said that guidelines are network-specific, so where one network agrees to run an advertisement, a different network may require a claim within the ad to be substantiated and changed according that network's guidelines. [Hr'g Tr. June 21, 2024, ECF No. 82, pp. 43-44]. Still, Ms. Solk and Ms. Arend both testified that advertisements which include guaranteed returns need to be substantiated to clear the Federal Trade Commission guidelines. Further, Ms. Arend agreed that if a network requires substantiation of a claim guaranteeing a return on an investment, it is mandatory for the agency's client to provide the agency with substantiation of the claim. [*Id.* at pp. 69-70]. Ms. Arend also testified that an agency has an obligation to be "[a] hundred percent" ethical when engaging in any type of workaround. [*Id.* at p. 70].

Multiple red flags appeared from networks which required NRIA to substantiate its claims of guaranteed returns. Mr. Torres was aware that several networks were uncomfortable with NRIA's ads, but instead of requiring NRIA to substantiate its claims, Mr. Torres found workarounds to get the networks to air NRIA's ads. In 2019, when Mr. Torres became aware that Dave Ramsey screens companies first before advertising them on his podcast, Mr. Torres – before

Page 15

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

receiving pushback from Dave Ramsey – told NRIA that he could brainstorm a workaround to avoid Mr. Ramsey's screening. [Pl. Ex. 36, pp. 1-2]. In 2020, when CNN refused to air NRIA's high risk investment ads, Mr. Torres stated that he hoped other networks had not picked up on it yet and would allow the ads to "slide through." [Pl. Ex. 46, pp. 2-3]. In 2021, when Lou Dobbs told Media Effective that he was not comfortable promoting NRIA's 10% guaranteed return, Mr. Torres brainstormed with NRIA ways to substantiate the guarantee, such as using an "explanation in very simple words of how the guaranteed 10% works … on company letterhead or something official." [Pl. Ex. 55, pp. 1]. Yet, Javier Torres testified that based on his experience investing in real estate, he knew that nothing could be guaranteed. He also testified that this did not prevent him from providing media outlets with NRIA's scripts which promoted guaranteed return rates. [Hr'g Tr. June 21, 2024, ECF No. 82, pp. 135-137].

The Defendants argue that Mr. Torres was duped by Nick Salzano like many others that did business with NRIA. This argument has some appeal, but only up to a point. There is no evidence in the record that Mr. Torres ever confronted Mr. Salzano on the guaranteed return rates or did his own investigation on how NRIA could guarantee a rate of return when he knew that no one does this. As an experienced advertising executive, Mr. Torres had to do more than bury his head in the sand when legitimate concerns were raised about the content of NRIA's ads. Giving Mr. Torres the benefit of the doubt that for some time he was relying on Mr. Salzano, things changed in March 2021 when Nick Salzano was arrested. Although Mr. Torres testified that he did not learn about the arrest until late 2021, NRIA instructed Mr. Torres to stop including Nick Salzano on any further communications in March 2021. That same month, NRIA asked Mr. Torres

Page 16

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

to submit all documentation of scripts or ads that Media Effective placed on behalf of NRIA. Mr. Torres was unfazed by these developments even though he knew that media outlets had challenged the content of NRIA's advertisements. In addition, in March 2021, a news article was published stating that Nick Salzano was arrested for wire fraud and identity theft. In April 2021, another news article was published stating that Nick Salzano and NRIA were under SEC investigation. Had Mr. Torres performed a novice investigation in April 2021, Mr. Torres would have seen news articles concerning Nick Salzano's arrest and the SEC investigation. Taking all of these facts into consideration, Javier Torres was on inquiry notice that NRIA may have been using advertisements to defraud investors as of April 2021. Yet, he did not bother to do any investigation.[6]

### Were Media Effective's Commissions/Margins Excessive?

#### I.    The Agreement Between NRIA and Media Effective

Javier Torres testified that he had no written or oral agreement with NRIA requiring Media Effective to disclose its margin on media buys. NRIA and Media Effective were parties to an Agency of Record ("AOR"), an agreement between the ad agency (Media Effective) and the advertiser-client (NRIA) which defines the agency's role. Typically, an AOR will include an expiration date, at which point the client would review the agency or potentially invite other agencies to pitch their business. The AORs were not placed into evidence, but Ms. Arend and Ms. Solk testified that they reviewed four AORs between the parties and they described the agreements.

---

[6] Mr. Torres had a habit of turning a blind eye to many of NRIA's warning signs of wrongdoing. While Mr. Torres can say he did not know NRIA was running a Ponzi scheme, it appears that he showed overt disinterest in whether something suspicious and perhaps underhanded was occurring at NRIA. Mr. Torres testified that by October 2021, he learned of Nick Salzano's arrest, the SEC investigation into NRIA, and the several news articles which highlighted these issues. Still unaffected, Mr. Torres continued to fulfill NRIA's advertising requests until January or February 2022. [Joint Stip. ¶ 26].

Debtor:          National Realty Investment Advisors, LLC, *et al.*
Case No.:        22-14539
Adv. No.         23-01335
Caption:         **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

According to Ms. Solk, the AORs between Mr. Torres and NRIA were brief and lacked prescribed timelines or exclusivity, so either party could have terminated or renegotiated the relationship. The agreements merely stated that Media Effective was authorized to buy ad space on behalf of NRIA. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 100]. Ms. Arend testified that an AOR may or may not include terms regarding a commission, and that if the client wants transparency surrounding an agency's commission, the terms would be set forth in an AOR. In this instance, the AOR between Media Effective and NRIA did not include terms requiring commission transparency. Without terms defined in the AOR, an agency does not have a duty to disclose its margins. But Ms. Arend also testified that if parties agree to be transparent about commission, the agency has a duty to be truthful in its disclosure. [Hr'g Tr. June 21, 2024, ECF No. 82, pp. 45, 55-56]. According to Mr. Torres, NRIA instructed him to provide the company with competitive media buys and produce an all-inclusive invoice of the costs to NRIA. NRIA's payment included Javier's built-in commission so Media Effective's profit varied depending on the cost of media buys. [Def. Ex. 2, ¶ 76].

Throughout the hearing, Mr. Torres explained that his most used high-volume media buyer was Hybrid Media Services LLC ("Hybrid"). Hybrid worked directly with television and radio stations to purchase large quantities of discounted advertising space. Ms. Arend explained how Hybrid's model of purchasing bulk, discounted media time is referred to as an "arbitrage model." In an arbitrage model, a company such as Hybrid buys media and advertising inventory in bulk at a discount and repackages it to sell at a higher price to advertisers. On top of the cost for media time, Hybrid charges a 15% commission/fee to advertisers buying the discounted media space.

| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
|---|---|
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

[Hr'g Tr. Apr. 10, 2024, ECF No. 62, pp. 144-145].[7] NRIA's costs were rolled up into one bill for Hybrid's discounted cost for ad space, Hybrid's 15% commission, and Media Effective's margin or commission. [*Id.* at 146-47].

The parties disagreed on whether Javier's margin was a "fee for service" or a commission. It appears that prior to October 2021, Media Effective's invoices to NRIA did not disclose a commission and Media Effective did not provide transparency with respect to its margin. It further appears that NRIA was satisfied with this arrangement. Ms. Arend argued that the arrangement between NRIA and Media Effective was fee for service because Mr. Torres ran his business model as an all-inclusive price of the media time he purchased. But the Plaintiff claims that from the relationship's conception, Media Effective charged a commission on its services because of Javier's use of the word "commission" in emails at certain points before October 2021. For example, in an email from Mr. Torres to Nick Salzano in October 2019, Mr. Torres says that NRIA will pay a standard rate of 15% for an agency/broker commission. [Pl. Ex. 33]. However, this email was solely in reference to Media Effective's services for the South Asian networks. In other communications, Mr. Torres refers to his fee as a commission when communicating with Hybrid in December 2019, August 2020, and August 2021. [Pl. Exs. 106, 132, and 133]. However, none of these communications to Hybrid using the word commission were shared with Nick Salzano or NRIA.

---

[7] According to the expert testimony and the invoices provided to Javier Torres from Hybrid for its services, the industry-wide traditional commission rate for volume buyers of media is 15%. [Pl. Ex. 60, p. 36; *see* Hr'g Tr. June 21, 2024, ECF No. 82, pp. 60-62].

Page 19
Debtor:      National Realty Investment Advisors, LLC, *et al.*
Case No.:    22-14539
Adv. No.     23-01335
Caption:     **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

The Court is not convinced that Javier's use of the word commission before October 2021 turns the agreement with NRIA into a commission-based arrangement. Media Effective did not agree to be transparent with respect to its margin, and it wasn't. From 2012 until October 2021, the arrangement between NRIA and Media Effective was fee for service. But starting in October 2021, when NRIA asked Mr. Torres to "call out" his commission in future invoices – and he agreed to do so – the arrangement became commission-based, and Media Effective owed a duty to be truthful when disclosing its commission. [*See* Pl. Exs. 70 and 71].

## II.    Media Effective's Role and Profits

From 2016 to 2022, the Debtors transferred approximately $36,500,000 to Media Effective broken down as follows:

| | |
|---|---|
| 2016: | $667,000 |
| 2017: | $866,000 |
| 2018: | $2,063,000 |
| 2019: | $3,046,000 |
| 2020: | $12,618,000 |
| 2021: | $16,114,000 |
| 2022: | $1,125,000 |

[*See* Joint Stip. ¶ 28]. Of the money transferred from NRIA, Javier Torres paid media vendors (primarily Hybrid) approximately $23.5 million for the discounted media time plus Hybrid's 15% commission. After these fees, Media Effective profited almost $13 million between the years 2016 to 2022. [Joint Stip. ¶¶ 22, 30, 31].

According to an exhibit prepared by the Plaintiff's expert witness in accounting and Ponzi schemes, after paying the fees of Hybrid and other vendors, Media Effective averaged a 36% commission between the years 2016 and 2022. Mr. Torres would have yielded a higher average

Page 20
Debtor:         National Realty Investment Advisors, LLC, *et al.*
Case No.:       22-14539
Adv. No.        23-01335
Caption:        **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

commission but, in 2022, Media Effective bought more ad space than NRIA's budget, resulting in a negative margin for that year. Putting 2022 aside, Media Effective's average margin was approximately 45%.

| Media Effective Margin on NIRA Payments | | Incoming from NRIA | Outgoing to Advertising Agency | Estimated Mark-Up | Estimated Mark-Up Percentage |
|---|---|---|---|---|---|
| Year | 2016 | $667,480 | ($329,923) | $337,557 | 51% |
| | 2017 | $886,150 | ($509,025) | $377,125 | 43% |
| | 2018 | $2,063,070 | ($1,142,525) | $920,545 | 45% |
| | 2019 | $3,046,950 | ($1,590,981) | $1,455,969 | 48% |
| | 2020 | $12,618,792 | ($6,928,445) | $5,690,347 | 45% |
| | 2021 | $16,114,705 | ($9,535,390) | $6,579,315 | 41% |
| | 2022 | $1,125,143 | ($3,510,742) | ($2,385,599) | n/a |
| TOTALS: | | $36,522,290 | ($23,547,031) | $12,975,259 | 36% |

[*See* Pl. Ex. 7].

The Plaintiff believes that because of Hybrid's extensive role buying discounted media time and providing advertisement research and analytics, Mr. Torres played a minimal "middleman" role for which he was excessively paid. Initially, Mr. Torres alleged that he analyzed NRIA's ad viewership to determine whether to increase or decrease the ad frequency and usage of certain networks. [Def. Ex. 2, ¶¶ 76-80]. He also claimed that a large part of Media Effective's service was creating a media plan for NRIA. But through testimony, the Court learned that Hybrid was responsible for much of the substantive research and analysis that was passed on by Media Effective as its own work for NRIA. Sometimes Nick Salzano knew ahead of time the stations and networks where he wanted NRIA's ads to be placed, in which case Mr. Torres would simply relay Nick Salzano's direction to Hybrid, who would implement the direction and buy media time with those stations. But other times, if Nick Salzano did not know where NRIA's ads should be featured,

| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
|---|---|
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

he directed Mr. Torres to brainstorm the stations which would best target NRIA's demographic. In that situation, Mr. Torres testified that he would give NRIA's target demographic to Hybrid, who would then brainstorm the ideal stations and times to correspond with NRIA's target audience. Hybrid would also negotiate with those stations and give Mr. Torres the negotiated rate. After the ads aired, Nick Salzano would monitor how the ads performed, whether they reached NRIA's target audience, and whether to pull the stations or ads based on other key metrics. Mr. Torres would then communicate Nick Salzano's metrics to Hybrid, who would make Nick Salzano's requested changes. [Hr'g Tr. April 10, 2024, ECF No. 62, pp. 26-30]. During his testimony, Mr. Torres described that his position between Hybrid and NRIA was like a "horrible game of telephone." [*Id.* at p. 35]. There is no doubt that Media Effective was paid handsomely for serving as a middleman between NRIA and Hybrid. It is doubtful that NRIA knew the extent of the services provided by Hybrid that were passed off as Media Effective's work.

According to Patryk Golaszewski, the Operations Manager at NRIA, he believed it was Javier Torres and Media Effective negotiating advertising spots for NRIA, not Hybrid. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 189]. Nick Salzano (who did not testify) may have been aware of Javier's position as a middleman. Nick Salzano described Media Effective to other NRIA directors as "a small private firm that is [tied] into major buying groups of mass broadcast media and gets us good deals and research." [Def. Ex. 88, ¶ 11]. Mr. Torres argues that regardless of his use of vendors like Hybrid, NRIA cared only about the net cost for advertising, not Javier's margin. [Def. Ex. 2, ¶¶ 58, 100]. Nick Salzano and NRIA had previously worked directly with television/radio stations to buy advertising time. For example, Nick Salzano worked directly with CNBC and Sirius

Page 22

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Radio and, according to Mr. Torres, spent more money on this media time than Media Effective would have charged. [Pl. Ex. 20, p. 5]. Thus, NRIA was familiar with negotiating rates directly with networks and stations and had a basis to compare rates charged by Media Effective with those it negotiated directly. Patryk Golaszewski testified that on numerous occasions he negotiated on behalf of NRIA with networks to get a lower-than-market rate. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 192].

Although NRIA appeared to be aware of Javier's use of vendors, Mr. Torres did not want his vendors or Nick Salzano to know that he was potentially being paid above a reasonable value for his services. In June 2020, Nick Salzano sent an email to Katey Kana wherein he stated he believed that NRIA was paying outside vendors a median commission of 12.5%. [Def. Ex. 88, ¶ 14]. And in August 2020, Hybrid helped Mr. Torres draft an email to NRIA describing Media Effective's role when it came to buying media. Hybrid suggested that Mr. Torres tell NRIA that Media Effective does "not totally rely[] on the network of buyers," and that he works on the media buys himself. [Pl. Ex. 105, p. 1]. This exchange indicates that Mr. Torres did not want to disclose to NRIA the extent of his dependency on media buyers like Hybrid. For example, on November 22, 2019, Javier Torres accidentally forwarded an invoice to NRIA that included Hybrid's logo. Mr. Torres told Hybrid that he hoped "[NRIA would not] start snooping around." [Pl. Ex. 112]. In another instance, a contact at Emerging Networks (another high-volume buyer occasionally used by Media Effective) asked Mr. Torres if they could collaborate with NRIA and Nick Salzano. Mr. Torres replied, "[n]o, I don['t] think it's a good idea… You don['t] need to be introduced. Nick[] knows about you and Emerging Networks." [Pl. Ex. 49]. Similarly, sometime after Nick Salzano's

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

arrest in 2021, Patryk Golaszewski contacted Fox News to find out the market value of media time to see whether NRIA could save money on advertising. Mr. Torres found out that someone from NRIA had contacted Fox News and informed Nick Salzano. Nick Salzano told Mr. Golaszewski to shut down the investigation. [Hr'g Tr. May 17, 2024, ECF No. 75, pp. 39-40 and Hr'g Tr. May 20, 2024, ECF No. 76, p. 195]. On direct examination, the Plaintiff asked Mr. Torres: "you personally did not want NRIA knowing the identities of Hybrid Media or Emerging Networks?" Mr. Torres said, "I was clear with Salzano that those were my private contacts. Yes." [Hr'g Tr. April 10, 2024, ECF No. 62, p. 50].

In sum, Media Effective's "secret sauce" was the ability to purchase media time and market research from high volume buyers like Hybrid and Emerging Networks and deliver it to NRIA at a higher price. The price paid by NRIA resulted in a hefty profit for Media Effective even though for the most part, Media Effective was doing nothing more than playing a middleman's role. There is no doubt that Mr. Torres did not want Nick Salzano or NRIA dealing directly with Media Effective's vendors out of fear that NRIA might learn how much Media Effective was profiting from the relationship. But it does not appear that NRIA was concerned with Media Effective's profit margin until late 2021 when Mr. Torres was asked to disclose his commission.

III.   <u>Whether NRIA Paid Reasonable Value for Media Effective's Services?</u>

In October 2021, around the same time Javier Torres learned of Nick Salzano's arrest and the SEC investigation, Patryk Golaszewski asked Mr. Torres to break down his commission on future NRIA invoices. In response, Mr. Torres stated that his commission was typically built into the invoice and that the volume buyers and Media Effective all split a 5-15% commission. Mr.

Page 24

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Torres agreed to disclose his commission and estimated that a good indicator was 8% for radio and 7% for television. [Pl. Ex. 67]. From this point forward, Mr. Torres broke down his commissions but noted in the invoice that the commission amount "could be less or more" than the amount shown and that the commission is usually, but not always, shared depending on the volume buyer. [Pl. Ex. 71]. However, the Plaintiff presented evidence which Mr. Torres could not rebut showing that Media Effective significantly unreported its margin in those breakdowns. [*See* Pl. Exs. 70, 71, 72]. For example, when totaling four weeks of invoices from November 2021, NRIA paid Media Effective a total of $1,463,676. Media Effective owed Hybrid $914,910.25, making Mr. Torres's commission $548,765.75. Meanwhile, Mr. Torres represented to NRIA that his commission was only $113,360, meaning his calculation was understated by over $400,000. [Hr'g. Tr. April 10, 2024, ECF No. 62, pp. 226-235,]; [Pl. Exs. 71 and 74].

According to the invoice evaluation performed by the Plaintiff's financial expert, had the 7-8% commission been accurate for the years 2016 to 2022, Media Effective's commissions would have been $1,879,710. Even considering the industry standard of a 15% commission, Media Effective's commissions from 2016 to 2022 would have been $4,155,358. But Media Effective's actual commissions totaled $12,975,259, making its average commission around 36%. [Pl. Ex. 115]. Ms. Solk, testifying for the Plaintiff, stated that a 15% commission is typically the maximum in the advertising industry, and that if an agency receives greater than 15%, they better be bringing value to their client above and beyond what their client could get itself. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 144].

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

The Plaintiff wants the Court to believe that Javier Torres was scamming Nick Salzano and NRIA from the outset of the relationship. The Court does not find that, prior to October 2021, Media Effective defrauded NRIA by taking excessive commissions on its services because it had no agreement with NRIA to be transparent about its margin. There was evidence that NRIA was under the impression that Media Effective was providing good pricing, and it was suggested that the amounts paid by NRIA to Media Effective were at or better than market rates for the media time purchased, even with Media Effective's high margins. [Def. Ex. 57]. Overall, the evidence was inconclusive as to the market value of the services provided by Media Effective to NRIA over the years. Mr. Torres maintains that Hybrid bought media at 50% off the market rate from networks and stations, based on an email from Kevin Mannix, president of Hybrid, who estimated that Mr. Torres bought media time 50% off the networks' market rates. [Def. Ex. 57]. But this email from Mr. Mannix was nothing more than a general estimate. It did not reference specific time periods, stations, or networks, or whether the estimate concerned Hybrid's dealings with Media Effective alone or all of Hybrid's customers. The Defendants' expert, Ms. Arend, did not speak to Mr. Mannix or request the market value of media time from stations and networks themselves. [Hr'g Tr. April 10, 2024, ECF No. 62, pp. 212-15]. Ms. Arend's testimony on the value of the advertisement time purchased for NRIA was also based on a "Vivvix Report," [Def. Ex. 58], which was presented to show that NRIA was paying less for advertisement time than the market. But this report was not prepared by Ms. Arend, and she was unable to determine how the information concerning NRIA's costs made it into the report. [Hr'g Tr. April 10, 2024, ECF No. 62, pp. 161-62, 215-17]. Defendants' expert, Ms. Solk testified that the market rate of advertising time for a given timeframe would need to be calculated by assessing the network or station's floor pricing

Page 26

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

for that specific period, which Mr. Mannix did not do in this case. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 128]. It was Ms. Solk's opinion that Media Effective received payments from NRIA that far exceeded the value of Javier's services. [*Id.* at p. 145]. Though Ms. Solk provided a credible analysis, her testimony is based largely upon commission-based agreements which did not exist here until October 2021. Prior to October 2021, Mr. Torres and NRIA operated under a fee for service arrangement wherein value should not be measured based on a commission or margin.

But when Mr. Torres was asked in October 2021 to disclose his commission, Mr. Torres deceived NRIA by understating it. The fact that Javier Torres so egregiously misrepresented Media Effective's commission suggests that he knew it was not justified. [*See* Pl. Exs. 71 and 74]. As stated above, Javier's disclosure to NRIA portrayed that a reasonable commission for Media Effective was 7% on radio buys and 8% on television buys. He also suggested that Media Effective and its vendors would split a 15% commission between them. Thus, he gave NRIA the impression that the entire commission being paid over the cost of the advertising was 15%.

Media Effective should be held to the reasonable value which Mr. Torres set himself beginning in October 2021. Therefore, the reasonable value of Media Effective's services from October 2021 onward – when Mr. Torres and NRIA operated under a commission-based arrangement – is best evaluated at what Mr. Torres believed was reasonable in his disclosure to NRIA: 7% commission for radio buys, 8% commission for television buys, and 15% total commission. Prior to October 2021, the Plaintiff did not prove that NRIA paid more than the market rate for the advertising placed by Media Effective.

Page 27

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

## LEGAL ANALYSIS

### I. Actual Fraud

Count I of the Complaint alleges that NRIA transferred funds to the Defendants (as either initial, immediate, or mediate transferees) with the intent to defraud investors in furtherance of NRIA's Ponzi scheme. [ECF No. 31, ¶¶ 109]. Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, the Plaintiff may avoid any transfer of interest in the Debtors' property made within two years before the petition date if the transfer was made with "actual intent to hinder, delay, or defraud any entity to which" the debtor was indebted. The Liquidation Trustee relies on the "Ponzi scheme presumption" to infer NRIA's actual intent to defraud creditors. The Ponzi scheme presumption concludes that transfers made during a Ponzi scheme could be made "for no purpose other than to hinder, delay or defraud creditors." *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) (quoting *Gowan v. The Patriot Group*, LLC, 452 B.R. 391, 423 (Bankr. S.D.N.Y. 2011)). Under the presumption, intent is established as a matter of law so long as the transferor intended to defraud *any* entity to which the debtor was indebted. *In re C.F. Foods, L.P.*, 280 B.R. 103, 111 (Bankr. E.D. Pa. 2002) (citing 11 U.S.C. § 548(a)(1)(A)) (avoiding transfers made to a charity because debtor ran a scheme to defraud investors).

The Debtors' intent to defraud creditors can be inferred because the Plaintiff established (without much opposition) that NRIA was a Ponzi scheme. A Ponzi scheme uses money from new investors "to pay artificially high returns to earlier investors" to attract new investors and perpetuate an appearance of profitability. *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 8 (S.D.N.Y. 2007). The Plaintiff proved that by 2019 (and probably earlier) NRIA was insolvent and that NRIA

Page 28

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

used incoming investor money to pay the guaranteed returns. [Hr'g Tr. May 20, 2024, ECF No. 75, pp. 191–95; Def. Ex. 2, ¶ 32]. Also, in the U.S. District Court of New Jersey, Nick Salzano admitted to orchestrating a Ponzi scheme and committing securities fraud from 2018 to 2022. Plaintiff's Ponzi scheme expert testified that he found NRIA's fraudulent loans and bank statements dated as far back as 2017. [Hr'g Tr. May 20, 2024, ECF No. 76, p. 60].

For the Ponzi scheme presumption to apply, the Plaintiff must show how the transfer at issue was "related to" or "in furtherance of" the Ponzi scheme. *In re DBSI, Inc.*, 476 B.R. 413, 422 (Bankr. D. Del. 2012) (citations omitted); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. at 105 (holding "certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply"); *In re Live Well Fin. Inc.*, 2023 WL 3995900, at *16-17 (Bankr. D. Del. June 13, 2023) (finding it is the plaintiff-trustee's burden to prove *both* "that a Ponzi scheme existed and that the specific transfers at issue were in furtherance of the Ponzi scheme").

Media Effective was paid by NRIA to place advertisements and maximize exposure so that NRIA would attract as many new investors as possible. Even though the investments were ultimately closed by NRIA's employees, the ads placed by Media Effective were a critical component of the scheme. *See Zazzali v. AFA Fin. Group, LLC*, 2012 WL 4903593, at *8 (Bankr. D. Del. Aug. 28, 2012) (finding that "payments made for the purpose of attracting new investors to the scheme are avoidable as actually fraudulent"); *and see Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 691 (Bankr. S.D.N.Y. 2019) ("Ponzi scheme operators often engage in some legitimate transaction but if the legitimate transactions further the scheme or are funded by the scheme they are part of the scheme.").

Page 29
Debtor:        National Realty Investment Advisors, LLC, *et al.*
Case No.:      22-14539
Adv. No.       23-01335
Caption:       **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendants have raised the affirmative defense under § 548(c) of the Bankruptcy Code, which says that transferees may keep an interest transferred to the extent they accepted the transfer for value and in good faith. The defendant-transferee bears the burden of proving the transfer was received in good faith and for value. *Image Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 391 (E.D. Pa. 2013). "For value," an element of the defense, exists if the Debtors received a fair equivalent in exchange for its property, or an amount "not disproportionately small as compared with the value of the property." *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) (emphasis omitted) (citations omitted). Reasonable value cannot always be a mathematic formula, so courts are instructed to assess the facts of each case, fair market value, and whether there was an arm's length transaction. *Id.* at 678-79.

As stated above, once Media Effective started to deceive NRIA as to its commissions in October 2021, NRIA was paying Media Effective far more than what was being disclosed by Mr. Torres. Thus, the Defendants certainly do not get the benefit of the "for value" component of the good faith defense from that point forward. Prior to October 2021, the issue is more complicated. On one hand, the evidence was inconclusive as to market value of the advertising purchased by NRIA from Media Effective. On the other, if a standard commission for an advertising agency is 15%, then Media Effective was being overpaid which supports the Plaintiff's allegation that NRIA received a value disproportionately small compared to the price. The Court has found that the Plaintiff proved that the compensation paid by NRIA to Media Effective from October 2021 forward was excessive. That finding is relevant for the purposes of the Defendants' § 548(c) defense because it sets a point at which the Defendants cannot use the "for value" portion of the

Page 30

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

defense. But, as set forth below, the Defendants are precluded from use of the good faith defense at an earlier point, April 2021. So, the consequences of the Court's "for value" determination are less important.

Turning to the good faith element of the defense, the Court must ask whether, through an objective reasonable person standard, Javier Torres knew or should have known that he was being paid to place advertisements that were fraudulent. A defendant is not automatically protected simply because it had no actual knowledge of the fraud. If the transferee is on notice of "suspicious circumstances regarding a transfer," they are obligated to conduct a diligent investigation of the issues putting the transferee on inquiry notice. *Image Masters, Inc.*, 489 B.R. at 391-92. Stated differently, the good faith element requires two parts: whether the transferee was on inquiry notice of the fraud and whether the transferee did a diligent investigation of the transferor. *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 23 (citations omitted) ("The issue presented is whether the information [the transferee] learned would have caused a reasonable prime broker in its position 'to investigate the matter further.'"). Inquiry notice asks not what the transferee knew, but whether they should have attempted to learn more given the circumstances. *Id.* As discussed above, Javier Torres (Media Effective) was on inquiry notice of NRIA's fraud as of April 2021. At that time, a reasonable media/advertising agent would have investigated NRIA's claims that the returns on the investors' funds were guaranteed.

Javier Torres and Media Effective cannot assert the good faith defense as of April 2021, and the Plaintiff established that transfers from NRIA to Media Effective during the same time were made with fraudulent intent. From April 2021 onward, the Debtors transferred to Media

Page 31

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Effective $14,259,796. [ECF No. 31, Ex. A]. From this amount, Hybrid and other vendors were paid $9,654,683.84. [Pl. Ex. 117]. Thus, Media Effective's profit from April 2021 onward equals $4,605,112.16. Because the Court has found that as of April 2021 Mr. Torres reasonably should have known that NRIA was making misrepresentations to investors and did not investigate, net transfers from the Debtors to Media Effective during this period ($4,605,112.16) are recoverable as damages for the Plaintiff's fraudulent transfer claims.

## II.   <u>Constructive Fraud</u>

Count II of the Liquidation Trustee's Complaint seeks to avoid transfers made to all Defendants as constructively fraudulent under state and federal law. Section 548(a)(1)(B) of the Bankruptcy Code provides that NRIA may avoid transfers if it received less than reasonably equivalent value in return for the transfer while NRIA was insolvent. *See also N.J.S.A. 25:2-25(a)(2) and 25:2-27(a)*. Based on the evidence, the Court has found that until October 2021, the agreement between NRIA and Media Effective was "fee for service." And Plaintiff did not prove by a preponderance of the evidence that the amounts paid by NRIA for advertisements placed by Media Effective were more than the market rate.

But starting in October 2021, based on the written representations of Javier Torres concerning commissions, the Court finds that Media Effective's commissions were unreasonable. When asked to break down his markup in future invoices, Mr. Torres estimated that his commission ranged from 7-8% with a slight variance depending on the invoice. He also said that Media Effective and its suppliers *shared* a 15% commission when Hybrid alone was charging 15% and Media Effective was charging its commission on top of that. In fact, Media Effective's

Page 32

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

commission averaged 36%. And as stated above, but for one bad year in 2022, Media Effective's commission would have averaged 45%. Javier's egregious misrepresentations suggest that even he believed that when Media Effective's compensation was viewed as a commission, NRIA was being overcharged—by a lot. Ms. Arend also testified that if an agency agreed to disclose its commission to a client, the agency has a duty to be truthful in its disclosure.[8]

The Court has found that NRIA received less than reasonably equivalent value in return for Media Effective's advertising services when more than 15% was charged as commission from the period of October 2021 onward. During this period, NRIA transferred to Media Effective $6,747,450 [ECF No. 31, Ex. A] and Media Effective paid Hybrid and other vendors $5,289,966.84. [Pl. Ex. 117]. Therefore, Media Effective's margin totaled $1,457,483.16 after Mr. Torres began deceiving NRIA about his commission. Most, if not all, of this profit should be awarded as damages to the Plaintiff under the constructive fraud claim. With respect to ads placed by Media Effective through Hybrid, NRIA was paying a 15% commission (to Hybrid), and Media Effective should get nothing beyond that. As to other volume buyers, the record is less clear and might require some adjustment to the damage amount set forth above. Since Plaintiff's damages based on constructive fraud would be less than (and included within) the damages on the actual fraudulent conveyance claim ($4,605,112.16), there is no need to conduct further analysis.

---

[8] In an October 2021 email to NRIA, Mr. Torres explained his commission structure: "most of the time the volume buyers and myself negotiate a commission with the media companies between 5-15% and it is split among the participants." [Pl. Ex. 67, p. 3]. According to this email, Media Effective would be getting its commission from the volume buyers' 5-15%, which was certainly not the case with Hybrid.

Page 33
Debtor:        National Realty Investment Advisors, LLC, *et al.*
Case No.:      22-14539
Adv. No.       23-01335
Caption:       **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## III.   Aiding and Abetting Securities Fraud

In Count III, the Plaintiff alleges that Media Effective and Javier Torres aided and abetted in securities fraud under New Jersey Uniform Securities Law, §§ *N.J.S.A. 49:3-47 to -76*. [ECF No. 31, ¶¶ 122-132]. Proving that an agent aided and abetted in securities fraud in New Jersey requires the Plaintiff to show that with reasonable care, Mr. Torres could have known that NRIA was misleading investors. *N.J.S.A. §§ 49:3-71(a)(2) and 71(d)*. In New Jersey, it is unlawful for any person to offer, sell, or purchase a security by either employing any scheme to defraud, by engaging in any act operating as fraud or deceit, or by advising others to invest in or purchase securities. *N.J.S.A. § 49:3-52*. An employee or agent of a seller in securities who materially aids in the sale or conduct are jointly and severally liable to the same extent as the investment advisor unless the employee or agent did not know and could not have known through reasonable care that someone is selling securities by means of untrue statements. *N.J.S.A. § 49:3-71(d)*. An "agent" according to New Jersey's Uniform Securities Law is an individual representing an issuer of securities in the effectuation of purchases or sales of securities. This may include partners, officers, or directors of a securities issuer if their role was to effectuate sales. *N.J.S.A. § 49:3-49(b)*.

In *Zendell v. Newport Oil Corp.*, 226 N.J. Super. 431 (App. Div. 1988), plaintiff alleged a law firm was liable as a "seller" of securities as defined by the Securities Act of 1933 (1933 Act), *15 U.S.C.S. § 77a et seq.*, and New Jersey Uniform Securities Law (NJUSL), for its role in organizing and presenting the sale of unregistered securities on behalf of a partnership it represented. The state *Zendell* court favorably cited the Supreme Court's decision in *Pinter v. Dahl*, which limited the broad application of the 1933 Act, finding the language and legislative history did not support expanding those potentially liable beyond persons who "pass title," "offer,"

Page 34

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

or "solicit" offers to buy securities. 486 U.S. 622, 643 (1988). Instead, *Pinter* held the 1933 Act's

"failure to impose express liability for mere participation in unlawful sales transactions suggests

that Congress did not intend that the section impose liability on participants collateral to the offer

or sale." *Id.* at 650. In rejecting the "substantial factor" test, which previously imposed liability to

persons "whose participation in the buy-sell transaction [wa]s a substantial factor in causing the

transaction to take place," *Id.* at 650., the *Pinter* court noted that a such a test would,

> extend . . . liability to participants only remotely related to the relevant aspects
> of the sales transaction. Indeed, it might expose securities professionals, such as
> accountants and lawyers, whose involvement is only the performance of their
> professional services, to . . . strict liability for rescission. The buyer does not, in
> any meaningful sense, "purchas[e] the security from" such a person.

> [Id. at 651].

Therefore, the appellate court in *Zendell* did not impose liability on the law firm, finding "no

plaintiff had any contact with [the firm]," the firm never acted as a broker, selling agent, or

underwriter for the partnership venture, and therefore, the law firm could not be considered a seller

or control agent under either federal or state securities law. 226 N.J. Super. at 441.

Similarly, in determining whether a creditor of one of the general partners in a limited

partnership was responsible for losses under NJUSL, the court in *Abrams v. Ohio Cas. Ins. Co.*,

322 N.J. Super. 330, 337 (App. Div. 1999), stated "[f]ederal securities law concepts are used to

define 'control person' under the New Jersey statute." The court held that defendant did not have

"control of a seller" or qualify as a "seller" under NJUSL because plaintiffs failed to show

defendant's "active participation" in the management of the partnership. *Id.*

Page 35

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Here, Mr. Torres signed an Agency of Record with NRIA, which authorized Media Effective to buy advertising and media time with networks and stations on behalf of NRIA. This "agency" did not extend to transactions between NRIA and its investors. Although the Court has found that Javier Torres should have known that NRIA was defrauding investors through its advertisements in April 2021, Mr. Torres was not authorized to "close" investments. The ads invited investors to call a NRIA phone number, which would direct investors to NRIA's "closers" to effectuate and secure the investment. The Plaintiff failed to prove that Mr. Torres spoke to or procured an investment from an individual. *See Matter of Bruno*, 2021 WL 1140095, at *4 (N.J. Super. App. Div. Mar. 25, 2021) (finding managing member president to be an "agent" to securities sales because he individually solicited investments from individuals and misrepresented the use of investor funds to five people).

The Plaintiff failed to prove that Mr. Torres and Media Effective acted as agents to effectuate the purchase and sales of securities. Thus, no relief is warranted under Plaintiff's aiding and abetting securities fraud claim under New Jersey law.

## IV.   Fraud and Aiding and Abetting in Fraud

In Counts IV and V the Plaintiff alleges that Media Effective and Javier Torres committed fraud and aided and abetted in fraud. [ECF No. 31, ¶¶ 133-156]. As stated in the Court's factual findings, the Plaintiff did not meet its burden of proving that Mr. Torres knew that NRIA was running a Ponzi scheme and defrauding investors. Thus, the fraud claims based on actual knowledge of the fraudulent misrepresentations were not established.

Page 36

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

Under New Jersey law, fraud and aiding and abetting in fraud require the Plaintiff to prove that Media Effective knowingly intended others to rely on NRIA's fraudulent misrepresentations. To establish fraud in New Jersey, the Plaintiff must show that: (1) the Defendants made a material misrepresentation of an existing or past fact; (2) the Defendants made the misrepresentation with the knowledge or belief of the fact's falsity; (3) the Defendants intended the other to rely on it; (4) the other person reasonably relied on the fact; and (5) the act resulted in damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). And to establish aiding and abetting in fraud in New Jersey, the Plaintiff must prove that (1) NRIA committed fraud which caused an injury at the time of the Defendants' assistance; (2) the Defendants were aware their role was "part of an overall illegal or tortious activity" when they provided the assistance; and (3) the Defendants knowingly *and* substantially assisted in the fraud. *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999); *see In re Norvergence, Inc.*, 405 B.R. 709, 746 (Bankr. D.N.J. 2009). To be found liable, Javier Torres must have shared NRIA's intent to commit fraud; there needed to be a "meeting of the minds." *In re SemCrude L.P.*, 864 F.3d 280, 297 (3d Cir. 2017).

The Plaintiff's claim that Javier Torres had actual knowledge of NRIA's fraud was not supported by either of the two witnesses who were on the scene at NRIA when the fraudulent conduct was happening—Mr. Torres and Patryk Golaszewski. Thus, the Plaintiff relied only on "badges of fraud." Although Plaintiff did demonstrate that Mr. Torres was not transparent or truthful with NRIA when it came to its commissions and its heavy reliance on volume media buyers, this questionable conduct related to the dealings between Media Effective and NRIA. It

Page 37

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

had nothing to do with whether Mr. Torres knew that NRIA was defrauding its investors. Therefore, the Plaintiff did not prevail on the claims in Counts IV and V.[9]

## V.    Unjust Enrichment, Preliminary Injunction, and Equitable Relief

In Count VI of the Amended Complaint, the Liquidation Trustee alleges that all Defendants were unjustly enriched. [ECF No. 31, ¶ 157]. An unjust enrichment claim under New Jersey law must establish that the defendant "received a benefit and that retention of that benefit without payment would be unjust." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 754 (D.N.J. 2013) (quoting *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F.Supp.2d 192, 196 (D.N.J. 2012). The Court believes that its decision to award Plaintiff $4,605,112.16 in damages under Count I above is a just result and will not award damages beyond that for unjust enrichment.

Count VII of the Amended Complaint asks the Court to grant a preliminary injunction barring all Defendants from selling, transferring, or otherwise disposing of the Atlantic Highlands, New Jersey property, any fraudulent transfers, or the Defendants' bank accounts as set forth in Exhibit C to the Amended Complaint. [ECF No. 31, ¶ 165]. This relief is in place due to the Court's Temporary Restraining Order, [ECF No. 9], which remains in effect. Once the Defendants pay the damages awarded herein, the Temporary Restraining Order will be dissolved and Count VII will

---

[9] Plaintiff seeks damages in the amount of $127 million with respect to actual fraud claims against Media Effective. NRIA raised over $600 million in investments, and approximately $295 million were sourced from television and radio advertisements. Because Media Effective was responsible for 43% of NRIA's advertisements, the Plaintiff alleges that Media Effective should pay $127 million (43% of $295 million) in damages pursuant to Count III aiding and abetting in securities law, Count IV fraud, and Count V aiding and abetting in fraud. [Hr'g. Tr. May 20, 2024, ECF No. 76, pp. 8-9]. While the basis underlying the Plaintiff's damages theory is understandable, the numbers are speculative and approximate. In any event, the Plaintiff did not prevail on any of these three Counts. Therefore, the Plaintiff's request for damages of $127 million under Counts III, IV, and V is denied.

Page 38

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

be moot. Similarly, Count VIII (Constructive Trust) and Count IX (Accounting) will be moot once the Plaintiff is paid its damages.

## VI.  Interest and Attorney's Fees

The Liquidation Trustee is entitled to pre- and post-judgment interest on the fraudulent conveyance judgment beginning from the date the Plaintiff filed its complaint, November 10, 2023. Pre-judgment interest is permissible in certain circumstances under federal law. A Court should assess (1) the need to fully compensate the wronged party, (2) fairness and equities of the award, (3) the remedial purpose of the relevant statute, and/or (4) any other principles deemed relevant by the Court. *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992). While § 548 of the Bankruptcy Code is silent on pre-judgment interest, the statute does not forbid it. *Picard Tr. For SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 186 (2d Cir. 2022) (awarding pre-judgment interest in favor of the trustee at the prime interest rate at the date of the beginning of the trustee's liquidation). The Court will allow pre-judgement interest at the prime rate on November 10, 2023, through the date of the judgment. The Plaintiff is also entitled to post-judgment interest after the date of entry of the judgment accruing at the federal judgment rate. *In re 1031 Tax Group, LLC*, 439 B.R. 84, 86-87 (Bankr. S.D.N.Y. 2010) (awarding trustee post-judgment interest on fraudulent transfers at the federal interest rate accruing from the date of entry of the judgment).

Finally, the Court denies the Plaintiff's request for attorney's fees. When considering awarding attorney's fees, the "American Rule" states that each litigant pays their own attorney's

Page 39

| | |
|---|---|
| Debtor: | National Realty Investment Advisors, LLC, *et al.* |
| Case No.: | 22-14539 |
| Adv. No. | 23-01335 |
| Caption: | **DECISION RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

fees, "win or lose, unless a statute or contract provides otherwise." *Peter v. Nantkwest, Inc.*, 589

U.S. 23, 28 (2019). The American Rule is based upon the premise that parties should have liberal

access to the courts, not conditioned on the prospect of losing and paying litigation costs. The

American Rule applies to bankruptcy litigation. See *In re S.S.*, 271 B.R. 240, 245 (Bankr. D.N.J.

2002) (citations omitted).

## CONCLUSION

For the reasons set forth above, judgment will be entered in the amount of $4,605,112.16

plus pre- and post-judgment interest in favor of the Plaintiff and against the Defendants, Media

Effective and Javier Torres, jointly and severally.[10]

**DATED: October 11, 2024**

Honorable John K. Sherwood
United States Bankruptcy Court

---

[10] At to the other Defendants, their liability under § 550(a)(2) for transfers received from Media Effective and Javier Torres would be limited to the amounts received. Upon request of Plaintiff and to the extent necessary, the Court will enter separate judgments against the other Defendants.