**ICE MILLER LLP**
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Ryan Hibbard, Esq. (admitted *pro hac vice*)
John D. French, Esq. (*pro hac vice* forthcoming)
1500 Broadway
Suite 2900
New York, NY 10036
Phone: 212-835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com
ryan.hibbard@icemiller.com
jd.french@icemiller.com

*Counsel to AIRN Liquidation Trust Co., LLC*
*in its capacity as Liquidation Trustee of*
*the AIRN Liquidation Trust*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>NATIONAL REALTY INVESTMENT ADVISORS, LLC,<br><br>        Debtor. | Chapter 11<br><br>Case No. 22-14539 (JKS) |
| In re:<br><br>AIRN LIQUIDATION TRUST, CO., LLC, in its capacity as Liquidation Trustee of the AIRN LIQUIDATION TRUST,<br><br>       Plaintiff,<br><br>v.<br><br>BETHANY SALZANO, KYLE STAFIRNY, REFERRAL MARKETING LLC, AND LINK N' LOG LLC,<br><br>       Defendants. | Adv. Pro. No. 24- _____ - JKS |

## COMPLAINT

AIRN Liquidation Trust Co., LLC ("Plaintiff" or "Liquidation Trustee"), in its capacity as Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the *First Amended Joint Chapter 11 Plan of Liquidation of National Realty Investment Advisors, LLC and its Affiliated Debtors* [Case No. 22-14539, Dkt. No. 3256] (as amended and supplemented, the "Plan")[1] and the order confirming same [Case No. 22-14539, Dkt. No. 3599] (the "Confirmation Order"), which has been assigned and, as of the Effective Date of the Plan, holds the claims of Contributing Investors (as that term is defined in the Plan), by and through its undersigned counsel, brings this complaint (this "Complaint") against Defendants, Bethany Salzano and Kyle Stafirny ("Stafirny") (collectively, the "Individual Defendants"), Referral Marketing LLC ("Referral Marketing") and Link N' Log LLC ("Link N' Log") (collectively, the "Defendants"), and hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      This action seeks to recover millions of dollars on behalf of approximately 2,000 investors (the "Investors") defrauded through debtors National Realty Investment Advisors, LLC, NRIA Partners Portfolio Fund I, LLC ("Fund"), and their affiliated and subsidiary debtors (collectively "NRIA" or "Debtors"). Hundreds of the Investors are retirees who lost millions in retirement funds, leaving many of them destitute.

2.      NRIA's pre-petition leadership has already faced, and pled guilty to, significant federal and state regulatory criminal charges for securities, tax and other malfeasances. Thomas

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Disclosure Statement.

"Nicholas" Salzano ("Salzano"), who ran NRIA from behind the scenes, and Rey E. Grabato, II

("Grabato"), along with other NRIA leadership, were charged with federal allegations of securities

violations and fraud. *See Complaint, SEC v. NRIA, et al.*, Case No. 2:22-cv-06066 (Oct. 13, 2022),

Dkt No. 1; *see also* Indictment, *United States of America v. Salzano and Grabato*, Case No. 2:22-

cr-00690 (Oct. 12, 2022), Dkt No. 19.

3.      Salzano previously played an integral part in the NorVergence, Inc.

("NorVergence") fraudulent scheme, which resulted in a $50 million consent judgment entered

against him, a permanent injunction barring Salzano from participating in similar fraudulent

conduct in the future, and a guilty plea to five felony counts of theft over $500, resulting in three

years supervised probation. On February 27, 2024, Salzano pled guilty to securities fraud,

conspiracy to commit wire fraud, and conspiracy to defraud the United States in connection with

his role at NRIA. At his plea hearing, Salzano further admitted to operating the Debtors pre-

petition as a Ponzi scheme by admitting under oath to *each* of the elements of a Ponzi scheme.

4.      The Individual Defendants are both Salzano family members, insiders of NRIA

within the meaning of section 101(31) of title 11 of the United States Code (the "Bankruptcy

Code"), and conspired with Salzano and others to induce Investors to invest in NRIA's fraudulent

scheme. Defendant Bethany Salzano is Salzano's daughter, Dustin Salzano's sister, and most

recently served as NRIA's pre-petition Senior Vice President of Executive Operations. Defendant

Stafirny is husband to Bethany Salzano, brother-in-law to Dustin Salzano, son-in-law to Salzano,

and most recently served as Director of Technology of NRIA.

5.      The Individual Defendants knew and understood that Salzano's criminal past would

materially impair their ability to solicit Investors in the NRIA fraud scheme. As a result, the

Individual Defendants (i) aided, abetted and facilitated Salzano's attempts to conceal his criminal past from the Investors, causing NRIA to expend and divert millions of dollars of Investor funds to "scrub" the internet to conceal Salzano's criminal past, along with other efforts to conceal Salzano's past; (ii) referred to Salzano by his middle name, Nicholas, rather than Thomas, again to hide his criminal past; (iii) knew well that Grabato was nothing more than a nominee and powerless proxy for Salzano; (iv) actively participated in the marketing and media strategies of the NRIA fraud campaign; (v) falsified bank statements in furtherance of the fraud and/or was aware of the falsification of bank statements; and (vi) facilitated NRIA's raising of approximately $664 million from Investors before its scheme collapsed, through private placement memoranda (each a "PPM") that were knowingly and wholly replete with fraudulent misrepresentations and omissions of material facts.

6.    The Individual Defendants also employed other means to siphon Investor funds for their own personal benefit and to compensate others to further the fraud. Defendants Referral Marketing and Link N' Log were incorporated and designed to compensate the Defendants and others with the use of Investor funds. In the aggregate, Defendants received fraudulent transfers of at least $3,937,842, which provided no benefit or consideration to the Debtors' estate, creditors and/or Investors, were fraudulent, and should be avoided and turned over to the Liquidation Trustee for the benefit of the Investors. *See* **Exhibits A–D**.

7.    Accordingly, the Liquidation Trustee seeks and should be entitled to a judgment in its favor in an amount not less than all Investor losses caused by NRIA's fraud and such other

amounts under applicable law; and avoiding, unwinding, and recovering at least $3,937,842 million Debtors paid to Defendants, as detailed on **Exhibits A–D**.[2]

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and the *Standing Order*, dated July 23, 1984, referring all cases under the Bankruptcy Code to the bankruptcy judges for this District, as amended on September 18, 2012. Standing Order of Reference 12-1 (Simandle, C.J.).

9.      The claims asserted in this adversary proceeding are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

10.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

11.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), this adversary proceeding relates to the above-captioned chapter 11 case (the "Chapter 11 Case") of the Debtors.[3]

12.      This Court has personal jurisdiction over Defendants consistent with the Constitution and laws of the United States, as well as Bankruptcy Rule 7004(f) and other applicable law.

13.      Pursuant to Bankruptcy Rule 7008, Plaintiff consents to the entry of final orders or judgments by this Court, in the event it is determined that this Court cannot do so consistent with Article III of the United States Constitution absent the consent of the parties.

---

[2] Plaintiff is continuing its investigation against Defendants and reserves the right to supplement this Complaint as additional facts and information come to light.

[3] All of the chapter 11 cases, other than that of National Realty Investment Advisors, LLC (Case No. 22-14539 (JKS)), were closed effective as of August 25, 2023 at 6:30 p.m. (EST) in accordance with the *Final Decree Closing Certain Cases and Amending Caption of Remaining Case* [Dkt. No. 3854] entered by this Court on December 4, 2023.

14.     The statutory and legal bases for the relief requested in this Complaint are sections 105(a), 542, 544, 547, 548, 550, and 551 of the Bankruptcy Code, Bankruptcy Rules 7001, 7004, section 6502 of title 26 of the United States Code, section 3306(b) of title 28 of the United States Code and applicable state law, including New Jersey Statutes Annotated ("N.J.S.A.") sections 2C:20-4; 25:2-25; 25:2-27; and 49:3-71.

## PARTIES

15.     Plaintiff is the Liquidation Trustee of the AIRN Liquidation Trust established pursuant to the Plan and the Liquidation Trust Agreement approved by the Confirmation Order.

16.     Pursuant to Article IV.F of the Plan, Plaintiff retains all rights to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw, as appropriate, any and all of the Debtors' or Estates' Causes of Action (whether existing as of the Petition Date (as hereinafter defined) or thereafter arising), and all Avoidance Actions and Contributed Claims, all well as Liquidation Trust Actions, as each of those terms is defined in the Plan.

17.     Defendant Bethany Salzano is an individual who, based on information and belief, resides at 4 Sutton Road, Hopacong, NJ 07843. From October 2021 to May 2022, Bethany Salzano served as Senior Vice President of Executive Operations of NRIA. Bethany Salzano served as Director of Marketing & Investor Relations of NRIA from June 2012 to June 2016 and Director of Investor Relations of NRIA from June 2016 to November 2021. Defendant Bethany Salzano is married to Defendant Stafirny, is a daughter of Salzano, and a sister of Dustin Salzano. At all relevant times, Bethany Salzano was an insider of NRIA. Bethany Salzano received over $226,579 in purported compensation for her employment at NRIA. **Exhibit A**.

6

18.     Defendant Stafirny is an individual who, based on information and belief, resides at 4 Sutton Road, Hopacong, NJ 07843. Defendant Stafirny served as Director of Technology of NRIA from January 2020 to in or about January 2023. Stafirny is married to Defendant Bethany Salzano, is a son-in-law of Salzano, and a brother-in-law of Dustin Salzano. At all relevant times, Bethany Salzano was an insider of NRIA. Stafirny received over $352,850 in purported compensation for his employment at NRIA. **Exhibit C**.

19.     Upon information and belief, defendant, Referral Marketing was formed in New Jersey on March 27, 2012. Bethany Salzano is the sole managing member of Referral Marketing. Referral Marketing received at least $3,039,770 from NRIA and NRIA funds[4] between January 2016 and June 2021. **Exhibit B**. Salzano assisted Bethany Salzano in incorporating Referral Marketing, which purportedly served as an independent contractor of NRIA.

20.     Upon information and belief, defendant Link N' Log was formed in New Jersey on March 7, 2019, and received over $318,641 from NRIA from July 2019 to June 2021 for purported information technology and website services. **Exhibit D**. Defendant Stafirny is a member/manager of Link N' Log.

## **BACKGROUND**

### I.    **Salzano Operated NRIA as a Ponzi Scheme**.

21.     Salzano, Grabato, and other co-conspirators, including the Individual Defendants, operated NRIA and its affiliated debtor entities as a Ponzi scheme to defraud innocent Investors for the benefit of those in their inner circle, their insiders, and affiliates.

---

[4] Referral Marketing also received two transfers from Rey Grabato, LLC. The Rey Grabato, LLC bank account was controlled by Salzano and Grabato. The majority of the deposits into this account were from NRIA.

22.     Salzano purportedly served as a "Senior Independent Executive Advisor and Portfolio Manager" of NRIA, although his involvement in NRIA was more akin to a President or chief executive officer until he was removed in October 2021. Salzano controlled NRIA from its inception through and for a period after his alleged disassociation with NRIA. Salzano's control of NRIA and his criminal history were concealed from Investors with the assistance of the Individual Defendants, which, as discussed in greater detail herein, was an important element of the Debtors' fraudulent scheme.

23.     Grabato was the purported majority owner, President, and Chief Executive Officer of NRIA. Yet, Grabato was nothing more than a front for Salzano, who actually controlled NRIA.

24.     NRIA's operations mirrored the Security Exchange Commission's ("SEC") definition of a Ponzi scheme – an investment fraud that pays existing or first-in investors with the monies of the newer investors so that it appears the first-in investors are receiving value when, in reality, all they are receiving are the funds collected from the newer investors. Simply put, NRIA did not have adequate funds to operate its business and pay investor distributions without a constant influx of new Investor capital.

25.     As part of this fraudulent scheme, NRIA, its leadership team and their co-conspirators, including the Individual Defendants, used NRIA to solicit approximately $664 million in investments from unsuspecting Investors.

26.     NRIA claimed to operate as a real estate investment, management, and development firm that, since its inception, developed dozens of luxury properties in Florida, New York, New Jersey, and Pennsylvania. NRIA also claimed that it would pay extraordinarily high guaranteed returns to its Investors, and that its Investors would be paid their return of capital first.

8

In reality, NRIA was a Ponzi scheme, using Investors' contributions to pay distributions, purchase properties, orchestrate an extensive marketing effort to attract new Investors, and pay the personal expenses of NRIA's leadership and insiders, including the Individual Defendants.

27.    Investors invested in the scheme in various ways throughout NRIA's existence: (i) initially, NRIA induced Investors through guaranteed returns to purchase properties (the "Deeded Properties") that would be renovated, developed, rented, managed, and/or sold by U.S. Construction LLC ("USC") and/or Premier Access Management LLC ("Premier"), entities controlled by Salzano's son, Dustin Salzano, and John Farina ("Farina") (a fact that was concealed from Investors), (ii) then by investing in a series of single property limited liability companies sold by PPMs that purportedly were to renovate or build specific properties (the "Pre-Fund Phase") and, (iii) finally, by pooling their money into NRIA Partners Portfolio Fund I LLC, a real estate investment fund managed by NRIA (the "Fund"). The evolution of NRIA's investment programs were designed to induce Investors to continue investing in NRIA to prolong the scheme's inevitable collapse.

## A.    The Deeded Property Phase

28.    As part of the Deeded Property Phase, NRIA solicited Investors to purchase properties that would be renovated, developed, rented, managed, and/or sold by USC and Premier. USC and Premier worked on virtually all Deeded Properties and represented and guaranteed Investors that such Deeded Properties would be built on time and at a fixed price. Such guarantees were executed between the individual Deeded Property Investor and USC or Premier.

29.    NRIA and USC concealed Salzano's purported verbal agreement to pay the expenses related to the USC and Premier guarantees to Investors, and such guarantees ultimately

were funded with Investors' contributions. *See* **Exhibit E**, Transcript of the Deposition of Dustin Salzano ("D. Salzano Dep.") at 227:20–229:11. Unbeknownst to Investors, when the guaranteed returns were not satisfied, NRIA would make up the shortfall. NRIA paid at least $899,549 to fulfill USC's obligations under its guarantees, and at least $4,100,086 to fulfill Premier's obligations under its guarantees.

30.    NRIA further guaranteed to buy back any Deeded Properties if Investors were not satisfied with their investment. Due to USC's poor construction and/or Premier's poor property management, NRIA was forced to pay Deeded Property Investors millions to fulfill its obligations on the buy-back guarantees.

31.     As the Deeded Properties phase was winding down, NRIA had a negative net value, negative cash balance and negative net income for the prior year. None of this was disclosed to Investors in any investment offering document – in fact, it was purposefully concealed.

**B.      The Pre-Fund Phase**

32.     Beginning in or about 2016, NRIA offered and sold to Investors pooled investment securities in the form of membership interests in a succession of single property limited liability companies (each, a "Pre-Fund LLC"). NRIA represented to each Investor which property the Investor was investing in and from which property the Investor would supposedly receive profits. Once again, Investors were induced to invest through NRIA's buy-back guarantees, and USC's fixed price contracts and fast build guarantees, then called "on-time build guarantees." The promised returns far exceeded available funds.

33.     Investments in the Pre-Fund LLCs were obtained through a network of unregistered commission-based independent contracts referred to internally as "project managers" (collectively,

10

the "Independent Contractors"). The Independent Contractors were not NRIA employees. Instead, the Independent Contractors each entered into Independent Contractor Agreements with NRIA, with the primary objective to facilitate deals and solicit potential Investors.

34.    In total, NRIA raised over $65 million from Investors in a series of twenty-seven Pre-Fund LLCs through fraudulent PPMs that concealed, among other things, Salzano's history of fraud and Dustin Salzano and USC's participation in the scheme.

35.    The Pre-Fund LLC PPMs promised a guaranteed minimum return, with targeted returns as high as 21%. Fourteen Pre-Fund LLCs were obligated under the terms of their PPMs to pay monthly distributions to Investors that began almost immediately after the closing of the capital raise.

36.    The Pre-Fund PPMs made countless materially false representations and omitted material facts. Among the false statements made to Investors in the Pre-Fund PPMs was the misrepresentation that the securities offerings would be conducted through its officers and advisors, *none of whom will be entitled to any commission or other special consideration for their selling efforts*. In reality the Pre-Fund LLC offerings were sold by Independent Contractors that were compensated solely on a commission basis, or a commission related draw. The employment of these Independent Contractors to sell NRIA securities violated state and federal securities law.

37.    Additional materially false representations and omitted facts in the Pre-Fund LLC PPMs accompanying such offerings were made with respect to:

   a.    Salzano's true role as the control person of NRIA and its affiliated entities, and his prior criminal record and pattern and practice of engaging in fraud;

   b.    NRIA's virtually exclusive use of Salzano's son's company, USC, in connection with all property renovation and development;

c.  Salzano, Dustin Salzano, Grabato, and Farina's contractual and other affiliations with, and transfers to, other persons with known, public criminal records, including real estate fraud;

d.  Salzano, Dustin Salzano, Grabato, and Farina's true inexperience with respect to real estate development;

e.  the use of the offering proceeds, grossly understating how much of the proceeds would be immediately diverted to Salzano, Dustin Salzano, Grabato, and Farina;

f.  misrepresenting that NRIA and/or the Fund could and were generating "guaranteed returns" of 12% or more, when in fact NRIA and its affiliated entities were never profitable for any person or entity other than NRIA leadership, their friends, and family members;

g.  misrepresenting that certain property developments in the Deeded Property Phase were backed by "fast build guarantees" and "rental guarantees" by USC and Premier, respectively, when in fact payment on such guarantees were made by NRIA using other Investor funds (consistent with Ponzi scheme practices);

h.  failing to disclose that Investor funds were used to make payments and transfers to Salzano and other NRIA leadership's family members;

i.  the segregation of offering proceeds, representing that such proceeds would be held in a segregated account when they were in fact deposited directly into NRIA's operating account where they were commingled with all of NRIA's other cash;

j.  NRIA's solvency;

k.  the use of unregistered Independent Contractors who were paid commissions for selling securities and soliciting Investors;

l.  each Investor's right to recission on the securities sales as a result of these misrepresentations; and

m. other material misrepresentations and omissions detrimental to Investors, further described herein.

12

38.    A copy of the operating agreement for each Pre-Fund LLC was also part of the disclosure documents annexed to the Pre-Fund LLC PPMs provided to Investors. The operating agreements of each Pre-Fund LLC required that all the money of the Pre-Fund LLC be deposited in bank accounts in its own name, and prohibited the commingling of the Pre-Fund LLC's funds with the funds of any other person. For example:

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
### OF
## FEDERAL HIGHWAY CAPITAL 318, LLC
*A Florida Limited Liability Company*

**THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT** of Federal Highway Capital 318, LLC (the "Company") is hereby adopted and entered into as of the 21st day of June, 2017, for good and valuable consideration, by the Company and the Initial Members (as defined below).

\*\*\*

**7.4    Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other Person.

This never happened. Instead, the Pre-Fund LLCs' funds were commingled among themselves and NRIA's operating accounts, where they were misapplied as needed to pay distributions to Investors, commissions, and other cash needs of NRIA.

39.    Salzano directed most of the construction and development work for the Pre-Fund LLCs to USC. Dustin Salzano falsely represented that he was either a member or managing member of the underlying Pre-Fund LLC to the financial institution maintaining the Pre-Fund LLCs' accounts. Thereafter, unknown to the Investors, USC, through Dustin Salzano, would exercise control of Investor funds deposited in those accounts. Despite assuring Investors in writing through the Pre-Fund LLC PPMs and operating documents that monies would not be

13

commingled, and that the manager of the Pre-Fund LLC in which Investors invested would control the business of the Pre-Fund LLC, NRIA had Dustin Salzano, USC, and their employees to exercise control over Investor financial information and Investor money, including by commingling it with NRIA operating funds, as well as with the cash of other Pre-Fund LLCs.

40.     USC failed to redevelop the properties timely as guaranteed, NRIA did not return Investors' capital and profits as obligated under the terms of their respective PPMs, and distributions to the Pre-Fund LLC Investors were halted.

**C.     The Fund Phase**

41.     Eventually, NRIA realized that a more efficient way of carrying on and expanding its scheme was to create one pooled fund. On February 5, 2018, Salzano, Grabato, and Arthur S. Scuttaro ("Scuttaro"), with the assistance, participation and in collaboration with others, formed the Fund. The creation of the Fund made it more difficult for Investors to track the profitability of any particular property in which they were invested.

42.     Because NRIA had little or no meaningful revenue and no profits from operations from which to repay loans and pay Investors their "guaranteed returns," a principal goal of the Fund was to "roll up" pre-existing Investors in individual Pre-Fund LLCs into one pooled fund, and to solicit investments from additional Investors. To entice Investors to exchange their Pre-Fund Phase investments for an equity investment in the Fund, NRIA offered to exchange Investors' outstanding principal investment for an interest in the Fund. As a fraudulent inducement to roll into the Fund, NRIA, in part through Bethany Salzano, offered to credit the Investors with fictitious returns and bonuses, and promised to pay distributions on the combined amount. The Pre-Fund losses, roll-over bonuses, and phantom profits concealed over $50 million in losses that were

14

absorbed by Investors in the Fund. The fraudulent inducements furthered NRIA's scheme and deepened NRIA's insolvency.

43.      Bethany Salzano knew or was reckless in not knowing that the NRIA roll-up scheme substantially diluted the value of units held by other Investors in the Fund and heightened the risk of loss to Investors but concealed those facts from existing and prospective Investors.

44.      Bethany Salzano was instrumental to this process, directly contacting Investors via email and convincing them to roll their investment into the Fund. For example, on December 20, 2019, Bethany Salzano emailed an Investor and stated NRIA would pay the Investor a 16% rollover bonus (calculated off of the Investor's principal investment) for rolling their investment into the Fund. **Exhibit F**. At the same time, the Individual Defendants were also soliciting new Investors to purchase interests in the Fund.

45.      As the Fund grew, NRIA continued and expanded its use of unregistered Independent Contractors and their agents to sell membership interests in the Fund and employed a multi-million-dollar international media campaign to attract Investors. NRIA, directly and through its co-conspirators, promised Fund Investors that they would receive monthly distributions ranging from 6% to eventually 12% on an annualized basis and represented to certain Investors that the targeted return on their investment was 21% or higher. NRIA also provided an "absolute" and "unconditional" written guarantee that Fund Investors would receive a return of at least 12% per year for a period of five years and that any shortfall would be paid by NRIA. NRIA's absolute and unconditional guarantee and promise of extraordinary returns were clearly fraudulent, which was even more evident due to the preceding failure of the Pre-Fund LLC guarantees. Nevertheless, the Individual Defendants continued to aid in the aggressive sale of the securities of the Fund.

15

46.    The membership interests in the Fund were sold through PPMs and subsequently amended and restated PPMs, ultimately increasing the maximum amount of the offering to $750 million.

47.    As with the Pre-Fund LLC PPMs, the Fund's initial PPM (together with all of the subsequent PPMs and sticker supplements, the "Fund PPMs") contained material misrepresentations, omissions, and knowingly false promises intended to mislead and defraud Investors. Paramount among them were the Fund PPMs false representation that NRIA did not pay any referral fees or commissions to anyone soliciting new investments. Moreover:

a.    the Fund PPMs once again failed to disclose that Salzano and not Grabato was actually in control of NRIA.

b.    the Fund PPMs falsely stated that "returns to Investors will at least amount to a minimum guaranteed 12% annualized return or else any shortfall will be paid by [NRIA]" and further explained that 100% of all cash flows would be dedicated to lenders and Investors first and that NRIA would only be paid after Investors received their preferred returns and return of capital. These statements were false.

c.    the Fund PPMs do not disclose and omitted that USC was majority owned by Dustin Salzano, the son of the actual decisionmaker in control of NRIA, in contravention of the PPM's conflicts of interest disclosures.

d.    the Fund PPMs also did not disclose that many of the Pre-Fund LLC bank accounts and some of the major property level LLC Fund bank accounts were actually under the control of USC and its employees, and that USC used Grabato's signature stamp on payments, including payments to itself.

e.    the Fund PPMs materially omit Salzano's involvement in the NorVergence fraud, NorVergence's bankruptcy, and Salzano's criminal charges arising therefrom.

f.    the Fund PPMs failed to disclose that Investor money was frequently commingled in NRIA's operating accounts.

16

      g. the Fund PPMs failed to disclose NRIA's poor track-record of success on the Pre-Fund projects, while misrepresenting the cash available to roll into the Fund from those Projects to induce rollovers.

48.     The Individual Defendants knowingly benefited from the Fund PPMs and the false representations and material omissions contained therein.

49.     NRIA, through Salzano, Scuttaro, and others, trained and provided scripts and talking points on how to respond to concerns from Investors that NRIA was operating a Ponzi scheme. These scripts and talking points "falsely represented that NRIA was not a Ponzi scheme and that it had substantial cash flow from operations to pay Investor distributions."[5]

50.     Under the terms of the Fund's operating agreement, NRIA was the manager of, and adviser to, the Fund and was vested with control of the management and conduct of the Fund's business. As the Fund bought and issued securities, NRIA was acting as an "investment adviser" as such term is defined in the Investment Advisers Act of 1940. NRIA was expressly authorized to, among other things, direct the formulation of investments and strategies for the Fund, use leverage, issue promissory notes, and open, maintain and close accounts with brokers, dealers, and custodians. Further, the Fund PPM stated, "[t]he Manager [NRIA] has discretionary authority with respect to the management of the assets and investments of the Company [the Fund]." The Fund's operating agreement and PPM provide that NRIA was compensated by the Fund, including, but not limited to, paying the salaries of NRIA's officers. NRIA was not registered as an investment advisor with the SEC, the New Jersey Bureau of Securities (the "Bureau"), or any other state securities regulator.

---

[5] Scuttaro Information, *USA v. Scuttaro*, Case No. 2:22-cr-00692-EP-1 (D.N.J. Oct. 13, 2022), Dkt. No. 1. at 8–9.

51.    During the period that NRIA served as investment adviser to the Fund, it simultaneously had a direct relationship with Investors and provided Investors with individualized investment advice. Because neither NRIA nor the Fund generated enough cash from operations to cover distributions made to Investors, Bethany Salzano and others at NRIA falsified the Fund's financial statements and financial information included within marketing materials to mislead Investors as well as lenders.

52.    Because neither NRIA nor the Fund was ever capable of generating sufficient, legitimate revenue to pay the distributions it "guaranteed" to Investors, NRIA and Bethany Salzano engaged in the intentional distribution of false financial information.

**II.    Government Agencies Found NRIA to be a Fraudulent Scheme**.

53.    The evidence deduced to date by various governmental agencies led those agencies to conclude that NRIA was operated as a Ponzi scheme to defraud Investors, and those agencies have charged NRIA and certain of the NRIA insiders accordingly.

**A.    New Jersey Bureau of Securities**

54.    On June 21, 2022, just two weeks after the date the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code on June 7, 2021 (the "Petition Date"), the Bureau filed a letter response to oppose certain sales of properties and to inform the Court of NRIA's violations of antifraud provisions of the New Jersey Uniform Securities Law ("NJUSL"), N.J.S.A. 49:3-52(a), (b), and (c), in connection with the offer and sale of securities in the Fund. *See* Letter to Honorable John K. Sherwood, U.S.B.J., *In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS (Bankr. D.N.J. June 21, 2022) [Dkt. No. 60]. Attached to the Bureau's letter response was a Summary Cease and Desist Order against the Fund, its general partner, NRIA,

18

NRIA Capital Partners, Inc., NRIA Structured Credit Strategies, LLC, and four Fund officers (Salzano, Grabato, O'Brien, and Scuttaro) based, in large part, on the violations described above.[6]

### B.    Federal Government

55.    On October 13, 2022, the SEC announced charges it brought against NRIA and NRIA executives "for running a Ponzi-like scheme."[7] The SEC's Complaint alleged that the NRIA defendants "engaged in a Ponzi-like scheme" and that many NRIA Investors "expressly told NRIA staff that they feared the Fund was a Ponzi scheme."[8]

56.    The United States of America, through the United States Attorney for the District of New Jersey (the "Government"), re-filed a Motion for Permission to Intervene and for a Stay on December 14, 2022 ("Motion for Stay") in *SEC v. NRIA, et al.*, Case No. 2:22-cv-06066 (Dec. 14, 2022), Dkt. No. 21-1. The Motion to Stay was filed to intervene and stay discovery in the SEC case until the conclusion of the Government's parallel criminal case, captioned *United States v. Thomas Nicholas Salzano, a/k/a "Nick Salzano," and Rey E. Grabato, II*, 22-cr-00690 (Oct. 12, 2022). In its Motion for Stay, the Government noted that "NRIA generated little to no profits and operated as a Ponzi scheme, which was kept afloat by new Investors."[9] Further, the Government charged Scuttaro with conspiring with Salzano, Grabato, and others to defraud NRIA Investors.[10] Scuttaro accepted a plea agreement.[11]

---

[6] *See* Summary Cease and Desist Order, *In the Matter of National Realty Investment Advisors, LLC* (N.J. Bureau of Securities June 21, 2022).
[7] Litigation Release No. 25558, Securities and Exchange Commission, New Jersey Real Estate Development Firm and Four Executives Charged with $600 Million Ponzi-Like Fraud (Oct. 14, 2022), accessible at: https://www.sec.gov/litigation/litreleases/2022/lr25558.htm.
[8] *See* Complaint, *SEC v. NRIA, et al*., Case No. 2:22-cv-06066 (Oct. 13, 2022), Dkt. No. 1 at 2, 11.
[9] Motion for Stay, *SEC v. NRIA, et al.*, Case No. 2:22-cv-06066 (Dec. 14, 2022), Dkt. No. 21-1 at 2–3.
[10] *See generally* Scuttaro Information.
[11] Plea Agreement, *USA v. Scuttaro*, Case No. 2:22-cr-00692-EP-1 (D.N.J. Oct. 13, 2022), Dkt. No. 5.

57.     The Government again alleged NRIA was a Ponzi scheme kept alive by new Investors.[12] The Government also alleged that Salzano and Scuttaro provided scripts to Independent Contractors, including Defendants, on how to handle concerns from Investors that NRIA was operating a Ponzi scheme, and the scripts "falsely represented that NRIA was not a Ponzi scheme and that it had substantial cash flow from operations to pay Investor distributions."[13]

58.     On February 27, 2024, Salzano pled guilty to securities fraud, conspiracy to commit wire fraud, and conspiracy to defraud the United States in the Government's parallel criminal case, in which he further admitted to operating the Debtors pre-petition as a Ponzi scheme by admitting under oath to *each* of the elements of a Ponzi scheme. Salzano's sentencing is currently scheduled for August 6, 2024. At all times relevant to this Complaint, Salzano's control of NRIA and his criminal history was concealed from Investors with the assistance of the Defendants.

## III.    NRIA's Principals Have a History of Fraudulent Schemes.

59.     Salzano's brother, Peter Salzano, formed NorVergence.[14] While Salzano was never officially employed by NorVergence, he served as a purported consultant, like with NRIA.[15] But, behind the scenes, Salzano was an integral part of the NorVergence operation.[16] Scuttaro was the

---

[12] Scuttaro Information at 2.
[13] Scuttaro Information at 8–9.
[14] *See Order (A) Approving the Administrative Consent Order with the State of New Jersey Bureau of Securities, (B) Authorizing the Debtors to Enter into the Administrative Consent Order with the State of New Jersey Bureau of Securities, and (C) Granting Related Relief, In re National Realty Investment Advisors, LLC*, Case No. 22-14539-JKS (Bankr. D.N.J. Dec. 8, 2022), Dkt. No. 1651 at 15 (hereinafter, "Consent Order"); D. Salzano Dep. 18:7-10 (stating that Thomas Salzano and Peter Salzano owned and operated NorVergence).
[15] Consent Order at 20.
[16] Consent Order at 20; D. Salzano Dep. 18:7-10 (stating that Salzano owned and operated NorVergence).

Senior Vice President of Application Screening at NorVergence.[17] Dustin Salzano worked at NorVergence in high school and college.[18]

60.     The NorVergence scheme involved leasing a device at highly inflated rates to vulnerable small businesses and non-profits that allegedly reduced phone bills by converting oral communications to data. NorVergence was a fraudulent scheme designed to lock unwitting customers into five-year leases for its services.[19] Just like NRIA, the NorVergence scheme depended on a constant influx of new customers to generate funds to pay for NorVergence's expenses and the personal expenses of Salzano and others.[20]

61.     Two years after its inception, NorVergence was forced into an involuntary chapter 11 bankruptcy proceeding, which was subsequently converted to a chapter 7 liquidation proceeding.[21] The bankruptcy trustee in the NorVergence proceedings brought an adversary proceeding against 42 defendants, including Salzano.[22] The complaint charged Salzano with fraudulent transfers under 11 U.S.C. §§ 544(b), 548, 550, as well as N.J.S.A. 25:2-1 to -36 and N.J.S.A. 25:2-27(b), and conversion, misappropriation, unjust enrichment, breach of fiduciary duty, and fraud.[23] Salzano asserted his Fifth Amendment right against self-incrimination in response to the complaint.[24]

---

[17] Consent Order at 20.
[18] D. Salzano Dep. 11:21-22, 14:5-10.
[19] Consent Order at 20–21.
[20] Consent Order at 21.
[21] Consent Order at 21–22.
[22] Consent Order at 22.
[23] Consent Order at 22.
[24] Consent Order at 22.

62.     In November 2004, the Federal Trade Commission ("<u>FTC</u>") filed a complaint against NorVergence for its improper conduct.[25] In 2006, Salzano was investigated by the FTC for his involvement in NorVergence resulting in a permanent injunction barring Salzano from participating in similar fraudulent conduct in the future.[26] Additionally, a $50 million consent judgment was entered against Salzano for his role in the NorVergence fraud.[27]

63.     Salzano was criminally charged and indicted for his role in the NorVergence scheme in Louisiana, which led to Salzano pleading guilty to five felony counts of theft over $500, being sentenced to three years' supervised probation, and being ordered to pay $45,000 to local businesses.

64.     At all relevant times, the Individual Defendants knew of Salzano's involvement with NorVergence and his guilty plea.

## IV.    Defendant Bethany Salzano was Critical to and Facilitated the Sustained Growth of NRIA's Scheme, and the Solicitation of Investors.

65.     As NRIA's Ponzi scheme was massive in its scope, Salzano did not, and could not, execute the fraud alone. Salzano worked closely with his inner circle, including the Individual Defendants, to solicit a continuous stream of investments, make knowing misrepresentations to Investors, conceal his past fraudulent activity, alter bank statements to paint a fictional solvent

---

[25] *See* Complaint for Injunctive and Other Equitable Relief, *FTC v. NorVergence, Inc.*, Case No. 2:04-5414, Dkt. No. 1 (D.N.J. 2004).

[26] *See* Stipulated Permanent Injunction and Order as to Individual Defendant Thomas N. Salzano, *FTC v. Salzano, et. al*, Case No. 2:06-02883, Dkt. No. 4 (D.N.J. 2006).

[27] Press Release, Federal Trade Commission, FTC Settles Court Case Against NorVergence Principals: Thomas and Peter Salzano Prohibited from Making Future Misrepresentations (June 26, 2006), accessible at: https://www.ftc.gov/news-events/news/press-releases/2006/06/ftc-settles-court-case-against-norvergence-principals.

financial position of NRIA, convert and launder funds through Referral Marketing for their personal benefit and continuation of the fraud.

### A.      Bethany Salzano was an Insider

66.      Bethany Salzano is the daughter of Salzano. Bethany Salzano began working at NRIA in 2012. Bethany Salzano knew of Salzano's prior involvement with the NorVergence fraud. Bethany Salzano also knew her father, Salzano, used a different first name in connection with NRIA to conceal his past.

67.      Bethany Salzano was initially hired as the "Director of Marketing & Investor Relations" for NRIA. This director position was her first full-time job after college. Bethany's title changed several times during her employment at NRIA. She was subsequently named the Director of Investor Relations and then the Senior Vice President of Executive Operations. Bethany Salzano worked closely and conferred frequently with NRIA executives and Investors. At all relevant times, Bethany Salzano knew her father, Salzano, was controlling NRIA.

68.      During her employment at NRIA, Bethany Salzano managed capital distribution payments to Investors, served as the point of contact for Investors involved in joint venture profit sharing arrangements, prepared redemption forms and payouts, and was in charge of regulating employee "adherence to business ethics and corporate policies," among other things. *See* **Exhibit G**.

69.      Bethany Salzano was in the "inner circle" of the NRIA fraud scheme, along with Salzano and Grabato, with a shared office within the walls of NRIA.

70.      At all relevant times, Bethany Salzano was an insider of NRIA.

71.     During her employment at NRIA, Bethany Salzano received approximately $226,579 directly from NRIA and approximately $3,039,700 through Referral Marketing from NRIA funds.[28]

**B.     Bethany Salzano Actively Solicited Potential Investors**

72.     Bethany Salzano actively solicited potential Investors to invest in NRIA. In one instance, Bethany Salzano promised that an investment in an NRIA project would result in a 12% return on the Investor's full principal investment and a 20% return on half of the principal investment. To convince the potential Investor that the joint venture had minimal risk, Bethany Salzano advised the potential Investor that the investment would be "fully secured against our paid off super prime collateral in Brooklyn, NY . . . ." **Exhibit H**. Bethany Salzano's advisement was a blatant lie as (i) NRIA's books and records reveal no Investors had legitimate security interests on any of NRIA's properties and no efforts were made to perfect any such liens; and (ii) NRIA was incapable of paying the stated returns and instead used the capital contributions of other Investors to make up the shortfall.

**C.     Bethany Salzano Actively Concealed Her Father's Criminal Past and Involvement**

73.     Bethany Salzano knowingly coordinated and aided in the concealment of her father's criminal history to further the NRIA fraud. NRIA paid FATbit Technologies ("FATbit") to suppress negative search results related to Salzano and NorVergence. FATbit created new web pages relating to search terms such as "Norvergence class action" and "Norvergence phone

---

[28] Bethany Salzano also received two direct transfers from Thomas Salzano, LLC, in addition to direct transfers from NRIA. The Thomas Nicholas Salzano, LLC bank account was controlled by Salzano. The majority of the deposits into this account were from NRIA.

24

system" to "suppress the information related to the NORV case." **Exhibit I**. FATbit also published

a significant quantity of blogs to further conceal negative reports relating to Salzano, NorVergence

or any other negative stories that would harm NRIA.

74.     FATbit provided NRIA with full reports detailing the scope of its online reputation

management services ("ORM Services") and its efforts to suppress negative links. Notably,

FATbit helped suppress internet links reporting on Salzano's March 2021 arrest. **Exhibit J**. The

reports generated by FATbit and the accompanying invoices for ORM Services were sent directly

to Bethany Salzano and Grabato. Bethany Salzano coordinated payments from NRIA and, at times,

approved the payments to FATbit on behalf of NRIA. These efforts, however, were ultimately

unsuccessful given that information about Salzano's past fraud and March 2021 arrest remained

available and assessable to the public online.

### D.     Bethany Salzano Actively Participated in the Fraud

75.     Bethany Salzano was also actively involved in the preparation and circulation of

PPMs and had knowledge that offering documents and Form D, Notice of Exempt Offering of

Securities ("Form D") contained false and misleading information and omitted the criminal past

of her father, Salzano, who she knew was in control of NRIA, solely designed to induce Investors

into investing in the NRIA Ponzi scheme.

76.     Bethany Salzano had direct contact with NRIA's securities counsel, Eric Weingold

("Weingold"),[29] material involvement in the preparation and editing of the PPMs, and knew

various offering documents and Form Ds were misleading, pursuant to which Investors were

---

[29] An adversary proceeding against Weingold for, among other things, aiding and abetting securities fraud, was filed
on May 31, 2024, bearing adversary proceeding no. 24-01440.

defrauded into investing in the NRIA Ponzi scheme. For example, Bethany Salzano emailed Weingold on May 9, 2018, requesting a Form D for the Fund, which Weingold subsequently provided via email on the same day. Bethany Salzano knew this Form D included blatant misrepresentations and omissions. **Exhibit K**.

77.     Through numerous communications with Weingold, Bethany Salzano also transmitted several versions of the Fund and Pre-Fund PPMs used to raise money and directed Weingold to make edits to the PPMs, when necessary.

78.     Bethany Salzano knew that the PPMs included various misrepresentations and omissions. By way of example, the PPMs failed to disclose that: (i) the controlling role of her father in NRIA and his history of fraud; (ii) Dustin Salzano, Salzano's son, was NRIA's preferred contractor and property manager through USC and Premier; (iii) NRIA offerings were sold by commission-based and unlicensed salespersons; (iv) NRIA failed to perform as required under the buyback guarantees when Pre-Fund projects were not sold on time; and (v) the prior losses suffered by NRIA.

79.     For example, Bethany Salzano emailed Weingold on February 23, 2017, requesting certain language be added under the "Compensation Section" of a PPM, which section misrepresented that Grabato is the 100% owner of NRIA and "he will receive distributions of all net profits of the Manager and the Project Manager as they ultimately flow through . . . ." **Exhibit L**. Bethany Salzano makes no mention of Salzano, his compensation, or his controlling role at NRIA.

80.     Bethany Salzano also emailed Weingold on March 11, 2021, stating "Attached are urgent updates needed to the PPM." This email exchange occurred about a week after Salzano's

26

March 4, 2021 arrest and yet makes no mention of the need to add Salzano's arrest to the PPM's disclosures. **Exhibit M**.

81.    Bethany Salzano also emailed Weingold on March 23, 2017, instructing Weingold to remove certain language from the Seventh Street Capital 494, LLC PPM and from the Union Street Capital 248, LLC PPM. The language at issue stated "[i]n accordance with this tiered payout schedule, upon re-sale of the Property, the Company will distribute 100% of net profits to Investors until Investors have realized and received a full 10% annualized return, plus a return of their principal." **Exhibit N**. Bethany Salzano explained this language should be deleted because "[w]e feel this sentence is redundant and unnecessary to include." *Id.* Bethany Salzano never corrected this blatantly false statement in the PPMs but merely requested it be removed because it was "redundant."

82.    Further, in yet another example of Bethany Salzano's involvement in editing the PPMs, she emailed Weingold a copy of the Denery Lane Capital 843, LLC PPM on January 11, 2018 with handwritten comments. **Exhibit O**. The comments instructed Weingold to remove Adam Levine's name and biography from the PPM, as well as to add language referencing a 12% guaranteed return. *Id.*

83.    Additionally, Bethany Salzano was on email communications where Salzano directed Weingold to create a guaranteed return agreement, promising Investors a minimum annualized return of 12%. Weingold amended the PPM to reflect such guarantee and drafted the corresponding agreement. **Exhibit P**. The "guaranteed" returns of NRIA were a fraudulent misrepresentation used to entice individuals to invest in the NRIA scheme.

**E.    Bethany Salzano Falsified Bank Statements to Inflate the Amount of Cash in NRIA Accounts**

84.    Bethany Salzano altered multiple bank statements to inflate materially the amount of cash in certain NRIA bank accounts and knew or should have known such altered bank statements were shared with NRIA's lenders. Specifically, Bethany Salzano (i) altered multiple TD Bank statements for NRIA 423 Third Manager LLC ("NRIA 423") and NRIA Brooklyn II LLC ("NRIA Brooklyn") to inflate the amount of cash held in the corresponding bank accounts; (ii) either knew or should have known altered bank statements were shared with a financial institution;  and (iii) altered the December 2019 and January 2020 bank statements of the Fund that were shared with a lender as part of the lender's due diligence process. Such actions concealed NRIA's true financial condition to others.

85.    By way of example, O'Brien emailed Salzano and Grabato on November 7, 2017, with a list of requests from prospective lenders, including the October 2017 TD Bank statements for NRIA 423 Third Manager LLC ("NRIA 423") and NRIA Brooklyn II LLC ("NRIA Brooklyn"). **Exhibit Q**. Salzano replied via email on November 8, 2017 to Grabato and O'Brien stating "TD Bank is upgrading the on line [sic] accounts" for these specific entities and that the October 2017 bank statements will be available and sent the next morning. *Id*. That next morning, Bethany Salzano scanned altered versions of the October 2017 TD Bank statements for NRIA 423 and NRIA Brooklyn and sent them to herself via email. **Exhibit R**. The combined cash balances on the October 2017 bank statements that were altered totaled over $2 million when in fact the accounts held less than $2,000.

28

## NRIA Brooklyn Bank Statement

 

## NRIA 423 Bank Statement

 

86.     On November 9, 2017, Salzano then emailed the altered October 2017 TD Bank

statements for NRIA 423 and NRIA Brooklyn to O'Brien. **Exhibit S**. Later that day, Bethany

Salzano emailed O'Brien and Salzano a Dropbox link via email. **Exhibit T**. The subject line of the

email states "NRIA Oct Bank Statements = $6,813,771." *Id.* Within the body of the email, Bethany

Salzano states "TD ending balance = $4,922,484." *Id.* This balance is equal to the aggregate ending

balances of the TD Bank account statements circulated, including the two altered bank statements.



87.     At the end of 2017, Bethany Salzano repeated this process. On December 18, 2017,

Bethany Salzano scanned altered versions of the November 2017 TD Bank statements for NRIA

Brooklyn and for NRIA 423 and sent them to herself via email. **Exhibit U**. On January 10, 2018,

Bethany Salzano scanned altered versions of the December 2017 bank statements for the same

accounts and again sent them to herself via email. **Exhibit V**. The altered November and December

TD Bank statements for NRIA Brooklyn and NRIA 423 each contained beginning and ending

balances inflated by $1 million.

88.     On January 11, 2018, Bethany Salzano emailed Salzano a Dropbox link that

appears to contain the November and December 2017 TD Bank statements.



89.     In another example, on January 23, 2020, an employee of Republic Bank and

Bethany Salzano each received a notification via email from Proofpoint that files in "Secure Share"

would expire soon. **Exhibit W**. Details included in the email indicate that four altered bank

statements were shared with Republic Bank, as the month-end balances are inflated when

compared to the bank statements received directly from TD Bank. *Id.*



90.      Bethany Salzano repeated this conduct numerous times. In yet another example, the December 2019 and January 2020 bank statements of the Fund were each altered so that the beginning and ending cash balance was inflated by $3 million. The metadata of the altered bank statements reveals Bethany Salzano was the author and created the fictitious bank statements on February 21, 2020. These bank statements were ultimately shared with LendingOne in connection with a refinance on February 21, 2020 and February 22, 2020. **Exhibit X–Y**. The Fund's December 2019 financial statements were similarly inflated by $3 million.

91.      Bethany Salzano repeatedly falsified documents, bank statements in particular, in furtherance of the Ponzi scheme, and to hide NRIA's true financial condition from lenders, who were duped into lending in furtherance of the fraud. In 2019, Bethany Salzano also directed another NRIA employee to backdate the operating agreement of Akron Capital, LLC ("Akron Capital") to July 2, 2012. **Exhibit Z**. The operating agreement was back dated to conceal the fact that Dustin Salzano was originally a part owner of Akron Capital.

**F.      Defendant Bethany Salzano Continued to Deceive Investors After Her Father's May 2021 Arrest**

92.      Bethany Salzano continued to deceive Investors even after her father was arrested in March 2021, sharing updates with Investors that she knew were false.

93.      On March 12, 2021, Bethany Salzano sent an Investor an email stating "NRIA is aware of the recent charges filed against one of its *independent consultants*." **Exhibit AA**. (emphasis added). The email included Grabato's signature block but was sent directly from Bethany Salzano's email address. *Id*. As Salzano's daughter and as a long time NRIA employee,

Bethany Salzano knew Salzano was a control person of NRIA and not merely an "independent consultant." Dustin Salzano made it clear in his deposition that "it was known that he [Nick Salzano] was running the day-to-day operations and making a lot of important decisions." **Exhibit E**, D. Salzano Dep. at 341:12–14.

94.    Bethany Salzano was on email correspondence between an Investor and Scuttaro, which minimized Salzano's role with NRIA and the significance of his arrest. Specifically, on February 20, 2022, an Investor emailed Scuttaro, forwarding him an article stating NRIA was subject to an SEC probe. Bethany Salzano was subsequently added to the email chain and the Investor was told by Scuttaro via email that Nick was only an independent consultant who used to work for NRIA and that none of NRIA's owners or employees had been charged with any wrongdoing. **Exhibit AB**. Bethany Salzano knew that this statement and the representations made to the Investor were false, yet she said and did nothing to correct the known misrepresentations made to the Investors.

### G.    Bethany Salzano Knew Her Brother, Dustin Salzano, Controlled NRIA's Bank Accounts

95.    Dustin Salzano controlled various entity level NRIA bank accounts even though NRIA and USC were allegedly separate companies, which was never disclosed to Investors.

96.    Bethany Salzano knew that her brother Dustin Salzano controlled various NRIA bank accounts. On May 14, 2021, Bethany Salzano shared login credentials for a bank account with Thomas Fierro ("Fierro") and Christopher Fiorenza ("Fiorenza") via email. While attempting to access the bank account using the login credentials, Fierro noticed an authorization code was

sent to a phone number he did not recognize. Subsequently, Bethany Salzano emailed Fierro and others explaining that the authorization code was sent to Dustin Salzano's cell phone.

97.    Additionally, on January 11, 2018, Bethany Salzano received an email directly from Grabato with the subject line stating "New. . . Accounts to set up." Attached to the email was a PDF with the bank account information for 142 NE 7th Capital LLC, an NRIA entity. In the body of the email Grabato states "USC is managing this account." Accordingly, Bethany Salzano knew of and was complicit in Dustin Salzano's exercise of control over bank accounts, even though Dustin Salzano was purportedly not employed by NRIA or any of its debtor entities.

**H.    Bethany Salzano Aided in the Creation of Feeder Funds to Further the Fraud**

98.    In addition to soliciting new Investors through blatant misrepresentations and using Referral Marketing to divert millions of Investor funds, as discussed below, Bethany Salzano helped form LLCs for certain NRIA Investors, which would ultimately serve as "feeder funds." For example, on September 7, 2017, Bethany Salzano directed another NRIA employee to set up a certain LLC ("LLC A") for an alleged Investor and potential co-conspirator ("Investor A"). Subsequently, tens of millions of dollars in transactions with NRIA flowed through this entity, including referral fees paid by NRIA. Moreover, unlike substantially all of NRIA's Investors, LLC A's investments/loans appeared to have shorter terms, pre-approved early redemptions, guaranteed returns up to 21%, and LLC A was paid management fees for arranging certain loans with NRIA.

99.    Bethany Salzano also helped manage the relationship between NRIA, and another alleged Investor and potential co-conspirator ("Investor B"), and all of their corporate entities. Notably, Bethany Salzano helped facilitate interest free loans between Investor B and NRIA. The proceeds from these interest free loans would be sent to Investor A and LLC A before being

34

invested back into NRIA in a circular transaction. When the funds were finally paid out by NRIA, they would then be moved back through Investor B who would repay the initial NRIA loan and keep the Investor returns.

**I.    Bethany Salzano Used Referral Marketing to Divert Funds from NRIA**

100.    On June 1, 2012, NRIA entered into an "Independent Contractor Agreement" with Referral Marketing for the provision of a variety of services aimed at soliciting additional investments in NRIA. **Exhibit AC**. Such services included "the prospecting of sales suspects and leads vita its own telemarketing" and "interacting with Company Sales Suspects, Prospects, and Clients for investment real estate inquiries and opportunities in land development. . . ." *Id.*

101.    On or in June 2021, Bethany Salzano became a full-time W2 employee of NRIA for a base salary of $234,000 per year.

102.    Most of Bethany Salzano's compensation from NRIA was paid through, and laundered by, Referral Marketing, an entity Salzano helped create and incorporate in March 2012, which Bethany Salzano later controlled.

103.    Pursuant to the terms of the Independent Contractor Agreement, Bethany Salzano was paid weekly salary amounts from NRIA in addition to frequent "bonuses." These bonuses compensated Bethany Salzano for aiding and abetting the fraud on Investors, paying her $300 per joint venture partnership she handled and $10 per wire confirmation, in addition to various other fees. For example, for her solicitation efforts for the one-week period between February 1, 2021 and February 7, 2021, Bethany Salzano was paid over $24,000 in bonuses, in addition to a $1,000 management fee.

**INV # 2021-06**

**Period: 02.01.2021 – 02.07.2021**

**Bill to:** National Realty Investment Advisors, LLC
1325 Paterson Plank Road, Second Floor
Secaucus, NJ 07094
(201) 210-2727

**Bonus Activity**

| QTY. | DESCRIPTION | CPU. | TOTAL |
|------|-------------|------|-------|
| 102 | Wire Confirmation | $10 | $1,020 |
| 65 | Joint Venture Partnership Agreement | $300 | $19,500 |
| 1 | Bank Lien Waiver | $100 | $100 |
| 2 | Investor's Account / Asset Statement | $150 | $300 |
| 18 | Joint Venture Partnership Payoff Calculation & Recording | $150 | $2,700 |
| 1 | Bonus Production | $450 | $450 |
| | | TOTAL DUE | $24,070.00 |

Please make checks payable to:
**REFERRAL MARKETING, LLC**

*Thank You for Your Business!*

104.     In October of 2019, Bethany Salzano also received over $85,000 in Investor funds from Referral Marketing for the purchase of real property located at 4 Sutton Road, Hopatcong, NJ 07843 (the "Property"), a shared residence of the Individual Defendants. *See* **Exhibit AD**, and **Exhibit AE**.

105.     Between May 2017 and June 2020, Investor funds in the aggregate amount of $49,336.95 were paid to Referral Marketing and used to finance the purchase of a 2018 Sea Ray 230SPX, the purchase or lease of a 2020 Chevy Blazer, and make payments on another car, an Infiniti. **Exhibits AF–AH**.

106.     On February 24, 2020, a wire transfer in the amount of $20,000 was sent from Referral Marketing's TD Bank account ending in 4920 to Marine Max North East LLC.

36

*Referral Marketing LLC – TD Bank x4920 Excerpt*

| Other Withdrawals | | |
|---|---|---|
| POSTING DATE | DESCRIPTION | AMOUNT |
| 02/13 | DEBIT | 242,000.00 |
| 02/24 | WIRE TRANSFER OUTGOING, Marine Max North East Llc | 20,000.00 |
| 02/24 | WIRE TRANSFER FEE | 25.00 |
| | Subtotal: | 262,025.00 |

This was the down payment for a boat for or on behalf of Kyle Stafirny and Bethany Salzano, which had a total purchase price of $52,450. Further, Referral Marketing bank statements indicate a payment made for and in connection with a 2020 Chevy Blazer on or around May 29, 2020 and Referral Marketing made recurring payments for an Infiniti vehicle. **Exhibits AF–AH**.

107. Referral Marketing also laundered Investor funds from NRIA that were then used to pay Jamie Samul (Nick Salzano's ex-wife and Bethany's mother) $442,592 via 105 checks, Miabelle Salzano (Nick Salzano's daughter and Bethany's half-sister) $35,621, and Kyle Stafirny $23,500. Referral Marketing was plainly used by Salzano, Bethany Salzano and others as an entity to "wash," or launder fraudulent transfers to Salzano, Grabato, and family members and affiliates. Rey Grabato, LLC also transferred funds to Referral Marketing, providing over $90,000 in transfers for the likely benefit of Bethany and Kyle Stafirny. **Exhibit B**. A separate adversary proceeding will be filed to recover transfers not sought within this complaint.

108. There was no legitimate business justification for Referral Marketing to receive any Investor funds from NRIA. The Investor funds diverted from NRIA to Referral Marketing (an entity owned and controlled by Bethany Salzano) were solely for the benefit of Salzano family members, an allegation Nick Salzano has already admitted to in open court, Plea Hearing Transcript, 39:17–39:21 *United States of America v. Thomas Nicholas Salzano*, No. 2:22–cr–00690–EP–1 (D.N.J.), and to further the fraud.

109.     Referral Marketing also served as a vehicle for NRIA to purchase its own property, creating the appearance that NRIA projects were in high demand. In January 2018, $815,000 was transferred from NRIA to Referral Marketing. Within a couple of days, corresponding transfers from the Referral Marketing account were sent to real estate law firms and title companies for apparent NRIA real estate transactions. Such transactions resulted in a circular movement of funds, where NRIA was clandestinely funneling Investor money through Referral Marketing to purchase their own properties and pay themselves.

*Referral Marketing LLC – TD Bank x4920 Excerpt*

**Deposits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/02 | DEPOSIT | 450,000.00 |
| 01/03 | DEPOSIT | 253,000.00 |
| 01/05 | DEPOSIT | 112,000.00 |
| 01/05 | DEPOSIT | 7,360.00 |
| 01/12 | DEPOSIT | 7,300.00 |
| 01/19 | DEPOSIT | 7,000.00 |
| 01/19 | DEPOSIT | 1,210.00 |
| 01/26 | DEPOSIT | 10,100.00 |
| | Subtotal: | 847,970.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/02 | DEBIT | 1,040.00 |
| 01/03 | WIRE TRANSFER OUTGOING, Crystal Title & Escrow Co., Inc. | 453,000.00 |
| 01/03 | WIRE TRANSFER FEE | 25.00 |
| 01/05 | WIRE TRANSFER OUTGOING, Keith D. Kern P.A. | 250,000.00 |
| 01/05 | WIRE TRANSFER FEE | 25.00 |
| 01/08 | WIRE TRANSFER OUTGOING, Azzolini & Benedetti Llc | 112,000.00 |
| 01/08 | WIRE TRANSFER FEE | 25.00 |
| | Subtotal: | 816,115.00 |

110.     As previously stated, Referral Marketing received not less than $3,039,770 in transfers from NRIA funds.

**J.      Bethany Salzano Failed to Comply with Rule 2004 Subpoenas, Refused to Appear at Her Scheduled Rule 2004 Deposition, and Asserts the Fifth Amendment**

111.     Bethany Salzano was served with a Rule 2004 Subpoena for document production on September 28, 2022. Through her counsel at the time, Bethany Salzano did not provide any documents and instead elected to assert the Fifth Amendment. Subsequently, on April 29, 2024 Bethany Salzano was served with a Rule 2004 Subpoena to provide testimony on May 15, 2024 at the New York offices of Ice Miller LLP ("Ice Miller"). On May 14, 2024, Bethany Salzano emailed counsel for the Liquidation Trustee stating, "I am not represented by council at this time and will be asserting my fifth amendment right." **Exhibit AI**. Bethany Salzano then failed to appear for her Rule 2004 examination.

**V.      Stafirny was Critical to the Sustained Growth of NRIA's Scheme.**

**A.  Stafirny Was an Insider and Integral to the Fraud**

112.     Stafirny was an NRIA insider and integral to NRIA's fraud. He was a confidant of his father-in-law, Salzano, and privy to the inner workings of the fraud.

113.     Stafirny began working for NRIA in April 2017. NRIA and Link N' Log entered into a contract with Travel Junket LLC ("Travel Junket"), an NRIA subsidiary, to design, launch, and host a website for Travel Junket. Grabato executed the contract on behalf of Travel Junket. At the outset, Stafirny was involved in marketing to Investors. Travel Junket sent thousands of emails to potential Investors, inviting them to attend an investment seminar in exchange for cash. The emails read, for example:

At Travel Junket we reward special people, like you, with special treatment. Sign up now and get a $1,000 check! Yep – FREE cash on the barrelhead – available ONLY to Accredited Investors!

There's No Purchase necessary and No Strings attached. Just plan a trip through NYC, visit our sponsor's 1 hour investment seminar, and pick up your $1,000 check there (no investment necessary).

**Exhibit AJ**.

114.    As early as September 2017, Stafirny sent test emails to himself containing the copy that was to be sent to Investors. While NRIA was the sponsor, the emails did not disclose that Travel Junket was owned by NRIA. With Stafirny's oversight and guidance, hundreds of thousands of Travel Junket emails were sent to potential Investors. NRIA never disclosed that it owned Travel Junket.

115.    Bethany Salzano and Stafirny were married in Jersey City, New Jersey on May 5, 2018.

116.    After the two were married, Stafirny took on a much more prominent role at NRIA. In June 2019, Link N' Log was retained by NRIA to develop, maintain, and host a "database and investment management platform for Indian Investors." Originally focused on NRIA's foreign Investors, it expanded to U.S. Investors as well.

117.    With Stafirny's assistance, NRIA used the Investor portal to defraud foreign Investors. Stafirny designed a user interface that would display an Investor's investment amount, ACH percentage, "assured" rate of return, and projected return. To develop the interface, Stafirny was included on correspondence that revealed the unrealistic, unsustainable, and fraudulent rates of return offered to Investors.

40

118.    For example, Stafirny received the PPM for NRIA's EB5 1300 Manhattan Fund, LLC, which was provided to foreign Investors. According to the memorandum, the EB5 1300 Manhattan Fund, LLC was "formed to make investments through the United States EB-5 immigrant Investor program." Under the EB-5 Program, foreign nationals can become eligible to obtain lawful permanent residence in the United States based on qualifying capital investment projects. NRIA, with Stafirny's help, capitalized on foreign nationals' desire to obtain permanent residence by offering them fraudulent investments.

119.    In 2020, Stafirny also created and edited marketing videos for NRIA.

120.    On January 20, 2020, NRIA executed an agreement with Link n' Log purporting to name Link N' Log, the entity, as NRIA's Director of Technology. In reality, Stafirny became NRIA's Director of Technology after the agreement was executed. Under the agreement, Link N' Log was to receive $4,000 per week plus "a one percent (1.0%) net profit bonus on each development project that newly breaks ground and finished during the Contractor's term." Under the agreement, Stafirny's base compensation was $208,000.

121.    On June 10, 2021, Stafirny signed a new contract to work as Vice President of Information Technology. His salary was $6,000 per week, or $312,000 per year.

122.    From February 2020 to May 2022—around the same time that Stafirny was employed to perform the role of Director of Technology and Vice President of Information Technology for NRIA, NRIA paid TeamLogic IT, an IT contractor, approximately $760,000 to perform IT services on top of Stafirny's salary. Stafirny signed the services agreement with TeamLogic IT on behalf of NRIA. Stafirny approved TeamLogic's invoices and directed its work, and Stafirny relied on TeamLogic for a variety of IT functions that NRIA did not perform in-house.

41

123.    From April 2021 to at least December 2021, Stafirny also filled the role of Director of Advertising and Marketing, purportedly in a "temporary" capacity.

124.    During Stafirny's employment at NRIA, Link N' Log was used as another vehicle to divert NRIA funds to the Individual Defendants, family members, and others.

**B.    Stafirny Uses NRIA's Massive Advertising and Marketing Budget to Induce Investors**

125.    Through his IT roles and Director of Advertising and Marketing role, Stafirny was extensively involved in NRIA's outsized advertising and marketing efforts. Stafirny quickly became aware that NRIA was often accused of operating as a Ponzi scheme and that it offered unattainable returns to its Investors. For example, in September 2020, Salzano sent an email to several NRIA employees instructing them on how to respond to accusations that NRIA operated as a Ponzi scheme. **Exhibit AK**.

126.    As Director of Advertising and Marketing, Stafirny directed NRIA's internal team and oversaw, among other things:

(a)    NRIA's publication, "NR Living," including article copy and publication;

(b)    publication and preparation of "construction reports" that NRIA sent out to Investors;

(c)    the development and publication of "Company Overview" videos focused on NRIA's investment opportunities and company culture;

(d)    ensuring that NRIA's branding and marketing strategy was keeping up with its competitors by performing market research and adjusting strategy accordingly; and

(e)    maximizing the effectiveness of NRIA marketing campaigns through digital ads, print ads, radio ads, television ads, celebrity endorsement, videos, and phone calls, and maintaining data on the effectiveness of each strategy and adjusting accordingly.

127.     Stafirny also oversaw NRIA's phone lead list. He ensured that certain leads were "blacklisted" such that NRIA would not contact them. In one instance, for example, famed whistleblower Barry Minkow filed a complaint with the SEC accusing NRIA of operating a Ponzi scheme.[30] Minkow thereafter became an "Enemy of NRIA," and Stafirny removed him from the call list and subsequently advised other employees on how the call list worked to make sure Minkow was not contacted.

128.     In another example from December 2020, Stafirny received an Investor complaint claiming that NRIA was a Ponzi scheme. **Exhibit AL**. Katey Kana ("Kana"), who was then serving as NRIA's Director of Media, responded to Stafirny, directing him to delete the Investor from the communication list:

---

**From:** Katey Kana <kkana@nria.net>
**Sent:** Mon, 28 Dec 2020 16:47:06 +0000
**To:** Kyle Stafirny <kstafirny@nria.net>
**CC:** Jesse Lively <jlively@nria.net>, Katey Kana <kkana@nria.net>
**Subject:** Re: NRIA: Construction Update December 2020
**Attachments:**
· Screen Shot 2020-12-28 at 11.45.44 AM.png  *(180 kb)*
· Screen Shot 2020-12-28 at 11.45.51 AM.png  *(182 kb)*
· Screen Shot 2020-12-28 at 11.45.57 AM.png  *(113 kb)*

here is the problem: see attached

when prospects start dropping verbiage like "ponzi, fbi, fraud" we need to IMMEDIATELY pull these contacts from receiving any further communications from us.

WTF.

---

129.     Stafirny was also involved in developing TV advertisements for NRIA. He oversaw the advertisement scripts, storyboard, and production of NRIA's generic TV advertisements. And

---

[30]     https://hudsoncountyview.com/with-sec-probe-underway-whistleblower-alleges-fraud-at-secaucus-based-real-estate-fund/

he coordinated with Javier Torres at Media Effective concerning the placement of those advertisements, including on channels like Newsmax, Fox News, CNBC Financial News, and CNBC. Stafirny also oversaw placement of the advertisements in Southeast Asia—again, supporting NRIA's efforts to induce and defraud foreign Investors—on channels like Zee TV, Sony, TV Asia, Bolly Radio, Fan Asia, and EBA Radio.

130.    Stafirny, in conjunction with Patryk Golaszewski ("Golaszewski") also approved scripts and placements for NRIA's advertising campaign with Bill O'Reilly. After the scripts were approved, the Bill O'Reilly advertisements were placed on the O'Reilly Update Morning Edition, the O'Reilly Update PM Radio, and on No Spin News TV. **Exhibit AM**.

C.    **Stafirny Used His Role to Aid and Abet in the Fraud**

131.    In his role at head of IT at NRIA, Stafirny had a prominent role in covering up fraudulent activity.

132.    For example, after Salzano's public arrest, O'Brien repeatedly asked Stafirny to remove Salzano's access from NRIA systems. **Exhibit AN**. Despite being asked repeatedly, Stafirny did not remove Salzano's access to NRIA's systems.

133.    Subsequently, in August 2021, O'Brien became suspicious that Salzano was still in control of NRIA through his use of Grabato's email account. O'Brien communicated his suspicion to Stafirny and asked who had access to Grabato's accounts. In response, Stafirny denied that Salzano had access to Grabato's account. But Stafirny forwarded the email privately to Glenn La Mattina ("La Mattina") and Grabato. In response, La Mattina wrote: "Coley isn't dumb." **Exhibit AO**. Stafirny, who knew Salzano was directing NRIA employees from Grabato's email account because of their relationship, denied knowledge and participated in covering it up.

44

134.    And long before that, Stafirny was an active participant in concealing NRIA's fraud from O'Brien. In a private communication with his father-in-law Salzano and his wife Bethany, Stafirny agreed to process a request to restrict O'Brien's access to certain NRIA file folders. **Exhibit AP**. O'Brien was restricted from accessing the "PPM Accredited Folders," the "Tax Return & K1s," and the "Scanjet" folders on the company's file server. *Id.*

135.    To execute the fraud and hide his activities from suspicious employees, Investors, and executives, Salzano needed the leader of IT in his pocket. Salzano used Stafirny to facilitate his fraudulent operation and to conceal it as well. Stafirny was a willing participant, and he received a large, unreasonably high salary for his efforts.

136.    After Salzano was arrested, Stafirny facilitated Salzano's continued access to NRIA systems and to Grabato's email account.

### D.    Stafirny Played a Critical Role in Covering Up the Fraud and Preventing Investors from Discovering It

137.    One of Stafirny's principal jobs at NRIA was to conceal the truth of NRIA's fraud from Investors. He did so through the company's search engine optimization ("SEO") strategy, through which NRIA—and Salzano—attempted to push negative press about NRIA down in internet search results.

138.    As early as September 2020, Stafirny was involved in NRIA's effort to purchase domain names, including "nriaponzi.net," "nriaponzi.com," "nriaponzischeme.com," and "nriaponzischeme.net." **Exhibit AQ**.

139.    In May 2020, a prospective Investor filed a BBB complaint against NRIA, claiming NRIA was a Ponzi scheme. The Investor cited correspondence from NRIA that claimed its

investment would pay a 16% to 21% annualized return; that NRIA had "over 1000 projects completed"; that NRIA's clients had "NEVER lost money investing with us for 14 years running"; and that NRIA had "[z]ero defaults, zero failures." It also included information about NRIA's "guaranteed" 12% return. **Exhibit AR**.

140.    In response, Stafirny provided Salzano with a list of the communications that had been sent to the Investor, along with data about how many times the Investor had opened the email. *Id*. He subsequently provided advice on how to optimize NRIA's email marketing strategy:

---

**From:** Kyle Stafirny <kstafirny@nria.net>
**Sent:** Wed, 27 May 2020 14:09:41 +0000
**To:** Nicholas Salzano <nicholas@nria.net>, Brian Harrington <bharrington@nria.net>
**CC:** Glenn La Mattina <glamattina@nria.net>, Art Scutaro <ascutaro@nria.net>
**Subject:** RE: BBB COMPLAINT - CEASE ALL CONTACT AND EMAILS TO THIS PERSON ASAP - CALL ME
**Attachments:**
· *(662 b)*
· *(5 kb)*
· *(880 b)*
· *(740 b)*
· *(600 b)*
· *(5 kb)*
· *(1102 b)*
· *(1088 b)*
· *(1064 b)*
· *(1106 b)*

This contact's history is below:

* Created on May 11, 2020
* Called May 11, 2020
* Sent the "NRIA: On the Move: A message from our CEO" on May 12, 2020

* Opened this email 12 times

* Sent the "Reminder: Special Announcement - Act quickly on this deeply undervalued enhanced return opportunity!" On May 12, 2020
* Resent the "NRIA: On the Move: A message from our CEO" On May 14, 2020
* Sent the "George, This opportunity is closing out. Last chance, act now!" On May 16, 2020

* Opened this email 19 times

This seems like a one off guy who's just confused on what we are doing. Although, I do recommend we need to think about how we are continually spamming people with the same email. I recommend we start filtering out recipients who've already read the email from receiving the same email over and over.

Best regards,

Kyle Stafirny
Director of Technology

<http://www.nria.net/>

---

141.    Salzano was arrested on March 4, 2021, and Kana, then-Director of Advertising & Marketing, resigned from her position shortly thereafter. Stafirny continued to work for NRIA and

assumed Kana's role. **Exhibit AS**. In the aftermath of Salzano's arrest, NRIA worked with Acronym, an internet search marketing company, to restructure NRIA's SEO strategy.

142.    In an April 14, 2021 email, shortly after Salzano's arrest, Grabato told Acronym that Stafirny would take over Kana's duties. Grabato attached a "Search Account Restructure" spreadsheet to that email. **Exhibit AT**. The spreadsheet included a number of positive search keywords alongside a "Negatives" list, which included terms like:

(f)    "fake"

(g)    "illegal"

(h)    "fraud"

(i)    "scheme"

(j)    "scam"

(k)    "ponzi"

(l)    "con"

(m)    "sham"

(n)    "shady"

(o)    "fraudulent."

143.    Despite NRIA's best efforts, the ensuing months saw widespread negative press coverage. In his new dual IT-Advertising role, Stafirny took on an active role in trying to suppress the coverage of Salzano's arrest.

144.    For example, Stafirny instructed NRIA employees on how SEO worked and how to avoid increasing the news of Salzano's arrest in search engine rankings.

145.    Shortly thereafter, Golaszewsky, who was working under Stafirny's direction at the time, emailed a list of search results for NRIA Google searches from eight different geographic locations. In the email, Golaszewsky instructed: "Please find attached screenshots of google search results. We want to try to push down the bad press and get our seo [search engine optimization] up more to push this stuff down." **Exhibit AU**.

146.    At some point in 2021, NRIA contracted with Sage Titans, a reputation management firm, to help NRIA manage the fallout. Stafirny worked closely with the company and advised NRIA on how best to proceed.

147.    Sage Titans and Stafirny worked together to protect both NRIA and Salzano. In May 2021, Stafirny and Sage Titans corresponded about transferring the websites "nicksalzano.com" and "nicksalzano.net" to Sage Titans' management. **Exhibit AV**. The websites were launched in 2021 to attempt to divert search results for Salzano's name. The site was conspicuously filled with stories and posts that repeated Salzano's name in full. It claimed that Salzano was a "famous ghost storyteller," and posts on the website contains various ghost stories. The first post on the website appeared on May 31, 2021.



148.    In September 2021, another article was published in the Philadelphia Inquirer on Salzano's arrest, Ponzi scheme accusations, and investigation of NRIA by the SEC and FBI. Again, Stafirny instructed employees on how to avoid increasing the story's position on Google. **Exhibit AW**.

149.     As more negative news broke, Stafirny became unable to contain the fallout. In April 2022, Sage Titans advised that NRIA's online presence was "getting affected severely." **Exhibit AX**. Sage Titans attached screenshots of search results showing that searches for "NRIA" had been overcome with negative articles from various sources. Grabato forwarded the email to Stafirny and wrote: "Kyle, pls review this for me and let me know your recommendations. Thanks!" *Id.*

150.     Of course, Stafirny knew about Salzano's and NRIA's fraud simply by virtue of his relationship with Salzano, Dustin Salzano, and Bethany Salzano. During the height of NRIA's fraud—and the time during which Stafirny was most active with NRIA—the couple bought a house together. As already detailed, Bethany Salzano received millions of dollars from NRIA, purportedly as payment for her services, that she used to funnel money to family members and make personal purchases.

151.     Stafirny knew that Bethany Salzano's business, Referral Marketing, through which she received payments from NRIA, was a means by which Salzano and Bethany Salzano diverted the proceeds of fraud for personal use. Indeed, Stafirny himself received payments from Referral Marketing. As discussed, Referral Marketing was used by Bethany Salzano and Stafirny for personal expenses, including the purchase of a boat and the purchase or lease of two vehicles.

152.     By virtue of his relationship with Bethany Salzano and Salzano, Stafirny knew that NRIA was operating as a Ponzi scheme; that his wife, Bethany Salzano, repeatedly engaged in fraud to induce banks to extend loans to NRIA; and that Bethany Salzano and her father, Salzano, together used Referral Marketing to divert funds from NRIA for their personal use.

50

153.    With that knowledge, Stafirny became a central and integral part of the fraud. Stafirny removed O'Brien's access to incriminating documents, refused to restrict Salzano's access to NRIA systems after he was arrested, and facilitated Salzano's use of Grabato's email so that Salzano could continue operating NRIA from behind the scenes. He oversaw NRIA's advertising and marketing activities with the explicit purpose of maximizing NRIA's ability to induce fraudulently Investors with unrealistic returns. He participated in NRIA's advertising in countless mediums, including email, phone calls, videos, TV ads, radio ads, and celebrity endorsements. He worked closely with NRIA insiders and contractors to hide the truth from Investors.

154.    Worse still, Stafirny had insider knowledge of NRIA from the very beginning of his relationship with them. His very first project, Travel Junket, induced Investors with the promise of a $1,000 check if they attended an NRIA investment seminar. Of course, in all its correspondence, Travel Junket never disclosed that it was owned by NRIA.

155.    In the second project he worked on, the NRIA Investor portal, Stafirny became privy to the intimate details of how NRIA solicited foreign Investors with the promise of unachievable returns.

**E.    Stafirny Failed to Comply with Rule 2004 Subpoenas**

156.    Like Bethany Salzano, Stafirny was served with a Rule 2004 Subpoena for document production on September 28, 2022. Through his counsel at the time, Stafirny did not provide any documents and instead elected to assert the Fifth Amendment. Subsequently, on April 29, 2024, Stafirny was served with a Rule 2004 Subpoena to provide testimony on May 14, 2024 at the New York offices of Ice Miller. On May 13, 2024, Stafirny emailed counsel for the

51

Liquidation Trustee stating, "I am not represented by council at this time and will be asserting my fifth amendment right." **Exhibit AY**.  Stafirny then failed to appear for his Rule 2004 examination.

## VI.    Defendants Conspired to Defraud Investors.

157.    Ultimately, Defendants were active, integral participants in NRIA's fraudulent scheme, conspired with Salzano to defraud Investors, and were rewarded with lucrative fraudulent payments for their substantial assistance. Salzano directed Defendants to engage in coordinated action which served to conceal NRIA's true financial condition, divert Investor funds, and further NRIA's fraud.

158.    Each Defendant played an integral role in NRIA's fraudulent enterprise and materially aided in and conspired with each other, in keeping NRIA afloat. As detailed in paragraphs 65 through 111, Defendant Bethany Salzano, among other things, aided in the transmission of altered bank statements that misrepresented NRIA's financial condition, solicited Investors with materially false statements, helped review and revise misleading PPMs, and attempted to conceal her father's criminal history. As detailed in paragraphs 112 through 156, Defendant Stafirny, among other things, helped NRIA solicit and defraud foreign Investors, helped conceal the extent of NRIA's fraud from certain other employees, and attempted to conceal NRIA's fraud from Investors with SEO strategies. As detailed in paragraphs 100 through 110, Defendant Referral Marketing, was, among other things, used as a vehicle to divert Investor funds, to facilitate numerous fraudulent transfers, and to launder money for the benefit of the Defendants. As detailed in paragraphs 113 through 124, Defendant Link N' Log was similarly created and used as a vehicle to diver Investor funds and received numerous fraudulent transfers. Collectively, these actions were instrumental to NRIA's Ponzi scheme and were coordinated efforts by and amongst

Salzano and the Defendants. Accordingly, the Defendants are responsible and liable to the Liquidation Trustee in the sum of all damages resulting from NRIA's fraud, together with such other and further amounts under applicable law.

## VII.   Defendants Received Significant Fraudulent Transfers.

159.   Defendants received numerous fraudulent and otherwise voidable transfers from NRIA. Charts detailing all the transfers made by and or on behalf of NRIA to or on behalf of Defendants are attached as **Exhibits A–D**. All of these transfers were made in furtherance of NRIA's Ponzi scheme, orchestrated and run by Salzano, with the Defendants' material assistance as a fraudulent scheme to hinder, delay, and/or defraud Investors and creditors.

## COUNT I

### AIDING AND ABETTING SECURITIES FRAUD PURSUANT TO THE NEW JERSEY UNIFORM SECURITIES ACT
### (N.J.S.A. § 49:3-71)
### (*Against Individual Defendants*)

160.   Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

161.   Under New Jersey law, an individual violates the New Jersey Uniform Securities Act ("NJUSA") if they, among other things:

(a)   Offer, sell, or purchase a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

(b)   Offer, sell, or purchase a security by employing any device, scheme, or artifice to defraud;

(c)   Offer, sell, or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, or

53

(d)     Engage in the business of advising others, for compensation, either directly or through publications or writings, or as to the value of securities, or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities (i) in willful violation of this act or of any rule or order promulgated pursuant to this act, or (ii) employs any device, scheme or artifice to defraud the other person or engages in any act, practice or course of business or conduct which operates or would operate as a fraud or deceit on the other person, is liable as set forth in subsection (c) of this section.

N.J.S.A. § 49:3-71(a).

162.    Furthermore, the NJUSA establishes a broad scope of parties that may be liable for

violations of the act:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer, or director of such a seller, or investment adviser, every person occupying a similar status or performing similar functions, every employee of such a seller or investment adviser who materially aids in the sale or in the conduct giving rise to the liability, and every broker-dealer, investment adviser, investment adviser representative or <u>agent</u> who materially aids in the sale or conduct are also liable jointly and severally with and to the same extent as the seller or investment adviser, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts under paragraphs (1) through (5) of subsection (a) of this section which give rise to liability. There is contribution as in cases of contract among the several persons so liable.

N.J.S.A. § 49:3-71(d).

163.    The Individual Defendants knew that the PPMs and other offering documents

contained materially false and misleading information that concealed the true nature of NRIA's

ongoing Ponzi scheme but did nothing to prevent the distribution of PPMs or the ongoing

solicitation of Investors. Individual Defendants not only knew about but had themselves identified

NRIA's material misrepresentations that went to the very heart of NRIA's scheme, including but

not limited to failures to disclose (a) the commingling of Investor funds with general NRIA funds,

(b) the ongoing related-party transactions, (c) the non-disclosure of Salzano's true managerial, control-person role; and (d) the risks associated with the lack of arm's length transactions.

164.    The Individual Defendants materially participated in facilitating, marketing, and promoting the sale of securities, as well as other related conduct, for their own personal gain—aiding and abetting not only in the defrauding of Investors but also in violation of the NJUSA.

165.    The Individual Defendants knew there were glaring misstatements and omissions in NRIA's PPMs, did nothing to stop their dissemination, and continued to provide NRIA with assistance in the issuance and solicitation of the inaccurate PPMs.

166.    As a result of Individual Defendants' aiding and abetting other insiders in selling securities in violation of the NJUSA, Investors were injured and lost millions of dollars to the Ponzi Scheme.

167.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that Individual Defendants, acting in their capacities as employees and agents of NRIA, aided and abetted securities fraud in violation of the NJUSA and are entitled to damages pursuant to N.J.S.A. § 49:3-71 in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT II

### FRAUD
#### (*Against All Defendants*)

168.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

169.    NRIA was a Ponzi scheme that caused millions of dollars of damages to approximately 2,000 individual Investors—many of whom were elderly and, in some instances, invested their life savings with NRIA and/or the Fund.

170.    But for the Defendants' conduct, particularly as it relates to Defendants' knowingly and intentionally making and/or causing to be made false representations and material omissions to Investors and potential Investors to defraud Investors and obtain their funds, the Ponzi scheme would not have been as expansive and destructive to thousands of Investors.

171.    The Defendants knew at the time that they made representations to NRIA's Investors that the representations were untrue and/or that the Defendants and NRIA had no intention of keeping the promises made to Investors. The Defendants made these representations repeatedly because they knew they were important representations to Investors, and that Investors would rely on them when making Investments.

172.    The Investors were reasonable in relying upon representations made to them in connection with the sale of securities in formalized PPMs, supporting operating agreements, and supporting guarantees.

173.    In relying on these material misrepresentations from the Defendants, Investors chose to entrust substantial investment monies to NRIA, which were systematically diverted for the benefit of the Defendants and NRIA's principals without Investors' knowledge.

174.    The Defendants substantially benefited from their participation in the NRIA Ponzi scheme. The scheme caused the Defendants to earn income derived from Investors' investments.

175.    The Defendants were aware of the role they played in this illegal scheme at the time they assisted NRIA.

56

176.    As a result of Defendants' misconduct, the Investors, and therefore Plaintiff, suffered an injury through funds lost to the Ponzi scheme engaged in by NRIA and Defendants.

## COUNT III

### AIDING AND ABETTING FRAUD
### (*Against All Defendants*)

177.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

178.    As established herein, the Debtors committed fraud through a Ponzi scheme which caused millions of dollars of damages to approximately 2,000 individual Investors—many of whom were elderly and, in some instances, invested their life savings with NRIA and/or the Fund.

179.    But the Debtors did not commit the fraud alone. The Debtors' fraud was aided and abetted by others, including the Defendants. But for the Defendants' conduct, particularly as it relates to the Defendants' knowingly and intentionally making and/or causing to be made false representations and material omissions to Investors and potential Investors to defraud Investors and obtain their funds, the Ponzi scheme would not have been as expansive and destructive to thousands of Investors.

180.    Defendants knew at the time that they made representations to NRIA's Investors that the representations were untrue and/or that the Defendants and NRIA had no intention of keeping the promises made to Investors. Defendants made these representations repeatedly because they knew they were important representations to Investors, and that Investors would rely on them when making investments.

181.    The Investors were reasonable in relying upon representations made to them in connection with the sale of securities in formalized PPMs, supporting operating agreements, and supporting guarantees.

182.    In relying on these material misrepresentations from the Defendants, Investors chose to entrust substantial investment monies to NRIA which were systematically diverted for the benefit of the Defendants and NRIA's principals without Investors' knowledge.

183.    The Defendants substantially benefited from their participation in the NRIA Ponzi scheme. The scheme caused Defendants to earn income from commissions derived from Investors' investments.

184.    The Defendants were aware of the role they played in this illegal scheme at the time they assisted NRIA.

185.    The Defendants knowingly and substantially assisted NRIA in its fraud.

186.    As a result of the Defendants' misconduct, the Investors, and therefore Plaintiff, suffered an injury through funds lost to the Ponzi scheme engaged in by NRIA and aided and abetted by Defendants.

187.    As a direct and proximate result of the Defendants' aiding and abetting of fraud, Plaintiff has been damaged in an amount to be determined at trial.

188.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against the Defendants finding that they aided and abetted the insiders' fraudulent Ponzi scheme and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT IV

### THEFT BY DECEPTION IN VIOLATION OF N.J.S.A. § 2C:20-4
### (*Against All Defendants*)

189.    Plaintiff repeats and realleges each of the preceding paragraphs, which are

incorporated by reference as if fully set forth herein.

190.    Any person is guilty, or civilly liable under N.J.S.A. § 2C:20-20, if they purposely

obtain property of another by deception in violation of N.J.S.A. § 2C:20-4. Under § 2C:20-4, a

person deceives if he purposely:

     a.  Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind, and including, but not limited to, a false impression that the person is soliciting or collecting funds for a charitable purpose; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

     b.  Prevents another from acquiring information which would affect his judgment of a transaction; or

     c.  Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship.

191.    The Defendants and other insiders obtained control over NRIA Investor monies

through a series of deliberately false and misleading statements, as set out in detail above, intended

to create and/or reinforce a false impression, including about the track record for success of NRIA

and its advisors, about who would control Investor monies, about the protections applied to

Investor monies, and about the source of returns paid to Investors on their monies.

192.    The Defendants' misrepresentations include statements and representations within and relating to the Fund PPMs, as well as email communications with Investors regarding their "returns" and "rollovers" into the Fund.

193.    The Defendants also obtained control over NRIA Investor monies by purposely preventing those Investors from acquiring information that would affect the Investors' judgment of the transaction, including by concealing the extent of Salzano's involvement and his criminal past, concealing the true state of NRIA's finances, and concealing the connection between NRIA and USC.

194.    NRIA Investors relied upon the false impression created by the Defendants in deciding to entrust NRIA with their investment monies. Accordingly, the Defendants violated N.J.S.A. § 2C:20-4 and Plaintiff is entitled to threefold damages, a reasonable attorney's fee, and costs of investigation and litigation under N.J.S.A. § 2C:20-20.

## COUNT V

### NEGLIGENT MISREPRESENTATION
### (*Against Individual Defendants*)

195.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

196.    The Individual Defendants caused to be made false representations and omissions to Investors and potential Investors to obtain control of Investor monies.

197.    The Individual Defendants made these misrepresentations and omissions negligently.

198.    The Investors were reasonable in relying upon representations made to them in connection with the sale of securities in formalized PPMs, supporting operating agreements, and supporting guarantees.

199.    In relying on these material misrepresentations from the Individual Defendants, the Investors chose to entrust substantial investment monies to NRIA which were largely squandered by the Individual Defendants resulting in this bankruptcy.

200.    As a result of the Individual Defendants' actions, NRIA's Investors ultimately lost hundreds of millions of dollars.

## COUNT VI

### BREACH OF FIDUCIARY DUTY
### (*Against Individual Defendants*)

201.    Plaintiff repeats realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

202.    The Individual Defendants are insiders of NRIA.

203.    The Individual Defendants owed fiduciary duties to NRIA and their Investors, including but not limited to the duties to act in good faith and to conduct themselves in a manner that was in the best interest of both NRIA and its Investors. As part of their fiduciary duties, they were also required to be honest and candid and to make complete and accurate disclosures in their dealings with the Investors in all material respects.

204.    The Individual Defendants actively misrepresented information to Investors and failed to disclose conflicts of interest and misuse of Investor funds, to the personal benefit of the insiders and their families and friends. Many of the employees and contractors of NRIA were

61

family members or friends of Salzano, Grabato, and other insiders, who were "overpaid" for services they may not have even rendered.

205.    The Individual Defendants played an active and informed role in these breaches, and in fact, knew of these misrepresentations and conflicts of interest, among others, and took no meaningful steps to try and address them. And the Individual Defendants did nothing to protect Investors despite knowing that these breaches of fiduciary duties were not disclosed in the PPMs.

206.    The Individual Defendants were aware of NRIA's fraud but did not sound the alarm. Instead, they continued to conceal NRIA's wrongdoing from Investors and diverted Investor funds for their benefit.

207.    Through their acts and omissions, the Individual Defendants repeatedly violated their fiduciary duties to Investors.

208.    As a result of the Individual Defendants' breaches of fiduciary duties, Investors were injured and lost millions to the Ponzi Scheme

209.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that Individual Defendants breached their fiduciary duties and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT VII

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (*Against Individual Defendants*)

210.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

211.    Salzano, Grabato, and other NRIA insiders owed fiduciary duties to NRIA and their Investors, including but not limited to the duties to act in good faith and to conduct themselves in a manner that was in the best interest of both NRIA and its Investors. As part of their fiduciary duties, they were also required to be honest and candid and to make complete and accurate disclosures in their dealings with the Investors in all material respects.

212.    Salzano, Grabato, and other NRIA insiders actively misrepresented information to Investors and failed to disclose their conflicts of interest and misuse of Investor funds, to the personal benefit of the Insiders and their families and friends.

213.    The Individual Defendants played an active and informed role in these breaches, and in fact, knew of these misrepresentations and conflicts of interest, among others, and took no meaningful steps to try and address them. And the Individual Defendants did nothing to protect Investors despite knowing that these breaches of fiduciary duties were not disclosed in the PPMs.

214.    The Individual Defendants were aware of NRIA's fraud but did not sound the alarm. Instead, they continued to conceal NRIA's wrongdoing from Investors and diverted Investor funds for their benefit.

215.    Through their acts and omissions, Salzano, Grabato, and other NRIA insiders repeatedly violated their fiduciary duties to Investors, and the Individual Defendants knowingly gave substantial assistance to Salzano, Grabato, and other NRIA insiders in breaching these fiduciary duties.

216.    As a result of the Individual Defendants' aiding and abetting breaches of fiduciary duties, Investors were injured and lost millions to the Ponzi Scheme.

217.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment finding that the Individual Defendants aided and abetted breaches of fiduciary duties and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action.

## COUNT VIII

### NEGLIGENCE
### (*Against Individual Defendants*)

218.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

219.    The Individual Defendants owed a duty to the Debtors and to the Investors to exercise reasonable care in connection with the management of the Investors' financial investments.

220.    Debtors and Investors were within an identifiable class of persons with respect to whom the Individual Defendants knew or had reason to know was likely to suffer damage from the Individual Defendants' failure to exercise reasonable care.

221.    The Individual Defendants failed in their duty to exercise reasonable care when they mismanaged the Investors' financial investments during the course of the fraudulent scheme described above.

222.    Among other things, the Individual Defendants failed to exercise reasonable care by permitting the Investors' financial investments to be misapplied throughout the fraudulent scheme and by permitting the Investors' financial investments to be used for the personal benefit of the Individual Defendants.

223.   The Individual Defendants' negligence proximately caused Debtors and Debtors' Investors to suffer damage.

## COUNT IX

### CIVIL CONSPIRACY TO COMMIT FRAUD
### (*Against All Defendants*)

224.   Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

225.   The Defendants acted in concert with one another to create and further the overarching scheme to solicit investments from individuals across the United States and the globe through relentless advertising and marketing full of false or far-off promises that concealed the conflicted nature and sordid pasts of those involved in the operations of NRIA, and then to use the Investor monies to continue the ongoing scheme of making it appear that NRIA could and did run many successful real estate investment projects from Brooklyn to South Florida when, in reality, NRIA would be underwater without a constant inflow of new Investor funds.

226.   Each of the Defendants played a role in this conspiracy.

227.   Upon information and belief, each of the Defendants agreed to carry out their respective roles in the conspiracy to benefit themselves and their entities.

228.   As a foreseeable result of the Defendants' actions, the NRIA Investors were deprived of monies to the benefit of the Defendants.

229.   As a proximate result of the Defendants' actions, the Debtors and its Investors have suffered damages in an amount to be proven at trial.

230.   Because each of the Defendants acted willfully, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## COUNT X

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER SECTIONS 548(a)(I)(A), 550(a), AND 551(a) OF THE BANKRUPTCY CODE**
(*Against All Defendants*)

231.   Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

232.   Plaintiff is entitled to disgorgement of the funds transferred from the Debtors to Defendants because such payments constitute actual fraudulent transfers under the applicable sections of the Bankruptcy Code.

233.   Plaintiff has identified transfers received by Defendants from the Debtors within the two years preceding the Petition Date, on or after June 7, 2020, as set forth on **Exhibits A–D** (the "Two Year Transfers").

234.   The Two-Year Transfers were transfers of interests in property belonging to Debtors to or for the benefit of Defendants, and Defendants are either an initial, immediate, or mediate transferee of the Two-Year Transfers.

235.   Each of the Two-Year Transfers was made within the two-year period prior to the Petition Date.

236.   As is set forth in detail above, each of the Two-Year Transfers was made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme. Further, in the context of a Ponzi scheme, intent to hinder, delay, or defraud creditors is presumed from the nature of the scheme itself.

237.   At the time of such transfers, the Debtors were insolvent or had been rendered insolvent by such transfers.

238.   Defendants did not take any of the transfers in good faith.

239.   Based upon the foregoing, Plaintiff is entitled to a judgment avoiding the Two-Year Transfers under 11 U.S.C. § 548(a), plus such additional costs, interest and other charges to which it may be entitled under applicable law, and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

## COUNT XI

### AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER SECTIONS 548(a)(I)(B), 550(a), AND 551(a) OF THE BANKRUPTCY CODE
(*Against All Defendants*)

240.   Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

241.   Plaintiff is entitled to disgorgement of the funds transferred from the Debtors to Defendants because such payments constitute fraudulent transfers under applicable law.

242.   Plaintiff has identified the Two-Year Transfers as set forth on **Exhibits A–D.**

243.   The Two-Year Transfers were transfers of interests in property belonging to Debtors to or for the benefit of Defendants.

244.   Each of the Two-Year Transfers was made within the two-year period prior to the Petition Date.

245.   The Two-Year Transfers were made to or for the benefit of Defendants, and Defendants are either an initial, immediate, or mediate transferee of the fraudulent transfers.

67

246.    The Debtors did not receive reasonably equivalent value in exchange for the Two-Year Transfers.

247.    On the dates that each of the fraudulent transfers were made, the Debtors were (i) insolvent or became insolvent as a result of such transfer; (ii) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

248.    Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the Two-Year Transfers paid to Defendants under 11 U.S.C. § 548(a) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

### COUNT XII

**AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS UNDER SECTIONS 544(b)(1), 550(a), and 551(a) OF THE BANKRUPTCY CODE AND THE NEW JERSEY UNIFORM FRAUDULENT TRANSFER ACT**
**(N.J. Rev. Stat. § 25:2-25(a)(1))**
***(Against All Defendants)***

249.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

250.    Plaintiff is entitled to disgorgement of the funds transferred from the Debtors to Defendants because such payments constitute actual fraudulent transfers under the applicable sections of the Bankruptcy Code.

251.   Plaintiff has identified transfers received by Defendants from the Debtors within the four years preceding the Petition Date, on or after June 7, 2018, as set forth on **Exhibits A–D** (the "Four-Year Transfers").

252.   Plaintiff also identified transfers received by Defendants from the Debtors within the ten years preceding the Petition Date, on or after June 7, 2012, as set forth on **Exhibits A–D** (the "Ten-Year Transfers") (collectively with the Four-Year Transfers, the "544(b) Transfers").

253.   The 544(b) Transfers were transfers of interests in property belonging to Debtors to or for the benefit of Defendants, and Defendants are either an initial, immediate, or mediate transferee of the fraudulent transfers.

254.   Each of the 544(b) Transfers was made either within the four-year period prior to the Petition Date or the ten-year period prior to the Petition Date.

255.   Each Debtor that made one or more of the 544(b)Transfers has at least one creditor with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the Petition Date.

256.   The 544(b) Transfers were made with actual intent to hinder, delay, or defraud creditors because, among other things, they were made in furtherance of and perpetuated the Ponzi scheme and fraudulently diverted assets for the benefit of Defendants as detailed herein.

257.   Debtors made the Ten-Year Transfers within the ten-year period prior to the Petition Date. The Ten-Year Transfers are voidable under applicable law as the IRS is a creditor in this Chapter 11 Case with an allowed unsecured claim and has filed Claim Nos. 692 and 658. *See* 26 U.S.C. § 6502 and 28 U.S.C. § 3306(b).

258.     The 544(b) Transfers are avoidable under applicable law — N.J.S.A. § 25:2-25(a)(1), 26 U.S.C. § 6502, 28 U.S.C. § 3306(b), and/or comparable provisions of law in other jurisdictions that have adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act — by a creditor holding an allowed unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

259.     Defendants did not take any of the transfers in good faith.

260.     Based upon the foregoing, the Liquidation Trustee is entitled to a judgment avoiding the 544(b) Transfers under 11 U.S.C. §§ 544(b), New Jersey Revised Statutes § 25:2-25(a)(1), 26 U.S.C. § 6502, and 28 U.S.C. § 3306(b), and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550.

## COUNT XIII

**AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER SECTIONS 544(b)(1), 550(a), and 551(a) OF THE BANKRUPTCY CODE AND THE NEW JERSEY UNIFORM FRAUDULENT TRANSFER ACT**
**(N.J. Rev. Stat. §§ 25:2-25(b) & 25:2-27)**
***(Against All Defendants)***

261.     Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

262.     Plaintiff is entitled to disgorgement of the funds transferred from the Debtors to Defendants because such payments constitute fraudulent transfers under applicable law.

263.     Plaintiff has identified the Four-Year Transfers set forth on **Exhibits A–D**. Plaintiff has also identified the Ten-Year Transfers set forth on **Exhibits A–D.**

264.    The 544(b)Transfers were transfers of interests in property belonging to Debtors to or for the benefit of Defendants, and Defendants are either an initial, immediate, or mediate transferee of the fraudulent transfers.

265.    The 544(b)Transfers were transfers of interests in property belonging to Debtors to or for the benefit of Defendants.

266.    Each of the 5444(b)Transfers was made within the four-year period prior to the Petition Date or the ten-year period prior to the Petition Date.

267.    The Debtors did not receive reasonably equivalent value in exchange for the Four-Year Transfers.

268.    On the dates that each of the 544(b) Transfers were made, the Debtors were (i) insolvent or became insolvent as a result of such transfer; (ii) engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

269.    Debtors made the Ten-Year Transfers within the ten-year period prior to the Petition Date. The Ten-Year Transfers are voidable under applicable law as the IRS is a creditor in these Chapter 11 Case with an allowed unsecured claim and has filed Claim Nos. 692 and 658. *See* 26 U.S.C. § 6502 and 28 U.S.C. § 3306(b).

270.    The 544(b) Transfers are avoidable under applicable law — N.J.S.A. 25:2-25(a)(2), 25:2-27(a), 26 U.S.C. § 6502, 28 U.S.C. § 3306(b), and/or comparable provisions of law in other jurisdictions that have adopted the Uniform Voidable Transactions Act, the Uniform Fraudulent

Transfer Act or the Uniform Fraudulent Conveyance Act — by a creditor holding an allowed

unsecured claim and thus by Plaintiff pursuant to Bankruptcy Code section 544(b).

271.   Each Debtor that made one or more of the 544(b)Transfers has at least one creditor

with an allowable unsecured claim for liabilities, which claim remained unsatisfied as of the

Petition Date.

272.   Based upon the foregoing, Plaintiff is entitled to a judgment avoiding the 544(b)

Transfers under 11 U.S.C. §§ 544(b), New Jersey Revised Statutes §§ 25:2-25(b) and 25:2-29(1),

26 U.S.C. § 6502, and 28 U.S.C. § 3306(b), and recovering and preserving the avoided transfers

under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers

under 11 U.S.C. § 550.

## COUNT XIV

### TURNOVER OF PROPERTY OF THE ESTATE PURSUANT TO SECTION 542(b) OF THE BANKRUPTCY CODE
#### (*Against All Defendants*)

273.   Plaintiff repeats and realleges each of the preceding paragraphs, which are

incorporated by reference as if fully set forth herein.

274.   The funds from NRIA that were transferred to Defendants were property of NRIA

and therefore became property of the Debtors' estate when NRIA filed its petition for relief.

275.   The funds from NRIA that were transferred to Defendants are of consequential

value and benefit to the estate and may be used pursuant to Section 363 of the Bankruptcy Code.

276.   Based on the foregoing, the Liquidation Trustee is entitled to a judgment ordering

Defendants to turn over to Plaintiff the $3,937,842, as more specifically described on **Exhibits A–

D**, under 11 U.S.C. § 542.

## COUNT XV

### CONVERSION
### (*Against All Defendants*)

277.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

278.    NRIA had an absolute right to demand the return of the $3,937,842 held by Defendants.

279.    Defendants wrongfully and without authorization have assumed control, dominion, and ownership over the $3,937,842 million.

280.    Accordingly, the Liquidation Trustee is entitled to a judgment against Defendants in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon and the costs of this action.

## COUNT XVI

### UNJUST ENRICHMENT
### (*Against All Defendants*)

281.    Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

282.    Defendants were enriched and received economic benefits without justification as a result of their conduct, including but not limited to their receipt of $3,937,842.

283.    Defendants' retention of the funds is unjust, and it would be inequitable for Defendants to retain the benefit conferred on them by NRIA, and for those assets to remain out of the reach of NRIA's creditors and Investors.

73

284.     Further, because the funds were received in connection with the Defendants' fraud, breaches of fiduciary duty, and securities law violations, Defendants have been unjustly enriched at the expense of NRIA, its creditors, and the Investors.

285.     Based upon the foregoing, the Liquidation Trustee is entitled to a judgment against Defendants in the amount they were unjustly enriched, including but not limited to the $3,937,842, together with an award of pre- and post-judgment interest thereon and the costs of this action.

## COUNT XVII

### EQUITABLE LIEN
### (*Against All Defendants*)

286.     Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

287.     Defendants engaged in numerous acts of theft, fraud, and securities law violations as detailed above.

288.     As a result of these fraudulent acts, the Defendants profited substantially.

289.     It is unjust for the Defendants to retain this enrichment, and the profits therefrom, that is wrongly derived from NRIA Investor funds.

290.     Plaintiff is therefore entitled to an equitable lien against all properties and assets owned by Defendants.

## COUNT XVIII

### AVOIDANCE OF PREFERENCES PURSUANT TO 11 U.S.C. § 547
### (*Against All Defendants*)

291.     Plaintiff repeats and realleges each of the preceding paragraphs, which are incorporated by reference as if fully set forth herein.

74

Plaintiff has identified transfers received by the Defendants from the Debtors within the one year preceding the Petition Date as set forth on **Exhibit AZ**, totaling not less than $552,304.23 (the "Preferences").

292.    Each Preference was a transfer of an interest in property belonging to one of the Debtors and was for or on account of an antecedent debt owing by one of the Debtors to Defendants.

293.    Each respective Debtor was insolvent at the time of the Preferences, or such Preference rendered each respective Debtor insolvent.

294.    Each Defendant was an insider of NRIA within the meaning of section 101(31) of the Bankruptcy Code.

295.    Such Preferences were each made within one year of the filing of each respective Debtor's petition under the Bankruptcy Code.

296.    Such Preferences enabled Defendants to receive more than they would have received if (i) each respective Debtor's case were a case under chapter 7, (ii) the Preferences had not been made, and (iii) Defendants received payment on the debts owed to it by each respective Debtor to the extent provided for by the Bankruptcy Code. Accordingly, Plaintiff is entitled to a judgment avoiding the Preferences under section 547 of the Bankruptcy Code and recovering and preserving the avoided Preferences under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided Preferences under 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Liquidation Trustee respectfully requests entry of a final judgment in favor of the Liquidation Trustee and against Defendants as follows:

(a)     On Count I, a judgment against the Individual Defendants finding that the Individual Defendants aided and abetted securities fraud and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(b)     On Count II, a judgment against the Defendants finding that the Defendants engaged in fraud and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(c)     On Count III, a judgment against the Defendants finding that the Defendants aided and abetted fraud and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(d)     On Count IV, a judgment against the Defendants finding that the Defendants violated N.J.S.A. § 2C:20-4, Plaintiff is entitled to threefold damages, a reasonable attorney's fee, and costs of investigation and litigation under N.J.S.A. § 2C:20-20, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(e)     On Count V, a judgment against the Individual Defendants finding that the Individual Defendants made negligent misrepresentations and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(f)     On Count VI, a judgment against the Individual Defendants finding that the Individual Defendants breached their fiduciary duties and for money damages in an

76

amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(g)     On Count VII, a judgment against the Individual Defendants finding that the Individual Defendants aided and abetted breaches of Salzano, Grabato, and other NRIA insiders' fiduciary duties and awarding damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(h)     On Count VIII, a judgment against the Individual Defendants finding that the Individual Defendants were negligent and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(i)     On Count IX a judgment against all Defendants finding that Defendants engaged in a civil conspiracy to commit fraud, that Defendants acted willfully, and that Plaintiff is entitled to both monetary damages and punitive damages to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(j)     On Count X, a judgment against all Defendants avoiding the Two-Year Transfers under 11 U.S.C. § 548(a)(1)(A) and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(k)     On Count XI, a judgment against all Defendants avoiding the Two-Year Transfers under 11 U.S.C. § 548(a)(1)(B) and recovering and preserving the avoided transfers

77

under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(l)     On Count XII, a judgment against all Defendants avoiding the 544(b) Transfers under 11 U.S.C. § 544(b), New Jersey Revised Statutes § 25:2-25(a)(1), 26 U.S.C. § 6502, and 28 U.S.C. § 3306(b), and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(m)     On Count XIII, a judgment against all Defendants avoiding the 544(b) Transfers under 11 U.S.C. § 544(b), New Jersey Revised Statutes §§ 25:2-25(b) & 25:2-29(1), 26 U.S.C. § 6502, and 28 U.S.C. § 3306(b), and recovering and preserving the avoided transfers under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided transfers under 11 U.S.C. § 550, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(n)     On Count XIV, a judgment ordering all Defendants turnover $3,937,842, under 11 U.S.C. § 542;

(o)     On Count XV, a judgment against all Defendants finding that the Defendants converted $3,937,842 and for money damages in an amount to be determined at trial, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(p)     On Count XVI, a judgment against Defendants in the amount they were unjustly enriched, including but not limited to $3,937,842, together with an award of pre- and post-judgment interest thereon from the date of demand to the date of payment and the costs of this action;

(q)     On Count XVII, a judgment against all Defendants finding that it is unjust for the Defendants to retain the enrichment, and the profits therefrom, wrongly derived from NRIA Investor funds and that Plaintiff is entitled to an equitable lien against all properties and assets owned by Defendants; and

(r)     On Count XVIII, a judgment against Defendants avoiding the Preferences under section 547 of the Bankruptcy Code and recovering and preserving the avoided Preferences under 11 U.S.C. §§ 550 and 551 or for money damages in the amount of the avoided Preferences under 11 U.S.C. § 550.

Dated: June 7, 2024

**ICE MILLER LLP**

/s/ Louis T. DeLucia
Louis. T. DeLucia, Esq.
Alyson M. Fiedler, Esq.
Ryan Hibbard, Esq. (admitted *pro hac vice*)
John D. French, Esq. (*pro hac vice* forthcoming)
1500 Broadway
Suite 2900
New York, NY 10036
Phone: (212) 835-6312
louis.delucia@icemiller.com
alyson.fiedler@icemiller.com
ryan.hibbard@icemiller.com
jd.french@icemiller.com

*Counsel to the AIRN Liquidation Trust Co., LLC,*
*in its capacity as Liquidation Trustee of the AIRN*
*Liquidation Trust*